UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO.: 9:20-cv-82231-AMC

LA DOLFINA S.A. LLC,
a Florida limited liability company, and
ADOLFO CAMBIASO, individually

       Plaintiff,

v.

D. ALAN MEEKER, individually,
a/k/a ALAN MEEKER,
a/k/a DAVID ALAN MEEKER,
CRESTVIEW FARM, LLC,
a Texas limited liability company, and
CRESTVIEW GENETICS, LLC,
a Nevada limited liability company,

       Defendants.

_____/

## AFFIDAVIT OF ROBERTO ZEDDA

      I, Roberto Zedda, sometimes known as Robertito Zedda, being of full age and otherwise sui generis, hereby state the following:

1.     Unless otherwise stated herein, I make this Affidavit based upon facts of which I have personal knowledge.

2.     I am the Manager of La Dolfina S.A. LLC, a Florida limited liability company that is the assignee of the claims of La Dolfina S.A., a business entity of the Argentine Republic, of the claims of La Dolfina are forth in the Complaint filed in this action.

3.     Mr. Cambiaso is a professional 10 goal polo player, the highest ranking, and he, his La Dolfina horses and his La Dolfina team are widely regarded as the very best amongst the best in the sport of polo.  Horses used in the sport of polo, commonly called polo ponies though not pony-sized, are the most valuable performance asset of polo players and polo teams.

4.     The present lawsuit herein concerns the unauthorized transportation and use of Plaintiffs' equine genetic material and the unauthorized cloning and sale by Defendants of unique and

invaluable cloned polo ponies horses from the genetic material from those horses owned by Plaintiffs and used in the sport of polo.

5.      The polo pony clones at issue, such as Aiken Cura and Cuartetera, derived from the genetic stock of polo horses owned by Plaintiff Cambiaso and by La Dolfina S.A., an Argentine company ("La Dolfina S.A."), which polo horses are world-renown for their unique and superior athletic abilities, intellectual acumen, temperament, and vastly superior performance in the sport of high-goal polo.

6.      The Defendants in this case previously entered into certain contractual relationships with Plaintiffs in 2009 and 2019 defining the very limited bases by which Defendants were permitted access to the equine genetic material belonging to Plaintiffs for the purpose of creating a very limited number of clones from horses belonging to Plaintiffs.  Those agreements were made in reliance upon Defendants stating that Defendants would respect the terms of those agreements.

7.      Recently, it has come to my attention that Defendant Meeker, individually and through his Crestview Farm, and utilizing the resources and facilities of Crestview Genetics, has engaged in the unauthorized misappropriation, and use in the United States of certain equine genetic material derived from La Dolfina's, and Mr. Cambiaso's renown polo ponies.

8.      In particular instances relevant to this lawsuit, Defendants  have transported Plaintiffs' equine genetic material from Argentina to the United States without the knowledge and consent of La Dolfina and Mr. Cambiaso; has cloned certain of those polo horses; have sold some of those cloned progeny to buyers outside of the United States; and imminently intends to sell and ship more of that unauthorized, cloned progeny  to locations outside the jurisdiction of this Court and outside of the United States.

9.      In 2009, Mr. Cambiaso agreed to allow Crestview Farm limited access to polo ponies owned by either Mr. Cambiaso or La Dolfina, for the very limited "purpose of extracting tissue samples for cloning."  **Exhibit 1.**

10.     No purchase by or sale to Defendants of any Cambiaso or La Dolfina horse was provided for that 2009 Agreement.  The 2009 Agreement only allowed access to Plaintiffs' unique horses for the purpose of extracting tissue samples for cloning and did not convey any ownership of either that genetic material to either Crestview Farm, to any of the other Defendants, or to any individual or entity acting on their behalf or with them.

11.     Crestview Farm never actually developed or provided any technology to clone horses under the 2009 Agreement.  Crestview Genetics had to purchase such technology 16 months later from a third party in the United States, Via Gen.

12.     The 2019 Agreement likewise provided that Crestview Genetics agreed and considered La Dolifna and Mr. Cambiaso the registered owners of the polo ponies being cloned.  **Exhibit 2 hereto**

13.     Defendants represented to Plaintiffs in Florida and elsewhere, and agreed in the 2009 and 2019 Agreements that Defendants considered  La Dolfina and Mr. Cambiaso the owners of the original polo ponies (and their genetic material), and that the clones that came from them were subject to very limited rights to Defendants.

14.     Mr. Meeker and the Crestview Defendants also represented to Plaintiffs in Florida that they would not clone any La Dolfina or Cambiaso horses outside of express, mutual agreements between the parties.

15.     In Wellington, Palm Beach County Florida, during a great amount of meetings in the past years including 2019, Defendants made promises to La Dolfina that Defendants would undertake only the mutually-agreed upon use of the equine genetic material of Plaintiffs to create only clones authorized and agreed upon by the parties.

16.     La Dolfina and Mr. Cambiaso have recently learned that in the Fall of 2020, Meeker began the unauthorized selling of La Dolfina clones to third parties which Defendants had created in an unauthorized manner earlier.

17.     Despite the 2009 and 2019 Agreements, Defendants have learned that Defendants have misappropriated, transported and utilized Plaintiffs' genetic material to  create unauthorized clones, which Defendants have then sold to unknown third parties.

18.     Specifically, on November 18, 2020 Defendants' counsel admitted, in paragraph #2 of correspondence to La Dolfina, **Exhibit 3 hereto**, that:

> Crestview Farm has **created several cloned foals** under its continuing rights under the 2009 Agreement, and has **sold three of them to a third party** for more than the minimum price mentioned in the 2009 Agreement or as later agreed by the parties.

19.     Defendants failed to disclose the buyers and the sales prices as well.

20.     From that correspondence, as well as in subsequent correspondence from Defendants' attorneys, it has become clear to La Dolfina that Defendants have disavowed all of Defendants'

representations and contractual and fiduciary obligations under the 2009 through 2019 cloning business dealings with La Dolfina.

21.     However, the 2009 document did not impart to Meeker, nor to any Crestview Farm, the rights claimed by Meeker to the La Dolfina clones and does not impart to Defendants any ownership to any genetic material owned by La Dolfina and by Mr. Cambiaso.

22.     The same is true of the 2019 documents, by which the parties contemplated Defendants would have only a limited license to use, on a very restrictive schedule, the genetic material of such enormously successful, famous and valuable polo ponies as Aiken Cura and Cuartetera, as well as other polo ponies belonging to Plaintiffs.

23.     La Dolfina has since learned that Crestview Genetics was not truthful to La Dolfina and Mr. Cambiaso when negotiating the 2019 Agreement.  La Dolfina is now aware that Crestview Genetics did not own unrestricted rights to Storm Cat 02, a clone of a grandson of the great Secretariat racehorse.

24.     Defendants' unauthorized misappropriation and use of equine genetic material belonging to La Dolfina and Mr. Cambiaso demonstrates what is now a familiar pattern also seen in the recent litigation Crestview Genetics had with Mr. Young and the Owners of Storm Cat.  In that Storm Cat litigation it was claimed Defendants made misrepresentations to the owners of Storm Cat, then took highly unique and valuable equine genetic material from their owners, produced unauthorized clones, and then marketed the clones and material throughout the World for profit without regard for the rights and impact of the Storm Cat owners of the original horses and their genetic material.

25.     Defendant Crestview Genetics eventually settled the Storm Cat litigation by abandoning all of Defendant's claims to ownership of Storm Cat clones and agreeing only to a limited license of the clone Storm Cat 02 and genetics of the clone.   **Exhibit 4.**

26.     Therefore, Defendants were not truthful to La Dolfina and Mr. Cambiaso when Defendants represented in 2019 that Defendant Crestview Genetics was the owner of the Storm Cat 02 clone.

27.     The actions of Defendants have already caused, and threaten to further cause irreparable harm to the La Dolfina and Cambiaso genetic line of polo ponies, as well as to the professional performance of the owner of Mr. Cambiaso.

28.     By widely distributing the polo pony clones throughout the World, and particularly to buyers of great financial means, Defendants threaten to create unlimited distribution and access of Plaintiffs' highly specific and accomplished equine genetic lines to competitors to Plaintiffs in the

professional sport of polo, thus harming beyond repair both the genetic bloodlines and the competitive advantage of La Dolfina and Mr. Cambiaso, which relies very heavily upon close control and authority over those bloodlines.

29.     Further, the unsupervised clones from , if not trained, managed and competed properly, threaten to dilute the reputation for the outstanding performance abilities of the the La Dolfina-branded equine genetic stock.

30.     As well, any unauthorized identification of the clones, whose training will not be correctly supervised because they live outside the La Dolfina stable, will dilute the value of the the La Dolfina brand, which is a registered trademark in numerous countries.

31.     The harm Defendants are causing La Dolfina and Mr. Cambiaso is not capable of being reversed and cannot be cured by later paying La Dolfina or Cambiaso merely money.  The dilution and distribution of Plaintiffs' equine genetic lines cannot be reversed once it proceeds on the wide basis being pursued by Defendants.

32.     Defendants must be forced to stop their unauthorized transportation and use of Plaintiffs' equine genetic material and stop their sale of the unauthorized clones (as well as any genetic material.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Robert Zedda

12/11/20

Date

# EXHIBIT 1

## HORSE CLONING CONTRACT

This Horse Cloning Contract ("Agreement") is entered into between Adolfo Cambiaso ("Owner") and Crestview Farm, L.L.C., a Texas limited liability company ("Crestview"), for the purposes and consideration set forth hereinbelow.

WHEREAS, Owner is the owner of certain mares and also owns full rights to the tissue of Aiken Currah, a deceased stallion, which tissue is currently in cryogenic stasis;

WHEREAS, Crestview is currently involved in the use of advanced biotechnologies in the cloning of horses;

WHEREAS, Owner and Crestview wish to enter into an arrangement for the purpose of jointly producing, marketing and selling cloned animals;

WHEREAS, in furtherance of the foregoing, Owner is willing to provide tissue from certain mares and from Aiken Currah in accordance with the terms and conditions set forth hereinbelow.

NOW, THEREFORE, in consideration of the payment of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the parties hereby agree as follows:

1.    Mare Cloning.   Owner agrees to allow Crestview to select four mares from Owner's stock for the purpose of extracting tissue samples for cloning, Crestview's selections to be subject to the reasonable approval of Owner.  Upon selection of the mares, Crestview will pay Owner the sum of US$250,000 per mare.  If the mares are successfully cloned, Owner will in addition receive one foal clone from each mare.  As part of the consideration provided to Owner, Owner agrees to, and does hereby, grant Crestview complete and exclusive licensing rights in and to the mare and all cloned foals.

2.    Aiken Currah Option.   At the option and request of Crestview, and in lieu of one of the mares chosen in Paragraph 1 herein, Owner agrees to provide the cryogenically maintained tissue samples of Aiken Currah to Crestview.  Upon delivery of same to Crestview (at its expense), Crestview will cause its scientists to determine whether the tissue is viable for cloning.  If the tissue is determined to be viable for cloning, Crestview will pay Owner an additional sum of US$150,000 within ten (10) days after the date that Crestview's scientists have determined that the Aiken Currah tissue is viable for cloning.  If determined not to be viable for cloning, Crestview will cause all unused tissue samples to be returned to Owner at Crestview's expense.  If Aiken Currah is successfully cloned, Owner shall also receive one foal clone of Aiken Currah and fifty percent (50%) of the net proceeds of all sales of all such clones.

3.    Further Cooperation.   Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

1

4.    Sale of Clones.   Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.   Owner and Crestview will jointly determine all final sales prices and terms.

5.    Number of Clones.   Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.   If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

6.    Extraction and Use of Tissue.   Crestview will cause the mare tissues samples to be extracted and/or analyzed under veterinary supervision and in accordance with prudent, customary and accepted veterinary practice so as not to endanger the health of any such mare or, to the extent practicable, the unused portions of the tissue of Aiken Currah.   Owner agrees to allow Crestview reasonable access to the mares for obtaining such samples on more than one occasion if necessary to obtain such samples.

7.    Cloning Expenses.   Crestview agrees to pay all fees incurred or charged by its scientists and consultants, without cost or obligation to Owner.

8.    No Warranties.   Neither party to this Agreement makes any warranties or representations to the other regarding the tissue samples or the likelihood of success of the cloning program to be undertaken hereunder.   Accordingly, should the cloning program be unsuccessful, neither party will have any further liability or obligation to the other.   Crestview further reserves the right to terminate the cloning program at any time in its sole and absolute discretion without further liability or obligation to Owner.

9.    Counterparts.   This Agreement may be executed in any number of counterparts, and may be exchanged between the parties by facsimile, electronic mail, or similar means.   An electronically transmitted, fully executed copy of this Contract shall be valid as an original.

OWNER:

_____
Adolfo Cambiaso

CRESTVIEW:

CRESTVIEW FARM, L.L.C.,
a Texas limited liability company

By:_____
D. Alan Meeker
Manager

H:\Client\MEEKER, Alan\Crestview Farm, LLC HORSE_CLONING_CONTRACT_CAMBIASO-AMC Rev (LFC F 6-12-09).doc

2

**From:** Gutierrez Ernesto [mailto:EGutierrez@aa2000.com.ar]
**Sent:** Monday, March 14, 2011 8:20 AM
**To:** Alan Meeker
**Subject:**

Dear Alan,

Sory about the delay , but you was a visionary. I start a world war againt my wife.
As we spoke  days ago, I agree in the final cost of production for the clones in U$D 2.150.000.-

About the payment of the due balance,

Cash            U$D 550.000.-
60 days         U$D 250.000.-
120 days        U$D 200.000.-

During the first two years, you take 100% of the total net income for Crestview Arg. operations. (I agree
on Adolfito´s Portion).
In case this doesn't pay your favor for U$D 1.150.000.-, I will take care for the difference. Its important
for you to know that I'm willing to guarantee at all times, the total amount by means of any instrument
you should consider convenient.

I 've already paid off the start up costs for around  U$D 400.000.-  I will be supporting these too, by
myself.

If you are on board with this propousal,  we must find the best way to do it.

Abrazos
Ernesto

# EXHIBIT 2



July 29, 2019, City of Buenos Aires

Dear Sirs,

Crestview Genetics LLC
Av. Eduardo Madero 900, 16th floor
City of Buenos Aires
Argentina

Re: Offer No. 01-29072019

Dear Sirs,

The underwriters, constituting address to all effects herein in Honduras 5663, Autonomous City of Buenos Aires, Republic of Argentina, hereby submit this irrevocable offer (hereinafter, the "Offer"). The terms and conditions of the proposed agreement are established in ANNEX I.

This Offer shall be considered accepted if we receive from you an acceptance letter, sent to the address indicated above, pursuant to the guideline in ANNEX II (hereinafter, the "Acceptance"), within the following 3 days after you have received the Offer. If the Acceptance is not received within the established term, this Offer will lapse automatically.

Regards,



La Dolfina S.A.
Name: Adolfo Cambiaso
Position: [President]

Adolfo Cambiaso
DNI No. 24,564,301

*Spousal consent:*

*Pursuant to Article 470 of the Argentine Civil and Commercial Code, Mrs. Maria Celina Vazquez DNI 24,463,271, spouse of Mr. Adolfo Cambiaso, hereby grants her consent to the transactions pursuant to the terms and conditions of the Offer and its annexes.*

------------------------
Maria Celina Vazquez
DNI 24,463,271

## ANNEX I

The following agreement is entered into by and between:

I.   Adolfo Cambiaso, DNI No. 24,564,301, domiciled in [...] Republic of Argentina ("AC"), together with La Dolfina S.A. ("LD"), and

II.  Crestview Genetics LLC, a limited liability company organized according to the laws of the State of Nevada, USA, with a principal office located at 4770 Bryant Irvin Court, Suite 400 of the city of Fort Worth, Texas ("Crestview US" and jointly with AC and LD, (the "Parties"). Crestview US is represented in this act by Mr. David Alan Meeker, in his capacity as Manager.

**WHEREAS:**

A.   AC and Crestview US have assigned their quotas, representing the 66.66% of the stock capital of Crestview Genetics Argentina S.R.L. ("CGA") to Ernesto Gutierrez Conte ("EG");

B.   The Parties wish to continue developing business with horse breeding and clones;

C.   Pursuant to certain agreements executed among AC, CGA, EG and Crestview US, dated July 29, 2019, LD will be the registered owner of the cloned horses identified in Schedule I (the "Clones"), which are currently under AC and LD's control at its farm in the Province of Cordoba, Argentina. Nevertheless, AC and LD recognize that Crestview US has certain breeding, cloning, trademark and licensing marketing rights of each of the Clones; and

D.   The Parties wish to enter into this agreement in order to regulate certain specific matters.

**THEREFORE, the following terms and conditions shall apply to the Parties:**

**1. Registration of Clones:** Contemporaneously with the execution of the agreements referenced in paragraph C above, AC will register the clones identified in Schedule I into the name of LA DOLFINA S.A. LA DOLFINA S.A. is owned 100% by AC and his wife.

**2. Restriction on Transfer of Clones:** After the transfer of ownership of the Clones referenced in Paragraph 1 above, AC and LD shall not transfer, sell or encumber the Clones identified in Schedule I without having the prior written consent of Crestview US. Additionally, the Clones shall only be played on a La Dolfina branded team. Any other uses in playing is prohibited.

**3. Crestview US Breeding Rights:** In consideration of this Agreement, LD shall donate, gratuitously assign, transfer and irrevocably deliver, without charge, condition or right to any consideration to Crestview US oocytes originating from the Clones (the "Clone Oocytes"), in order to be fertilized, free of charge, with semen provided from stallions of AC or LD or any other stallion (collectively the "Stallion Semen"). Thereafter the embryos resulting from the Oocytes and Stallion Semen (the Crestview US Embryos) shall be implanted into recipient mares on behalf of Crestview US to produce live foals (each a "Live Foal"). In no event shall the number of Live Foals born each year be less than the number of Live Foals born each year for AC and LD collectively that are derived from Clone Oocytes and Stallion Semen, but in no event shall the number of Live Foals for Crestview US be less than one third (1/3) of the total production. No third party shall have any breeding rights in the Clones in any year until Crestview US receives at least one third (1/3) of the total production of Live Foals for such year.

Leonardo M. Schestenger
Escribano
Mat. 4456

AC or LD shall donate, gratuitously assign, transfer and irrevocably deliver, without charge, condition or right to any consideration to Crestview US at least 6 other oocytes taken from certain mares under the control or at the direction of AC that will be agreed by the parties (Non-Clone Oocytes), in order to be fertilized with Stallion Semen or other stallion semen as the parties shall agree to produce live foals not derived from the Clones.

Both parties shall agree yearly on the embryos and bloodline crosses to be made, according to the will of the parties and the advice of AC.

The costs of embryo transfer and implant in a recipient of said embryos will be paid by AC or LD.

**4. Limitations:** AC will decide with which Stallion Semen or other stallion semen by which the oocytes obtained from the Clones are fertilized.

If Crestview US would like to make embryos with the semen of other stallions and the Clones, it must have the express consent of LD to do so.

In the event of a future sale of embryos or horses from the Clones, the parties shall agree on a market price that does not lead to a fall in prices.

**5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

**6. CRESTVIEW US CLONING RIGHTS.** After Crestview US finishes the actual cloning process of 10 "CUARTETERAS", as paid for by AC or LD, AC and LD authorize Crestview US to create up to two (2) additional clones of the horse "CUARTETERA" at the cost of Crestview US, for the exclusive amateur (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras). Crestview US has and shall expressly prohibited the sale or further cloning of the Meeker Cuarteteras.

In the event AC detects either the existence of more clones of Cuartetera produced by Crestview US in excess of the number of clones contemplated hereunder, that further cloning was made of the Meeker Cuarteteras, the Meeker Cuarteteras were sold or attempted to be sold, or the Meeker Cuarteteras were used for professional benefit, both parties agree that the Meeker Cuarteteras and any clones of the Meeker Cuarteteras shall be delivered to AC within 48 hours.

AC will have 50% breeding rights to the Meeker Cuarteteras in perpetuity.

**7. STORM CAT.** Crestview US owns a clone of the stallion named STORM CAT, according to the document listed in Schedule II, (hereinafter "Storm Cat 02"). Storm Cat 02 is presently on the farm of AC/LD in the Province of Cordoba, Argentina.

Crestview US shall donate, gratuitously assign, transfer and irrevocably deliver, without charge, condition or right to any consideration to AC the samples of semen from the stallion Storm Cat 02 that AC requires for exclusive use on mares of his property or LD. Notwithstanding the foregoing, AC and LD collectively shall only produce an equal amount of foals from Storm Cat

Leonardo M. Schesinger
Escribano
Mat. 4456

02 as is produced for Crestview US each year. Neither AC nor LD shall ever allow any third party to breed to Storm Cat 02. AC and LD agree that neither shall attempt to clone Storm Cat 02. AC and LD shall not collect or store tissue or cells from Storm Cat 02 for any reason. LD may collect semen from Storm Cat 02 for the exclusive use of Crestview US and LD in accordance with the provisions of this Section 7.

8. **Assignment of land parcel:** AC shall donate, gratuitously assign, and irrevocably transfer, without charge, condition or right to any consideration to Crestview Farm, LLC a buildable land parcel adjacent to polo field No. 1 and located at its new development known as "La Dolfina Polo Ranch". AC shall complete such donation within a period of 30 (thirty) days from execution of this agreement. Crestview Farm, LLC is a third party beneficiary of this Agreement for purposes of this paragraph.

9. **Force Majeure:** Neither Party shall be liable for any breach of its obligations under this agreement, loss or damage of any nature incurred as a result of an act of force majeure. This includes, but not by way of limitation, any failures or delays in performance caused by any act of nature, flood, accident, plague, pest, disease, strikes, fire, explosion, lightning, lockouts, labor disputes, fires, riots, incendiaries, interference by civil or military authorities, compliance with the laws, orders or policies of any governmental authority.

10. **Assignment:** The Parties shall not be entitled to transfer or assign this agreement or any of its rights and privileges hereunder to any third party without the prior written consent of the other party.

11. **Notices:** Any notice or consent required under this agreement shall be in writing and in English, and delivered personally, by international courier or by registered airmail, return receipt requested, or by facsimile to the other party at the respective address specified in the heading of this agreement or to such other address the Parties may designate by notice given in accordance herewith.

12. **Entire agreement:** This agreement constitutes the entire agreement between the Parties with reference to the subject hereof and supersedes all prior written or verbal negotiations, understandings, representations and agreements, if any.

13. Applicable law and jurisdiction: This agreement shall be governed by the laws of the State of Delaware, USA without regard to any conflict of law principles. Each of the Parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Delaware, USA, as applicable, for any matter arising out of or relating to this agreement, except that in actions seeking to enforce any order or any judgment of any such court located in Delaware, USA, such personal jurisdiction will be non-exclusive. If any dispute arises between the Parties with respect to this agreement which leads to a proceeding to resolve such dispute, the prevailing party will be entitled to receive reasonable attorneys' fees, court costs, expert witness fees, and out-of-pocket costs incurred in such proceeding, in addition to any other court relief. Notwithstanding this, the Parties declare and accept that this agreement is final and produces the effects of res judicata, without the need for judicial approval.

**SCHEDULE A**

**Identification of Clones**

| | |
|---|---|
| DOLFINA B01 CUARTETERA - CLON 00 | DOLFINA CUARTETERA |
| DOLFINA B01 CUARTETERA - CLON 1 | DOLFINA CUARTETERA |
| DOLFINA B03 CUARTETERA - CLON 3 | DOLFINA CUARTETERA |
| DOLFINA B04 CUARTETERA - CLON 4 | DOLFINA CUARTETERA |
| DOLFINA B05 CUARTETERA - CLON 5 | DOLFINA CUARTETERA |
| DOLFINA B06 CUARTETERA - CLON 6 | DOLFINA CUARTETERA |
| DOLFINA B07 CUARTETERA - CLON 7 | DOLFINA CUARTETERA |
| DOLFINA B09 CUARTETERA - CLON 9 | DOLFINA CUARTETERA |
| DOLFINA C01 LAPA - CLON 1 | DOLFINA LAPA |
| DOLFINA C02 LAPA - CLON 2 | DOLFINA LAPA |
| DOLFINA C03 LAPA - CLON 3 | DOLFINA LAPA |
| DOLFINA C04 LAPA - CLON 4 | DOLFINA LAPA |
| DOLFINA C05 LAPA - CLON 5 | DOLFINA LAPA |
| DOLFINA C06 LAPA - CLON 6 | DOLFINA LAPA |
| DOLFINA C07 LAPA - CLON 7 | DOLFINA LAPA |
| DOLFINA D01 SMALL PERASON - CLON 1 | SMALL PEARSON |
| DOLFINA D02 SMALL PERASON - CLON 2 | SMALL PEARSON |
| DOLFINA D03 SMALL PERASON - CLON 3 | SMALL PEARSON |
| DOLFINA D04 SMALL PERASON - CLON 4 | SMALL PEARSON |
| DOLFINA D05 SMALL PERASON - CLON 5 | SMALL PEARSON |
| DOLFINA D06 SMALL PERASON - CLON 6 | SMALL PEARSON |
| A03 RAPTOR | RAPTOR |
| A02 RAPTOR | RAPTOR |
| DOLFI E01 CURA - CLON 1 | AIKEN CURA |

Leonardo M. Schestenger
Escribano
Mat. 4456



SCHEDULE II

STORM CAT LICENSE AGREEMENT

Leonardo M. Schestopey
Escribano
Mat 1456

**ANNEX II**

Leonardo M. Schestenger
Escribano
Mat. 4456

July 29, 2019, City of Buenos Aires

La Dolfina S.A.
[]

Adolfo Cambiaso
[]

Re: Offer No. 04-29072019

Dear Sirs,

We hereby irrevocably accept the offer No. 04-29072019, dated July 29, 2019 (the "Offer") including all terms and conditions established in ANNEX I of such Offer.

Regards,



Crestview Genetics LLC
Name
Title



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CRESTVIEW GENETICS, LLC

    Plaintiff,

v.

CHRIS YOUNG AND OVERBROOK
FARM, LLC,

    Defendants.

NO. 4:16-cv-00195-A

JURY TRIAL DEMANDED

## SETTLEMENT AGREEMENT

1.  **Effective Date.** This Settlement Agreement ("Agreement") is entered into on April 15, 2017 ("Effective Date").

2.  **Parties.** This Agreement is by and between Crestview Genetics, LLC ("Crestview"), on the one hand, and Chris Young ("Young") and Overbrook Farm, LLC ("Overbrook Farm") (collectively Young and Overbrook Farm are referred to as "Overbrook"), on the other hand. Crestview, Young, and Overbrook Farm will be referred to collectively as the "Parties."

3.  **Genetic Material.** In settlement of the above-styled and numbered cause (the "Litigation"), the Parties acknowledge that Crestview has heretofore obtained from Overbrook certain genetic material from Storm Cat, a valuable thoroughbred race horse owned by Overbrook (referred to as the "Genetic Material"), which Genetic Material has been involved in the dispute involved in the Litigation. The Parties acknowledge that Crestview has heretofore utilized the Genetic Material to create a clone of Storm Cat (the "Initial Clone"). And the Parties also acknowledge that the Initial Clone has been involved in the dispute in the Litigation.

SETTLEMENT AGREEMENT
2736573v2

Page 1



4.      **Dispute Involved.** The Parties also acknowledge that there has been a dispute involving whether or not the Parties had an agreement relating to the Genetic Material and the Initial Clone and other things including a valuable trademark (the "Trademark") which is Storm Cat™ which is also an issue in the Litigation.  The Parties acknowledge hereunder that Storm Cat is a Trademark owned by Overbrook.

5.      **Crestview's USPTO Application.** The Parties also acknowledge that Crestview has filed an Intent to Use Application with the U.S. Patent and Trademark Office claiming an intent use the Trademark Storm Cat, to which Overbrook has objected and filed an opposition with the PTO.  In settlement of the Litigation and the dispute between the Parties, it is agreed that upon execution hereof, Crestview will withdraw its Application for Registration with the PTO for the Trademark Storm Cat, and will cooperate as is reasonably necessary in connection with the prosecution of a trademark in favor of Overbrook Farm for the Trademark Storm Cat™; and will not ever re-apply for a registration of Storm Cat or infringe upon Overbrook's rights to the Trademark.

6.      **Number of Clones.** The Parties hereto agree that Crestview shall have the right to use the Initial Clone for purposes set forth in this Agreement and also the right to create one additional clone (the "Second Clone") for purposes under this Agreement at its own expense in utilizing the Genetic Material and/or its own techniques and capabilities.  The Parties intend for Crestview to be authorized to have two clones in existence at any given time, but no more than two clones at any given time.  The Parties acknowledge that a clone may die or become infertile.  If either the Initial Clone or the Second Clone dies or becomes infertile, the Parties agree that Crestview has the right to create an additional clone (a "Replacement Clone") at its own expense in utilizing the Genetic Material and/or its own techniques and capabilities.  If a Replacement Clone dies or becomes infertile, the Parties agree that Crestview has the right to create an additional clone at its

SETTLEMENT AGREEMENT                                                                 Page 2
275673v2



own expense in utilizing the Genetic Material and or its own techniques and capabilities. And at that time, Crestview will provide certification from a qualified veterinarian to confirm any infertility or death of such a clone to Overbrook. The Parties agree that the Initial Clone, the Second Clone, any Replacement Clone, and any replacement of a Replacement Clone are "Authorized Clones," and only two Authorized Clones are allowed to exist at any given time under this agreement. The parties agree that Crestview has the exclusive right to create clones of Storm Cat during the Term of this Agreement. Crestview will timely inform Overbrook of the creation of the Second Clone and any other Authorized Clone, and reasonably keep Overbrook informed of the existence of Authorized Clones.

7.     **Use of Clones.**  It is agreed by the Parties that Crestview shall have the right to use the Authorized Clones to create offspring of the Authorized Clones and to sell same, and to sell semen from the Authorized Clones for use in the industries set forth herein below, and limited to such industries, and not otherwise, within the Term of this Agreement. The parties agree that Crestview shall have the exclusive right during the Term of this Agreement to use any clone to create offspring of a clone and to sell same and to sell semen from a clone.

8.     **License.**  In connection with Crestview's operations utilizing the Authorized Clones as authorized under this Agreement, Crestview shall have certain licensed rights with respect to the Trademark Storm Cat. Such rights are set forth herein below:

A.     It is acknowledged that Overbrook is the sole and exclusive owner of the trademark/tradename "STORM CAT" (referred to as the "Mark") which Mark is existing, viable and protectable by Overbrook. In exchange for the License granted herein, Crestview agrees to withdraw the application it has filed with the United States PTO relating to the Mark immediately upon execution of the settlement agreement, and will provide reasonable cooperation to Overbrook in Overbrook's registration of the Mark with the USPTO and any foreign registrations of same at Overbrook's cost and expense.

SETTLEMENT AGREEMENT
279673v2



B.  Overbrook hereby grants to Crestview a non-exclusive, limited, non-assignable License (the "License") to use the Mark (directly or through its agents) during the term of the Agreement (it shall include extensions if applicable as set for here and below), in connection with and for the limited purpose of marketing of semen of cloned offspring of the horse, Storm Cat, and for the breeding of offspring from same to produce foals for sale and use as permitted hereunder. This License is granted for use within the United States for which certain indemnification is provided by Overbrook, as set forth herein below. This License is also granted for use by Crestview worldwide, although it is recognized that no indemnification is provided by Overbrook in connection with any worldwide use outside of the United States, also set forth below, also by Crestview under this License inures to the benefit of Overbrook's ownership of the Mark.

C.  Such License does not permit the use of such Mark for any other purpose, except as expressly granted under Section B, and Crestview agrees to so limit the use of such Mark and not to engage in any activities that violate Overbrook's rights in said Mark, including any infringement of the Mark. Unless a further agreement is reached in writing and signed by the Parties, the use of said Mark shall be used as legally permitted only in the industries of polo, jumping, dressage, para-equestrian dressage, eventing, driving, endurance, reining, vaulting, sport horses, cutting horses, and barrel-racing horses, as well as other sports upon which the Parties may agree in writing. Crestview will assure the legality of use in any such industry.

D.  Crestview hereby indemnifies Overbrook from any and all third party claims, damages and losses (including reasonable attorney's fees) caused by any breach of this License by Crestview or its agents or those acting on its behalf.

E.  The Parties acknowledge and agree that Crestview is solely responsible for its method of operating its business using the Mark, however, Crestview acknowledges that the rights granted to Crestview pursuant to Section B above may only be exercised after obtaining Overbrook's approval of any proposed use of the Mark in accordance with this section. Presently, it is acknowledged that Crestview intends to use the Mark generally as set forth in paragraph nine (9) of this Agreement, all of which use is satisfactory to Overbrook and agreed to by the Parties. Prior to any use of the Mark which has not previously been approved or is not substantially consistent with a previously approved use, Crestview shall deliver a representative sample of its proposed use of the Mark to Overbrook for its approval, which approval shall not be unreasonably withheld, conditioned, or delayed. Within five (5) days of actual receipt of such representative sample by the Overbrook representative as set forth in the notice paragraph below from Crestview, Overbrook will approve such further use of the Mark, or alternatively, provide written notice to Crestview of Overbrook's objection in reasonable detail to allow Crestview a meaningful opportunity to modify its proposed use of the Mark to comply with the terms of this Agreement. Overbrook shall be deemed to have actually received a representative sample (a) on the date the sample is delivered to





the Overbook representative if delivered personally, (ii) on the date sent by facsimile or email (with confirmation of delivery) if sent before 5 PM EST on a business day, and otherwise on the next business day if sent after 5 PM EST on a business day, the weekend or a federal holiday, or (c) on the next business day if delivered by national overnight courier (with confirmation of delivery), provided notice is also sent by email at the applicable email address(es). If Crestview has not received written notice of any objection within five (5) days following Overbrook's receipt of a representative sample, Overbrook shall be deemed to have approved such use of the Mark. Approval of any particular use of the Mark, once given by Overbrook, shall continue in effect with respect to such use, and any use substantially consistent therewith, without need for further approval, unless such use, is altered in any material respect. Notwithstanding the foregoing, if at any time any particular use of the Mark by Crestview does not comply with the terms of this Agreement, Overbrook shall have the right to require Crestview to cease any such use upon written notice to Crestview.

If Overbrook reasonably requires additional information to evaluate Crestview's proposed use, Crestview will submit to Overbrook sufficient information for Overbrook to evaluate same. If Overbrook does not agree to the proposed use, it agrees to timely work together with Crestview to help Crestview use the Mark in its needed manner as long as it is consistent with the terms hereof. Crestview may submit its representative samples, and Overbrook may provide its approvals, via email to the applicable email address set forth in the notice provision below.

F.   The License hereunder is terminable by Overbrook upon a material breach of this Agreement by Crestview unless Crestview cures such breach within ninety (90) days of receiving notice of same from Overbrook.

G.   Notwithstanding the preceding paragraphs, Crestview's clients and Crestview have the right to designate a name to offspring from any Storm Cat clone, a name which includes the words Storm or Cat, but it may not use the exact name "Storm Cat" or confusingly similar spellings of the name "Storm Cat" (e.g., "Storm Kat"). Notwithstanding the foregoing, for purposes of written agreements with its customers or clients or agents, Crestview shall have the right to refer to a clone created under any agreement with Overbrook as "Storm Cat Clone 01", "Storm Cat Clone 02" and the like. However, it is agreed that there will never be more than two clones of Storm Cat existing at any given time. It is the intention of the Parties that the use of "Storm Cat Clone 01", and the like, is not intended to be used as a trademark, but rather simply for purposes of identifying the Clone in such agreements.

H.   Overbrook represents and warrants that upon performance under this Agreement, that (i) Overbrook has, and will continue to have, full and sufficient rights to grant the License set forth herein, (ii) Overbrook is the sole and exclusive owner of the Mark in the U.S., and (iii) Crestview's use of the Mark in accordance with this License will not infringe or violate any intellectual property or proprietary rights of

Page 5



a third party relating to use of said Mark within the United States. Overbrook agrees to indemnify Crestview and its agents from any third party claims, damages, and losses (including reasonable attorney's fees) caused by Crestview's or its agents' use of the Mark in accordance with the terms of this License, and in breach of these warranties.

I.   The Parties also agree that Overbrook will be entitled to conduct any policing of infringement of the Mark and will use its sole discretion in determining what steps to take to protect the Mark and deal with potential infringement issues. If Overbrook elects not to prosecute actions against any third party that Crestview reasonably believes infringes or otherwise misuses the Mark, Crestview shall have the right to prosecute such actions independently and, if it exercises such right, it shall fund one hundred percent (100%) of the costs and expenses thereof and be entitled to one hundred percent (100%) of any recovery of monetary damages. Each party agrees to reasonably cooperate with the other's prosecution of such action at the expense of the party providing the action. Each party agrees to timely inform the other party of any information that involves any third-party infringement or misuse or threat of infringement or misuse of the Mark. The Parties shall promptly do such acts and execute, acknowledge, and deliver such documentation as is reasonably necessary for the Parties to fulfill their respective obligations pursuant to this section. And in such case or cases, Overbrook will use its sole discretion to determine what action, if any, it chooses to take in connection with same.

9.   **Agreed Use of Mark.**   It is agreed that Crestview may use the Mark as follows:

A.   Within Crestview's business emails and correspondence (not primarily for marketing purposes) wherein it designates Crestview Genetics, LLC as a licensee of the Mark and as the source of semen of cloned offspring of the horse Storm Cat, and for breeding of offspring of same to produce foals for sale with language in a footnote or otherwise readily visible as follows:

   "STORM CAT™ is a trademark of Overbrook Farm, LLC, and as used herein, Crestview Genetics, LLC is an authorized licensee for use of such mark".

B.   In marketing materials substantially similar to the Attachment 1 hereto in which the Mark may be used in a similar presentation to the other clone referenced in the Attachment 1, with the substitution of "STORM CAT™" for the words DOLFINA CUARTETERA, and with the footnote that "STORM CAT™" is a trademark of Overbrook Farm, LLC, and Crestview Genetics, LLC is an authorized licensee for such mark as used herein.

C.   Other marketing material as may be later approved by Overbrook in accordance with the terms of this Agreement, in which "STORM CAT™" or "STORM CAT®" (upon completion of registration) is used in a non-generic and non-descriptive

SETTLEMENT AGREEMENT                                                    Page 6
279673v2

manner and in which language appears in a footnote or some other readily visible manner on the marketing material as follows:

"STORM CAT™ is a trademark of Overbrook Farm, LLC, and Crestview Genetics, LLC is an authorized licensee for such mark as used herein."

D.   If the Mark is registered with the United States PTO for the uses set forth in Section B of the Agreement, Crestview shall refer to the Mark as a registered mark and shall use the ® symbol in connection with the Mark and the disclaimers set forth above.

10.   **Term of Agreement.** The Term of this Agreement is set forth herein, subject to early termination which is also described herein below. Specifically, this Agreement shall be effective from the Effective Date set forth herein, and Crestview will have the rights granted hereunder for an initial term of five (5) years (the "Initial Term"), upon payment of the amount of $250,000 by April 15, 2017 by wire transfer to Overbook Farm (the "First Payment"). Upon payment of the First Payment, Crestview shall have the rights to operate hereunder during the Initial Term. Thereafter, at the end of the Initial Term and by April 15, 2022, Crestview shall have the right to pay a second payment of $150,000 (the "Second Payment"), which Second Payment shall authorize Crestview to perform under this Agreement and to maintain its rights hereunder for an additional five (5) year term (the "Second Five-Year Term"). During the Second Five-Year Term, Crestview shall have the rights and obligations under this Agreement. Upon the end of Second Five-Year term, Crestview shall have additional rights as set forth in the next paragraph.

Crestview shall have the right to maintain all its rights under this Agreement for another Five-Year term from April 15, 2027 to April 15, 2032 ("Third Five-Year Term") by paying to Overbrook Farm by April 15, 2027 an additional $750,000 ("Third Payment.") After payment of the Third Payment, Crestview shall have the rights to operate under this Agreement during the Third Five-Year Term. As an alternative to its right to purchase the Third Five-Year Term,



Crestview shall have the right from April 15, 2027 to April 15, 2031 to purchase up to five one-year options for $50,000 each to preserve all its rights under this Agreement ("Option Fee") for the year for which an Option Fee is paid. The deadline for payment of each $50,000 Option Fee is April 15, 2027, April 15, 2028, April 15, 2029, April 15, 2030, and April 15, 2031. If Crestview does not by April 15, 2027 purchase the Third-Five Year Term, but does purchase one or more one-year options, Crestview shall suspend its Breeding Program until it pays a fee to reactivate its rights to resume its Breeding Program under this Agreement ("Reactivation Fee"). From the date Crestview pays a Reactivation Fee, Crestview will be entitled to resume its Breeding Program and shall have the rights to operate under this Agreement until April 15, 2032. If Crestview pays a Reactivation Fee, then it is not required to pay any additional Option Fee. If Crestview does not pay the Option Fee by each deadline and the Reactivation Fee has not been paid, this Agreement terminates effective April 16 of the year in which the Option Fee is not paid and when no Reactivation Fee has been paid. If Crestview pays the Option Fee to preserve all its rights under this Agreement, then the Reactivation Fee will be:

    $750,000 if paid by April 15, 2028

    $750,000 if paid by April 15, 2029

    $700,000 if paid by April 15, 2030

    $650,000 if paid by April 15, 2031

    $600,000 if paid by April 15, 2032

For example, if Crestview purchases the first of its five one-year options by April 15, 2027 for $50,000.00 and pays the applicable Reactivation Fee of $750,000.00 by April 15, 2028, Crestview must suspend its Breeding Program from April 15, 2027 until such time as it pays the Reactivation

SETTLEMENT AGREEMENT
275073v2

Page 8



Fee. But from the date such Reactivation Fee is paid, Creatview shall have the right to operate under this Agreement until April 15, 2032.

If Creatview either (i) pays the $750,000 for the Third Five-Year Term, or (ii) pays each Option Fee up to the payment of a Reactivation Fee and then pays the applicable Reactivation Fee, then Creatview shall have the right to pay an additional $750,000 by April 15, 2032 ("Fourth Payment") to maintain all its rights under this Agreement for an additional and final five-year term from April 15, 2032 to April 15, 2037 ("Fourth Five-Year Term"). If Creatview suspended its Breeding Program and not resumed its Breeding Program after paying a Reactivation Fee, it shall be entitled to resume its Breeding Program on April 15, 2032 and after payment of the Fourth Payment. After payment of the Fourth Payment, Creatview shall have the rights and obligations under this Agreement until April 15, 2037, at which time this Agreement shall terminate.

11.    **Termination.** The Parties agree that upon a material breach by either party hereunder (the "Breaching Party"), the other party shall have the right to give notice of breach to the Breaching Party. Upon receipt of such notice, the Breaching Party shall have thirty (30) days to cure the breach. If the breach is not cured, the non-Breaching Party shall have the right to terminate this Agreement, and in such event, the Parties shall have all their rights and remedies at law or in equity.

12.    **Certain Exclusivity.** The Parties acknowledge that notwithstanding certain language in the Trademark provisions herein above, that during the Term of this Agreement, Overbrook agrees that it will not engage in the cloning of Storm Cat or Genetic Material. However, Overbrook is not limited in use of its Trademark in any other manner.

13.    **Performance Relating to Genetic Material.** Upon execution of this Agreement, it is agreed that Creatview shall return to Overbrook all of the Genetic Material previously provided by

Leonardo M. Schesinger
Escribano
Mat. 4456

Overbrook to Crestview and also including all cell samples and other material associated with such Genetic Material. All such material will be returned to Overbrook using a method and temperature that best preserves same for potential future use (for example, if the material has been held in cryogenic storage, it should be shipped in a comparable manner). It is also agreed that Crestview shall have the right to send certain cell samples and sperm from any Authorized Clone to be stored at the University of California at Davis, to be used by Crestview to perform under this Agreement only during the Term hereof. No use will be made of such material unless provided for under the terms of this Agreement.

14.    **Mutual Releases.** The Parties, on behalf of themselves, their corporate parents, subsidiaries, corporate affiliates, members, shareholders, managers, directors, officers, employees, attorneys, insurers, and fiduciaries in their representative capacities, hereby fully, finally, and forever release and discharge each other and each other's respective corporate parents, subsidiaries, corporate affiliates, members, managers, shareholders, directors, officers, employees, insurers, attorneys, and fiduciaries in their representative capacities, from any and all claims, causes of action, liabilities, damages, debts, judgments, garnishments, covenants, demands, expenses or suits, arising in law or in equity, that they have or may have against one another, known or unknown, liquidated or unliquidated, past or present, whether the subject of the Litigation or not. The Parties expressly reserve from this release any claims that they have or may in the future have for the breach of this Agreement.

15.    **No Amendments and Merger.** This Agreement shall not be amended or revised except in writing signed by all Parties. This Agreement contains the entire agreement of the Parties regarding the settlement of the Claims and supersedes any prior oral or written agreements or understandings between the Parties, including the Mediation Settlement Agreement signed by the

SETTLEMENT AGREEMENT                                                          Page 10
279673v2



Parties on March 31, 2017. The Parties agree that they are each relying on their own judgment in entering into this Agreement. The Parties agree that they are not relying on any statement or representation of any other Party in making the decision to enter into this Agreement.

16.     **Governing Law.** This Agreement is entered into in the State of Texas, and it shall be interpreted in accordance with and governed in all respects by the laws of the State of Texas, without regard to conflict of laws principles. Any action to enforce this Agreement shall be brought solely in any court of competent jurisdiction located in Tarrant County, Texas.

17.     **Fees in a Breach.**    In the event of a breach of this Agreement, the prevailing Party in any action to enforce its rights shall be entitled to recover its costs and expenses, including reasonable attorneys' fees.

18.     **Joint Drafting.** Each Party has cooperated in the drafting and preparation of this Agreement, and it shall be construed according to the plain meaning of its language and not for or against either Party.

19.     **No Waiver.** No breach of any provision or condition of this Agreement may be waived unless in writing and signed by the waiving party. Waiver of any breach of any provision or condition hereof shall not be deemed a waiver of any other breach of the same or other provisions contained herein.

20.     **Authority and Non-Assignment of Claims.** Each Party acknowledges that it is entering into this Agreement voluntarily. Each Party represents and warrants that it is under no legal impediment to the entry into and confirmation of this Agreement. The individuals signing below on behalf of the Parties designated represent by their signatures that they have full authority to sign on behalf of the entity posted below. The Parties hereby represent and warrant that they own and have not sold, transferred, or assigned their claims or defenses that are released, discharged,

SETTLEMENT AGREEMENT
279673v2

Page 11

Leonardo M. Scheatenger
Escribano
Mia. #456

terminated, or disclaimed through this Agreement to any other person or entity prior to exercising this Agreement. In the event of such sale, transfer or assignment of any Claims or the matters herein released, discharged, terminated, or disclaimed, the selling/transferring/assigning party agrees to indemnify and hold harmless the other Party from and against any liability for loss, and for any cost or expense, including reasonable attorneys' fees or judgment or settlement arising out of or occasion by any such sale, transfer or assignment.

21.   **Confidentiality.** In exchange for the mutual promises made herein and other consideration recited herein, the Parties and their respective attorneys and employees agree that the terms of this Agreement are confidential and that neither the Parties nor any corporate parent, corporate affiliate, subsidiary, member, manager, shareholder, employee, officer, director, attorney, or fiduciary in a representative capacity may disclose or divulge the terms of this Agreement to any person or entity unless (a) disclosure is ordered by a court of competent jurisdiction in response to a valid subpoena or by a governmental agency, such as the IRS; (b) if all of the Parties otherwise agree in advance in writing; (c) disclosure is necessary for a Party in any action or proceeding to enforce the terms of this Agreement or the Agreed Permanent Injunction or Agreed Temporary Restraining Order (or disclosure is necessary to defend against such action or proceeding); or (d) disclosure is necessary for their professional tax, investment, legal, or business advisors to provide services to them. Each party agrees to make all reasonable efforts to keep any permitted disclosures as confidential as possible, and to attempt to limit the scope of any such disclosure to the minimum extent necessary. In the event a disclosure in circumstance (a) or (b) occurs, the disclosing Party will ensure the persons or entities receiving the information are aware of this confidentiality provision and agree to be bound by the provision.

SETTLEMENT AGREEMENT
279673v2

Page 12



22.  **Statements to Third Parties.** If asked by any third person or entity about the Action or the Petition, the Party (or its respective corporate parent, corporate affiliate, subsidiary, member, manager, shareholder, employee, officer, director, attorney, or fiduciary in a representative capacity) being asked shall only disclose that this matter was settled amicably and under confidential terms.

23.  **Attorney's Fees.** The Parties agree to bear their own attorneys' fees, expenses, and costs.

24.  **Non-disparagement.** This Parties agree not to disparage each other or Storm Cat or the business operation hereunder.

SETTLEMENT AGREEMENT
2756732v2

Page 13



ACTA DE CERTIFICACION DE FIRMAS
LEY 404

F 015599042

1   Buenos Aires,  28  de    Julio      de  2019  .- En mi carácter de escribano

2   Titular del Registro Notarial número 858 de la Ciudad de Buenos Aires

3   CERTIFICO: Que la/s

         firmas                     que obra/n en el

4   documento que adjunto a esta foja, cuyo requerimiento de certificación se

5   formaliza simultáneamente por ACTA número       142       del LIBRO

6   número     043          , es/son puesta/s en mi presencia por la/s persona/s

7   cuyo/s nombre/s, documento/s de identidad y justificación de identidad se indican:

8   David Alan MEEKER, titular del Pasaporte Estadounidense número

9   557504852;  Adolfo CAMBIASO, titular del Documento Nacional de

10  Identidad número 24.564.301.- El primer compareciente acredita su

11  identidad y lo identifico en los términos establecidos por el inciso a) del

12  artículo 306 del Código Civil y Comercial de la Nación, exhibiendo el

13  pasaporte previamente mencionado, cuya fotocopia en sus partes

14  pertinentes reservo, en tanto el último es persona de mi conocimiento, doy

15  fe.- INTERVIENEN el Señor David Alan MEEKER en su carácter de

16  Gerente de la sociedad que gira de conformidad con las Leyes del Estado

17  de Nevada, Estados Unidos de América, bajo la denominación de

18  "CRESTVIEW GENETICS, LLC", con sede social en 100 Pier I Place,

19  Suite 2001, Fort Worth, Texas 76102, Estados Unidos de América, a

20  mérito del Contrato Social reformado y reordenado del 3 de julio de 2018

21  del que surge que "CRESTVIEW GENETICS, LLC", se constituyó como

22  una sociedad de responsabilidad limitada de conformidad con la Ley

23  mediante la presentación de su Instrumento Constitutivo ante la Secretaría

24  de Estado del Estado de Nevada el 2 de noviembre de 2009; en tanto el

25  Señor Adolfo CAMBIASO lo hace por sí y en nombre y representación, y

 

F 015599042

en su carácter de Presidente de la sociedad que gira en esta Plaza bajo la     26
denominación de " LA DOLFINA S.A.", con sede social en Cerrito 1,266,     27
piso 6°, oficina "26", a mérito de: I) El Estatuto Social que fuera     28
formalizado el 10 de diciembre de 1998, mediante escritura 79, ante la     29
Escribana de esta Ciudad, María Inés Morelli, al folio 276 del Registro     30
Notarial 519 de la Capital Federal, de su adscripción, e inscripta la primera     31
copia ante la Inspección General de Justicia el 30 de diciembre de 1998     32
bajo el Número 16,283, del Libro 3, Tomo de Sociedades por Acciones; y     33
II) El Acta de Asamblea General Ordinaria del 7 de octubre de 2016,     34
mediante la cual se eligieron las autoridades y distribuyeron los cargos del     35
actual Directorio, obrante al folio 21 del Libro de Actas de Asambleas     36
número 1, rubricado ante la Inspección General de Justicia el 29 de marzo     37
de 1999 bajo el número 22621-99.- La documentación relacionada en sus     38
originales he tenido a la vista, asegurando los comparecientes la plena     39
vigencia de sus representaciones; y que ellas no les han sido revocadas ni     40
limitadas en forma alguna, agregando el Señor Meeker que el presente     41
constituye un acto aislado,  con suficientes facultades para el presente     42
otorgamiento.- Se deja expresa constancia que el documento adjunto     43
cuyas firmas se certifican consiste en la Oferta N° 04-29072019.- Sello     44
Original F015599042 y Anexo F003317712.-     45
     46
     47
     48
                              Leonardo M. Schesteager     49
                              Escribano
                              Mat. 4456                   50

# EXHIBIT 3

CRESTVIEW FARM, LLC
4770 Bryant Irvin Court, Suite 400
Fort Worth, Texas 76107
ross@cviewgroup.com

November 18, 2020

Juan Carlos diCaro
<jcdicaro@gmail.com>

Dear Juan Carlos,

I hope you are well during these extraordinary times. I have been asked by Crestview Farm, LLC, to respond to your questions in various emails with Alan Meeker regarding how the 2009 Horse Cloning Agreement (the "2009 Agreement") affect horses, clones and the relations between Crestview Farm, LLC ("Crestview Farm") and Adolfo Cambiaso (Adolfo).  This letter is written to you as you have stated you are the official representative of Adolfo.

I won't attempt to recite or analyze every important provision in the 2009 Agreement, but some of the key points include the following.

1.   Adolfo sold to Crestview Farm the "complete and exclusive licensing rights in and to the mare[s] and all cloned foals" for One Million Dollars, which Crestview Farm has paid to Adolfo.  An exclusive license that does not contain an express reservation of rights transfers all substantial rights to the assignee. Thus, all substantial rights to the mares and the cloned foals are the property of Crestview Farm, irrespective of their location.

2.   Crestview Farm has created several cloned foals under its continuing rights under the 2009 Agreement, and has sold three of them to a third party for more than the minimum price mentioned in the 2009 Agreement or as later agreed to by the parties. Those clones are identified in Exhibit A.

3.   Since Crestview Farm's rights in the mares and cloned foals are "complete and exclusive" and therefore without limitation; Adolfo has no corresponding rights in them.  Therefore, please account for (i) any clones of any of the mares or clones thereof created by Adolfo, (ii) whether any third parties have been granted by Adolfo any right to the name/image/ride/profit, etc., from these mares and clones, (iii) whether Adolfo is riding or otherwise profiting from such mares and clones, and (iv) whether Adolfo has transferred any tissue or cells of any of the mares, clones or horses related to the 2009 Agreement to any third party.  Upon information and belief, Adolfo has allowed third parties to clone the mare, Cuartetera (which is subject to the 2009 Agreement) at least twice.  Adolfo must cease and desist activity described in this paragraph without the express written consent of Crestview Farm.

4.   Crestview Farm's rights under the 2009 Agreement are completely separate from and superior to any rights held by Adolfo under the 2019 Settlement Agreement with Crestview Genetics, LLC (a separate entity from Crestview Farm with different owners).

All that being said Crestview Farm is still willing to discuss entering into an agreement regarding remaining Crestview Farm Clones/Cells not already out-conveyed. Feel free to suggest something. The last 10 years building friendships and good business should be a basis from which we can continue, assuming all parties come to final agreements.

I trust this helps clarify the situation.  Please let me know Mr. Cambiaso's position as soon as convenient, and whether I can be helpful going forward.

Very truly yours,

*/s/ Ross E. Eichberg*

Ross E. Eichberg
General Counsel,
Crestview Group of Companies

<u>EXHIBIT A</u>

<u>DESCRIPTION OF SOLD CLONES</u>

Name: CF Cuartetera P01
Date of Birth: April 4, 2020

Name: CF Cuartetera P02
Date of Birth April 21, 2020

Name: CF Cuartetera P03
Date of Birth: June 2, 2020

<u>IDENTIFICATION OF MARES/HORSES</u>

Cuartetera

Lapa

Small Person*

Nona**

Colibri

Aiken Currah aka Aiken Cura

*A Third Party has claimed and shown evidence that they are the actual owners of Small Person, which establishes a material breach of the 2009 Agreement by Adolfo.

** Adolfo has still not provided tissue/cells for Nona in violation of the 2009 Agreement, which is a material breach of the 2009 Agreement by Adolfo.

EXHIBIT 4

Leonardo M. Schestenger
Escribano
· 156

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CRESTVIEW GENETICS, LLC

    Plaintiff,

v.

CHRIS YOUNG AND OVERBROOK
FARM, LLC,

    Defendants.

NO. 4:16-cv-00295-A

JURY TRIAL DEMANDED

## SETTLEMENT AGREEMENT

1. **Effective Date.** This Settlement Agreement ("Agreement") is entered into on April 15, 2017 ("Effective Date").

2. **Parties.** This Agreement is by and between Crestview Genetics, LLC ("Crestview"), on the one hand, and Chris Young ("Young") and Overbrook Farm, LLC ("Overbrook Farm") (collectively Young and Overbrook Farm are referred to as "Overbrook"), on the other hand. Crestview, Young, and Overbrook Farm will be referred to collectively as the "Parties."

3. **Genetic Material:** In settlement of the above-styled and numbered cause (the "Litigation"), the Parties acknowledge that Crestview has heretofore obtained from Overbrook certain genetic material from Storm Cat, a valuable thoroughbred race horse owned by Overbrook (referred to as the "Genetic Material"), which Genetic Material has been involved in the dispute involved in the Litigation. The Parties acknowledge that Crestview has heretofore utilized the Genetic Material to create a clone of Storm Cat (the "Initial Clone"). And the Parties also acknowledge that the Initial Clone has been involved in the dispute in the Litigation.

SETTLEMENT AGREEMENT
279673v2

Page 1

Leonardo M. Schestienger
Escribano
Mat. 4456

4.   **Dispute Involved.**  The Parties also acknowledge that there has been litigate involving whether or not the Parties had an agreement relating to the Genetic Material and the Initial Clone and other things including a valuable trademark (the "Trademark") which is Storm Cat™ which is also an issue in the Litigation.  The Parties acknowledge hereunder that Storm Cat™ is a Trademark owned by Overbrook.

5.   **Crestview's USPTO Application.**  The Parties also acknowledge that Crestview has filed an Intent to Use Application with the U.S. Patent and Trademark Office claiming an intent use the Trademark Storm Cat, to which Overbrook has objected and filed an opposition with the PTO.  In settlement of the Litigation and the dispute between the Parties, it is agreed that upon execution hereof, Crestview will withdraw its Application for Registration with the PTO for the Trademark Storm Cat, and will cooperate as is reasonably necessary in connection with the prosecution of a trademark in favor of Overbrook Farm for the Trademark Storm Cat™; and will not ever re-apply for a registration of Storm Cat or infringe upon Overbrook's rights to the Trademark.

6.   **Number of Clones.**  The Parties hereto agree that Crestview shall have the right to use the Initial Clone for purposes set forth in this Agreement and also the right to create one additional clone (the "Second Clone") for purposes under this Agreement at its own expense in utilizing the Genetic Material and/or its own techniques and capabilities.  The Parties intend for Crestview to be authorized to have two clones in existence at any given time, but no more than two clones at any given time.  The Parties acknowledge that a clone may die or become infertile.  If either the Initial Clone or the Second Clone dies or becomes infertile, the Parties agree that Crestview has the right to create an additional clone (a "Replacement Clone") at its own expense in utilizing the Genetic Material and/or its own techniques and capabilities.  If a Replacement Clone dies or becomes infertile, the Parties agree that Crestview has the right to create an additional clone at its

SETTLEMENT AGREEMENT
2796737v2

Page 2



own expense in utilizing the Genetic Material and or its own techniques and capabilities. And at that time, Crestview will provide certification from a qualified veterinarian to confirm any infertility or death of such a clone to Overbrook. The Parties agree that the Initial Clone, the Second Clone, any Replacement Clone, and any replacement of a Replacement Clone are "Authorized Clones," and only two Authorized Clones are allowed to exist at any given time under this agreement. The parties agree that Crestview has the exclusive right to create clones of Storm Cat during the Term of this Agreement. Crestview will timely inform Overbrook of the creation of the Second Clone and any other Authorized Clone, and reasonably keep Overbrook informed of the existence of Authorized Clones.

7. **Use of Clones.** It is agreed by the Parties that Crestview shall have the right to use the Authorized Clones to create offspring of the Authorized Clones and to sell same, and to sell semen from the Authorized Clones for use in the industries set forth herein below, and limited to such industries, and not otherwise, within the Term of this Agreement. The parties agree that Crestview shall have the exclusive right during the Term of this Agreement to use any clone to create offspring of a clone and to sell same and to sell semen from a clone.

8. **License.** In connection with Crestview's operations utilizing the Authorized Clones as authorized under this Agreement, Crestview shall have certain licensed rights with respect to the Trademark Storm Cat. Such rights are set forth herein below:

    A. It is acknowledged that Overbrook is the sole and exclusive owner of the trademark/tradename "STORM CAT" (referred to as the "Mark") which Mark is existing, viable and protectable by Overbrook. In exchange for the License granted herein, Crestview agrees to withdraw the application it has filed with the United States PTO relating to the Mark immediately upon execution of the settlement agreement, and will provide reasonable cooperation to Overbrook in Overbrook's registration of the Mark with the USPTO and any foreign registrations of same at Overbrook's cost and expense.





Leonardo M. Schesionger
Escribano
Mat. 4456

B.   Overbrook hereby grants to Crestview a non-exclusive, limited, non-assignable license (the "License") to use the Mark (directly or through its agents) during the term of the Agreement (it shall include extensions if applicable as set for here and below), in connection with and for the limited purpose of marketing of semen of cloned offspring of the horse, Storm Cat, and for the breeding of offspring from same to produce foals for sale and use as permitted hereunder. This License is granted for use within the United States for which certain indemnification is provided by Overbrook, as set forth herein below. This License is also granted for use by Crestview worldwide, although it is recognized that no indemnification is provided by Overbrook in connection with any worldwide use outside of the United States, also set forth below. Use by Crestview under this License inures to the benefit of Overbrook's ownership of the Mark.

C.   Such License does not permit the use of such Mark for any other purpose, except as expressly granted under Section B, and Crestview agrees to so limit the use of such Mark and not to engage in any activities that violate Overbrook's rights in said Mark, including any infringement of the Mark. Unless a further agreement is reached in writing and signed by the Parties, the use of said Mark shall be used as legally permitted only in the industries of polo, jumping, dressage, para-equestrian dressage, eventing, driving, endurance, reining, vaulting, sport horses, cutting horses, and barrel-racing horses, as well as other sports upon which the Parties may agree in writing. Crestview will assure the legality of use in any such industry.

D.   Crestview hereby indemnifies Overbrook from any and all third party claims, damages and losses (including reasonable attorney's fees) caused by any breach of this License by Crestview or its agents or those acting on its behalf.

E.   The Parties acknowledge and agree that Crestview is solely responsible for its method of operating its business using the Mark; however, Crestview acknowledges that the rights granted to Crestview pursuant to Section B above may only be exercised after obtaining Overbrook's approval of any proposed use of the Mark in accordance with this section. Presently, it is acknowledged that Crestview intends to use the Mark generally as set forth in paragraph nine (9) of this Agreement, all of which use is satisfactory to Overbrook and agreed to by the Parties. Prior to any use of the Mark which has not previously been approved or is not substantially consistent with a previously approved use, Crestview shall deliver a representative sample of its proposed use of the Mark to Overbrook for its approval, which approval shall not be unreasonably withheld, conditioned, or delayed. Within five (5) days of actual receipt of such representative sample by the Overbrook representative as set forth in the notice paragraph below from Crestview, Overbrook will approve such further use of the Mark, or alternatively, provide written notice to Crestview of Overbrook's objection in reasonable detail to allow Crestview a meaningful opportunity to modify its proposed use of the Mark to comply with the terms of this Agreement. Overbrook shall be deemed to have actually received a representative sample (a) on the date the sample is delivered to

SETTLEMENT AGREEMENT                                                 Page 4
279673v2





the Overbrook representative if delivered personally, (b) on the date sent by facsimile or email (with confirmation of delivery) if sent before 5 PM EST on a business day, and otherwise on the next business day if sent after 5 PM EST on a business day, the weekend or a federal holiday, or (c) on the next business day if delivered by national overnight courier (with confirmation of delivery), provided notice is also sent by email at the applicable email address(es). If Crestview has not received written notice of any objection within five (5) days following Overbrook's receipt of a representative sample, Overbrook shall be deemed to have approved such use of the Mark. Approval of any particular use of the Mark, once given by Overbrook, shall continue in effect with respect to such use, and any use substantially consistent therewith, without need for further approval, unless such use, is altered in any material respect. Notwithstanding the foregoing, if at any time any particular use of the Mark by Crestview does not comply with the terms of this Agreement, Overbrook shall have the right to require Crestview to cease any such use upon written notice to Crestview.

If Overbrook reasonably requires additional information to evaluate Crestview's proposed use, Crestview will submit to Overbrook sufficient information for Overbrook to evaluate same. If Overbrook does not agree to this proposed use, it agrees to timely work together with Crestview to help Crestview use the Mark in its needed manner so long as it is consistent with the terms hereof. Crestview may submit its representative samples, and Overbrook may provide its approvals, via email to the applicable email address set forth in the notice provision below.

F.     The License hereunder is terminable by Overbrook upon a material breach of this Agreement by Crestview unless Crestview cures such breach within ninety (90) days of receiving notice of same from Overbrook.

G.     Notwithstanding the preceding paragraphs, Crestview's clients and Crestview have the right to designate a name to offspring from any Storm Cat clone, a name which includes the words Storm or Cat, but it may not use the exact name "Storm Cat" or confusingly similar spellings of the name "Storm Cat" (e.g., "Storm Kat"). Notwithstanding the foregoing, for purposes of written agreements with its customers or clients or agents, Crestview shall have the right to refer to a clone created under any agreement with Overbrook as "Storm Cat Clone 01", "Storm Cat Clone 02" and the like. However, it is agreed that there will never be more than two clones of Storm Cat existing at any given time. It is the intention of the Parties that the use of "Storm Cat Clone 01", and the like, is not intended to be used as a trademark, but rather simply for purposes of identifying the Clone in such agreements.

H.     Overbrook represents and warrants that upon performance under this Agreement, that (i) Overbrook has, and will continue to have, full and sufficient rights to grant the License set forth herein, (ii) Overbrook is the sole and exclusive owner of the Mark in the U.S., and (iii) Crestview's use of the Mark in accordance with this License will not infringe or violate any intellectual property or proprietary rights of

Page 5.

SETTLEMENT AGREEMENT
27987/3v2



a third party relating to use of said Mark within the United States. Overbrook agrees to indemnify Crestview and its agents from any third party claims, damages, and losses (including reasonable attorney's fees) caused by Crestview's or its agents' use of the Mark in accordance with the terms of this License, and in breach of these warranties.

I.  The Parties also agree that Overbrook will be entitled to conduct any policing of infringement of the Mark and will use its sole discretion in determining what steps to take to protect the Mark and deal with potential infringement issues. If Overbrook elects not to prosecute actions against any third party that Crestview reasonably believes infringes or otherwise misuses the Mark, Crestview shall have the right to prosecute such actions independently and, if it exercises such right, it shall fund one hundred percent (100%) of the costs and expenses thereof and be entitled to one hundred percent (100%) of any recovery of monetary damages. Each party agrees to reasonably cooperate with the other's prosecution of such action at the expense of the party provoking the action. Each party agrees to timely inform the other party of any information that involves any third-party infringement or misuse or threat of infringement or misuse of the Mark. The Parties shall promptly do such acts and execute, acknowledge, and deliver such documentation as is reasonably necessary for the Parties to fulfill their respective obligations pursuant to this section. And in such case or cases, Overbrook will use its sole discretion to determine what action, if any, it chooses to take in connection with same.

9.  **Agreed Use of Mark.** It is agreed that Crestview may use the Mark as follows:

A.  Within Crestview's business emails and correspondence (not primarily for marketing purposes) wherein it designates Crestview Genetica, LLC as a licensee of the Mark and as the source of semen of cloned offspring of the horse Storm Cat, and for breeding of offspring of same to produce foals for sale with language in a footnote or otherwise readily visible as follows:

"STORM CAT™ is a trademark of Overbrook Farm, LLC, and as used herein, Crestview Genetica, LLC is an authorized licensee for use of such mark".

B.  In marketing materials substantially similar to the Attachment 1 hereto in which the Mark may be used in a similar presentation to the other clone referenced in the Attachment 1, with the substitution of "STORM CAT™ for the words DOLFINA CUARTETERA, and with the footnote that "STORM CAT™ is a trademark of Overbrook Farm, LLC, and Crestview Genetica, LLC is an authorized licensee for such mark as used herein.

C.  Other marketing material as may be later approved by Overbrook in accordance with the terms of the Agreement, in which "STORM CAT™" or "STORM CAT®" (upon completion of registration) is used in a non-generic and non-descriptive

Leonardo M. Schestinger
Escribano
Mat. 4456

manner and in which language appears in a footnote or some other readily visible manner on the marketing material as follows:

"STORM CAT™ is a trademark of Overbrook Farm, LLC, and Crestview Genetics, LLC is an authorized licensee for such mark as used herein.".

D. If the Mark is registered with the United States PTO for the uses set forth in Section B of the Agreement, Crestview shall refer to the Mark as a registered mark and shall use the ® symbol in connection with the Mark and the disclaimers set forth above.

10. Terms of Agreement. The Term of this Agreement is set forth herein, subject to early termination which is also described herein below. Specifically, this Agreement shall be effective from the Effective Date set forth herein, and Crestview will have the rights granted hereunder for an initial term of five (5) years (the "Initial Term"), upon payment of the amount of $250,000 by April 15, 2017 by wire transfer to Overbrook Farm (the "First Payment"). Upon payment of the First Payment, Crestview shall have the rights to operate hereunder during the Initial Term. Thereafter, at the end of the Initial Term and by April 15, 2022, Crestview shall have the right to pay a second payment of $150,000 (the "Second Payment"), which Second Payment shall authorize Crestview to perform under this Agreement and to maintain its rights hereunder for an additional five (5) year term (the "Second Five-Year Term"). During the Second Five-Year Term, Crestview shall have the rights and obligations under this Agreement. Upon the end of Second Five-Year term, Crestview shall have additional rights as set forth in the next paragraph.

Crestview shall have the right to maintain all its rights under this Agreement for another Five-Year term from April 15, 2027 to April 15, 2032 ("Third Five-Year Term") by paying to Overbrook Farm by April 15, 2027 an additional $750,000 ("Third Payment.") After payment of the Third Payment, Crestview shall have the rights to operate under this Agreement during the Third Five-Year Term. As an alternative to its right to purchase the Third Five-Year Term,

Page 7

SETTLEMENT AGREEMENT
279673v2



Crestview shall have the right from April 15, 2027 to April 15, 2031 to purchase up to five one-year options for $50,000 each to preserve all its rights under this Agreement ("Option Fee") for the year for which an Option Fee is paid. The deadline for payment of each $50,000 Option Fee is April 15, 2027, April 15, 2028, April 15, 2029, April 15, 2030, and April 13, 2031. If Crestview does not by April 15, 2027 purchase the Third-Five Year Term, but does purchase one or more one-year options, Crestview shall suspend its Breeding Program until it pays a fee to reactivate its rights to resume its Breeding Program under this Agreement ("Reactivation Fee"). From the date Crestview pays a Reactivation Fee, Crestview will be entitled to resume its Breeding Program and shall have the rights to operate under this Agreement until April 15, 2032. If Crestview pays a Reactivation Fee, then it is not required to pay any additional Option Fee. If Crestview does not pay the Option Fee by each deadline and the Reactivation Fee has not been paid, this Agreement terminates effective April 16 of the year in which the Option Fee is not paid and when no Reactivation Fee has been paid. If Crestview pays the Option Fee to preserve all its rights under this Agreement, then the Reactivation Fee will be:

   $750,000 if paid by April 15, 2028

   $750,000 if paid by April 15, 2029

   $700,000 if paid by April 15, 2030

   $650,000 if paid by April 15, 2031

   $600,000 if paid by April 15, 2032

For example, if Crestview purchases the first of its five one-year options by April 15, 2027 for $50,000.00 and pays the applicable Reactivation Fee of $750,000.00 by April 15, 2028, Crestview must suspend its Breeding Program from April 15, 2027 until such time as it pays the Reactivation

SETTLEMENT AGREEMENT
279673v2

Page 8



Fee. But from the date such Reactivation Fee is paid, Crestview shall have the right to operate under this Agreement until April 15, 2032.

If Crestview either (i) pays the $750,000 for the Third Five-Year Term, or (ii) pays each Option Fee up to the payment of a Reactivation Fee and then pays the applicable Reactivation Fee, then Crestview shall have the right to pay an additional $750,000 by April 15, 2032 ("Fourth Payment") to maintain all its rights under this Agreement for an additional and final five-year term from April 15, 2032 to April 15, 2037 ("Fourth Five-Year Term"). If Crestview suspended its Breeding Program and not resumed its Breeding Program after paying a Reactivation Fee, it shall be entitled to resume its Breeding Program on April 15, 2032 and after payment of the Fourth Payment. After payment of the Fourth Payment, Crestview shall have the rights and obligations under this Agreement until April 15, 2037, at which time this Agreement shall terminate.

11.   _Termination._ The Parties agree that upon a material breach by either party hereunder (the "Breaching Party"), the other party shall have the right to give notice of breach to the Breaching Party. Upon receipt of such notice, the Breaching Party shall have thirty (90) days to cure the breach. If the breach is not cured, the non-Breaching Party shall have the right to terminate this Agreement, and in such event, the Parties shall have all their rights and remedies at law or in equity.

12.   _Certain Exclusivity._ The Parties acknowledge that notwithstanding certain language in the Trademark provisions herein above, that during the Term of this Agreement, Overbrook agrees that it will not engage in the cloning of Storm Cat or Genetic Material. However, Overbrook is not limited in use of its Trademark in any other manner.

13.   _Performance Relating to Genetic Material._ Upon execution of this Agreement, it is agreed that Crestview shall return to Overbrook all of the Genetic Material previously provided by

Page 9

SETTLEMENT AGREEMENT
279673v2

Leonardo M. Schestepfer
Escribano
Mat. 4456

Overbrook to Crestview and also including all cell samples and other material associated with such Genetic Material. All such material will be returned to Overbrook using a method and temperature that best preserves same for potential future use (for example, if the material has been held in cryogenic storage, it should be shipped in a comparable manner). It is also agreed that Crestview shall have the right to send certain cell samples and sperm from any Authorized Clone to be stored at the University of California at Davis, to be used by Crestview to perform under this Agreement only during the Term hereof. No use will be made of such material unless provided for under the terms of this Agreement.

14.   **Mutual Releases.** The Parties, on behalf of themselves, their corporate parents, subsidiaries, corporate affiliates, members, shareholders, managers, directors, officers, employees, attorneys, insurers, and fiduciaries in their representative capacities, hereby fully, finally, and forever release and discharge each other and each other's respective corporate parents, subsidiaries, corporate affiliates, members, managers, shareholders, directors, officers, employees, insurers, attorneys, and fiduciaries in their representative capacities, from any and all claims, causes of action, liabilities, damages, debts, judgments, garnishments, covenants, demands, expenses or suits, arising in law or in equity, that they have or may have against one another, known or unknown, liquidated or unliquidated, past or present, whether the subject of the Litigation or not. The Parties expressly reserve from this release any claims that they have or may in the future have for the breach of this Agreement.

15.   **No Amendments and Merger.** This Agreement shall not be amended or revised except in writing signed by all Parties. This Agreement contains the entire agreement of the Parties regarding the settlement of the Claims and supersedes any prior oral or written agreements or understandings between the Parties, including the Mediation Settlement Agreement signed by the

Page 10

SETTLEMENT AGREEMENT
279673v2

Leonardo M. Schesteyger
Escribano
Mat. 4456

Parties on March 31, 2017. The Parties agree that they are each relying on their own judgment in entering into this Agreement.   The Parties agree that they are not relying on any statement or representation of any other Party in making the decision to enter into this Agreement.

16.   **Governing Law.** This Agreement is entered into in the State of Texas, and it shall be interpreted in accordance with and governed in all respects by the laws of the State of Texas, without regard to conflict of laws principles.   Any action to enforce this Agreement shall be brought solely in any court of competent jurisdiction located in Tarrant County, Texas.

17.   **Fees in a Breach.**   In the event of a breach of this Agreement, the prevailing Party in any action to enforce its rights shall be entitled to recover its costs and expenses, including reasonable attorneys' fees.

18.   **Joint Drafting.**   Each Party has cooperated in the drafting and preparation of this Agreement, and it shall be construed according to the plain meaning of its language and not for or against either Party.

19.   **No Waiver.**   No breach of any provision or condition of this Agreement may be waived unless in writing and signed by the waiving party.   Waiver of any breach of any provision or condition hereof shall not be deemed a waiver of any other breach of the same or other provisions contained herein.

20.   **Authority and Non-Assignment of Claims.**   Each Party acknowledges that it is entering into this Agreement voluntarily.   Each Party represents and warrants that it is under no legal impediment to the entry into and confirmation of this Agreement.   The individuals signing below on behalf of the Parties designated represent by their signatures that they have full authority to sign on behalf of the entity posted below.   The Parties hereby represent and warrant that they own and have not sold, transferred, or assigned their claims or defenses that are released, discharged,

Page 11

SETTLEMENT AGREEMENT
275573v2

Leonardo M. Schestenger
Escribano
Mat. 4456

terminated, or disclaimed through this Agreement to any other person or entity prior to executing this Agreement. In the event of such sale, transfer or assignment of any Claims or the matters herein released, discharged, terminated, or disclaimed, the selling/transferring/assigning party agrees to indemnify and hold harmless the other Party from and against any liability of loss, and for any cost or expense, including reasonable attorneys' fees or judgment or settlement arising out of or occasion by any such sale, transfer or assignment.

21.   Confidentiality. In exchange for the mutual promises made herein and other consideration recited herein, the Parties and their respective attorneys and employees agree that the terms of this Agreement are confidential and that neither the Parties nor any corporate parent, corporate affiliate, subsidiary, member, manager, shareholder, employee, officer, director, attorney, or fiduciary in a representative capacity may disclose or divulge the terms of this Agreement to any person or entity unless (a) disclosure is ordered by a court of competent jurisdiction in response to a valid subpoena or by a governmental agency, such as the IRS; (b) if all of the Parties otherwise agree in advance in writing; (c) disclosure is necessary for a Party in any action or proceeding to enforce the terms of this Agreement or the Agreed Permanent Injunction or Agreed Temporary Restraining Order (or disclosure is necessary to defend against such action or proceeding); or (d) disclosure is necessary for their professional tax, investment, legal, or business advisors to provide services to them. Each party agrees to make all reasonable efforts to keep any permitted disclosures as confidential as possible, and to attempt to limit the scope of any such disclosure to the minimum extent necessary. In the event a disclosure in circumstances (a) or (b) occurs, the disclosing Party will ensure the persons or entities receiving the information are aware of this confidentiality provision and agree to be bound by the provision.

SETTLEMENT AGREEMENT
279673v2



22.   **Statements to Third Parties.** If asked by any third person or entity about the Action or the Petition, the Party (or its respective corporate parent, corporate affiliate, subsidiary, member, manager, shareholder, employee, officer, director, attorney, or fiduciary in a representative capacity) being asked shall only disclose that this matter was settled amicably and under confidential terms.

23.   **Attorney's Fees.** The Parties agree to bear their own attorneys' fees, expenses, and costs.

24.   **Non-disparagement.** This Parties agree not to disparage each other or Storm Cat or the business operation hereunder.