# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### WEST PALM BEACH DIVISION

### CASE NO.: 9:20-cv-82231-AMC/BER

**LA DOLFINA S.A. LLC,**
**a Florida limited liability company, and**
**ADOLFO CAMBIASO, individually**

  **Plaintiffs,**

**v.**

**D. ALAN MEEKER, individually,**
**a/k/a ALAN MEEKER,**
**a/k/a DAVID ALAN MEEKER,**
**CRESTVIEW FARM, LLC,**
**a Texas limited liability company, and**
**CRESTVIEW GENETICS, LLC,**
**a Nevada limited liability company,**
**PARK PLACE POLO TEAM CORPORATION,**
**a Florida corporation, and**
**PARK PLACE POLO FIELDS CORPORATION,**
**a Florida corporation,**

  **Defendants.**

_____/

## <u>SECOND AMENDED COMPLAINT</u>

As and for their Second Amended Complaint and Action for Declaratory Relief, Plaintiffs

La Dolfina S.A. LLC ("La Dolfina") and Adolfo Cambiaso ("Mr. Cambiaso") (collectively

"Cambiaso / La Dolfina"), allege and state as follows against Defendants D. Alan Meeker a/k/a

Alan Meeker a/k/a David Alan Meeker ("Meeker"), Crestview Farm, LLC ("Crestview Farm" or

"Farm") and Crestview Genetics, LLC ("Crestview Genetics" or "Genetics") (Meeker, Farm and

Genetics, collectively the "Crestview Defendants") and against Park Place Polo Team Corporation

("Park Place Polo Team") and Park Place Polo Fields Corporation ("Park Place Polo Fields")

(collectively, the "Park Place Polo Defendants"):

1

### I.      Allegations Common to All Counts.

### A.      A History of the Contractual Relationship.

1.      This case concerns the evolution of an equine cloning venture over more than 10 years.   During this time, Meeker, as manager of both Farm and Genetics, utilized the Farm and Genetics entities interchangeably and as his alter-egos.

2.      The relationship between Mr. Cambiaso and Meeker and Farm commenced with a 2009 Horse Cloning Agreement (the "2009 Agreement"). **Exhibit 1 hereto.**  Therein,  Meeker, by and through Farm, and Mr. Cambiaso agreed to explore equine cloning of Mr. Cambiaso's horses.

3.      The 2009 Agreement reads much like an exploratory letter of intent, with many conditions precedent, such as proving out the science of cloning horses, further cooperation, and formation of a future joint venture.   In fact, the 2009 Agreement failed because of the non-performance of material terms set forth in ¶¶ 3, 4 and 5 thereof, to wit: (i) Farm never acquired the cloning technology so as to be able to produce the clones; (ii) the parties never came to a mutually acceptable agreement as to the endorsement marketing; (iii) the parties never came to a mutual agreement as to the final sales price and terms of sale of any clones; and (iv) the parties never came to an agreement as to production of the additional "second edition" clones.

4.      The 2009 Agreement was particularly clear, and the parties expressly agreed, that no such clones of Cambiaso horses, if such clones were ever created, could be sold *unless both* Meeker / Farm *and* Mr. Cambiaso agreed *not only* as to the price of such sale, but on the *terms* of any such sale. The 2009 Agreement never transferred title to the Cambiaso horses, nor gave Meeker unilateral control over the joint venture.

5.      The 2009 Agreement, had numerous conditions precedent requiring the *mutual agreement* of Mr. Cambiaso and Meeker and Farm in the following paragraphs of the 2009

2

Agreement: in ¶ 3, requiring further cooperation,   to agree on a "mutually acceptable program";

in ¶ 4 requiring the parties to   "jointly determine all final sales prices *and terms*"; and, in ¶ 5,

requiring mutual agreement to produce additional clones of the Cambiaso horses, to wit:

> 3.   Further Cooperation.   Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.   Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.
>
> 4.   Sale of Clones.   Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.   Owner and Crestview will jointly determine all final sales prices and terms.
>
> 5.   Number of Clones.   Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.   If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

6.     First, the 2009 Agreement, was invalid because the parties failed to agree on its

material terms. Second, if a valid agreement was even formed (which Plaintiffs deny), it was later

terminated and forever extinguished by the parties' agreement to novation, via the March 23, 2011

Quota Holders Agreement (the "Quota Holders Agreement").   **Exhibit 2.**   The Quota Holders

Agreement formed the Argentine equine cloning company "Crestview Genetics SRL", for the

purpose of cloning horses, amongst Meeker, Genetics, Farm, Mr. Cambiaso, and Mr. Julio Ernesto

Gutierrez Conte ("Ernesto Gutierrez"), an Argentine businessman.   Third, if the 2009 Agreement

was not novated or extinguished, it has been misused and materially breached in multiple ways by

the Crestview Defendants.

7.     The 2011 Quota Holders Agreement cancelled, terminated and replaced all prior

agreements amongst the parties regarding the topic of equine cloning. The 2009 Agreement was

cancelled, discharged, terminated and/or replaced by the Quota Holders Agreement.

8.     The Quota Holders Agreement provided that Crestview Genetics SRL, was to be

managed by Ernesto Gutierrez, who was also funding the operations of that new company. The

parties to the Quota Holders Agreement expressly agreed that the parties' performance under the Quota Holders Agreement would not result in a breach or default of any other agreement to which they were parties.

9.      Ernesto Gutierrez paid Mr. Meeker $ 1,533.000 (U.S.) as consideration for the cancelation, termination extinguishment and/or replacement of the 2009 Agreement.   Meeker directed to which Meeker entities such payments were to be made by Mr. Gutierrez.

10.      The other parties each performed under the Quota Holders Agreement, which was a legally valid agreement.

11.      After the making of the 2011 Quota Holders Agreement, for the ensuing nine (9) years, no further mention of the 2009 Agreement, nor of any purported continuing rights of Meeker or Farm under that extinguished agreement, was thereafter made by Meeker, nor by Farm, nor Genetics, nor anyone else. Thus, any purported "rights" arising thereunder have been discharged, extinguished or waived.

12.      Thereafter, in 2019, the parties decided to terminate the Quota Holders Agreement according to the terms of that agreement.   In so terminating, the parties agreed to create two new agreements: the 2019 Settlement Agreement, **Exhibit 3**, and the 2019 Side Letter Agreement, **Exhibit 4.**

13.      The 2019 Settlement Agreement, **Exhibit 3,** dated July 29, 2019, expressly terminated the 2011 Quota Holders Agreement, and disbursed the assets of Crestview Genetics SRL amongst the parties.

14.      Contemporaneously with the July 29, 2019 Settlement Agreement, Genetics offered to Mr. Cambiaso / La Dolfina an agreement to continue in the equine cloning business on

a limited basis.  This offer was accepted by Mr. Cambiaso / La Dolfina, and the offer and acceptance is known as the "2019 Side Letter Agreement." **Exhibit 4.**

15.    The 2019 Side Letter Agreement between Mr. Cambiaso, La Dolfina and Genetics, managed by Meeker, *expressly required*: (i) *mutual* agreement of the parties as to the sale price of any clone of Cambiaso / La Dolfina horse, if there were to be such a sale; (ii) that all equine tissue relating to the Cambiaso / La Dolfina horse clones were then and "shall always be" under the custody and control of the parties; (iii) clones created under the Side Letter Agreement "shall only be played on a La Dolfina branded team, and all other uses of such clones was prohibited"; (iv) that Meeker was allowed to create only 2 clones of La Dolfina's famous polo pony "La Dolfina Cuartetera" for his and his children's' amateur, non-professional use; (v) that Meeker was prohibited from further cloning of his two La Dolfina Cuartetera clones; and (vi) in the event further La Dolfina Cuartetera clones were made by Meeker or Crestview, or were sold or transferred, the Meeker La Dolfina Cuartetera clones and any clones therefrom shall be delivered to Mr. Cambiaso within 48 hours.

16.    The parties to that Side Letter Agreement also expressly agreed that the 2019 Side Letter Agreement constituted the entire agreement between the parties with respect to the equine cloning of Cambiaso / La Dolfina horses, and the parties further expressly agreed that the Side Letter Agreement superseded all prior written or verbal negotiations, understanding, representations and agreements, if any.

### b.    Recent Developments.

17.    The within lawsuit was commenced December 8, 2020.  Since then, the Farm and Crestview Defendants have admitted Farm assigned certain past (though previously terminated) rights under the (invalid or previously cancelled) 2009 Agreement to Genetics (the "**Admission of**

**Assignment"**).   During the months following that Admission of Assignment, the Crestview Defendants have never denied nor attempted to retract this Admission.

18.     Very recently, in the past month of June 2021, after a court-ordered turnover of documents to Plaintiffs by the Crestview Defendants, Plaintiffs have now learned that on November 9, 2020, the Crestview Defendants sold three (3) La Dolfina Cuartetera clones to Defendant Park Place Polo Team through a closely-related entity and agent of Park Place Polo Team.

19.     Also learned in that production of documents by Defendants was that the Crestview Defendants also sold to the Park Place Polo Team an option for the creation and purchase of seven (7) additional Cuartetera clones, and the ability for Park Place Polo team to create more Cuartetera clones.

20.     Park Place Polo Team is a direct competitor to Mr. Cambiaso and La Dolfina in the highly competitive professional polo industry.

21.     This sale of a total of 10 La Dolfina Cuartetera clones was memorialized in a November 9, 2020 Horse Purchase and Sale Agreement (the "November 9 Secret Cloning Agreement"). **Exhibit 5.**   Defendants withheld the November 9 Secret Cloning Agreement from Plaintiffs for more than 6 months until the production was enforced by Court Order.

22.     The total purchase price paid to the Crestview Defendants for the sale of the La Dolfina Cuartetera clones under the November 9 Secret Cloning Agreement is $ 2,905,000.00.

23.     The November 9 Secret Cloning Agreement expressly provided that Defendant Crestview Farm, an entity whose rights (if any were even formed under the 2009 Agreement) were forever extinguished by the agreement to novation and entry into the 2011 Quota Holders Agreement and the concurrent payment of $1,533,000 from Mr. Guiterrez to Meeker controlled

entities, nevertheless, purportedly (i) sold 3 Cuartetera clones and the option to purchase 7 more Cuartetera clones to Defendant Park Place Polo Team; and (ii) that payment for the clones was made to Farm's Frost Bank account..

24.     Notably, in the November 9 Secret Cloning Agreement, the Crestview Defendants falsely represented to Park Place Polo Team that: (i) Farm did not need the approval of any other person or entity to sell or otherwise convey La Dolfina Cuartetera clones under the November 9 Secret Cloning Agreement; (ii) there were no suits or actions threatened by anyone that could affect Farm's claimed ability to perform Farm's obligations to produce and deliver the La Dolfina Cuartetera clones to Park Place Polo Team; (iii) that Farm had not breached the 2009 Agreement (although never formed or previously cancelled); (iv) that no event had occurred (despite the initial invalidity for lack of agreement and performance, and despite the 2011 novation by the Quota Holders Agreement) which would prevent Farm from enforcing the 2009 Agreement; and (v) all La Dolfina Cuartetera clones being produced under the November 9 Secret Cloning Agreement were being produced pursuant to the (never valid or previously-cancelled) 2009 Agreement.

25.     Further, the Crestview Defendants represented to Park Place Polo Team that: (vi) the La Dolfina Cuartetera clones sold to Park Place Polo Team were "free and clear of any claims by Cambiaso"; (vii) while the Crestview Defendants would not produce any further Cuartetera clones (other than the 10 clones to Park Place Polo Team, and 10 clones to Mr. Cambiaso, should he order them pursuant to the 2019 Side Letter Agreement); and (viii) Park Place Polo Team was sold the "right" to produce more La Dolfina Cuartetera clones should Park Place Polo Team so decide.

26.     Essentially, the Crestview Defendants have sold La Dolfina horses and options under the disguise of purported rights held by Crestview Farm under the previously never formed

or extinguished 2009 Agreement, entirely ignoring the limitations and need for mutual consent from Cambiaso in 2009 Agreement. In sum, the Crestview Defendants have now attempted to rewrite history to give the false impression that Crestview Farm had the authority and title to convey La Dolfina Cuartetera clones, acting as if the 2009 Agreement was valid or had not been terminated in 2011, to create a new fiction to suit their improper and illegal objectives, and to support the Crestview Defendants' illicit sales of La Dolfina clones to Defendant Park Place Polo Team.

27.    The Crestview Defendants then continually repeat their position in numerous transactional documents and court filings, in an attempt to *gaslight*[1] this Court, Plaintiffs, and the global public into believing the cancelled and replaced 2009 Agreement (if it was even formed) is somehow still in existence.   Not only was the 2009 Agreement invalid for lack of agreement or performance, but the 2009 Agreement had been forever terminated and replaced by the parties' agreement to enter into the 2011 Quota Holder Agreement. The 2009 Agreement was never valid or has been extinguished for almost a decade.

28.    Nevertheless, the Crestview Defendants purport to have created the November 9 Secret Cloning Agreement, under which the Crestview Defendants then agree that if Park Place Polo Team were to sell, transfer or assign La Dolfina Cuartetera clones into the public market, the

---

[1] See *Gaslighting in Litigation*, American Bar Association, 2017, Alyson A. Foster: "Effective gaslighting can be accomplished in several different ways. Sometimes, a person can assert something with such an apparent intensity of conviction that the other person begins to doubt their own perspective. Other times, vigorous and unwavering denial coupled with a display of righteous indignation can accomplish the same task. Bringing up historical facts that seem largely accurate but contain minute, hard-to-prove distortions and using them to "prove" the correctness of one's position is another method. Gaslighting is particularly effective when coupled with other tactics such as shaming and guilting. Anything that aids in getting another person to doubt their judgment and back down will work."
Source:https://www.americanbar.org/groups/litigation/committees/woman-advocate/articles/2017/gaslighting-in-litigation/

Crestview Defendants would suffer irreparable, non-monetary harm, and would thus be entitled to an injunction against Park Place Polo Team, and could recover those clones and all genetic tissue of those clones.

29.     Finally, under that November 9 Secret Cloning Agreement, the Crestview Defendants and the Park Place Polo Defendants set up an indemnity and escrow structure to deal with anticipated litigation by Mr. Cambiaso and La Dolfina to either "rescind" the 2009 Agreement, or otherwise recover the La Dolfina Cuartetera clones from the Crestview Defendants and / or the Park Place Polo Defendants.

30.     Under that structure, the Crestview Defendants escrowed $250,000 of the clone sales money paid by Defendant Park Place Polo Team with a Florida law firm, Akerman, LLP, pursuant to a written Florida-based and Florida-law and jurisdiction-governed Escrow Agreement that is internal Exhibit E to the November 9 Secret Cloning Agreement.  **See Exhibit 5 hereto.**

31.     Further, under that escrow structure, Park Place Polo Team, by its owner Andrey Borodin and his entities, was required to pay the costs of defense of any claims by Mr. Cambiaso / La Dolfina once the $250,000 was escrow was exhausted.

32.     Recent discovery has revealed that the escrow has been exhausted and that Defendant Park Place Polo Team, by and through its affiliated entities owned or controlled by Mr. Borodin, are presently paying for the defense of the Crestview Defendants in this suit, and for the prosecution by the Crestview Defendants of the related case presently also pending before this Court (the "2021 SDFL" case) after transfer from the Northern District of Texas.

33.     Further, during the course of this litigation, the November 9 Secret Cloning Agreement has since been amended and extended twice, December 21, 2020 and more recently on June 10, 2020 (the "Amendments").  **See Exhibits 6 and 7.**     Remarkably, while each of those

Amendments extends the time of Park Place Polo Team to exercise the option to purchase 7 additional La Dolfina Cuartetera clones, each of those Amendments restates and ratifies the remaining material terms of the November 9 Secret Cloning Agreement.

34.     One of the material terms of the November 9 Secret Cloning Agreement is that no litigation exists by Mr. Cambiaso to challenge the clone sale and recover the clones, and that the Crestview Defendants have no reason to know of any such litigation.   Clearly, after the December 9, 2020 inception of the within litigation, that is not the case, and the representations to Park Place Polo Team by the Crestview Defendants in the Amendments to the contrary are patently false.

### c.  Even if Not Invalid for Lack of Agreement or Performance of its Material Terms, the 2009 Agreement was Forever Terminated by the 2011 Quota Holders Agreement Novation.

35.     This case is about an ongoing unlawful and fraudulent scheme orchestrated by the Crestview Defendants to misappropriate unique and invaluable horses and genetic material owned by Plaintiffs, by creating the fiction of a magically-resuscitated 2009 Agreement, so that the Crestview Defendants could give the false impression that Crestview Farm had the authority and title to convey clones and genetic material of the World's best polo horses belonging to Plaintiffs, and then and make and sell clones of those horses to the international market.

36.     During November 2010, and contemporaneously with an auction in Argentina where the first polo horse clone was sold, the parties abandoned the idea of selling clones because once a clone is sold, its genetic material is forever propagated, and it can be continually cloned. Instead, the parties decided to start a new venture in Argentina to provide cloning services and sell only offspring of clones[2] (rather than clones themselves).

---

[2] A clone is a genetically identical copy of a cell or an organism, that is not created from two parents and is not the product of sexual reproduction. A clone of a horse has the identical DNA as the original horse.
"Clones are genetic copies of an animal," says Larisa Rudenko, Ph.D., a Molecular Biologist and Senior Adviser for biotechnology in at the FDA Center for Veterinary Medicine.

37.     The 2009 Agreement had, in any event, failed for lack of agreement or performance of material terms by that time. Farm never acquired the cloning technology (it was licensed by Genetics from Viagen in 2010).   The parties never came to a mutually acceptable agreement as to the endorsement marketing, nor as to the final sales price and terms of sale of any clones; nor as to the production of the additional "second edition" clones. Thus, the 2009 Agreement was never valid.

38.     In 2011, to be certain that any claimed rights under the 2009 Agreement were extinguished, the parties agreed that the 2009 Agreement was entirely cancelled, forever terminated and replaced by the mutual agreement of the parties to enter into the Quota Holders Agreement along with payment to the Crestview Defendants of $1,533,000 in consideration paid in 2011 and 2012 by Ernesto Gutierrez.

39.     Throughout the next decade as technology advanced and the parties became increasingly sophisticated and continued to refine their business strategies, the parties entered into several other contracts, none of which ever allowed Meeker, Crestview Farm, Crestview Genetics, or any other Crestview entity to unilaterally make and /or sell any clone derived from the genetic material belonging to La Dolfina or Mr. Cambiaso for their own benefit or to market clones to the polo community.

40.     Meeker repeatedly told the global media, that neither Meeker, the Crestview Defendants, nor Mr. Cambiaso or La Dolfina planned to make and sell clones of La Dolfina and /or Cambiaso horses commercially but were focused solely on selling only offspring of clones.

---

By contrast, offspring of clones differ from clones in that: offspring are (i) formed from two parents; (ii) the product of sexual reproduction; (iii) involve formation and fusion of two gametes (reproductive cells); and (iii) offspring of the same parents differ in their genetic constitution.

41.     Then, in 2020, almost a decade after accepting payment for the novation and termination of the 2009 Agreement (if even valid), for the first time, the Crestview Defendants suddenly claimed the right to unilaterally set all sale terms, clandestinely sell, and pocket all proceeds from unauthorized creation of and sales of clones of Mr. Cambiaso's, and even more defiantly, the La Dolfina horses and genetic material.

42.     Documents that the Defendants were compelled to produce by this Court establish that the Crestview Defendants have tortured and deliberately misinterpreted the language of the invalid or long ago terminated 2009 Agreement in an attempt to substantiate their actions and somehow justify their scheme.

43.     Surreptitiously, the Crestview Defendants entered into a multi-million dollar contract to produce and sell clones created by the misappropriation of horses and genetic material belonging to La Dolfina with Defendant Park Place Polo Team through a closely-related entity, affiliate and agent, known to be operated by Andrey Borodin, a Russian billionaire and exile living in the United Kingdom who owns a competitor polo team called Park Place Polo Team.

44.     Not only have the Crestview Defendants sold and delivered 3 unauthorized clones of La Dolfina Cuartetera, and sold the option for purchase of 7 more such clones, the Defendants have made those sales to Defendant Park Place Polo Team, a direct competitor of Mr. Cambiaso and La Dolfina, all while making untrue representations to the public that the Crestview Defendants were authorized by Plaintiffs to make those sales.

45.      The clandestine conduct of Meeker, Crestview Farm and Crestview Genetics is unauthorized, fraudulent and terribly heartbreaking for Mr. Cambiaso, who for the last decade has reposed trust and confidence in Meeker and the Crestview Defendants and their collective representations to Mr. Cambiaso, La Dolfina, third parties and the global media, that no clones of

La Dolfina and / or Mr. Cambiaso would ever be sold after the single sale in November 2010 at auction. Mr. Guiterrez who purchased the clone returned her to Mr. Cambiaso and Meeker.

46.     Mr. Cambiaso and La Dolfina relied on Meeker and the Crestview Defendants' commitment to closely restrict the production of the Cambiaso / La Dolfina horse clones, and the Crestview Defendants' representations that those Defendants would never sell Cambiaso / La Dolfina horse clones without the express, mutual consent of Mr. Cambiaso.

47.     The Crestview Defendants made these representations first in the now-terminated (if even formed) 2009 Agreement, and then again in conjunction with the Crestview Defendants agreement to novation and termination of the 2009 Agreement by acceptance of $1,533,000 and entering into a substituted agreement known as the 2011 Quota Holder Agreement.

48.     Meeker and the Crestview Defendants' belated and unauthorized efforts to resurrect the cancelled and terminated 2009 Agreement (if even valid) is a complete fiction, invented by Meeker and his entities to support their unlawful and fraudulent multi-million dollar sale of Cuartetera clones to Park Place Polo Team.    The resurrection of the 2009 Agreement was a sham, meant to disguise that the 2009 Agreement was never enforceable or had long since been extinguished, and give the false impression that Crestview Farm had the authority and title to convey the unauthorized La Dolfina clones and genetic material.

49.      Defendants' conduct causes continuing and irreparable harm to Plaintiffs whose horses are being cloned and sold without their authorization or consent, and, as explained further below, dilutes Mr. Cambiaso and La Dolfina's carefully created bloodlines, and hijacks the prestige and brand power of Mr. Cambiaso and La Dolfina in the world of polo horse breeding.

50.     Plaintiffs seek immediate declaratory relief to establish that the 2009 Agreement (i) failed for lack of agreement on its material terms, (ii) to the extent it somehow survived that lack

of agreement or performance, it was thereafter terminated upon the parties' novation and agreement to cancel and extinguish the 2009 Agreement by entering into the Quota Holders Agreement and the Crestview Defendants' acceptance of $1,533,000 in 2011 and 2012, (iii) to the extent that the 2009 Agreement is deemed valid by the Court (which Plaintiffs deny), it has been materially breached.. Any contrary acts or assertions by Defendants selling or promising to sell clones or the genetic materials of Plaintiffs' horses or Plaintiffs' clones are illegal and should be immediately enjoined.

### d.    The Context of Cloning Polo Ponies.[3]

51.    In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team.   Meeker himself has admitted this fact in a December 2016 interview, explaining: "It's 70% to 80% the horse, and everyone, including Cambiaso, will tell you this."[4]

52.    The polo horse clones at issue are derived from the genetic stock of polo ponies owned by Plaintiffs Mr. Cambiaso and La Dolfina's parent La Dolfina S.A., an Argentine company ("La Dolfina S.A."), polo ponies that are world-renowned for their unique and superior athletic abilities, acumen, temperament, and vastly superior performance in the sport of high-goal polo. Mr. Cambiaso and his wife are the sole owners of La Dolfina S.A., and Mr. Cambiaso owns individually some of the horses and genetic material relevant hereto.[5]

---

[3] Horses utilized as equine athletes in the modern sport of polo are commonly called "polo ponies" though not pony-size at all.

[4] *Six cloned horses help rider win prestigious polo match*, by Jon Cohen, Dec. 13, 2016.
Source: https://www.sciencemag.org/news/2016/12/six-cloned-horses-help-rider-win-prestigious-polo-match

[5] Most cloning today uses a process called somatic cell nuclear transfer:
- Scientists take an egg from a female animal … and remove the gene-containing nucleus.
- The nucleus of a cell from an animal the breeder wishes to copy is added to the egg.
- After other steps in the laboratory take place, the egg cell begins to form into an embryo.
- The embryo is implanted in the uterus of a surrogate dam (female parent), which carries it to term and delivers

53.     In Argentina, as well as throughout the World, breeders tightly control the reproductive capacities of their animals by charging stud fees or controlling the brood stock. New scientific-technological advances have provided economic opportunities in the development of pure genetic information.

54.     Crestview Farm had entered into the 2009 Agreement, which was never valid or was later terminated and replaced by the 2011 Quota Holders Agreement, later terminated by the 2019 Settlement Agreement and replaced in part by the 2019 Side Letter Agreement.

55.     The Crestview Defendants are otherwise subject to certain obligations and duties from those contractual events and novation, relating to the cloning, marketing and selling offspring of clones of Plaintiffs' renown polo ponies. None of these contractual obligations give the Crestview Defendants the unfettered ability to make and / or sell clones of Plaintiffs' horses.

56.     Yet, as set forth herein, the Crestview Defendants have ignored their rights, duties and obligations under all of the relevant contracts and have caused, and continue to cause, actual and continuing harm to Plaintiffs.

57.     Recently, it has come to the attention of Plaintiffs that Meeker, individually and as an agent and representative of Crestview Farm, and utilizing the resources and facilities of Defendant Crestview Genetics, has:

(a)     engaged in the unauthorized misappropriation of certain genetic material belonging to La Dolfina and from certain of La Dolfina's renowned polo ponies;

(b)     has used La Dolfina's genetic material to create unauthorized clones of certain of those polo ponies;

(c)     has sold some of those clones using false and / or misleading descriptions of fact or false or misleading representations of fact, including by implying

---

it like her own offspring. Clones may allow farmers to upgrade the quality of their herds by providing more copies of their best animals…. Source: United States Food and Drug Administration, https://www.fda.gov/consumers/consumer-updates/animal-cloning-and-food-safety

that Plaintiffs approve these actions and passing off these clones as his own, misleading the public as to their source and wrongfully taking advantage of the commercial reputation of La Dolfina and Mr. Cambiaso;

(d)     has caused and allowed the unauthorized distribution of Plaintiffs' proprietary equine genetic material and clones to competitors and the general public; and

(e)     has sold options for more unauthorized clones created by the misappropriation of La Dolfina's genetic material to locations in interstate and foreign commerce both within and outside the United States, thus confusing, deceiving or inducing mistaken purchasing decisions by potential buyers and the international market for high end polo ponies.

58.     These actions by the Crestview Defendants are fraudulent, direct breaches of the contracts between the parties, and, or alternatively, breaches of certain duties and obligations that arose from the cloning business contracts amongst the Plaintiffs and the Crestview Defendants.

59.     The past breaches and present intentions of Meeker and the Crestview Defendants to commit further fraud and further breach the contractual and fiduciary duties between Plaintiffs and those Defendants have already caused, and threaten to further cause irreparable harm to the La Dolfina and Cambiaso genetic line of polo ponies, as well as to the professional performance of the owner of La Dolfina, Adolfo Cambiaso.

60.     Mr. Cambiaso is a professional 10-goal polo player, the highest ranking, and he, his La Dolfina horses, and his La Dolfina stable and team are widely regarded as the very best amongst the best in the sport of polo. Mr. Cambiaso is globally recognized as the best polo player in world history.

61.     The unauthorized cloning of La Dolfina and Cambiaso horses and international sale of the clones and genetic material threatens to irreparably harm Plaintiffs' ability to successfully compete and win at the highest levels of polo because this unauthorized distribution of Plaintiffs clones and genetic material dilutes and irretrievably distributes the unique and irreplaceable genetic material found in the La Dolfina polo pony lineages. Defendants' actions constitute

16

unauthorized appropriation, possession and distribution of genetic material owned by Mr. Cambiaso through his La Dolfina S.A entity. This conduct also constitutes and includes false advertising, false endorsement, reverse passing off and misuse of the celebrity status of La Dolfina and Mr. Cambiaso which are actionable under the Lanham Act, 15 U.S.C. §1125(a)(1), and these and other factual predicates set forth below constitute continuing violations of The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1) and 1839(3).

62.     For clarity, the injuries proximately caused by Defendants' ongoing and continuous misconduct are not readily curable with later economic damage awards.

63.     As with the initial Complaint and First Amended Complaint, but now further informed by the newly-discovered facts of wrongdoing by the Crestview Defendants, this Second Amended Complaint therefore seeks to immediately recover the Cambiaso / La Dolfina horse clones and related genetic material, and for an immediate temporary restraining order, as well as a permanent injunction to prevent the further irretrievable and irreparable dilution and dissemination of the La Dolfina genetic pool by the unauthorized activities of Meeker, whether alone or by and through the other Crestview Defendants and other Crestview-related entities or affiliates, and the Park Place Polo Defendants who now also have unauthorized control of horses and genetic material belonging to Plaintiffs.

64.     Plaintiffs had attempted to resolve this matter amicably during protracted negotiations with the Crestview Defendants; however, and despite demand, the Crestview Defendants have failed to cease and desist their unauthorized use, misappropriation, licensing and transfer of La Dolfina and Mr. Cambiaso's genetic material and clones. Further, the Crestview Defendants abruptly filed an anticipatory suit in the Northern District of Texas during ongoing settlement negotiations.

65.     That related action has since been transferred to this District after the Northern District of Texas found that suit to be an improper and "anticipatory lawsuit", which was more properly litigated in this District.

## II.   Common Allegations of Parties, Jurisdiction and Venue.

### A.  The Parties.

66.     **Plaintiff La Dolfina S.A., LLC ("La Dolfina")** is a Florida limited liability company with offices in Palm Beach County, Florida, and is the assignee of La Dolfina, S.A., an Argentine entity *Sociedad Anónima* (Corporation) which is considered an Argentine citizen and resident, and which is La Dolfina's only member.

67.     **Plaintiff Adolfo Cambiaso ("Mr. Cambiaso")** is an Argentinian national, with an address in Palm Beach County, Florida who plays polo professionally in Wellington, Palm Beach County, Florida. Mr. Cambiaso is currently ranked number one in the world of international polo. Mr. Cambiaso and La Dolfina recently won their eighth (8th) consecutive title at the World's most prestigious and competitive polo tournament, the 127th edition of the Argentine Polo Open ("*Abierto Argentino de Polo*").  La Dolfina has won the Argentine Polo Open fourteen (14) times in their last twenty (20) appearances, while Mr. Cambiaso, individually, has won the Argentine Open seventeen (17) times. Mr. Cambiaso, with horses and professional players provided by La Dolfina, also won in April, 2021 the most prestigious domestic tournament, the United States Polo Championship, in Palm Beach County, Florida. As a result of Mr. Cambiaso's performance on the field and his world-renowned polo pony breeding program, Mr. Cambiaso is widely recognized as a polo superstar and the leading celebrity in the United States and in the international polo community.

68.     In addition to winning their eighth (8th) consecutive Argentine Open in December

2020,   Mr. Cambiaso and La Dolfina's cloned horses including La Dolfina's renowned

"Cuartetera" polo horse received the following accolades:

**Fomento Equino Cup to the best mounted player of the final:** *Adolfo Cambiaso.*

**Gonzalo Tanoira Award to the best mounted player of the tournament:** *Adolfo Cambiaso.*

**Lady Susan Townley Best Playing Pony Award:** *Dolfina B09 Cuartetera Clone*, played by *Adolfo Cambiaso*.

**BPP Polo Argentino and Best Playing Pony Sociedad Rural Argentina:** *Dolfina B06 Cuartetera Clone*, played by *Adolfo Cambiaso*.

Cuartetera and her clones are uniquely and solely affiliated with La Dolfina and Mr. Cambiaso,

as Mr. Cambiaso bred her, trained her, and through his playing skill and success with Cuartetera

playing for the La Dolfina polo team made her the dominant equine athlete and celebrity in the

world of international polo.

69.     **Defendant D. Alan Meeker a/k/a Alan Meeker, a/k/a David Alan Meeker**

**("Meeker")** is a citizen and resident of Tarrant County, Texas, having an address at 4770 Bryant

Irvin Court, Suite 400, Fort Worth, TX 76107.   Meeker, both individually as well as the Manager

of and through by use of the entities Crestview Farm, LLC, Crestview Genetics, LLC, and

Crestview Farm Aiken, LLC, as well as through some of his other 114 entities, conducted

substantial, repeated and not isolated business in Florida, as well as in Florida with La Dolfina and

Mr. Cambiaso. Meeker has further come into Florida repeatedly to conduct business on behalf of

himself and Crestview Farm and Crestview Genetics.

70.     Meeker has also availed himself of the privilege of conducting further business in

Florida, registering his genetics company CQUENTIA NGS, LLC (CQuentia"), a Texas limited

liability company, under FLDOS filing # M18000001107, in which he is the Chief Executive

Officer and Manager, to conduct business in Florida, on January 31, 2018.   Meeker subsequently and repeatedly has filed annual reports in Florida listing Meeker as a manager of that Florida company from 2018 through the present.   In addition to being in Florida for the purpose of engaging in business solicitation and service activities as to Mr. Cambiaso and La Dolfina, S.A., Meeker also conducted business in Palm Beach County, Florida with respect to and on behalf of his genetics company, CQuentia, where he solicited individuals to raise money for CQuentia. While doing so, Meeker relied upon the reputation of having conducted cloning business with Plaintiffs.

71.     Further in addition to the Cambiaso, La Dolfina and CQuentia business activities in Florida, Meeker conducted a related cloning business in Palm Beach County, Florida during periods relevant hereto, such as with Chris Young and Overbrook Farm, LLC, owners of the famous "Storm Cat", a grandson of the racehorse "Secretariat."     Set forth below, misrepresentations by Defendants as to their rights to Storm Cat became part of the material terms of the contractual obligations of Defendants with Plaintiffs.

72.     Further, Meeker has previously availed himself of the privilege of conducting other business in Florida, registering his company, in which he is the Chief Executive Officer and Manager, TOTAL DIAGNOSTIX II, LLC ("Total Diagnostix"), a Tennessee limited liability company, under FLDOS filing # M15000007588 to conduct business in Florida, on December 23, 2015.   Meeker subsequently and repeatedly filed annual reports in Florida listing Meeker as a manager of that Florida company from 2015 through 2018. Meeker and his Total Diagnostix and CQuentia companies have recently been sued in both Florida state and federal courts for claims including but not limited to fraud, civil theft, unjust enrichment, and for breach of contract.[6]

---

[6] Meeker's CQuentia was recently subject to a *qui tam* lawsuit for False Claim Act violations for Anti-Kickback and Stark Law violations in *United States ex rel. Piňon v. CQuentia Series LLC d/b/a CQuentia Labs, Total Diagnostix,*

73.     Meeker also resides at least part-time in Florida, at a single family, one bedroom condominium at 2211 Las Casitas Drive, in Wellington, Palm Beach County, Florida 33414. Meeker, as a manager of yet another of his companies,[7] previously contracted in Florida with a Florida company, J-5 Construction, LLC, for the renovation of that condominium. The Standard Terms and Conditions in the Construction Agreement state that the location of any dispute shall be exclusively in Palm Beach County, and Florida law is to be applied.

74.     **Defendant Crestview Farm, LLC ("Crestview Farm")** is incorporated in Texas as a Texas limited liability company having an address and principal place of business at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107.   Meeker denies being an individual Member; however he admits he is the Manager. [DE 18-1].   At all times relevant hereto, Meeker so dominated and controlled Crestview Farm to such an extent that the independent existence of Crestview Farm is non-existent and Meeker is the alter ego of Crestview Farm. Meeker himself illustrates the lack of separateness or distinction between himself and Crestview Farm writing in a September 10, 2019 email:

> We are putting together the Viagen Argentina LLC agreement to govern our yearly cloning rights with Viagen and our ability to promote Viagen Argentina as the go to cloning company that we own too. The LLC will be owned 90% by Viagen's parent company Genetic Reflections, LLC. The remaining 10% is to be owned by AC, J5 and Crestview Farm (me).

**See Exhibit 12 hereto.**

---

*LLC, and Decatur Hospital Authority, d/b/a Wise Regional Health Systems.*  Meeker is the Chief Executive Officer of the CQuentia Labs conglomerate and his attorney involved in the facts herein, Mr. Ross, is CQuentia's General Counsel.  From:   http://www.cquentia.com/about-cquentia/our-team/

[7] According to corporationwiki.com, Alan Meeker has been associated with thirty-eight companies, according to public records. The companies were formed over a nineteen year period with the most recent being incorporated two years ago in March of 2018. Twenty-five of the companies are still active while the remaining thirteen are now listed as inactive.

[7] According to corporationwiki.com, Alan Meeker has been associated with thirty-eight companies, according to public records. The companies were formed over a nineteen year period with the most recent being incorporated two years ago in March of 2018. Twenty-five of the companies are still active while the remaining thirteen are now listed as inactive.
Source: https://www.corporationwiki.com/Texas/Fort-Worth/alan-meeker/34667043.aspx

75.     At times relevant hereto, Meeker deliberately used the corporate form of Crestview Farm fraudulently or for improper purposes, and as more fully set forth herein below, formed or used the corporate form, including but not limited to being a mere device or sham and used to commit fraud and to frustrate La Dolfina and Mr. Cambiaso and which caused and threaten to further cause injury to Plaintiffs.   Crestview Farm, by and through its agent and representative Meeker, conducted substantial, repeated and not isolated business with La Dolfina and Mr. Cambiaso in the State of Florida.   Crestview Farm further has committed the aforesaid breaches and tortious acts in Florida, having an effect on La Dolfina and Mr. Cambiaso in Florida as further described herein below.   Further, Crestview Farm conducted a cloning business with Plaintiffs, Mr. Cambiaso, La Dolfina's parent and assignor, and others in Palm Beach County, Florida during periods relevant hereto.

76.     Since 2009, according to the written admission of Defendants in this litigation, "***Farm** assigned its rights to possess or create certain clones to **Genetics**….*" See [8 *8] (Defendants' Motion to Dismiss, emphasis added) previously filed by Defendants in this case. This event has become known in this case as the **"Assignment"** and counsel's statement has become known as the **"Admission of Assignment."**

77.     However, any such purported assignment of rights by Farm was never valid because of the failure of the 2009 Agreement for lack of agreement or performance of material terms, as well as by the 2011 Quota Holder Agreement novation of the 2009 Agreement.

78.     **Defendant Crestview Genetics, LLC ("Crestview Genetics")** is incorporated in Nevada as a Nevada limited liability company, having an address and principal place of business at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107. Meeker presently denies being an individual Member; however, he admits that he is the Manager.   [DE 18-1]. Further, in May 2016

Crestview Genetics filed a Certificate of Interested Persons in the Northern District of Texas listing the Members of Crestview Genetics as the David Alan Meeker Family Irrevocable Trust, Dan H. Meeker, Trustee and Dan H. Meeker Family Children's Irrevocable Trust, D. Alan Meeker, Trustee. **Exhibit 13**.

79.    At all times relevant hereto, Meeker so dominated and controlled Crestview Genetics to such an extent that the independent existence of Crestview Genetics is non-existent and Meeker is the alter ego of Crestview Genetics. At all times relevant hereto, Meeker deliberately formed and used the corporate form of Crestview Genetics fraudulently or for improper purposes, and as more fully set forth herein below, formed and used the corporate form, including but not limited to being a mere device or sham and being used to commit fraud and to frustrate La Dolfina and Mr. Cambiaso and which caused and threaten to further cause injury to Plaintiffs. Crestview Genetics, by and through its agent and representative Meeker, conducted substantial, repeated and not isolated business with La Dolfina and Mr. Cambiaso in the State of Florida.

80.    Crestview Genetics further has committed the breaches and tortious acts in Florida, having an effect on La Dolfina and Mr. Cambiaso in Florida as further described herein below. Further, Crestview Genetics conducted cloning business with Plaintiffs, Mr. Cambiaso and assignor La Dolfina S.A. and others in Palm Beach County, Florida during periods relevant hereto. Crestview is involved in breeding jumping horses, champion Arabians, thoroughbreds, and others and envisions an expanded worldwide program and exponential growth.[8]

81.    The misrepresentations of Meeker and the Crestview Defendants set forth herein were made by the Crestview Defendants in Wellington, Palm Beach County, Florida.   Further,

---

[8] According to a telephone interview by Lewis T. Stevens with Alan Meeker on behalf of Crestview Genetics on March 14, 2016. https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1157&context=kjeanrl

the misconduct and breaches by the Crestview Defendants have had an effect on Plaintiffs in Palm Beach County, Florida[9] as well as elsewhere, in that Defendants have sold, unauthorized clones of Plaintiffs' horses to competitors of Plaintiffs in Florida, who compete against Plaintiffs in Palm Beach County and elsewhere.

82.     **Defendant Park Place Polo Team Corporation** is a Florida Corporation, having its principal place of business at 4370 South Road, Wellington, Florida 33414, where it operates and occupies a polo farm, and it maintains a Registered Agent in Florida.   At times relevant hereto, pursuant to the November 9 Secret Cloning Agreement, Park Place Polo Team was the actual purchaser of the three La Dolfina Cuartetera clones and holder of the option for the purchase of seven more La Dolfina Cuartetera clones, all from the Crestview Defendants.   At times relevant hereto, Park Place Polo Fields had possession of the three La Dolfina Cuartetera clones purchased by its related co-Defendant Park Place Polo Team through its agent, a British Virgin Island entity. After this suit was filed, Park Place Polo Fields, together with Park Place Polo Team, caused the three La Dolfina Cuartetera clones to be removed from the jurisdiction of this Court, where at least two of those three clones have since suffered significant injury and waste.

83.     The claimed rights of Park Place Polo Team to the La Dolfina Cuartetera clones ultimately arise solely from the never formed or cancelled 2009 Agreement, upon which the November 9, 2020 Agreement improperly relies.   Park Place Polo Team employs as its agent a British Virgin Island company called Pegasus Rider, Ltd. ("Pegasus"), and both Pegasus and Park Place Polo Team are commonly owned and controlled by Andrey Borodin, sole patron and sponsor

---

[10]   See, e.g.: *The Best Playing Pony and Her Chicken – Part 2:* "When B09 [9th Clone of Cuartetera]  went to Valiente, she got very nervous since she was always in a stall just like the rest of them. She was not used to this way of life. She had to have that chicken all the way through the U.S. Open final [in Wellington Florida], when she won best-playing pony. There's a famous photo of her at the at the awards ceremony with a chicken sitting on her back."

of the Park Place Polo Team, and both Park Place Defendants share a common president and manager, John A. Simmonds.

84.    **Defendant Park Place Polo Fields Corporation** is a Florida Corporation, having its principal place of business at 4370 South Road, Wellington, Florida 33414, where it owns a polo farm operated and occupied by its related co-Defendant Park Place Polo Team.   Park Place Polo Fields maintains a Registered Agent in Florida.   At times relevant hereto, Park Place Polo Fields had possession of the three La Dolfina Cuartetera clones purchased by its related co-Defendant Park Place Polo Team.   After this suit was filed, Park Place Polo Fields, together with Park Place Polo Team, caused the three La Dolfina Cuartetera clones to be removed from the jurisdiction of this Court, where at least two of those three clones have since suffered significant injury and waste.   Both co-Defendant Park Place Polo Team and Park Place Polo Fields are commonly owned and controlled by Andrey Borodin, sole patron and sponsor of the Park Place Polo Team, and both such Defendants share a common President and manager, John A. Simmonds.

85.    From the aforesaid substantial and repeated, and not isolated, activities in Florida with respect to his and Defendants' cloning and genetics business, Meeker and Defendants Crestview Farm and Crestview Genetics are at home in Florida or have operated, conducted, engaged in or carried on a business venture in Florida.   Further, as set forth more fully herein, these Defendants have committed tortious acts in Florida (making fraudulent misrepresentations and Lanham Act and Defense of Trade Secret Act violations), causing injury to Plaintiffs here in Florida (selling clones to Plaintiffs' competitor in Florida, diluting and distributing proprietary genetic material here and injuring Plaintiffs' competitive advantage and business reputation in Florida) while conducting or soliciting cloning sales and services in Florida.

25

86.     This Court has previously determined that it has personal jurisdiction over all the Crestview Defendants and Mr. Meeker, which is now the law of the case. [DE 81*4].   To the extent the personal jurisdictional foundations must be restated,   in addition to the other jurisdictional averments set forth herein, Plaintiffs state herein:

a.  On numerous occasions spanning over a decade from 2009-2019,   Mr. Meeker, Farm, Genetics, and their attorneys came to Florida to negotiate and discuss with Mr. Cambiaso and La Dolfina the 2009, 2011, and 2012 agreements at issue in this lawsuit. Namely, Mr. Meeker, Farm, Genetics, held repeated meetings with Cambiaso and La Dolfina at the J-5 Equestrian Farm in Wellington, Palm Beach County Florida negotiating and contracting the 2009 Agreement and 2019 Side Letter Agreement. Mr. Meeker, for himself and as an agent and representative of Farm and Genetics, repeatedly, and on numerous occasions held meetings and negotiations with Plaintiffs Adolfo Cambiaso and La Dolfina in Wellington, Palm Beach County, Florida negotiating the 2009 Agreement and 2019 Side Letter Agreement.

b.  Further, Mr. Meeker, on behalf of himself and Genetics and Farm, conducted a "tremendous amount of business concerning equine cloning" in Wellington, Palm Beach County, Florida. Mr. Meeker, on behalf of himself and Genetics and Farm, solicited others to purchase clones and foals of clones in Wellington, Palm Beach County, Florida.

c.  Because the Crestview Defendants have repeatedly and on numerous occasions met with Plaintiffs in Florida to negotiate and discuss the cloning Agreements that are the basis for this lawsuit, and because those Defendants

26

undertook significant business operations within Florida including the solicitation of business and customers, the Crestview Defendants have purposefully availed themselves with Florida such that Mr. Meeker, Farm and Genetics should reasonably anticipate being hauled into court in Florida and are therefore subject to the personal specific, and general, jurisdiction of this Court pursuant to the Florida Long Arm Statute.

d.  The exercise personal jurisdiction over Meeker, Farm and Genetics in Florida also comports with fair play and substantial justice.   Meeker, Farm, and Genetics are at home here, conduct other business, and clearly have ample financial resources and would not be burdened financially by having to litigate this case in Florida.

e.  Meeker has held himself out as the sole decision-maker of Farm and Genetics, and Meeker also resides at least part-time in Florida, at a single family, one bedroom his condominium at 2211 Las Casitas Drive, in Wellington, Palm Beach County, Florida.

f.  Mr. Meeker, Farm, Genetics, and their attorneys held several meetings at the J-5 Equestrian Farm in Wellington, Palm Beach County Florida negotiating and contracting the 2009 Agreement and 2019 Side Letter Agreement.   Mr. Meeker, Farm, and Genetics repeatedly conducted business with Robert P. Jornayvaz and other individuals in Wellington, Palm Beach County, Florida.

g.  The three unauthorized Cuartetera clones and option to the seven more Cuartetera clones were sold to Defendant Park Place Polo Team, its agent and closely related entity in Florida, and a Florida-based escrow, with a Broward

County, Florida law firm, Akerman, L.P., serving as escrow agent, was set up by all Defendants in Florida to fund any litigation related to or arising from the sale of La Dolfina's Cuartetera clones.

h.  The misappropriated La Dolfina Cuartetera clones were located here in Wellington, Florida, until improperly and secretly moved out of Florida by all Defendants in concert.   As depicted in **Figure 1** of this Second Amended Complaint, a December 2020 photograph taken of those three clones at the 62 acre equestrian facility belonging to Park Place Polo and Mr. Borodin, located at 4370 South Road, Wellington, Florida 33414.

i.  Mr. Meeker, as a manager of yet another of his companies,   previously conducted other business in Florida with a Florida company, J-5 Construction, LLC, for the renovation of that condominium. [DE 22 ¶ 19].

j.  Because Defendants are selling Plaintiffs' misappropriated genetic material and clones into Florida and soliciting customers and further sales of genetic material and clones belonging to La Dolfina or Cambiaso in Florida, Florida has a strong interest in hearing this case.   Florida has a further interest in hearing this case because several of La Dolfina / Cambiaso clones have been played in polo tournaments in Palm Beach County, Florida, including a clone of Cuartetera.[10]

k.  Moreover, Plaintiffs have an undeniable interest in efficiently resolving the

---

[10]  See, e.g.: *The Best Playing Pony and Her Chicken – Part 2:* "When B09 [9[th] Clone of Cuartetera]   went to Valiente, she got very nervous since she was always in a stall just like the rest of them. She was not used to this way of life. She had to have that chicken all the way through the U.S. Open final [in Wellington Florida], when she won best-playing pony. There's a famous photo of her at the awards ceremony with a chicken sitting on her back." Source:   https://polochannel.com/the-best-playing-pony-and-her-chicken-part-2/

dispute in the forum where most of the agreements were negotiated, Plaintiffs maintain property, and where Plaintiffs routinely met with Defendants.   See *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1359 (11th Cir. 2013). As well, performance of the covenants and restrictions by Defendants in the Agreements was due in Florida, and violations of the Lanham Act and Defend Trade Secrets Act occurred here in Florida.

88.   This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337, by virtue of the allegations of the Crestview Defendants' violations of the Lanham Act, 15 U.S.C. § 1125(a)(1) and violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq., as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

89.   This Court has supplemental jurisdiction over all of the state law claims against all Defendants, because those claims arise out of a common nucleus of operative fact with Plaintiffs' federal claims and are so integrally related to each other that they are part of the same case and controversy.  All of the claims alleged herein arise from the unauthorized creation and sale of Plaintiffs' clones, horses, and genetic material by the Crestview Defendants to the Park Place Polo Defendants.

90.    This Court also has original subject matter jurisdiction pursuant to 22 U.S.C. §§ 2201 and 2202 and pursuant to Fed. R. Civ. P. 57 because Plaintiffs also seek declaratory relief herein.

91.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this is the Judicial District in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated or is a Judicial

District in which any defendant is subject to the court's personal jurisdiction with respect to such action.

92.     The Northern District of Texas Related Case, which now has been consolidated with this case, was previously transferred to this Court by the Northern District of Texas. The Northern District found that "Florida has a more localized connection to the lawsuit, and this factor weighs in favor of transfer." [DE 80-1 *17].   The Northern District further found that "[b]ecause the balance of the 1404(a) factors are either neutral or weigh in favor of transfer, the Court concludes that transfer to the Southern District of Florida is proper here."   [DE 80-1 *17].

### III.     Further Facts of the Common Allegations.

#### A.  Mr. Cambiaso's 2006 Idea to Clone Polo Ponies.

93.     Mr. Cambiaso's interest in cloning polo ponies arose out of an unfortunate and mortal injury to his favorite horse, an agile chestnut stallion named "Aiken Cura."   During a tie-break period ("chukker") of the 2006 Argentine Polo Open Championship ("*Campeonato Argentino Abierto de Polo*") a high-goal, professional polo tournament that Mr. Cambiaso and La Dolfina had been playing in, Aiken Cura collapsed with a broken limb when returning to the side of the field in Palermo, Bueno Aires, Argentina.   When Mr. Cambiaso felt the horse begin to limp beneath him, he leapt out of his saddle and threw his blue-and-white helmet to the ground in anguish.   "Save this one whatever it takes!" he pleaded, covering his face with his gloves.   But the leg had to be amputated below the knee, and eventually Mr. Cambiaso, whose La Dolfina team won the Argentine Open that year and has won this most-prestigious of high-goal tournaments an additional twelve times[11], was forced to euthanize his beloved Aiken Cura.

---

[11] La Dolfina has won the Argentine Open eight consecutive times including in 2020.

94.     Before euthanizing Aiken Cura, Mr. Cambiaso requested veterinarians obtain a skin sample from the horse and put the sample into a deep freeze to store in a Buenos Aires laboratory. This decision turned out to be prescient because the technology at the time was not thought to be capable of recreating tissue that could be used to generate life and recreate animals.

95.     Mr. Cambiaso who, together with his La Dolfina team, relies heavily on the abilities of his equine athletic partners on the field of play, remembers his thinking that day: "I just thought maybe, someday, I could do something with the cells."

**B. The 2009 Agreement.**

96.     Three years later, in 2009, Meeker, who is a Texas oilman with an amateur interest in cloning, approached Mr. Cambiaso and offered to enter into a joint business venture to determine the viability of cloning some of the best polo ponies belonging to Mr. Cambiaso. Many of the discussions with Mr. Cambiaso and misrepresentations by the Crestview Defendants regarding the Cloning Initiative occurred in Wellington, Palm Beach County, Florida.   Many of the agreements and negotiations amongst the parties regarding the 2009 Agreement were made in Palm Beach County, Florida.

97.     Meeker, Crestview Farm and Mr. Cambiaso entered into 2009 Agreement, promising to explore and potentially agree to its material terms. Thereafter, they agreed to cancel and terminate and extinguish any claimed rights under the 2009 Agreement in perpetuity and replace it with the 2011 Quota Holders Agreement.   Thus, in 2011, the parties agreed to the novation of any claimed rights arising under the 2009 Agreement.

98.     The 2009 Agreement, drafted on or about June 15, 2009 by Meeker and Farm's attorneys, was premised on the mutual assumptions and understandings shared by Meeker, Crestview Farm, and Mr. Cambiaso that:

WHEREAS, Owner is the owner of certain mares and also owns full rights to the tissue of Aiken Currah, a deceased stallion, which tissue is currently in cryogenic stasis;

WHEREAS, Crestview is currently involved in the use of advanced biotechnologies in the cloning of horses;

WHEREAS, Owner and Crestview wish to enter into an arrangement for the purpose of jointly producing, marketing and selling cloned animals;

WHEREAS, in furtherance of the foregoing, Owner is willing to provide tissue from certain mares and from Aiken Currah in accordance with the terms and conditions set forth hereinbelow.

99.    The document was thus premised upon the underlying understanding of Meeker, Crestview Farm, and Mr. Cambiaso that:

(a)    The genetic donor polo pony mares and the tissue of Aiken Cura (misspelled Aiken Currah in the Contract) was owned and would continue to be owned by Mr. Cambiaso;

(b)    Meeker through his Crestview Farm, LLC entity was then "involved in the use of advanced technologies in the cloning of horses";

(c)    A joint "arrangement" was later to be entered into between the parties; and

(d)    Mr. Cambiaso would provide genetic tissue from Aiken Cura and polo pony mares that Mr. Cambiaso owned according the terms of the Contract.

100.    The parties never intended the 2009 Agreement to be the final expression of the terms of the cloning business endeavor.   Drafted by the Crestview Defendants' attorneys, the 2009 Agreement lacks an "entire agreement" or integration clause, and reads more akin to a letter of intent, contingent on the cloning technology actually working and requiring further preconditions, terms and agreements that would be negotiated at a later time:

- in paragraphs 1 and 2, requiring the successful cloning to occur;
- in paragraph 3, requiring further negotiation to establish a mutually acceptable cloning program only if the cloning was successful, to wit:

3.    Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

- also in paragraph 3, providing that until the negotiation and establishment of a mutually acceptable program, Mr. Cambiaso, and not Meeker and not Crestview Farm, was to continue to be considered the owner of the original animal;
- requiring, in paragraph 4, further mutual agreement between the parties as to sales price and, as importantly, terms; and
- in paragraph 5, requiring further mutual agreement prior to any "second edition" (or generation) of cloned polo ponies.

101.    Mr. Cambiaso, an Argentine for whom English is not his native language, did not participate in the drafting of this English-only document, which was not translated by the Crestview Defendants' attorneys.   Mr. Cambiaso was not given an opportunity to review the document with his attorneys. Mr. Cambiaso understood from the concurrent representations by the Crestview Defendants, that Mr. Cambiaso was executing the 2009 Agreement on behalf of himself.

102.    At all times relevant hereto, Mr. Cambiaso was the owner of the original horse Aiken Cura. The 2009 Agreement pertains only to certain horses and genetic material belonging to Mr. Cambiaso. While the horse "Aiken Cura", and the genetic material contemplated under the 2009 Agreement belonged solely to Mr. Cambiaso, the horses, clones, and genetic material presently being misappropriated by Defendants pursuant to alleged rights conveyed to Crestview Farm and Meeker under the 2009 Agreement belong to, and are the sole property of, La Dolfina.

103.    The 2009 Agreement also contained significant restrictions upon the Crestview Defendants, requiring the further cooperation and *mutual agreement* of the parties with respect to the *production, endorsement, and marketing* of clones of Mr. Cambiaso's horses, and with respect to the final sales prices and *terms of sale* of any such clones, if ever produced, to wit:

3.    Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

33

4.   Sale of Clones.   Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.   Owner and Crestview will jointly determine all final sales prices and terms.

5.   Number of Clones.   Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.  If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

104.   For clarity, and as set forth herein, the central factual complaint of Mr. Cambiaso and La Dolfina herein is that Plaintiffs did not mutually agree with Defendants as to either the production, endorsement, marketing, sales and terms of sale of clones of horses belonging to Mr. Cambiaso or La Dolfina, and that the 2009 Agreement never conveyed any rights to any of the Defendants to *unilaterally* produce, sell, license or exercise any ownership whatsoever over horses, clones, or genetic material belonging to Mr. Cambiaso or La Dolfina.   Paragraphs 3, 4 and 5 were all very clear that *mutual* agreement of Mr. Cambiaso and Farm were required before any of those acts, and/or a change in clone ownership, was to occur.

105.   Although the 2009 Agreement first failed for lack of agreement on or performance of its material terms, and was subsequently cancelled and replaced by the parties via the novation of the 2011 Quota Holders Agreement, to the extent that the Crestview Defendants erroneously rely upon that 2009 Agreement, the 2009 Agreement expressly prevented the Crestview Defendants from unilaterally producing, endorsing, marketing or setting the sales prices and terms of the sale of any clones produced pursuant to the 2009 Agreement. Thus, although Plaintiffs believe that the 2009 Agreement was never entered into or forever extinguished and terminated in its entirely, and that the gaslighting to the contrary by the Crestview Defendants is wholly specious, to the extent there may be a judicial finding that the 2009 Agreement somehow survived its failure

34

of agreement on material terms or performance or was not replaced by novation in 2011 agreement, the evidence reflects that the Crestview Defendants have knowingly and intentionally breached material terms of that 2009 Agreement.

106.    The cloning technology ultimately proved successful by Viagen, a cloning technology company, which later licensed that technology to Crestview Genetics in 2010.   Farm did not ever acquire that technology required to make clones.

107.    Between January 6, 2010 and January 2, 2011, certain polo pony clones were born including a clone of Cuartetera, Adolfo Cambiaso's best and most famous polo pony that is owned by La Dolfina.

108.    Significantly, nowhere in the 2009 Agreement or elsewhere does Mr. Cambiaso grant Meeker or the Crestview Farm any ownership rights in any of the horses, clones, and / or genetic material therefrom.

109.    The Crestview Defendants repeatedly represented that they would not clone *any* Cambiaso or La Dolfina horse outside of express, mutual agreements between the parties. Their representations and commitments ultimately have proved false.

C.   **The Cancelation and Termination of the 2009 Agreement – All Parties Mutually Agree to a Novation (if the Agreement was Even Valid)**.

110.    In November 2010, as part of an exploratory initiative of the parties to understand the monetary value of such a clone, the only authorized offer for sale of one Cuartetera clone, "B 02", took place in an highly-regarded auction sale in San Ysidro, Argentina.

111.    However, just prior to the sale, Ernesto Gutierrez explained to the parties that public release of the B 02 Cuartetera clone into the market would not be to the benefit of the parties.   Mr. Gutierrez advised Mr. Cambiaso and Meeker to never sell clones, because then the clones could

be continually replicated by downstream purchasers and the group would lose control of unique and highly valuable genetics possessed within a La Dolfina Cuartetera clone.

112.    Mr. Gutierrez right then proposed that he bid and attempt to win the auction and then return the clone back into the ownership and control of La Dolfina and the parties, with Mr. Gutierrez then joining in and investing in an equine cloning business with the parties.

113.    Mr. Gutierrez then proceeded to outbid all bidders for Cuartetera, and he purchased the clone for a price of $800,000, and Meeker received $400,000 from the proceeds of this one sale.

114.    Immediately, and true to his word, Mr. Gutierrez returned B 02 to La Dolfina and the parties entered into the joint venture he and the parties had agreed to set up and operate for equine cloning.

115.     No more public sales of Cuartetera or Cambiaso / La Dolfina horse clones occurred until the Crestview Defendants began their recent campaign of unauthorized clone creation, misappropriation, and sales.

116.    In March 2011, consistent with their agreement that public sale of any Cambiaso or La Dolfina clone was not prudent, to the extent the 2009 Agreement was not already extinguished by the failure of agreement on or the performance of its material terms, the parties expressly agreed to ***cancel and extinguish*** the 2009 Agreement and by novation ***replace*** the 2009 Agreement by entering into the 2011 Quota-Holders Agreement.   See **Exhibit 2,** to wit:

  8.6.  Entire Agreement. This Agreement shall constitute the complete agreement between the Parties in relation to the topics contained herein and replaces all the agreements, statements and understandings previous to the Parties, either orally or in writing.

117.    The $ 1,533,000 paid by Ernesto Gutierrez to Meeker as consideration to cancel and replace the 2009 Agreement were made by Mr. Gutierrez to Meeker to entities owned or

controlled by Meeker, and as specifically directed by Meeker, to wit: two wire transfers to

Meeker's company **"Conglomerate Gas II, L.P."** and two wire transfers to **Meeker's Crestview**

**Genetics, LLC:**

| Date | Recipient | Amount (U.S. $) | Recipient Bank |
|------|-----------|-----------------|----------------|
| May 26, 2011 | Conglomerate Gas II, L.P. | $ 500,000.00 | South West Bank |
| August 23, 2011 | Conglomerate Gas II, L.P. | $ 250,000.00 | South West Bank |
| November 21, 2011 | Crestview Genetics, LLC | $ 250,000.00 | South West Bank |
| May 9, 2012 | Crestview Genetics, LLC | $ 533,000.00 | South West Bank |

118.    In sum, and as demonstrated by Meeker's acceptance of the $ 1,533,000 from Mr.

Gutierrez, Meeker, on behalf of himself and his Crestview entities, Mr. Cambiaso, La Dolfina, and

Mr. Gutierrez all agreed that selling a clone was a bad business idea because the sold clone could

then be re-cloned continually by its purchasers.   In fact, the one clone offered for sale was

purchased at that sale by Mr. Gutierrez and immediately brought back into the possession and

control of Mr. Cambiaso and La Dolfina.   The parties to the 2009 Agreement never agreed to key

terms including regarding the prices and terms of clone sales and Mr. Cambiaso, Meeker and Mr.

Guiterrez entered into a different venture with a different business objective than selling clones.

119.    A fundamental premise behind the termination and extinguishment in perpetuity of

the 2009 Agreement among Mr. Gutierrez, Mr. Cambiaso and Meeker was that clones would and

should never be sold.   This was a founding principal of the agreement amongst the parties, and

was a principal that Meeker reiterated and repeated frequently to Mr. Cambiaso, La Dolfina, Mr.

Gutierrez and to the public through the global media.

120.    Mr. Gutierrez paid $1,533,000 to Meeker and the Crestview Defendants for the

cancellation and novation of any claimed rights arising under the 2009 Agreement. Thus, any

claimed rights under this now terminated 2009 Agreement were waived, extinguished, discharged in perpetuity by the parties' agreement to a novation. According to Mr. Guiterrez:

> 20.     We all intended everything concerning the prior 2009 agreement between Mr. Meeker and Mr. Cambiaso to be terminated by my payment to Mr. Meeker and formation of the Argentine SRL entity, which would take up the cloning business.  I paid $1,533,000 to Mr. Meeker in exchange for his agreement to terminate that 2009 Agreement and instead start the SRL business with me.  My understanding that part of this money was to reimburse Mr. Meeker for any money he paid Mr. Cambiaso or La Dolfina for genetic samples of their polo horses. Mr. Meeker accepted the payment  from me under these terms without complaint, reservation or objection.

**Exhibit 14,** *Affidavit of Julio Ernesto Gutierrez Conte* [DE 41-1]*.*

121.     The 2011-2012 Gutierrez payments to Meeker and the Crestview Defendants forever cancelled and replaced the 2009 Agreement with the 2011 Quota Holders Agreement.

122.     Thus, the Crestview Defendants cannot claim any rights to horses, clones, or genetic material belonging to Cambiaso or La Dolfina under the 2009 Agreement.

123.     Because the 2009 Agreement was previously forever terminated and replaced (if ever valid), the Crestview Defendants do not possess any right under the 2009 Agreement to unilaterally create, sell or convey La Dolfina or Cambiaso clones to the Park Place Polo Defendants as the Crestview Defendants have purported to do by the November 9 Secret Cloning Agreement.

124.     Until very recently, none of the Crestview Defendants have claimed or asserted any rights or entitlement under the 2009 Agreement to: (i) ownership of Mr. Cambiaso's or La Dolfina horses; or (ii) the authority to market, endorse, produce and sell any Cambiaso / La Dolfina horse clones.

125.    For over nine (9) years from 2011 to 2020, no mention of any claimed rights under the 2009 Agreement was ever made.  This is belied by the acceptance by Meeker and the Crestview Defendants of the $1,533,000 in consideration of the cancellation and replacement of the 2009 Agreement, and the accompanying conduct of the Crestview Defendants extending over the next nine years.

126.    Further Meeker has made multiple public statements to international global media outlets including Vanity Fair Magazine, 60 Minutes, National Geographic and Science Magazine about the importance of restricting the distribution of clones and focusing instead on selling of the babies of clones rather than the clones themselves, and during which time no assertion of any purported rights under the 2009 Agreement to anyone was ever made. **Exhibits 25, 26, and 27.**

127.    At all times relevant hereto, Defendant Meeker acted in Palm Beach County, Florida as the sales agent and representative of Defendants Crestview Genetics and Crestview Farm, offering Defendants' cloning services of Plaintiffs' horses.   Meeker made repeated "sales pitches" and solicited business regarding Plaintiffs' clones in Florida on behalf of himself and the other Defendants.

128.    The aforesaid statements by Meeker, on behalf of himself and the Crestview Defendants are literally false and can be presumed to have deceived the public.   It is also accurate, however, that the Crestview Defendants' course of conduct, by and through Meeker, their common manager, for a decade, and during which time they never claimed any rights to sell clones of horses of Cambiaso /La Dolfina, is consistent with the 2011 Quota Holders Agreement novation of the 2009 Agreement and the parties' conduct in failing to agree on and finalize material terms of the 2009 Agreement.

129.    No party has ever disputed the validity of the 2011 Quota Holders Agreement.

### D.  2019 Settlement Agreement

130.    On July 29, 2019,  Mr. Cambiaso, La Dolfina, Meeker, Crestview Genetics, and Mr. Gutierrez entered into the 2019 Settlement Agreement, wherein the parties expressly agreed to "terminate [their] commercial and corporate relationship." [12]  **Exhibit 3, \*2 ¶ B.**

131.    The 2019 Settlement Agreement did not convey ownership of any clone to Genetics, Crestview Farm or Meeker, and no rights were given to Meeker, Crestview Farm or Genetics to clone or market any Cuartetera clones.

132.    The 2019 Settlement Agreement did not somehow resurrect, as of 2011, the invalid or forever terminated 2009 Agreement.

### E.  2019 Side Letter Agreement

133.    Also on July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement, **Exhibit 4** hereto.   The 2019 Side Letter Agreement regarded breeding certain cloned Cambiaso / La Dolfina horses identified in Schedule I attached to the Agreement.

134.    The 2019 Side Letter Agreement provided, among other things, that La Dolfina S.A. would transfer the oocytes of the Schedule I clones to Genetics in order for the oocytes to be

---

[12] Substantially all of the negotiations amongst Meeker, the other Crestview Defendants, La Dolfina and Mr. Cambiaso, which included and misrepresentations by those Defendants, occurred in Wellington, Palm Beach County, Florida.  Previously, much of the agreements and negotiations amongst the parties that became part of the 2009 Agreement and the later 2019 Agreement were made in Palm Beach County, Florida.  Further, performance of the covenants and restrictions made by and binding Defendants in the 2009 and 2019 Agreements, including the extinguishment of the 2009 Agreement was undertaken and owed in Wellington, Florida, the epicenter of competitive polo in the United States for four months of each year, to wit: Defendants were bound from misappropriating Plaintiffs' proprietary equine genetic material and from selling clones World-wide, including Florida. Defendants have now violated those covenants and restrictions. **Exhibit 8,** *Affidavit of Robert Jornayvaz III*; **Exhibit 17,** *Correspondence from Defendants' attorneys*; **Exhibits 10 and 11,** *Affidavit and Second Affidavit of Roberto Zedda;* **Figure 1** hereto, below.

fertilized with semen provided from stallions belonging to and chosen by Plaintiffs.[13] **Exhibit 4**. The 2019 Side Letter Agreement made clear that, in the event of the sale of offspring (not clones) from any of the clones identified by Schedule I or in the event of the sale of any non-clone oocytes (oocytes from clones to be fertilized with stallion semen as the parties agree to produce offspring of clones), Plaintiffs and Genetics "shall agree on a market price." **Exhibit 4**.

135.    In addition, the 2019 Side Letter Agreement stated that Crestview Genetics must clone 10 "Cuarteteras" for the exclusive use of Cambiaso and La Dolfina, and, should Crestview Genetics successfully complete and deliver these Cuartetera clones to La Dolfina, Alan Meeker, by and through Crestview Genetics, may clone two Cuarteteras "for the exclusive amateur (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras)" but that the sale or further cloning of the Meeker Cuarteteras is "expressly prohibited." **Exhibit 4**.

136.    The 2019 Side Letter Agreement did not allow, nor otherwise contemplate, from the genetic material of Cambiaso / La Dolfina horses, unilateral actions by the Crestview Defendants for the production, endorsement, marketing nor sale of any clone, nor allow the sale of any oocytes to be used to clone.

137.    As consideration for Mr. Cambiaso and La Dolfina agreeing to enter into the 2019 Side Letter Agreement, Meeker and Crestview Genetics purportedly conveyed to Mr. Cambiaso and La Dolfina the ownership and cloning rights to the valuable "Storm Cat 02" racehorse clone. Discussed further herein below, Plaintiffs have come to understand that at the time of the 2019 Side Letter Agreement, Meeker and Crestview Genetics did not actually own Storm Cat 02 and its genetic material, but the Crestview Defendants in fact only possessed a very limited license to use, on a very restrictive schedule, the Storm Cat 02 clone[14].

---

[13] An oocyte is an immature ovum, or egg cell.

[14] This misrepresentation by Meeker and the Crestview Defendants as to the scope of their equine cloning rights is

138.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the right to sell any clones or genetic material of horses owned by Plaintiffs under any circumstances.

139.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the right to sell any clones or offspring of clones owned by Plaintiffs unilaterally.

### F.  Defendants' Misrepresentations to Plaintiffs Regarding the 2019 Side Letter Agreement.

140.    Concurrently with the negotiation and execution of the 2019 Side Letter Agreement, numerous misrepresentations were made by Meeker, individually and through his Crestview Genetics.

141.    First, Meeker consistently represented that La Dolfina is and would always be expressly recognized as the Registered Owner of the clones listed in Schedule 1 with Genetics having only certain limited rights. **Exhibit 4, *2019 Side Letter Agreement* *1 ¶ II.**

142.    Meeker, on behalf of himself and Crestview Genetics made promises that those Defendants would undertake only the mutually-agreed upon use of the genetic material to create only clones and offspring from clones as specifically authorized and agreed upon by the parties. Importantly, any Cuartetera clones would only be ridden in competition by Mr. Cambiaso and his then-minor son (who is now a professional polo player of the highest caliber) and these clones could only be played on La Dolfina-branded teams. **Exhibit 4, *2019 Side Letter Agreement* *1 ¶2.**

143.    Park Place Polo is not a La Dolfina-branded team but rather a competitor of La Dolfina.

---

part of a pattern of misconduct by those Defendants, which was repeated when those Defendants misrepresented to the Park Place Polo Defendants that Meeker and Crestview possessed rights to create and sell the La Dolfina Cuartetera clones to Park Place Polo Team.

144.    These representations were made by Meeker to Adolfo Cambiaso both at the time of making the 2009 Agreement, as well as at the time of making the 2019 Side Letter Agreement, and during the decade within.

145.    Those representations were consistent with the purpose and intent of the 2009 and 2019 agreements and business relationship, which was to explore and potentially promote the very limited cloning of a very small number of polo pony clones and to closely restrict the commercial distribution of those clones belonging to Mr. Cambiaso and La Dolfina.   This close restriction of the creation and distribution of the clones was also consistent with the terms of the 2011 Quota Holders Agreement and the relationship between the parties throughout the prior decade.

146.    These restrictive terms were also consistent with the sport of polo, where it is widely considered that a player's success is more than 70% attributable to the quality of his polo pony string,[15] and in the case of La Dolfina, where a powerful and valuable brand had been built by Mr. Cambiaso based upon the competitive successes, celebrity, and "drawing power" of Mr. Cambiaso himself and La Dolfina.

147.    However, as became clear to Plaintiffs only recently, those underlying representations were false, and made by the Crestview Defendants only to induce Plaintiffs to enter into the contractual relationships set forth herein. The Crestview Defendants had and have no intention of honoring those representations or the contractual terms to which Plaintiffs eventually agreed.

148.    Additionally, La Dolfina and Mr. Cambiaso only later learned that despite the representations by Meeker in connection with the 2019 Side Letter Agreement and 2019 Settlement Agreement, at that time neither Meeker nor any of his Crestview entities were the actual

---

[15]  See footnote 2, herein, 70% estimate attributable to Meeker.

*owners* of the Storm Cat stallion Clone, and had falsely induced the Plaintiffs into signing the 2019 Side Letter Agreement based on misrepresentations about their ownership of this Clone.

149.    Had La Dolfina and Mr. Cambiaso known that Meeker, Crestview Farm, and Crestview Genetics did not intend to honor Defendants' promised commitment to restrict the ownership and distribution of the Cambiaso / La Dolfina clones, Cambiaso would not have entered into the 2009 Agreement and Cambiaso and La Dolfina would not have entered into and the 2019 Side Letter Agreement.

150.    Though already failed, and / or forever terminated and replaced by novation, the 2009 Agreement was in any event void as a matter of law because of the fraudulent misrepresentations of Meeker and the Crestview Defendants.

151.    The 2019 Side Letter Agreement was likewise void because of the aforesaid misrepresentations by the Crestview Defendants made to Plaintiffs to induce execution of that Agreement.

152.    In addition to being void due to the Crestview Defendants fraudulent misrepresentations, the 2019 Side Letter Agreement is further unenforceable for failure of consideration because no consideration supports Meeker's unauthorized cloning and clone sales. Meeker's recent conversion of the cloned horses is also in blatant contravention of the terms of the 2019 Side Letter Agreement that did not transfer any ownership rights nor allow Meeker or the Crestview Defendants to secretly and surreptitiously make and sell cloned horses, as has been recently discovered.

153.    At the time Plaintiffs and Defendant Crestview Genetics entered into the 2019 Side Letter Agreement, Meeker and Crestview Genetics purportedly contributed as consideration the ownership and cloning rights to the valuable "Storm Cat 02" racehorse clone.  As discussed

further herein below, at the time of the 2019 Side Letter Agreement, Meeker and Crestview Genetics did not actually own Storm Cat 02 and its genetic material but only had a limited license to use, on a very restrictive schedule, the Storm Cat 02 clone.

154.   Because Meeker and Crestview Genetics did not actually own Storm Cat 02, despite their express representations to the contrary to induce Plaintiffs to execute the Side Letter Agreement, those Defendants neither put in the full consideration required under the Side Letter Agreement, nor were able to perform under the Side Letter Agreement and hid the nature of their true and limited rights concerning Storm Cat 02. Moreover, there was no consideration paid for the unilateral usurpation of the valuable property rights belonging to Plaintiffs in their horses and their genetic lineages, which Meeker and the Crestview Defendants are fraudulently treating as their own.

### G.  Defendants' Scheme to Misappropriate Valuable Equine Genetic Material

155.   Only now has the deliberate plan by Meeker and the Crestview Defendants to steal genetic material and clones from rightful owners become clear to La Dolfina and Mr. Cambiaso.

156.   The present scheme by the Crestview Defendants under color of purported contract is not the first time that the Crestview Defendants have attempted to misappropriate and use in an unauthorized manner highly valuable and unique equine genetic material that does not belong to the Crestview Defendants.

### H.  The "Storm Cat" Misappropriation

157.   The present case is not the first instance wherein Meeker, through the use of his Crestview entities, has misappropriated genetic material and clones owned and belonging to another party.

158.     Overbrook Farm, LLC, the owner of the famous racehorse Storm Cat[16], a grandson of the World-renowned thoroughbred racehorse "Secretariat," is a prior victim of Meeker and his Crestview Entities.

159.     Meeker, by and through his alter-ego Crestview entities, embarked on an aggressive scheme to misappropriate the unique and famous genetic material of Storm Cat, and spared no effort to wrongfully strip away the rightful ownership of the genetic material from the owners of Storm Cat.

160.     Specifically, Meeker, by and through Crestview Genetics, misappropriated Storm Cat genetic material from Overbrook Farm LLC and created an unauthorized clone of Storm Cat, named "Storm Cat 02."  **Exhibit 15.**

161.     It was only upon the owner of Storm Cat happening upon an article exposé about the cloning of Storm Cat in the magazine *Vanity Fair* did the owner learn of the misappropriation and unauthorized cloning of Overbrook Farm LLC's horse. **Exhibit 15.**

162.     The owner of Storm Cat has made clear, "[w]e never discussed giving Crestview ownership of the genetic material, but simply a right to produce, with our approval, a certain number of clones with the material." **Exhibit 15.**

163.     When the owner of Storm Cat found out about the unauthorized Storm Cat clone from *Vanity Fair* and then made demand upon Meeker and Crestview Genetics to cease and desist,

---

[16] The bloodline of Storm Cat is very valuable because of Secretariat's successes and the subsequent successes of Storm Cat progeny.   For example, as of 2016, Storm Cat progeny had earned an aggregate of over $ 128,000,000 in winning race purses, have sold for an aggregate of over $ 319,000,000 over 452 yearlings (averaging over $ 705,750 per yearling) with 91 Storm Cat yearlings selling for over $ 1,000,000.

Defendant Crestview Genetics has itself admitted in a prior federal lawsuit that Storm Cat was "a championship thoroughbred; Storm Cat was a grandson of the world-renowned thoroughbred, Secretariat; Storm Cat has also been known as the leading North American sire in 1999 and 2000; and Storm Cat had a breeding career that was legendary throughout the equine world, which career extended over twenty years."

Crestview Genetics decided that the best defense to their malfeasance was to commence litigation against Overbrook and its individual owner in an effort to suppress and avoid compliance with that cease and desist demand.

164.    Ultimately, Meeker and Crestview Genetics were forced to concede that they did not own either the Storm Cat genetic material or the right to trademark Storm Cat marks.   In the Storm Cat Settlement Agreement that was reached in April 2017, wherein Crestview Genetics conceded its misappropriation of the genetic material and withdrew, in perpetuity, its intent to use application with the U.S. Patent and Trademark Office which it had unilaterally filed without authorization of the owners of Storm Cat.

165.    In return, under the Storm Cat Settlement Agreement, Meeker and Crestview Genetics received very limited rights which were defined as (1) a *limited license* "to use" certain Storm Cat genetic material for limited cloning, and (2) certain "*licensed rights*" with respect to the Storm Cat mark, which limited rights were renewable in 5-year increments.   **Exhibit 16.**

166.    Significant to the present case, neither Meeker, Genetics, Crestview Farm, or any other individual or entity received *ownership* of Storm Cat genetic material or the initial unauthorized Storm Cat clone wrongfully created by Meeker and Crestview Genetics.

167.    For clarity, in the Storm Cat litigation, Meeker and Crestview Genetics: (1) misappropriated genetic material from a famous and valuable horse; (2) created an unauthorized clone of that horse; (3) with the intent to market the clone and its progeny and genetic material throughout the World;   (4) when confronted with the malfeasance, commenced litigation to block the owner's rights; and (5) was later forced to relinquish Meeker and Crestview Genetics' specious claims to Storm Cat and settle for strictly limited rights.

168.    In the present case, it appears history is repeating itself, because Meeker has made representations to the public that Meeker and his entities possess the unilateral right to clone Cambiaso / La Dolfina horses and possess the unilateral right to then sell those clones, all without the mutual agreement and consent of Mr. Cambiaso or La Dolfina.

### I.    The "Cuartetera" Misappropriation:   Defendants Violate Multiple Federal Laws by the Unauthorized Creation and Sale of Cuartetera Clones Without Authorization by Plaintiffs.

169.    Just prior to the filing of the initial Complaint, La Dolfina and Mr. Cambiaso learned that, in the Fall of 2020, Meeker, by and through the use of the Crestview Defendants, had commenced the unauthorized creation and selling of three La Dolfina Cuartetera clones to third parties by fraudulently representing that the 2009 Agreement was still valid. Specifically, on November 18, 2020, an Agent of the Crestview Defendants admitted, in paragraph #2 of correspondence to La Dolfina **[Exhibit 17 hereto]**, that:

```
Crestview Farm has created several cloned foals under
its continuing rights under the 2009 Agreement, and has
sold three of them to a third party for more than the
minimum price mentioned in the 2009 Agreement or as
later agreed by the parties.
```

**See Exhibit 17,** *18 November 2020 correspondence from Defendants' attorneys,* specifically describing in <u>Exhibit </u>1 to that correspondence, those clones of Plaintiffs' Cuartetera as:

**"CF Cuartetera P01 dob April 4, 2020;**
**CF Cuartetera P02 dob April 21, 2020;**
**CF Cuartetera P03 dob June 2, 2020"**

170.    From correspondence with Meeker and in subsequent conversations with his agents, it has become clear to La Dolfina and Mr. Cambiaso that Meeker and the Crestview Defendants have disavowed all of the representations and contractual and fiduciary obligations

made by Defendants to Plaintiffs from 2010 through 2019 regarding all agreements and cloning business dealings.

171.    The invalid or later terminated 2009 Agreement never imparted to Meeker nor to Crestview Farm, the rights claimed by the Crestview Defendants to unilaterally (i) sell and / or set the terms for the sale of any La Dolfina Cuartetera clone; or (ii) set the terms for the use or sale of any genetic material belonging to Mr. Cambiaso or La Dolfina.   In truth and in fact, the invalid or terminated 2009 Agreement was not signed or otherwise entered into by La Dolfina and never gave any of the Defendants any rights to clone, much less own, sell or license any La Dolfina horses, genetic material, or clones.

172.    Further, the Crestview Defendants have appropriated the identity of Mr. Cambiaso and La Dolfina, champions and leaders of the polo world, to falsely imply an endorsement by Plaintiffs to the cloning and sale of the clones.

173.    The Crestview Defendants' unauthorized misappropriation, use, and unilateral sale of equine genetic material belonging to La Dolfina and Mr. Cambiaso forms a familiar pattern also seen in the Storm Cat litigation – Defendants making misrepresentations, then grab highly unique and valuable equine genetic material from their rightful owners, claim ownership to it, surreptitiously produce unauthorized clones, and then market and sell the clones and material throughout the world for profit, all the while falsely implying to third parties purchasing the clones that the rightful owners have approved the terms of those illicit sales.

174.    That pattern of misappropriation and misrepresentation as to cloning authorization has likewise been repeated by the Crestview Defendants to the Park Place Polo Defendants by the Crestview Defendants' misplaced reliance upon the 2009 Agreement when contracting with the Park Place Polo Defendants in the November 9, 2020 Agreement.

**J.  The Cuartetera Clone Sales to a Competitor in Florida**

175.     The Crestview Defendants have, without authorization, utilized the genetic material belonging to La Dolfina to create a presently unknown number of unauthorized clones of Cuartetera. Meeker, by and through the use of Crestview Farm, has sold three (3) Cuartetera clones along with the option to purchase at least seven (7) more Cuartetera clones to Pegasus, a British Virgin Island shell company owned and controlled by Plaintiffs' competitor, Park Place Polo Team patron Andrey Borodin.

176.     Indeed, the first drafts of the November 9 Secret Cloning Agreement were made directly with another Park Place Polo entity, "Park Place Polo, Ltd.", another Borodin-owned and controlled B.V.I. company.

177.     That sale and option of the ten (10) Cuartetera clones to Borodin's Pegasus was consummated through the November 9 Secret Cloning Agreement.  **See Exhibit 5 hereto, 26 pages Bates stamped by Defendants as "CF000004 to CF 000030."**

178.     The November 9 Secret Cloning Agreement is secret because it was keep hidden from its execution, and for an additional six months from the Court during the pendency of this case, despite demand from Plaintiffs.

179.     The November 9 Secret Cloning Agreement was only recently turned over to Plaintiffs as part of 32 pages of documents produced to Plaintiffs by Defendants pursuant to the June 17, 2021 Order of the Court. This production was six months after Plaintiffs first requested the documents surrounding the sale of the Cuartetera clones and Defendants' legal team agreement on the record at the January 29, 2021 Hearing to produce them.

180.     Six months after the Court initially requested its production, production is still not complete, has been unnecessarily redacted, and information withheld.   A request from Plaintiffs' counsel to Defense Counsel for the complete production of unredacted and complete copies of this

50

agreement have been ignored.   This refusal to Plaintiffs' request and continued hiding of Court Ordered material is especially disconcerting, given the other spoliation of evidence set forth further herein below.

181.    The creation and sale by the Crestview Defendants to the Polo Park Place Team Defendants of these La Dolfina Cuartetera clones was not authorized by La Dolfina or Mr. Cambiaso.   Even the 2009 Agreement, if ever valid was forever terminated, extinguished and replaced in 2011, did not permit such unilateral action by the Crestview Defendants.   There is no legal basis on which the Crestview Defendants can legitimately rely on as a basis for presently allowing the Crestview Defendants to create, market or sell the La Dolfina Cuartetera clones.

182.    Further, the commercial advertising or promotion and sale of these clones of Cuartetera to the consuming public and specifically to Plaintiffs' competitor, Park Place Polo Team and Andrey Borodin through his shell company Pegasus, was not authorized by Plaintiffs, and falsely claimed or implied by false implication that La Dolfina had no rights to their own horses and clones and that La Dolfina's horses could be cloned and sold by the Crestview Defendants without the authorization of La Dolfina and / or Mr. Cambiaso, and that the Crestview Defendants had the unrestricted authority to sell Plaintiffs' horses and genetic material.

183.    The Crestview Defendants, through their agent and attorney Ross Eichberg, informed Plaintiffs on November 18, 2020 that Crestview Farm had sold, without authorization from La Dolfina or Mr. Cambiaso, three (3) of the unauthorized foals of Cuartetera to someone else.   Recent Court-ordered discovery as well as admissions made by the Crestview Defendants Counsel then revealed that the purchaser of the clones was the competitor of Plaintiffs, the Park Place Polo Team, owned by billionaire Andrey Borodin. **Composite Exhibit 18,** *Andrey Borodin's Park Place Polo Team Purchased the Clones***; Exhibit 8,** *Affidavit of Robert Jornayvaz III, ¶ 14.*

184.    When Mr. Eichberg made that disclosure to Plaintiffs on November 18, 2020,

Defendants and Eichberg as their agent intentionally failed to disclose:

(a) The actual identity of the purchaser of the clones;

(b) the Crestview Defendants had also sold Mr. Borodin an option to purchase seven more Cuartetera clones;

(c) the Crestview Defendants had falsely stated to Mr. Borodin or his representatives, *inter alia*, that the Crestview Defendants had an exclusive license to sell those clones for their "own account;" that their actions were allegedly authorized by the canceled and replaced 2009 Agreement; that all approvals of persons whose approvals were required had been allegedly obtained; and that the 2009 Agreement had not been novated, extinguished, or terminated in any manner;

(d) Mr. Borodin has agreed to finance the cost of any litigation that were to ensue if Mr. Cambiaso and / or La Dolfina were to challenge the right of the Crestview Defendants to sell the Cuartetera clones;

(e) That the Crestview Defendants considered any breach of the Secret Clone Sale Agreement by Borodin or Pegasus to cause irreparable harm, entitling the Crestview Defendants to injunctive relief and replevin of the Cuartetera clones; and

(f) Conversely, the Crestview Defendants were required to reimburse Pegasus and Borodin if Mr. Cambiaso and / or La Dolfina was successful in obtaining replevin of the clones from Pegasus or Borodin.

185.    All of these undisclosed sales and options for sales of Cuartetera clones to Pegasus

for the Park Place Defendants and Mr. Borodin by the Crestview Defendants were part of the

pattern of willful misconduct constituting a continuing fraud upon Plaintiffs, and evidence of the

continuing violations of federal law by Defendants, causing irreparable harm to Plaintiffs.

### K.  Spoliation of Evidence -the Sold Cuartetera Clones Have Been Secretly Moved Out of Florida During this Litigation and Have Been Injured.

186.    In Early November 2020 three Cuartetera clones were transported from Crestview

Farm's facility in Aiken, South Carolina to Wellington, Palm Beach County, Florida. See **Figure**

**1,** below, a December 2020 photograph taken of those three clone foals at the 62 acre equestrian

facility belonging to Park Place Polo Fields, run by Defendant Park Place Polo Team, and located at 4370 South Road, Wellington, Florida 33414:

**Figure 1**



187.    Plaintiffs have since discovered that the three unauthorized Cuartetera clones were moved out of Florida and into Aiken, South Carolina on or about December 22, 2020. See **Exhibit 19,** *Andrey Borodin's Park Place Polo Removes the 3 Clones from this Jurisdiction in the Midst of Litigation, Brookledge003-4, 10.*

188.    This matter was filed against the Crestview Defendants on December 8, 2020. The removal of the three unauthorized Cuartetera clones from the jurisdiction of this Court occurred after this litigation had commenced and with both the Crestview Defendants and the Park Place Defendants knowing of this litigation and the within lawsuit and applications for injunction and for temporary restraining order.

189.    Further, in order to transport the Clones out of Florida, Defendants were required by law to have the Clones tested for equine infections anemia ("EIA"), and obtain from a veterinarian both a negative test result for the EIA (a "Coggins test" certificate), and Defendants were also required to obtain from a veterinarian an "Equine Health Certificate" prepared and executed by a local veterinarian in Florida within thirty (30) days of travel.

190.    Those documents were submitted to the Florida Department of Agriculture by the Defendants and, because they are required by law to be truthful, should be presumed to be truthful, accurate and admissible prior statements of the Defendants.

191.    Defendants compelled that veterinarian to execute a document stating the veterinarian would not speak to anyone regarding those health and Coggins tests and papers for the three clones moved to South Carolina.   The identity of the veterinarian is known, Daren Tamplin DVM, and he is now being represented by Akerman LLP , the same law firm that is counsel to the Park Place Polo Defendants who have received discovery subpoenas from Plaintiffs. **Exhibit 9**.

192.    Further, recently produced documents confirm that Dr. Tamplin was required to sign a non-disclosure agreement by the Park Place Polo Defendants when providing care to the clones – a highly unusual step in the equine veterinary industry.

193.    Mr. Borodin and his Park Place Polo Team are competitors of Plaintiffs, and competed *against Mr. Cambiaso in Wellington, Florida* at the International Polo Club in Wellington, Florida in the Winter of 2020 and in the Spring of 2021.[17]

194.    Mr. Borodin and his Polo Park Place polo operation operate in the United Kingdom and elsewhere in the World when Borodin and his Park Place Polo team are not competing in Florida, rending imminent risk the unauthorized Cuartetera clones in the possession of Mr. Borodin and his Park Place Polo operation will be transported to the United Kingdom or elsewhere in the World, beyond the reach of this Court.

---

[17] See United States Polo Association press release December 22, 2020: https://www.uspolo.org/gauntlet-of-polo/2021

195.    Two of the three La Dolfina Cuartetera clones have also incurred injury and significant waste since being relocated out of Florida.   One of the clones, "B 01" (later re-named "P 01" by the Crestview Defendants) was injured and infected so grievously that B 01 had to be transported to a veterinary hospital within South Carolina where the clone remained for approximately one month receiving emergency care. The status of the other injured clone is presently unknown, but it was injured.

196.    Upon information and belief, the three Cuartetera clones could again be moved to the United Kingdom and will later likely be trained and used in international polo tournaments against La Dolfina and against other polo teams for which Mr. Cambiaso is employed as a player. Mr. Cambiaso just finished competing against Mr. Borodin and his Park Place Polo Team in the United Kingdom this Summer and faced Park Place Polo Team in the 2021 United States Polo Championship this past April in Wellington, Florida.

197.    Upon further information and belief, Mr. Borodin and his Park Place Defendants intend to extract genetic material from the Cuartetera clones in their possession in order to create additional Cuartetera clones, causing significant additional imminent risk of imminent risk of irreparable harm to Plaintiffs, and confusion to consumers.

**L.    The Crestview Defendants Continue to Misappropriate and Sell Unauthorized Cuartetera Clones During this Litigation.**

198.    For clarity, on June 17, 2021, the Court ordered that the Defendants "***provide Plaintiffs with the bill(s) of sale for the three Cuartetera clone foals described in the First Amended Complaint [ECF No. 22], including any agreements or documentation underlying those bill(s) of sale***."

199.    These were documents Defendants had promised to produce to Plaintiffs during the January 29, 2021 Hearing on Plaintiffs' Motion for Temporary Restraining Order, but had failed to produce to Plaintiffs.

200.    Those documents have finally now been produced with redactions and are thirty-two (32) pages and are hereto as **Exhibit 5,** *The Secret Cloning Agreement***; Exhibit 6,** *Amendment to the Secret Cloning Agreement***; and Exhibit 7** *Second Amendment to the Secret Cloning Agreement***.**

201.    What Plaintiffs have learned from the 32 pages of documents are the following, highly relevant facts which, according to **<u>Table 1</u>** and **<u>Table 2</u>**, attached hereto as **Exhibits 29** and **30,** are ***inconsistent*** with the prior, sworn factual averments of Meeker before this Court and in the Northern District of Texas, and are further ***inconsistent*** with the statements of counsel for Meeker, Crestview Farm and Genetics. As noted above, although made six months after the January 29, 2021 Hearing wherein the Crestview Defendants first promised this Court the production of these documents, this production is notably and materially incomplete due to over redaction, and production of unsigned and incomplete documents including a Bill of Sale that contains no signature block or signature for Pegasus Rider Ltd., the shell British Virgin Island entity controlled by Mr. Borodin, and his Cyprus based lawyers.

202.    The 32 pages produced demonstrate misconduct by Meeker, Crestview Farm and Genetics:

   (a) On November 9, 2020, Meeker, by using Crestview Farm, and Pegasus, the entity owned and controlled by Mr. Borodin contracted   for the purchase and sale of the ***three (3) Cuartetera clones*** and for an option (the "Option") to purchase ***an additional seven (7) Cuartetera clones*** by Borodin [**Exhibit 5,** CF00004]; and

   (b) the Crestview Defendants represented to Borodin that the Crestview Defendants ***had the unilateral right, pursuant to the 2009 Agreement, to***

*sell those Cuartetera clones without permission of Mr. Cambiaso* or La Dolfina [**Exhibit 5,** CF00004];

(c) That the purchase price for the clones was *$ 800,000 per clone*, for an aggregate of   $2.4 million [**Exhibit 5,** CF00005] ;

(d) That Borodin's *time to exercise the Option was extended <u>twice</u> <u>during</u> the present litigation:* by a First and then Second Amendment, on *December 21, 2020* (the "First Amendment") [**Exhibit 6,** CF00001-2] and again v*ery recently on June 10, 2021* (the "Second Amendment") [**Exhibit 7,** CF000031-32]*,* so that Mr. Borodin has an additional year, until late June, 2022, to elect his Option;

(e) That should the Option to purchase the seven additional Cuartetera clones be exercised, then *Borodin's purchase price would be diminished by approximately 49% f*or each of the ten (10) Cuartetera clones purchased [**Exhibit 5,** CF00005];

(f) the Crestview Defendants represented to Borodin three times that the Crestview Defendants *were not aware of any litigation or any claims by Mr. Cambiaso* that the Crestview Defendants were not entitled to enforce the 2009 Agreement at three times: (i) the time of making of the Secret Clone Sale Agreement [**Exhibit 5, CF00007**], and at the (ii) the December 21, 2020 Amendment[**Exhibit 6,** CF00001-2]; and (iii) the June 10, 2021 Amendment [**Exhibit 7,** CF000031-32**]**;

(g) the Crestview Defendants represented to Borodin that the Crestview Defendants *were not in default under the 2009 Agreement* at each of those three times described in 6) [**Exhibit 5, CF00007**];

(h) the Crestview Defendants represented to Borodin that the ten Cuartetera clones were *free and clear of any claims by Mr. Cambiaso* at each of those three times described in 6) [**Exhibit 5, CF00007**];

(i) the Crestview Defendants granted an *assignable license* to Borodin for Borodin *to produce an additional ten (10) Cuartetera clones* [**Exhibit 5, CF00008**];

(j) the Crestview Defendants claimed *irreparable injury, no adequate remedy at law, and* the *right to enjoin* Borodin from producing any further Cuartetera clones, and a *right to recover* from Borodin *all Cuartetera clones* in the event of breach of the Secret Clone Sale Agreement by Borodin or an assignee of Borodin [**Exhibit 5, CF00008-9**] ;

(k) the Crestview Defendants were so concerned that Mr. Cambiaso had a legitimate claim to the clones (despite their prior and inconsistent representation that Mr. Cambiaso had no such claim), that they anticipated litigation by Mr. Cambiaso about the clones was likely, and so Crestview Farm, Meeker and Borodin agreed that if Mr. Cambiaso sued to rescind the 2009 Agreement or recover the Cuartetera clones, then: (i) *Meeker and Borodin would each be responsible to pay certain share of the legal expenses of defense*, that (ii) *any such litigation would not be settled*

57

*without Borodin's consent*, and (iii) that the Crestview Defendants **would have to pay back Borodin** for the Cuartetera clones if Mr. Cambiaso or La Dolfina successfully recovers any of the clones [**Exhibit 5, CF00010**];

(l) **the Crestview Defendants disclaimed any liability** to Borodin as a result of any claims by Mr. Cambiaso challenging rights to the clones [**Exhibit 5,** CF00010**];

(m) **Meeker, Crestview Farm and Borodin set up an Escrow Agreement** with the **Florida** law firm of Akerman LLP ("the Akerman Escrow Agreement") t**o escrow against any litigation by Mr. Cambiaso** certain of Borodin's purchase monies from the purchase and sale of the Cuartetera clones from the Crestview Defendants, [**Exhibit 5,** CF000024-30]; and

(n) That Meeker, Crestview Farm and **Borodin consented to the jurisdiction and venue of the federal courts located in the Southern District of Florida** in any action relating to the Akerman Escrow Agreement. [**Exhibit 5,** CF000028, ¶ 10].

203.    That under the Akerman Escrow Agreement, in the event of dispute, **the escrowed Cuartetera clone purchase monies can be paid** into the federal or state Courts in Broward County, Florida. **Exhibit 5**, CF000024, ¶¶ 4, 10. The willful acts by Meeker revealed in the 32 pages of documents Meeker and the Crestview Defendants attempted to keep secret reveals the strength Plaintiffs' likelihood of success on the merits on not just the federal claims herein, but the other claims advanced by Plaintiffs.  For example, clearly there is a continuing fraud upon Plaintiffs as well as arguably upon this Court occurring, as exemplified by the two undisclosed extensions of the Borodin / Pegasus options during the pendency of this litigation, on December 21, 2020 and June 10, 2021. Defendants' continue to attempt to market and sell more unauthorized clones despite their representations to the Court that no sales were contemplated.   **Exhibits 7** and **8,** CF000001-2, CF000031-32. The 32 pages further demonstrate a high level of inconsistency with Meeker's and his counsel's prior averments in this case and in the closely-related case amongst the same parties, *Crestview Farm, LLC v. Cambiaso, et al.,* (Case No. 21-cv-81066-AMC/BER) (the "SDFL 21" case), which was recently transferred to this Court from the Northern District of Texas. See **Exhibits 29 and 30**.

58

204.   The 32 pages also demonstrate the continuing fraud by Defendants before and during this litigation, by (i) creating and not disclosing the November 9 Secret Clone Sale Agreement structure; (ii) repeatedly extending the Borodin / Pegasus option to purchase seven more Cuartetera clones during this litigation and not disclosing same; (iii) providing for an escrow arrangement in Florida and not disclosing the same; and (iv) by spuriously opposing equitable relief when the Crestview Defendants themselves insisted upon such equitable relief from Borodin / Pegasus for the same reasons.

205.   The November 9 Secret Clone Sale Agreement provides direct evidence that the Crestview Defendants have not only sold 3 unauthorized Cuartetera clones to an agent and affiliate of the Polo Park Place Polo Defendants, but also provided an option for Pegasus "[a]t any time on or before the 6 weeks from the Effective Date, the Buyer may elect to purchase all the seven Cloned Foals [7 additional unauthorized Cuartetera clones] by giving written notice to the Seller….". **Exhibit 5.** *CF000005 § 3.1.*

206.   The sale of this option to purchase was concealed from the Plaintiffs and from the Court.

207.   After this litigation was commenced against Defendants, the Crestview Defendants continue their brazen misappropriation of La Dolfina's genetic material.

208.   On December 21, 2020, the Crestview Defendants entered into the **First Amendment** to the November 9 Secret Cloning Agreement, by which the Defendants extended the time during which Park Place Polo Team, though its closely related affiliate, could exercise the option to purchase 7 additional unauthorized Cuartetera Clones, agreeing "[a]t any time on or before 30 June 2021, the Buyer may elect to purchase all the seven Cloned Foals….'". **Exhibit 6,** *CF000001-2 First Amendment to the November 9 Secret Clone Sale Agreement ¶ 2.*

209.   As it became clear that this case was going to continue, and that the anticipatory suit by the Crestview Defendants was likely to be transferred to Florida, on June 10, 2021, the Crestview Defendants entered into a **Second Amendment** to the November 9 Secret Cloning Agreement, by which Defendants again extended the time during which Park Place Polo Team could exercise the option to purchase 7 additional unauthorized Cuartetera Clones, agreeing "[a]t any time on or before 30 June 2022, the Buyer may elect to purchase all the seven Cloned Foals …". **Exhibit 7,** *CF000031-32 Second Amendment to the November 9 Secret Clone Sale Agreement ¶ 2.*

210.   Notably, both Amendments to the November 9 Secret Cloning Agreement ratified the representations by the Crestview Defendants in the initial the November 9 Secret Cloning Agreement, stating "[a]ll other provision of the Agreement continue with full force and effect."

211.   Particularly repeated and ratified, but problematic for the Crestview Defendants, are the representations that no litigation exists by Mr. Cambiaso to challenge the clone sale and recover the clones, and that the Crestview Defendants have no reason to know of any such litigation. **Exhibits 6 and 7**.

212.   This continuing misconduct and continued misrepresentations by the Crestview Defendants is direct evidence of the ongoing unauthorized misappropriation of genetic material and clones belonging to Plaintiffs and is why a Temporary Restraining Order should be entered against all Defendants preventing further sales and distribution of those clones and genetic material.

213.   The distribution of Plaintiffs' unique genetic material and clones by the Crestview Defendants to a polo competitor with the financial means to transport those cloned foals throughout the world has irreparably harmed Plaintiffs and the now known looming threat of the

Crestview Defendants selling and additional 7 unauthorized Cuartetera clones to Plaintiffs competitor threatens further irreparable harm to Plaintiffs by the irreversible dissipation and dilution to competitors of Mr. Cambiaso and La Dolfina of the Cambiaso / La Dolfina unique equine genetic material and clones.

214.   Newly-discovered information has now revealed that payment for the commencement of creation seven (7) new clones has now been made by Defendant Park Place Polo Team to the Crestview Defendants.   Upon information and belief, the creation of those clones has now started.

215.   Additionally, Meeker, Farm and Genetics have now purportedly "assigned" their non-existent cloning rights under the defunct 2009 Agreement to Mr. Borodin and his entities in exchange for $ 2,905,000.00 dollars in Cuartetera clone purchases, and in exchange for an agreement by Mr. Borodin and his entities to indemnify and hold Meeker and the Crestview entities harmless from any lawsuit by Mr. Cambiaso or La Dolfina regarding ownership of the clones and the right to create and sell the clones.

216.   Additionally, a new contract has surfaced, a **"Technical Consulting and Services Agreement"** (the "Consulting Agreement") between Crestview Farm, LLC and Park Place Polo Limited, respectively the Meeker and Borodin affiliated entities that are very closely related to the Crestview Defendants and the Park Place Polo Defendants.

217.   Part of the ongoing fraud by the Crestview Defendants is the constant creation and use of similarly named entities, to avoid detection and thwart Plaintiffs' rights and claims set forth herein. As of December, 2020, Meeker had created at least 114 separate corporate entities, and at least eight separate Crestview entities, to the extent known.   All of these Crestview entities share common ownership and management and have been created by Meeker as his alter egos and, at

relevant times set forth herein, were used for fraudulent and deceptive purposes by the Crestview Defendants.

218.    Under the Consulting Agreement, which was also dated November 9, 2020, the same date as the Secret Cloning Agreement, the Crestview Defendants have agreed *"to provide to Park Place [Polo Limited] assistance with the setting up [sic] Park Place's laboratory facilities and horse cloning program, including providing assistance regarding the acquisition of equipment, installation of equipment, and advising Park Place in the commercial and technical aspects of horse cloning."*

219.    Under the Consulting Agreement, for an initial payment of $ 2,100,000.00 to the Crestview Defendants, and a second payment of $ 1,750,000.00, the Crestview Defendants will assist Park Place Polo Limited, an agent and closely-related affiliate of Defendant Park Place Polo Team, to set up an equine cloning laboratory in Aiken, South Carolina[18], and provide access and personnel to do so.

220.    The Consulting Agreement payments were made to the same Frost Bank account belonging to Crestview Farm that received payments pursuant to the November 9 Secret Cloning Agreement.

221.    The motive of the Crestview Defendants to sell Cuartetera clones has been revealed – money, millions of dollars, arising from both the November 9 Secret Cloning Agreement and from the contemporaneous Consulting Agreement.

222.    This prurient, greedy motive is all the more clear in light of the context of the fact that from May through the end of June, 2020, Meeker had been negotiating with the principal of J-5 Equestrian, Mr. Robert P. Jornayvaz, III, to borrow $ 1,500.000.00 from Mr. Jornayvaz.

---

[18]   Public Records reveal that the Park Place Polo Defendants and Mr. Borodin recently made two large land tract purchases in Aiken, South Carolina, very near the Crestview Farm Aiken laboratory location.

223.     On June 30, 2020, when Mr. Jornayvaz insisted on a personal guarantee, Meeker abandoned Meeker's loan negotiations with Mr. Jornayvaz, and pivoted to Mr. Borodin and Park Place Polo.   Meeker then created a complex transactional structure with Mr. Borodin and his Park Place Polo Team and its closely-related entities, whereby Meeker did not have to give a personal guarantee and nor provide any standard releases for the transaction.

224.     Thus, the entire transaction with the Park Place Polo Defendants by the Crestview Defendants is permeated and infected by greed, and was undertaken by the Crestview Defendants with knowing and malicious disregard for the rights of the Plaintiffs.

225.     Further, the 32 pages, which Defendants were forced to turn over by the June 16, 2021 Court Order, including the Secret Clone Sale Agreement, two Amendments to the Secret Clone Sale Agreement, and an Escrow Agreement utilizing Akerman LLP as Escrow Agent, with a Florida jurisdiction, venue and choice of law clause all evidence the great lengths to which the Crestview Defendants are willing to go in order to disguise their unlawful and fraudulent scheme to misappropriate unique and invaluable horses and genetic material owned by Plaintiffs.

226.     To date, Akerman LLP apparently represents four different persons and entities involved this litigation including the two named Park Place Polo Defendants - but has refused to accept service of a discovery subpoena on behalf of British Virgin Island shell company Pegasus Rider Ltd and Andrey Borodin. Instead, Akerman invites Plaintiffs to initiate a request for Judicial Assistance under the Hague Evidence Convention which is time consuming and expensive.

227.     The Secret Clone Sale Agreement establishes multiple other false or misleading representations of fact that, upon information and belief, permeated the Crestview Defendants' commercial interactions, commercial advertising and promotion to Mr. Borodin, and Park Place, Bartolo and Camila Castagnola and other consumers in the United States and elsewhere. The

production of these documents is still not complete as the Crestview Defendants continue to withhold information about the various persons and entities who have negotiated and participated in this contractual arrangement. Defendants have also failed to provide Plaintiffs with the buyer's signature page to the bill of sale. Defendants also failed to produce an executed copy of the "Escrow Agreement".

228.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely stated to Mr. Borodin and his representatives that the Crestview Defendants have an exclusive license to sell Cuartetera clones for their "own account." See **Exhibit 5**, CF00004.

229.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely represent their actions were authorized by the extinguished 2009 Agreement.

230.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely claimed that all approvals of persons whose approvals were required had been obtained for the sale of Cuartetera clones by the Crestview Defendants to a third party.

231.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely claimed that the 2009 Agreement was valid, and had not been terminated, novated, or extinguished in any manner.

232.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely claimed that the sold Cuartetera Clones would not be subject to any claims by Mr. Cambiaso or La Dolfina.

233.    Further discovery is needed to identify other documents and evidence that contain such false or misleading descriptions of fact or false or misleading representations of fact which are likely to cause confusion, mistake or to deceive consumers as to Mr. Cambiaso's affiliation,

mistake or to deceive consumers as to La Dolfina's affiliation, connection or association as to Mr. Cambiaso's and La Dolfina's sponsorship or approval of these unauthorized Cuartetera clones.

234.    Further, based on the limited evidence available to date, including the 32 incomplete  pages of documents produced to Plaintiffs recently, and upon information and belief, the Crestview Defendants in their commercial advertising or promotion made and continue to make false or misleading statements about the nature, characteristics, and qualities of the Cuartetera clones and other clones and genetic material owed by Mr. Cambiaso and La Dolfina, including the Crestview Defendants' purported abilities to produce clones from the horses and genetic material under the invalid or extinguished 2009 Agreement without any authorization by Mr. Cambiaso and / or La Dolfina and falsely convey that these Cuartetera Clones are authorized to be produced and do not violate the contractual and obligations of the Crestview Defendants.

235.    Additionally, in § 8.1 of the Secret Cloning Agreement, without the authorization or knowledge of Plaintiffs, the Crestview Defendants purport to grant the Park Place Defendants the "limited right" to clone 10 additional Cuartetera clones.  This purported transfer or rights which were completely extinguished first by the failure of agreement on the material terms of the 2009 Agreement, and then by the 2011 Quota Holders Agreement novation, and were never unilateral in any event, creates the present additional false descriptions or false representations of fact, false advertising, false endorsement, continuing misrepresentations and related consumer and market confusion by the Crestview Defendants to downstream public purchasers once these clones are offered for sale.

### M.    By False Advertising and False Association, the Crestview Defendants Offer to the Public the Unauthorized Sale of Other Unauthorized La Dolfina Horse Clones.

236.    In December, 2020, a month after the unauthorized sale of the unauthorized clones to the Park Place Polo Defendants, on November 1, 2020, the Crestview Defendants also offered

the sale of La Dolfina horse clones to Barolome Castagnola, another competitor of Plaintiffs.   See **Exhibit 22,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto, and **Exhibit 21,** *Affidavit of Bartolome Castagnola* ¶¶ 4-10.

237.   On December 1, 2020, Meeker, on behalf of himself, Crestview Genetics and Crestview Farm, stated to Camila Castagnola in a Whatsapp message exchange [See **Table 1** below] that Meeker and his Crestview entities are presently making clones of Plaintiffs' polo horses and are selling them, and falsely implied that Defendants were authorized by Plaintiffs to do so, to wit:

(a)   "***You guys should buy one of my new Colibri or Aiken Cura clones! I'm making new Lapa clones too***."

(b)   Meeker also stated that all of Plaintiffs' "***Cuartetera***" polo horse clones are already "***all spoken for***", and

(c)   that Meeker has "***babies of Cuartetera***" for sale.

**Table 1**



**See Exhibit 22,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and <u>Exhibit 1</u> thereto and images above at **<u>Figure 2</u>,** *WhatsApp messages of December 1, 2020 from Alan Meeker to Camila Castagnola,*

238.     The Crestview Defendants are thus continuing, without authorization and in violation of federal law, to create clones from equine genetic material belonging to Plaintiffs, and to otherwise manipulate, transport and sell clones and genetic material that is the sole and exclusive property of La Dolfina without authorization, to other competitors of Mr. Cambiaso and La Dolfina.   **Exhibit 21,** *Affidavit of Bartolome Castagnola* ¶¶ *4-10***; Exhibit 22,** *Affidavit of Camila Castagnola* ¶¶ *3-4.*

239.     These December 1, 2020 false or misleading statements to Bartolome Castagnola and Camila Castagnola by Meeker and Defendants are consistent with the prior admissions by Defendants' Counsel on November 18, 2020 that Defendants have "created several cloned foals …. and has sold three of them….." **Exhibit 17.**

240.     Meeker, on behalf of himself and the Crestview Defendants, then called Mr. Castagnola in early December, 2020, and during that call, Meeker:

     (a) offered to sell Mr. Castagnola cloned polo ponies of Lapa, Aiken Cura and Colibri;

     (b) told Mr. Castagnola that the Crestview Defendants owned those clones of Plaintiffs' unique polo horses; and

     (c) would ***imminently begin selling clones*** of Plaintiffs' famous and successful polo horse "Cuartetera."

**Exhibit 21,** *Affidavit of Bartolome Castagnola* ¶¶ 5, 8 and 9.

241.     These statements to the public were false or misleading.   Meeker himself has previously admitted and stated to the public that Defendants would not sell the clones of Plaintiffs' horses, stating "***If we sold one of our clones of Cuartetera or Lapa, we would be selling the original genetic material that someone else could then clone for themselves. That takes us out***

*of the loop.*"   **Exhibit 27,** *Cloning: Fort Worth firm seeks the best polo ponies in the world*, Jeff

Hooper,   Fort   Worth   Business   Press,   March   24,   2018,   found   at:

https://fortworthbusiness.com/technology/cloning-fort-worth-firm-seeks-the-best-polo-ponies-in-

the-world/.   Indeed, the tight restriction of distribution of equine genetic material and clones of

Mr. Cambiaso was a fundamental premise of the 2009 Agreement,  the parties' subsequent

contracts and related course of conduct thereafter.

242.   Plaintiffs currently are and have long-been the registered owners of the original

polo horses (the clones of which Defendants now are advertising for sale). The names of those

horses have long-been associated with the La Dolfina and Cambiaso names and teams. **Exhibits**

**10 and 11,** *Affidavit and Second Affidavit of Roberto Zedda.* Meeker's statements to the

Castagnolas and other consumers in interstate and foreign commerce that he had the authority to

sell the clones were false or misleading descriptions of fact or false or misleading representations

of fact. Defendants have made and continue to make unauthorized use of the names and identities

of Plaintiffs and their unique horses, such as Cuartetera, and have adopted, in the names of the

clones, the identity of Plaintiffs and their horses that are so similar and related to the Plaintiffs,

their celebrity, and their original horses, such that consumers were likely to be confused and

assume that Plaintiffs have authorized the cloning of Plaintiffs' original horses and sale of the

clones.

243.   These false descriptions or false representations of fact *("[y]ou guys should buy*

*one of my Colibri or Akin Cura Clones!"…* "**I have babies of Cuartetera"** ) had the capacity to

deceive or did deceive consumers of high end polo horses. Moreover, the statements evidenced in

the recent production on June 17, 2021 and the commercial promotion and advertising to the

Castagnolas   discussed   above   omitted   material   information   that   renders   Defendants'

representations misleading or false. This deception had a material effect on purchasing decisions that resulted in the unauthorized sale and transport of the clones discussed above and future clones. Moreover, given the interstate and international nature of the sales of these championship polo ponies, these misrepresentations affected interstate and foreign commerce. The grant of the "limited right" to clone 10 additional Cuartetera clones in the Secret Cloning Agreement will proliferate additional false descriptions or false representations of fact, concealment, false advertising, false endorsement, continuing misrepresentation and related consumer and market confusion to downstream purchasers once these clones are offered for sale by the Park Place Defendants given their unique and inherent association with the Plaintiffs, and Plaintiffs' drawing power and celebrity.

244.     Mr. Cambiaso is the most well-known polo player and breeder of polo horses in the world. Mr. Cambiaso is considered the best polo player in world history. He is a celebrity in the polo world, and La Dolfina is recognized as the most accomplished and successful polo team owning several of the best polo ponies in history along with renowned as the top polo pony breeder in the world.

245.     The false implication that Mr. Cambiaso, the leading celebrity in this world, approves of or sponsors these unauthorized clones is likely to cause confusion, or to cause mistake or to deceive consumers as to the origin, sponsorship, or approval of these Clones and the unauthorized commercial activities of Defendants. **Exhibit 23**, *Affidavit of Santiago Ballester,* ¶¶ 20-28.

246.     Federal law protects the public's interest in freedom from deception and the celebrity's interest in his or her commercial investment and the "drawing power" of his fame in endorsing products. Defendants' conduct hijacks or appropriates Mr. Cambiaso and La Dolfina's

celebrity status, their ability to commercialize this fame and renown, without their authorization. This conduct has and is likely to cause confusion among consumers as to the affiliation, connection or association, between Mr. Cambiaso and La Dolfina and the Defendants' unauthorized clones or as to Mr. Cambiaso and La Dolfina's sponsorship or approval of these unauthorized clones. This conduct violates federal law and is likely to continue once the Park Place Defendants begin the unauthorized cloning of Plaintiffs' horses supposedly granted by the Secret Cloning Agreement.

247.    Plaintiffs have been injured by these false or misleading descriptions of facts or false or misleading representations of fact or material omissions to the public about the Cambiaso / La Dolfina clones in multiple ways including the physical loss of these clones and the continuing false impressions created in the marketplace by the false statements and misrepresentations that Meeker had acquired control of the prized La Dolfina breeding stock and could clone its horses in his sole discretion. Critically, this conduct flies in the face of the Parties' agreements, understanding, continual affirmations, and course of conduct, that clones would never be sold, and if any horses were sold from this venture, they would be offspring or babies of the clones rather than the clones themselves.

248.    These false descriptions or representations or material omissions are likely to and have caused confusion, mistake or have deceived purchasers as to the affiliation, connection or extent of the association between Plaintiffs and Defendants and this misconduct has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and goodwill.

249.    The statements to the Castagnolas and others are also advertisements or promotions that misrepresent the nature, characteristics or qualities of Defendants' services or commercial activities by falsely representing that Defendants had the exclusive commercial right to engage in

these sales and, conversely, impliedly misrepresenting that the clones had been made, marketed, and sold with the authorization and implied endorsement of the Plaintiffs.

250.    The Crestview Defendants thereby misrepresented to the public and /or omitted or concealed material information as to the legality of the clone sales, causing confusion about the provenance of the clones, diminishing the nature, characteristics and qualities of Plaintiffs' commercial activities and ultimate authority over Plaintiffs' unique, invaluable polo horse bloodlines.

251.    This misconduct and concealment has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.

252.    The Crestview Defendants' unauthorized conduct is tantamount to selling the products (clones in this case) of Mr. Cambiaso and La Dolfina as their own. The Crestview Defendants falsely and misleadingly imply that they had the authorization and consent of Mr. Cambiaso and La Dolfina to produce and sell these clones when in fact they do not. These clones of famous La Dolfina horses are uniquely and solely associated with Mr. Cambiaso and La Dolfina. When the Crestview Defendants represent these clones as their own as they have done, they are engaged in the illegal practice of "reverse passing off" which occurs when a seller sells another's products as his own. "Reverse Passing Off" is a prohibited practice under the Lanham Act because it misleads the public as to the source of goods in the marketplace and harms the reputation of the originator of these horses– in this case La Dolfina and Mr. Cambiaso. This practice deprives Mr. Cambiaso and La Dolfina of value of their name and the goodwill that would occur if the buying public were to become aware of the true source of these sold clones.

71

253.    The clones originated with Mr. Cambiaso and La Dolfina, the owners of the original horses from which these clones were created and the owners of the genetic material that was used for their creation.

254.    The Crestview Defendants have falsely designated the origin of these clones by representing to consumers that they have the right to create and clone the horses of La Dolfina and Cambiaso as if they are the property of Defendants and concealing that they do not have authorization to engage in this conduct, and in fact have even granted the Park Place Defendants the rights to clone La Dolfina's horses – without consent or authorization.

255.    This false designation of origin of the clones is likely to and has caused consumer confusion as to the true origin of these horses.

256.    The Crestview Defendants' continuing false designation of origin of the Clones has harmed the Plaintiffs including causing harm to their commercial interest in reputation or sales.

### N.    The Harm to Plaintiffs Is Irreparable.

257.    This case cannot be resolved solely through monetary damages.   More importantly to Plaintiffs, the harm to Plaintiffs is irreparable and cannot ever be cured by monetary damages alone. Once the unique genetic material and clones that are the exclusive property of Plaintiffs are distributed World-wide by the technologically savvy and well-financed Defendants, beyond the jurisdiction of this Court, there will be no remedy available to reverse or cure that harm. **Exhibit 21,** *Affidavit of Bartolome Castagnola* ¶11. To wit: the Park Place Polo Defendants have already moved the 3 Cuartetera clones out of the state of Florida during the pendency of this litigation, the litigation of which Park Place Defendants had full knowledge of.

258.    The irreparable injury is *neither* remote *nor* speculative. **Exhibit 23**, *Affidavit of Santiago Ballester,* ¶¶ 20-28. The Crestview Defendants presently intend to and have agreed to sell an additional 7 Cuartetera clones, which are the sole and exclusive property of La Dolfina, to

Pegasus / Borodin / Park Place Polo should they elect to exercise such option on or before June 30, 2022. **Exhibit 7**. The Crestview Defendants have already sold and shipped, and imminently intend to sell and ship more of, the unauthorized Cuartetera clones, and the Crestview Defendants themselves have previously acknowledged that the unauthorized sale of the clones would cause irreparable harm.   **See Exhibit 5,** CF000008**;** § 9.2 of the Secret Clone Sale Agreement.

259.    In stark contrast to their claim of irreparable harm and their preservation of injunctive remedies in their agreement with Park Place Polo, the Crestview Defendants brazenly opposed the seeking of injunctive relief by Plaintiffs in this Court at the January 29, 2021 Hearing. [DE 38].

260.    Further, leading up to and during the January 29, 2021 TRO Hearing, Defendants and their attorneys materially mislead this Court by representing that neither Meeker, Crestview Farm, or Genetics has any interest or intention of conducting any additional sales of any other clones belonging to Mr. Cambiaso or La Dolfina. To wit:

> There are **no additional sales of any other clones of any other horses associated with Mr. Cambiaso or La Dolfina, S.A.** that are **pending or under discussion**. Thus, there is **no imminent "harm" to enjoin**. [DE 38*18] *Response in Opposition to Plaintiff's Motion to Expedite Ex Parte Renewed Motion for TRO*.

> The other thing I would point out is the **sale** of those foals **took place on November 9th of 2020**, so you know, this is posited to you as if it is some TRO to grab property and there was confusion earlier between personal jurisdiction over a party and whether the Court has ability to enjoin and reach property or other third parties. I'm not going to go too far into that confusion, but here, there is **no urgency arising out of the potential sale of those horses**. That sale took place between people in Texas and South Carolina and **was consummated in early November, long before either of these actions were filed**. [**DE 53**, *TRO Hearing Transcript*, Mr. O'Quinn, 92:15-25].

> Meeker similarly swore under oath:

> The contract for sale of the "Cuartetera" clones was signed before this lawsuit was filed. There are **no additional sales of any other clones of any other horses associated with Mr. Cambiaso or La Dolfina, S.A. that are pending or under**

**discussion**. There are **no ongoing negotiations for the sale of any clone** of any horses associated with Mr. Cambiaso or La Dolfina, S.A. at present. [38-1*7] *Declaration of D. Alan Meeker* ¶ 12

**To date** [February 4, 2021], **only four of the clones developed under the 2009 Agreement** have been **sold**. [DE 54] *Declaration of David Alan Meeker* ¶ 15

261.    Thus, leading up to, during, and continuing after the January 29, 2021 TRO Hearing, the Crestview Defendants and their attorneys materially mislead this Court by representing that neither Meeker, Crestview Farm, or Genetics has any interest or intention of conducting any additional sales of any other clones. The representation that no further cloning or sale of clones was imminent leading up to and at the January 29, 2021 TRO Hearing is demonstrably false in light of the recently produced Secret Clone Sale Agreement and both amendments thereto. **Exhibit**s **5, 6, and 7**.

262.    Meeker's false statements in Defendants' communications and advertisements to sell Plaintiffs' clones to Mr. Castagnola, a competitor of Plaintiffs, as well as admissions of previously offering to sell to others, as well as the 32 pages of the Secret Clone Sale Agreement and two Amendments thereto during the pendency of this litigation extending the time during which the Borodin / Pegasus option and the Escrow Agreement, establish that the Crestview Defendants are not only violating their prior agreements with Plaintiffs but have ongoing interest, intention, and plans to sell additional clones and genetic material owned by Plaintiffs. See **Exhibit 21**, *Affidavit of Bartolome Castagnola* ¶¶ 8 – 10;   **Exhibit 22**, *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto; **Exhibit 6**, *Amendment to the Secret Clone Sale Agreement*; **Exhibit 7**, *Second Amendment to the Secret Clone Sale Agreement.*

263.    The evidence also shows that unrestricted cloning and World-wide distribution of the unique genetic clones belonging to Plaintiffs cannot be reversed, is irreparable, and cannot be cured by monetary damages. **Exhibit 21;** *Affidavit of Bartolome Castagnola* ¶ 11; **Exhibit 10;**

*Affidavit of Roberto Zedda* ¶¶ 27-31; **Exhibits 5, 6, and 7,** CF000001-32.**; Exhibit 23,** *Affidavit of Santiago Ballester,* ¶¶ 20-28.

264.    All Defendants themselves unequivocally acknowledged in their Secret Clone Sale Agreement the irreparable nature of the harm caused by the unauthorized distribution or sale of Cuartetera and other Cambiaso / La Dolfina clones or genetic material.   **See Exhibit 5,** CF000008-10**.** Therein, the Crestview Defendants reserved their right to seek injunctive relief in the event of breach of their agreement with Mr. Borodin and/or Park Place. Thus, any contrary assertions in this litigation must be deemed waived and lack any credibility whatsoever.

265.    All conditions precedent to this Action have either been waived, excused or performed.

## Count I

### Preliminary and Permanent Injunctions – Continuing Misappropriation

266.    Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through  265 of the General Allegations.

267.    The genetic material of the horses and clones owned by La Dolfina and / or Mr. Cambiaso is highly unique. The strict limitations on the cloning and distribution of the clones is necessary to ensure the continued viability and quality of the cloned genetic lines, as well as to sustain the market demand and market value of the genetic copies of the La Dolfina polo ponies. **Exhibit 23**, *Affidavit of Santiago Ballester* ¶¶*26-28.*

268.    The Crestview Defendants have removed unauthorized equine genetic material belonging to Plaintiffs and others from the Republic of Argentina and brought that material to the United States.

269.    Further, during the pendency of this litigation, the Crestview Defendants together with the Park Place Defendants have two executed Amendments to the Secret Cloning Agreement,

extending the option for Park Place Defendants to elect to purchase 7 additional unauthorized

Cuartetera clones that are the sole property and belong to La Dolfina. Just one week prior to the

Status Conference set before this Court [DE 82], on June 10, 2021 the Crestview Defendants and

Park Place Defendants executed the Second Amendment wherein:

> "**At any time on or before 30 June 2022**, the **Buyer may elect to purchase all the seven Cloned Foals**...."" **Exhibit 7**, CF000031 *Second Amendment to the Horse Purchase and Sale Agreement* § 2

270.    The unauthorized misappropriation of the La Dolfina and Mr. Cambiaso's horses'

genetic material, unauthorized cloning, unauthorized sale and unauthorized World-wide

distribution of the La Dolfina and Mr. Cambiaso clones by Defendants as alleged herein has caused

and will continue to cause La Dolfina and Mr. Cambiaso irreparable and immediate injury, loss,

and damages, for which there is no adequate remedy at law.

271.    Plaintiffs are likely to prevail on the merits of this lawsuit.

272.    No adequate remedy of law exists that can fully protect Plaintiffs from damages,

Plaintiffs will continue to suffer if Meeker, Crestview Farm, Crestview Genetics, and all entities,

individuals, parents, subsidiaries, affiliates thereof, and the Park Place Polo Defendants, are

permitted to continue to misappropriate the genetic material and clones owned by La Dolfina or

Mr. Cambiaso horses and sell the unauthorized clones and / or their genetic material into the

market.

273.    The Crestview Defendants have both not only admitted to but insisted upon

recognition that *irreparable injury, no adequate remedy at law, and* the *right to enjoin* Borodin

from producing any further Cuartetera clones, and a *right to recover* from Borodin *all Cuartetera*

*clones* in the event of breach of the Secret Clone Sale Agreement by Borodin or an assignee of

Borodin. Defendants should be estopped from and have waived taking a contrary position to this

request for injunctive relief as Plaintiffs herein are suffering and continue to suffer the same irreparable harm by the continued and ongoing unauthorized cloning and sale of clones owned by La Dolfina.

274.    The Crestview Defendants have purportedly "assigned" the cloning rights to Cuartetera to the Park Place Polo Defendants or their affiliates.

275.    The relief sought by Plaintiffs is further necessary to prevent and restrain the ongoing violations of law described herein.

276.    The balance of equities additionally favors Plaintiffs and is in the public interest.

WHEREFORE, Plaintiffs seek a preliminary injunction, to be made permanent at the conclusion of this case, against all Defendants, and against all of the Defendants' entities, principals, owners, individuals, parents, subsidiaries, affiliates thereof, enjoining those individuals and entities, from continuing to misappropriate and clone the La Dolfina and Mr. Cambiaso horses and genetic material, and from marketing and selling the clones and genetic material.

## Count II

### Prejudgment Writ of Replevin

277.    Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through 265 of the General Allegations.

278.    This is a claim for prejudgment Writ of Replevin pursuant to F.S. § 78.01 *et seq.* and Fed. R. Civ. P. 64.

279.    The claimed property is (i) all of the unique genetic material from any and all horses owned by La Dolfina and/or Mr. Cambiaso in the possession or custody of the Crestview Defendants; (ii) all born clones from that unique genetic material owned by La Dolfina and / or Mr. Cambiaso in the possession or custody of the Crestview Defendants; (iii) all clones of La

Dolfina and Mr. Cambiaso horses presently in gestation and in the custody of the Crestview Defendants and the Crestview Defendants' agents and /or principals; and (iv) the three Cuartetera clones B01, B02, and B03 presently in the possession and control of the Park Place.

280.    Plaintiffs are entitled to possession of the claimed property because the Plaintiffs are the sole owners of the property. The claimed property is being wrongfully detained by Defendants who misappropriated the genetic material belonging to La Dolfina and Mr. Cambiaso.

281.    In Florida, a purchaser cannot obtain clear title from a thief to defeat the original owner. The most a bona fide purchaser for value can obtain from a thief is superior title to everyone except the original owner. See Florida Statute 672.403. Therefore, whether or not Park Place is deemed to be a bona fide purchaser for value of the three clones, the Park Place Defendants are not entitled to detain Plaintiff's property and the Park Place Defendants are wrongfully withholding La Dolfina's three Cuartetera clones.

282.    The claimed property has not been taken for a tax, assessment or fine pursuant to law.

283.    The claimed property has not been taken under an execution or attachment against the property of Plaintiffs or if taken, is exempt.

284.    The claimed property is in imminent danger of concealment, removal and / or transfer as is evidenced by the sale of the 3 clones and removal from of these 3 clones from Florida, and by the subsequent two Amendments to the November 9 Secret Clone Sale Agreement, whereby the Crestview Defendants agree to provide an option to the Park Place Polo Defendants, their affiliates and agents, for the purchase of seven additional La Dolfina Cuartetera clones up and until June 30, 2022.

285.     Indeed, one of the three clones, "B 10" (a/k/a "P 01") was so grievously injured and then left untreated while in the possession, custody and control of the Park Place Polo Entities and their agents and closely-related affiliate entities that the clone had to be transported to an equine hospital for approximately one month of emergent care to tend to the injuries and the resultant infection which was caused by the failure to properly treat the wounds to B 10.   Another of the clones has also been injured while in the possession, custody and control of the Park Place Polo entities.

286.     The claimed property is being wrongfully detained, used, wasted, and sold by Defendants.

WHEREFORE, pursuant to F.S. §78.01 *et seq.,* this Court should therefore issue a prejudgment Writ of Replevin requiring all Defendants to immediately *turn over* all of the claimed property to the sole possession, custody and control of La Dolfina prior to final judgement.

## Count III

### Declaratory Judgment – Failure to Agree on Material Terms, Invalidity, Novation or Extinguishment of the 2009 Agreement

287.     Plaintiffs repeat and reallege against all Defendants   ¶¶ 1 through 265   of the General Allegations.

288.     There is a case and controversy regarding the respective rights to Plaintiffs' equine genetic material and horses under ¶¶ 1, 2 and 4 of the 2009 Agreement. Plaintiffs seek declaratory judgment establishing that the 2009 Agreement failed and it was void as a matter of law because: (i) Farm never acquired the cloning technology so as to be able to produce the clones; (ii) the parties never came to a mutually acceptable agreement as to the endorsement marketing; (iii) the parties never came to a mutual agreement as to the final sales price and terms of sale of any clones; and (iv) the parties never came to an agreement as to production of the additional "second edition"

clones. Plaintiffs believe that this issue can be determined as a matter of law from the four corners of the agreement.

289.    In the alternative, Plaintiffs seek declaratory judgment establishing that it is beyond doubt that this Agreement was extinguished in perpetuity by the novation and agreement of the parties to enter into the 2011 Quota Holder Agreement along with the Crestview Defendants' acceptance of $1,533,000.

290.    The Parties to that 2009 Agreement as well agreed to cancel or extinguish that Agreement in 2011.

291.    The Parties agreed that the 2011 Quota Holder Agreement would take the place of the 2009 Agreement. The parties agree that the Quota Holders Agreement was a valid Agreement until terminated by the 2019 Settlement Agreement.

292.    The 2019 Settlement Agreement did not resurrect the previously-failed and cancelled 2009 Agreement.

293.    The 2019 Side Letter Agreement instead addressed equine cloning of Plaintiff's horses, and that 2019 Side Letter Agreement specifically prohibited the Crestview Defendants from taking unilateral action to market, advertise, endorse, set the terms for and sell Cambiaso / La Dolfina horses.

294.    The cancellation and replacement of the 2009 Agreement by the 2011 Quota Holder Agreement was supported by valid consideration in the form of payment of $ 1,533,000 to the Crestview Defendants.

295.    The 2011 Quota Holder Agreement was a valid agreement.

296.    The Crestview Defendants falsely and inappropriately claim that their actions are authorized pursuant to the terms of extinguished or replaced 2009 Agreement.

297.     The Crestview Defendants have no right to unilaterally use and sell the genetic material of La Dolfina's Cuartetera under a claim of right of the previously-cancelled and replaced 2009 Agreement, nor under any subsequent contract amongst the parties.

298.     The recent improper reliance upon the invalid or novated 2009 Agreement by the Crestview Defendants has caused and continues to cause the Plaintiffs past and future injury.

299.     However, the Crestview Defendants continue to state to the public, such as to the Park Place Polo Defendants, to various courts, and to others, that the 2009 Agreement is a valid basis for the present Cambiaso / La Dolfina horse clone sales by the Crestview Defendants.

300.     Further, the Park Place Polo Defendants now claim certain rights to the ownership of the La Dolfina Cuartetera clones and to the right to continue cloning pursuant to the Secret Cloning Agreement.

301.     Therefore, there is a bonafide, actual, present and practical need for a declaration of the Court as to the rights and remedies of the court with respect to the invalid or cancelled 2009 Agreement and the effect of that invalidity or cancellation upon the Secret Cloning Agreement, and the sale of clones and attempted assignment of cloning rights thereunder by the Crestview Defendants to the Park Place Polo Defendants.

302.     The controversy between the parties is real and immediate. As a result of the outstanding option Crestview Farm has conveyed to the Park Place Polo Defendants through their closely-related affiliates to elect to purchase seven (7) additional Cuartetera clones up and until June 30, 2022, and a concomitant grant of cloning rights to the Park Place Defendants, there is a substantial likelihood that is practically a certainty that the Plaintiffs will suffer substantial injury in the future.

303.    The execution of the Second Amendment to the Secret Cloning Agreement by Meeker on behalf of Crestview Farm on June 10, 2021, as well as the creation of the equine cloning Consulting Agreement between the Crestview Defendants and the Park Place Polo closely related affiliates, establishes not only a reasonable expectation this misconduct regarding the Cambiaso / La Dolfina clones will continue and be repeated in the future, but a certainty that the Crestview Defendants and the Park Place Polo Defendants intend to continue the unauthorized cloning and that the Defendants' misconduct with the clones is thus ongoing.

304.    At this point in time, all of the Defendants have a sufficient repository of misappropriated equine genetic material belonging to Plaintiffs to continue this misconduct unabated without the intervention of this Court.

305.    Thus, the standing requirements are satisfied.

WHEREFORE, Plaintiffs seek declaratory judgement against all Defendants, or such other remedies as the Court may deem proper, such as return of all clones to Plaintiffs, and to determine that (i) the 2009 Agreement failed for lack of agreement or performance of its material terms, and (ii) that the parties agreed to a novation or extinguishment of the 2009 Agreement via the 2011 Quota Holders Agreement; and what the rights and remedies of the parties under the 2009 Agreement (if any) presently are.   The relief also requested includes a declaratory judgment that the Secret Cloning Agreement, which relies upon the purported survival of the 2009 Agreement, and any Amendments thereto, are also void *ab initio*, novated, breached, or otherwise invalid, for lack of any underlying right to create and sell clones under the invalid or cancelled and replaced 2009 Agreement.

**Count IV**
**Breach of the 2009 Agreement**
**(In the Alternative)**

306.    Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

307.    This count is brought in the alternative.

308.    Plaintiff Cambiaso and Defendants Meeker and his alter-ego Crestview Farm entered into the 2009 Agreement (the "2009 Agreement"). **Exhibit 1.**

309.    The Crestview Defendants have admitted in this litigation that certain claimed rights under the 2009 Agreement were assigned to Crestview Genetics from Crestview Farm. Both Crestview Defendant are controlled by and used as alter-egos by Defendant Meeker

310.    The 2009 Agreement was invalid, cancelled, forever terminated and replaced by the parties' agreement to enter into the 2011 Quota Holders Agreement, which the Parties agree was a valid agreement.

311.    To the extent the Crestview Defendants presently take the position that the 2009 Agreement is still valid and operating (which Plaintiffs dispute) or the Court finds that this Agreement is valid, then the Crestview Defendants breached the 2009 Agreement by unilaterally using the genetic material of the horse Cuartetera owned by La Dolfina, creating unauthorized clones of Cuartetera, and unilaterally selling and setting all prices and terms of such sales of the unauthorized clones of Cuartetera, and even allowing the Park Place Defendants to continue cloning this horse, without any knowledge or consent by Mr. Cambiaso or La Dolfina.

312.    Such unilateral action was not permitted by ¶¶ 3, 4 and 5 of the 2009 Agreement during the short time that Agreement was effective.

313.    La Dolfina was not a party to the 2009 Agreement.

314.     The 2009 Agreement did not convey or contemplate the conveyance of ownership of any horse or genetic material to Meeker, Crestview Farm, or other Crestview Entity. The 2009 Agreement only ever allowed Crestview Farm, as provided in ¶ 1, very limited access and license for Crestview Farm "to select four mares from Owner's (defined as Mr. Cambiaso) stock *for the purpose of extracting tissue samples for cloning*." [emphasis added].

315.     Further, ¶ 4 of the 2009 Agreement *required a mutuality of agreement* by both Mr. Cambiaso and Crestview Farm (and by Genetics as admitted assignee), stating *"Owner and Crestview will <u>jointly</u> determine <u>all final sales prices and terms.</u>"*

316.     Mr. Cambiaso never agreed to the unilateral production and sale by Crestview Farm, Meeker, or any other individual or entity of any clones of Mr. Cambiaso's horses or the horses or especially the clones of La Dolfina, because La Dolfina was not ever part of the failed 2009 Agreement. Mr. Cambiaso never agreed that the Crestview Defendants could grant the rights to third parties such as the Park Place Polo Defendants to continue cloning Cuartetera as contemplated by the Secret Clone Sales Agreement.

317.     Mr. Cambiaso never agreed or otherwise provided the rights to Crestview Farm and Meeker to sell clones of Cuartetera as Crestview Farm and Meeker have now done and is evidenced by the Secret Clone Sale Agreement and amendments thereto.   **Exhibits 5, 6 and 7.** Quite to the contrary, to the extent that the 2009 Agreement contemplated the sale of any clones, the 2009 Agreement required Mr. Cambiaso, not Meeker or Crestview Farm, to market the first three of each cloned horse for sale and required Mr. Cambiaso "jointly determine [with Crestview Farm and Meeker] all final sales prices and terms." **Exhibit 1**, ¶ 4.

318.     The 2009 Agreement did not convey unlimited rights to or ownership of any genetic material, horses, or clones therefrom from Mr. Cambiaso to Crestview Farm.[19] Nor did the 2009 Agreement permit the surreptitious sales of Cuartetera clones without the knowledge or authorization of Mr. Cambiaso.

319.     Additionally, Mr. Cambiaso, Meeker, and Crestview Farm did not ever negotiate and agree to "an acceptable breeding program providing for the endorsement and marketing of clones and Crestview's cloning program" as required by ¶ 3 of the 2009 Agreement. **Exhibit 1**.

320.     By breaching the aforesaid provisions of the 2009 Agreement in the manner and method by which they did so, the Crestview Defendants also breached the implied covenant of good faith and fair dealing implicit in those provisions of the 2009 Agreement.

WHEREFORE, Plaintiff Adolfo Cambiaso demands judgment against the Crestview Defendants, including but not limited to actual and incidental damages and return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

**Count V**
**Fraudulent Inducement, Concealment and Misrepresentation**
**Regarding the 2019 Side Letter Agreement**

321.     Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through  265 of the General Allegations.

322.     On July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement, **Exhibit 4** hereto.

---

[19] Defendants' current mischaracterization of the 2009 Agreement as a "purchase and sale" of famous equine genetic material and clones is reminiscent of the similar attempts at mischaracterization by Meeker of the agreement with Storm Cat's owners, which Meeker was subsequently forced to abandon.

323.    In the 2019 Side Letter Agreement, those same Defendants covenanted and promised to restrict possession and distribution of the Cambiaso / La Dolfina horse clones to the parties and no one else.

324.    The Crestview Defendants made those representations of material fact to induce Mr. Cambiaso and La Dolfina to enter into the 2019 Side Letter Agreement, and the Crestview Defendants knew Mr. Cambiaso and La Dolfina would rely upon those representations when entering into the 2019 Side Letter Agreement.

325.    Mr. Cambiaso and La Dolfina did in fact rely upon those representations in entering into the 2019 Side Letter Agreement.

326.    Further, at the same time, Defendants intended to misappropriate the genetic material from select La Dolfina Cuartetera and create and sell unauthorized clones therefrom. Defendants hid this intent from Plaintiffs during the negotiation and execution of the 2019 Side Letter Agreement.

327.    At the time of the negotiation and execution of the 2019 Side Letter Agreement, the Crestview Defendants hid from Mr. Cambiaso the fact that those Defendants considered the 2009 Agreement to be still active and in force.   Those Defendants further hid from Mr. Cambiaso and that Defendants intended to market and sell Cambiaso and La Dolfina clones to the public almost a decade following the failure, extinguishment, novation or termination of the 2009 Agreement, despite the replacement of the 2009 Agreement by the 2011 Quota Holder Agreement, and the later 2019 Side Letter Agreement, and the eventual 2019 Settlement Agreement.

328.    At the time Defendants hid their intent to rely upon and use the 2009 Agreement from Plaintiffs, Defendants knew that such intent, if expressed, would stop Plaintiffs from entering into the 2011 Quota Holder Agreement and the later 2019 Side Letter Agreement and Plaintiffs

would cease providing access to Defendants of genetic material of Cuartetera and other valuable polo pony equine lineages owned by Plaintiff Mr. Cambiaso and / or La Dolfina. The Crestview Defendants also hid their intent to sell clones from Plaintiffs and, in fact, continually and misleadingly represented to Plaintiffs and the global media that they had no intention of selling clones. Plaintiffs reasonably relied on these representations.

329.   At the time of these concealments, misrepresentations and omissions, Defendants knew them to be material, false and misleading and intended that Plaintiffs rely on their concealment and omissions to mislead Mr. Cambiaso.

330.   Those concealments, omissions and misrepresentations by the Crestview Defendants were willful, malicious and designed to directly interfere with and harm Plaintiffs' property rights regarding the Cambiaso / La Dolfina horse clones, their production and their sale.

331.   Plaintiffs reasonably relied upon Defendants' prior novation and agreement to terminate and forever extinguish any claimed rights arising under the 2009 Agreement by accepting payment of $1,533,000 and entering into the 2011 Quota Holder Agreement and the later 2019 Side Letter Agreement.

332.   As a direct and proximate result of those concealments, misrepresentations and omissions by Meeker and Crestview Genetics, Plaintiffs have been damaged and continue to be damaged.

WHEREFORE, Plaintiffs demand judgment against all Crestview Defendants, other incidental and consequential damages, punitive damages, prejudgment and post-judgment interest, and such further relief as requested below and as this Court may deem just and proper, including but not limited to return of all clones and genetic material from Plaintiffs' horses.

## Count VI

**Breach of Contract**
**Regarding the 2019 Side Letter Agreement**

333.     Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

334.     On July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement. **Exhibit 4**.

335.     The 2019 Side Letter Agreement provided, among other things, that La Dolfina S.A. would transfer the oocytes of the Schedule I Cambiaso / La Dolfina horse clones to Defendant Genetics in order for the oocytes to be fertilized with semen provided from stallions belonging to and chosen by Plaintiffs. **Exhibit 4**.

336.     A material term of the 2019 Side Letter Agreement was the agreement and representation by Meeker and Crestview Genetics, on behalf of Meeker the Crestview Defendants that "Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells ***for the exclusive use of AC (Mr. Cambiaso) and LD (La Dolfina)*** at no cost to AC or LD during the term of this agreement." **Exhibit 4**, ¶ 8.

337.     The Crestview Defendants did not honor that provision.   The continuing unauthorized production and sale of Cuartetera clones by Meeker by and through Crestview Farm to persons and entities other than Mr. Cambiaso or La Dolfina violates material terms and a fundamental premise of the 2019 Side Letter Agreement.

338.     This conduct constitutes a material breach of the 2019 Side Letter Agreement which has caused, and continues to cause damage and irreparable harm to Plaintiffs. In addition, the 2019 Side Letter Agreement stated that Crestview Genetics must clone 10 "Cuarteteras" for

88

the exclusive use of Cambiaso and La Dolfina, and, should Crestview Genetics successfully complete and deliver these Cuartetera clones to La Dolfina, Alan Meeker, by and through Crestview Genetics, may clone two Cuarteteras "for the exclusive amateur (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras)" but that the sale or further cloning of the Meeker La Dolfina Cuarteteras was "expressly prohibited." **Exhibit 4**.

339.    The 2019 Side Letter Agreement did not allow or otherwise contemplate the sale of any clone or the sale of any oocytes to be used to clone.

340.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the unilateral right to sell any clones or genetic material of horses owned by Plaintiffs under any circumstances. Defendant Meeker acknowledged and reaffirmed in March 2020 that the Cuartetera clones in gestation were for the use of Mr. Cambiaso and that he promised to discuss payment for cloning services for the creation of those clones. Despite this affirmation, Defendant Meeker then quietly and secretly sold those very clones to the Park Place Polo Defendants. **Exhibit 5.**

341.    Further, the sales of the Cuartetera clones to the Park Place Polo Defendants, or to their closely-related affiliates or Mr. Borodin himself, violates the express restrictive terms of the 2019 Side Letter Agreement, which has as its core, material term, that only a limited number of clones of Cuartetera and very specific conditions were ever to be produced.

342.    The 2019 Side Letter Agreement prohibits the unilateral sale of clones by the Defendants. Mr. Cambiaso is required to expressly consent to any cloning under the terms of the agreement. **Exhibit 4**, ¶ 6.

343.     Any clones produced under the 2019 Side Letter Agreement are to be registered to La Dolfina. **Exhibit 4,** ¶ 1.

344.     The 2019 Side Letter Agreement mandates that any Cuartetera clones shall only be played on a La Dolfina branded team. **Exhibit 4,** ¶ 2.   By breaching the aforesaid provisions of the 2019 Side Letter Agreement in the manner and method by which they did so, Defendants also breached the implied covenant of good faith and fair dealing implicit in those provisions of the 2019 Side Letter Agreement.

345.     The 2019 Side Letter Agreement contains a remedy of replevin that requires Defendants to deliver within 48 hours any unauthorized clones or those being used contrary to the specific language in this agreement restricting their production and use. **Exhibit 4,** ¶ 6.

WHEREFORE, Plaintiffs demand judgment against Defendants Meeker, Crestview Farm, and Crestview Genetics, including but not limited to actual and incidental damages and return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

## Count VII

### Breach of Bailment Contracts
### Regarding the 2009 Agreement
### and 2019 Side Letter Agreement

346.     Plaintiffs repeat and reallege against all Crestview Defendants  ¶¶ 1 through 265 of the General Allegations. This count is brought in the alternative with respect to the 2009 Agreement.

347.     Both the 2009 and 2019 Agreements gave possession to Defendants of certain of Plaintiffs' genetic material for strictly limited purposes and under strictly limited parameters. While the 2009 Agreement was never valid or forever terminated and extinguished in 2011 by agreement to novation and the parties entering into the Quota Holders Agreement, to the extent

relied upon presently by the Crestview Defendants, the 2009 Agreement has also been breached by the recent acts of those Defendants.

348.    Under both the invalid or terminated 2009 Agreement and 2019 Side Letter Agreement, equine genetic material belonging to Plaintiffs, and any clones therefrom, were delivered to the Crestview Defendants only temporarily.

349.    The 2009 and 2019 Agreements, as well can be implied from the conduct of the parties during this time period, created only a bailment for the mutual benefit of the parties in return for the benefits flowing from the fact of bailment.

350.    Further, Crestview Defendants were charged with the exercise of care, to preserve the value of the bailed genetic material and clones, for example, by not engaging in unauthorized production and sale which would dilute the valuable genetic bloodlines.

351.    Defendants nonetheless exceeded the scope of their authorized bailment and misappropriated Plaintiffs' genetic material and produced and sold unauthorized clones and provided options to sell more of those clones.[20]

352.    The 2019 Side Letter Agreement contains a remedy of replevin that requires Defendants to deliver within 48 hours any unauthorized clones or those being used contrary to the specific language in this agreement restricting their production and use. **Exhibit 4, ¶ 6.**

353.    As a direct and proximate consequence of these breaches of the conditions of bailment under both the 2009 and 2019 Agreements, and the refusal of the Defendants to return tissue harvested thereunder or the Cuartetera clones created from that tissue, Plaintiffs have been injured.

---

[20] Much in the same pattern of conduct as in the matter of Storm Cat.

WHEREFORE, Plaintiffs demand judgment against the Crestview Defendants, including but not limited to actual and incidental damages and return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

## Count VIII

### Breach of Fiduciary Duties

354.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of the General Allegations.   This count is also brought in the alternative with respect to the 2009 Agreement.

355.    Under the 2009 and 2019 Agreements, Defendants represented that they possessed and were experienced in the use of advanced biotechnologies in the cloning of horses and Plaintiffs relied upon Defendants and their expertise.   As such equine cloning experts, Defendants enjoyed a superior position to Plaintiffs during the negotiation and performance of those Agreements. Therefore, Defendants enjoyed a special relationship with Plaintiffs and specifically agreed to that relationship.

356.    The Crestview Defendants specifically solicited that special relationship and all Defendants have benefitted from their superior position in that relationship, while Plaintiffs relied upon Defendants to act on Plaintiffs' behalf and to look out for Plaintiffs' best interests in the discharge of the Defendants' roles in the cloning initiative and the protection of Plaintiffs' unique and successful polo bloodlines.   The Crestview Defendants thus had a fiduciary relationship with Plaintiffs.

357.    Those Crestview Defendants breached those duties by the aforesaid purposeful and malicious misconduct and omissions by Defendants, the most recent of which, the Secret Clone Sale Agreement and the undisclosed extensions of options to sell Borodin / Pegasus the Cuartetera

clones produced for Mr. Cambiaso, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Plaintiffs and to the harm and damage to Plaintiffs.

358.    By the aforesaid acts and omissions of and by the Crestview Defendants, those Defendants breached their duty of loyalty to Plaintiffs which obligated the Defendants to use reasonable and due diligence and care in the use of the genetic material and cloning and marketing and sale of the clones, so as to preserve Plaintiffs' rights as a member of the cloning initiative.

359.    The Crestview Defendants owed those fiduciary duties to Plaintiffs by virtue of the Defendants' professed superior knowledge in equine cloning technology, for which Plaintiffs reposed much trust in those Defendants, and upon which Plaintiffs relied in choosing to enter into the 2009 and 2019 Agreements and contribute genetic material of a vastly superior caliber.

360.    The breach of these duties proximately caused Plaintiffs' damages.

361.    As a result of the aforesaid acts and omissions by the Crestview Defendants and the consequent breaches of fiduciary duties to Plaintiffs, Plaintiffs gave sustained damages, including but not limited to deprivation of the value of its genetic material, dilution of Plaintiffs' brand and other irreparable harm, as well as non-monetary and monetary damages.

WHEREFORE, Plaintiffs demand judgment against all Crestview Defendants, other incidental and consequential damages, punitive damages, prejudgment and post-judgment interest, and such further relief as requested below and as this Court may deem just and proper, including but not limited to return of all clones and genetic material from Plaintiffs' horses.

## Count IX

### Unjust Enrichment and Disgorgement

362.    Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through 265 of the General Allegations.

363.    Defendants have now received and enjoyed the benefit of the possession and use of Plaintiffs' equine genetic material and clones therefrom, and their breeding and earning capacity without paying for same and while having exceeded the strict limits of Defendants' very limited bailment of that genetic material and clones.

364.    Defendants accepted, appreciated, and have wrongfully retained the benefits of Plaintiffs' equine genetic material and clones therefrom, and their breeding and earning capacity.

365.    The Crestview Defendants know that the 2009 Agreement was never valid or long-since cancelled and replaced, and thus know or should know that any recent reliance upon the 2009 Agreement is not legitimate.

366.    All of the Defendants have now profited by their wrongful and unauthorized sale of clones of horses belonging to Plaintiffs. That purposeful and malicious misconduct and omissions by Defendants, the most recent of which, the Secret Clone Sale Agreement and extensions of options to sell Borodin / Pegasus the Cuartetera clones, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Plaintiffs and to the harm and damage to Plaintiffs.

367.    In contrast, Plaintiffs have been denied possession of the clones, the genetic material of the clones, have seen their brand and genetic bloodlines sold without authorization, the value diluted, and Plaintiffs have been denied Plaintiffs' right to approve or disapprove of the sale and terms of the sale of the clones, not to mention Plaintiffs' right to an equal share of any proceeds from any such sale.

368.    Under these circumstances, it is therefore inequitable for the Park Place Polo Defendants to retain the genetic material, and the clones to allow the cloning and retain sales and breeding earnings from the clones or genetic material, and should disgorge and return the clones.

369.     Under these circumstances, it is therefore inequitable for the Crestview Defendants to retain the millions of dollars paid to those Defendants, and they should be ordered to disgorge same to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against all Defendants, including but not limited to return of all clones and genetic material from Plaintiffs' horses and disgorgement of all profits and proceeds of sale of the Cambiaso / La Dolfina horse clones.

## Count X

### Conversion

370.     Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through 265 of the General Allegations.

371.     As set forth herein, Defendants' conversion of Plaintiffs' genetic material and clones is purposeful, malicious misconduct, the most recent of which, the Secret Clone Sale Agreement and extensions of options to sell Borodin / Pegasus the Cuartetera clones, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Plaintiffs and to the harm and damage to Plaintiffs.

372.     Defendants exceeded the scope of their authorized use of Plaintiffs' equine genetic material and clones therefrom.   Defendants have exercised dominion over and claimed ownership of clones from that genetic material and have specifically admitted selling the clones into the public market and have retained all proceeds therefrom.

373.     Defendants have thus converted the equine genetic property and clones that are owned and the sole property of Plaintiffs from Plaintiffs to Defendants' for Defendants' own nefarious use and exclusive benefit.

374.     These continuing acts of dominion are inconsistent with Plaintiffs' ownership of their horses and related genetic material.

375.     The Crestview Defendants accepted the investment of Plaintiffs' equine genetic material into the cloning initiative with the understanding and agreement that such contribution was for limited purpose and use, and was not a purchase and sale of that material.   Nevertheless, Defendants have converted that genetic material and the clones created therefrom to their own use, thus permanently depriving Plaintiff of those assets.

376.     As a result of such conversion, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment against all Defendants, other incidental and consequential damages, punitive damages, prejudgment and post-judgment interest, and such further relief as requested below and as this Court may deem just and proper, including but not limited to return of all clones and genetic material from Plaintiffs' horses.

## **Count XI**

### **Equitable Accounting**

377.     Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

378.     Under the 2009 and 2019 Agreements, Defendants represented that they possessed and were experienced in the use of advanced biotechnologies in the cloning of horses and Plaintiffs relied upon Defendants and their expertise.   As such equine cloning experts, Defendants enjoyed a superior position to Plaintiffs during the negotiation and performance of those Agreements.

379.     Therefore, the 2009 and 2019 Agreements created a fiduciary relationship amongst the parties, and Defendants enjoyed a special relationship with Plaintiffs and specifically agreed to that relationship.

380.     Moreover, the relationship between the parties contemplated a complex scientific process, equine cloning, which requires meticulous record-keeping, accounting and involves use of sophisticated technology including the extraction, propagation and storage of genetic tissue.

381.    By virtue of Defendants' physical possession of Plaintiffs' genetic material and operation of the biotechnology to effect the cloning therefrom as agreed and specified under the preliminary but cancelled 2009 Agreement, the 2019 Side Letter Agreement, and 2019 Settlement Agreement, Defendants were required to keep and disclose accurate records to account for the location and use of Plaintiffs' genetic material and the clones therefrom, and the revenues derived from all financial activity regarding same.

382.    The Crestview Defendants have not shared this information with Plaintiffs despite Plaintiffs' demand, while admitting that Defendants have sold and plan to imminently sell, several Cuartetera clones belonging to La Dolfina into the public market.

383.    Under the aforesaid circumstances, Defendants should be ordered to account to Plaintiffs for the inventory and use of Plaintiffs' genetic material and the clones created therefrom, and the revenues derived from all financial activity regarding same.

WHEREFORE, Plaintiffs demands judgment against the Crestview Defendants requiring an accounting to Plaintiffs of the inventory and use of Plaintiffs' genetic material, the clones created therefrom, and the revenues derived from all financial and contractual activity regarding the same.

<u>**Count XII**</u>
**Imposition of a Constructive Trust**

384.    Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through 265 of the General Allegations.

385.    As set forth herein, the Crestview Defendants have exceeded the scope of their authorized use of Plaintiffs' equine genetic material and clones therefrom and Defendants have claimed ownership of clones from that genetic material and have specifically admitted selling the clones into the public market and have retained all proceeds therefrom.

386.    Further, the Park Place Polo Defendants and their closely-related affiliates knowingly took possession of the Cuartetera clones and knowingly purchased an option for seven (7) more such clones, which option apparently has been exercised during this litigation.

387.    All Defendants have thus converted the equine genetic property and clones that are the sole property of Plaintiffs for Defendants' own exclusive use and exclusive benefit, permanently depriving Plaintiffs of those assets.

388.    As a result of such conversion, Plaintiffs have been damaged.

389.    Should the Court order Defendants to return to Plaintiffs the Cambiaso / La Dolfina equine genetic material and clones, all oocytes, all embryos, all foals in gestation, and any proceeds derived from the sale thereof, to Plaintiff, in order to secure Defendants' performance, Plaintiffs seek a constructive trust upon all of the membership interest of Crestview Genetics, LLC and Crestview Farm, LLC held by Defendants, whether directly or indirectly so held.   Plaintiffs also seek the imposition of a constructive trust upon any equine generic property that they own in the possession, custody or control of the Park Place Polo Defendants.

390.    The imposition of such a constructive trust is to serve as a method of securing Defendants' performance of such an Order of the Court, and not as an additional award of damages.

WHEREFORE, Plaintiffs demand the imposition of a constructive trust, in favor of Plaintiffs, upon all of the membership interest of Crestview Genetics, LLC and Crestview Farm, LLC held by Defendants, whether held directly or indirectly through a third party, and upon any equine generic property owned by Plaintiffs in the possession, custody or control of the Park Place Polo Defendants.

## Count XIII

### Violation of Trademark Act of 1946 ("Lanham Act")
### 15 U.S.C. § 1125(a)(1)(B) – False Advertising

391.     Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of

the General Allegations.

392.     Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427,

specifically provides:

> (2)      Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or device,
> or any combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which—
>
> (A)      is likely to cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another person, or as to
> the origin, sponsorship, or approval of his or her goods, services, or commercial
> activities by another person, or
>
> (B)      in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

393.     Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A)

and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B).

394.     A claim under 15 U.S.C. §1125(a)(1)(A) is known as a "false association"  claim.

395.     A claim under 15 U.S.C. § 1125(a)(1)(B) is known as a "false advertising" claim.

Plaintiffs bring the within cause of action as a false advertising claim under 15 U.S.C. §

1125(a)(1)(B).

396.     The Secret Cloning Agreement establishes multiple other false or misleading

descriptions of fact, or false or misleading representations of fact, and false or misleading

statements that, upon information and belief, permeated Defendants' commercial interactions, commercial advertising and promotion to Mr. Borodin, and Park Place, Bartolo and Camila Castagnola and, upon information and belief, other consumers in the United States and elsewhere.

397.    These documents establish multiple false and or/misleading statements including but not limited to: that the Crestview Defendants falsely stated to Mr. Borodin or his representatives that they had an exclusive license to sell those clones for their "own account."

398.    These documents establish that the Crestview Defendants falsely claimed that their actions were authorized by the invalid or previously-cancelled and replaced 2009 Agreement.

399.    These documents establish that the Crestview Defendants falsely claimed that all approvals of persons whose approvals were required had been obtained.

400.    These documents establish that the Crestview Defendants falsely claimed that the 2009 Agreement had not failed, been extinguished by novation, terminated or altered in any manner.

401.    These documents establish that Meeker and Farm falsely claimed that the sold Clones would not be subject to any claims by Mr. Cambiaso and La Dolfina.

402.    These false or misleading descriptions of fact or false or misleading representations of fact falsify and misrepresent the "nature, characteristics, or qualities" of the Clones sold by the Defendants falsely stating or implying that the sale of these clones was authorized and valid.

403.    These false or misleading descriptions of fact or false or misleading representations of fact are likely to cause confusion, mistake or to deceive consumers as to Mr. Cambiaso's affiliation, connection or association as to his and La Dolfina's sponsorship or approval of these unauthorized clones.   Thus, these statements literally falsify and misrepresent that "nature,

characteristics, or qualities" of the Clones because they falsely represent that they were authorized and legal to have been produced, when in truth and fact, they were not.

404.    Further, based on the limited evidence available to date, including the November 9 Secret Cloning Agreement, the Crestview Defendants, in the commercial advertising and promotion of the Cambiaso / La Dolfina clones, made and upon information and belief continue to make false or misleading statements to consumers in the United States and worldwide about the nature, characteristics or qualities of the clones.

405.    Those continuing false and misleading statements include these Defendants' purported abilities to produce clones of these horses under the invalid or extinguished 2009 Agreement without any authorization by Mr. Cambiaso and La Dolfina and/or falsely convey that these Clones are authorized to be produced and do not violate the contractual and obligations of the Defendants, which is an inherent and fundamental part of their "nature, characteristics, or qualities." These false statements are about the Crestview Defendants' commercial activities and falsely state or imply that they had Plaintiffs' authorization to sell these clones which, in truth and fact, belong to Plaintiffs.

406.    These continuing false or misleading descriptions of fact or false or misleading representations of fact are outright false or omit material information that render the misrepresentation misleading or false.   Specifically, the omission of the inability of the Crestview Defendants to unilaterally clone Cambiaso / La Dolfina horses without consent of Plaintiffs, and then to sell and transfer them, and sell and transfer options to create more of them, as their own property, makes these representations or omissions misleading or outright false.

407.    These continuing false or misleading descriptions of fact or false or misleading representations of fact are not opinion or puffery.

408.     A reasonable consumer of high end polo horses would not believe that these claims are puffery but rather factual given the Defendants' misrepresentations about their purported legal rights to produce and sell these clones.

409.     The Crestview Defendants, in the Secret Cloning Agreement, represented to the Park Place Polo entities and affiliates that there were no competing claims to the Cuartetera clones, and that the sale of those clones did not breach or place the Crestview Defendants in default of any agreement.   Those statements of material fact were patently false.

410.     The Defendants have made further statements, set forth in the General Allegations, to other members of the public, such as Mr. and Mrs. Castagnola, that the Crestview Defendants are the authorized sellers of authorized clones of Plaintiffs' original, unique polo horses such as Aiken Cura, Cuartetera, Colibri and Lapa.   See **Exhibits 21 and 22 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.* Upon information and belief, these statements have been made to other consumers as well.

411.     The Crestview Defendants represented to the Castagnolas that Defendants owned and were authorized to produce clones from Plaintiffs' horses, to wit *"You should buy one of my new Colibri or Aiken Cura clones!   I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2** **herein, and Exhibits 22 and 21,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola.*

412.     Those statements by the Crestview Defendants were literally false because none of the Agreements expressly granted Defendants a right to advertise and sell those clones and clone foals. At the very least these statements were misleading and were designed to conceal the true facts from a prospective purchaser of high end polo horses.

413.    The Crestview Defendants further represented to the public, in response to a member of the public's inquiry  "*Si, you have Cuartetera??*" that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for*."  That statement was misleading by implying that Defendants had authorization to create and sell to the public clones of Plaintiffs' renown Cuartetera polo horse.

414.    By these representations, as well as others in the public media, the advertisements and statements of the Crestview Defendants were (1) false or misleading, and (2) deceived or had the capacity to deceive the public.  Defendants did not have the authorization of Plaintiffs to create, advertise and sell into the public market clones and cloned foals of Plaintiffs' renown polo horses.

415.    The aforesaid statements and advertising to the public by Defendants therefore were both false or misleading and deceived or had the capacity to deceive the public that the clones and cloned foals offered for sale by Defendants were authorized clones of Plaintiffs' horses, possessing the same abilities as Plaintiffs' original horses by way of genetics and training by Plaintiffs' polo trainers and Mr. Cambiaso.[21]

416.    The deception by the Crestview Defendants (3) had a material effect on the purchasing decisions of the public, such as Mr. Borodin and his Park Place Polo Team, who clearly have the financial ability to purchase nothing but the best polo horses.

---

[21] Meeker has publicly opined that Cambiaso's ponies are highly prized, and those involved in training and showing their clones consider their involvement a great privilege, and care is taken to have the clones trained and handled by the same people involved in the original horse training. Telephone interview of Alan Meeker by Lewis T. Stevens with Alan Meeker on behalf of Crestview Genetics on March 14, 2016.
Source:   https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1157&context=kjeanrl

417.     Further, Defendants have (4) offered their services of cloning Plaintiffs' horses and transported Plaintiffs' equine genetic material and clones across state lines and apparently across United States borders, such as from Argentina into the United States and from the United States to elsewhere, thus affecting interstate commerce.

418.     Finally, (5) the commercial advertising, promotion and sale of the misrepresented cloning services and misappropriated clones belonging to Plaintiffs have already been and are likely to further cause irreparable harm to Plaintiffs by the unrestricted distribution and dilution of Plaintiffs' unique equine genetic blood lines to competitors and the public at large.

419.     In addition to the specific instances of the advertisement, promotion and offers to the Castagnolas, Park Place Polo and Andrey Borodin, and upon information and belief to other consumers, Defendants' oral statements in the public media asserting the authorization and ownership of Defendants over the clones of Plaintiffs' horses have been widely disseminated through media channels such as in *Vanity Fair, 60 Minutes* and other public media. **Exhibits 25, 26, and 27.**   This is actionable misconduct under the Lanham Act because it constitutes false and misleading commercial advertising and promotion.

420.     At all times relevant hereto, Meeker acted in Palm Beach County, Florida as the sales agent and representative of Defendants Crestview Genetics and Crestview Farm, **Exhibit 8,** *Affidavit of Robert Jornayvaz, III,* offering Defendants' cloning services and offering sales of offspring of Plaintiffs' clones. Meeker made repeated "sales pitches" and solicited business regarding offspring of Plaintiffs' clones in Florida on behalf of himself and the other Defendants. **Exhibit 8,** *Affidavit of Robert Jornayvaz, III, ¶¶ 5-7, 10.*

421.     The aforesaid statements by Defendants are literally false and can be presumed to have deceived the public.   Even if not literally false, the statements are impliedly false because

104

neither the 2009 Agreement, nor the 2019 Agreement, grant Defendants the right to sell the "second edition" of clones of Plaintiffs' polo horses.

422.    The aforesaid statements by Defendants in Florida and in multiple states were material, in that Defendants' deception as to the authorization of the clones and provenance of the clones as being from Plaintiffs' renown polo horses and polo training operation, and thus containing the same, vastly superior attributes, was likely to influence the consumer's purchasing decision.

423.    By relying heavily upon names of the horses or Plaintiffs' identities in their commercial advertising, promotion and sale of the horses, Defendants' expressly creating a link between renowned polo ponies and the renowned Plaintiffs, enhancing the likelihood that Defendants' misrepresentations will influence the purchasing decisions of the public.

424.    In Palm Beach County, Florida, Defendants, by and through their sales agent and representative Meeker, have further represented a relationship with Plaintiffs, further implying that the clones and sales of clones and cloned foals were authorized by Plaintiffs, thus using that relationship to procure business for the profit of Defendants.

425.    These statements were made by Defendants in Florida and other locations, and Defendants offered their services and the clones for sale in multiple states and countries also by and through national publications, thus affecting interstate commerce.

426.    The statements by Defendants to the Castagnolas, and upon information and belief to other consumers, are commercial advertisements or promotions that misrepresent the nature, characteristics or qualities of Defendants' services or commercial activities by falsely representing that Defendants had the exclusive commercial right to engage in these sales.

427.    The statements by Defendants to the Castagnolas, impliedly misrepresent that the clones had been made and marketed by the sole authority of the Defendants, and thereby misrepresent and diminish the nature, characteristics and qualities of Plaintiffs' horses and commercial activities and ultimate authority over Plaintiffs' polo horse bloodlines.

428.    This purposeful misconduct by Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will, and this misconduct by Defendants was taken with wanton and reckless disregard for the harm to Plaintiffs and their interests and rights.   The injury to Plaintiffs' commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

429.    Plaintiffs have been, are currently, and are likely to be further damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1). Thus, Plaintiffs have standing to bring these claims.

430.    Defendants' unlawful conduct is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' false advertising and related deception of consumers who have or will withhold trade from Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

431.    The loss of the exclusivity to Plaintiffs' equine blood lines by the unauthorized creation and sale of the clones, has caused and will continue to cause actual confusion in the marketplace, resulting in loss of goodwill and profits, and harming and threatening to further harm

the business reputation of Plaintiffs as exclusively possessing their exclusive polo horse blood lines as the premier and most successful competitors in the sport of polo.

432.    In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team.   Meeker himself has admitted "It's 70% to 80% the horse, and everyone, including Cambiaso, will tell you this."[22]

433.    Defendants' willful misconduct has resulted in injury to Plaintiffs' commercial interest in business reputation. The injury to business reputation is based on the unauthorized sales of the highest quality clones by Defendants in the marketplace. Simply put, Plaintiff's horses are the superstars of the polo world.   For example, Cuartetera, in the world of polo is an iconic horse, the Michael Jordon, Tiger Woods or Secretariat of the sport of polo.

434.    Because of Defendants' misconduct, Plaintiffs have no way of preserving the integrity and reputation as exclusive possessors of clones of La Dolfina Cuartetera and the other Cambiaso / La Dolfina polo horses bloodlines.

435.    The Crestview Defendants have destroyed the ability of Plaintiffs to ensure the meticulous training and preparation of these clones only for the highest echelon of international polo competition, and controlling any breeding to which they may be subject.

436.    The unauthorized proliferation of these clones to third parties and competitors, over whom Plaintiffs have no control, will diminish the value of the offspring and further clones belonging to and in the possession of Plaintiffs.   Unauthorized creation and distribution of these unauthorized clones results in a diminution in their value to both Plaintiffs, and of Plaintiffs' reputation and value in and to the public market, while further degrading the exclusive stature of

---

[22] *Six cloned horses help rider win prestigious polo match*, by Jon Cohen, Dec. 13, 2016.
Source: https://www.sciencemag.org/news/2016/12/six-cloned-horses-help-rider-win-prestigious-polo-match

these ponies in the most elite level of polo.  These impacts of Defendants' misconduct thus directly results in a loss of business reputation to Plaintiffs.

437.    By willfully making the Cuartetera and other of Plaintiffs' equine bloodlines available to competitors of Plaintiffs, the Crestview Defendants are directly harming the business reputation of Plaintiffs as the most successful competitors in the global polo industry.

438.    The damage to Plaintiffs and their interests is irreparable and Defendants' willful misconduct continues, threatening further irreparable harm to Plaintiffs, their economic and reputational interests, competitive advantage, business reputation and their goodwill in the competitive sport of polo.

WHEREFORE, Plaintiffs demand judgment and relief against the Crestview Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a) for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

## Count XIV

### Violation of Trademark Act of 1946 ("Lanham Act")
### 15 U.S.C. § 1125(a)(1)(A) – False Association

439.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

440.    Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

(3)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device,

or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B)     in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

441.     Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B).

442.     A claim under 15 U.S.C. §1125(a)(1)(A) is known as a "false association " claim.

443.     A claim under 15 U.S.C. § 1125(a)(1)(B) is known as a "false advertising" claim. Plaintiffs bring the within cause of action as a false association or endorsement claim under 15 U.S.C. § 1125(a)(1)(A).

444.     The Crestview Defendants have made the aforesaid statements, set forth in the General Allegations, to the consuming public by using Plaintiffs' names and the names of Plaintiffs' horses, to falsely imply that Plaintiffs have endorsed Defendants as authorized sellers of clones of Plaintiffs' original, unique polo horses by specifically naming the horses Aiken Cura, Cuartetera, Colibri and Lapa.  **Exhibits 21 and 22 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.*

445.     These single parents[23] of the clones at issue are known throughout the polo industry to be the best and most prized horses belonging to Plaintiffs, responsible for much of Plaintiffs' professional success since their originals were introduced to the sport. It is reasonable that no one

---

[23] Each clone is produced from replication of only one "parent" horse.

would represent that they had for sale clones originating from such horses unless such clones and cloning were endorsed by Plaintiffs.

446.   However, as described herein above, Plaintiffs have not in fact endorsed the sale of the clones of Plaintiffs' horses to the public, such as the Castagnolas or Mr. Borodin and the Park Place Polo entities.

447.   Defendants' conduct in the promotion and sale in commerce of these Clones utilized false or misleading descriptions of fact or false or misleading representations of fact or false designation of origin. These statements falsify or misrepresent Mr. Cambiaso's and La Dolfina's affiliation, connection or association with these Clones in written representations made to Park Place Polo and/or Mr. Borodin.

448.   The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that their actions were authorized by the invalid or extinguished 2009 Agreement.

449.   The Secret Cloning Agreement establishes that the Crestview Defendants falsely stated to Park Place and Mr. Borodin that all approvals of persons whose approvals were required had been obtained.

450.   The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin  that the Crestview Defendants **were not in default under the 2009 Agreement** at each of those three times described in § 6. **Exhibit 5,** CF00007.

451.   The Secret Cloning Agreement establishes that Meeker and Farm falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants represented to Borodin that the ten Cuartetera clones were **free and clear of any claims by Mr. Cambiaso** at each of those three times described in § 6 of the Secret Cloning Agreement. **Exhibit 5,** CF00007.

452.     The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants had the ability to and indeed granted an ***assignable license*** to Borodin for Borodin ***to produce an additional ten (10) Cuartetera clones.*** **Exhibit 5**, CF00008 § 8.1.

453.     The representations by the Crestview Defendants in 2020 were all false, to wit, it was ***not true*** that: (i) the sale of the clones were authorized by Plaintiffs by and through the 2009 Agreement, (ii) all approvals of persons whose approvals were required had been obtained, (iii) the Clones were free of all claims by Mr. Cambiaso, and (iv) that Defendants had a legal capacity and right to grant Park Place/Mr. Borodin a license to produce more clones.

454.     These statements by the Crestview Defendants are all false or misleading descriptions or fact or false or misleading representations of fact or false designation of origin because they falsify or misrepresent Mr. Cambiaso's and La Dolfina's affiliation, connection or association with these Clones that they never authorized, and represent that this transaction had been undertaken with Mr. Cambiaso's and La Dolfina's endorsement or authorization. These statements have been made to members of the public, and discovery may reveal the further extent of those statements to the public.

455.     When Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!  I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2** **herein, and Exhibits 22 and 21,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Plaintiffs when such endorsement did not exist.

456.    Moreover, these false statements falsely stated that the Defendants originated the Clones when in truth and in fact they had been created using genetic tissue that had been misappropriated from Mr. Cambiaso and La Dolfina.

457.    Thus, by claiming that they had the right to engage in these transactions, Defendants misleadingly described or represented the true nature of their ability to produce these clones, which they could not without the authorization of Mr. Cambiaso and La Dolfina, and implied Mr. Cambiaso and La Dolfina had an affiliation, connection or association with these Clones that they never authorized.

458.    Defendants further willfully represented to the public, in response to a member of the public's inquiry   "*Si, you have Cuartetera??*" that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for*."   That statement was misleading by implying that Plaintiffs had endorsed the creation and sale to the public clones of Plaintiffs' renowned Cuartetera polo horse, when in fact Plaintiffs had not endorsed such cloning and sale.

459.    Defendants willfully made and created these false designations of origin, misleading descriptions of fact or false or misleading representations of fact, and made these false endorsement statements and implications for the commercial benefit of Defendants.

460.    By these misrepresentations, as well as others in the public media, the advertisements and statements of Defendants were willfully (1) false or misleading, and (2) deceived or had the capacity to deceive the public.

461.    Defendants did not have the endorsement of Plaintiffs to create, advertise and sell into the public market clones and cloned foals of Plaintiffs' renown polo horses.   The aforesaid statements and advertising to the public by Defendants therefore were both false or misleading and deceived or had the capacity to deceive the public that the clones and cloned foals offered for sale

by Defendants were endorsed, connected or affiliated with Plaintiffs, and that Plaintiffs were part of the cloning endeavor that the offered clones possessed the same abilities as Plaintiffs' original horses by way of genetics and training by Plaintiffs' polo trainers and Mr. Cambiaso.[24]

462.    The willful deception by Defendants (3) had a material effect on the purchasing decisions of the public, such as Mr. Borodin and his Park Place Polo Team, who clearly have the financial ability to purchase nothing but the best polo horses and have in fact purchased three Cuartetera clones and purchased the option for seven more Cuartetera clones. **Exhibit 5.** These statements are believed to have been made to other consumers as well.

463.    Further, Defendants have (4) offered to sell clones and their services of cloning Plaintiffs' horses and transported Plaintiffs' equine genetic material and clones across state lines and apparently across United States borders, such as from Argentina into the United States and from the United States to elsewhere, thus affecting interstate commerce.

464.    Finally, (5) Defendants' willful representations by use of the specific names of the horses, which undeniably apply a direct endorsement by Plaintiffs, during the sale of the clones belonging to Plaintiffs, has already and are likely to further cause irreparable harm to Plaintiffs by the unrestricted distribution and dilution of Plaintiffs' unique equine genetic blood lines to competitors and the public at large.

465.    While making these false statements, which falsely implied endorsements by Plaintiffs of the clones sales, Meeker willfully acted in Florida as the sales agent and representative of Defendants Crestview Genetics and Crestview Farm, **Exhibit 8,** *Affidavit of Robert Jornayvaz,*

---

[24] Meeker has publicly opined that Cambiaso's ponies are highly prized, and those involved in training and showing their clones consider their involvement a great privilege, and care is taken to have the clones trained and handled by the same people involved in the original horse training.   Telephone interview of Alan Meeker by Lewis T. Stevens on March 14, 2016.
Source: https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1157&context=kjeanrl

*III,* offering Defendants' cloning services in general and offering for sale the offspring of clones of Plaintiffs' horse.   Meeker made repeated "sales pitches" and solicited business regarding Plaintiffs' clones in Florida on behalf of himself and the other Defendants. **Exhibit 8,** *Affidavit of Robert Jornayvaz, III, ¶¶ 5-7, 10.*

466.   The aforesaid statements by Defendants are literally false and can be presumed to have deceived the public because Plaintiffs did not endorse the sale of the clones of Plaintiffs' prized polo horses to third parties, yet the Park Place Polo Team, through its agent and closely-related affiliate, did in fact execute the Secret Cloning Agreement and purchase three clones and options for seven more clones.   **Exhibits 5, 6, and 7.**

467.   Even if not literally false, the statements are impliedly false because neither the 2009 Agreement, nor the 2019 Agreement, grant Defendants the right to sell the "second edition" of clones of Plaintiffs' polo horses or any clones without the Plaintiffs' express consent. Therefore, Defendants do not have the endorsement of Plaintiffs to undertake such acts.

468.   The aforesaid statements by Defendants in Florida and in multiple states were material, in that Defendants' deception as to the endorsement of the cloning and that the clones as being authorized as coming from Plaintiffs' renown polo horses and polo training operation, and thus containing the same, vastly superior attributes, was likely to influence the consumer's purchasing decision. These statements have been made to members of the public, and discovery may reveal the further extent of those statements to the public.

469.   By relying heavily upon names of the horses and upon Plaintiffs' identities as known owners of those horses, in conjunction with the advertising and sale of the horses, the Crestview Defendants purposefully expressed and implied a link between the renown polo ponies and an endorsement by the renown Plaintiffs.

114

470.    These links enhanced the likelihood that Defendants' misrepresentations did and will continue to influence the purchasing decisions of the public as to those clones.

471.    Defendants, in Palm Beach County Florida and elsewhere, by and through their sales agent and representative Meeker, have further represented a close and special relationship with Plaintiffs, further implying that the clones and sales of clones of Plaintiffs' renowned polo ponies were endorsed by Plaintiffs.

472.    These representations and implications have caused and are likely to cause continuing confusion, deception and mistake to the public, while the Crestview Defendants are leveraging that appearance of a close and special relationship to procure business for the profit of Defendants.   In other words, Plaintiffs are likely to cause confusion, deception or mistake as to the affiliation, connection or association of the Crestview Defendants' illegal horse selling activities with Plaintiffs, or the Plaintiffs' sponsorship or approval of the unauthorized Cuarteteras and the Crestview Defendants' related activities. These statements were made in interstate and international commerce.

473.    These statements were made by the Crestview Defendants in Florida and in multiple states and countries including by and through national publications, thus affecting interstate commerce.   There are many such publications, some of which are cited herein and incorporated by reference herein.

474.    This willful misconduct by the Crestview Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.   The injury to Plaintiffs' commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

475.     Plaintiffs have been, are currently, and are likely to be damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1)   Thus, Plaintiffs have standing to bring these claims.

476.     Defendants' unlawful and willful conduct is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' false endorsement and related deception of consumers who have or will withhold trade from Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

477.     The loss of the exclusivity to Plaintiffs' equine blood lines by the unauthorized creation and sale of the clones, has caused and will continue to cause actual confusion in the marketplace, resulting in loss of goodwill and profits, and harming and threatening to further harm the business reputation of Plaintiffs as exclusively possessing their exclusive polo horse blood lines as the premier and most successful competitors in the sport of polo.

478.     In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team.   The misconduct of the Crestview Defendants has resulted in injury to Plaintiffs' commercial interest in business reputation.

479.     The injury to business reputation is based on the unauthorized sales of the highest quality clones by Defendants in the marketplace. Simply put, Plaintiff's horses are the superstars of the polo world.   For example, Cuartetera, in the world of polo is an iconic horse, with the stature in polo as Michael Jordon, Tiger Woods or Secretariat possesses in their respective sports.

480.     Because of Defendants' misconduct, Plaintiffs have no way of preserving the integrity and reputation as exclusive possessors of Cuartetera and the other of Plaintiffs' polo

horses' bloodlines by ensuring their meticulous training and preparation of these clones only for the highest echelon of international polo competition, and controlling any breeding that they may be subjected to.

481.    The unauthorized proliferation of these clones to third parties and competitors, over whom Plaintiffs have no control, will diminish the value of the offspring and further clones belonging to and in the possession of Plaintiffs.   Unauthorized creation and distribution of these unauthorized clones results in a diminution in their value to both Plaintiffs and of Plaintiffs' reputation and value in and to the public market, while further degrading the exclusive stature of these ponies in the most elite level of polo.   These impacts of Defendants' misconduct thus directly results in a loss of business reputation to Plaintiffs.

482.    By making the Cuartetera and other of Plaintiffs' equine bloodlines available to competitors of Plaintiffs, Defendants are willfully directly harming the business reputation of Plaintiffs as the most successful competitors in the global polo industry.

WHEREFORE, Plaintiffs demand judgment and relief against the Crestview Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a), for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

**Count XV**

**Violation of the Trademark Act of 1946 (Lanham Act)**
**15 U.S.C. § 1125(a)(1)(A)**
**False Association - Celebrity Status**

483.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

484.    Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

(4)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(C)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(D)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

485.    Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B). The Lanham Act prohibits unauthorized misappropriation and misuse of a celebrity's image or persona when used in association with a product so as to imply that the celebrity endorses the product.

486.    Mr. Cambiaso is widely accepted as the leading celebrity in the world of international polo. He is the world's most accomplished polo player and breeder of championship winning high goal polo horses, including Cuartetera.

487.    The La Dolfina polo organization is widely recognized as the leading breeder of elite and world- renowned polo horses.

488.    Plaintiffs' horses are the superstars of the polo world.   Cuartetera, in the world of polo is an iconic horse, the Michael Jordon, Tiger Woods or Secretariat of the sport of polo.

489.    Meeker is not recognized as a celebrity in the world of polo, as either a player or breeder, or in any capacity.

490.    Unlike La Dolfina, Crestview Farms is not recognized as a breeder of elite and world- renowned polo horses.

491.    The Lanham Act is designed to protect commercial interests in identities, including those of celebrities.

492.    A Plaintiff such as Mr. Cambiaso does not require a registered trademark to protect his commercial interests under the Lanham Act.

493.    The use of common law or unregistered trademarks by an unauthorized user is a violation of the Lanham Act. In false endorsement cases, the term "mark" applies to a celebrity's persona and the "strength" of the mark refers to the level of recognition that the celebrity has among the segment of the public to whom the advertisements or promotions are directed.

494.    The level of recognition that Mr. Cambiaso and La Dolfina have among the segment of the high goal polo horse buying market is extremely high.

495.    Cuartetera is synonymous with La Dolfina and Mr. Cambiaso. She is registered in the breeding registry as "Dolfina Cuartetera" and is synonymous and integrally associated with La Dolfina and Mr. Cambiaso, and not the Defendants.

496.    Mr. Borodin, Park Place Polo, and the Castagnolas are in the segment of the market where Mr. Cambiaso's and La Dolfina's persona and "mark" are highly regarded, given their fame and accomplishments.

497.    The Lanham Act protects unauthorized use of a celebrity's persona in association with a product so as to imply that the celebrity endorses the product.

498.    Defendants falsely represented to the purchasing public in this market segment that they had the ability to sell Dolfina Cuartetera clones.

499.    When the Crestview Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!  I'm making new Lapa clones too.  … I have babies of Cuartetera"* **Figure 2 herein, and Exhibits 22 and 21,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Mr. Cambiaso and La Dolfina, and this false implication wrongfully implied that Mr. Cambiaso, a celebrity, had endorsed the sale.

500.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the ten Cuartetera clones were ***free and clear of any claims by Mr. Cambiaso*** at each of those three times described in § 6 of the Secret Cloning Agreement. **Exhibit 5, page CF00007.**

501.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants had the ability to and indeed granted an ***assignable license*** to Borodin for Borodin ***to produce an additional ten (10) Cuartetera clones.*** **Exhibit 5**, CF00008 § 8.1.

502.    The representations by the Crestview Defendants are false, because it was and is not true that: (i) the sale of the Clones were authorized by the 2009 Agreement, (ii) all approvals

of persons whose approvals were required had been obtained, that the Clones were free of all claims by Mr. Cambiaso, (iii) the Crestview Defendants had the purported ability to grant Park Place Polo Team and Mr. Borodin a license to produce more clones, (iv) that the clone sales transaction had been undertaken with the endorsement or authorization of Mr. Cambiaso and La Dolfina.

503.     These false and fraudulent assertions that Mr. Cambiaso and La Dolfina, both recognized and leading celebrities in this market segment, had approved or endorsed these putative sales are a misuse and wrongful appropriation of Mr. Cambiaso's persona and La Dolfina's powerful and valuable brand. Upon and information and belief, these assertions are believed to have been made to other consumers as well.

504.     Mr. Cambiaso and La Dolfina never approved of the sale of these unauthorized Dolfina Cuartetera clones by Defendants.

505.     The misuse of Mr. Cambiaso's persona and La Dolfina's powerful and valuable brand are likely to cause confusion to consumers as to the Plaintiffs as to sponsorship or approval of these sales of clones of Dolfina Cuartetera.

506.     The misuse of Mr. Cambiaso's persona and La Dolfina's brand occurred in interstate and international commerce.

507.     The misuse of Mr. Cambiaso's persona and La Dolfina's brand violates the public's interest in deception and the Plaintiffs' commercial investment and drawing power in endorsing their own products.

508.     The false implication that Mr. Cambiaso and La Dolfina approve of the sale of these unauthorized and illegal Dolfina Cuartetera clones are likely to cause confusion, mistake, or to

deceive consumers as to the origin, sponsorship, or approval by Plaintiffs as to the unauthorized and illegal clone sales by Defendants.

509.   This willful misconduct by the Crestview Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.   The injury to Plaintiffs'   commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

510.   Plaintiffs have been, are currently, and are likely to be damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1)   Thus, Plaintiffs have standing to bring these claims.

511.   Defendants' unlawful and willful conduct is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' false endorsement and related deception of consumers who have or will withhold trade from Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

512.   Defendants have wrongfully deprived Plaintiffs' interests in their own commercial investment or drawing power of their persona and brand. This deprivation has damaged the Plaintiffs in an amount to be determined at trial.

WHEREFORE, Plaintiffs demand judgment and relief against all Crestview Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing,

advertising and selling clones from Plaintiffs' equine genetic material; and awarding Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a), for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

### Count XVI

**Violation of the Trademark Act of 1946 (Lanham Act)**
**15 U.S.C. § 1125(a)(1)(A)**
**False Designation of Origin - Reverse Passing Off**

513.    Plaintiffs repeat and reallege against the Crestview Defendants from ¶¶ 1 through 265 of the General Allegations.

514.    Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

(5)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(E)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(F)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

515.    Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B).

516.    The Lanham Act, § 1125(a)(1)(A), prohibits "reverse passing off", which as in this case, involves the sale of another's products as one's own. Reverse passing is a violation of the

Lanham Act because it constitutes a "false designation of origin" of the goods and thus a violation of § 1125(a)(1)(A).

517.    The Cuartetera clones at issue originated with Mr. Cambiaso and La Dolfina. The mare Cuartetera Dolfina is the property of La Dolfina. The clones of Cuartetera Dolfina thus originated with the Plaintiffs.

518.    The genetic material of these Dolfina Cuartetera is not in the public domain, and never was.

519.    The production of these Clones was based on the misappropriation of their genetic material by Defendants. Because the genetic material is the property of La Dolfina and/or Mr. Cambiaso the Defendants had no right or entitlement to produce any Clones without authorization.

520.    Defendants falsely designated the origin of the Cloned Foals as their own to Park Place Polo and/or Mr. Borodin and the Castagnolas. These statements are believed to have been made to other consumers as well.

521.    When Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!  I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2** herein, and **Exhibits 22 and 21,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied that these Clones originated with them rather than Mr. Cambiaso and La Dolfina.

522.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the ten Cuartetera clones were ***free and clear of any claims by Mr. Cambiaso***. **Exhibit 5**, CF00007 § 6.1.

523.    These statements falsely designated the origin of the clones as those of the Defendants rather than their true originators, Mr. Cambiaso and La Dolfina.

524.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants had the ability to and indeed granted an ***assignable license*** to Borodin for Borodin ***to produce an additional ten (10) Cuartetera clones***. **Exhibit 5,** CF00008 § 8.1. These statements falsely designated the origin of the Clones as those of the Defendants rather than their true originators and producers, Mr. Cambiaso and La Dolfina, as they falsely represent that they had complete control to grant property rights to consumers.

525.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that they could exercise an option to purchase seven more Cuartetera clones. These statements falsely designated the origin of the Clones as those of the Defendants rather than their true originators, Mr. Cambiaso and La Dolfina, as they falsely represent that they had complete control to grant property rights to consumers.

526.    The Secret Cloning Agreement, its related documents, and the communications with the Castagnolas establish that the Crestview Defendants made multiple false or misleading description of fact, or related false or misleading representation of fact concerning the designation of origin of the unauthorized clones.

527.    The repeated and willful false designations of origin are likely to cause consumer confusion, mistake or deception as to the origin, sponsorship or approval by Plaintiffs of the Crestview Defendants' illicit and unauthorized conduct.

528.    These repeated and willful false designations of origin can confuse the consuming public as to the origin of manufacture of these Clones as the original horses are unquestionably the property of La Dolfina, rather than the Defendants. These statements are believed to have been made to other consumers as well.

529.    This reverse passing off conduct occurred in interstate and international commerce.

530.    This reverse passing off conduct violates the public's interest in freedom from deception.

531.    This reverse passing off conduct is likely to mislead the public as to the source of horses in the marketplace and harm the reputation of the originator, in this case Mr. Cambiaso and La Dolfina.

532.    The likelihood of confusion benefits the Defendants who have taken advantage of the commercial reputation of Mr. Cambiaso and La Dolfina.

533.    This willful misconduct by the Crestview Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.   The injury to Plaintiffs' commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

534.     Plaintiffs have been, are currently, and are likely to be damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1)   Thus, Plaintiffs have standing to bring these claims.

535.    The   unlawful and willful conduct by the Crestview Defendants is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' deception of consumers who have or will withhold trade from Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

WHEREFORE, Plaintiffs demand judgment and relief against the Crestview Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a), for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

### Count XVII

**Violation of The Defend Trade Secrets Act**
**18 U.S.C. §§ 1832 *et seq.***

536.     Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

537.     The genetic material from Plaintiffs' renowned polo horses are proprietary, confidential trade secrets, developed from years of selective breeding. **Exhibits 10 and 11,** *Affidavit and Second Affidavit of Robert Zedda.* The horses involved include the horses Aiken Cura, Cuartetera, Lapa, Colibri, the further horses listed in the schedule to the 18 November 2020 correspondence from Defendant Crestview Genetics counsel, and all other horses belonging to Plaintiffs. **Exhibit 17.**

538.     In 2009 and 2019, the Crestview Defendants agreed to very limited circumstances under which Defendants might sample and utilize the genetic material. Very tight restrictions and protocols were put on the use the genetic material, to prevent the public dissemination of this confidential genetic material. Defendants confirmed this was the understanding of the parties, to avoid being cut "out of the loop."

539.     In both of the Agreements, and during the numerous years in between, Defendants agreed and represented and covenanted to Plaintiffs that Defendants would keep confidential the equine genetic material of Plaintiffs' horses, which Plaintiff considered trade secrets, as part of the agreements between the parties.

540.     The "tissue samples" as described in the 2009 Agreement, and the clones containing the equine genetic material belonging to Plaintiffs under the 2019 Agreement were intended by Defendants to be kept secret and away from the public.

541.     To that end, in the 2019 Agreement, Defendants expressly represented and warranted to keep strict control over the clones with Adolfo Cambiaso ("AC") and La Dolfina ("LD"), to wit:

**5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

542.     Therefore, the genetic material, whether in tissue samples from, or within clones from Plaintiffs' renowned polo horses, are considered trade secrets under The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1); 1839(3).   These trade secrets are confidential information   related to a product or service used in, or intended for use in, interstate or foreign commerce in that: (a) Mr. Cambiaso and La Dolfina are engaged in the international professional sport of polo as a business, in which Plaintiffs' polo horses and clones are utilized by Plaintiffs; and (b) Defendants' cloning services to Plaintiffs have been provided through interstate and foreign commerce of the equine genetic material and clones, both interstate domestically, such as

between Florida and South Carolina, and internationally, such as between Argentina and the United States.

543.    Through the prior representations of Plaintiffs, see **Exhibit 11,** *Second Affidavit of Roberto Zedda,* Plaintiffs have registered Plaintiffs' ownership of the original polo horses, and the Defendants have agreed to keep the equine genetic material from these horses from the general public.   Therefore, the equine genetic material taken from or derived from Plaintiffs' horses has independent economic value from this genetic material's information not being generally known to the public.

544.    Consistent with this protection of genetic material by Plaintiffs, Defendants too have acknowledged and agreed to keep any Cuartetera genetic material from being distributed in their Secret Cloning Agreement with Mr. Borodin/Park Place:

> 9.1    Except as expressly authorized in this Clause 9.1, Seller agrees that, without Buyer's prior written consent, Seller will not produce any clones of Cuatatera or provide tissue samples containing Cuartetera genetic material to any person. Seller has agreed to produce ten (10) clones of Cuartetera for Cambiaso (AC Clones). As of the Effective Date, Cambiaso has not elected to have such AC Clones produced. In the event Cambiaso does elect to have such AC Clones produced and Cambiaso tenders payment for such AC Clones, such AC Clones will be produced and delivered to Cambiaso.   Seller agrees that Seller will not produce, or license any other party to produce, any further clones of Cuartetera pursuant to Seller's rights under the Horse Cloning Agreement. Except as provided in this Agreement, Seller makes no representations, warranties or covenants regarding the cloning of Cuartetera by Cambiaso or other person.

545.    Thus, Defendants should be estopped from now claiming that this genetic material is anything other than valuable trade secret information that is protectable under the DTSA.

546.    The equine genetic material from Plaintiffs' horses is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information has been closely guarded by Plaintiffs and continues to be the subject of reasonable efforts by Plaintiffs to maintain its secrecy.

547.    In their Secret Cloning Agreement with Mr. Borodin/Park Place Polo, Defendants recognize that the distribution of genetic material in light of its uniqueness and value, will lead to irreparable harm, and reserve themselves injunctive remedies should this material be distributed in violation of the need for secrecy:

> 9.2    Seller and Buyer also agree that, in the event Seller violates the covenant in Clause 9.1, Buyer would suffer irreparable injury for which it would not have an adequate remedy at law. Accordingly, Seller agrees that Buyer is entitled to specifically enforce the covenant in Clause 9.1 in equity. Without limiting the generality of the foregoing, Buyer shall have the right to an injunction to enjoin Seller from producing clones of Cuartetera and/or providing tissue samples to any other person what would enable such other person to produce clones of Cuartetera, in violation of Clause 9.1. In addition, Buyer may compel Seller to transfer, and to recover from Seller's transferees and transfer, to Buyer at no cost to Buyer, any clones of Cuartetera that are produced in violation of the covenant in Paragraph 7.1.

548.    Despite expressly representing and warranting to maintain the confidentiality of the genetic material and demanding this protection from Mr. Borodin/Park Place Polo, Defendants have undertaken the aforesaid misconduct by which Defendants have willfully and maliciously released Plaintiffs' proprietary equine genetic material into the general public marketplace thus exposing Plaintiffs' trade secrets to discovery by the public. **Exhibits 22, 21, 8, 17, 5, 6, and 7,** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Cloning Agreement and Amendments.*

549.    Defendants have done so by willfully and maliciously misappropriating Plaintiffs' genetic material from Plaintiffs' horses, by improper means for profit, selling clones of Plaintiffs' renowned polo horses to third parties such as Mr. Borodin and Park Place Polo Team, and threaten to do so again. See **Exhibits 22, 21, 8, 17, 5, 6, and 7,** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Cloning Agreement and Amendments.*

130

550.     These wrongful acts of releasing Plaintiffs' trade secrets into the public domain for profit have injured and threaten to further injure and damage Plaintiffs, including but not limited to: (a) forcing Plaintiffs to compete against clones of Plaintiffs' best playing polo ponies (this year, for example, two of Plaintiffs' clones won for Plaintiff two *Best Playing Pony* awards in the final of the Argentine Polo Open); (b) irreparably diluting the genetic purity of the superior equine blood lines belonging to Plaintiff; (c) damaging the good will of Plaintiffs; and (d) damaging Plaintiffs' uniquely successful and superior brand names and public identity through misuse and mis-affiliation of Plaintiffs with the unauthorized clones.

551.     Defendants' actions therefore constitute willful and malicious misuse of Plaintiffs' trade secrets.   This is particularly so with respect to the actions of Defendants taken since the 2019 Agreement, in violation of that 2019 Agreement and by their execution of the Secret Cloning Agreement.

552.     The intentions expressed by the Crestview Defendants in Mr. Meeker's December 1, 2020 WhatsApp communications to the Castagnolas constitutes actual and threatened misuse of Plaintiffs' trade secrets.

WHEREFORE, Plaintiffs demands against the Crestview Defendants jointly and severally monetary damages pursuant to 28 U.S.C. § 1836(b)(3)(B), return of all of Plaintiffs' equine genetic material, whether tissue sample, clones in gestation, foals of clones, or full-grown clones derived therefrom, a permanent injunction enjoining Defendants from utilizing said trade secret information in any way; consequential and incidental damages, imposition of a constructive trust upon the income obtained by any Defendant or on their behalf from the sale of any of Plaintiffs' equine genetic material, disgorgement of profits and compensatory damages pursuant to 18 U.S.C.

§1836(b)(3)(B), exemplary and punitive damages pursuant to 18 U.S.C. §1836(b)(3)(C), and reasonable attorneys' fees under 18 U.S. C. § 1836(b)(3)(D).

## Count XVIII

### Violation of the Florida Uniform Secrets Act– F.S. §§ 685.001 *et seq.*

553.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

554.    The genetic material from Plaintiffs' renowned polo horses are proprietary, confidential trade secrets, developed from years of selective breeding.  **Exhibits 10 and 11,** *Affidavits of Robert Zedda.*   The horses involved include the horses Aiken Cura, Cuartetera, Lapa, Colibri, the further horses listed in the schedule to the November 18, 2020 correspondence from Crestview Genetics counsel, and all other horses belonging to Plaintiffs.

555.    In 2009 and 2019, the Crestview Defendants agreed to very limited circumstances under which Defendants might sample and utilize the genetic material.   Very tight restrictions and protocols were put on the use the genetic material, to prevent the public dissemination of this confidential genetic material.   Defendants confirmed this was the understanding of the parties, to avoid being cut "out of the loop."

556.    In both of the Agreements, and during the numerous years in between, Defendants agreed and represented and covenanted to Plaintiffs that Defendants would keep confidential the equine genetic material of Plaintiffs' horses, which Plaintiff considered trade secrets, as part of the agreements between the parties.

557.    The "tissue samples" as described in the 2009 Agreement, and the clones containing the equine genetic material belonging to Plaintiffs under the 2019 Agreement were intended by Defendants to be kept secret and away from the public.

558.   To that end, in the 2019 Agreement, Defendants expressly represented and warranted to keep strict control over the clones with Adolfo Cambiaso ("AC") and La Dolfina ("LD"), to wit:

**5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

559.   Therefore, the genetic material, whether in tissue samples from, or within clones from Plaintiffs' renown polo horses, are considered trade secrets under trade secret under the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.*   These trade secrets are confidential information because Plaintiffs derive independent economic value from this information, because it is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts by Plaintiffs to maintain their secrecy. At all relevant times, Defendants were aware of these facts and even represented and warranted to keep that trade secret information confidential.

560.   The Crestview Defendants demanded similar assurances from Mr. Borodin in the Secret Cloning Agreement and prohibited the distribution of any tissue samples given their value and the need for secrecy.   Consistent with this protection of genetic material by Plaintiffs, Defendants too have acknowledged and agreed in the Secret Cloning Agreement to keep any

Cuartetera genetic material from being distributed in their Agreement with Mr. Borodin/Park Place.

561.    Thus, the Crestview Defendants should be estopped from now claiming that this genetic material is anything other than valuable trade secret information that is protectable under the FUTSA. Through the prior representations of Plaintiffs, **Exhibit 11,** *Second Affidavit of Roberto Zedda,* Plaintiffs have registered Plaintiffs' ownership of the original polo horses, and the Defendants have agreed to keep the equine genetic material from these horses from the general public.  Therefore, the equine genetic material taken from or derived from Plaintiffs' horses has independent economic value from this genetic material's information not being generally known to the public.

562.    The equine genetic material from Plaintiffs' horses is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information has been closely guarded by Plaintiffs and continues to be the subject of reasonable efforts by Plaintiffs to maintain its secrecy.

563.    Despite expressly representing and warranting to maintain the confidentiality of the genetic material, the Crestview Defendants have willfully and maliciously undertaken the aforesaid misconduct by which Defendants have released Plaintiffs' proprietary equine genetic material into the general public marketplace, thus exposing Plaintiffs' trade secrets to discovery by the public. **Exhibits 22, 23, 8, and 17** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel.*

564.    The Crestview Defendants have done so by willfully and maliciously misappropriating Plaintiffs' trade secrets by improper means for profit, selling clones of Plaintiffs' renown polo horses to third parties such as Mr. Borodin and Park Place Polo Team, and threaten

to do so again. **Exhibits 21, 8, 17, 5, 6, and 7,** *Affidavit Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Cloning Agreement with Amendments and Escrow Agreement.*

565.     These wrongful, malicious and willful acts of releasing Plaintiffs' trade secrets into the public domain for profit have injured and threaten to further injure and damage Plaintiffs, including but not limited to: (a) forcing Plaintiffs to compete against genetic twins of Plaintiffs' best playing polo ponies (this year, for example, two of Plaintiffs' clones won for Plaintiff two *Best Playing Pony* awards in the final of the Argentine Polo Open); (b) irreparably diluting the genetic purity of the superior equine blood lines belonging to Plaintiff; (c) damaging the good will of Plaintiffs; and (d) damaging Plaintiffs' uniquely successful and superior brand names and public identity through misuse and mis-affiliation of Plaintiffs with the unauthorized clones.

566.     The Crestview Defendant actions therefore constitute willful and malicious misuse of Plaintiffs' trade secrets.   This is particularly so with respect to the actions of Defendants taken since the 2019 Agreement, in violation of that 2019 Agreement and by their execution of the Secret Cloning Agreement.

567.     Defendants' intentions expressed in Meeker's December 1, 2020 WhatsApp communications to the Castagnolas constitutes actual and threatened misuse of Plaintiffs' trade secrets.

WHEREFORE, pursuant to F.S. §§ 685.001 *et seq.*, Plaintiffs' demand against the Crestview Defendants jointly and severally monetary damages pursuant to), return of all of Plaintiffs' equine genetic material, whether tissue sample, clones in gestation, foals of clones, or full-grown clones derived therefrom, a permanent injunction enjoining Defendants from utilizing said trade secret information in any way; consequential and incidental damages, and imposition of

a constructive trust upon the income obtained by any Defendant or on their behalf from the sale of any of Plaintiffs' equine genetic material, disgorgement of profits and compensatory damages, exemplary   and punitive damages, and reasonable attorneys' fees pursuant to F.S. § 688.005.

**Count XIX**

**Violation of the Florida Uniform Secrets Act– F.S. §§ 685.001 *et seq.*
Commercial Appropriation Of Name And Identity**

568.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

569.    Florida Statutes § 540.08, Florida Statutes, provides in relevant part that: "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use."

570.    Despite the clear language of F.S. §540.08, the Crestview Defendants have made the aforesaid statements, set forth in the General Allegations, to the public by using Plaintiffs' names and names of Plaintiffs' horses, that Plaintiffs have endorsed the cloning and sale of the clones of Plaintiffs' original, unique polo horses by specifically naming the horses Aiken Cura, Cuartetera, Colibri and Lapa.  **Exhibits 21 and 22 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.*

571.    These horses at issue are known throughout the polo industry to be the best and most prized horses belonging to Plaintiffs, responsible for much of Plaintiffs' professional success since their originals were introduced to the sport. It is reasonable that no one would represent that they had for sale clones originating from such horses unless such clones and cloning were endorsed by Plaintiffs.

572.    However, as described herein above, Plaintiffs have not in fact endorsed the sale of the clones of Plaintiffs' horses to the public, such as the Castagnolas or Mr. Borodin.

573.    Therefore, by the specific use of Plaintiffs' horses' names by Defendants in Defendants' advertising and public statements, Defendants have falsely advertised and represented that Plaintiffs have endorsed the sale of the Cambiaso and La Dolfina clones.

574.    For example, when the Crestview Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!   I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2 herein, and Exhibits 22 and 21,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Plaintiffs when such endorsement did not exist.

575.    Defendants further represented to the public, in response to a member of the public's inquiry   *"Si, you have Cuartetera??"* that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for*."   That statement was misleading by implying that Plaintiffs had endorsed the creation and sale to the public clones of Plaintiffs' renown Cuartetera polo horse, when in fact Plaintiffs had not endorsed such cloning and sale.

576.    Defendants made and created these false endorsement statements and implications for the commercial benefit of Defendants.

577.    The Crestview Defendants used Plaintiffs famous names and the names of Plaintiffs renowned horses in social media, in communications, in interviews, amongst other public medial, in order to promote, advertise and market the clones of Plaintiff's horses.

578.    The Crestview Defendants did not have the permission or authority to produce and sell the clones of Plaintiffs' horses, on any terms, and further not and do not have Plaintiffs'

consent to use Plaintiffs' name and identity to advertise, promote, market or endorse Defendants' cloning business.

579.    Defendant intentionally, willfully and maliciously publicly disseminated or used Plaintiffs' identity and the identity of Plaintiffs' original polo horses to produce and sell clones without Plaintiffs' consent to produce clones for sale to the public. Defendants did so for purposes of trade or for other commercial or advertising purposes and profit.

580.    Defendants had actual or constructive knowledge of the wrongfulness of their conduct and acted with intent or with reckless disregard to Plaintiffs of property interests during the entire time period in which the unauthorized use of Plaintiffs' identities and Plaintiffs' horses' identities has taken place, which is continuing presently.

581.    Defendants' conduct was reckless and wanton in care, willful and malicious, and further such conduct constitutes a conscious disregard of or indifference to Plaintiffs' rights.

582.    As detailed more fully herein above, the willful and malicious misconduct by Defendants has caused and continues to cause irreparable harm to Plaintiffs' name, reputation, good will, competitive advantage, as well as inflicting other harm upon Plaintiffs.

WHEREFORE, Plaintiffs demand judgment jointly and severally against the Crestview Defendants for all remedies available under F.S.§ 540.08, including but not limited to, both actual loss and damages, costs, interest, reasonable royalties, punitive and exemplary damages, restitution of Defendants' unlawfully-obtained proceeds and profits, a statutory fine of $ 1,000 per violation in addition to the civil remedies allowed by law, injunction against further use of Plaintiffs' and Plaintiffs' horses names for any purpose, injunction against further use and sale of any equine genetic material belonging to Plaintiffs from Plaintiffs' horses, and for such other relief the Court finds just and proper.

## Count XX

### Preliminary and Permanent Injunctions –
### Return of the 3 Clones and the 7 Additional Clones

583.     Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through 265 of the General

Allegations.

584.     The three (3) Cuartetera clones have been removed from this District, and are in

South Carolina and may imminently transported abroad, to the United Kingdom, or elsewhere.

585.     The 3 misappropriated Cuartetera clones were removed from Florida only after the

commencement of Plaintiffs' suit before this Court on December 8, 2020.   At that time,

Defendants' prior legal counsel were informed of the existence of the Complaint and knew of

Plaintiffs' claim for preliminary injunctive relief.

586.     Because of the subject matter of this dispute, the unauthorized cloning and sale of

clones, was at issue, and Defendants had a legal duty to preserve the three Cuartetera clones and

access to the clones, and not to remove, nor advise, cause, assist or inform any third party to remove

the three Cuartetera clones from the jurisdiction of this Court.

587.     The removal of the three Cuartetera clones from the jurisdiction of this Court, the

sale of the 3 clones of Cuartetera, and option for sale of 7 more clones of Cuartetera **[Exhibits 5,**

**6, 7]**, particularly if the clones have been flown overseas, constitutes destruction of evidence

because the three Cuartetera clones have been removed from the reach of Plaintiffs, and the Court,

are no longer available to be inspected and confirmed as the clones of Plaintiffs' Cuartetera.

588.     The destruction-by-removal-beyond-reach of the three clones represents a

significant impairment of the ability of the Plaintiffs to prove that Defendants have been creating

and selling clones of Plaintiffs' Cuartetera to competitors of Plaintiffs.

589.     The presence of the three Cuartetera clones is necessary to test and prove the clones were created and sold to a non-party, competitor of Plaintiffs. Should Plaintiffs not be able to prove the allegations of the lawsuit in these respects because of the absence of the clones as evidence of Defendants' misconduct, then Plaintiffs would be further damaged by Defendants' unlawful acts.

590.     Further, recent discovery has revealed the 7 additional clones are likely in production by the Crestview Defendants, purportedly on behalf of the Park Place Polo Defendants. Those clones, or the oocytes, embryos, or mares in gestation with those seven additional clones, should also be delivered to Plaintiffs.

WHEREFORE, Plaintiffs seek such relief as the Court may find just and proper under the circumstances, including but not limited to an Order requiring return of all the Cuartetera clones to the jurisdiction of this Court, turnover of all records of creation and/or sale of all clones of Plaintiffs' horses, adverse inference jury instruction, and appropriate sanctions such as attorneys' fees and costs.

## Count XXI

### Spoliation of Evidence

### Regarding the Improper Removal and Waste of the Cuartetera Clones

591.     Plaintiffs repeat and reallege against all Defendants ¶¶ 1 through 265   of the General Allegations.

592.     The three (3) Cuartetera clones [**Figure 1 herein**] were removed from Florida after the existence of this lawsuit and after the existence of a potential civil action between the parties hereto.

593.     The removal of those clones was undertaken with the coordinated actions of both the Crestview Defendants and the Park Place Polo Defendants. For example, public records and

other shipping records reveal that the clones were shipped from the Park Place Polo farm in Wellington, Florida, to the Crestview Farm in Aiken, South Carolina.

594.    The public records previously filed with the Court, along with documents recently obtained through discovery indicate that Meeker, by and through the use of one of his Crestview Entities involved in the transport and the Park Place Polo Defendants worked in concert to arrange that transport and the Park Place Polo Defendants made payment of transport of those clones to South Carolina, out of the jurisdiction of this Court, during the pendency of this litigation.

595.    Upon the arising of the dispute, which occurred even before the November 18, 2020 correspondence, Defendants had a legal duty to preserve evidence, such as the three Cuartetera clones, and not remove, nor advise, assist or inform anyone else to remove, any evidence, including those clones, from the jurisdiction of this Court.

596.    Nevertheless, the three Cuartetera clones have been removed from Florida and sent to South Carolina and perhaps elsewhere.   This removal-beyond-the-reach of Plaintiffs and the Court is essentially destruction of evidence in this case, which significantly impairs the ability of Plaintiffs to prove that Defendants did sell clones of Plaintiffs' renowned Cuartetera to a competitor of Plaintiffs in Florida.

WHEREFORE, Plaintiffs seek all appropriate remedies from the Court against all Defendants, and those who might act in consort with them with respect to that spoliation, which should include the Akerman law Firm and all other legal team firms and attorneys of all Defendants, and which remedies should include an injunction against further spoliation of evidence, restoration of any evidence removed, as well as against Defendants, and for Plaintiffs' attorneys' fees and costs, an adverse inference instruction at trial, actual and consequential damages, and punitive damages if deemed appropriate.

## Count XXII

### Spoliation of Evidence

### Regarding the Improper Removal of ESI

597.    Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 265 of the General Allegations.

598.    Since 2019, the parties have been in dispute over the clones, the agreements and their business relationship with various negotiations and correspondence amongst the parties and their attorneys occurring as recently as mid-2019.

599.    As set forth herein below, however, *all of the ESI spoliation misconduct described herein occurred after the commencement of this SDFL case, after the commencement of the NDTX cases, and after the Litigation Hold and Demand was issued by Plaintiffs to Defendants' counsel.*

600.    During that time and presently, Meeker, his attorneys, his entities, and all those acting with them or on their behalf had knowledge that there were matters in dispute which were referred to, described or contained in various forms of social media and other ESI.

601.    On January 27, 2020, Plaintiff dispatched Litigation Hold and Preserve Demands upon counsel for Meeker, Crestview Farm and Genetics directly demanding the preservation and holding of relevant ESI.

602.    Nevertheless, and despite the Hold and Preserve Demands promulgated by Plaintiffs' counsel to the Crestview Defendants' counsel, and despite obligations of Rules 26, 45,

the Local Rules, and the Sedona Conference Principles   (approved by this District),[25]  important

ESI has since been removed, altered and deleted by the Defendants.[26]

603.    There are indications of alternation or destruction of important, material and highly

relevant evidence during litigation by Meeker is the basis for this Motion and Order.

604.    Robert Zedda is the Manager of La Dolfina. Zedda communicated frequently with

Meeker concerning cloning and the related dealings between the parties during the relevant time

frame in this case.

605.    On January 24, 2021, Zedda noticed that a Meeker Instagram account

(@dalanmeeker) had been taken down. This Meeker account was used to regularly post pictures,

videos and comments related to polo pony clones, generally, and to Cuartetera clones specifically.

Zedda had seen videos announcing the birth of some Cuartetera clones and showing them being

born, as well as other stories and posts related to cloned ponies.

606.    Meeker's account profile became unavailable on January 24, 2021, but Zedda

previously saved screenshots of the profile for that account.   Before it was taken down, Meeker's

Instagram account had 164 posts and 630 followers. *Id.* at ¶ 20. By way of example, in **Figure 1**

below, the deleted Meeker account contained several pictures of the Cuartetera clones (circled)

and of Plaintiff Cambiaso with those clones (also circled).

---

[25]  The legal right standard, as defined by The Sedona Conference, "requires a party to preserve, collect, search, and produce [d]ocuments and ESI which the [other] party has a legal right to obtain." *See* The Sedona Conference, *The Sedona Conference Commentary on Rule 34 and Rule 45 "Possession, Custody, or Control"* at 484.

[26]  This conduct is in addition to the removal of the cloned horses from the jurisdiction of this Court. .   *See, e.g.*: DE 58, Expedited Motion for Inspection of the Horses.



607.    There are other such preserved screenshots previously filed by Plaintiffs with this Court. The Preliminary Injunction Hearing was conducted on January 29, 2021.

608.    The Court was advised by Plaintiffs' counsel of a concern that Meeker may have deleted his Instagram account (@dalanmeeker) and related content on January 24, 2021. Defendants' counsel did not respond, nor advise the Court subsequently of Meeker's response to concerns of potential spoliation.

609.    Nevertheless, a new Instagram account profile for Meeker became available on or about February 3, but instead of @dalanmeeker, the account profile was in the name @alanmeeker.

610.    As of February 22, 2021, unlike the old Meeker Instagram account, which had many followers, the new Meeker account has zero posts and only three followers.  ***Meeker's old***

***Instagram profile and the posts associated with it are no longer available on Instagram*** - and they have independent evidentiary value.

611.    In better times between the parties, Meeker had created two WhatsApp discussion groups for the purpose of allowing group discussions about cloning La Dolfina polo ponies, and those group discussion channels were employed by Meeker to communicate with others in the groups. **Exhibit 28,** *Fourth Affidavit of Robert Zedda*   ¶ 6. The first was a group he called ***"New Cuartetera Clones,"*** and included Zedda, Plaintiff Cambiaso, Diego Bucking (a lawyer for La Dolfina), and Adrien Mutto (a biologist previously employed by Crestview Genetics SRL (Argentina)).

612.    On or about January 29, 2021, *the date of the Preliminary Injunction Hearing and after issuance upon Defendants' counsel of Litigation Hold and Preserve Demands on January 27, 2021,* **Zedda and Plaintiff Cambiaso were *deleted*** from the "New Cuartetera Clones" and "Clone Update" WhatsApp group discussions.

613.    Fortunately, Mr. Zedda took screen shots of his removal from these groups, so that the deletion is a matter of fact, not opinion.

614.    Meeker has further terminated access to the group chats in question for Zedda and Plaintiff Cambiaso.

615.    Meeker knowingly altered and prevented access to these groups indicating an intent to spoil evidence in these groups.

616.    Meeker appears to be very knowledgeable about electronic evidence and concealing his "fingerprints" from electronic files. As depicted in <u>Figure 4</u> of Mr. Zedda's Affidavit, Meeker once instructed Zedda that ***"Documents contains [sic] data that will show***

*where it is created.   **If you forward the pdf I'm sending you, they will be able to tell I created it.**"*



617.    The current ESI misconduct is a further indication of Meeker's ability and willingness to avoid detection. **Exhibit 20,** *Bernard Affidavit at ¶ 34-35.*

618.    Relief from this Court, including but not limited to a Preservation Order from this Court, sanctions, dismissal or striking, and / or appropriate jury instruction at time of trial, is entirely appropriate in light of indications of the following improper actions by Defendants:

(1) **deletion or removal** of the Meeker Instagram Account "@dalanmeeker";

(2) followed by putting back up "@dalanmeeker" **with unknown content altered or deleted;**

(3) **the deletion or removal a second time** of the Meeker Instagram Account "@dalanmeeker";

(4) **followed by the creation** of a *new* Meeker Instagram Account "@alanmeeker" which contains almost none of the first "@d_alanmeeker" content [see *Instagram Affidavit of Robert Zedda,* **Exhibit   28 hereto**]; and

(5) the **alteration** of several WhatsApp accounts, which contained conversations amongst the parties and also with third parties which are important, material, and highly relevant and probative to the central issues of this case involving equine cloning and the authorization of the Defendants to unilaterally sell, without authorization or endorsement by Plaintiffs, those clones *vel non.* DE 22, *First Amended Complaint*, Breaches of Contract claims and Lanham Act claims.

619.    All of those social media accounts contained important, highly relevant, and probative material to the central issues of this case involving equine cloning and the absence of authorization by Plaintiffs to the Defendants to unilaterally sell the clones, without authorization or endorsement by Plaintiffs.

WHEREFORE, Plaintiffs seek all appropriate remedies from the Court against the Crestview Defendants, and against those who might act in consort with them, including but not limited to injunction against further spoliation of evidence, restoration of any evidence removed, against Defendants, as well as for Plaintiffs' attorneys' fees and costs, an adverse inference instruction at trial, actual and consequential damages, and punitive damages if deemed appropriate.

## Jury Demand

Plaintiffs hereby request trial by jury on all matters so triable as of right.

Respectfully submitted,

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*
Avery S. Chapman, Esq.
FL Bar No. 517321
Grace De la Gueronniere, Esq.
FL Bar NO. 1021673
12008 South Shore Blvd.
Suite 105
Wellington, Florida 33414
Tel. 561.753.5996
asc@chapmanlawgroup.net
grg@chapmanlawgroup.net


DAVIS GRAHAM & STUBBS LLP


*Habib Nasrullah*
Habib Nasrullah, Esq.
Molly Kokesh, Esq.
Admitted pro hac vice
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel: (303) 892-9400
habib.nasrullah@dgslaw.com
molly.kokesh@dgslaw.com

*Counsel for Plaintiffs La Dolfina S.A. LLC and Adolfo Cambiaso*

**<u>Certificate of Service</u>**

I HEREBY CERTIFY that on the date appearing on the first page of this document, I electronically filed the foregoing with the document with the Clerk of the Court using the CM/ECF filing system, which will then serve   all counsel of record or pro se parties on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*
Avery S. Chapman, Esq.

**Service List**
La Dolfina, S.A., LLC, et al. v. D. Alan Meeker, et al.
CASE NO. 9:20-cv-82231-AMC/BER

Gary A. Woodfield
Nason Yeager Gerson Harris & Fumero, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
561-686-3307
gwoodfield@nasonyeager.com, bpetroni@haileshaw.com, sdaversa@nasonyeager.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Ryan Dwight O'Quinn
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
305-423-8553
Email: ryan.oquinn@dlapiper.com , javier.rodriguez@dlapiper.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Caitlyn Elizabeth Hubbard, Esq.
William N. Warren, Esq.
Kelly Hart & Hallman
201 Main Street Suite 2500
Fort Worth, TX 76102
817-332-2500
Email: caitlyn.hubbard@kellyhart.com, bill.warren@kellyhart.com
*Counsel for Defendant Alan David Meeker and Defendant Crestview Farm, LLC.*

James C. Bookhout, Esq.
Jason S. Lewis, Esq.
DLA Piper LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
(214) 743-4549
Email: james.bookhout@dlapiper.com, jason.lewis@dlapiper.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*