**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO .20-82231-CIV-AMC/BER**
**(21-81066-CIV-AMC/BER consolidated)**

**LA DOLFINA S.A., LLC, a Florida**
**Limited liability company, and**
**ADOLFO CAMBIASO, individually,**
     **Plaintiffs,**

**v.**

**D. ALAN MEEKER, individually,**
**a/k/a ALAN MEEKER or DAVID**
**ALAN MEEKER, CRESTVIEW**
**FARM, LLC, a Texas Limited**
**Liability Company, and**
**CRESTVIEW GENETICS, LLC, a**
**Nevada limited Liability company,**
     **Defendants.**

_____

**CRESTVIEW FARM, L.L.C,**

     **Plaintiff,**

**v.**

**ADOLFO CAMBIASO, LA DOLFINA, S.A.,**
**and LA DOLFINA, S.A., LLC,**
     **Defendants and**
     **Counterclaim/Third Party Complaint Plaintiffs,**

**v.**

**CRESTVIEW FARM, L.L.C.,**
     **Counterclaim Defendant, and**
**D. ALAN MEEKER and**
**CRESTVIEW GENETICS,**
     **Third Party Defendants.**

_____

## COUNTERCLAIM AND THIRD PARTY COMPLAINT

     With respect to the Complaint in consolidated Case No. 21-81066-CIV-AMC/BER,

Defendants Adolfo Cambiaso ("Mr. Cambiaso"), La Dolfina S.A., and La Dolfina S.A., LLC

1

(those entities collectively "La Dolfina") (and Mr. Cambiaso and La Dolfina collectively, the "Counterclaim/Third Party Plaintiffs "), as and for their Counterclaim against Defendants D. Alan Meeker a/k/a Alan Meeker a/k/a David Alan Meeker ("Meeker"), Crestview Farm, LLC ("Crestview Farm" or "Farm"), and as and for their Third Party Complaint against Crestview Genetics, LLC ("Crestview Genetics" or "Genetics") and D. Alan Meeker a/k/a Alan Meeker a/k/a David Alan Meeker (Meeker, Farm and Genetics, collectively the "Crestview Defendants" or "Counterclaim/Third Party Defendants"), state as follows:

## I.     <u>Common Allegations to the Counterclaim and Third Party Complaint</u>.

**A.     A History of the Contractual Relationship.**

1.     This case concerns the evolution of an equine cloning venture over more than 10 years. During this time, Meeker, as manager of both Farm and Genetics, utilized the Farm and Genetics entities interchangeably and as his alter-egos.

2.     Recent discovery has revealed that since November 2, 2009, if not earlier, Farm was the 50% owner of Genetics, and as of December 31, 2017 Farm became the 100% owner of Genetics.  **Exhibits 1, 2 and 3,** the *Operating Agreement of Genetics*, the *Purchase and Sale Agreement* by Farm with its Genetics Co-Member, and the *Assignment of 100% of Membership Interests in Genetics to Farm* **(collectively bates stamped "DHMCIT001 through 42").**[1]

3.     The relationship regarding the cloning venture between Mr. Cambiaso and Meeker and Farm and Genetics commenced with a 2009 Horse Cloning Agreement (the "2009 Agreement").  **Exhibit 4 hereto.**   Therein, Meeker, by and through Farm and Genetics, and Mr. Cambiaso agreed to explore equine cloning of Mr. Cambiaso's horses.

---

[1] These documents were very recently produced August 12, 2021 by the Dan H. Meeker Childrens' Irrevocable Trust.

4.    The 2009 Agreement reads much like an exploratory letter of intent, with many conditions precedent, such as proving out the science of cloning horses, further cooperation, and formation of a future joint venture, for performance of that 2009 Agreement to occur.   In fact, the 2009 Agreement failed because of the non-performance of material terms set forth in ¶¶ 3, 4 and 5 thereof, to wit: (i) Farm never acquired the cloning technology so as to be able to produce the clones; (ii) the parties never came to a mutually acceptable agreement as to "*the endorsement and marketing of clones*"; (iii) the parties never came to a mutual agreement as to "*the final sales price and terms of sale*" of any clones; and (iv) the parties never came to an agreement as to production of the additional *"second edition*" clones. **Exhibit 4, ¶¶ 3, 4 and 5.**

5.    The 2009 Agreement was particularly clear, and the parties expressly agreed, that no such clones of Cambiaso horses, if such clones were ever created, could be sold *unless both* Meeker, Farm, Genetics, *and* Mr. Cambiaso agreed *not only* as to the price of such sale, but on the "*final terms*" of any such sale. The 2009 Agreement never transferred title to the Cambiaso horses, nor gave Meeker unilateral control over the joint venture.

6.    The 2009 Agreement, had numerous conditions precedent requiring the *mutual agreement* of Mr. Cambiaso, Meeker, Farm, and Genetics in the following paragraphs of the 2009 Agreement: in ¶ 3, requiring further cooperation, to agree on a "mutually acceptable program"; in ¶ 4 requiring the parties to "jointly determine all final sales prices *and terms*"; and, in ¶ 5, requiring mutual agreement to produce additional clones of the Cambiaso horses, to wit:

> 3.    Further Cooperation.   Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

3

> 4.   Sale of Clones.   Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.  Owner and Crestview will jointly determine all final sales prices and terms.
>
> 5.   Number of Clones.  Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.  If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

7.   First, the 2009 Agreement, was invalid because the parties failed to agree on its material terms. Second, if a valid agreement was even formed (which Counterclaim/Third Party Plaintiffs deny), it was later terminated and forever extinguished by the parties' agreement to novation, via the March 23, 2011 Quota Holders Agreement (the "Quota Holders Agreement"). **Exhibit 5.**

8.   Farm was a party to the 2011 Quota Holders Agreement by virtue of Farm's 50% ownership of Genetics pursuant to the November 2, 2009 Operating Agreement of Genetics. **Exhibit 1.**  In fact, Farm later became a 100% of Genetics pursuant to the December 31, 2017 Purchase and Sale Agreement and Assignment to Farm of the remaining 50% of Genetics. **Exhibits 2 & 3 hereto.**

9.   The 2011 Quota Holders Agreement formed the Argentine equine cloning company "Crestview Genetics SRL", for the purpose of cloning others' polo horses, amongst Meeker, Genetics, Farm, Mr. Cambiaso, and Mr. Julio Ernesto Gutierrez Conte ("Ernesto Gutierrez"), an Argentine businessman.   Third, if the 2009 Agreement was not previously novated or extinguished, it has been materially breached in multiple ways discussed herein by the Crestview Defendants.

10.     The 2011 Quota Holders Agreement expressly cancelled, terminated and replaced all prior agreements amongst the parties regarding the topic of equine cloning, providing in Section 8.6:

> 8.6. <u>Entire Agreement</u>. This Agreement shall constitute the complete agreement between the Parties in relation to the topics contained herein and replaces all the agreements, statements and understandings previous to the Parties, either orally or in writing.

11.     The Quota Holders Agreement provided that Crestview Genetics SRL, was to be managed by Ernesto Gutierrez, who was also funding the operations of that new company. The parties to the Quota Holders Agreement expressly agreed that the parties' performance under the Quota Holders Agreement would not result in a breach or default of any other agreement to which they were parties.

12.     Ernesto Gutierrez paid Mr. Meeker $ 1,533.000 (U.S.) as consideration for the cancelation, termination extinguishment and/or replacement of the 2009 Agreement.   Meeker directed to which Meeker entities such payments were to be made by Mr. Gutierrez.

13.     The other parties each performed under the Quota Holders Agreement, which was a legally valid agreement.

14.     After the making of the 2011 Quota Holders Agreement, for the ensuing nine (9) years, no further mention of the 2009 Agreement, nor of any purported continuing rights of Meeker or Farm or Genetics under that extinguished agreement, was thereafter made by Meeker, nor by Farm, nor Genetics, nor anyone else. Thus, any purported "rights" arising thereunder have been discharged, extinguished or waived.

15.     Thereafter, in 2019, the parties decided to terminate the Quota Holders Agreement according to the terms of that agreement.   In so terminating, the parties agreed to create two new

agreements: the 2019 Settlement Agreement, **Exhibit 6**, and the 2019 Side Letter Agreement, **Exhibit 7.**

16.     The 2019 Settlement Agreement, **Exhibit 6,** dated July 29, 2019, expressly terminated the 2011 Quota Holders Agreement, and disbursed the assets of Crestview Genetics SRL amongst the parties.

17.     Contemporaneously with the July 29, 2019 Settlement Agreement, Meeker, Farm and Genetics offered to Mr. Cambiaso / La Dolfina an agreement to continue in the equine cloning business on a limited basis.   This offer was accepted by Mr. Cambiaso and La Dolfina, and the offer and acceptance is known as the "2019 Side Letter Agreement." **Exhibit 7.**

18.     The 2019 Side Letter Agreement between Mr. Cambiaso, La Dolfina and Farm and Genetics, the Crestview entities managed by Meeker, *expressly required*: (i) *mutual* agreement of the parties as to the sale price of any clone of Cambiaso / La Dolfina horse, if there were to be such a sale; (ii) that all equine tissue relating to the Cambiaso / La Dolfina horse clones were then and "shall always be" under the custody and control of the parties; (iii) clones created under the Side Letter Agreement "shall only be played on a La Dolfina branded team, and all other uses of such clones was prohibited"; (iv) that Meeker was allowed to create only 2 clones of La Dolfina's famous polo pony "La Dolfina Cuartetera" for his and his children's' amateur, non-professional use; (v) that Meeker was prohibited from further cloning of his two La Dolfina Cuartetera clones; and (vi) in the event further La Dolfina Cuartetera clones were made by Meeker or Crestview, or were sold or transferred, the Meeker La Dolfina Cuartetera clones and any clones therefrom shall be delivered to Mr. Cambiaso within 48 hours.

19.     The parties to that Side Letter Agreement also expressly agreed that the 2019 Side Letter Agreement constituted the entire agreement between the parties with respect to the equine

cloning of Cambiaso / La Dolfina horses, and the parties further expressly agreed that the Side Letter Agreement superseded all prior written or verbal negotiations, understanding, representations and agreements, if any.

**B.    Recent Developments.**

**1)    The Admission of Assignment.**

20.    The Crestview Defendants have admitted Farm assigned certain past (though previously terminated) rights under the (invalid or previously cancelled) 2009 Agreement to Genetics (the "**Admission of Assignment**"). Farm is also the owner of Genetics. During the months following that Admission of Assignment, the Crestview Defendants have never denied nor attempted to retract this Admission of Assignment.

21.    Now that recent discovery has revealed that Farm is the owner of Genetics, the Admission of Assignment makes more sense. While the 2009 Agreement already terminated by this time for failure of performance, novation or settlement, it is Farm, through its membership interest in Genetics, which has attempted to improperly resurrect that terminated 2009 Agreement.

**2)    Sale of La Dolfina Cuartetera Clones to Park Place Polo.**

22.    On November 9, 2020, the Crestview Defendants sold three (3) La Dolfina Cuartetera clones to Defendant Park Place Polo Team through a closely-related entity and agent of Park Place Polo Team.

23.    The Crestview Defendants also sold to the Park Place Polo Team an option for the creation and purchase of seven (7) additional Cuartetera clones, and the ability for Park Place Polo team to create more Cuartetera clones.

24.    Park Place Polo Team is a direct competitor to Mr. Cambiaso and La Dolfina in the highly competitive professional polo industry.

25.     This sale of a total of 10 La Dolfina Cuartetera clones was memorialized in a November 9, 2020 Horse Purchase and Sale Agreement (the "November 9 Secret Cloning Agreement"). **Exhibit 8.**   Defendants withheld the November 9 Secret Cloning Agreement from Counterclaim/Third Party Plaintiffs and the Court for more than 6 months and only turned it over after a Court Order in the instant litigation.

26.     The total purchase price paid to the Crestview Defendants for the sale of the La Dolfina Cuartetera clones under the November 9 Secret Cloning Agreement is $ 2,905,000.00.

27.     The November 9 Secret Cloning Agreement expressly provided that Defendant Crestview Farm, an entity whose rights (if any were even formed under the 2009 Agreement) were forever extinguished by the agreement to novation and entry into the 2011 Quota Holders Agreement and the concurrent payment of $1,533,000 from Mr. Guiterrez to Meeker controlled entities, nevertheless, purportedly (i) sold 3 Cuartetera clones and the option to purchase 7 more Cuartetera clones to Defendant Park Place Polo Team; and (ii) that payment for the clones was made to Farm's Frost Bank account..

28.     Notably, in the November 9 Secret Cloning Agreement, the Crestview Defendants falsely represented to Park Place Polo Team that: (i) Farm did not need the approval of any other person or entity to sell or otherwise convey La Dolfina Cuartetera clones under the November 9 Secret Cloning Agreement; (ii) there were no suits or actions threatened by anyone that could affect Farm's claimed ability to perform Farm's obligations to produce and deliver the La Dolfina Cuartetera clones to Park Place Polo Team; (iii) that Farm had not breached the 2009 Agreement (although never formed or previously cancelled); (iv) that no event had occurred (despite the initial invalidity for lack of agreement and performance, and despite the 2011 novation by the Quota Holders Agreement) which would prevent Farm from enforcing the 2009 Agreement; and (v) all

La Dolfina Cuartetera clones being produced under the November 9 Secret Cloning Agreement were being produced pursuant to the (never valid or previously-cancelled) 2009 Agreement.

29.     Further, the Crestview Defendants represented to Park Place Polo Team that: (vi) the La Dolfina Cuartetera clones sold to Park Place Polo Team were "free and clear of any claims by Cambiaso"; (vii) while the Crestview Defendants would not produce any further Cuartetera clones (other than the 10 clones to Park Place Polo Team, and 10 clones to Mr. Cambiaso, should he order them pursuant to the 2019 Side Letter Agreement); and (viii) Park Place Polo Team was sold the "right" to produce more La Dolfina Cuartetera clones should Park Place Polo Team so decide.

30.     Essentially, the Crestview Defendants have sold La Dolfina horses and options under the disguise of purported rights held by Crestview Farm under the previously never formed or extinguished 2009 Agreement, entirely ignoring the limitations and need for mutual consent from Cambiaso in 2009 Agreement.

31.     In sum, the Crestview Defendants have now attempted to rewrite history to give the false impression that Crestview Farm had the authority and title to convey La Dolfina Cuartetera clones, acting as if the 2009 Agreement was valid or had not been terminated in 2011, to create a new fiction to suit their improper and illegal objectives, and to support the Crestview Defendants' illicit and unauthorized sales of La Dolfina clones to Defendant Park Place Polo Team.

32.     The Crestview Defendants then continually repeat their position in numerous transactional documents and court filings, trying to delude this Court, Plaintiffs, and the global public into believing the cancelled and replaced 2009 Agreement (if it was even formed) is somehow still in existence.   Not only was the 2009 Agreement invalid for lack of agreement or performance, but the 2009 Agreement had been forever terminated and replaced by the parties'

agreement to enter into the 2011 Quota Holder Agreement. The 2009 Agreement was never valid or has been extinguished for almost a decade.

33.     Nevertheless, the Crestview Defendants purport to have created the November 9 Secret Cloning Agreement, under which the Crestview Defendants then agree that if Park Place Polo Team were to sell, transfer or assign La Dolfina Cuartetera clones into the public market, the Crestview Defendants would suffer irreparable, non-monetary harm, and would thus be entitled to an injunction against Park Place Polo Team, and could recover those clones and all genetic tissue of those clones.

34.     Finally, under that November 9 Secret Cloning Agreement, the Crestview Defendants and the Park Place Polo entities set up an indemnity and escrow structure to deal with anticipated litigation by Mr. Cambiaso and La Dolfina to either "rescind" the 2009 Agreement, or otherwise recover the La Dolfina Cuartetera clones from the Crestview Defendants and / or the Park Place Polo entities.

35.     Under that structure, the Crestview Defendants escrowed $250,000 of the clone sales money paid by Defendant Park Place Polo Team with a Florida law firm, Akerman, LLP, pursuant to a written Florida-based and Florida-law and jurisdiction-governed Escrow Agreement that is internal Exhibit E to the November 9 Secret Cloning Agreement.   **See Exhibit 8 hereto.**

36.     Further, under that escrow structure, Park Place Polo Team, by its owner Andrey Borodin and his entities, was required to pay the costs of defense of any claims by Mr. Cambiaso / La Dolfina once the $250,000 of Florida escrow money was exhausted.

37.     Further, during the course of this litigation, the November 9 Secret Cloning Agreement has since been amended and extended twice, December 21, 2020 and more recently on June 10, 2021 (the "Amendments").   **See Exhibits 9 and 10.**     Remarkably, while each of those

Amendments extends the time of Park Place Polo Team to exercise the option to purchase 7 additional La Dolfina Cuartetera clones, each of those Amendments restates and ratifies the remaining material terms of the November 9 Secret Cloning Agreement.

38.     One of the material terms of the November 9 Secret Cloning Agreement is that no litigation exists by Mr. Cambiaso to challenge the clone sale and recover the clones, and that the Crestview Defendants have *no reason to know* of any such litigation.   Clearly, after the December 9, 2020 inception of the within litigation, that is not the case, because there are many reasons to know of such litigation.   Therefore, the representations to the contrary to Park Place Polo Team by the Crestview Defendants in the Amendments to the November 9 Secret Cloning Agreement to are patently false.

**C.    Even if Not Invalid for Lack of Agreement or Performance of its Material Terms, the 2009 Agreement was Forever Terminated by the 2011 Quota Holders Agreement Novation.**

39.     These counterclaims are based on an ongoing unlawful and fraudulent scheme orchestrated by the Crestview Defendants to misappropriate unique and invaluable horses and genetic material owned by Plaintiffs, by creating the fiction of a magically-resuscitated 2009 Agreement, so that the Crestview Defendants could give the false impression that Crestview Farm had the authority and title to convey clones and genetic material of the World's best polo horses belonging to Plaintiffs, and then and make and sell clones of those horses to the international market.

40.     During November 2010, and contemporaneously with an auction in Argentina where the first polo horse clone was sold, the parties abandoned the idea of selling clones because once a clone is sold, its genetic material is forever propagated, and it can be continually cloned.

Instead, the parties decided to start a new venture in Argentina to provide cloning services and sell only offspring of clones[2] (rather than clones themselves).

41.     The 2009 Agreement had, in any event, failed for lack of agreement or performance of material terms by that time. Farm never acquired the cloning technology (it was licensed by Genetics from Viagen in 2010 and Farm has taken the position in the litigation that Farm is separate from Genetics).   Further, parties never came to a mutually acceptable agreement as to the "endorsement and marketing of clones", nor as to the "final sales price and terms" of sale of any clones; nor and mutual agreement as to the production of the additional "*second edition*" clones. Thus, the 2009 Agreement was never valid or terminated for failure of performance.

42.     In 2011, to be certain that any claimed rights under the 2009 Agreement were extinguished, the parties agreed that the 2009 Agreement was entirely cancelled, forever terminated and replaced by the mutual agreement of the parties to enter into the March, 2011 Quota Holders Agreement, with payment of consideration to the Crestview Defendants of $1,533,000 by Ernesto Gutierrez.

43.     Meeker, self-proclaimed Manager of both Farm and Genetics, has repeatedly told the global media, that neither Meeker, the Crestview Defendants, nor Mr. Cambiaso or La Dolfina planned to make and sell clones of La Dolfina and /or Cambiaso horses commercially but were focused solely on selling only offspring of clones.

---

[2]     A clone is a genetically identical copy of a cell or an organism, that is not created from two parents and is not the product of sexual reproduction. A clone of a horse has the identical DNA as the original horse.

"Clones are genetic copies of an animal," says Larisa Rudenko, Ph.D., a Molecular Biologist and Senior Adviser for biotechnology in at the FDA Center for Veterinary Medicine.

By contrast, offspring of clones differ from clones in that: offspring are (i) formed from two parents; (ii) the product of sexual reproduction; (iii) involve formation and fusion of two gametes (reproductive cells); and (iii) offspring of the same parents differ in their genetic constitution.

44.     Then, in 2020, almost a decade after accepting payment for the novation and termination of the 2009 Agreement (if even valid), for the first time, the Crestview Defendants suddenly claimed the right under that previously terminated and novated 2009 Agreement, to unilaterally set all sale terms, clandestinely sell, and retain all proceeds from unauthorized creation of and sales of clones of Mr. Cambiaso's, and even more defiantly, the La Dolfina horses and genetic material.

45.     The documents that the Defendants were compelled to produce by this Court, **Exhibits 8, 9 and 10**, described herein, establish that the Crestview Defendants have tortured and deliberately misinterpreted the language of the invalid or long ago terminated 2009 Agreement in an attempt to substantiate their actions and somehow justify their scheme.

46.     Surreptitiously, the Crestview Defendants entered into a multi-million dollar contract to produce and sell clones created by the misappropriation of horses and genetic material belonging to La Dolfina with Defendant Park Place Polo Team through a closely-related entity, affiliate and agent, known to be operated by Andrey Borodin, a Russian billionaire and exile living in the United Kingdom who owns the Park Place Polo Team.

47.     The clandestine conduct of Meeker, Crestview Farm and Crestview Genetics is unauthorized, fraudulent and terribly heartbreaking for Mr. Cambiaso, who for the last decade has reposed trust and confidence in Meeker and the Crestview entity Defendants and their collective representations to Mr. Cambiaso, La Dolfina, Mr. Gutierrez, and other third parties and the global media, that no clones of La Dolfina and / or Mr. Cambiaso would ever be sold after the single sale in November 2010 at auction. Mr. Guiterrez who purchased the clone returned her to Mr. Cambiaso and Meeker.

48.     Mr. Cambiaso and La Dolfina relied on Meeker and the Crestview Defendants'
commitment to closely restrict the production of the Cambiaso / La Dolfina horse clones, and the
Crestview Defendants' representations that those Defendants would never sell Cambiaso / La
Dolfina horse clones without the express, mutual consent of Mr. Cambiaso.

49.     The Crestview Defendants made these representations first in the now-terminated
(if even formed) 2009 Agreement, and then again in conjunction with the Crestview Defendants
agreement to novation and termination of the 2009 Agreement by acceptance of $1,533,000 and
entering into a substituted agreement known as the 2011 Quota Holder Agreement.

50.     Meeker and the Crestview Defendants' belated and unauthorized efforts to resurrect
the cancelled and terminated 2009 Agreement (if even valid) is a complete fiction, invented by
Meeker and his entities to support their unlawful and fraudulent multi-million dollar sale of
Cuartetera clones to Park Place Polo Team.     The resurrection of the 2009 Agreement was a sham,
meant to disguise that the 2009 Agreement was never enforceable or had long since been
extinguished, and give the false impression that Crestview Farm had the authority and title to
convey the unauthorized La Dolfina clones and genetic material.

51.     The conduct of Counterclaim/Third Party Defendants has caused and continues to
cause irreparable harm to Counterclaim/Third Party Plaintiffs whose horses are being cloned and
sold without their authorization or consent, and, as explained further below, dilutes Mr. Cambiaso
and La Dolfina's carefully created bloodlines, and hijacks the prestige and brand power of Mr.
Cambiaso and La Dolfina in the world of polo horse breeding.

52.     In these Counterclaims, Counterclaim/Third Party Plaintiffs seek immediate
declaratory relief to establish that the 2009 Agreement (i) failed for lack of agreement on its
material terms, (ii) to the extent it somehow survived that lack of agreement or performance, it

14

was thereafter terminated upon the parties' novation and agreement to cancel and extinguish the 2009 Agreement by entering into the Quota Holders Agreement and the Crestview Defendants' acceptance of $1,533,000 in 2011 and 2012, (iii) to the extent that the 2009 Agreement is deemed valid by the Court (which Counterclaim/Third Party Plaintiffs deny), it has been materially breached.   Any contrary acts or assertions by Defendants selling or promising to sell clones or the genetic materials of Plaintiffs' horses or Plaintiffs' clones are illegal and should be immediately enjoined.

**D.      The Context of Cloning Polo Ponies.**[3]

53.      In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team.   Meeker himself has admitted this fact in a December 2016 interview, explaining: "It's 70% to 80% the horse, and everyone, including Cambiaso, will tell you this."[4]

54.      The polo horse clones at issue are derived from the genetic stock of polo ponies owned by Counterclaim/Third Party Plaintiffs Mr. Cambiaso and La Dolfina's parent La Dolfina S.A., an Argentine company ("La Dolfina S.A."), polo ponies that are world-renowned for their unique and superior athletic abilities, acumen, temperament, and vastly superior performance in the sport of high-goal polo. Mr. Cambiaso and his wife are the sole owners of La Dolfina S.A., and Mr. Cambiaso owns individually some of the horses and genetic material relevant hereto.[5]

---

[3] Horses utilized as equine athletes in the modern sport of polo are commonly called "polo ponies" though not pony-size at all.

[4] *Six cloned horses help rider win prestigious polo match*, by Jon Cohen, Dec. 13, 2016. Source: https://www.sciencemag.org/news/2016/12/six-cloned-horses-help-rider-win-prestigious-polo-match

[5] Most cloning today uses a process called somatic cell nuclear transfer:
- Scientists take an egg from a female animal … and remove the gene-containing nucleus.
- The nucleus of a cell from an animal the breeder wishes to copy is added to the egg.

55.     In Argentina, as well as throughout the World, breeders tightly control the reproductive capacities of their animals by charging stud fees or controlling the brood stock. New scientific-technological advances have provided economic opportunities in the development of pure genetic information.

56.     Meeker, Farm and Genetics    entered into the 2009 Agreement, which was never performed, later novated and replaced by the 2011 Quota Holders Agreement, or later terminated by the 2019 Settlement Agreement and replaced in part by the 2019 Side Letter Agreement.

57.     The Crestview Defendants are otherwise subject to certain obligations and duties from those contractual events and novation, relating to the cloning, marketing and selling offspring of clones of Plaintiffs' renown polo ponies. None of these contractual obligations give the Crestview Defendants the unfettered and unilateral ability or authorization to make and / or sell clones of Plaintiffs' horses to third parties.

58.     Yet, as set forth herein, the Crestview Defendants have ignored their rights, duties and obligations under all of the relevant contracts, have sold La Dolfina horse clones to third parties, and have caused, and continue to cause, actual and continuing harm to Plaintiffs.

59.     Recently, it has come to the attention of Counterclaim/Third Party Plaintiffs that Meeker, individually and as an agent and representative of Crestview Farm, and utilizing the resources and facilities of Defendant Crestview Genetics, has:

---

- After other steps in the laboratory take place, the egg cell begins to form into an embryo.
- The embryo is implanted in the uterus of a surrogate dam (female parent), which carries it to term and delivers it like her own offspring.

  Clones may allow farmers to upgrade the quality of their herds by providing more copies of their best animals….

Source: United States Food and Drug Administration, https://www.fda.gov/consumers/consumer- updates/animal-cloning-and-food-safety

(a)   engaged in the unauthorized misappropriation of certain genetic material belonging to La Dolfina and from certain of La Dolfina's renowned polo ponies;

(b)   has used La Dolfina's genetic material to create unauthorized clones of certain of those polo ponies;

(c)   has sold to the Park Place Polo Team Corporation some of those clones using false and / or misleading descriptions of fact or false or misleading representations of fact, including by implying that Counterclaim/Third Party Plaintiffs approve these actions and passing off these clones as his own, misleading the public as to their source and wrongfully taking advantage of the commercial reputation of La Dolfina and Mr. Cambiaso;

(d)   has caused and allowed the unauthorized distribution and control of Plaintiffs' proprietary equine genetic material and clones to competitors and the general public, including the Park Place Polo Corporation and the Park Place Polo Fields Corporation ; and

(e)   has sold options to the Park Place Polo Team Corporation for more unauthorized clones created by the misappropriation of La Dolfina's genetic material to locations in interstate and foreign commerce both within and outside the United States, thus confusing, deceiving or inducing mistaken purchasing decisions by potential buyers and the international market for high end polo ponies.

60.   These actions by the Crestview Defendants are fraudulent, direct breaches of the contracts between the parties, and, or alternatively, breaches of certain duties and obligations that arose from the cloning business contracts amongst the Counterclaim/Third Party Plaintiffs and the Crestview Defendants.

61.   The past breaches and present intentions of the Crestview Defendants to commit further fraud and further breach the contractual and fiduciary duties between Counterclaim/Third Party Plaintiffs and those Defendants have already caused, and threaten to further cause irreparable harm to the La Dolfina and Cambiaso genetic line of polo ponies, as well as to the professional performance of the owner of La Dolfina, Adolfo Cambiaso.

62.   Mr. Cambiaso is a professional 10-goal polo player, the highest ranking, and he, his horses, his La Dolfina horses, and his La Dolfina stable and team are widely regarded as the

17

very best amongst the best in the sport of polo. Mr. Cambiaso is globally recognized as the best polo player in world history.

63.     The unauthorized cloning of La Dolfina and Cambiaso horses and international sale of the clones and genetic material threatens to irreparably harm Plaintiffs' ability to successfully compete and win at the highest levels of polo because this unauthorized distribution of Counterclaim/Third Party Plaintiffs clones and genetic material dilutes and irretrievably distributes the unique and irreplaceable genetic material found in the La Dolfina polo pony lineages. Defendants' actions constitute unauthorized appropriation, possession and distribution of genetic material owned by Mr. Cambiaso through his La Dolfina S.A entity and violation of the various federal laws on which some of these counterclaims are based.

64.     For clarity, the injuries proximately caused by Defendants' ongoing and continuous misconduct are not readily curable with later economic damage awards.

65.     Counterclaim/Third Party Plaintiffs seek to immediately recover the Cambiaso / La Dolfina horse clones and related genetic material, and for an immediate temporary restraining order, as well as a permanent injunction to prevent the further irretrievable and irreparable dilution and dissemination of the La Dolfina genetic pool by the unauthorized activities of Meeker, whether alone or by and through the other Crestview Defendants and other Crestview-related entities or affiliates, and for an injunction against Park Place Polo entities who or which now also have unauthorized control of horses and genetic material belonging to Plaintiffs.

E.      **Parties, Jurisdiction and Venue.**

66.     **Counterclaim/Third Party Plaintiff La Dolfina S.A., LLC** is a Florida limited liability company with offices in Palm Beach County, Florida, and is the assignee of **Counterclaim/Third Party Plaintiff La Dolfina, S.A.,** an Argentine entity *Sociedad Anónima* (Corporation) which is considered an Argentine citizen and resident, and which is La Dolfina's

only member.   Collectively, La Dolfina, S.A., LLC and La Dolfina, S.A. are referred to herein as **"La Dolfina."**

67.    **Counterclaim/Third Party Plaintiff Adolfo Cambiaso ("Mr. Cambiaso")** is an Argentinian national, with an address in Palm Beach County, Florida who plays polo professionally in Wellington, Palm Beach County, Florida. Mr. Cambiaso is currently ranked number one in the world of international polo. Mr. Cambiaso and La Dolfina recently won their eighth (8th) consecutive title at the World's most prestigious and competitive polo tournament, the 127th edition of the Argentine Polo Open ("*Abierto Argentino de Polo*").   La Dolfina has won the Argentine Polo Open fourteen (14) times in their last twenty (20) appearances, while Mr. Cambiaso, individually, has won the Argentine Open seventeen (17) times. Mr. Cambiaso, with horses and professional players provided by La Dolfina, also won in April, 2021 the most prestigious domestic tournament, the United States Polo Championship, in Palm Beach County, Florida. As a result of Mr. Cambiaso's performance on the field and his world-renowned polo pony breeding program, Mr. Cambiaso is widely recognized as a polo superstar and the leading celebrity in the United States and in the international polo community.

68.    **Third Party Defendant D. Alan Meeker a/k/a Alan Meeker, a/k/a David Alan Meeker ("Meeker")** is a citizen and resident of Tarrant County, Texas, having an address at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107.   Meeker, both individually as well as the Manager of and through and by use of the entities Crestview Farm, LLC, Crestview Genetics, LLC, and Crestview Farm Aiken, LLC, as well as through some of his other 114 entities, conducted substantial, repeated and not isolated business in Florida, as well as in Florida with La Dolfina and Mr. Cambiaso. Meeker has further come into Florida repeatedly to conduct business on behalf of himself and Crestview Farm and Crestview Genetics. This Court has previously determined that it

has personal jurisdiction over all the Crestview Defendants, which is now the law of the case. [consolidated case ECF 81*4].   Further, the Crestview Defendants are engaging in court proceedings before this Court.

69.    **Counterclaim Defendant Crestview Farm, LLC ("Crestview Farm" or "Farm")** is incorporated in Texas as a Texas limited liability company having an address and principal place of business at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107.   Meeker denies being an individual Member; however he admits he is the Manager. [DE 18-1].   At all times relevant hereto, Meeker so dominated and controlled Crestview Farm to such an extent that the independent existence of Crestview Farm is non-existent and Meeker is the alter ego of Crestview Farm. Meeker himself illustrates the lack of separateness or distinction between himself and Crestview Farm.

70.    **Third Party Defendant Crestview Farm, LLC ("Crestview Genetics" or "Genetics")** is incorporated in Nevada as a Nevada limited liability company, having an address and principal place of business at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107. Recent discovery has revealed that since November 2, 2009, if not earlier, Farm was the 50% owner of Genetics[6], and as of December 31, 2017 Farm became the 100% owner of Genetics. **Exhibits 1, 2 and 3.**

71.    Since 2009, according to the written admission of Defendants in this litigation, ***"Farm assigned its rights to possess or create certain clones to Genetics…."*** See consolidated case ECF 8 *8 (Defendants' Motion to Dismiss First Amended Complaint filed in the related case,

---

[6] The pre-2017 ownership of Genetics reflected in Exhibits 1, 2, and 3 is inconsistent with the May 2016 Crestview Genetics, wherein Genetics filed a Certificate of Interested Persons in the Northern District of Texas listing the Members of Crestview Genetics as the David Alan Meeker Family Irrevocable Trust, Dan H. Meeker, Trustee and Dan H. Meeker Family Children's Irrevocable Trust, D. Alan Meeker, Trustee. **Exhibit 14.**

*La Dolfina, S.A., LLC, et al. v. D. Alan Meeker, et al.,* CASE NO.: 9:20-cv-82231-AMC/BER, with which the within case is presently consolidated. This event has become known in this case as the "Assignment" and counsel's statement has become known as the "Admission of Assignment."

72.     However, any such purported Assignment of rights by Farm was never valid because of the failure of the 2009 Agreement for lack of agreement or performance of material terms, as well as by the 2011 Quota Holder Agreement novation of the 2009 Agreement.

73.     At all times relevant hereto, Meeker so dominated and controlled Crestview Farm and Crestview Genetics to such an extent that the independent existence of Crestview Farm and Genetics is non-existent and Meeker is the alter ego of Farm and Genetics. At all times relevant hereto, Meeker deliberately formed and used the corporate forms of Farm and Genetics fraudulently or for improper purposes, and as more fully set forth herein below, formed and used the Farm and Genetics corporate forms, including but not limited to being a mere devices or shams and being used to commit fraud and to frustrate La Dolfina and Mr. Cambiaso and which caused and threaten to further cause injury to Plaintiffs.

74.     Further, as set forth more fully herein, these Defendants have committed tortious acts and federal statutory violations in Florida causing injury to Counterclaim/Third Party Plaintiffs here in Florida (selling clones to Plaintiffs' competitor in Florida, diluting and distributing proprietary genetic material here and injuring Plaintiffs' competitive advantage and business reputation in Florida) while conducting or soliciting cloning sales and services in Florida.

88.     This Court also has original subject matter jurisdiction over these counterclaims and third party claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337, by virtue of the allegations of the Crestview Defendants' violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)

21

and violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq., as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

89.     This Court has supplemental jurisdiction over all of the state law claims against all Defendants, because those claims arise out of a common nucleus of operative fact with Plaintiffs' federal claims and are so integrally related to each other that they are part of the same case and controversy.  All of the claims alleged herein arise from the unauthorized creation and sale of Plaintiffs' clones, horses, and genetic material by the Crestview Defendants to the Park Place Polo entities.

90.      This Court also has original subject matter jurisdiction pursuant to 22 U.S.C. §§ 2201 and 2202 and pursuant to Fed. R. Civ. P. 57 because Counterclaim/Third Party Plaintiffs also seek declaratory relief herein.

91.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this is the Judicial District in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated or is a Judicial District in which any defendant is subject to the court's personal jurisdiction with respect to such action.

92.     This case was previously transferred to this Court by the Northern District of Texas. The Northern District found that "Florida has a more localized connection to the lawsuit, and this factor weighs in favor of transfer." [consolidated case ECF 80-1 *17].  The Northern District further found that "[b]ecause the balance of the 1404(a) factors are either neutral or weigh in favor of transfer, the Court concludes that transfer to the Southern District of Florida is proper here." [consolidated case ECF   80-1 *17].

**F.      Mr. Cambiaso's 2006 Idea to Clone Polo Ponies.**

93.      Mr. Cambiaso's interest in cloning polo ponies arose out of an unfortunate and mortal injury to his favorite horse, an agile chestnut stallion named "Aiken Cura."  During a tie-break period ("chukker") of the 2006 Argentine Polo Open Championship ("*Campeonato Argentino Abierto de Polo*") a high-goal, professional polo tournament that Mr. Cambiaso and La Dolfina had been playing in, Aiken Cura collapsed with a broken limb when returning to the side of the field in Palermo, Bueno Aires, Argentina, and had to be euthanized.

94.      Before euthanizing Aiken Cura, Mr. Cambiaso requested veterinarians obtain a skin sample from the horse and put the sample into a deep freeze to store in a Buenos Aires laboratory. This decision turned out to be prescient because the technology at the time was not thought to be capable of recreating tissue that could be used to generate life and recreate animals.

**G.      The 2009 Agreement.**

95.      Three years later, in 2009, Meeker, who is a Texas oilman with an amateur interest in cloning, approached Mr. Cambiaso and offered to enter into a joint business venture to determine the viability of cloning some of the best polo ponies belonging to Mr. Cambiaso. Many of the discussions with Mr. Cambiaso and misrepresentations by the Crestview Defendants regarding the Cloning Initiative occurred in Wellington, Palm Beach County, Florida.   Many of the agreements and negotiations amongst the parties regarding the 2009 Agreement were made in Palm Beach County, Florida.

96.      Meeker, Crestview Farm and Mr. Cambiaso entered into 2009 Agreement, promising to explore and potentially agree to its material terms. Thereafter, Meeker, Farm and Genetics agreed to cancel and terminate and extinguish any claimed rights under the 2009 Agreement in perpetuity and replace it with the 2011 Quota Holders Agreement. Thus, in 2011, the parties agreed to the novation of any claimed rights arising under the 2009 Agreement.

97.     The 2009 Agreement, drafted on or about June 15, 2009 by Meeker and Farm's attorneys, was premised on the mutual assumptions and understandings shared by Meeker, Crestview Farm, and Mr. Cambiaso that:

> **WHEREAS**, Owner is the owner of certain mares and also owns full rights to the tissue of Aiken Currah, a deceased stallion, which tissue is currently in cryogenic stasis;
>
> **WHEREAS**, Crestview is currently involved in the use of advanced biotechnologies in the cloning of horses;
>
> **WHEREAS**, Owner and Crestview wish to enter into an arrangement for the purpose of jointly producing, marketing and selling cloned animals;
>
> **WHEREAS**, in furtherance of the foregoing, Owner is willing to provide tissue from certain mares and from Aiken Currah in accordance with the terms and conditions set forth hereinbelow.

98.     The document was thus premised upon the underlying understanding of Meeker, Crestview Farm, and Mr. Cambiaso that:

(a)     The genetic donor polo pony mares and the tissue of Aiken Cura (misspelled Aiken Currah in the Contract) was owned and would continue to be owned by Mr. Cambiaso;

(b)     Meeker through his Crestview Farm, LLC entity was then "involved in the use of advanced technologies in the cloning of horses";

(c)     A joint "arrangement" was later to be entered into between the parties; and

(d)     Mr. Cambiaso would provide genetic tissue from Aiken Cura and polo pony mares that Mr. Cambiaso owned according the terms of the Contract.

99.     The parties never intended the 2009 Agreement to be the final expression of the terms of the cloning business endeavor.   Drafted by the Crestview Defendants' attorneys, the 2009 Agreement lacks an "entire agreement" or integration clause, and reads more akin to a letter of intent, contingent on the cloning technology actually working and requiring further preconditions, terms and agreements that would be negotiated at a later time:

- in paragraphs 1 and 2, requiring the successful cloning to occur;
- in paragraph 3, requiring further negotiation to establish a mutually acceptable cloning program only if the cloning was successful, to wit:

> 3.   Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

- also in paragraph 3, providing that until the negotiation and establishment of a mutually acceptable program, Mr. Cambiaso, and not Meeker and not Crestview Farm, was to continue to be considered the owner of the original animal;

- requiring, in paragraph 4, further mutual agreement between the parties as to sales price and, as importantly, terms; and

- in paragraph 5, requiring further mutual agreement prior to any "second edition" (or generation) of cloned polo ponies.

100.   Mr. Cambiaso, an Argentine for whom English is not his native language, did not participate in the drafting of this English-only document, which was not translated by the Crestview Defendants' attorneys.  Mr. Cambiaso was not given an opportunity to review the document with his attorneys. Mr. Cambiaso understood from the concurrent representations by the Crestview Defendants, that Mr. Cambiaso was executing the 2009 Agreement on behalf of himself.

101.   At all times relevant hereto, Mr. Cambiaso was the owner of the original horse Aiken Cura. The 2009 Agreement pertains only to certain horses and genetic material belonging to Mr. Cambiaso. While the horse "Aiken Cura", and the genetic material contemplated under the 2009 Agreement belonged solely to Mr. Cambiaso, the horses, clones, and genetic material presently being misappropriated by Defendants pursuant to alleged rights conveyed to Crestview Farm and Meeker under the 2009 Agreement belong to, and are the sole property of, La Dolfina.

102.   The 2009 Agreement also contained significant restrictions upon the Crestview Defendants, requiring the further cooperation and *mutual agreement* of the parties with respect to the *production, endorsement, and marketing* of clones of Mr. Cambiaso's horses, and with respect to the final sales prices and *terms of sale* of any such clones, if ever produced, to wit:

3.    Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

4.    Sale of Clones.  Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.  Owner and Crestview will jointly determine all final sales prices and terms.

5.    Number of Clones.  Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.  If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

103.    For clarity, and as set forth herein, the central factual complaint of Mr. Cambiaso and La Dolfina herein is that Counterclaim/Third Party Plaintiffs did not mutually agree with Defendants as to the production, endorsement, marketing, sales and terms of sale of clones of horses belonging to Mr. Cambiaso or La Dolfina, and that the 2009 Agreement never conveyed any rights to any of the Defendants to *unilaterally* produce, sell, license or exercise any ownership whatsoever over horses, clones, or genetic material belonging to Mr. Cambiaso or La Dolfina. Paragraphs 3, 4 and 5 were all very clear that *mutual* agreement of Mr. Cambiaso and Farm were required before any of those acts, and/or a change in clone ownership, was to occur.

104.    Although the 2009 Agreement first failed for lack of agreement on, or performance of, its material terms, and was subsequently cancelled and replaced by the parties via the novation of the 2011 Quota Holders Agreement, to the extent that the Crestview Defendants erroneously rely upon that 2009 Agreement, the 2009 Agreement expressly prevented the Crestview Defendants from unilaterally producing, endorsing, marketing or setting the sales prices and terms of the sale of any clones produced pursuant to the 2009 Agreement. Thus, although Counterclaim/Third Party Plaintiffs believe that the 2009 Agreement was never entered into or

forever extinguished and terminated in its entirely, to the extent there may be a judicial finding that the 2009 Agreement somehow survived its failure of agreement on material terms or performance or was not replaced by novation in 2011 agreement, the evidence reflects that the Crestview Defendants have knowingly and intentionally breached material terms of that 2009 Agreement.

105.    The cloning technology ultimately proved successful by Viagen, a cloning technology company, which later licensed that technology to Crestview Genetics in 2010.   Farm did not ever acquire that technology required to make clones.

106.    Between January 6, 2010 and January 2, 2011, certain polo pony clones were born including a clone of Cuartetera, Adolfo Cambiaso's best and most famous polo pony that is owned by La Dolfina.

107.    Significantly, nowhere in the 2009 Agreement or elsewhere does Mr. Cambiaso grant Meeker or the Crestview Farm any ownership rights in any of the horses, clones, and / or genetic material therefrom.

108.    The Crestview Defendants repeatedly represented that they would not clone *any* Cambiaso or La Dolfina horse outside of express, mutual agreements between the parties. Their representations and commitments ultimately have proved false.

**H.    The Novation of the 2009 Agreement.**

109.    In November 2010, as part of an exploratory initiative of the parties to understand the monetary value of such a clone, the only authorized offer for sale of one Cuartetera clone, "B 02", took place in an highly-regarded auction sale in San Ysidro, Argentina.

110.    However, just prior to the sale, Ernesto Gutierrez, an Argentine businessman and acquaintance of Mr. Cambiaso, explained to the parties that public release of the B 02 Cuartetera clone into the market would not be to the benefit of the parties, given the unique genetic nature of

the clone.    Mr. Gutierrez advised Mr. Cambiaso and Meeker to never sell clones, because then the clones could be continually replicated by downstream purchasers, and the group would lose control of unique and highly valuable genetics possessed within a La Dolfina Cuartetera clone.

111.    Mr. Gutierrez right then proposed that he bid and attempt to win the auction and then return the clone back into the ownership and control of La Dolfina and the parties, with Mr. Gutierrez then joining in and investing in an equine cloning business with the parties.

112.    Mr. Gutierrez then proceeded to outbid all bidders for Cuartetera, and he purchased the clone for a price of $800,000, from which Meeker received $400,000 from the proceeds of this one sale.

75.    Immediately, and true to his word, Mr. Gutierrez returned B 02 to La Dolfina and the parties entered into the joint venture he and the parties had agreed to set up and operate for equine cloning, a venture shortly thereafter memorialized by the 2011 Quota Holders Agreement. **Exhibit 5.**

76.    No more public sales of Cuartetera or Cambiaso / La Dolfina horse clones occurred until the Crestview Defendants began their recent campaign of unauthorized clone creation, misappropriation, and sales.

113.    In March 2011, consistent with their agreement that public sale of any Cambiaso or La Dolfina clone was not prudent, to the extent the 2009 Agreement was not already extinguished by the failure of agreement on or the performance of its material terms, the parties expressly agreed by novation to ***cancel and extinguish*** and ***replace*** the 2009 Agreement by entering into the 2011 Quota Holders Agreement.   The 2011 Quota Holders Agreement replaced all prior agreements amongst the parties regarding equine cloning. See **Exhibit 5,** to wit:

8.6.  <u>Entire Agreement</u>. This Agreement shall constitute the complete agreement between the Parties in relation to the topics contained herein and replaces all the agreements, statements and understandings previous to the Parties, either orally or in writing.

114.    Farm was a party to the 2011 Quota Holders Agreement by virtue of Farm's 50% ownership of Genetics pursuant to the November 2, 2009 Genetics Operating Agreement. **Exhibit 1 hereto.**  Farm later became a 100% owner of Genetics on December 31, 2017. **Exhibits 2 and 3   hereto.**

115.    As part of the novation, Mr. Gutierrez paid $ 1,533,000 to corporate Meeker designated, owned and controlled by Meeker, as consideration to cancel and replace the 2009 Agreement.   In sum, and as demonstrated by Meeker's acceptance of the $ 1,533,000 from Mr. Gutierrez, Meeker, on behalf of himself and his Crestview entities, Mr. Cambiaso, La Dolfina, and Mr. Gutierrez all agreed that selling a clone was a bad business idea because the sold clone could then be re-cloned continually by its purchasers.

116.    Further, the 2009 Agreement had been previous void because of the failure of the parties to agree on material terms of that Agreement, including regarding a "*mutually acceptable program for endorsement and marketing of clones*" and failure to "*jointly determine all final sales prices and terms*", both of which were required by the 2009 Agreement. **Exhibit 6. ¶¶ 2 & 3 therein.**

117.    Mr. Cambiaso, Meeker, Genetics, Farm and Mr. Guiterrez instead entered into a different venture with a different business objective, producing clones of different polo horses belonging to others, rather than producing and selling clones of polo horses belonging to Mr. Cambiaso and La Dolfina.

118.    A fundamental premise behind the termination and extinguishment in perpetuity of the 2009 Agreement among Mr. Gutierrez, Mr. Cambiaso and Meeker was that clones would and

should never be sold.   This was a founding principal of the agreement amongst the parties, and was a principal that Meeker reiterated and repeated frequently to Mr. Cambiaso, La Dolfina, Mr. Gutierrez and to the public through the global media.

119.    Mr. Gutierrez paid $1,533,000 to Meeker and the Crestview Defendants for the cancellation and novation of any claimed rights arising under the 2009 Agreement. Thus, any claimed rights under this now terminated 2009 Agreement were waived, extinguished, discharged in perpetuity by the parties' agreement to a novation.

120.    The 2011-2012 Gutierrez payments to Meeker and the Crestview Defendants forever cancelled and replaced the 2009 Agreement with the 2011 Quota Holders Agreement.

121.    Thus, the Crestview Defendants cannot claim any rights to horses, clones, or genetic material belonging to Cambiaso or La Dolfina under the 2009 Agreement.

122.    Because the 2009 Agreement was previously forever terminated and replaced (if ever valid), the Crestview Defendants do not possess any right under the 2009 Agreement to unilaterally create, sell or convey La Dolfina or Cambiaso clones to the Park Place Polo entities as the Crestview Defendants have purported to do by the November 9 Secret Cloning Agreement.

123.    Until very recently, none of the Crestview Defendants have claimed or asserted any rights or entitlement under the 2009 Agreement to: (i) ownership of Mr. Cambiaso's or La Dolfina horses; or (ii) the authority to market, endorse, produce and sell any Cambiaso / La Dolfina horse clones.

124.    For over nine (9) years from 2011 to 2020, no mention of any claimed rights under the 2009 Agreement was ever made.   This is belied by the acceptance by Meeker and the Crestview Farm and Genetics Defendants of the $1,533,000 in consideration of the cancellation

and replacement of the 2009 Agreement, and the accompanying conduct of the Crestview Defendants extending over the next nine years.

125.    Further Meeker has made multiple public statements to international global media outlets including Vanity Fair Magazine, 60 Minutes, National Geographic and Science Magazine about the importance of restricting the distribution of clones and focusing instead on selling of the babies of clones rather than the clones themselves, and during which time no assertion of any purported rights under the 2009 Agreement to anyone was ever made. **Composite Exhibit 21.**

126.    The Crestview Defendants' course of conduct, by and through Meeker, their common manager, for a decade, and during which time they never claimed any rights to sell clones of horses of Cambiaso /La Dolfina, is consistent with the 2011 Quota Holders Agreement novation of the 2009 Agreement and the parties' conduct in failing to agree on and finalize material terms of the 2009 Agreement.

127.    No party has ever disputed the validity of the 2011 Quota Holders Agreement.

**I.      2019 Settlement Agreement.**

128.    On July 29, 2019,  Mr. Cambiaso, La Dolfina, Meeker, Crestview Genetics, and Mr. Gutierrez entered into the 2019 Settlement Agreement, wherein the parties expressly agreed to "terminate [their] commercial and corporate relationship." [7]   **Exhibit 6, \*2 ¶ B.**

129.    The 2019 Settlement Agreement did not convey ownership of any clone to Genetics, Crestview Farm or Meeker, and no rights were given to Meeker, Crestview Farm or Genetics to clone or market any Cuartetera clones.

130.    The 2019 Settlement Agreement did not somehow resurrect, as of 2011, the invalid or forever terminated 2009 Agreement.

_____

[7]

J.      **2019 Side Letter Agreement.**

131.    Also on July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement, **Exhibit 7** hereto.   The 2019 Side Letter Agreement regarded breeding certain cloned Cambiaso / La Dolfina horses identified in <u>Schedule I</u> attached to the Agreement.

132.    The 2019 Side Letter Agreement provided, among other things, that La Dolfina S.A. would transfer the oocytes of the <u>Schedule 1</u> clones to Genetics in order for the oocytes to be fertilized with semen provided from stallions belonging to and chosen by Plaintiffs.[8] **Exhibit 7**. The 2019 Side Letter Agreement made clear that, in the event of the sale of offspring (not clones) from any of the clones identified by <u>Schedule 1</u> or in the event of the sale of any non-clone oocytes (oocytes from clones to be fertilized with stallion semen as the parties agree to produce offspring of clones), Counterclaim/Third Party Plaintiffs and Genetics "shall agree on a market price." **Exhibit 7**.

133.    In addition, the 2019 Side Letter Agreement stated that Crestview Genetics must clone 10 "Cuarteteras" ***for the exclusive use*** of Cambiaso and La Dolfina, and, should Crestview Genetics successfully complete and deliver these Cuartetera clones to La Dolfina, Alan Meeker, by and through Crestview Genetics, may clone two Cuarteteras "***for the exclusive amateur*** (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras)" but that the sale or further cloning of the Meeker Cuarteteras is "*expressly prohibited*." **Exhibit 7**.

134.    The 2019 Side Letter Agreement did not allow, nor otherwise contemplate, from the genetic material of Cambiaso / La Dolfina horses, unilateral actions by the Crestview

---

[8] An oocyte is an immature ovum, or egg cell.

Defendants for the production, endorsement, marketing nor sale of any Cambiaso / La Dolfina horse clone to the public, nor allow the sale of any oocytes to be used to clone such horses.

135.    As consideration for Mr. Cambiaso and La Dolfina agreeing to enter into the 2019 Side Letter Agreement, Meeker and Crestview Genetics purportedly conveyed to Mr. Cambiaso and La Dolfina the ownership and cloning rights to the valuable "Storm Cat 02" racehorse clone. Counterclaim/Third Party Plaintiffs At the time of the 2019 Side Letter Agreement, Meeker and Crestview Genetics did not actually own Storm Cat 02 and its genetic material, but the Crestview Defendants in fact only possessed a very limited license to use, on a very restrictive schedule, the Storm Cat 02 clone[9].

136.    The 2019 Side Letter Agreement did not give Meeker, Farm nor Genetics, or any other individual or entity, the right to sell any clones or genetic material of horses owned by Counterclaim/Third Party Plaintiffs under any circumstances.

137.    The 2019 Side Letter Agreement did not give Meeker, Farm, or Genetics, or any other individual or entity the right to sell any clones or offspring of clones owned by Counterclaim/Third Party Plaintiffs unilaterally.

**K.    Defendants' Misrepresentations to Counterclaim/Third Party Plaintiffs Regarding the 2019 Side Letter Agreement.**

138.    Concurrently with the negotiation and execution of the 2019 Side Letter Agreement, numerous misrepresentations were made by Meeker, individually and through his Crestview Genetics. To the extent Genetics is or was owned by Farm at that time, then those misrepresentations were also made by Farm.

---

[9]  This misrepresentation by Meeker and the Crestview Defendants as to the scope of their equine cloning rights is part of a pattern of misconduct by those Defendants, which was repeated when those Defendants misrepresented to the Park Place Polo entities that Meeker and Crestview possessed rights to create and sell the La Dolfina Cuartetera clones to Park Place Polo Team.

139.    First, Meeker consistently represented that La Dolfina is and would always be expressly recognized as the Registered Owner of the clones listed in <u>Schedule 1</u> with Genetics and Farm   having only certain limited rights. **Exhibit 7,** *2019 Side Letter Agreement* **\*1 ¶ II.**

140.    Meeker, on behalf of himself and Genetics and Farm made promises that those Defendants would undertake only the mutually-agreed upon use of the genetic material to create only clones and offspring from clones as specifically authorized and agreed upon by the parties. Importantly, any Cuartetera clones would only be ridden in competition by Mr. Cambiaso and his then-minor son (who is now a professional polo player of the highest caliber) and these clones could only be played on La Dolfina-branded teams. **Exhibit 7,** *2019 Side Letter Agreement* **\*1 ¶2.**

141.    Park Place Polo is not a La Dolfina-branded team but rather a competitor of La Dolfina.

142.    These representations were made by Meeker, Farm and Genetics to Adolfo Cambiaso both at the time of making the 2009 Agreement, as well as at the time of making the 2019 Side Letter Agreement, and during the decade within.

143.    Those representations were consistent with the purpose and intent of the 2009 and 2019 agreements and business relationship, which was to explore and potentially promote the very limited cloning of a very small number of polo pony clones and to closely restrict the commercial distribution of those clones belonging to Mr. Cambiaso and La Dolfina.   This close restriction of the creation and distribution of the clones was also consistent with the terms of the 2011 Quota Holders Agreement and the relationship between the parties throughout the prior decade.

144.    These restrictive terms were also consistent with the powerful and valuable brand had been built by Mr. Cambiaso based upon the competitive successes, celebrity, and "drawing power" of Mr. Cambiaso himself and La Dolfina.

145.    However, as became clear to Counterclaim/Third Party Plaintiffs only recently, those underlying representations were false, and made by the Crestview Defendants only to induce Counterclaim/Third Party Plaintiffs to enter into the contractual relationships set forth herein. The Crestview Defendants had and have no intention of honoring those representations or the contractual terms to which Counterclaim/Third Party Plaintiffs eventually agreed.

146.    Additionally, La Dolfina and Mr. Cambiaso only later learned that despite the representations by Meeker, Farm and Genetics in connection with the 2019 Side Letter Agreement and 2019 Settlement Agreement, at that time neither Meeker nor any of his Crestview entities were the actual *owners* of the Storm Cat stallion Clone, and had falsely induced the Counterclaim/Third Party Plaintiffs into signing the 2019 Side Letter Agreement based on misrepresentations about their ownership of this Clone.

147.    Had La Dolfina and Mr. Cambiaso known that Meeker, Crestview Farm, and Crestview Genetics did not intend to honor Defendants' promised commitment to restrict the ownership and distribution of the Cambiaso / La Dolfina clones, Cambiaso would not have entered into the 2009 Agreement and Cambiaso and La Dolfina would not have entered into and the 2019 Side Letter Agreement.

148.    Though already failed, and / or forever terminated and replaced by novation, the 2009 Agreement was in any event void as a matter of law because of the fraudulent misrepresentations of Meeker and the Crestview Defendants.

149.    The 2019 Side Letter Agreement was likewise void because of the aforesaid misrepresentations by the Crestview Defendants made to Counterclaim/Third Party Plaintiffs to induce execution of that Agreement.

150.    In addition to being void because of the Crestview Defendants' fraudulent misrepresentations, the 2019 Side Letter Agreement is further unenforceable for failure of consideration because no consideration supports the Crestview Defendants' unauthorized cloning and clone sales. Meeker's recent conversion of the cloned horses is also in blatant contravention of the terms of the 2019 Side Letter Agreement that did not transfer any ownership rights nor allow the Crestview Defendants to secretly and surreptitiously make and sell cloned horses, as has been recently discovered.

**L.    The "Cuartetera" Misappropriation:   Defendants Violate Multiple Federal Laws by the Unauthorized Creation and Sale of Cuartetera Clones Without Authorization by Plaintiffs.**

151.    Just prior to the filing of the initial Complaint, La Dolfina and Mr. Cambiaso learned that, in the Fall of 2020, Meeker, individually and by and through the use of his Crestview entity Defendants, had commenced the unauthorized creation and selling of three La Dolfina Cuartetera clones to third parties by fraudulently representing that the 2009 Agreement was still valid. Specifically, on November 18, 2020, an Agent of the Crestview entity Defendants admitted, in paragraph #2 of correspondence to La Dolfina **[Exhibit 15 hereto]**, that:

> Crestview Farm has created several cloned foals under its continuing rights under the 2009 Agreement, and has sold three of them to a third party for more than the minimum price mentioned in the 2009 Agreement or as later agreed by the parties.

**See Exhibit 15,** *18 November 2020 correspondence from Defendants' attorneys,* specifically describing in Exhibit 1 to that correspondence, those clones of Plaintiffs' Cuartetera as:

> **"CF Cuartetera P01 dob April 4, 2020;**
> **CF Cuartetera P02 dob April 21, 2020;**
> **CF Cuartetera P03 dob June 2, 2020"**

152.     From correspondence with Meeker and in subsequent conversations with his agents, it has become clear to La Dolfina and Mr. Cambiaso that Meeker and the Crestview entity Defendants have disavowed all of the representations and contractual and fiduciary obligations made by Defendants to Counterclaim/Third Party Plaintiffs from 2010 through 2019 regarding all agreements and cloning business dealings.

153.     The invalid or later terminated and novated 2009 Agreement never imparted to Meeker nor to Farm, nor to Genetics, the unilateral rights claimed by the Crestview Defendants to (i) sell and / or set the final prices and terms for the sale of any La Dolfina Cuartetera clone; or (ii) set the final terms for the use or sale of any genetic material belonging to Mr. Cambiaso or La Dolfina.   In truth and in fact, the invalid or terminated 2009 Agreement was not signed or otherwise entered into by La Dolfina and never gave any of the Defendants any rights to clone, much less own, sell or license any La Dolfina horses, genetic material, or clones.

154.     Further, the Crestview Defendants have appropriated the identity of Mr. Cambiaso and La Dolfina, champions and leaders of the polo world, to falsely imply an endorsement by Counterclaim/Third Party Plaintiffs to the cloning and sale of the clones.

155.     This pattern of misappropriation and misrepresentation as to cloning authorization has likewise been repeated by the Crestview Defendants to the Park Place Polo Team Corporation and Park Place Polo Fields Corporation.   These misrepresentations by the Crestview Defendants come in the form of the statement by the Crestview Defendants that the 2009 Agreement allows such a clone sales transaction under the November 9 Secret Cloning Agreement with the Park Place Polo Corporation and subsequent amendments to that Agreement in December 2020 and June 2021.

**M.      The Cuartetera Clone Sales to a Competitor in Florida.**

156.    Through the November 9 Secret Cloning Agreement, the Crestview Defendants have, without authorization, utilized the genetic material belonging to La Dolfina to create a presently unknown number of unauthorized clones of Cuartetera. Meeker, by and through the use of Crestview Farm, has sold three (3) Cuartetera clones along with the option to purchase at least seven (7) more Cuartetera clones to Pegasus, a British Virgin Island shell company owned and controlled by Plaintiffs' competitor, Park Place Polo Team Corporation and its patron, Andrey Borodin.

157.    Indeed, the first drafts of the November 9 Secret Cloning Agreement were made directly with another Park Place Polo entity, "Park Place Polo, Ltd.", another Borodin-owned and controlled B.V.I. company.

158.    That sale and option of the ten (10) Cuartetera clones to Borodin's Pegasus was consummated through the November 9 Secret Cloning Agreement.  **See Exhibit 8 hereto, 26 pages Bates stamped by Defendants as "CF000004 to CF 000030."**

159.    The November 9 Secret Cloning Agreement is secret because it was keep hidden from its execution, and for an additional six months from the Court during the pendency of this case, despite demand from Plaintiffs.

160.    The November 9 Secret Cloning Agreement was only recently turned over to Counterclaim/Third Party Plaintiffs as part of 32 pages of documents produced to Counterclaim/Third Party Plaintiffs by Defendants pursuant to the June 17, 2021 Order of the Court. This production was six months after Counterclaim/Third Party Plaintiffs first requested the documents surrounding the sale of the Cuartetera clones and Defendants' legal team agreement on the record at the January 29, 2021 Hearing to produce them.

161.    The creation and sale by the Crestview Defendants to the Polo Park Place Team Corporation of these La Dolfina Cuartetera clones was not authorized by La Dolfina or Mr. Cambiaso.   Even the 2009 Agreement, if ever valid was forever terminated, extinguished and replaced in 2011, did not permit such unilateral action by the Crestview Defendants.   There is no legal basis on which the Crestview Defendants can legitimately rely on as a basis for presently allowing the Crestview Defendants to create, market or sell the La Dolfina Cuartetera clones.

162.    Further, the commercial advertising or promotion and sale of these clones of Cuartetera to the consuming public and specifically to Plaintiffs' competitor, Park Place Polo Team and Andrey Borodin through his shell company Pegasus, was not authorized by Plaintiffs, and falsely claimed or implied by false implication that La Dolfina had no rights to their own horses and clones and that La Dolfina's horses could be cloned and sold by the Crestview Defendants without the authorization of La Dolfina and / or Mr. Cambiaso, and that the Crestview Defendants had the unrestricted authority to sell Plaintiffs' horses and genetic material.

163.    The Crestview Defendants, through their agent and attorney Ross Eichberg, informed Counterclaim/Third Party Plaintiffs on November 18, 2020 that Crestview Farm had sold, without authorization from La Dolfina or Mr. Cambiaso, three (3) of the unauthorized foals of Cuartetera to someone else.

164.    When Mr. Eichberg made that disclosure to Counterclaim/Third Party Plaintiffs on November 18, 2020, Defendants and Eichberg as their agent intentionally ***failed to disclose***:

   (a) The actual identity of the purchaser of the clones;

   (b) the Crestview Defendants had also sold Mr. Borodin an option to purchase seven more Cuartetera clones;

   (c) the Crestview Defendants had falsely stated to Mr. Borodin or his representatives, *inter alia*, that the Crestview Defendants had an exclusive license to sell those clones for their "own account;" that their actions were allegedly authorized by the canceled and replaced 2009 Agreement; that all approvals of persons whose approvals were required had been allegedly

obtained; and that the 2009 Agreement had not been novated, extinguished, or terminated in any manner;

(d) Mr. Borodin has agreed to finance the cost of any litigation that were to ensue if Mr. Cambiaso and / or La Dolfina were to challenge the right of the Crestview Defendants to sell the Cuartetera clones;

(e) That the Crestview Defendants considered any breach of the Secret Clone Sale Agreement by Borodin or Pegasus to cause irreparable harm, entitling the Crestview Defendants to injunctive relief and replevin of the Cuartetera clones; and

(f) Conversely, the Crestview Defendants were required to reimburse Pegasus and Borodin if Mr. Cambiaso and / or La Dolfina was successful in obtaining replevin of the clones from Pegasus or Borodin.

165.     All of these undisclosed sales and options for sales of Cuartetera clones to Pegasus and Mr. Borodin by the Crestview Defendants were part of the pattern of willful misconduct constituting a continuing fraud upon Plaintiffs, and evidence of the continuing violations of federal law by Defendants, causing irreparable harm to Plaintiffs.

**N.     Spoliation of Evidence -the Sold Cuartetera Clones Have Been Secretly Moved Out of Florida During this Litigation and Have Been Injured.**

166.     In Early November 2020 three Cuartetera clones were transported from Crestview Farm's facility in Aiken, South Carolina to Wellington, Palm Beach County, Florida. See **Figure 1,** below, a December 2020 photograph taken of those three clone foals at the 62 acre equestrian facility belonging to Park Place Polo Fields, run by Defendant Park Place Polo Team, and located at 4370 South Road, Wellington, Florida 33414:

**Figure 1**



167.    Counterclaim/Third Party Plaintiffs have since discovered that the three unauthorized Cuartetera clones were moved out of Florida and into Aiken, South Carolina on or about December 22, 2020 by the <u>Crestview Defendants</u>, apparently for the purchaser of the clones. See **Exhibit 16, bates stamped "Brookledge003-4, 10"**.

168.    The farm manager for the purchaser of the clones, in fact has stated that the clones are in South Carolina, (<u>they were shipped there by the Crestview Defendants</u>) but that such fact should be hidden from Mr. Cambiaso and La Dolfina, because having the clones in Florida is to the advantage of Mr. Cambiaso and La Dolfina:   **Exhibit 25, Transcript[10]  of Message:**

*"So now what I really want to try and do is try and protect the fact that they are in Aiken. I don't think he's going to do anything stupid, but· they are -- they're fighting over the -- like the sort of litigation and where this hearing and whatever the Meeker/Adolfo battle is, where it ends up being, whether it's in Texas or Florida or· Argentina.· So I think where they are kind of has something to do with that, and I think if they're in· Florida it works to Adolfo's advantage because he wants to do the court case in Florida, and obviously· they've now left."*

*"But, yeah, if you could try and go along· with the play, you know, just -- I mean, you can even say Park Place asked me to say nothing about it. I don't know much about it, but, you know, I've been  asked to say nothing.· That way you're not denying anything, confirming anything.· But, yeah, they are on to trying to find where they are.· But if they think they're in Kentucky, that's better for us."*
*(End of recording.)*

---

[10] *Certified Transcript of Voice Message,* Produced by Julio ·Arellano and Amista Polo, Inc. on August 11, 2021, as **Bates Number JA-Amista.**

169.    This matter was filed against the Crestview Defendants on December 8, 2020. The removal of the three unauthorized Cuartetera clones from the jurisdiction of this Court occurred after this litigation had commenced and with both the Crestview Defendants and the Park Place Polo entities knowing of this litigation and applications for injunction and for temporary restraining order.

170.    Further, in order to transport the Clones out of Florida, the Crestview Defendants were required by law to have the Clones tested for equine infections anemia ("EIA"), and obtain from a veterinarian both a negative test result for the EIA (a "Coggins test" certificate), and Defendants were also required to obtain from a veterinarian an "Equine Health Certificate" prepared and executed by a local veterinarian in Florida within thirty (30) days of travel.

171.    Those documents were submitted to the Florida Department of Agriculture by the Defendants and, because they are required by law to be truthful, should be presumed to be truthful, accurate and admissible prior statements of the Defendants.

172.    Defendants compelled that veterinarian to execute a document stating the veterinarian would not speak to anyone regarding those health and Coggins tests and papers for the three clones moved to South Carolina.  The identity of the veterinarian is known, Daren Tamplin DVM, and he is now being represented by Akerman LLP, the same law firm that is counsel to the Park Place Polo entities who have received discovery subpoenas from Plaintiffs.

173.    Further, recently produced documents confirm that Dr. Tamplin was required to sign a non-disclosure agreement by the Park Place Polo entities when providing care to the clones – a highly unusual step in the equine veterinary industry.

174.    Mr. Borodin and his Park Place Polo Team are competitors of Plaintiffs, and competed *against Mr. Cambiaso in Wellington, Florida* at the International Polo Club in

Wellington, Florida in the Winter of 2020 and in the Spring of 2021[11] as well as in 2021 tournaments in the United Kingdom this Summer.

175.    Mr. Borodin and his Polo Park Place polo operation operate in the United Kingdom and elsewhere in the World when Borodin and his Park Place Polo team are not competing in Florida, rending imminent risk the unauthorized Cuartetera clones in the possession of Mr. Borodin and his Park Place Polo operation will be transported to the United Kingdom or elsewhere in the World, beyond the reach of this Court.

176.    Upon information and belief, the three Cuartetera clones could again be moved to the United Kingdom and will later likely be trained and used in international polo tournaments against La Dolfina and against other polo teams for which Mr. Cambiaso is employed as a player.

177.    Upon further information and belief, Mr. Borodin and his Park Place entities intend to extract genetic material from the Cuartetera clones in their possession in order to create additional Cuartetera clones, causing significant additional imminent risk of imminent risk of irreparable harm to Counterclaim/Third Party Plaintiffs , and confusion to consumers.

**O.    The Crestview Defendants Continue to Misappropriate and Sell Unauthorized Cuartetera Clones During this Litigation.**

178.    For clarity, on June 17, 2021, the Court ordered that the Crestview Defendants "***provide Counterclaim/Third Party Plaintiffs with the bill(s) of sale for the three Cuartetera clone foals described in the related case First Amended Complaint [ECF No. 22], including any agreements or documentation underlying those bill(s) of sale***."

---

[11] See United States Polo Association press release December 22, 2020:
https://www.uspolo.org/gauntlet-of-polo/2021

179.     These were documents Defendants had promised to produce to Counterclaim/Third Party Plaintiffs during the January 29, 2021 Hearing on Plaintiffs' Motion for Temporary Restraining Order, but had failed to produce to Plaintiffs.

180.     Those documents have finally now been produced with redactions and are thirty-two (32) pages and are hereto as **Exhibit 8,** *The Secret Cloning Agreement***; Exhibit 9,** *Amendment to the Secret Cloning Agreement***;** and **Exhibit 10** *Second Amendment to the Secret Cloning Agreement***.**

181.     What Counterclaim/Third Party Plaintiffs have learned from the 32 pages of documents are the following, highly relevant facts which, according to **<u>Table 1</u>** and **<u>Table 2</u>**, attached hereto as **Exhibits 23** and **24,** are ***inconsistent*** with the prior, sworn factual averments of Meeker before this Court and in the Northern District of Texas, and are further ***inconsistent*** with the statements of counsel for Meeker, Crestview Farm and Genetics.

182.     The 32 pages produced demonstrate misconduct by Meeker, Crestview Farm and Genetics:

(a)   On November 9, 2020, Meeker, by using Crestview Farm, and Pegasus, the entity owned and controlled by Mr. Borodin contracted   for the purchase and sale of the ***three (3) Cuartetera clones*** and for an option (the "Option") to purchase ***an additional seven (7) Cuartetera clones*** by Borodin [**Exhibit 8,** CF00004]; and

(b)   the Crestview Defendants represented to Borodin that the Crestview Defendants ***had the unilateral right, pursuant to the 2009 Agreement, to sell those Cuartetera clones without permission of Mr. Cambiaso*** or La Dolfina [**Exhibit 8,** CF00004];

(c)   That the purchase price for the clones was ***$ 800,000 per clone***, for an aggregate of   $2.4 million [**Exhibit 8,** CF00005] ;

(d)   That Borodin's ***time to exercise the Option was extended <u>twice</u> during the present litigation:*** by a First and then Second Amendment, on ***December 21, 2020*** (the "First Amendment") [**Exhibit 9,** CF00001-2] and again v***ery recently on June 10, 2021*** (the "Second Amendment") [**Exhibit 10,** CF000031-32**]**, so that Mr. Borodin has an additional year, until late June, 2022, to elect his Option;

(e) That should the Option to purchase the seven additional Cuarteta clones be exercised, then ***Borodin's purchase price would be diminished by approximately 49%*** *f*or each of the ten (10) Cuartetera clones purchased [**Exhibit 8,** CF00005];

(f) the Crestview Defendants represented to Borodin three times that the Crestview Defendants ***were not aware of any litigation or any claims by Mr. Cambiaso*** that the Crestview Defendants were not entitled to enforce the 2009 Agreement at three times: (i) the time of making of the Secret Clone Sale Agreement [**Exhibit 8, CF00007**], and at the (ii) the December 21, 2020 Amendment[**Exhibit 9,** CF00001-2]; and (iii) the June 10, 2021 Amendment [**Exhibit 10,** CF000031-32**]**;

(g) the Crestview Defendants represented to Borodin that the Crestview Defendants ***were not in default under the 2009 Agreement*** at each of those three times described in 6) [**Exhibit 8, CF00007**];

(h) the Crestview Defendants represented to Borodin that the ten Cuartetera clones were ***free and clear of any claims by Mr. Cambiaso*** at each of those three times described in 6) [**Exhibit 8, CF00007**];

(i) the Crestview Defendants granted an ***assignable license*** to Borodin for Borodin ***to produce an additional ten (10) Cuartetera clones*** [**Exhibit 8, CF00008**];

(j) the Crestview Defendants claimed ***irreparable injury, no adequate remedy at law, and*** the ***right to enjoin*** Borodin from producing any further Cuartetera clones, and a ***right to recover*** from Borodin ***all Cuartetera clones*** in the event of breach of the Secret Clone Sale Agreement by Borodin or an assignee of Borodin [**Exhibit 8, CF00008-9**] ;

(k) the Crestview Defendants were so concerned that Mr. Cambiaso had a legitimate claim to the clones (despite their prior and inconsistent representation that Mr. Cambiaso had no such claim), that they anticipated litigation by Mr. Cambiaso about the clones was likely, and so Crestview Farm, Meeker and Borodin agreed that if Mr. Cambiaso sued to rescind the 2009 Agreement or recover the Cuartetera clones, then: (i) ***Meeker and Borodin would each be responsible to pay certain share of the legal expenses of defense***, that (ii) ***any such litigation would not be settled without Borodin's consent***, and (iii) that the Crestview Defendants ***would have to pay back Borodin*** for the Cuartetera clones if Mr. Cambiaso or La Dolfina successfully recovers any of the clones [**Exhibit 8, CF00010**];

(l) ***the Crestview Defendants disclaimed any liability*** to Borodin as a result of any claims by Mr. Cambiaso challenging rights to the clones [**Exhibit 8, CF00010**];

(m)***Meeker, Crestview Farm and Borodin set up an Escrow Agreement*** with the **<u>Florida</u>** law firm of Akerman LLP ("the Akerman Escrow Agreement") t***o escrow against any litigation by Mr. Cambiaso*** certain of Borodin's

purchase monies from the purchase and sale of the Cuartetera clones from the Crestview Defendants, [**Exhibit 8,** CF000024-30]; and

(n) That Meeker, Crestview Farm and ***Borodin consented to the jurisdiction and venue of the federal courts located in the <u>Southern District of Florida</u>*** in any action relating to the Akerman Escrow Agreement. [**Exhibit 8,** CF000028, ¶ 10].

183.   As noted above, although made six months after the January 29, 2021 Hearing wherein the Crestview Defendants first promised this Court the production of these documents, this production is notably and materially incomplete due to over redaction, and production of unsigned and incomplete documents including a Bill of Sale that contains no signature block or signature for Pegasus Rider Ltd., the shell British Virgin Island entity controlled by Mr. Borodin, and his Cyprus based lawyers.

184.   The willful and malicious acts by the Crestview Defendants taken in knowing violation of Mr. Cambiaso's and La Dolfina's rights, as revealed in the 32 pages of documents, reveals the strength Plaintiffs' likelihood of success on the merits on not just the federal claims herein, but the other claims advanced by Plaintiffs.   For example, clearly there is a continuing fraud upon Counterclaim/Third Party Plaintiffs as well as arguably upon this Court occurring, as exemplified by the two undisclosed extensions of the Borodin / Pegasus options during the pendency of this litigation, on December 21, 2020 and June 10, 2021. The Crestview Defendants' continue to attempt to market and sell more unauthorized clones despite their representations to the Court that no sales were contemplated.   **Exhibits 10** and **11, bates stamped "CF000001-2, CF000031-32".** The 32 pages further demonstrate a high level of inconsistency with Meeker's and his counsel's prior averments in this case and in the closely-related, consolidated case amongst the same parties, *Crestview Farm, LLC v. Cambiaso, et al.,* (Case No. 21-cv-81066-AMC/BER) (the "SDFL 21" case), which was recently transferred to this Court from the Northern District of Texas.

See **Exhibits 23 and 24, <u>Table 1</u> and <u>Table 2</u>, respectively, Inconsistencies of Prior Averments by Meeker and Meeker Legal Team.**

185.    The 32 pages also demonstrate the continuing fraud by the Crestview Defendants before and during this litigation, by (i) creating and not disclosing the November 9 Secret Clone Sale Agreement structure; (ii) repeatedly extending the Borodin / Pegasus option to purchase seven more Cuartetera clones during this litigation and not disclosing same; (iii) providing for an escrow arrangement in Florida and not disclosing the same; and (iv) by spuriously opposing equitable relief when the Crestview Defendants themselves insisted upon such equitable relief from Borodin / Pegasus for the same reasons.

186.    On December 21, 2020, the Crestview Defendants entered into the **First Amendment** to the November 9 Secret Cloning Agreement, by which the Defendants extended the time during which Park Place Polo Team, though its closely related affiliate, could exercise the option to purchase 7 additional unauthorized Cuartetera Clones, agreeing "[a]t any time on or before 30 June 2021, the Buyer may elect to purchase all the seven Cloned Foals….'". **Exhibit 9,** *CF000001-2 First Amendment to the November 9 Secret Clone Sale Agreement ¶ 2.*

187.    On June 10, 2021, the Crestview Defendants entered into a **Second Amendment** to the November 9 Secret Cloning Agreement, by which Defendants again extended the time during which Park Place Polo Team could exercise the option to purchase 7 additional unauthorized Cuartetera Clones, agreeing "[a]t any time on or before 30 June 2022, the Buyer may elect to purchase all the seven Cloned Foals …". **Exhibit 10,** *CF000031-32 Second Amendment to the November 9 Secret Clone Sale Agreement ¶ 2.*

188.    Notably, both Amendments to the November 9 Secret Cloning Agreement ratified the representations (including that that no litigation exists by Mr. Cambiaso to challenge the clone

sale and recover the clones, and that the Crestview Defendants have no reason to know of any such litigation) by the Crestview Defendants in the initial the November 9 Secret Cloning Agreement, stating "[a]ll other provision of the Agreement continue with full force and effect." **Exhibits 9 and 10**.

189.    This continuing misconduct and continued misrepresentations by the Crestview Defendants is direct evidence of the ongoing unauthorized misappropriation of genetic material and clones belonging to Counterclaim/Third Party Plaintiffs and is why a Temporary Restraining Order should be entered against all Defendants preventing further sales and distribution of those clones and genetic material.

190.    The distribution of Plaintiffs' unique genetic material and clones by the Crestview Defendants to a polo competitor with the financial means to transport those cloned foals throughout the world has irreparably harmed Counterclaim/Third Party Plaintiffs and the now known looming threat of the Crestview Defendants selling and additional 7 unauthorized Cuartetera clones to Counterclaim/Third Party Plaintiffs competitor threatens further irreparable harm to Counterclaim/Third Party Plaintiffs by the irreversible dissipation and dilution to competitors of Mr. Cambiaso and La Dolfina of the Cambiaso / La Dolfina unique equine genetic material and clones.

191.    Newly-discovered information has now revealed that payment for the commencement of creation seven (7) new clones has now been made by Defendant Park Place Polo Team to the Crestview Defendants.  Upon information and belief, the creation of those clones has now started.

192.    Additionally, Meeker, Farm and Genetics have now purportedly "assigned" their non-existent cloning rights they erroneously and fraudulently claim under the defunct 2009

Agreement to Mr. Borodin and his entities in exchange for $ 2,905,000.00 dollars for Cuartetera clone purchases, and in exchange for an agreement by Mr. Borodin and his entities to indemnify and hold Meeker and the Crestview entities harmless from any lawsuit by Mr. Cambiaso or La Dolfina regarding ownership of the clones and the right to create and sell the clones.

193.    Additionally, a new contract has surfaced, a **"Technical Consulting and Services Agreement"** (the "Consulting Agreement") between Crestview Farm, LLC and Park Place Polo Limited, respectively the Meeker and Borodin affiliated entities that are very closely related to the Crestview Defendants and the Park Place Polo.

194.    Under the Consulting Agreement, which was also dated November 9, 2020, the same date as the Secret Cloning Agreement, the Crestview Defendants have agreed ***"to provide to Park Place [Polo Limited] assistance with the setting up [sic] Park Place's laboratory facilities and horse cloning program, including providing assistance regarding the acquisition of equipment, installation of equipment, and advising Park Place in the commercial and technical aspects of horse cloning."***

195.    Under the Consulting Agreement, for an initial payment of $ 2,100,000.00 to the Crestview Defendants, and a second payment of $ 1,750,000.00, the Crestview Defendants will assist Park Place Polo Limited, an agent and closely-related affiliate of Park Place Polo Team, to set up an equine cloning laboratory in Aiken, South Carolina, and provide access and personnel to do so demonstrating the increased risk of the cloning of the misappropriated clones

196.    Thus, the entire transaction with the Park Place Polo entities by the Crestview Defendants is permeated and infected by greed, and was undertaken by the Crestview Defendants with knowing and malicious disregard for the rights of Mr. Cambiaso and La Dolfina, and the willful disregard by the Crestview Defendants for Mr. Cambiaso and La Dolfina pursuant to the

2011 Quota Holders Agreement novation and the 2019 Settlement Agreement and 2019 Side Letter Agreement.

197.    Park Place Counterclaim/Third Party Plaintiffs The Secret Clone Sale Agreement establishes multiple other false or misleading representations of fact that, upon information and belief, permeated the Crestview Defendants' commercial interactions, commercial advertising and promotion to Mr. Borodin, and Park Place, Bartolome and Camila Castagnola and other consumers in the United States and elsewhere. The production of these documents is still not complete as the Crestview Defendants continue to withhold information about the various persons and entities who have negotiated and participated in this contractual arrangement.

198.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely stated to Mr. Borodin and his representatives that the Crestview Defendants have an exclusive license to sell Cuartetera clones for their "own account." See **Exhibit 8**, **bates stamped "CF00004."**

199.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely represent their actions were authorized by the extinguished 2009 Agreement.

200.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely claimed that all approvals of persons whose approvals were required had been obtained for the sale of Cuartetera clones by the Crestview Defendants to a third party.

201.    The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely claimed that the 2009 Agreement was valid, and had not been terminated, novated, or extinguished in any manner.

202.   The Secret Clone Sale Agreement establishes that the Crestview Defendants falsely claimed that the sold Cuartetera Clones would not be subject to any claims by Mr. Cambiaso or La Dolfina.

203.   Further discovery is needed to identify other documents and evidence that contain such false or misleading descriptions of fact or false or misleading representations of fact which are likely to cause confusion, mistake or to deceive consumers as to Mr. Cambiaso's affiliation, mistake or to deceive consumers as to La Dolfina's affiliation, connection or association as to Mr. Cambiaso's and La Dolfina's sponsorship or approval of these unauthorized Cuartetera clones.

204.   Further, based on the limited evidence available to date, including the 32 incomplete  pages of documents produced to Counterclaim/Third Party Plaintiffs recently, and upon information and belief, the Crestview Defendants in their commercial advertising or promotion made and continue to make false or misleading statements about the nature, characteristics, and qualities of the Cuartetera clones and other clones and genetic material owed by Mr. Cambiaso and La Dolfina, including the Crestview Defendants' purported abilities to produce clones from the horses and genetic material under the invalid or extinguished 2009 Agreement without any authorization by Mr. Cambiaso and / or La Dolfina and falsely convey that these Cuartetera Clones are authorized to be produced and do not violate the contractual and obligations of the Crestview Defendants.

205.   Additionally, in § 8.1 of the Secret Cloning Agreement, without the authorization or knowledge of Plaintiffs, the Crestview Defendants purport to grant the Park Place the "limited right" to clone 10 additional Cuartetera clones.  This purported transfer or rights which were completely extinguished first by the failure of agreement on the material terms of the 2009 Agreement, and then by the 2011 Quota Holders Agreement novation, and which rights were never

unilateral in any event, creates the present additional false descriptions or false representations of fact, false advertising, false endorsement, continuing misrepresentations and related consumer and market confusion by the Crestview Defendants to downstream public purchasers once these clones are offered for sale.

**P.  By False Advertising and False Association, the Crestview Defendants Offer to the Public the Unauthorized Sale of Other Unauthorized La Dolfina Horse Clones.**

206.   In December, 2020, a month *after* the unauthorized sale of the unauthorized clones to the Park Place Polo entities, on November 1, 2020, the Crestview Defendants also offered the sale of La Dolfina horse clones to Bartolome Castagnola, another competitor of Plaintiffs.   See **Exhibit 19,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto, and **Exhibit 18,** *Affidavit of Bartolome Castagnola* ¶¶ 4-10.

207.   On December 1, 2020, Meeker, on behalf of himself, Crestview Genetics and Crestview Farm, stated to Camila Castagnola in a Whatsapp message exchange [See **Table 1** below] that Meeker and his Crestview entities are presently making clones of Plaintiffs' polo horses and are selling them, and falsely implied that Defendants were authorized by Counterclaim/Third Party Plaintiffs to do so, to wit:

(a)  "***You guys should buy one of my new Colibri or Aiken Cura clones! I'm making new Lapa clones too***."

(b)  Meeker also stated that all of Plaintiffs' "***Cuartetera***" polo horse clones are already "***all spoken for***", and

(c)  that Meeker has "***babies of Cuartetera***" for sale.

**Table 3**



**See Exhibit 19,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and <u>Exhibit 1</u> thereto and images above at

<u>**Table 3,**</u> *WhatsApp messages of December 1, 2020 from Alan Meeker to Camila Castagnola,*

      208.    The Crestview Defendants are thus continuing, without authorization and in

violation of federal law, to create clones from equine genetic material belonging to Plaintiffs, and

to otherwise manipulate, transport and sell clones and genetic material that is the sole and exclusive

property of La Dolfina without authorization, to other competitors of Mr. Cambiaso and La

Dolfina.  **Exhibit 18,** *Affidavit of Bartolome Castagnola* ¶¶ *4-10*; **Exhibit 19,** *Affidavit of Camila*

*Castagnola* ¶¶ *3-4.*

209.    These December 1, 2020 false or misleading statements to Bartolome Castagnola and Camila Castagnola by Meeker and Defendants are consistent with conduct demonstrated in the Secret Cloning Agreement.

210.    Meeker, on behalf of himself and the Crestview entity Defendants Farm and Genetics, then called Mr. Castagnola in early December, 2020, and during that call, Meeker:

(a) offered to sell Mr. Castagnola cloned polo ponies of Lapa, Aiken Cura and Colibri;

(b) told Mr. Castagnola that the Crestview Defendants owned those clones of Plaintiffs' unique polo horses; and

(c) would *imminently begin selling clones* of Plaintiffs' famous and successful polo horse "Cuartetera."

**Exhibit 18,** *Affidavit of Bartolome Castagnola* ¶¶ 5, 8 and 9.

211.    These statements to the public were false or misleading.  Meeker himself has previously admitted and stated to the public that Defendants would not sell the clones of Plaintiffs' horses, stating "*If we sold one of our clones of Cuartetera or Lapa, we would be selling the original genetic material that someone else could then clone for themselves. That takes us out of the loop.*"  See within **Composite Exhibit 21,** *Cloning: Fort Worth firm seeks the best polo ponies in the world*, Jeff Hooper, Fort Worth Business Press, March 24, 2018, found at: https://fortworthbusiness.com/technology/cloning-fort-worth-firm-seeks-the-best-polo-ponies-in-the-world/.  Indeed, the tight restriction of distribution of equine genetic material and clones of Mr. Cambiaso was a fundamental premise of the 2009 Agreement,  the parties' subsequent contracts and related course of conduct thereafter.

212.    Counterclaim/Third Party Plaintiffs currently are, and have long-been, the registered owners of the original polo horses, the clones of which horses the Crestview Defendants now are advertising and selling.   The names of those horses have long-been associated with the La Dolfina and Cambiaso names and teams. **Exhibits 12 and 13,** *Affidavit and Second Affidavit of*

*Roberto Zedda.* Meeker's statements to the Castagnolas and other consumers in interstate and foreign commerce that he had the authority to sell the clones were false or misleading descriptions of fact or false or misleading representations of fact. Defendants have made and continue to make unauthorized use of the names and identities of Counterclaim/Third Party Plaintiffs and their unique horses, such as Cuartetera, and have adopted, in the names of the clones, the identity of Counterclaim/Third Party Plaintiffs and their horses that are so similar and related to the Plaintiffs, their celebrity, and their original horses, such that consumers were likely to be confused and assume that Counterclaim/Third Party Plaintiffs have authorized the cloning of Plaintiffs' original horses and sale of the clones.

213. These false descriptions or false representations of fact *("[y]ou guys should buy one of my Colibri or Akin Cura Clones!"... "I have babies of Cuartetera"* ) had the capacity to deceive or did deceive consumers of high end polo horses. Moreover, the statements evidenced in the recent production on June 17, 2021 and the commercial promotion and advertising to the Castagnolas discussed above omitted material information that renders the Crestview Defendants' representations misleading or false. This deception had a material effect on purchasing decisions that resulted in the unauthorized sale and transport of the clones discussed above and future clones. Moreover, given the interstate and international nature of the sales of these championship polo ponies, these misrepresentations affected interstate and foreign commerce. The grant of the "limited right" to clone 10 additional Cuartetera clones in the Secret Cloning Agreement will proliferate additional false descriptions or false representations of fact, concealment, false advertising, false endorsement, continuing misrepresentation and related consumer and market confusion to downstream purchasers once these clones are offered for sale by the Park Place Polo

entities given their unique and inherent association with the Counterclaim/Third Party Plaintiffs , and their drawing power and celebrity.

214.    Mr. Cambiaso is the most well-known polo player and breeder of polo horses in the world. Mr. Cambiaso is considered the best polo player in world history. He is a celebrity in the polo world, and La Dolfina is recognized as the most accomplished and successful polo team owning several of the best polo ponies in history along with renowned as the top polo pony breeder in the world.

215.    The false implication that Mr. Cambiaso, the leading celebrity in this world, endorses, approves of, or sponsors these unauthorized sales and clones, is likely to cause confusion, or to cause mistake or to deceive consumers as to the origin, sponsorship, or approval of these Clones and the unauthorized commercial activities of Defendants. **Exhibit 20**, *Affidavit of Santiago Ballester*, ¶¶ 20-28.

216.    Federal law protects the public's interest in freedom from deception and the celebrity's interest in his or her commercial investment and the "drawing power" of his fame in endorsing products. Defendants' conduct hijacks or appropriates Mr. Cambiaso and La Dolfina's celebrity status, their ability to commercialize this fame and renown, without their authorization. This conduct has and is likely to cause confusion among consumers as to the affiliation, connection or association, between Mr. Cambiaso and La Dolfina and the Defendants' unauthorized clones or as to Mr. Cambiaso and La Dolfina's sponsorship or approval of these unauthorized clones.   This conduct violates federal law and is likely to continue once the Park Place Polo entities begin the unauthorized cloning of Plaintiffs' horses supposedly granted by the Secret Cloning Agreement.

217.    Counterclaim/Third Party Plaintiffs have been injured by these false or misleading descriptions of facts or false or misleading representations of fact or material omissions to the

public about the Cambiaso / La Dolfina clones in multiple ways including the physical loss of these clones and the continuing false impressions created in the marketplace by the false statements and misrepresentations that Meeker had legally acquired control of the prized La Dolfina breeding stock and could clone its horses in his sole discretion.

218.    Critically, this conduct flies in the face of the Parties' agreements, understanding, continual affirmations, and course of conduct, that clones would never be sold, and if any horses were sold from this venture, they would be offspring or babies of the clones rather than the clones themselves.

219.    These false descriptions or representations or material omissions are likely to and have caused confusion, mistake or have deceived purchasers as to the affiliation, connection or extent of the association between Counterclaim/Third Party Plaintiffs  and the Crestview Defendants and this misconduct has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and goodwill.

220.    The statements to the Castagnolas and others are also advertisements or promotions that misrepresent the nature, characteristics or qualities of Defendants' services or commercial activities by falsely representing that Defendants had the exclusive commercial right to engage in these sales and, conversely, impliedly misrepresenting that the clones had been made, marketed, and sold with the authorization and implied endorsement of the Plaintiffs.

221.    The Crestview Defendants thereby misrepresented to the public and /or omitted or concealed material information as to the legality of the clone sales, causing confusion about the provenance of the clones, diminishing the nature, characteristics and qualities of Plaintiffs' commercial activities and ultimate authority over Plaintiffs' unique, invaluable polo horse bloodlines.

222.    This misconduct and concealment has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.

223.    The Crestview Defendants' unauthorized conduct is tantamount to selling the products (clones in this case) of Mr. Cambiaso and La Dolfina as their own. The Crestview Defendants falsely and misleadingly imply that they had the authorization and consent of Mr. Cambiaso and La Dolfina to produce and sell these clones when in fact they do not. These clones of famous La Dolfina horses are uniquely and solely associated with Mr. Cambiaso and La Dolfina. When the Crestview Defendants represent these clones as their own as they have done, they are engaged in the illegal practice of "reverse passing off" which occurs when a seller sells another's products as his own. "Reverse Passing Off" is a prohibited practice under the Lanham Act because it misleads the public as to the source of goods in the marketplace and harms the reputation of the originator of these horses– in this case La Dolfina and Mr. Cambiaso. This practice deprives Mr. Cambiaso and La Dolfina of value of their name and the goodwill that would occur if the buying public were to become aware of the true source of these sold clones.

224.    The clones originated with Mr. Cambiaso and La Dolfina, the owners of the original horses from which these clones were created and the owners of the genetic material that was used for their creation.

225.    The Crestview Defendants have falsely designated the origin of these clones by representing to consumers that they have the right to create and clone the horses of La Dolfina and Cambiaso as if they are the property of Defendants and concealing that they do not have authorization to engage in this conduct, and in fact have even granted the Park Place Defendants the rights to clone La Dolfina's horses – without consent or authorization.

226.     This false designation of origin of the clones is likely to and has caused consumer confusion as to the true origin of these horses.

227.     The Crestview Defendants' continuing false designation of origin of the Clones has harmed the Counterclaim/Third Party Plaintiffs, including causing harm to their commercial interest in reputation or sales.

**Q.     The Harm to Counterclaim/Third Party Plaintiffs Is Irreparable.**

228.     This Counterclaim and Third Party Complaint cannot be resolved solely through monetary damages.   More importantly to Plaintiffs, the harm to Counterclaim/Third Party Plaintiffs is irreparable and cannot ever be cured by monetary damages alone. Once the unique genetic material and clones that are the exclusive property of   Counterclaim/Third Party Plaintiffs are distributed World-wide by the technologically savvy and well-financed Defendants, beyond the jurisdiction of this Court, there will be no remedy available to reverse or cure that harm. **Exhibit 18,** *Affidavit of Bartolome Castagnola* ¶11.

229.     The irreparable injury is *neither* remote *nor* speculative. **Exhibit 20**, *Affidavit of Santiago Ballester,* ¶¶ 20-28. The Crestview Defendants presently intend to and have agreed to sell an additional 7 Cuartetera clones, which are the sole and exclusive property of La Dolfina, to Pegasus / Borodin / Park Place Polo should they elect to exercise such option on or before June 30, 2022. **Exhibit 10**.

230.     The Crestview Defendants have already sold and shipped, and imminently intend to sell and ship more of, the unauthorized Cuartetera clones, and the Crestview Defendants themselves have previously acknowledged that the unauthorized sale of the clones would cause irreparable harm.   **See Exhibit 8, CF000008;** § 9.2 of the Secret Clone Sale Agreement.

231.    Counterclaim/Third Party Plaintiffs Further, leading up to and during the January 29, 2021 TRO Hearing, Defendants and their attorneys materially mislead this Court by representing that neither Meeker, Crestview Farm, or Genetics has any interest or intention of conducting any additional sales of any other clones belonging to Mr. Cambiaso or La Dolfina. To wit:

> **There are no additional sales of any other clones of any other horses associated with Mr. Cambiaso or La Dolfina, S.A.** that are **pending or under discussion**. Thus, there is **no imminent "harm" to enjoin**. [DE 38*18] *Response in Opposition to Plaintiff's Motion to Expedite Ex Parte Renewed Motion for TRO.*

> The other thing I would point out is the **sale** of those foals **took place on November 9th of 2020**, so you know, this is posited to you as if it is some TRO to grab property and there was confusion earlier between personal jurisdiction over a party and whether the Court has ability to enjoin and reach property or other third parties. I'm not going to go too far into that confusion, but here, there is **no urgency arising out of the potential sale of those horses**. That sale took place between people in Texas and South Carolina and **was consummated in early November, long before either of these actions were filed. [DE 53**, *TRO Hearing Transcript*, Mr. O'Quinn, 92:15-25].

> Meeker similarly swore under oath:

> The contract for sale of the "Cuartetera" clones was signed before this lawsuit was filed. There are **no additional sales of any other clones of any other horses associated with Mr. Cambiaso or La Dolfina, S.A. that are pending or under discussion**. There are **no ongoing negotiations for the sale of any clone** of any horses associated with Mr. Cambiaso or La Dolfina, S.A. at present. [38-1*7] *Declaration of D. Alan Meeker* ¶ 12

> **To date** [February 4, 2021], **only four of the clones developed under the 2009 Agreement** have been **sold**. [DE 54] *Declaration of David Alan Meeker* ¶ 15

232.    Clearly, these statement to the Court, Mr. Cambiaso and La Dolfina were false when made, given the existence of the November 9, 2020 Secret Cloning Agreements, and the first Amendments thereto in December 2020.   **Exhibits 8 and 9 hereto.**

233.    Thus, leading up to, during, and continuing after the January 29, 2021 TRO Hearing, the Crestview Defendants and their attorneys materially mislead this Court by

representing that neither Meeker, Crestview Farm, or Genetics has any interest or intention of conducting any additional sales of any other clones. The representation that no further cloning or sale of clones was imminent leading up to and at the January 29, 2021 TRO Hearing is demonstrably false today, in light of the recently produced Secret Clone Sale Agreement and both amendments thereto. **Exhibits 8, 9, and 10**.

234.    The Crestview Defendants' false statements in Meeker's communications and advertisements to sell Plaintiffs' clones to Mr. Castagnola, a competitor of Plaintiffs, as well as admissions of previously offering to sell to others, as well as the 32 pages of the Secret Clone Sale Agreement  and two Amendments thereto during the pendency of this litigation extending the time during which the Borodin / Pegasus option and the Escrow Agreement, establish that the Crestview Defendants are not only violating their prior agreements with Counterclaim/Third Party Plaintiffs  but have ongoing interest, intention, and plans to sell additional clones and genetic material owned by Plaintiffs. See **Exhibit 18**, *Affidavit of Bartolome Castagnola* ¶¶ 8 – 10; **Exhibit 19**, *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto; **Exhibit 9**, *Amendment to the Secret Clone Sale Agreement*; **Exhibit 10**, *Second Amendment to the Secret Clone Sale Agreement.*

235.    The evidence also shows that unrestricted cloning and World-wide distribution of the unique genetic clones belonging to Counterclaim/Third Party Plaintiffs cannot be reversed, is irreparable, and cannot be cured by monetary damages. **Exhibit 18;** *Affidavit of Bartolome Castagnola* ¶ 11; **Exhibit 12;** *Affidavit of Roberto Zedda* ¶¶ 27-31; **Exhibits 8, 9, and 10,** CF000001-32.**; Exhibit 20,** *Affidavit of Santiago Ballester,* ¶¶ 20-28.

236.    All Defendants themselves unequivocally acknowledged in their Secret Clone Sale Agreement the irreparable nature of the harm caused by the unauthorized distribution or sale of

Cuartetera and other Cambiaso / La Dolfina clones or genetic material.   **See Exhibit 8,** CF000008-10**.** Therein, the Crestview Defendants reserved their right to seek injunctive relief in the event of breach of their agreement with Mr. Borodin and/or Park Place. Thus, any contrary assertions in this litigation must be deemed waived and lack any credibility whatsoever.

237.    All conditions precedent to this Action have either been waived, excused or performed.

## Count I

### Preliminary and Permanent Injunctions – Continuing Misappropriation

238.     Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

239.    The genetic material of the horses and clones owned by La Dolfina and / or Mr. Cambiaso is highly unique. The strict limitations on the cloning and distribution of the clones is necessary to ensure the continued viability and quality of the cloned genetic lines, as well as to sustain the market demand and market value of the genetic copies of the La Dolfina polo ponies. **Exhibit 20**, *Affidavit of Santiago Ballester ¶¶26-28.*

240.    The Crestview Defendants have removed unauthorized equine genetic material belonging to Counterclaim/Third Party Plaintiffs   and others from the Republic of Argentina and brought that material to the United States.

241.    Further, during the pendency of this litigation, the Crestview Defendants together with the Park Place Defendants have two executed Amendments to the Secret Cloning Agreement, extending the option for Park Place Defendants to elect to purchase 7 additional unauthorized Cuartetera clones that are the sole property and belong to La Dolfina. Just one week prior to the Status Conference set before this Court [consolidated case ECF 82], on June 10, 2021 the Crestview Defendants and Park Place Defendants executed the Second Amendment wherein:

"**At any time on or before 30 June 2022**, the **Buyer may elect to purchase all the seven Cloned Foals**....'" **Exhibit 10**, CF000031 *Second Amendment to the Horse Purchase and Sale Agreement* § 2

242.    The unauthorized misappropriation of the La Dolfina and Mr. Cambiaso's horses' genetic material, unauthorized cloning, unauthorized sale and unauthorized World-wide distribution of the La Dolfina and Mr. Cambiaso clones by Defendants as alleged herein has caused and will continue to cause La Dolfina and Mr. Cambiaso irreparable and immediate injury, loss, and damages, for which there is no adequate remedy at law.

243.    Counterclaim/Third Party Plaintiffs are likely to prevail on the merits of this lawsuit, while the continued misrepresentations to the Court belie the extent to which the Crestview Defendants are willing to travel to avoid that result.

244.    No adequate remedy of law exists that can fully protect Counterclaim/Third Party Plaintiffs from damages, Counterclaim/Third Party Plaintiffs will continue to suffer if Meeker, Crestview Farm, Crestview Genetics, and all entities, individuals, parents, subsidiaries, affiliates thereof, and the Park Place Polo entities, are permitted to continue to misappropriate the genetic material and clones owned by La Dolfina or Mr. Cambiaso horses and sell the unauthorized clones and / or their genetic material into the market.

245.    The Crestview Defendants have both not only admitted to but insisted upon recognition that ***irreparable injury, no adequate remedy at law, and*** the ***right to enjoin Mr.*** Borodin from producing any further Cuartetera clones, and a ***right to recover*** from Borodin ***all Cuartetera clones,*** in the event of breach of the November 9 Secret Clone Sale Agreement by Mr. Borodin, or by an assignee of Mr. Borodin.   Defendants should be estopped from and have waived taking a contrary position to this request for injunctive relief as Counterclaim/Third Party Plaintiffs

herein are suffering and continue to suffer the same irreparable harm by the continued and ongoing unauthorized cloning and sale of clones owned by La Dolfina.

246.     The Crestview Defendants have purportedly "assigned" the cloning rights to Cuartetera to the Park Place Polo entities or their affiliates.

247.     The relief sought by Counterclaim/Third Party Plaintiffs  is further necessary to prevent and restrain the ongoing violations of law described herein.

248.     The balance of equities additionally favors Counterclaim/Third Party Plaintiffs and is in the public interest.

WHEREFORE, Counterclaim/Third Party Plaintiffs seek a preliminary injunction, to be made permanent at the conclusion of this case, against all Counterclaim/Third Party Defendants, and against all of the Counterclaim/Third Party Defendants' entities, principals, owners, individuals, parents, subsidiaries, affiliates thereof, enjoining those individuals and entities, from continuing to misappropriate and clone the La Dolfina and Mr. Cambiaso horses and genetic material, and from marketing and selling the clones and genetic material.

## Count II

### Prejudgment Writ of Replevin

249.     Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

250.     This is a claim for prejudgment Writ of Replevin pursuant to F.S. § 78.01 *et seq.* and Fed. R. Civ. P. 64.

251.     The claimed property is (i) all of the unique genetic material from any and all horses owned by La Dolfina and/or Mr. Cambiaso in the possession or custody of the Crestview Defendants; (ii) all born clones from that unique genetic material owned by La Dolfina and / or

Mr. Cambiaso in the possession or custody of the Crestview Defendants; (iii) all clones of La Dolfina and Mr. Cambiaso horses presently in gestation and in the custody of the Crestview Defendants and the Crestview Defendants' agents and /or principals; and (iv) the three Cuartetera clones B01, B02, and B03 presently in the possession and control of the Park Place.

252.    Counterclaim/Third Party Plaintiffs are entitled to possession of the claimed property because the Counterclaim/Third Party Plaintiffs are the sole owners of the property. The claimed property is being wrongfully detained by Defendants who misappropriated the genetic material belonging to La Dolfina and Mr. Cambiaso.

253.    In Florida, a purchaser cannot obtain clear title from a thief to defeat the original owner. The most a bona fide purchaser for value can obtain from a thief is superior title to everyone except the original owner. See Florida Statute 672.403. Therefore, whether or not Park Place is deemed to be a bona fide purchaser for value of the three clones, the Park Place Defendants are not entitled to detain Plaintiff's property and the Park Place Defendants are wrongfully withholding La Dolfina's three Cuartetera clones.

254.    The claimed property has not been taken for a tax, assessment or fine pursuant to law.

255.    The claimed property has not been taken under an execution or attachment against the property of Counterclaim/Third Party Plaintiffs   or if taken, is exempt.

256.    The claimed property is in imminent danger of concealment, removal and / or transfer as is evidenced by the sale of the 3 clones and removal from of these 3 clones from Florida, and by the subsequent two Amendments to the November 9 Secret Clone Sale Agreement, whereby the Crestview Defendants agree to provide an option to the Park Place Polo entities, their

affiliates and agents, for the purchase of seven additional La Dolfina Cuartetera clones up and until June 30, 2022.

257.    Indeed, one of the three clones, "B 10" (a/k/a "P 01") was so grievously injured and then left untreated while in the possession, custody and control of the Park Place Polo Entities and their agents and closely-related affiliate entities that the clone had to be transported to an equine hospital for approximately one month of emergent care to tend to the injuries and the resultant infection which was caused by the failure to properly treat the wounds to B 10.   Another of the clones has also been injured while in the possession, custody and control of the Park Place Polo entities.

258.    The claimed property is being wrongfully detained, used, wasted, and sold.

WHEREFORE, pursuant to F.S. §78.01 *et seq.,* this Court should therefore issue a prejudgment Writ of Replevin requiring the Counterclaim/Third Party Defendants to immediately *turn over* all of the claimed property to the sole possession, custody and control of La Dolfina prior to final judgement.

## Count III

### Declaratory Judgment – Failure to Agree on Material Terms, Invalidity, Failure to Perform, Novation or Extinguishment of the 2009 Agreement

259.    Counterclaim/Third Party Plaintiffs   repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

260.    There is a case and controversy regarding the respective rights to Plaintiffs' equine genetic material and horses under ¶¶ 1, 2 and 4 of the 2009 Agreement. Counterclaim/Third Party Plaintiffs   seek declaratory judgment establishing that the 2009 Agreement failed and it was void as a matter of law because: (i) Farm never acquired the cloning technology so as to be able to produce the clones; (ii) the parties never came to a mutually acceptable agreement as to the

endorsement marketing; (iii) the parties never came to a mutual agreement as to the final sales price and terms of sale of any clones; and (iv) the parties never came to an agreement as to production of the additional "second edition" clones. Counterclaim/Third Party Plaintiffs  believe that this issue can be determined as a matter of law from the four corners of the agreement.

261.   In the alternative, Counterclaim/Third Party Plaintiffs seek declaratory judgment establishing that it is beyond doubt that this Agreement was extinguished in perpetuity by the novation and agreement of the parties to enter into the 2011 Quota Holder Agreement along with the Crestview Defendants' acceptance of $1,533,000.

262.   The Parties to that 2009 Agreement as well agreed to cancel or extinguish that Agreement in 2011.

263.   The Parties agreed that the 2011 Quota Holder Agreement would take the place of the 2009 Agreement. The parties agree that the Quota Holders Agreement was a valid Agreement until terminated by the 2019 Settlement Agreement.

264.   The 2019 Settlement Agreement did not resurrect the previously-failed and cancelled 2009 Agreement.

265.   The 2019 Side Letter Agreement instead addressed equine cloning of Plaintiff's horses, and that 2019 Side Letter Agreement specifically prohibited the Crestview Defendants from taking unilateral action to market, advertise, endorse, set the terms for and sell Cambiaso / La Dolfina horses.

266.   The cancellation and replacement of the 2009 Agreement by the 2011 Quota Holder Agreement was supported by valid consideration in the form of payment of $ 1,533,000 to the Crestview Defendants.

267.   The 2011 Quota Holder Agreement was a valid agreement.

268.    The Crestview Defendants falsely and inappropriately claim that their actions are authorized pursuant to the terms of extinguished or replaced 2009 Agreement.

269.    The Crestview Defendants have no right to unilaterally use and sell the genetic material of La Dolfina's Cuartetera under a claim of right of the previously-cancelled and replaced 2009 Agreement, nor under any subsequent contract amongst the parties.

270.    The recent improper reliance upon the invalid or novated 2009 Agreement by the Crestview Defendants has caused and continues to cause the Counterclaim/Third Party Plaintiffs past and future injury.

271.    However, the Crestview Defendants continue to state to the public, such as to the Park Place Polo entities,   to various courts, and to others, that the 2009 Agreement is a valid basis for the present Cambiaso / La Dolfina horse clone sales by the Crestview Defendants.

272.    Further, the Park Place Polo entities now claim certain rights to the ownership of the La Dolfina Cuartetera clones and to the right to continue cloning pursuant to the Secret Cloning Agreement.

273.    Therefore, there is a bonafide, actual, present and practical need for a declaration of the Court as to the rights and remedies of the court with respect to the invalid or cancelled 2009 Agreement and the effect of that invalidity or cancellation upon the Secret Cloning Agreement, and the sale of clones and attempted assignment of cloning rights thereunder by the Crestview Defendants to the Park Place Polo entities..

274.    The controversy between the parties is real and immediate. As a result of the outstanding option Crestview Farm has conveyed to the Park Place Polo entities   through their closely-related affiliates to elect to purchase seven (7) additional Cuartetera clones up and until June 30, 2022, and a concomitant grant of cloning rights to the Park Place entities , there is a

substantial likelihood that is practically a certainty that the Counterclaim/Third Party Plaintiffs will suffer substantial injury in the future.

275.    The execution of the Second Amendment to the Secret Cloning Agreement by Meeker on behalf of Crestview Farm on June 10, 2021, as well as the creation of the equine cloning Consulting Agreement between the Crestview Defendants and the Park Place Polo closely related affiliates, establishes not only a reasonable expectation this misconduct regarding the Cambiaso / La Dolfina clones will continue and be repeated in the future, but a certainty that the Crestview Defendants and the Park Place Polo entities intend to continue the unauthorized cloning and that the Defendants' misconduct with the clones is thus ongoing.

276.    At this point in time, all of the Defendants have a sufficient repository of misappropriated equine genetic material belonging to Counterclaim/Third Party Plaintiffs  to continue this misconduct unabated without the intervention of this Court.

277.    Thus, the standing requirements are satisfied.

WHEREFORE, Counterclaim/Third Party Plaintiffs seek declaratory judgement against all Counterclaim/Third Party Defendants, to determine that (i) the 2009 Agreement failed for lack of agreement or performance of its material terms, and (ii) that the parties agreed to a novation or extinguishment of the 2009 Agreement via the 2011 Quota Holders Agreement; and what the rights and remedies of the parties under the 2009 Agreement (if any) presently are.   The relief also requested includes a declaratory judgment that the Secret Cloning Agreement, which relies upon the purported survival of the 2009 Agreement, and any Amendments thereto, are also void *ab initio*, novated, breached, or otherwise invalid, for lack of any underlying right to create and sell clones under the invalid or cancelled and replaced 2009 Agreement.   The relief requested finally

includes other remedies as the Court may deem proper, such as return of all clones to Counterclaim/Third Party Plaintiffs.

## Count IV

### Breach of the 2009 Agreement
### (In the Alternative)

278.    Counterclaim/Third Party Plaintiff Adolfo Cambiaso repeats and realleges against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

279.    This count is brought in the alternative.

280.    Plaintiff Cambiaso and Defendants Meeker and his alter-ego Crestview Farm entered into the 2009 Agreement **Exhibit 4.**

281.    The Crestview Defendants have admitted in this litigation that certain claimed rights under the 2009 Agreement were assigned to Crestview Genetics from Crestview Farm. Both Crestview Defendant are controlled by and used as alter-egos by Defendant Meeker

282.    The 2009 Agreement was invalid, cancelled, forever terminated and replaced by the parties' agreement to enter into the 2011 Quota Holders Agreement, which the Parties agree was a valid agreement and which was a novation of the 2009 Agreement.

283.    To the extent the Crestview Defendants presently take the position that the 2009 Agreement is still valid and operating (which Counterclaim/Third Party Plaintiffs dispute) or the Court finds that this Agreement is valid, then the Crestview Defendants breached the 2009 Agreement by unilaterally using the genetic material of the horse Cuartetera owned by La Dolfina, creating unauthorized clones of Cuartetera, and unilaterally selling and setting all prices and terms of such sales of the unauthorized clones of Cuartetera, and even allowing the Park Place entities to continue cloning this horse, without any knowledge or consent by Mr. Cambiaso or La Dolfina.

284.    Such unilateral action was not permitted by ¶¶ 3, 4 and 5 of the 2009 Agreement during the short time that Agreement was effective.

285.    La Dolfina was not a party to the 2009 Agreement.

286.    The 2009 Agreement did not convey or contemplate the conveyance of ownership of any horse or genetic material to Meeker, Crestview Farm, or other Crestview Entity. The 2009 Agreement only ever allowed Crestview Farm, as provided in ¶ 1, very limited access and license for Crestview Farm "to select four mares from Owner's  [Owner defined therein as Mr. Cambiaso] stock *for the purpose of extracting tissue samples for cloning*." [emphasis added].

287.    Further, ¶ 4 of the 2009 Agreement *required a mutuality of agreement* by both Mr. Cambiaso and Crestview Farm (and by Genetics as admitted assignee), stating *"Owner and Crestview will jointly determine all final sales prices and terms."*

288.    Mr. Cambiaso never agreed to the unilateral production and sale by Crestview Farm, Meeker, or any other individual or entity of any clones of Mr. Cambiaso's horses or the horses or especially the clones of La Dolfina, because La Dolfina was not ever part of the failed 2009 Agreement. Mr. Cambiaso never agreed that the Crestview Defendants could grant the rights to third parties such as the Park Place Polo entities to continue cloning Cuartetera as contemplated by the Secret Clone Sales Agreement.

289.    Mr. Cambiaso never agreed or otherwise provided the rights to Crestview Farm and Meeker to sell clones of Cuartetera as Crestview Farm and Meeker have now done and is evidenced by the Secret Clone Sale Agreement and amendments thereto.   **Exhibits 8, 9 and 10.** Quite to the contrary, to the extent that the 2009 Agreement contemplated the sale of any clones, the 2009 Agreement required Mr. Cambiaso, not Meeker or Crestview Farm, to market the first three of

each cloned horse for sale and required Mr. Cambiaso "jointly determine [with Crestview Farm and Meeker] all final sales prices and terms." **Exhibit 4**, ¶ 4.

290.     The 2009 Agreement did not convey unlimited rights to or ownership to the Crestview Defendants of any La Dolfina, nor Cambiaso horse, genetic material, horses, or clones therefrom. Nor did the 2009 Agreement permit the surreptitious sales of Cuartetera clones without the knowledge or authorization of Mr. Cambiaso.

291.     Additionally, Mr. Cambiaso, Meeker, and Crestview Farm did not ever negotiate and agree to "*an acceptable breeding program providing for the endorsement and marketing of clones and Crestview's cloning program*" as required by ¶ 3 of the 2009 Agreement. **Exhibit 4**.

292.     By breaching the aforesaid provisions of the 2009 Agreement in the manner and method by which they did so, the Crestview Defendants also breached the implied covenant of good faith and fair dealing implicit in those provisions of the 2009 Agreement.

WHEREFORE,   Plaintiff   Adolfo   Cambiaso   demands   judgment   against   the Counterclaim/Third Party Defendants, including but not limited to actual and incidental damages and return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

## Count V

### Fraudulent Inducement, Concealment and Misrepresentation
### Regarding the 2019 Side Letter Agreement

293.     Counterclaim/Third Party Plaintiffs   repeat and reallege against the Crestview Defendants ¶¶ 1 through   231 of the Common Allegations.

294.     On July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement, **Exhibit 7** hereto.

295.    In the 2019 Side Letter Agreement, those same Defendants covenanted and promised to restrict possession and distribution of the Cambiaso / La Dolfina horse clones to the parties and no one else.

296.    The Crestview Defendants made those representations of material fact to induce Mr. Cambiaso and La Dolfina to enter into the 2019 Side Letter Agreement, and the Crestview Defendants knew Mr. Cambiaso and La Dolfina would rely upon those representations when entering into the 2019 Side Letter Agreement.

297.    Mr. Cambiaso and La Dolfina did in fact rely upon those representations in entering into the 2019 Side Letter Agreement.

298.    Further, at the same time, Defendants intended to misappropriate the genetic material from select La Dolfina Cuartetera and create and sell unauthorized clones therefrom. Defendants hid this intent from Counterclaim/Third Party Plaintiffs  during the negotiation and execution of the 2019 Side Letter Agreement.

299.    At the time of the negotiation and execution of the 2019 Side Letter Agreement, the Crestview Defendants hid from Mr. Cambiaso the fact that those Defendants considered the 2009 Agreement to be still active and in force.   Those Defendants further hid from Mr. Cambiaso and that Defendants intended to market and sell Cambiaso and La Dolfina clones to the public almost a decade following the failure, extinguishment, novation or termination of the 2009 Agreement, despite the replacement of the 2009 Agreement by the 2011 Quota Holder Agreement, and the later 2019 Side Letter Agreement, and the eventual 2019 Settlement Agreement.

300.    At the time the Crestview Defendants hid their intent to rely upon and use the 2009 Agreement from Plaintiffs, the Crestview Defendants knew that such intent, if expressed, would stop Counterclaim/Third Party Plaintiffs  from entering into the 2011 Quota Holder Agreement

and the later 2019 Side Letter Agreement and Counterclaim/Third Party Plaintiffs would cease providing access to Defendants of genetic material of Cuartetera and other valuable polo pony equine lineages owned by Plaintiff Mr. Cambiaso and / or La Dolfina. The Crestview Defendants also hid their intent to sell clones from Counterclaim/Third Party Plaintiffs and, in fact, continually and misleadingly represented to Counterclaim/Third Party Plaintiffs and the global media that they had no intention of selling clones. Counterclaim/Third Party Plaintiffs reasonably relied on these representations.

301.    At the time of these concealments, misrepresentations and omissions, Defendants knew them to be material, false and misleading and intended that Counterclaim/Third Party Plaintiffs rely on their concealment and omissions to mislead Mr. Cambiaso.

302.    Those concealments, omissions and misrepresentations by the Crestview Defendants were willful, malicious and designed to directly interfere with and harm Plaintiffs' property rights regarding the Cambiaso / La Dolfina horse clones, their production and their sale.

303.    Counterclaim/Third Party Plaintiffs reasonably relied upon Defendants' prior novation and agreement to terminate and forever extinguish any claimed rights arising under the 2009 Agreement by accepting payment of $1,533,000 and entering into the 2011 Quota Holder Agreement and the later 2019 Side Letter Agreement.

304.    As a direct and proximate result of those concealments, misrepresentations and omissions by Meeker and Crestview Genetics, Counterclaim/Third Party Plaintiffs have been damaged and continue to be damaged.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment against all Counterclaim/Third Party Defendants, for actual, incidental and consequential damages, punitive damages, prejudgment and post-judgment interest, and such further relief as requested below and

as this Court may deem just and proper, including but not limited to return of all clones and genetic material from Plaintiffs' horses.

### Count VI

**Breach of Contract**
**Regarding the 2019 Side Letter Agreement**

305.    Counterclaim/Third Party Plaintiffs  repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

306.    On July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement. **Exhibit 7**.

307.    The 2019 Side Letter Agreement provided, among other things, that La Dolfina S.A. would transfer the oocytes of the <u>Schedule I</u>  Cambiaso / La Dolfina horse clones to Defendant Genetics in order for the oocytes to be fertilized with semen provided from stallions belonging to and chosen by Plaintiffs. **Exhibit 7**.

308.    A material term of the 2019 Side Letter Agreement was the agreement and representation by Meeker and Crestview Genetics, on behalf of Meeker the Crestview Defendants that "Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells ***for the exclusive use of AC (Mr. Cambiaso) and LD (La Dolfina)*** at no cost to AC or LD during the term of this agreement." **Exhibit 7**, ¶ 8.

309.    The Crestview Defendants did not honor that provision.   The continuing unauthorized production and sale of Cuartetera clones by Meeker by and through Crestview Farm to persons and entities other than Mr. Cambiaso or La Dolfina violates material terms and a fundamental premise of the 2019 Side Letter Agreement.

310.    This conduct constitutes a material breach of the 2019 Side Letter Agreement which has caused, and continues to cause damage and irreparable harm to Plaintiffs. In addition, the 2019 Side Letter Agreement stated that Crestview Genetics must clone 10 "Cuarteteras" for the exclusive use of Cambiaso and La Dolfina, and, should Crestview Genetics successfully complete and deliver these Cuartetera clones to La Dolfina, Alan Meeker, by and through Crestview Genetics, may clone two Cuarteteras "for the exclusive amateur (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras)" but that the sale or further cloning of the Meeker La Dolfina Cuarteteras was "expressly prohibited." **Exhibit 7.**

311.    The 2019 Side Letter Agreement did not allow or otherwise contemplate the sale of any clone or the sale of any oocytes to be used to clone.

312.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the unilateral right to sell any clones or genetic material of horses owned by Counterclaim/Third Party Plaintiffs   under any circumstances. Defendant Meeker acknowledged and reaffirmed in March 2020 that the Cuartetera clones in gestation were for the use of Mr. Cambiaso and that he promised to discuss payment for cloning services for the creation of those clones. Despite this affirmation, Defendant Meeker then quietly and secretly sold those very clones to the Park Place Polo entities.   **Exhibit 8.**

313.    Further, the sales of the Cuartetera clones to the Park Place Polo entities, or to their closely-related affiliates or Mr. Borodin himself, violates the express restrictive terms of the 2019 Side Letter Agreement, which has as its core, material term, that only a limited number of clones of Cuartetera and very specific conditions were ever to be produced.

314.    The 2019 Side Letter Agreement prohibits the unilateral sale of clones by the Defendants. Mr. Cambiaso is required to expressly consent to any cloning under the terms of the agreement. **Exhibit 7,** ¶ 6.

315.    Any clones produced under the 2019 Side Letter Agreement are to be registered to La Dolfina. **Exhibit 7,** ¶ 1.

316.    The 2019 Side Letter Agreement mandates that any Cuartetera clones shall only be played on a La Dolfina branded team. **Exhibit 7,** ¶ 2.   By breaching the aforesaid provisions of the 2019 Side Letter Agreement in the manner and method by which they did so, Defendants also breached the implied covenant of good faith and fair dealing implicit in those provisions of the 2019 Side Letter Agreement.

317.    The 2019 Side Letter Agreement contains a remedy of replevin that requires Defendants to deliver within 48 hours any unauthorized clones or those being used contrary to the specific language in this agreement restricting their production and use. **Exhibit 7,** ¶ 6.

WHEREFORE,   Counterclaim/Third   Party   Plaintiffs   demand   judgment   against Counterclaim/Third Party Defendants, including but not limited to actual and incidental damages and return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

<u>**Count VII**</u>

**Breach of Bailment Contracts**
**Regarding the 2009 Agreement**
**and 2019 Side Letter Agreement**

318.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants   ¶¶ 1 through 237 of the Common Allegations. This count is brought in the alternative with respect to the 2009 Agreement.

77

319.    Both the 2009 and 2019 Agreements gave possession to Defendants of certain of Plaintiffs' genetic material for strictly limited purposes and under strictly limited parameters. While the 2009 Agreement was never valid or forever terminated and extinguished in 2011 by agreement to novation and the parties entering into the Quota Holders Agreement, to the extent relied upon presently by the Crestview Defendants, the 2009 Agreement has also been breached by the recent acts of those Defendants.

320.    Under both the invalid and terminated 2009 Agreement and 2019 Side Letter Agreement, equine genetic material belonging to Plaintiffs, and any clones therefrom, were delivered to the Crestview Defendants only temporarily.

321.    The 2009 and 2019 Agreements created only a bailment for the mutual benefit of the parties in return for the benefits flowing from the fact of bailment. This bailment can also be implied by the conduct of the parties.

322.    Further, Crestview Defendants were charged with the exercise of care, to preserve the value of the bailed genetic material and clones, for example, by not engaging in unauthorized production and sale which would dilute the valuable genetic bloodlines.

323.    Defendants nonetheless exceeded the scope of their authorized bailment and misappropriated Plaintiffs' genetic material and produced and sold unauthorized clones and provided options to sell more of those clones.

324.    The 2019 Side Letter Agreement contains a remedy of replevin that requires Defendants to deliver within 48 hours any unauthorized clones or those being used contrary to the specific language in this agreement restricting their production and use. **Exhibit 7, ¶ 6.**

325.    As a direct and proximate consequence of these breaches of the conditions of bailment under both the 2009 and 2019 Agreements, and the refusal of the Defendants to return

tissue harvested thereunder or the Cuartetera clones created from that tissue, Counterclaim/Third Party Plaintiffs have been injured.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment against the Crestview Defendants, including but not limited to actual and incidental damages and return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

### Count VIII

**Breach of Fiduciary Duties**

326.    Counterclaim/Third Party Plaintiffs  repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.   This count is also brought in the alternative with respect to the 2009 Agreement.

327.    Under the 2009 and 2019 Agreements, Defendants represented that they possessed and were experienced in the use of advanced biotechnologies in the cloning of horses and Counterclaim/Third Party Plaintiffs  relied upon Defendants and their expertise.   As such equine cloning experts, Defendants enjoyed a superior position to Counterclaim/Third Party Plaintiffs during the negotiation and performance of those Agreements.   Therefore, Defendants enjoyed a special relationship with Counterclaim/Third Party Plaintiffs and specifically agreed to that relationship.

328.    The Crestview Defendants specifically solicited that special relationship and all Defendants have benefitted from their superior position in that relationship, while Counterclaim/Third Party Plaintiffs  relied upon Defendants to act on Plaintiffs' behalf and to look out for Plaintiffs' best interests in the discharge of the Defendants' roles in the cloning initiative and the protection of Plaintiffs' unique and successful polo bloodlines.   The Crestview Defendants thus had a fiduciary relationship with Plaintiffs.

329.     Those Crestview Defendants breached those duties by the aforesaid purposeful and malicious misconduct and omissions by Defendants, the most recent of which, the Secret Clone Sale Agreement and the undisclosed extensions of options to sell Borodin / Pegasus the Cuartetera clones produced for Mr. Cambiaso, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Counterclaim/Third Party Plaintiffs  and to the harm and damage to Plaintiffs.

330.     By the aforesaid acts and omissions of and by the Crestview Defendants, those Defendants breached their duty of loyalty to Counterclaim/Third Party Plaintiffs   which obligated the Defendants to use reasonable and due diligence and care in the use of the genetic material and cloning and marketing and sale of the clones, so as to preserve Plaintiffs' rights as a member of the cloning initiative.

331.     The Crestview Defendants owed those fiduciary duties to Counterclaim/Third Party Plaintiffs  by virtue of the Defendants' professed superior knowledge in equine cloning technology, for which Counterclaim/Third Party Plaintiffs reposed much trust in those Defendants, and upon which Counterclaim/Third Party Plaintiffs relied in choosing to enter into the 2009 and 2019 Agreements and contribute genetic material of a vastly superior caliber.

332.     The breach of these duties proximately caused damages to Counterclaim/Third Party Plaintiffs.

333.     As a result of the aforesaid acts and omissions by the Crestview Defendants and the consequent breaches of fiduciary duties to Plaintiffs, Counterclaim/Third Party Plaintiffs gave sustained damages, including but not limited to deprivation of the value of its genetic material, dilution of Plaintiffs' brand and other irreparable harm, as well as non-monetary and monetary damages.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment against all Counterclaim/Third Party Defendants, other incidental and consequential damages, punitive damages, prejudgment and post-judgment interest, and such further relief as requested below and as this Court may deem just and proper, including but not limited to return of all clones and genetic material from Plaintiffs' horses.

## Count IX

### Unjust Enrichment and Disgorgement

334.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

335.    Defendants have now received and enjoyed the benefit of the possession and use of Plaintiffs' equine genetic material and clones therefrom, and their breeding and earning capacity without paying for same and while having exceeded the strict limits of Defendants' very limited bailment of that genetic material and clones.

336.    Defendants accepted, appreciated, and have wrongfully retained the benefits of Plaintiffs' equine genetic material and clones therefrom, and their breeding and earning capacity.

337.    The Crestview Defendants know that the 2009 Agreement was never valid or long-since cancelled and replaced, and thus know or should know that any recent reliance upon the 2009 Agreement is not legitimate.

338.    All of the Defendants have now profited by their wrongful and unauthorized sale of clones of horses belonging to Plaintiffs. That purposeful and malicious misconduct and omissions by Defendants, the most recent of which, the Secret Clone Sale Agreement and extensions of options to sell Borodin / Pegasus the Cuartetera clones, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Counterclaim/Third Party Plaintiffs and to the harm and damage to Plaintiffs.

81

339.    In contrast, Counterclaim/Third Party Plaintiffs have been denied possession of the clones, the genetic material of the clones, have seen their brand and genetic bloodlines sold without authorization, the value diluted, and Counterclaim/Third Party Plaintiffs have been denied Plaintiffs' right to approve or disapprove of the sale and terms of the sale of the clones, not to mention Plaintiffs' right to an equal share of any proceeds from any such sale.

340.    Under these circumstances, it is therefore inequitable for the Park Place Polo entities to retain the genetic material, and the clones to allow the cloning and retain sales and breeding earnings from the clones or genetic material, and should disgorge and return the clones.

341.    Under these circumstances, it is therefore inequitable for the Crestview Defendants to retain the millions of dollars paid to those Defendants, and they should be ordered to disgorge same to Plaintiffs.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment against all Counterclaim/Third Party Defendants, including but not limited to return of all clones and genetic material from Plaintiffs' horses and disgorgement of all profits and proceeds of sale of the Cambiaso / La Dolfina horse clones.

## Count X

### Conversion

342.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

343.    As set forth herein, Defendants' conversion of Plaintiffs' genetic material and clones is purposeful, malicious misconduct, the most recent of which, the Secret Clone Sale Agreement and extensions of options to sell Borodin / Pegasus the Cuartetera clones, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Counterclaim/Third Party Plaintiffs and to the harm and damage to Plaintiffs.

344.    Defendants exceeded the scope of their authorized use of Plaintiffs' equine genetic material and clones therefrom.   Defendants have exercised dominion over and claimed ownership of clones from that genetic material and have specifically admitted selling the clones into the public market and have retained all proceeds therefrom.

345.    Defendants have thus converted the equine genetic property and clones that are owned and the sole property of Counterclaim/Third Party Plaintiffs from Counterclaim/Third Party Plaintiffs to Defendants' for Defendants' own nefarious use and exclusive benefit.

346.    These continuing acts of dominion are inconsistent with Plaintiffs' ownership of their horses and related genetic material.

347.    The Crestview Defendants accepted the investment of Plaintiffs' equine genetic material into the cloning initiative with the understanding and agreement that such contribution was for limited purpose and use, and was not a purchase and sale of that material.   Nevertheless, Defendants have converted that genetic material and the clones created therefrom to their own use, thus permanently depriving Plaintiff of those assets.

348.    As a result of such conversion, Counterclaim/Third Party Plaintiffs have been damaged.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment against all Counterclaim/Third Party Defendants, other incidental and consequential damages, punitive damages, prejudgment and post-judgment interest, and such further relief as requested below and as this Court may deem just and proper, including but not limited to return of all clones and genetic material from Plaintiffs' horses.

## Count XI

### Equitable Accounting

349.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

350.    Under the 2009 and 2019 Agreements, Defendants represented that they possessed and were experienced in the use of advanced biotechnologies in the cloning of horses and Counterclaim/Third Party Plaintiffs relied upon Defendants and their expertise.   As such equine cloning experts, Defendants enjoyed a superior position to Counterclaim/Third Party Plaintiffs during the negotiation and performance of those Agreements.

351.    Therefore, the 2009 and 2019 Agreements created a fiduciary relationship amongst the parties, and Defendants enjoyed a special relationship with Counterclaim/Third Party Plaintiffs and specifically agreed to that relationship.

352.    Moreover, the relationship between the parties contemplated a complex scientific process, equine cloning, which requires meticulous record-keeping, accounting and involves use of sophisticated technology including the extraction, propagation and storage of genetic tissue.

353.    By virtue of Defendants' physical possession of Plaintiffs' genetic material and operation of the biotechnology to effect the cloning therefrom as agreed and specified under the preliminary but cancelled 2009 Agreement, the 2019 Side Letter Agreement, and 2019 Settlement Agreement, Defendants were required to keep and disclose accurate records to account for the location and use of Plaintiffs' genetic material and the clones therefrom, and the revenues derived from all financial activity regarding same.

354.    The   Crestview   Defendants   have   not   shared   this   information   with Counterclaim/Third Party Plaintiffs despite Plaintiffs' demand, while admitting that Defendants

have sold and plan to imminently sell, several Cuartetera clones belonging to La Dolfina into the public market.

355.    Under the aforesaid circumstances, Defendants should be ordered to account to Counterclaim/Third Party Plaintiffs for the inventory and use of Plaintiffs' genetic material and the clones created therefrom, and the revenues derived from all financial activity regarding same.

WHEREFORE, Counterclaim/Third Party Plaintiffs demands judgment against the Counterclaim/Third Party Defendants, for an accounting to Counterclaim/Third Party Plaintiffs of the inventory and use of Plaintiffs' genetic material, the clones created therefrom, and the revenues derived from all financial and all contractual activity regarding the same.

## Count XII

### Violation of Trademark Act of 1946 ("Lanham Act")
### 15 U.S.C. § 1125(a)(1)(B) – False Advertising

356.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

357.    Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is

85

likely to be damaged by such act.

358.    Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B).

359.    A claim under 15 U.S.C. §1125(a)(1)(A) is known as a "false association"  claim.

360.    A claim under 15 U.S.C. § 1125(a)(1)(B) is known as a "false advertising" claim. Counterclaim/Third Party Plaintiffs bring the within cause of action as a false advertising claim under 15 U.S.C. § 1125(a)(1)(B).

361.    The 2020 Secret Cloning Agreement establishes multiple other false or misleading descriptions of fact, or false or misleading representations of fact, and false or misleading statements that, upon information and belief, permeated Defendants' commercial interactions, commercial advertising and promotion to Mr. Borodin, and Park Place, Bartolome and Camila Castagnola and, upon information and belief, other consumers in the United States and elsewhere.

362.    These documents establish multiple false and or/misleading statements including but not limited to: that the Crestview Defendants falsely stated to Mr. Borodin or his representatives that they had an exclusive license to sell those clones for their "own account."

363.    These documents establish that the Crestview Defendants falsely claimed that their actions were authorized by the invalid or previously-cancelled and replaced 2009 Agreement.

364.    These documents establish that the Crestview Defendants falsely claimed that all approvals of persons whose approvals were required had been obtained.

365.    These documents establish that the Crestview Defendants falsely claimed that the 2009 Agreement had not failed, been extinguished by novation, terminated or altered in any manner.

366.    These documents establish that Meeker and Farm falsely claimed that the sold Clones would not be subject to any claims by Mr. Cambiaso and La Dolfina.

367.    These false or misleading descriptions of fact or false or misleading representations of fact falsify and misrepresent the "nature, characteristics, or qualities" of the Clones sold by the Defendants falsely stating or implying that the sale of these clones was authorized and valid.

368.    These false or misleading descriptions of fact or false or misleading representations of fact are likely to cause confusion, mistake or to deceive consumers as to Mr. Cambiaso's affiliation, connection or association as to his and La Dolfina's sponsorship or approval of these unauthorized clones.   Thus, these statements literally falsify and misrepresent that "nature, characteristics, or qualities" of the Clones because they falsely represent that they were authorized and legal to have been produced, when in truth and fact, they were not.

369.    Further, based on the limited evidence available to date, including the November 9 Secret Cloning Agreement, the Crestview Defendants, in the commercial advertising and promotion of the Cambiaso / La Dolfina clones, made and upon information and belief continue to make false or misleading statements to consumers in the United States and worldwide about the nature, characteristics or qualities of the clones.

370.    Those continuing false and misleading statements include these Defendants' purported abilities to produce clones of these horses under the invalid or extinguished 2009 Agreement without any authorization by Mr. Cambiaso and La Dolfina and/or falsely convey that these Clones are authorized to be produced and do not violate the contractual and obligations of the Defendants, which is an inherent and fundamental part of their "nature, characteristics, or qualities." These false statements are about the Crestview Defendants' commercial activities and

falsely state or imply that they had Plaintiffs' authorization to sell these clones which, in truth and fact, belong to Plaintiffs.

371.    These continuing false or misleading descriptions of fact or false or misleading representations of fact are outright false or omit material information that render the misrepresentation misleading or false.   Specifically, the omission of the inability of the Crestview Defendants to unilaterally clone Cambiaso / La Dolfina horses without consent of Plaintiffs, and then to sell and transfer them, and sell and transfer options to create more of them, as their own property, makes these representations or omissions misleading or outright false.

372.    These continuing false or misleading descriptions of fact or false or misleading representations of fact are not opinion or puffery.

373.    A reasonable consumer of high end polo horses would not believe that these claims are puffery but rather factual given the Defendants' misrepresentations about their purported legal rights to produce and sell these clones.

374.    The Crestview Defendants, in the Secret Cloning Agreement, represented to the Park Place Polo entities and affiliates that there were no competing claims to the Cuartetera clones, and that the sale of those clones did not breach or place the Crestview Defendants in default of any agreement.   Those statements of material fact were patently false.

375.    The Defendants have made further statements, set forth in the Common Allegations, to other members of the public, such as Mr. and Mrs. Castagnola, that the Crestview Defendants are the authorized sellers of authorized clones of Plaintiffs' original, unique polo horses such as Aiken Cura, Cuartetera, Colibri and Lapa.   See **Exhibits 19 and 20 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.* Upon information and belief, these statements have been made to other consumers as well.

88

376.    The Crestview Defendants represented to the Castagnolas that Defendants owned and were authorized to produce clones from Plaintiffs' horses, to wit *"You should buy one of my new Colibri or Aiken Cura clones!   I'm making new Lapa clones too. … I have babies of Cuartetera"* **Figure 2 herein, and Exhibits 20 and 19,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola.*

377.    Those statements by the Crestview Defendants were literally false because none of the Agreements expressly granted Defendants a right to advertise and sell those clones and clone foals. At the very least these statements were misleading and were designed to conceal the true facts from a prospective purchaser of high end polo horses.

378.    The Crestview Defendants further represented to the public, in response to a member of the public's inquiry   *"Si, you have Cuartetera??"* that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for*."   That statement was misleading by implying that Defendants had authorization to create and sell to the public clones of Plaintiffs' renown Cuartetera polo horse.

379.    By these representations, as well as others in the public media, the advertisements and statements of the Crestview Defendants were (1) false or misleading, and (2) deceived or had the capacity to deceive the public. Defendants did not have the authorization of Counterclaim/Third Party Plaintiffs to create, advertise and sell into the public market clones and cloned foals of Plaintiffs' renown polo horses.

380.    The aforesaid statements and advertising to the public by Defendants therefore were both false or misleading and deceived or had the capacity to deceive the public that the clones and cloned foals offered for sale by Defendants were authorized clones of Plaintiffs' horses, possessing

the same abilities as Plaintiffs' original horses by way of genetics and training by Plaintiffs' polo trainers and Mr. Cambiaso.[12]

381.    The deception by the Crestview Defendants (3) had a material effect on the purchasing decisions of the public, such as Mr. Borodin and his Park Place Polo Team, who clearly have the financial ability to purchase nothing but the best polo horses.

382.    Further, Defendants have (4) offered their services of cloning Plaintiffs' horses and transported Plaintiffs' equine genetic material and clones across state lines and apparently across United States borders, such as from Argentina into the United States and from the United States to elsewhere, thus affecting interstate commerce.

383.    Finally, (5) the commercial advertising, promotion and sale of the misrepresented cloning services and misappropriated clones belonging to Counterclaim/Third Party Plaintiffs have already been and are likely to further cause irreparable harm to Counterclaim/Third Party Plaintiffs by the unrestricted distribution and dilution of Plaintiffs' unique equine genetic blood lines to competitors and the public at large.

384.    In addition to the specific instances of the advertisement, promotion and offers to the Castagnolas, the Park Place Polo entities and Andrey Borodin, and upon information and belief to other consumers, Defendants' oral statements in the public media asserting the authorization and ownership of Defendants over the clones of Plaintiffs' horses have been widely disseminated through media channels such as in *Vanity Fair, 60 Minutes* and other public media. **Exhibits 23,**

---

[12] Meeker has publicly opined that Cambiaso's ponies are highly prized, and those involved in training and showing their clones consider their involvement a great privilege, and care is taken to have the clones trained and handled by the same people involved in the original horse training. Telephone interview of Alan Meeker by Lewis T. Stevens with Alan Meeker on behalf of Crestview Genetics on March 14, 2016.
Source:   https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1157&context=kjeanrl

**24, and 25.**   This is actionable misconduct under the Lanham Act because it constitutes false and misleading commercial advertising and promotion.

385.    At all times relevant hereto, Meeker acted in Palm Beach County, Florida as the sales agent and representative of Defendants Crestview Genetics and Crestview Farm, **Exhibit 11,** *Affidavit of Robert Jornayvaz, III,* offering Defendants' cloning services and offering sales of offspring of Plaintiffs' clones. Meeker made repeated "sales pitches" and solicited business regarding offspring of Plaintiffs' clones in Florida on behalf of himself and the other Defendants. **Exhibit 11,** *Affidavit of Robert Jornayvaz, III, ¶¶ 5-7, 10.*

386.    The aforesaid statements by Defendants are literally false and can be presumed to have deceived the public.   Even if not literally false, the statements are impliedly false because neither the 2009 Agreement, nor the 2019 Agreement, grant Defendants the right to sell the "second edition" of clones of Plaintiffs' polo horses.

387.    The aforesaid statements by Defendants in Florida and in multiple states were material, in that Defendants' deception as to the authorization of the clones and provenance of the clones as being from Plaintiffs' renown polo horses and polo training operation, and thus containing the same, vastly superior attributes, was likely to influence the consumer's purchasing decision.

388.    By relying heavily upon names of the horses or Plaintiffs' identities in their commercial advertising, promotion and sale of the horses, Defendants' expressly creating a link between renowned polo ponies and the renowned Plaintiffs, enhancing the likelihood that Defendants' misrepresentations will influence the purchasing decisions of the public.

389.    In Palm Beach County, Florida, Defendants, by and through their sales agent and representative Meeker, have further represented a relationship with Plaintiffs, further implying that

the clones and sales of clones and cloned foals were authorized by Plaintiffs, thus using that relationship to procure business for the profit of Defendants.

390.    These statements were made by Defendants in Florida and other locations, and Defendants offered their services and the clones for sale in multiple states and countries also by and through national publications, thus affecting interstate commerce.

391.    The statements by Defendants to the Castagnolas, and upon information and belief to other consumers, are commercial advertisements or promotions that misrepresent the nature, characteristics or qualities of Defendants' services or commercial activities by falsely representing that Defendants had the exclusive commercial right to engage in these sales.

392.    The statements by Defendants to the Castagnolas, impliedly misrepresent that the clones had been made and marketed by the sole authority of the Defendants, and thereby misrepresent and diminish the nature, characteristics and qualities of Plaintiffs' horses and commercial activities and ultimate authority over Plaintiffs' polo horse bloodlines.

393.    This purposeful misconduct by Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will, and this misconduct by Defendants was taken with wanton and reckless disregard for the harm to Counterclaim/Third Party Plaintiffs and their interests and rights.   The injury to Plaintiffs' commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

394.    Counterclaim/Third Party Plaintiffs have been, are currently, and are likely to be further damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1). Thus, Counterclaim/Third Party Plaintiffs have standing to bring these claims.

395.    Defendants' unlawful conduct is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' false advertising and related deception of consumers who have or will withhold trade from Counterclaim/Third Party Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

396.    The loss of the exclusivity to Plaintiffs' equine blood lines by the unauthorized creation and sale of the clones, has caused and will continue to cause actual confusion in the marketplace, resulting in loss of goodwill and profits, and harming and threatening to further harm the business reputation of Counterclaim/Third Party Plaintiffs as exclusively possessing their exclusive polo horse blood lines as the premier and most successful competitors in the sport of polo.

397.    In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team.   Meeker himself has admitted "It's 70% to 80% the horse, and everyone, including Cambiaso, will tell you this."[13]

398.    Defendants' willful misconduct has resulted in injury to Plaintiffs' commercial interest in business reputation. The injury to business reputation is based on the unauthorized sales of the highest quality clones by Defendants in the marketplace. Simply put, Plaintiff's horses are the superstars of the polo world.   For example, Cuartetera, in the world of polo is an iconic horse, the Michael Jordon, Tiger Woods or Secretariat of the sport of polo.

---

[13] *Six cloned horses help rider win prestigious polo match*, by Jon Cohen, Dec. 13, 2016. Source: https://www.sciencemag.org/news/2016/12/six-cloned-horses-help-rider-win-prestigious-polo-match

399.    Because of Defendants' misconduct, Counterclaim/Third Party Plaintiffs have no way of preserving the integrity and reputation as exclusive possessors of clones of La Dolfina Cuartetera and the other Cambiaso / La Dolfina polo horses bloodlines.

400.    The Crestview Defendants have destroyed the ability of Counterclaim/Third Party Plaintiffs to ensure the meticulous training and preparation of these clones only for the highest echelon of international polo competition, and controlling any breeding to which they may be subject.

401.    The unauthorized proliferation of these clones to third parties and competitors, over whom Counterclaim/Third Party Plaintiffs have no control, will diminish the value of the offspring and further clones belonging to and in the possession of Plaintiffs.   Unauthorized creation and distribution of these unauthorized clones results in a diminution in their value to both Plaintiffs, and of Plaintiffs' reputation and value in and to the public market, while further degrading the exclusive stature of these ponies in the most elite level of polo.   These impacts of Defendants' misconduct thus directly results in a loss of business reputation to Plaintiffs.

402.    By willfully making the Cuartetera and other of Plaintiffs' equine bloodlines available to competitors of Plaintiffs, the Crestview Defendants are directly harming the business reputation of Counterclaim/Third Party Plaintiffs as the most successful competitors in the global polo industry.

403.    The damage to Counterclaim/Third Party Plaintiffs and their interests is irreparable and Defendants' willful misconduct continues, threatening further irreparable harm to Plaintiffs, their economic and reputational interests, competitive advantage, business reputation and their goodwill in the competitive sport of polo.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment and relief against Counterclaim/third Party Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Counterclaim/Third Party Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Counterclaim/Third Party Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a) for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

### Count XIII

**Violation of Trademark Act of 1946 ("Lanham Act")**
**15 U.S.C. § 1125(a)(1)(A) – False Association**

404.     Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

405.     Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

406.   Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B).

407.   A claim under 15 U.S.C. §1125(a)(1)(A) is known as a "false association " claim.

408.   A claim under 15 U.S.C. § 1125(a)(1)(B) is known as a "false advertising" claim. Counterclaim/Third Party Plaintiffs bring the within cause of action as a false association or endorsement claim under 15 U.S.C. § 1125(a)(1)(A).

409.   The Crestview Defendants have made the aforesaid statements, set forth in the Common Allegations, to the consuming public by using Plaintiffs' names and the names of Plaintiffs' horses, to falsely imply that Counterclaim/Third Party Plaintiffs have endorsed Defendants as authorized sellers of clones of Plaintiffs' original, unique polo horses by specifically naming the horses Aiken Cura, Cuartetera, Colibri and Lapa.  **Exhibits 19 and 20 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.*

410.   These single parents[14] of the clones at issue are known throughout the polo industry to be the best and most prized horses belonging to Plaintiffs, responsible for much of Plaintiffs' professional success since their originals were introduced to the sport. It is reasonable that no one would represent that they had for sale clones originating from such horses unless such clones and cloning were endorsed by Plaintiffs.

411.   However, as described herein above, Counterclaim/Third Party Plaintiffs have not in fact endorsed the sale of the clones of Plaintiffs' horses to the public, such as the Castagnolas or Mr. Borodin and the Park Place Polo entities.

412.   Defendants' conduct in the promotion and sale in commerce of these Clones utilized false or misleading descriptions of fact or false or misleading representations of fact or

---

[14] Each clone is produced from replication of only one "parent" horse.

false designation of origin. These statements falsify or misrepresent Mr. Cambiaso's and La Dolfina's affiliation, connection or association with these Clones in written representations made to Park Place Polo and/or Mr. Borodin.

413.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that their actions were authorized by the invalid or extinguished 2009 Agreement.

414.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely stated to Park Place and Mr. Borodin that all approvals of persons whose approvals were required had been obtained.

415.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin  that the Crestview Defendants *were not in default under the 2009 Agreement* at each of those three times described in § 6. **Exhibit 8,** CF00007.

416.    The Secret Cloning Agreement establishes that Meeker and Farm falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants represented to Borodin that the ten Cuartetera clones were *free and clear of any claims by Mr. Cambiaso* at each of those three times described in § 6 of the Secret Cloning Agreement. **Exhibit 8,** CF00007.

417.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants had the ability to and indeed granted an *assignable license* to Borodin for Borodin *to produce an additional ten (10) Cuartetera clones.* **Exhibit 8**, CF00008 § 8.1.

418.    The representations by the Crestview Defendants in 2020 were all false, to wit, it was *not true* that: (i) the sale of the clones were authorized by Counterclaim/Third Party Plaintiffs by and through the 2009 Agreement, (ii) all approvals of persons whose approvals were required

had been obtained, (iii) the Clones were free of all claims by Mr. Cambiaso, and (iv) that Defendants had a legal capacity and right to grant Park Place/Mr. Borodin a license to produce more clones.

419.    These statements by the Crestview Defendants are all false or misleading descriptions or fact or false or misleading representations of fact or false designation of origin because they falsify or misrepresent Mr. Cambiaso's and La Dolfina's affiliation, connection or association with these Clones that they never authorized, and represent that this transaction had been undertaken with Mr. Cambiaso's and La Dolfina's endorsement or authorization. These statements have been made to members of the public, and discovery may reveal the further extent of those statements to the public.

420.    When Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!  I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2 herein, and Exhibits 20 and 19,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Counterclaim/Third Party Plaintiffs when such endorsement did not exist.

421.    Moreover, these false statements falsely stated that the Defendants originated the Clones when in truth and in fact they had been created using genetic tissue that had been misappropriated from Mr. Cambiaso and La Dolfina.

422.    Thus, by claiming that they had the right to engage in these transactions, Defendants misleadingly described or represented the true nature of their ability to produce these clones, which they could not without the authorization of Mr. Cambiaso and La Dolfina, and implied Mr. Cambiaso and La Dolfina had an affiliation, connection or association with these Clones that they never authorized.

423.    Defendants further willfully represented to the public, in response to a member of the public's inquiry   "*Si, you have Cuartetera??*" that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for*."   That statement was misleading by implying that Counterclaim/Third Party Plaintiffs had endorsed the creation and sale to the public clones of Plaintiffs' renowned Cuartetera polo horse, when in fact Counterclaim/Third Party Plaintiffs had not endorsed such cloning and sale.

424.    Defendants willfully made and created these false designations of origin, misleading descriptions of fact or false or misleading representations of fact, and made these false endorsement statements and implications for the commercial benefit of Defendants.

425.    By these misrepresentations, as well as others in the public media, the advertisements and statements of Defendants were willfully (1) false or misleading, and (2) deceived or had the capacity to deceive the public.

426.    Defendants did not have the endorsement of Counterclaim/Third Party Plaintiffs to create, advertise and sell into the public market clones and cloned foals of Plaintiffs' renown polo horses.   The aforesaid statements and advertising to the public by Defendants therefore were both false or misleading and deceived or had the capacity to deceive the public that the clones and cloned foals offered for sale by Defendants were endorsed, connected or affiliated with Plaintiffs, and that Counterclaim/Third Party Plaintiffs were part of the cloning endeavor that the offered clones possessed the same abilities as Plaintiffs' original horses by way of genetics and training by Plaintiffs' polo trainers and Mr. Cambiaso.[15]

---

[15] Meeker has publicly opined that Cambiaso's ponies are highly prized, and those involved in training and showing their clones consider their involvement a great privilege, and care is taken to have the clones trained and handled by the same people involved in the original horse training.   Telephone interview of Alan Meeker by Lewis T. Stevens on March 14, 2016.
Source: https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1157&context=kjeanrl

427.    The willful deception by Defendants (3) had a material effect on the purchasing decisions of the public, such as Mr. Borodin and his Park Place Polo Team, who clearly have the financial ability to purchase nothing but the best polo horses and have in fact purchased three Cuartetera clones and purchased the option for seven more Cuartetera clones. **Exhibit 8.** These statements are believed to have been made to other consumers as well.

428.    Further, Defendants have (4) offered to sell clones and their services of cloning Plaintiffs' horses and transported Plaintiffs' equine genetic material and clones across state lines and apparently across United States borders, such as from Argentina into the United States and from the United States to elsewhere, thus affecting interstate commerce.

429.    Finally, (5) Defendants' willful representations by use of the specific names of the horses, which undeniably apply a direct endorsement by Plaintiffs, during the sale of the clones belonging to Plaintiffs, has already and are likely to further cause irreparable harm to Counterclaim/Third Party Plaintiffs by the unrestricted distribution and dilution of Plaintiffs' unique equine genetic blood lines to competitors and the public at large.

430.    While making these false statements, which falsely implied endorsements by Counterclaim/Third Party Plaintiffs of the clones sales, Meeker willfully acted in Florida as the sales agent and representative of Defendants Crestview Genetics and Crestview Farm, **Exhibit 11,** *Affidavit of Robert Jornayvaz, III,* offering Defendants' cloning services in general and offering for sale the offspring of clones of Plaintiffs' horse.  Meeker made repeated "sales pitches" and solicited business regarding Plaintiffs' clones in Florida on behalf of himself and the other Defendants. **Exhibit 11,** *Affidavit of Robert Jornayvaz, III, ¶¶ 5-7, 10.*

431.    The aforesaid statements by Defendants are literally false and can be presumed to have deceived the public because Counterclaim/Third Party Plaintiffs did not endorse the sale of

the clones of Plaintiffs' prized polo horses to third parties, yet the Park Place Polo Team, through its agent and closely-related affiliate, did in fact execute the Secret Cloning Agreement and purchase three clones and options for seven more clones.   **Exhibits 8, 9, and 10.**

432.    Even if not literally false, the statements are impliedly false because neither the 2009 Agreement, nor the 2019 Agreement, grant Defendants the right to sell the "second edition" of clones of Plaintiffs' polo horses or any clones without the Plaintiffs' express consent. Therefore, Defendants do not have the endorsement of Counterclaim/Third Party Plaintiffs to undertake such acts.

433.    The aforesaid statements by Defendants in Florida and in multiple states were material, in that Defendants' deception as to the endorsement of the cloning and that the clones as being authorized as coming from Plaintiffs' renown polo horses and polo training operation, and thus containing the same, vastly superior attributes, was likely to influence the consumer's purchasing decision. These statements have been made to members of the public, and discovery may reveal the further extent of those statements to the public.

434.    By relying heavily upon names of the horses and upon Plaintiffs' identities as known owners of those horses, in conjunction with the advertising and sale of the horses, the Crestview Defendants purposefully expressed and implied a link between the renown polo ponies and an endorsement by the renown Plaintiffs.

435.    These links enhanced the likelihood that Defendants' misrepresentations did and will continue to influence the purchasing decisions of the public as to those clones.

436.    Defendants, in Palm Beach County Florida and elsewhere, by and through their sales agent and representative Meeker, have further represented a close and special relationship

with Plaintiffs, further implying that the clones and sales of clones of Plaintiffs' renowned polo ponies were endorsed by Plaintiffs.

437.    These representations and implications have caused and are likely to cause continuing confusion, deception and mistake to the public, while the Crestview Defendants are leveraging that appearance of a close and special relationship to procure business for the profit of Defendants.   In other words, Counterclaim/Third Party Plaintiffs are likely to cause confusion, deception or mistake as to the affiliation, connection or association of the Crestview Defendants' illegal horse selling activities with Plaintiffs, or the Plaintiffs' sponsorship or approval of the unauthorized Cuarteteras and the Crestview Defendants' related activities. These statements were made in interstate and international commerce.

438.    These statements were made by the Crestview Defendants in Florida and in multiple states and countries including by and through national publications, thus affecting interstate commerce.  There are many such publications, some of which are cited herein and incorporated by reference herein.

439.    This willful misconduct by the Crestview Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.   The injury to Plaintiffs' commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

440.    Counterclaim/Third Party Plaintiffs have been, are currently, and are likely to be damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1)   Thus, Counterclaim/Third Party Plaintiffs have standing to bring these claims.

441.    Defendants' unlawful and willful conduct is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' false endorsement and related deception of consumers who have or will withhold trade from Counterclaim/Third Party Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

442.    The loss of the exclusivity to Plaintiffs' equine blood lines by the unauthorized creation and sale of the clones, has caused and will continue to cause actual confusion in the marketplace, resulting in loss of goodwill and profits, and harming and threatening to further harm the business reputation of Counterclaim/Third Party Plaintiffs as exclusively possessing their exclusive polo horse blood lines as the premier and most successful competitors in the sport of polo.

443.    In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team.   The misconduct of the Crestview Defendants has resulted in injury to Plaintiffs' commercial interest in business reputation.

444.    The injury to business reputation is based on the unauthorized sales of the highest quality clones by Defendants in the marketplace. Simply put, Plaintiff's horses are the superstars of the polo world.   For example, Cuartetera, in the world of polo is an iconic horse, with the stature in polo as Michael Jordon, Tiger Woods or Secretariat possesses in their respective sports.

445.    Because of Defendants' misconduct, Counterclaim/Third Party Plaintiffs have no way of preserving the integrity and reputation as exclusive possessors of Cuartetera and the other of Plaintiffs' polo horses' bloodlines by ensuring their meticulous training and preparation of these

clones only for the highest echelon of international polo competition, and controlling any breeding that they may be subjected to.

446.    The unauthorized proliferation of these clones to third parties and competitors, over whom Counterclaim/Third Party Plaintiffs have no control, will diminish the value of the offspring and further clones belonging to and in the possession of Plaintiffs.   Unauthorized creation and distribution of these unauthorized clones results in a diminution in their value to both Counterclaim/Third Party Plaintiffs and of Plaintiffs' reputation and value in and to the public market, while further degrading the exclusive stature of these ponies in the most elite level of polo. These impacts of Defendants' misconduct thus directly results in a loss of business reputation to Plaintiffs.

447.    By making the Cuartetera and other of Plaintiffs' equine bloodlines available to competitors of Plaintiffs, Defendants are willfully directly harming the business reputation of Counterclaim/Third Party Plaintiffs as the most successful competitors in the global polo industry.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment and relief against Counterclaim/third Party Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Counterclaim/Third Party Complaint Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Counterclaim/Third Party Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a), for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

## Count XIV

**Violation of the Trademark Act of 1946 (Lanham Act)**
**15 U.S.C. § 1125(a)(1)(A)**
**False Association - Celebrity Status**

448.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

449.    Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

450.    Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B). The Lanham Act prohibits unauthorized misappropriation and misuse of a celebrity's image or persona when used in association with a product so as to imply that the celebrity endorses the product.

451.    Mr. Cambiaso is widely accepted as the leading celebrity in the world of international polo. He is the world's most accomplished polo player and breeder of championship winning high goal polo horses, including Cuartetera.

452.    The La Dolfina polo organization is widely recognized as the leading breeder of elite and world- renowned polo horses.

453.    Plaintiffs' horses are the superstars of the polo world.   Cuartetera, in the world of polo is an iconic horse, the Michael Jordon, Tiger Woods or Secretariat of the sport of polo.

454.    Meeker is not recognized as a celebrity in the world of polo, as either a player or breeder, or in any capacity.

455.    Unlike La Dolfina, Crestview Farms is not recognized as a breeder of elite and world- renowned polo horses.

456.    The Lanham Act is designed to protect commercial interests in identities, including those of celebrities.

457.    A Plaintiff such as Mr. Cambiaso does not require a registered trademark to protect his commercial interests under the Lanham Act.

458.    The use of common law or unregistered trademarks by an unauthorized user is a violation of the Lanham Act. In false endorsement cases, the term "mark" applies to a celebrity's persona and the "strength" of the mark refers to the level of recognition that the celebrity has among the segment of the public to whom the advertisements or promotions are directed.

459.    The level of recognition that Mr. Cambiaso and La Dolfina have among the segment of the high goal polo horse buying market is extremely high.

460.    Cuartetera is synonymous with La Dolfina and Mr. Cambiaso. She is registered in the breeding registry as "Dolfina Cuartetera" and is synonymous and integrally associated with La Dolfina and Mr. Cambiaso, and not the Defendants.

461.    Mr. Borodin, Park Place Polo, and the Castagnolas are in the segment of the market where Mr. Cambiaso's and La Dolfina's persona and "mark" are highly regarded, given their fame and accomplishments.

462.    The Lanham Act protects unauthorized use of a celebrity's persona in association with a product so as to imply that the celebrity endorses the product.

463.    Defendants falsely represented to the purchasing public in this market segment that they had the ability to sell Dolfina Cuartetera clones.

464.    When the Crestview Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!  I'm making new Lapa clones too.  ... I have babies of Cuartetera"* **Table 3 herein, and Exhibits 20 and 19,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Mr. Cambiaso and La Dolfina, and this false implication wrongfully implied that Mr. Cambiaso, a celebrity, had endorsed the sale.

465.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the ten Cuartetera clones were ***free and clear of any claims by Mr. Cambiaso*** at each of those three times described in § 6 of the Secret Cloning Agreement. **Exhibit 8, page CF00007.**

466.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants had the ability to and indeed granted an ***assignable license*** to Borodin for Borodin ***to produce an additional ten (10) Cuartetera clones.*** **Exhibit 8**, **CF00008 § 8.1.**

467.    The representations by the Crestview Defendants are false, because it was and is not true that: (i) the sale of the Clones were authorized by the 2009 Agreement, (ii) all approvals

of persons whose approvals were required had been obtained, that the Clones were free of all claims by Mr. Cambiaso, (iii) the Crestview Defendants had the purported ability to grant Park Place Polo Team and Mr. Borodin a license to produce more clones, (iv) that the clone sales transaction had been undertaken with the endorsement or authorization of Mr. Cambiaso and La Dolfina.

468.    These false and fraudulent assertions that Mr. Cambiaso and La Dolfina, both recognized and leading celebrities in this market segment, had approved or endorsed these putative sales are a misuse and wrongful appropriation of Mr. Cambiaso's persona and La Dolfina's powerful and valuable brand. Upon and information and belief, these assertions are believed to have been made to other consumers as well.

469.    Mr. Cambiaso and La Dolfina never approved of the sale of these unauthorized Dolfina Cuartetera clones by Defendants.

470.    The misuse of Mr. Cambiaso's persona and La Dolfina's powerful and valuable brand are likely to cause confusion to consumers as to the Counterclaim/Third Party Plaintiffs as to sponsorship or approval of these sales of clones of Dolfina Cuartetera.

471.    The misuse of Mr. Cambiaso's persona and La Dolfina's brand occurred in interstate and international commerce.

472.    The misuse of Mr. Cambiaso's persona and La Dolfina's brand violates the public's interest in deception and the Plaintiffs' commercial investment and drawing power in endorsing their own products.

473.    The false implication that Mr. Cambiaso and La Dolfina approve of the sale of these unauthorized and illegal Dolfina Cuartetera clones are likely to cause confusion, mistake, or to

deceive consumers as to the origin, sponsorship, or approval by Counterclaim/Third Party Plaintiffs as to the unauthorized and illegal clone sales by Defendants.

474.     This willful misconduct by the Crestview Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.   The injury to Plaintiffs'   commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

475.     Counterclaim/Third Party Plaintiffs have been, are currently, and are likely to be damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1)   Thus, Counterclaim/Third Party Plaintiffs have standing to bring these claims.

476.     Defendants' unlawful and willful conduct is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' false endorsement and related deception of consumers who have or will withhold trade from Counterclaim/Third Party Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

477.     Defendants have wrongfully deprived Plaintiffs' interests in their own commercial investment or drawing power of their persona and brand. This deprivation has damaged the Counterclaim/Third Party Plaintiffs in an amount to be determined at trial.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment and relief against all Counterclaim/third Party Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Counterclaim/Third Party

Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Counterclaim/Third Party Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a), for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

### Count XV

**Violation of the Trademark Act of 1946 (Lanham Act)**
**15 U.S.C. § 1125(a)(1)(A)**
**False Designation of Origin - Reverse Passing Off**

478.   Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants from ¶¶ 1 through 237 of the Common Allegations.

479.   Section 43(a) of the Trademark Act of 1946 ("Lanham Act"), ch. 540, 60 Stat. 427, specifically provides:

(1)   Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

480.   Section 43(a)(1)(A) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(A) and section 43(a)(1)(B) of the Lanham Act is codified at 15 U.S.C. § 1125(a)(1)(B).

481.    The Lanham Act, § 1125(a)(1)(A), prohibits "reverse passing off", which as in this case, involves the sale of another's products as one's own. Reverse passing is a violation of the Lanham Act because it constitutes a "false designation of origin" of the goods and thus a violation of § 1125(a)(1)(A).

482.    The Cuartetera clones at issue originated with Mr. Cambiaso and La Dolfina. The mare Cuartetera Dolfina is the property of La Dolfina. The clones of Cuartetera Dolfina thus originated with the Plaintiffs.

483.    The genetic material of these Dolfina Cuartetera is not in the public domain, and never was.

484.    The production of these Clones was based on the misappropriation of their genetic material by Defendants. Because the genetic material is the property of La Dolfina and/or Mr. Cambiaso the Defendants had no right or entitlement to produce any Clones without authorization.

485.    Defendants falsely designated the origin of the Cloned Foals as their own to Park Place Polo and/or Mr. Borodin and the Castagnolas. These statements are believed to have been made to other consumers as well.

486.    When Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!  I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2** **herein, and Exhibits 20 and 19,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied that these Clones originated with them rather than Mr. Cambiaso and La Dolfina.

487.    The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the ten Cuartetera clones were ***free and clear of any claims by Mr. Cambiaso***. **Exhibit 8, CF00007 § 6.1.**

111

488.     These statements falsely designated the origin of the clones as those of the Defendants rather than their true originators, Mr. Cambiaso and La Dolfina.

489.     The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that the Crestview Defendants had the ability to and indeed granted an **assignable license** to Borodin for Borodin **to produce an additional ten (10) Cuartetera clones**. **Exhibit 8,** CF00008 § 8.1. These statements falsely designated the origin of the Clones as those of the Defendants rather than their true originators and producers, Mr. Cambiaso and La Dolfina, as they falsely represent that they had complete control to grant property rights to consumers.

490.     The Secret Cloning Agreement establishes that the Crestview Defendants falsely claimed to Park Place and/or Mr. Borodin that they could exercise an option to purchase seven more Cuartetera clones. These statements falsely designated the origin of the Clones as those of the Defendants rather than their true originators, Mr. Cambiaso and La Dolfina, as they falsely represent that they had complete control to grant property rights to consumers.

491.     The Secret Cloning Agreement, its related documents, and the communications with the Castagnolas establish that the Crestview Defendants made multiple false or misleading description of fact, or related false or misleading representation of fact concerning the designation of origin of the unauthorized clones.

492.     The repeated and willful false designations of origin are likely to cause consumer confusion, mistake or deception as to the origin, sponsorship or approval by Counterclaim/Third Party Plaintiffs of the Crestview Defendants' illicit and unauthorized conduct.

493.     These repeated and willful false designations of origin can confuse the consuming public as to the origin of manufacture of these Clones as the original horses are unquestionably the

property of La Dolfina, rather than the Defendants. These statements are believed to have been made to other consumers as well.

494.    This reverse passing off conduct occurred in interstate and international commerce.

495.    This reverse passing off conduct violates the public's interest in freedom from deception.

496.    This reverse passing off conduct is likely to mislead the public as to the source of horses in the marketplace and harm the reputation of the originator, in this case Mr. Cambiaso and La Dolfina.

497.    The likelihood of confusion benefits the Counterclaim/Third Party Defendants who have taken advantage of the commercial reputation of Mr. Cambiaso and La Dolfina.

498.    This willful misconduct by the Crestview Defendants has resulted in injury to Plaintiffs' commercial interests, reputation, competitive advantage, and good will.   The injury to Plaintiffs' commercial interests, including but not limited to, reputation, competitive advantage and good will brings those harmed interests within the zone of interests protected under the Lanham Act.

499.     Counterclaim/Third Party Plaintiffs have been, are currently, and are likely to be damaged by the aforesaid acts by Defendants, and Defendants are therefore liable in a civil action for such acts under 15 U.S.C. § 1125(a)(1)  Thus, Counterclaim/Third Party Plaintiffs have standing to bring these claims.

500.    The unlawful and willful conduct by the Crestview Defendants is not remote from the harm to Plaintiffs; rather the aforesaid misconduct by Defendants is the direct and proximate cause of the harm. The economic and reputational injury alleged flows directly from the deception wrought by the Defendants' deception of consumers who have or will withhold trade from

Counterclaim/Third Party Plaintiffs and this unlawful conduct has or will result in a diminution in value of Plaintiffs' cloning program, bloodlines and reputation.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment and relief against Counterclaim/third Party Defendants, jointly and severally, and respectfully requests judgment against Defendants, for a judgment enjoining and restraining Counterclaim/Third Party Defendants and all those acting in consort with them from using in any manner equine genetic material from any of Plaintiffs' horses, from creating, marketing, advertising and selling clones from Plaintiffs' equine genetic material; and awarding Counterclaim/Third Party Plaintiffs their actual damages, for enhanced damages as permitted by 15 U.S.C. § 1117(a), for prejudgment interest, reasonable attorneys' fees and costs, and such other and further relief as is just and proper.

## Count XVI

### Violation of The Defend Trade Secrets Act
### 18 U.S.C. §§ 1832 *et seq.*

501.     Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

502.     The genetic material from Plaintiffs' renowned polo horses are proprietary, confidential trade secrets, developed from years of selective breeding.  **Exhibits 12 and 13,** *Affidavit and Second Affidavit of Robert Zedda.*   The horses involved include the horses Aiken Cura, Cuartetera, Lapa, Colibri, the further horses listed in the schedule to the 18 November 2020 correspondence from Defendant Crestview Genetics counsel, and all other horses belonging to Plaintiffs. **Exhibit 15.**

503.     In 2009 and 2019, the Crestview Defendants agreed to very limited circumstances under which Defendants might sample and utilize the genetic material.   Very tight restrictions and protocols were put on the use the genetic material, to prevent the public dissemination of this

confidential genetic material.   The Crestview Defendants confirmed this was the understanding of the parties, to avoid being cut "out of the loop."

504.    In both of the Agreements, and during the numerous years in between, Defendants agreed and represented and covenanted to Counterclaim/Third Party Plaintiffs that Counterclaim/Third Party Defendants would keep confidential the equine genetic material of Plaintiffs' horses, which Plaintiffs considered trade secrets, as part of the agreements between the parties.

505.    The "tissue samples" as described in the 2009 Agreement, and the clones containing the equine genetic material belonging to Counterclaim/Third Party Plaintiffs under the 2019 Agreement were intended by the parties to be kept secret and away from the public.

506.    To that end, in the 2019 Agreement, Counterclaim/Third Party Defendants expressly represented and warranted to keep strict control over the clones with Adolfo Cambiaso ("AC" therein) and La Dolfina ("LD" therein), to wit:

> **5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

507.    Therefore, the genetic material, whether in tissue samples from, or within clones from Plaintiffs' renowned polo horses, are considered trade secrets under The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1); 1839(3).   These trade secrets are confidential information   related to a product or service used in, or intended for use in, interstate or foreign commerce in that: (a) Mr. Cambiaso and La Dolfina are engaged in the international professional

115

sport of polo as a business, in which Plaintiffs' polo horses and clones are utilized by Plaintiffs; and (b) Defendants' cloning services to Counterclaim/Third Party Plaintiffs have been provided through interstate and foreign commerce of the equine genetic material and clones, both interstate domestically, such as between Florida and South Carolina, and internationally, such as between Argentina and the United States.

508.     Through the prior representations of Plaintiffs, see **Exhibit 13,** *Second Affidavit of Roberto Zedda,* Counterclaim/Third Party Plaintiffs have registered Plaintiffs' ownership of the original polo horses, and the Defendants have agreed to keep the equine genetic material from these horses from the general public.   Therefore, the equine genetic material taken from or derived from Plaintiffs' horses has independent economic value from this genetic material's information not being generally known to the public.

509.     Consistent with this protection of genetic material by Plaintiffs, Defendants too have acknowledged and agreed to keep any Cuartetera genetic material from being distributed in their Secret Cloning Agreement with Mr. Borodin/Park Place:

> 9.1     Except as expressly authorized in this Clause 9.1, Seller agrees that, without Buyer's prior written consent, Seller will not produce any clones of Cuatatera or provide tissue samples containing Cuartetera genetic material to any person. Seller has agreed to produce ten (10) clones of Cuartetera for Cambiaso (AC Clones). As of the Effective Date, Cambiaso has not elected to have such AC Clones produced. In the event Cambiaso does elect to have such AC Clones produced and Cambiaso tenders payment for such AC Clones, such AC Clones will be produced and delivered to Cambiaso.   Seller agrees that Seller will not produce, or license any other party to produce, any further clones of Cuartetera pursuant to Seller's rights under the Horse Cloning Agreement. Except as provided in this Agreement, Seller makes no representations, warranties or covenants regarding the cloning of Cuartetera by Cambiaso or other person.

510.     Thus, Defendants should be estopped from now claiming that this genetic material is anything other than valuable trade secret information that is protectable under the DTSA.

511.     The equine genetic material from Plaintiffs' horses is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and

116

the information has been closely guarded by Counterclaim/Third Party Plaintiffs and continues to be the subject of reasonable efforts by Counterclaim/Third Party Plaintiffs to maintain its secrecy.

512.    In their Secret Cloning Agreement with Mr. Borodin/Park Place Polo, Defendants recognize that the distribution of genetic material in light of its uniqueness and value, will lead to irreparable harm, and reserve themselves injunctive remedies should this material be distributed in violation of the need for secrecy:

> 9.2    Seller and Buyer also agree that, in the event Seller violates the covenant in Clause 9.1, Buyer would suffer irreparable injury for which it would not have an adequate remedy at law. Accordingly, Seller agrees that Buyer is entitled to specifically enforce the covenant in Clause 9.1 in equity. Without limiting the generality of the foregoing, Buyer shall have the right to an injunction to enjoin Seller from producing clones of Cuartetera and/or providing tissue samples to any other person what would enable such other person to produce clones of Cuartetera, in violation of Clause 9.1. In addition, Buyer may compel Seller to transfer, and to recover from Seller's transferees and transfer, to Buyer at no cost to Buyer, any clones of Cuartetera that are produced in violation of the covenant in Paragraph 7.1.

513.    Despite expressly representing and warranting to maintain the confidentiality of the genetic material and demanding this protection from Mr. Borodin/Park Place Polo, Defendants have undertaken the aforesaid misconduct by which Defendants have willfully and maliciously released Plaintiffs' proprietary equine genetic material into the general public marketplace thus exposing Plaintiffs' trade secrets to discovery by the public. **Exhibits 20, 19, 11, 15, 8, 9, and 10,** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Cloning Agreement and Amendments.*

514.    Defendants have done so by willfully and maliciously misappropriating Plaintiffs' genetic material from Plaintiffs' horses, by improper means for profit, selling clones of Plaintiffs' renowned polo horses to third parties such as Mr. Borodin and Park Place Polo Team, and threaten to do so again. See **Exhibits 20, 19, 11, 15, 8, 9, and 10,** *Affidavits of Camila Castagnola,*

*Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Cloning Agreement and Amendments.*

515.    These wrongful acts of releasing Plaintiffs' trade secrets into the public domain for profit have injured and threaten to further injure and damage Plaintiffs, including but not limited to: (a) forcing Counterclaim/Third Party Plaintiffs to compete against clones of Plaintiffs' best playing polo ponies (this year, for example, <u>two</u> of Plaintiffs' clones won for Plaintiff two *Best Playing Pony* awards in the final of the Argentine Polo Open); (b) irreparably diluting the genetic purity of the superior equine blood lines belonging to Plaintiff; (c) damaging the good will of Plaintiffs; and (d) damaging Plaintiffs' uniquely successful and superior brand names and public identity through misuse and mis-affiliation of Counterclaim/Third Party Plaintiffs with the unauthorized clones.

516.    Defendants' actions therefore constitute willful and malicious misuse of Plaintiffs' trade secrets.   This is particularly so with respect to the actions of Defendants taken since the 2019 Agreement, in violation of that 2019 Agreement and by their execution of the Secret Cloning Agreement.

517.    The intentions expressed by the Crestview Defendants in Mr. Meeker's December 1, 2020 WhatsApp communications to the Castagnolas constitutes actual and threatened misuse of Plaintiffs' trade secrets.

WHEREFORE, Counterclaim/Third Party Plaintiffs demands against Counterclaim/third Party Defendants jointly and severally monetary damages pursuant to 28 U.S.C. § 1836(b)(3)(B), return of all of Plaintiffs' equine genetic material, whether tissue sample, clones in gestation, foals of clones, or full-grown clones derived therefrom, a permanent injunction enjoining Defendants from utilizing said trade secret information in any way; consequential and incidental damages,

imposition of a constructive trust upon the income obtained by any Defendant or on their behalf from the sale of any of Plaintiffs' equine genetic material, disgorgement of profits and compensatory damages pursuant to 18 U.S.C. §1836(b)(3)(B), exemplary and punitive damages pursuant to 18 U.S.C. §1836(b)(3)(C), and reasonable attorneys' fees under 18 U. S. C. § 1836(b)(3)(D).

## Count XVII

### Violation of the Florida Uniform Secrets Act– F.S. §§ 685.001 *et seq.*

518.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

519.    The genetic material from Plaintiffs' renowned polo horses are proprietary, confidential trade secrets, developed from years of selective breeding.  **Exhibits 10 and 11,** *Affidavits of Robert Zedda.*   The horses involved include the horses Aiken Cura, Cuartetera, Lapa, Colibri, the further horses listed in the schedule to the November 18, 2020 correspondence from Crestview Genetics counsel, and all other horses belonging to Plaintiffs.

520.    In 2009, 2011 and 2019, the Crestview Defendants agreed to very limited circumstances under which Defendants might sample and utilize the genetic material.   Very tight restrictions and protocols were put on the use the genetic material, to prevent the public dissemination of this confidential genetic material.   Defendants confirmed this was the understanding of the parties, to avoid being cut "out of the loop."

521.    In both of the Agreements, and during the numerous years in between, Defendants agreed and represented and covenanted to Counterclaim/Third Party Plaintiffs that Defendants would keep confidential the equine genetic material of Plaintiffs' horses, which Plaintiff considered trade secrets, as part of the agreements between the parties.

522.    The "tissue samples" as described in the 2009 Agreement, and the clones containing the equine genetic material belonging to Counterclaim/Third Party Plaintiffs under the 2019 Agreement were intended by Defendants to be kept secret and away from the public.

523.    To that end, in the 2019 Agreement, Defendants expressly represented and warranted to keep strict control over the clones with Adolfo Cambiaso ("AC") and La Dolfina ("LD"), to wit:

> **5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

524.    Therefore, the genetic material, whether in tissue samples from, or within clones from Plaintiffs' renown polo horses, are considered trade secrets under trade secret under the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.*   These trade secrets are confidential information because Counterclaim/Third Party Plaintiffs derive independent economic value from this information, because it is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts by Counterclaim/Third Party Plaintiffs to maintain their secrecy. At all relevant times, Defendants were aware of these facts and even represented and warranted to keep that trade secret information confidential.

525.    The Crestview Defendants demanded similar assurances from Mr. Borodin in the Secret Cloning Agreement and prohibited the distribution of any tissue samples given their value

and the need for secrecy. Consistent with this protection of genetic material by Plaintiffs, Defendants too have acknowledged and agreed in the Secret Cloning Agreement to keep any Cuartetera genetic material from being distributed in their Agreement with Mr. Borodin/Park Place.

526.    Thus, the Crestview Defendants should be estopped from now claiming that this genetic material is anything other than valuable trade secret information that is protectable under the FUTSA. Through the prior representations of Plaintiffs, **Exhibit 13,** *Second Affidavit of Roberto Zedda,* Counterclaim/Third Party Plaintiffs have registered Plaintiffs' ownership of the original polo horses, and the Defendants have agreed to keep the equine genetic material from these horses from the general public. Therefore, the equine genetic material taken from or derived from Plaintiffs' horses has independent economic value from this genetic material's information not being generally known to the public.

527.    The equine genetic material from Plaintiffs' horses is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information has been closely guarded by Counterclaim/Third Party Plaintiffs and continues to be the subject of reasonable efforts by Counterclaim/Third Party Plaintiffs to maintain its secrecy.

528.    Despite expressly representing and warranting to maintain the confidentiality of the genetic material, the Crestview Defendants have willfully and maliciously undertaken the aforesaid misconduct by which Defendants have released Plaintiffs' proprietary equine genetic material into the general public marketplace, thus exposing Plaintiffs' trade secrets to discovery by the public. **Exhibits 20, 21, 11, and 15** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel.*

529.    The Crestview Defendants have done so by willfully and maliciously misappropriating Plaintiffs' trade secrets by improper means for profit, selling clones of Plaintiffs' renown polo horses to third parties such as Mr. Borodin and Park Place Polo Team, and threaten to do so again. **Exhibits 19, 11, 15, 8, 9, and 10,** *Affidavit Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Cloning Agreement with Amendments and Escrow Agreement.*

530.    These wrongful, malicious and willful acts of releasing Plaintiffs' trade secrets into the public domain for profit have injured and threaten to further injure and damage Plaintiffs, including but not limited to: (a) forcing Counterclaim/Third Party Plaintiffs to compete against genetic twins of Plaintiffs' best playing polo ponies (this year, for example, two of Plaintiffs' clones won for Plaintiff two *Best Playing Pony* awards in the final of the Argentine Polo Open); (b) irreparably diluting the genetic purity of the superior equine blood lines belonging to Plaintiff; (c) damaging the good will of Plaintiffs; and (d) damaging Plaintiffs' uniquely successful and superior brand names and public identity through misuse and mis-affiliation of Counterclaim/Third Party Plaintiffs with the unauthorized clones.

531.    The Crestview Defendant actions therefore constitute willful and malicious misuse of Plaintiffs' trade secrets.   This is particularly so with respect to the actions of Defendants taken since the 2019 Agreement, in violation of that 2019 Agreement and by their execution of the Secret Cloning Agreement.

532.    Defendants' intentions expressed in Meeker's December 1, 2020 WhatsApp communications to the Castagnolas constitutes actual and threatened misuse of Plaintiffs' trade secrets.

WHEREFORE, pursuant to F.S. §§ 685.001 *et seq.*, Plaintiffs' demand against Counterclaim/third Party Defendants jointly and severally monetary damages pursuant to), return of all of Plaintiffs' equine genetic material, whether tissue sample, clones in gestation, foals of clones, or full-grown clones derived therefrom, a permanent injunction enjoining Defendants from utilizing said trade secret information in any way; consequential and incidental damages, and imposition of a constructive trust upon the income obtained by any Defendant or on their behalf from the sale of any of Plaintiffs' equine genetic material, disgorgement of profits and compensatory damages, exemplary  and punitive damages, and reasonable attorneys' fees pursuant to F.S. § 688.005.

## Count XIII

### Violation of the Florida Uniform Secrets Act– F.S. §§ 685.001 *et seq.* Commercial Appropriation Of Name And Identity

533.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237of the Common Allegations.

534.    Florida Statutes § 540.08, Florida Statutes, provides in relevant part that: "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use."

535.    Despite the clear language of F.S. §540.08, the Crestview Defendants have made the aforesaid statements, set forth in the Common Allegations, to the public by using Plaintiffs' names and names of Plaintiffs' horses, that Counterclaim/Third Party Plaintiffs have endorsed the cloning and sale of the clones of Plaintiffs' original, unique polo horses by specifically naming the horses Aiken Cura, Cuartetera, Colibri and Lapa.  **Exhibits 19 and 20 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.*

536.     These horses at issue are known throughout the polo industry to be the best and most prized horses belonging to Plaintiffs, responsible for much of Plaintiffs' professional success since their originals were introduced to the sport. It is reasonable that no one would represent that they had for sale clones originating from such horses unless such clones and cloning were endorsed by Plaintiffs.

537.     However, as described herein above, Counterclaim/Third Party Plaintiffs have not in fact endorsed the sale of the clones of Plaintiffs' horses to the public, such as the Castagnolas or Mr. Borodin.

538.     Therefore, by the specific use of Plaintiffs' horses' names by Defendants in Defendants' advertising and public statements, Defendants have falsely advertised and represented that Counterclaim/Third Party Plaintiffs have endorsed the sale of the Cambiaso and La Dolfina clones.

539.     For example, when the Crestview Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!   I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2** **herein, and Exhibits 20 and 19,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Counterclaim/Third Party Plaintiffs when such endorsement did not exist.

540.     Defendants further represented to the public, in response to a member of the public's inquiry   *"Si, you have Cuartetera??"* that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for*." That statement was misleading by implying that Counterclaim/Third Party Plaintiffs had endorsed the creation and sale to the public clones of Plaintiffs' renown Cuartetera polo horse, when in fact Counterclaim/Third Party Plaintiffs had not endorsed such cloning and sale.

541.    Defendants made and created these false endorsement statements and implications for the commercial benefit of Defendants.

542.    The Crestview Defendants used Counterclaim/Third Party Plaintiffs famous names and the names of Counterclaim/Third Party Plaintiffs renowned horses in social media, in communications, in interviews, amongst other public medial, in order to promote, advertise and market the clones of Plaintiff's horses.

543.    The Crestview Defendants did not have the permission or authority to produce and sell the clones of Plaintiffs' horses, on any terms, and further not and do not have Plaintiffs' consent to use Plaintiffs' name and identity to advertise, promote, market or endorse Defendants' cloning business.

544.    Defendant intentionally, willfully and maliciously publicly disseminated or used Plaintiffs' identity and the identity of Plaintiffs' original polo horses to produce and sell clones without Plaintiffs' consent to produce clones for sale to the public. Defendants did so for purposes of trade or for other commercial or advertising purposes and profit.

545.    Defendants had actual or constructive knowledge of the wrongfulness of their conduct and acted with intent or with reckless disregard to Counterclaim/Third Party Plaintiffs of property interests during the entire time period in which the unauthorized use of Plaintiffs' identities and Plaintiffs' horses' identities has taken place, which is continuing presently.

546.    Defendants' conduct was reckless and wanton in care, willful and malicious, and further such conduct constitutes a conscious disregard of or indifference to Plaintiffs' rights.

547.    As detailed more fully herein above, the willful and malicious misconduct by Defendants has caused and continues to cause irreparable harm to Plaintiffs' name, reputation, good will, competitive advantage, as well as inflicting other harm upon Plaintiffs.

WHEREFORE, Counterclaim/Third Party Plaintiffs demand judgment jointly and severally against Counterclaim/third Party Defendants for all remedies available under F.S.§ 540.08, including but not limited to, both actual loss and damages, costs, interest, reasonable royalties, punitive and exemplary damages, restitution of Defendants' unlawfully-obtained proceeds and profits, a statutory fine of $ 1,000 per violation in addition to the civil remedies allowed by law, injunction against further use of Plaintiffs' and Plaintiffs' horses names for any purpose, injunction against further use and sale of any equine genetic material belonging to Counterclaim/Third Party Plaintiffs from Plaintiffs' horses, and for such other relief the Court finds just and proper.

### Count XIX

### Preliminary and Permanent Injunctions –
### Prevention of Transfer of the 7 Additional Clones

548.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

549.    The three (3) Cuartetera clones have been removed from this District, and are in South Carolina and may imminently transported abroad, to the United Kingdom, or elsewhere.

550.    The 3 misappropriated Cuartetera clones were removed from Florida only after the commencement of Plaintiffs' suit before this Court on December 8, 2020.   At that time, Defendants' prior legal counsel were informed of the existence of the Complaint and knew of Plaintiffs' claim for preliminary injunctive relief.

551.    Because of the subject matter of this dispute, the unauthorized cloning and sale of clones, was at issue, and Defendants had a legal duty to preserve the three Cuartetera clones and access to the clones, and not to remove, nor advise, cause, assist or inform any third party to remove

the three Cuartetera clones from the jurisdiction of this Court.   Defendants willfully breached this legal duty and now claim that they have no control over these three clones.

552.    The removal of the three Cuartetera clones from the jurisdiction of this Court, the sale of the 3 clones of Cuartetera, and imminent option for sale of 7 more clones of Cuartetera **[Exhibits 8, 9, 10]**, constitutes continued harm to Plaintiffs/Counterclaim Defendants, as well as constitutes destruction of evidence because the three Cuartetera clones have been removed from the reach of Plaintiffs, and the Court, are no longer available to be inspected and confirmed as the clones of Plaintiffs' Cuartetera and impair Counterclaim/Third Party Plaintiffs' ability to prove their claims in this litigation.

553.    Recent discovery has revealed the 7 additional clones are likely in production by the Crestview Defendants, purportedly and secretly on behalf of the Park Place Polo entities. Those clones, or the oocytes, embryos, or mares in gestation with those seven additional clones, should also be delivered to Plaintiffs or held by a neutral third party until this litigation is adjudicated.

554.    The granting of injunctive relief is appropriate because (1) there is substantial likelihood that Counterclaim/Third Party Plaintiffs will prevail on the merits at trial; (2) Counterclaim/Third Party Plaintiffs will suffer irreparable harm if injunctive relief is not granted; (3) the benefits of the injunction will outweigh the harm it will cause the Crestview Defendants as the seven clones can be held safely at a neutral location to prevent their shipment overseas; and (4) the issuance of the injunction will not harm public.

WHEREFORE, Counterclaim/Third Party Plaintiffs seek such relief as the Court may find just and proper under the circumstances, including but not limited to an Order requiring turnover of all records of creation and/or sale of all clones of Counterclaim/Third Party Plaintiffs' horses,

ordering the seven clones to be safely held at a neutral location, an adverse inference jury instruction, and appropriate sanctions such as attorneys' fees and costs.

**Count XX**

**Spoliation of Evidence**

**Regarding the Improper Removal and Waste of the Cuartetera Clones**

555.    Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

556.    The three (3) Cuartetera clones [**Figure 1 herein**] were removed from Florida after the existence of this lawsuit and after the existence of a potential civil action between the parties hereto, by the Crestview Defendants, and to avoid detection of those clones by Mr. Cambiaso and La Dolfina. **Exhibit 25. Exhibit 16, bates stamped "Brookledge003-4, 10"**.

557.    The removal of those clones was undertaken with the coordinated actions of both the Crestview Defendants and the Park Place Polo entities. For example, public records and other shipping records reveal that the clones were shipped from the Park Place Polo farm in Wellington, Florida, to the Crestview Farm in Aiken, South Carolina.

558.    The public records previously filed with the Court, along with documents recently obtained through discovery indicate that Meeker, by and through the use of one of his Crestview Entities involved in the transport and the Park Place Polo entities worked in concert to arrange that transport and the Park Place Polo entities made payment of transport of those clones to South Carolina, out of the jurisdiction of this Court, during the pendency of this litigation.

559.    Upon the arising of the dispute, which occurred even before the November 18, 2020 correspondence, the Crestview Defendants had a legal duty to preserve evidence, such as the three Cuartetera clones, and not remove, nor advise, assist or inform anyone else to remove, any evidence, including those clones, from the jurisdiction of this Court.

560.     Nevertheless, the three Cuartetera clones have been removed from Florida by the Crestview Defendants and sent to South Carolina and perhaps elsewhere. **See Exhibit 25.;Exhibit 16, bates stamped "Brookledge003-4, 10"**. This removal-beyond-the-reach of Counterclaim/Third Party Plaintiffs and the Court is essentially destruction of evidence in this case, which significantly impairs the ability of Counterclaim/Third Party Plaintiffs to prove that Defendants did sell clones of Plaintiffs' renowned Cuartetera to a competitor of Counterclaim/Third Party Plaintiffs in Florida.

WHEREFORE, Counterclaim/Third Party Plaintiffs seek all appropriate remedies from the Court against Counterclaim/Third Party Defendants, and which remedies should include an injunction against further spoliation of evidence, restoration of any evidence removed, as well as against Defendants, and for Plaintiffs' attorneys' fees and costs, an adverse inference instruction at trial, actual and consequential damages, and punitive damages if deemed appropriate.

## Count XXI

### Spoliation of Evidence

### Regarding the Improper Removal of ESI

561.     Counterclaim/Third Party Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 237 of the Common Allegations.

562.     Since 2019, the parties have been in dispute over the clones, the agreements and their business relationship with various negotiations and correspondence amongst the parties and their attorneys occurring as recently as mid-2019.

563.     As set forth herein below, however, ***all of the ESI spoliation misconduct described herein occurred after the commencement of this SDFL case, after the commencement of the NDTX cases, and after the Litigation Hold and Demand was issued by Counterclaim/Third Party Plaintiffs to Defendants' counsel.***

564.    During that time and presently, Meeker, his attorneys, his entities, and all those acting with them or on their behalf had knowledge that there were matters in dispute which were referred to, described or contained in various forms of social media and other ESI.

565.    On January 27, 2020, Plaintiff dispatched Litigation Hold and Preserve Demands upon counsel for Meeker, Crestview Farm and Genetics directly demanding the preservation and holding of relevant ESI.

566.    Nevertheless, and despite the Hold and Preserve Demands promulgated by Plaintiffs' counsel to the Crestview Defendants' counsel, and despite obligations of Rules 26, 45, the Local Rules, and the Sedona Conference Principles   (approved by this District),[16] important ESI has since been removed, altered and deleted by the Defendants.[17]

567.    There are indications of alternation or destruction of important, material and highly relevant evidence during litigation by Meeker is the basis for this Motion and Order.

568.    Robert Zedda is the Manager of La Dolfina. Zedda communicated frequently with Meeker concerning cloning and the related dealings between the parties during the relevant time frame in this case.

569.    On January 24, 2021, Zedda noticed that a Meeker Instagram account (@dalanmeeker) had been taken down. This Meeker account was used to regularly post pictures, videos and comments related to polo pony clones, generally, and to Cuartetera clones specifically. Zedda had seen videos announcing the birth of some Cuartetera clones and showing them being born, as well as other stories and posts related to cloned ponies.

---

[16]  The legal right standard, as defined by The Sedona Conference, "requires a party to preserve, collect, search, and produce [d]ocuments and ESI which the [other] party has a legal right to obtain." *See* The Sedona Conference, *The Sedona Conference Commentary on Rule 34 and Rule 45 "Possession, Custody, or Control"* at 484.

[17]  This conduct is in addition to the removal of the cloned horses from the jurisdiction of this Court. .   *See, e.g.*: DE 58, Expedited Motion for Inspection of the Horses.

570.    Meeker's account profile became unavailable on January 24, 2021, but Zedda previously saved screenshots of the profile for that account.   Before it was taken down, Meeker's Instagram account had 164 posts and 630 followers. *Id.* at ¶ 20. By way of example, in **Figure 1** below, the deleted Meeker account contained several pictures of the Cuartetera clones (circled) and of Plaintiff Cambiaso with those clones (also circled).



571.    There are other such preserved screenshots previously filed by Counterclaim/Third Party Plaintiffs with this Court. The Preliminary Injunction Hearing was conducted on January 29, 2021.

572.    The Court was advised by Plaintiffs' counsel of a concern that Meeker may have deleted his Instagram account (@dalanmeeker) and related content on January 24, 2021.

Defendants' counsel did not respond, nor advise the Court subsequently of Meeker's response to concerns of potential spoliation.

573.    Nevertheless, a new Instagram account profile for Meeker became available on or about February 3, but instead of @dalanmeeker, the account profile was in the name @alanmeeker.

574.    As of February 22, 2021, unlike the old Meeker Instagram account, which had many followers, the new Meeker account has zero posts and only three followers.   *Meeker's old Instagram profile and the posts associated with it are no longer available on Instagram* - and they have independent evidentiary value.

575.    In better times between the parties, Meeker had created two WhatsApp discussion groups for the purpose of allowing group discussions about cloning La Dolfina polo ponies, and those group discussion channels were employed by Meeker to communicate with others in the groups. **Exhibit 22,** *Fourth Affidavit of Robert Zedda*   ¶ 6. The first was a group he called *"New Cuartetera Clones,"* and included Zedda, Plaintiff Cambiaso, Diego Bucking (a lawyer for La Dolfina), and Adrien Mutto (a biologist previously employed by Crestview Genetics SRL (Argentina)).

576.    On or about January 29, 2021, *the date of the Preliminary Injunction Hearing and after issuance upon Defendants' counsel of Litigation Hold and Preserve Demands on January 27, 2021,* **Zedda and Plaintiff Cambiaso were** *deleted* from the "New Cuartetera Clones" and "Clone Update" WhatsApp group discussions.

577.    Fortunately, Mr. Zedda took screen shots of his removal from these groups, so that the deletion is a matter of fact, not opinion.

578.    Meeker has further terminated access to the group chats in question for Zedda and Plaintiff Cambiaso.

579.     Meeker knowingly altered and prevented access to these groups indicating an intent to spoil evidence in these groups.

580.     Meeker appears to be very knowledgeable about electronic evidence and concealing his "fingerprints" from electronic files. As depicted in <u>Figure 4</u> of Mr. Zedda's Affidavit, Meeker once instructed Zedda that ***"Documents contains [sic] data that will show where it is created.   If you forward the pdf I'm sending you, they will be able to tell I created it."***



581.     The current ESI misconduct is a further indication of Meeker's ability and willingness to avoid detection. **Exhibit 17,** *Bernard Affidavit at ¶ 34-35.*

582.    Relief from this Court, including but not limited to a Preservation Order from this Court, sanctions, dismissal or striking, and / or appropriate jury instruction at time of trial, is entirely appropriate in light of indications of the following improper actions by Defendants:

(1) **deletion or removal** of the Meeker Instagram Account "@dalanmeeker";

(2) followed by putting back up "@dalanmeeker" **with unknown content altered or deleted;**

(3) **the deletion or removal a second time** of the Meeker Instagram Account "@dalanmeeker";

(4) **followed by the creation** of a *new* Meeker Instagram Account "@alanmeeker" which contains almost none of the first "@d_alanmeeker" content [see *Instagram Affidavit of Robert Zedda,* **Exhibit   26 hereto**]; and

(5) the **alteration** of several WhatsApp accounts, which contained conversations amongst the parties and also with third parties which are important, material, and highly relevant and probative to the central issues of this case involving equine cloning and the authorization of the Defendants to unilaterally sell, without authorization or endorsement by Plaintiffs, those clones *vel non.* DE 22, *First Amended Complaint*, Breaches of Contract claims and Lanham Act claims..

583.    All of those social media accounts contained important, highly relevant, and probative material to the central issues of this case involving equine cloning and the absence of authorization by Counterclaim/Third Party Plaintiffs to the Crestview Defendants to unilaterally sell the clones, without authorization or endorsement by Plaintiffs.

WHEREFORE, Counterclaim/Third Party Plaintiffs seek all appropriate remedies from the Court against the Crestview Defendants, and against those who might act in consort with them, including but not limited to injunction against further spoliation of evidence, restoration of any evidence removed, against the Crestview Defendants, as well as for Plaintiffs' attorneys' fees and costs, an adverse inference instruction at trial, actual and consequential damages, and punitive damages if deemed appropriate.

## Jury Demand

La Dolfina S.A., LLC, La Dolfina S.A., and Adolfo Cambiaso hereby request trial by Jury on all claims of the Counterclaim and Third Party Complaint so triable as of right.

Respectfully submitted,

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*
Avery S. Chapman, Esq.
FL Bar No. 517321
Grace De la Gueronniere, Esq.
FL Bar NO. 1021673
12008 South Shore Blvd.
Suite 105
Wellington, Florida 33414
Tel. 561.753.5996
asc@chapmanlawgroup.net
grg@chapmanlawgroup.net


DAVIS GRAHAM & STUBBS LLP


*Habib Nasrullah*
Habib Nasrullah, Esq.
Molly Kokesh, Esq.
Admitted pro hac vice
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel: (303) 892-9400
habib.nasrullah@dgslaw.com
molly.kokesh@dgslaw.com

*Counsel for Defendants La Dolfina S.A., La Dolfina S.A., LLC, and Adolfo Cambiaso*

135

## <u>Certificate of Service</u>

I HEREBY CERTIFY that on the date appearing on the first page of this document, I electronically filed the foregoing with the document with the Clerk of the Court using the CM/ECF filing system, which will then serve all counsel of record or pro se parties on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*

Avery S. Chapman, Esq.

**Service List**
Crestview Farm, S.A. v. Adolfo Cambiaso, et al.
CASE NO. 9:21-cv-81066-AMC/BER

James C. Bookhout, Esq.
Ryan Dwight O'Quinn, Esq.
Caitlyn Elizabeth Hubbard, Esq.
Jason S. Lewis, Esq.,
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
305-423-8553
Fax: 305-675-0807
Email: james.bookhout@dlapiper.com, ryan.oquinn@dlapiper.com,
caitlyn.hubbard@kellyhart.com, jason.lewis@dlapiper.com

William N. Warren, Esq.
Caitlyn E. Hubbard, Esq.
David E. Keltner, Esq.
Kelly Hart & Hallman
201 Main Str.
Suite 2500
Fort Worth, TX 76102
561-332-2500
Email: bill.warren@kellyhart.com, Caitlyn.hubbard@kellyhart.com, david.keltner@kellyhart.com

Gary A. Woodfield, Esq.
Susan Yofee, Esq.
NASON YEAGER GERSON HARRIS & FUMERO, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
Tel. (561) 686-3307
Fax (561) 686-5442
Email: gwoodfield@nasonyeager.com, syoffee@nasonyeager.com