**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 20-82231-CIV-AMC/BER**
**(21-81066-CIV-AMC/BER consolidated)**

**LA DOLFINA S.A., LLC,**
a Florida Limited liability company, and
**ADOLFO CAMBIASO,** individually,

      **Plaintiffs,**

v.

**D. ALAN MEEKER,** individually,
**a/k/a ALAN MEEKER,**
**a/k/a DAVID ALAN MEEKER,**
**CRESTVIEW FARM, LLC,**
a Texas limited liability company, and
**CRESTVIEW GENETICS, LLC,**
a Nevada limited liability company,
**PARK PLACE POLO TEAM CORPORATION,**
a Florida corporation, and
**PARK PLACE POLO FIELDS CORPORATION,**
a Florida corporation,

      **Defendants.**

───────────────────────────────

  **CRESTVIEW FARM, L.L.C,**

      **Plaintiff,**

v.

  **ADOLFO CAMBIASO, LA DOLFINA,**
  **S.A. ,and LA DOLFINA, S.A., LLC,**
      **Defendants and**
      **Counterclaim/Third Party Complaint Plaintiffs,**

v.

  **CRESTVIEW FARM, L.L.C.,**
      **Counterclaim Defendant, and**
**D. ALAN MEEKER and**
**CRESTVIEW GENETICS,**
      **Third Party Defendants.**

───────────────────────────────

## PLAINTIFFS' RENEWED EXPEDITED MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION

1

Pursuant to Fed. R. Civ. Pro. 65, 15 U.S.C. § 1116(a), 15 U.S.C. § 1125 (The Lanham Act), 28 U.S.C. § 1651(a) (The All Writs Act), and L.R. 5.4(d)(1), Plaintiffs (or "Movants"), respectfully request the issuance of a preliminary injunction against all the Defendants.

## Relief and Cause for Expedited Treatment

Recent discovery has revealed that Defendants have sold and have contracted to sell additional clones of Plaintiffs' horses and have paid a third party laboratory to produce those clones to avoid liability.   Plaintiffs submit this Renewed Expedited Motion for a Preliminary Injunction to enjoin Defendants from (1) further unauthorized creation, transfer, marketing, advertising and sale of cloned horses using equine genetic material owned by Plaintiffs; and (2) further transfer, marketing, advertising, use or distribution of any genetic material belonging  to Plaintiffs during the pendency of this case.

*Since* the January 29, 2021 Hearing on the Amended TRO Motion, *a lot has changed.*  From the limited discovery undertaken thus far, Plaintiffs have now uncovered *new material evidence* that supports the substantial likelihood of success on the merits. "[S]ubstantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success*." City of South Miami v. Desantis*, 408 F. Supp. 3d 1266, 1292 (S.D. Fla. 2019) (citation omitted).  Additionally, "[a]lthough the plaintiffs raise multiple claims against the defendants, the plaintiffs need only show a substantial likelihood of success on the merits on one claim."  *Wynn-Tobler v. Action Fin. Mortg. Corp.*, No. 06-21376-CIV, 2007 U.S. Dist. LEXIS 103306, at *14 n.5 (S.D. Fla. Mar. 20, 2007) (citation omitted).

Herein, Plaintiffs demonstrate their likely success in establishing that Defendants

have misappropriated, used, cloned and *sold* Plaintiffs' polo horses without authorization in support of the claims of the Second Amended Complaint:

1.     **New Material Additional Evidence of False Statements to the Court.**   The November 9, 2020 Secret Cloning Agreement, and its December 21, 2020 and June 10, 2021 Amendments (*during* the pendency of these cases).   The Amendments allow for the buyer to purchase an additional seven (7) Cuartetera clones, *plus* a "limited license" to produce ten (10) additional clones of Cuartetera.  **Exhibit 2**, ¶ 1.2, ¶ 8.1  ##CV000004, 0000008.

     **Support of the Merits: (1)** The Secret Cloning Agreement and Amendments demonstrate that the statements made at January 29, 2021 TRO Hearing were materially false. Defense Counsel stated "*there are no anticipated sales beyond the three that have already been consummated, so there is really no longer any pressing emergency.*" *See* **Exhibit 1**, Transcript at 143:3-7[1] and **Exhibit 2**, Secret Cloning Agreement and Amendments thereto; and   **(2)** The Secret Cloning Agreement, First and Second Amendments thereto also demonstrate the falsity of several of Defendant Meeker's sworn statements. See **Exhibit 3**, Chart of Sworn Statements by Meeker Now Known to be False.

**2.**     **New Material Evidence of False Advertising and Endorsement:**  The Secret Cloning Agreement, **Exhibit 2**, in ¶ 6.1, contains the representation by the Crestview Defendants, since *ratified and repeated on* December 21, 2020 and June 10, 2021, *after* the inception of this litigation, that "*Seller has obtained the approvals of all persons whose approvals are required to enter into this Agreement and perform the obligations thereunder.*"

---

[1] All italics and bold herein this Motion are for emphasis, unless noted otherwise.

**Support of the Merits:**  That untruthful representation clearly demonstrates and supports Plaintiffs Lanham Act and related claims that the Crestview Defendants **have sold clones** and **continue to offer for sale clones** while making false representations of the endorsement and agreement of the sales by Plaintiffs.  See. e.g.: *Osmose, Inc. v. Viance, LLC*, 612 F. 3d 1298, 1319 (11th Cir. 2010) ("If the court deems an advertisement to be literally false, then the [plaintiff] is not required to present evidence of consumer deception").

**3.    New Material Evidence of Common Farm-Genetics Ownership:** Recent discovery has revealed that when Crestview Genetics was initially formed, Crestview Farm was a 50% owner of Genetics. In 2009, *Farm was the <u>50% owner of Genetics.</u>* This production has further revealed that as of December 31, 2017, *Farm became the sole and <u>100% owner of Genetics.</u>*  See **Exhibit 4**, November 2, 2009 Operating Agreement of Crestview Genetics, LLC, **Exhibit 7**, Crestview Genetics, LLC Articles of Organization, and **Exhibit 5**,  December 31, 2017 Assignment of Membership Interest in Crestview Genetics, LLC.

**Support of the Merits:** The common ownership and control of Farm and Genetics defeats the position of the Crestview Defendants that Farm and Genetics are not responsible for the malfeasance and statutory violations of each other being "separate" entities.[2]

**4.    New Material Evidence That Defendants Knew Mr. Cambiaso Did Not Approve of the Sale of Cuartetera Clones and Embryos.**  In a 20<u>15</u> email just produced to Plaintiffs, Mr. Meeker inquired of Mr. Cambiaso whether Mr. Cambiaso and Mr.

---

[2] "Individuals may be liable for FTC Act violations committed by a corporate entity if the individual 'participated directly in the [deceptive] practices or acts or had authority to control them.'" FTC v. *IAB Mktg Assocs.,* 746 F.3d at 1228, 1233 (11th Cir. 2014) (quoting *FTC v. Amy Travel Serv, Inc.,* 875 F.2d 564, 573 (7th Cir. 1989).

Gutierrez would agree to sell embryos of Plaintiffs' renown Cuartetera polo pony to a polo competitor of Plaintiffs, asking: "***Are you all ok with this scenario?***".   Mr. Cambiaso responded immediately, "*I wouldn't give any cuarteteras, **because cuartetera embyos are worth more than the horse itself.**  I don't think it is a good deal for me – you are giving him our best blood Line.*"   Meeker then responds "*Ok.  I will not do the deal.*"  **Exhibit 6**, Bates ## Crestview 00004430-432.

**Support of the Merits:**  Independent of the novation of the 2009 Agreement, this 2015 email demonstrates that: **(1)**  Meeker *knew* well-before 2020 that the Crestview Defendants *did not have the unilateral ability* to sell clones and embryos of Plaintiffs' horses *without first obtaining authorization by Mr. Cambiaso*; and **(2)** the Crestview Defendants *knew* that Mr. Cambiaso *did not agree with the selling* or distribution of clones and embryos of clones of Plaintiffs' polo ponies to the public. This actual knowledge therefore **(3)** supports Plaintiffs' Lanham Act and related claims.

**5.     New Material Evidence of Defendants' Acknowledgement of Lack of Unilateral Right to Sell Clones:**  The Secret Cloning Agreement ¶10.2 includes an entire escrow structure and Escrow Agreement  [**Exhibit 2**,  ## CF00022-30]  with the Florida law firm, Akerman, L.P. surrounding a "covenant" by Defendants which acknowledged that Plaintiffs might sue the Seller or Purchaser of the clones. **Exhibit 2**, Bates ## CV000010, CF00022-30.

**Support of the Merits.**  This new information supports the Lanham Act, related claims and the common law causes of action of the SAC because: **(1)** in 2020, the Crestview Defendants *thus acknowledge by creating the covenant and Escrow Agreement* with the Florida Akerman L.P. law firm that the Crestview Defendants *did not have the*

*unilateral ability* to sell clones and embryos of Plaintiffs' horses; and **(2)** the Crestview Defendants *knew* that Mr. Cambiaso *did not agree with the selling* of clones and embryos of clones of Plaintiffs' polo ponies.

**6.      New Material Evidence of Defendants' Refusal to Represent to the Buyers of the Clones that (i) the 2009 Agreement was Enforceable; and (ii) the Clones were free and clear of claims of Plaintiffs.**  Akerman, L.P., has now produced an October 8, 2020 email [**Exhibit 8**, ## Akerman 000182-183], sent *during the drafting of the Secret Cloning Agreement,* wherein John Simmonds, the director, president, treasurer, and secretary of both Park Place Polo Defendants [**Exhibit 33**] and who was the representative of the purchaser of the Cuartetera clones, summarizes changes to the draft of that Agreement insisted upon by the *Crestview Defendants*: **(1)** "you *removed* the representation that the Horse Cloning Agreement [the 2009 Agreement] *is enforceable against Cambiaso* in accordance with its terms"; and **(2)**  you "will *not make any representations* as to  its [2009 Agreement's]  legal enforceability"; and  **(3)** "[y]ou *removed the representation* in Paragraph 4.4 that the horses PPP [Park Place Polo] purchases from Crestview *are free and clear of claims of any third person.*"  All of these requested revisions were in the executed version of the Secret Cloning Agreement. **Exhibit 2**.

        **Support of the Merits.**  **(1)** These requested revisions support the Second Amended Complaint, including the Lanham Act claims  because those Defendants included ***false representations*** to the purchaser of the clones in the Secret Cloning Agreement and its Amendments that: **(i)**  "*Seller has obtained the approvals of all persons whose approvals are required to enter into this Agreement and perform its obligations thereunder*"; and **(ii)** "Seller's  entering  into  this  Agreement,  consummating  the

transactions and performing the obligations hereunder, will not result in any breach of, or constitute a default under, any agreement to which Seller is a party…"; **(iii)** that "*There are no actions, suits or proceedings pending against Seller…*"; **(iv)** "there has no waiver or *any other event* that would limit Seller's right to enforce the Horse Cloning Agreement and/or License in accordance with its terms; **(v)** *the Agreement is legal, valid, binding and enforceable* against Seller in accordance with its terms."   **(2)** These were false material statements representing Plaintiffs' endorsement and approval of the clone sales, because, by October 8, 2020 if not before, Defendants knew: **(i)** knew the 2009 Agreement was not legally enforceable; and **(ii)** The clones were not free and clear of Mr. Cambiaso's claim of ownership; and by December 21, 2020 and June 10, 2021, the Crestview Defendants knew that **(iii)** Defendants had been sued by Plaintiffs to recover the clones and genetic material; and **(iv)** that Defendants did not have the approval of Mr. Cambiaso for the clone sales.

7.      **New Material Evidence of Continuing Cloning and Sales of Cuartetera Clones by Defendants.**   **(1)** Plaintiffs have now learned through the new discovery adduced that the Secret Cloning Agreement provided an option for the buyer to purchase an ***additional seven*** Cuartetera clones, *plus* a "limited license" to produce **ten additional clones** of Cuartetera.   **Exhibit 2**, ¶ 1.2, ¶ 8.1  ##CV000004, 0000008.   **(2)**  *Additionally,* in the October 8, 2020 Simmonds – Meeker email [**Exhibit 8**, # Akerman 000182-183], Mr. Simmonds notes that in the drafting of the Secret Cloning Agreement, Defendants "*removed the provision prohibiting it from allowing others to produce such clones.*" **(3)Further**, the Akerman law firm produced an executed "Technical Consulting and Services Agreement" between Crestview Farm and Park Place Polo, the purchaser of the

clones, wherein Crestview Defendants and their "Affiliates" would assist Park Place Polo and their "Affiliates" to set up, advise and assist Park Place Polo *in the operation of a horse cloning laboratory* in Aiken, South Carolina. **Exhibit 9**, ## Akerman00860-00970. **(4)** Defendants' September 18, 2019 production indicates *they contracted with Viagen for production of ten (10) Cuartetera clones*. **Exhibit 10**, ## Crestview 000000912-923.[3]

Support of the Merits.   In direct contrast to the prior representations of Counsel during the January 29, 2021 Hearing, Defendants have entered into contracts contemplating production of more Cuartetera clones, paid for that production, and sold those clones.

8.     **New Material Evidence Acknowledging the Novation of the 2009 Agreement Through the 2011 Quota Holders Agreement.**   On March 22, 2011, Defendant Meeker acknowledged, in an email concerning the Quota Holders Agreement, that "*I am fine with the agreement.*"   The March 23, 2011, response from the attorneys preparing the Quota Holders Agreement was **"OK, we will proceed with the *execution of the agreement as agreed*."   Exhibit 11**, # Crestview 00000670-672.     The Quota Holders Agreement contained the novation in Section 8.6 that "***This Agreement shall constitute the complete agreement between the Parties in relation to the topics contained herein and replaces all the agreements, statements and understandings previous to the Parties, either orally or in writing.***"   The Quota Holders Agreement **[Exhibit 19] was also accompanied by the $1.533 Million (U.S.) novation payment t**o Defendants' entities from Ernesto Gutierrez, the existence and purpose of which has never been rebutted by Defendants. **Exhibit 20**, DE 122-14, *Affidavit of Ernesto Gutierrez.*

---

[3] Which also raises the question: Why would Defendants, who claim to own and operate their own equine cloning laboratory, contract for production with Viagen?

**Support of the Merits.**   The Crestview Defendants are on record with accepting the novation of the 2009 Agreement by Section 8.6 of the 2011 Quota Holders Agreement. Therefore, the 2009 Agreement cannot be relied upon by the Crestview Defendants in their 2020-21 lawsuit nor in their 2020-21 contracts with third parties, nor in advertising, producing and selling clones of Plaintiffs' horses.   See. e.g.: *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1234 (11th Cir. 2008) ("Even if the contract's language were sufficiently ambiguous as to intent regarding the 2002 Contract *to allow us to consider parol evidence*, we find that *the only reasonable conclusion to be drawn* from the evidence at trial *is that the parties intended novation*.")

**9.**     **New Material Evidence and Knowledge of Crestview Defendants in 2020 that Mr. Cambiaso Considered the 2019 Side Letter Agreement the Only Valid Agreement:** On September 18, 2020, Mr. Juan Carlo Di Caro, a representative of Mr. Cambiaso and La Dolfina, wrote to Mr. Meeker to confirm that the only Cuartetera clones that should be in existence "*were cloned by the order of Adolfo and **under the only valid agreement**, subscribed in Buenos Aires in July 2019 when Adolfo and you, both withdrew from the firm 'Crestview Genetics Argentina SRL.'"* **Exhibit 12**, # Crestview 0000350. See also **Exhibit 34.**

**Support of the Merits.**   This new evidence supports the false endorsement and reverse passing off claims.   Therein, the Crestview Defendants do not rebut, and implicitly acknowledge in 2020, that the 2019 Side Letter Agreement is the only valid agreement. Therefore, Defendants made false statements as to Defendants' authority to produce and sell Cuartetera clones in Section 6.1 of the Secret Cloning Agreement, that *"To the best of Seller's knowledge, there has been no waiver or any event that would limit Seller's right*

*to enforce the* [2009] *Horse Cloning Agreement and/or License in accordance with its terms."* **Exhibit 2**, # CF000007.

10.     **New Material Evidence of Acknowledgement by Defendants of Irreparable Harm if Genetic Material Released to the Public**.  In Section  8.1 of Clause 8 of the Secret Cloning Agreement **[Exhibit 2**, # CF000008]**, Defendants provide for an equitable remedy based on irreparable harm: *"In the event Buyer violates the covenant of this Clause 8 **Seller would suffer irreparable injury** for which it would not have an adequate remedy at law.  Accordingly, Buyer agrees that **Seller is entitled to specifically enforce the covenant of Clause 8 in equity** ...  **Seller shall have the right to an injunction** to enjoin Buyer **from producing clones of Cuartetera** in violation of clause 8.  In addition, Seller may compel Buyer to transfer, and to recover from Buyer's transferers and transfer to Seller, at no cost to Seller, **any clones of Cuartetera** that Buyer produces in violation of the covenant in this Clause 8."*

          **Support of the Merits.**    Section 8.1 of the Secret Cloning Agreement strongly supports Plaintiffs' claims of irreparable harm and the appropriateness of injunctive relief.

11.     **New Material Evidence That Crestview Defendants Knew by March 11, 2020 That There Were Significant Disagreements with Plaintiffs.**     On March 11, 2020, Meeker wrote to counsel for Plaintiffs, sending drafts of "First Amendments" to the 2019 Side Letter Agreement and the 2009 Cloning Agreement, and acknowledging in both drafts that "***a question has arisen regarding the interpretation of***" each Agreement.  **Exhibit 14**, Crestview ## 0000485-492.  These Amendments were never executed, leaving the dispute over interpretation of the Agreements ***unresolved***.

**Support of the Merits.**   These proposed First Amendments in March 2020 and earlier, demonstrate that Crestview Defendants knew early in 2020 that there was a disagreement whether production and sale by Crestview Defendants of Plaintiffs' horse clones was authorized. Thus Crestview Defendants made significant false representations of endorsement and in reverse passing off in the Secret Cloning Agreement. [**Exhibit 2**, # CF000007].

12.   **New Material Evidence of False Statements to the Public of Crestview Defendants' Ownership and Rights to Clone Cuartetera *and* Payment for Production of the Clones.**  **(1)** On September 18, 2019, Defendants contracted (the "2019 Viagen Cloning Contract")[4] with Genetic Reflections, LLC d/b/a Viagen Equine, for the production of clones of the "B 00" clone of Plaintiffs' renown Cuartetera. **Exhibit 10**, ## 0000912-923 (See # 0000919 for identity of clone as of the horse Cuartetera).  Therein, Meeker represents to Viagen that <u>Farm</u> *"(a) is **the lawful owner** of the Animal and the tissue samples collected from the Animal and provided to ViaGen Equine, (b) has **sufficient rights to use, and permit ViaGen Equine to use**, the Animal and tissue samples as contemplated by the Cloning Contract and (c) **has the full capacity and authority** to enter the Cloning Contract and provide this certification."*  **(2)** as of December 1, 2020, the day before Crestview Defendants sued Plaintiffs in the NDTX action, the Crestview

---

[5] See also *Ferrellgas Partners., L.P. v. Barrow*, 143 F. App'x 180, 186 (11th Cir. 2005) (interpreting "stock sale agreement" to determine whether plaintiff had a "substantial likelihood of proving that it owned the 'Barrow' name"); *Canes Bar & Grill of South Florida v. Sandbar Bay,* 343 F. Supp. 3d 1236 (S.D.Fla. 2018), citing *Ferrellgas Partners,* supra, and interpreting a "Sale, Transfer and Assignment, and Covenant" in context of trademark infringement claim, and granting preliminary injunction.  See also *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1550 n.14 (M.D. Fla. 1990) (affirming jury's verdict finding defendants' conduct violated the Lanham Act *and* breached a contract that included a "use restriction").

Defendants paid Viagen $ 315,000 for production of seven (7) of those clones.  **Exhibit 32**, # FB0108

Support of the Merits.  These false assertions of title support the need for injunctive relief based on inequitable conduct, support the contract claims, and further establish that additional clones have been produced, demonstrating irreparable harm.

**12.     New Material Evidence That Crestview Defendants Possess Millions of Viable Cuartetera Cells.**   By September 18, 2009, the Crestview Defendants had produced and preserved through Viagen, 7.26 Million viable cells from Cuartetera.  **Exhibit 15**, # Crestview 00000995.

Support of the Merits.   As of 2009, and not counting subsequent Cuartetera cell culture production since then by the Crestview Defendants or Viagen, the Crestview Defendants have had sufficient Cuartetera cells to produce innumerable, unauthorized Cuartetera clones.  Further, only the Crestview Defendants have records of this activity, making Plaintiffs more likely to prevail on their claims for an ***equitable accounting*** for their genetic material.

**14.     New Material Evidence of Spoliation.**   On December 28, 2020, Ms. Ash Price, manager of the Park Place Polo Defendants, left a voicemail with Julio Arellano, which clearly demonstrates that the that Park Place Polo Defendants, with the knowledge and consent of the Crestview Defendants, have acted in secret to remove the three clones from the jurisdiction of this Court. The **attached transcript** and subsequent text message are shocking as they evince a brazen and concerted effort by the Park Place Defendants and Arellano to conceal the location of the clones from the Court and Plaintiffs. See [**Exhibit**

**16**, *transcript of voicemail*, and see **Exhibit 17 [#** JA-Amista000027:]**.**, a follow-up message the next day that states:

[12/29/20, 4:19:16 AM] julio arellano: I hope your place looked good and sorry I missed you. See you soon in Fla

[12/29/20, 4:19:09 AM] Ash Price: Morning Julio

[12/29/20, 4:19:24 AM] Ash Price: Yes I think we just need to try and conceal their whereabouts !

[12/29/20, 4:19:33 AM] Ash Price: They're speculating as people think they're in KY

**Support of the Merits.**   These messages establish spoliation and obstruction by the Crestview Defendants, in consort with the Park Place Polo Defendants, and illustrate that harm to Plaintiffs quickly becomes irreparable, because it is highly difficult if not impossible to recover unauthorized clones once they are released into the public market and concealed.

This Renewed Motion is precipitated by this recent discovery of the aforesaid facts of additional unauthorized activities, and of misrepresentations, omissions and literally false advertising, false endorsement, and reverse passing off undertaken by the Crestview Defendants, as well as additional evidence of spoliation and obstruction.   This new information substantially increases Plaintiffs' probability of success on the merits, and makes injunctive relief even more necessary.   See. e.g.: *Osmose, Inc.,* supra, 612 F. 3d at 1319.   These activities, acts and omissions were concealed from the Court at the January 29, 2021 Hearing on the initial TRO motion.   Further, the newly-discovered evidence completely rebuts the factual and legal position of the Crestview Defendants that the 2009 Agreement is alive in 2020 and allows the Crestview Defendants' unilateral production, advertising and sale of Cuartetera and other Plaintiff's horse clones.

The Court has previously expressed its own significant doubts about Defendants'
theory that the 2009 Agreement gave Defendants a unilateral right to produce and sell
clones of Plaintiffs' horses.  At the January 29, 2021 Hearing, the Court expressed that
skepticism:

> THE COURT: Well, **it seems to me that reading of that contract is a bit of a
> stretch.** I mean, how then do you reconcile the references to joint determination
> of final sales prices and terms?
> I mean, if that were the case, this would have just been an outright sale of the
> genetic material forevermore, and it seems **that is inconsistent, at least with the
> public representations of the Defendants** and the Plaintiffs, that they never
> wanted to give up the original clones themselves because that was essentially
> giving away the farm, so to speak.

**Exhibit 1**, Transcript of January 29, 2021 TRO Proceedings, 118:20-119:4.

> THE COURT: But I guess, **what authority** do you have for the notion that a
> licensing right equates to the authority sort of **to unilaterally sell** the underlying
> property itself?
> MR. WOODFIELD: Your Honor, that is the custom and trade in the industry,
> again which is addressed by Mr. Meeker in his declaration at paragraph eight.
> THE COURT: So you are saying to establish sort of wholesale practices in this
> industry, **I would turn to Mr. Meeker's view of what is acceptable**?
> MR. WOODFIELD: Well, but that -- if need be, additional evidence could be
> introduced as to what is the common practice in the trade. …

**Exhibit 1**, Transcript of January 29, 2021 TRO Proceedings, 120:10-21.

> THE COURT: **That may be, but it just seems a bit at odds with the
> representation**, at least in the submitted articles, that selling the clones
> themselves would be akin to really sort of gutting the entire value of the operation.
> ***
> THE COURT: I understand that point, assuming the 2009 agreement is valid. I'm
> willing to assume that for purposes of argument, **but it still seems a bit
> unpersuasive to me that that language would grant Defendants sort of
> complete and unilateral ability to sell original clones without any assent on
> the part of Plaintiffs,** but I think we have covered this sufficiently.

**Exhibit 1**, Transcript of January 29, 2021 TRO Proceedings, 121:1-4; 18-24.

The implausibility of the Crestview Defendants' position is now much more clear,
given the new material evidence set forth herein.  In support of the request for temporary

relief, Plaintiffs not only rely upon all of the attached Exhibits, but upon the Second Amended Complaint and all Exhibits thereto.  [DE 122].

## Legal Argument

To obtain a temporary restraining order, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam); *Levi Strauss & Co. v. Sunrise Int'l. Trading Inc.,* 51 F. 3d 982, 985 (11th Cir. 1995) (applying the test to a request for a preliminary injunction in a Lanham Act case); *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).  Further, "injunctive relief is available" on other Lanham Act claims, "not only [upon] trademark infringement claim[s]".  See 15 U.S.C. § 1116(a). " *Adidas, A.G. v. Addidascrazylight2.com,* Case 1:13-cv-21230-CMA  (S.D.Fla. April 16, 2013)  *16, fn.5. (granting ex parte temporary restraining order for Plaintiff upon complaint alleging trademark counterfeiting and infringement; false designation of origin under section 43(a) of the Lanham Act, and unfair  competition under Florida's common law).   As well, the existence of a contract does not bar a Plaintiff from simultaneously prosecuting Lanham Act claims.  *Aronowitz, supra,*  513 F.3d at 1234.[5]

---

[5] See also *Ferrellgas Partners., L.P. v. Barrow*, 143 F. App'x 180, 186 (11th Cir. 2005) (interpreting "stock sale agreement" to determine whether plaintiff had a "substantial likelihood of proving that it owned the 'Barrow' name"); *Canes Bar & Grill of South Florida v. Sandbar Bay,* 343 F. Supp. 3d 1236 (S.D.Fla. 2018), citing *Ferrellgas Partners,* supra, and interpreting a "Sale, Transfer and Assignment, and Covenant" in context of trademark infringement claim, and granting preliminary injunction).  See also *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1550 n.14 (M.D. Fla. 1990) (affirming jury's verdict finding defendants' conduct violated the Lanham Act *and* breached a contract that included a "use restriction").

<u>**Substantial Likelihood of Success on the Merits**</u>

"[S]ubstantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success*." City of South Miami v. Desantis*, 408 F. Supp. 3d 1266, 1292 (S.D. Fla. 2019) (quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)).  Likewise, "[a]lthough the plaintiffs raise multiple claims against the defendants, the plaintiffs need only show a substantial likelihood of success on the merits on one claim." *Wynn-Tobler* supra, No. 06-21376-CIV, 2007 U.S. Dist. LEXIS 103306, at *14 n.5.

**1.  The 2009 Agreement and lack of performance and failure of conditions precedent.**

The relationship between Mr. Cambiaso, Meeker and Farm concerning the cloning was first memorialized in the 2009 Agreement. **Exhibit 18**.   The 2009 Agreement reads much like an exploratory letter of intent, with many conditions precedent, such as proving out the science of cloning horses, further cooperation, and formation of a future joint venture.  In fact, the 2009 Agreement failed because of the non-performance of certain conditions precedent, requiring the *mutual agreement* of Mr. Cambiaso and Meeker and Farm, including: in ¶ 3, requiring further cooperation, to agree on a "mutually acceptable program"; in ¶ 4 requiring the parties to  "jointly determine all final sales prices *and terms*"; and, in ¶ 5, requiring mutual agreement to produce additional clones of the Cambiaso horses.

It is necessary for the Parties to agree on conditional  language  necessary  for formation of  a binding contract, see, e.g., *Adams v. Suozzi*, 340 F. Supp. 2d at 283, and "[c]ontracts  are  to  be  construed  in accordance with the plain meaning of the words contained therein." *Barakat v. Broward County Housing Auth.*, 771 So. 2d 1193, 1194-95

(Fla. 4th DCA 2000). The 2009 Agreement was particularly clear, and the parties expressly agreed, that no such clones of Cambiaso horses, if such clones were ever created, could be sold *unless both* Meeker / Farm *and* Mr. Cambiaso mutually agreed *not only* as to the price of such sale, but on the *terms* of any such sale. The Court was thus correct when expressing doubt that the 2009 Agreement ever transferred title to the Cambiaso horses, or gave Meeker unilateral control over the joint venture. *See* **Exhibit 1**, TRO Transcript at 118:20 through 121:24.

The Crestview Defendants' purported reliance on the 2009 Agreement consequently fails for lack of conditions precedent. There was no agreement on terms, for example, on whether the sold clones could be bred, whether Mr. Cambiaso could have breeding rights in any sold clones, or whether Park Place Polo could create more clones. There was no "joint determination" of anything. Meeker's own prior, public admission and representation to Plaintiffs confirm the parties' intent to restrict access to the clones under the 2009 Agreement, where in public media, Meeker stated, "*If we sold one of our clones of Cuartetera or Lapa, we would be selling the original genetic material that someone else could then clone for themselves. That takes us out of the loop.*"[6]

This 2018 statement is also consistent with the 2015 email between Meeker and Mr. Cambiaso, wherein Meeker agrees not to sell Cuartetera clones to Mr. Goodman because Mr. Cambiaso tells Mr. Meeker and Mr. Meeker agrees:

> "*I wouldn't give any cuarteteras, **because cuartetera embyos are worth more than the horse itself.** I don't think it is a good deal for me – you are giving him our best blood Line.*" Meeker then responds "***Ok. I will not do the deal.***" **Exhibit 6**, Bates ## Crestview 00004430-432.

---

[6] *Cloning: Fort Worth firm seeks the best polo ponies in the world*, Jeff Hooper Fort Worth Business Press, March 24, 2018, found at:
https://fortworthbusiness.com/technology/cloning-fort-worth-firm-seeks-the-best-polo-ponies-in-the-world/

The Crestview Defendants have not, in the intervening eight months, provided any evidence to support their own interpretation of the 2009 Agreement, while the recent discovery to date demonstrably supports the doubts expressed by the Court and supports Plaintiffs' position. Thus, the evidence demonstrates that Plaintiffs have shown a substantial likelihood of success on the merits.

### 2. The Novation of the 2009 Agreement by the 2011 Quota Holders Agreement.

The tacit acknowledgement by Defendants of the 2011 novation of the 2009 Agreement also supports the likelihood of success by Plaintiffs. The Court may recall that in **Exhibit 20**, Affidavit of Ernesto Gutierrez, the intention of the parties to highly restrict production and prohibit sale of clones was agreed-upon by Defendants. Mr. Gutierrez has averred under oath that the purpose of the $ 1,533,000 payment to the Crestview Defendants was for the extinguishment of the 2009 Agreement. See **Exhibit 20**, Affidavit of Ernesto Gutierrez. To the knowledge of Plaintiffs, in the decade since the 2011 novation through the Quota Holders Agreement, no further public sales of Cuartetera or Cambiaso / La Dolfina horse clones occurred until the Crestview Defendants began their 2020 campaign of unauthorized misappropriation, advertising and sales of genetic material and clones belonging to Plaintiffs. During this time and prior, Meeker repeatedly confirmed in the public media, and to Mr. Cambiaso and Mr. Gutierrez, that no clones were to be sold. **Exhibit 21**, DE  122-25-27, media reports. All of this evidence, viewed in the context of the new evidence of Defendants' acknowledgement of the 2011 novation of the 2009 Agreement further support the substantial likelihood of Plaintiffs' success on the merits.

### 3. The Terms of the 2011 Quota Holder's Agreement Intended a Novation, and Farm and Genetics Are Both Bound by that 2011 Novation.

The Quota Holders Agreement was intended by the parties to replace all prior agreements amongst the parties[7] concerning the cloning business:  ovation.  The Quota Holder's Agreement includes an "entire agreement" ***expressly replacing*** the prior 2009 Agreement:

> 8.6. <u>Entire Agreement</u>. This Agreement shall constitute the complete agreement between the Parties in relation to the topics contained herein and replaces all the agreements, statements and understandings previous to the Parties, either orally or in writing.

New evidence reveals that both Farm and Genetics are bound by the 2011 novation, because in 2009 Farm owned 50% of Genetics, and Farm continued to own 50% of Genetics up and until 2017 when Farm acquired all rights in Genetics and became the sole and 100% owner of Genetics. **Exhibits 4, 5, 7.**[8] In sum, there is a very substantial amount of evidence to support the substantial likelihood that Plaintiffs will prevail on the merits and prove that both Farm and Genetics were bound by the 2011 Quota Holder's Agreement and its integration clause.  There is also substantial evidence to support the substantial likelihood that Plaintiffs will prevail on the merits and prove that the Crestview Defendants never possessed any unilateral rights to produce, advertise and sell clones of Plaintiffs' horses under claim of the novated 2009 Agreement.

## 4. The 2019 Side Letter Agreement Also Extinguished All Prior Cloning Agreements.

---

[7] In 2009, Farm was at least the 50% owner of Genetics and then became the 100% owner in 2017. **Exhibits 4, 5 and 7**.

[8] Taking Defendants' current interpretation to its *ad absurdum* conclusion, by 2011 the Crestview Defendants had entered into two agreements that were inherently in conflict with one another, because the 2011 Quota Holders Agreement, in addition to replacing the 2009 Agreement, also restricted the cloning rights of the Crestview Defendants, thus placing the two agreements in inherent conflict.

As well, under the 2011 Quota Holders Agreement definitions of "Member", "Parties" and "Person". Farm, as the owner of Genetics, was party to the 2011 Quota Holders Agreement.  As well, Meeker, as a "Person" agreeing with the Quota Holders Agreement, became a party to the Quota Holders Agreement and has made repeated public statements using the first-person "me" to discuss "his" equine cloning and polo endeavors rather than adhere to or respect the separateness of any of the corporate entities.  **Exhibit 21**, DE122-26, 26, 27. **Exhibit 35**.

There is also substantial evidence to support the conclusion that the 2019 Side Letter Agreement also extinguished all prior cloning agreements amongst the parties.   To the extent that the 2009 Agreement was not extinguished for a lack of performance, failure of conditions subsequent, or extinguished by novation though the Quota Holders Agreement, ¶ 12 of the 2019 Side Letter Agreement expressly provided:

> **12. Entire agreement:** This agreement constitutes the entire agreement between the Parties with reference to the subject hereof and supersedes all prior written or verbal negotiations, understandings, representations and agreements, if any.

**Exhibit 22**.  As well, ¶ 4 of the 2019 Side Letter Agreement *also required mutual consent* by Plaintiffs and the Crestview Defendants for the sale price of any embryos of clones:

> In the event of a future sale of embryos or horses from the Clones, the parties shall agree on a market price that does not lead to a fall in prices.

The Crestview Defendants have not and cannot produce any evidence that Mr. Cambiaso nor La Dolfina ever agreed to the sale price, let alone the terms, of the putative, unauthorized and unilateral sale of Cuartetera clones and license to produce more Cuartetera clones to the Park Place Polo Defendants.  Plaintiffs therefore have further established a substantial likelihood of success on the merits under the Second Amended Complaint.  [DE 122].  New evidence now has been presented to this Court by Plaintiffs establishing that the substantial likelihood that Plaintiffs can now prove at trial that Defendants' representation to the public purchasers of the clones were false. That new evidence demonstrates that, by March 11, 2020, Meeker had knowledge that there was a dispute amongst the parties concerning the interpretation of both the 2009 Agreement and 2019 Side Letter Agreements. [**Exhibits 14**, **12 and 34**].

This evidence recounted above demonstrates likely success on all of Plaintiffs' claims, including, for example, Plaintiffs' claim for conversion. "Under Florida law, a

plaintiff may establish a claim for conversion by showing: (1) an act of dominion wrongfully asserted, (2) over plaintiff's property, and (3) inconsistent with plaintiff's ownership thereof." *Mathieson v. Am. Media*, No. 05-80823-CIV, 2006 U.S. Dist. LEXIS 112243, at *8 (S.D. Fla. Mar. 13, 2006).

Plaintiffs also now demonstrate from the new discovery a substantial likelihood of success on the merits of Plaintiffs' Lanham Act claims. The SAC is replete with examples of false advertising by the Crestview Defendants, such as the Crestview Defendants misrepresentations to the Castagnolas that they would purchase "Colibri or Aiken Cura clones" from Defendants, with Meeker describing the clones as *his*, [DE 122 at ¶ 237] ("buy one of *my* new Colibri or Aiken Cura clones") (emphasis added), an allegation of misleading statements sufficient on its own. Plaintiffs further allege that the Crestview Defendants made ***literally false claims*** to Mr. Borodin and Park Place Polo, competitors of Plaintiffs, in the Secret Cloning Agreement, when the Crestview Defendants *represented* to the Park Place Polo Team that: (1) Farm **did not need the approval** of any other person or entity to sell or otherwise convey La Dolfina Cuartetera clones; (2) **there were no suits or actions** threatened by anyone that could affect Farm's claimed ability to perform its obligations to produce and deliver the Cuartetera clones to Park Place Polo Team; (3) Farm **had not breached the 2009 Agreement**; (4) **that no event had occurred;**which would prevent Farm from enforcing the 2009 Agreement; and (5) all Cuartetera clones being produced under the Secret Cloning Agreement **were being produced pursuant to the** 2009 Agreement. [DE 122 ¶ 24].

Plaintiffs have now presented to the Court additional evidence demonstrating a substantial likelihood that Plaintiffs will be successful in proving that these statements by

the Crestview Defendants were patently false and actionable under the Lanham Act.  DE 122 ¶ 34.

### Irreparable Harm

The Eleventh Circuit has acknowledged that "once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim, "there is a "presumption of irreparable harm." *North American Medical. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) [citations omitted].  The same is true of Lanham Act claims.  *Id.* at 1229 (stating that the district court "may well decide that the particular circumstances of the instant case bear substantial parallels to previous cases such that a presumption of irreparable injury is an appropriate exercise of its discretion in light of the historical traditions").  *Id.* at 1228.

Based upon the new evidence, particularly as to the continued production and sale of the clones and the spoliation by hiding the clones, when taken together with the unrebutted averments of the SAC, that Plaintiffs are the registered owners of the original horses such as Cuartetera [**Exhibit 29**], and that the horses are literally the life-blood of reputation, good will and success to competitive polo athletes and their teams, Plaintiffs have demonstrated irreparable harm from the unilateral sale and distribution by Defendants of the clones into the world market by Defendants.  Although the Court is permitted to presume irreparable harm from the likely consumer confusion in this case, it is not necessary to rely on a presumption because the evidence supports the conclusion that there is a substantial likelihood of success on the merits.    *Adidas, A.G. v. Addidascrazylight2.com,* Case 1:13-cv-21230-CMA (S.D. Fla. April 16, 2013) * 13 (granting ex parte temporary injunction).

The Secret Cloning Agreement, its Amendments, and the Affidavits from Bartolome Castagnola, Camilla Castagnola and Roberto Zedda, establish that the Crestview Defendants have tried and continue to market and sell clones from tissue belonging to the Plaintiffs. See **Exhibits 2, 23, 24, 31**.   The Crestview Defendants have also sold Park Place Polo a license to clone and related technology thus enabling a proliferation of Cuartetera clones causing further immediate and irreparable injury to the Plaintiffs. See **Exhibit 9**.[9] The Court may recall that Plaintiffs previously provided the Court evidence that, on December 1, 2020, Mr. Meeker admitted to Camila Castagnola that he and his Crestview entities are presently making clones of Plaintiffs' polo horses, stating:

- "*You guys should buy one of my new Colibri or Aiken Cura clones! I'm making new Lapa clones too*;"
- that all of Plaintiffs' "*Cuartetera*" polo horse clones are already "*all spoken for*;" and
- that Mr. Meeker has "*babies of Cuartetera*" for sale.

**Exhibit 23,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto and images below. The Court was then also provided with evidence that Mr. Meeker called Mr. Castagnola in early December, 2020, offered to sell Mr. Castagnola cloned polo ponies of Lapa, Aiken Cura and Colibri; stated that Mr. Meeker owned those clones , and  represented that Defendants would imminently begin selling clones of Cuartetera.  **Exhibit 24,** *Affidavit of Bartolome Castagnola* ¶¶ 5, 8 and 9.

Now, Plaintiffs **bring to the Court additional evidence**, outlined above, providing strong evidence of the ongoing, unilateral, unauthorized sale of clones of Plaintiffs' horses,

---

[9] The *Second Affidavit* of Mr. Zedda, attached to the Second Amended Complaint, further establishes the ownership of the original horses from which the clones were misappropriated.

of false advertising, and of spoliation and obstructive conduct, thus demonstrating a substantial likelihood of success on the merits on one or more claims of the SAC. *City of South Miami v. Desantis*, supra, 408 F. Supp. 3d at 1292; *Wynn-Tobler* supra, No. 06-21376-CIV, 2007 U.S. Dist. LEXIS 103306, at *14 n.5.

The SAC contains two separate, non-duplicative injunction claims, Counts I and XX, which seek distinct remedies from one another. Count I is aimed at the original misconduct by enjoining all the Defendants from the selling of clones without authorization, while Count XX seeks to enjoin the removal of the clones from the jurisdiction of this Court to avoid the spoliation by removal of relevant evidence, as well as enjoining further sales of clones under the Secret Cloning Agreement and Amendments.

The Lanham Act also allows this Court to issue a Preliminary Injunction, and later make that injunction permanent based upon the new evidence which establishes the falsity of Defendants' Representations in Section 6.1 of the Secret Cloning Agreement, which continued via its Amendments *during the pendency of this litigation,* that: (1) Farm **did not need the approval** of any other person or entity to sell or otherwise convey La Dolfina Cuartetera clones;(2) **there were no suits or actions** threatened by anyone that could affect Farm's claimed ability to perform Farm's obligations to produce and deliver the La Dolfina Cuartetera clones to Park Place Polo Team; (3) Farm **had not breached the 2009 Agreement**; (4) **that no event had occurred;** which would prevent Farm from enforcing the 2009 Agreement; and (5) all La Dolfina Cuartetera clones being produced under the November 9 Secret Cloning Agreement **were being produced pursuant to the** 2009 Agreement.  See DE 122 ¶ 24. Plaintiffs have now presented to the Court additional evidence demonstrating a substantial likelihood that Plaintiffs will be successful in proving

that these statements by Defendants were patently false and actionable under the Lanham Act.  DE 122 ¶ 34.

The additional evidence demonstrates the efforts of evasion and spoliation, as well as the continuing cloning and selling of clones by Defendants.  See, e.g., the Ash Price-Julio Arelleno text messages, and the First and Second Amendments to the Secret Cloning Agreement. **Exhibits 16 and 17.**    The additional evidence shows the existence and possession on behalf of the Crestview Defendants, as early of 2009, of 7.26 Million viable cells from Cuartetera, which were preserved for Defendants and never accounted for. **Exhibit 15**.  Thus, the risk of the irreparable harm to Plaintiffs from the uncontrolled, unaccounted-for World-wide distribution of the unique genetic material belonging to Plaintiffs' horses has now exponentially increased.  T

The new evidence further has revealed that the purchaser of the clones under the Secret Cloning Agreement is engaged in a joint venture with the Crestview Defendants for the consulting and development of the purchaser's own equine cloning laboratory, assisted by the Crestview Defendants through the "Technical Consulting and Services Agreement". **Exhibit 9**, ## Akerman00860-00970.   Further, it is apparent that the Crestview Defendants are spreading equine cell lines to other companies, such as Viagen, for production of horse clones. **Exhibit 10**, ## Crestview 000000912-923, as well as recently paying Viagen for production of more Cuartetera clones. **Exhibit 10**, ## Crestview 000000912-923.

The irreparable harm that the Plaintiffs previously identified in  December 2020 and January 2021 has now ripened.   There is no monetary remedy that can conceivably compensate for this harm, particularly in a small community such as the polo world.  See, e.g.: *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008) ("the

'small community of companies that make up [Paulsson's] potential customers may' have been confused about who was providing services in Mexico under Paulsson's mark. There was a substantial threat to Paulsson's goodwill and the value of its [] mark in Mexico and throughout its small pool of potential customers…. Such damage to Paulsson's goodwill in Mexico and worldwide could not be quantified. Thus, the damage to Paulsson could not be undone by monetary remedies").

The Court did not reach the irreparable harm analysis in rendering its previous opinion on the January 29, 2021 Hearing. However, available then and now, and to provide clarity for this Court, Eduardo Novillo Astrada, the President of the Argentine Polo Association provided an affidavit detailing examples of the irreparable harm suffered by Plaintiffs caused by the Defendants' unauthorized creation and/or distribution of Cuartetera clones. *See* **Exhibit 25**, Affidavit of Eduardo Novillo Astrada, a top professional polo player and competitor of Mr. Cambiaso, who, at ¶¶ 9–15 of his Affidavit, explains that Cuartetera is known throughout the polo world to be the "*best polo pony . . . of all time in the world*;" that the unrestricted sale of Cuartetera clones without Plaintiffs' authorization causes harm that cannot be repaired or remedied once the clones are released to the public market; that distribution of such clones "harm[s] the competitiveness of Cuartetera's owner La Dolfina S.A.;" and that the "*presence of these clones will also severely dilute the uniqueness and desirability of the specific bloodlines of the original horses*." Another Affidavit is available to this Court and is attached again, that of Santiago Ballester, the *President of the Argentine Association of Polo Pony Breeders*, who explains in his affidavit that "*if Mr. Meeker is allowed to keep cloning and re-cloning Cuartetera* **it will be impossible to undo the harm to . . . the unique place Cuartetera has** *in the world of polo*

*in Argentina, the United States and all across the world where this game is played.*" *Id.* at ¶ 28.

In addition to the new evidence contained in the Secret Cloning Agreement, its Amendments, the September 18, 2019 Viagen Cloning Agreement, the December 1, 2020 payment by the Crestview Defendants to Viagen for $ 315,000, all of which demonstrate the continued dissipation of the equine genetic material of Plaintiffs. Nonetheless, Defendants refuse to advise the Court or Plaintiffs of the location of these clones, and have refused to divulge their health, going so far as to oppose [DE 63] Plaintiffs' Motion to Inspect the Clones [DE 58][10].

Plaintiffs are the registered owners of the original polo horses from which the clones have been produced, and so the names of those horses have long-been associated with the La Dolfina and Cambiaso names and teams. **Exhibit 29.** Consequently, unilateral, unauthorized cloning of La Dolfina and Cambiaso horses and international sale of the clones has and threatens[11] to further and irretrievably dilute and distribute the unique and irreplaceable genetic material found in the La Dolfina polo pony lineages, as well as threatens to irreparably harm the ability of La Dolfina and Mr. Cambiaso to successfully compete and win at the highest levels of polo, as well. These injuries are not readily curable with later economic damage awards. **Exhibit 24,** *Affidavit of Bartolome Castagnola* ¶¶ 6, 10 and 11.

---

[10]   Two of the three La Dolfina Cuartetera clones have incurred injury and significant waste since being relocated out of Florida. One of the clones, "B 01" (later re-named "P 01" by the Crestview Defendants) was injured and infected so grievously that B 01 had to be transported to a veterinary hospital within South Carolina where the clone remained for approximately one month receiving emergency care. **Exhibit 27**, ## PPPT000346-352. The status of the other injured clone is presently unknown, but it is known to have been injured. **Exhibit 28**, ## PPPT0002-0003.

[11] Substantial "threat" of irreparable harm is sufficient to establish irreparable injury. *See, e.g., Haitian Refugee Ctr., Inc. v. Baker*, 949 F.2d 1109, 1110 (11th Cir. 1991).

Notably, each of the subsequent horse cloning contracts the Defendants have drafted and executed with others contain provisions allowing the *Defendants* to seek injunctive relief in the event of breach. See, e.g.: **Exhibit 2**, Secret Cloning Agreement (at ¶ 20); **Exhibit 30** Non-Disclosure Agreement (at ¶ 5). Plaintiffs have presented the Court additional particularized facts that Plaintiffs will suffer immediate and irreparable loss, damage, and injury. *See, e.g.*,: **Exhibit 24**, *Affidavit of Bartolome Castagnola* ¶ 11; **Exhibit 31,** *Affidavit of Roberto Zedda* ¶¶ 27-31; **Exhibit 25**, Affidavit of Eduardo Novillo Astrada, at ¶¶ 9–15; **Exhibit 26**, Affidavit of Santiago Ballester, at ¶¶ 26–28.

Plaintiffs have also shown a likelihood of success on the merits of their state law claims. *Adidas*, supra * 15. The new evidence, *alone,* and as well when read in *pari materia* with the prior evidence supplied to the Court in support of the initial TRO application, demonstrate a substantial likelihood of success by Plaintiffs on the merits of the SAC. See, e.g.: See *Osmose, Inc.* supra,, 612 F. 3d 1298, (holding a preliminary injunction could issue for a false advertising claim when the advertisements posed a reasonable threat to the plaintiff's "goodwill and market position"). With respect to the Plaintiffs' state law consumer protection claims, the Court should apply Florida common law. See *Rolex Watch U.S.A., Inc. v. Forrester,* No. 83–8381–Civ-Paine, 1986 WL 15668, at *3 (S.D. Fla. Dec. 9, 1986) (citing *John H. Harland, Inc. v. Clarke Checks, Inc.*, 711 F.2d 966,972 (11th Cir. 1983).

### Balance of the Hardships

Because Defendants have no real legal right to unilaterally advertise, produce and sell clones of Plaintiffs' horses, the risk to the reputations and goodwill associated with Plaintiffs' horses outweigh any hardship to Defendants that might occur by enjoining Defendants' activities. *Adidas,* supra, * 17. Once the unique genetic material and clones

have been further distributed in the World, the loss, damage to good will, reputation and competitive advantage on the polo field is irreparable. *Affidavit of Bartolome Castagnola* ¶ 11, **Exhibit 24;** *Affidavit of Roberto Zedda* ¶¶ 27-31, **Exhibit 31.**

Therefore, on balance, the potential harm to Defendants in restraining Defendants' use of Plaintiffs' equine genetic material and restraining Defendants' sale of clones and clone progeny from Plaintiffs' polo horses is far outweighed by the harm being suffered by Plaintiffs if such relief is not granted. *Affidavit of Bartolome Castagnola* ¶¶ 8-11, **Exhibit 24;** *Affidavit of Roberto Zedda* ¶¶ 27-31, **Exhibit 31.**

### Public Interest

The public has an interest in not being misled as to the origin, source, or sponsorship of products when making purchasing decisions. .See, e.g.: *Nailtiques Cosmetic Corp. v. Salon Sciences*, Corp., No. 96-2709-CIV-NESBITT, 1997 WL 244746 at *5 (S.D. Fla. Jan 10, 1997), citing *Scarves By Vera, Inc. v. Todo Imports*, Ltd.,544 /F.2d 1167 (2d Cir. 1976). Indeed, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1509-10 (S.D. Fla. 1995) (citing Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1180 (9th Cir. 1988)). ("The public interest in ensuring the enforcement of federal consumer protection laws is strong."); *FTC v. Mallett,* 818 F. Supp. 2d 142, 149 (D.D.C. 2011); see also *FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir. 1989) ("[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight.").

Herein, the public has an interest in purchasing *authorized* and properly trained clones of Plaintiffs' horses. **Exhibit 31**, *Affidavit of Roberto Zedda, ¶¶* 29-30*.* Further,

until the rights of the parties under the Agreements are resolved, there will continue to be substantial confusion by the public as to whether the clones sold and offered for sale by the Crestview Defendants or the Park Place Polo Defendants are in fact the property of Defendants or Plaintiffs, are authorized and endorsed by Plaintiffs and are of the quality and ability as represented by Defendants.  Further, Defendants' use of the names of the original horses belonging to Plaintiffs in association with advertising and selling the clones (i.e.: "clones of Cuartetera") will continue to deceive and mislead the public as to the authorized origins of these clones being sold.

### Notice

Notice of this motion has been given to Defendants – all of whom have appeared.

### Amount of Bond

The Court has discretion to enter a minimal bond to prevent the unauthorized and inequitable conduct. *See, e.g., Abercrombie & Fitch Trading Co. v. Abercrombiesirelands.com, et al*., Case No. 17-61810-CIV-SCOLA, 2017 U.S. Dist. LEXIS 154730 (S.D. Fla. Sept. 22, 2017); (*Adidas AG, et al. v. Adidascrazylight2.com, et al.,* Case 1:13-cv-21230-CMA (S.D.Fla. March 16, 2013).[12]

### Conclusion

Wherefore, Plaintiffs respectfully requests that the Court enter a Preliminary Injunction in the form attached hereto**.**

### L.R. 7.1 Certificate of Consultation

All Defendants have been consulted on the relief requested herein and oppose the requested relief.

---

[12] Generally, see *Alston v. www.calculator.com, et al,* Case No. 20-cv-23013-BLOOM, (S.D.Fla. July 27, 2020), granting an Ex Parte Motion for Preliminary Injunction and setting bond at $ 5,000.00: ("'[I]t is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court ... [, and] the court may elect to require no security at all.'" *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (alteration in original)."

### **L.R. 7.1.(B)(2) Request for Oral Argument**

Plaintiffs hereby request Oral Argument on the within Motion.

Respectfully submitted,

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*

Avery S. Chapman, Esq.
FL Bar No. 517321
Grace De la Gueronniere
FL Bar No. 1021673
12008 South Shore Blvd.
Suite 105
Wellington, Florida 33414
Tel. 561.753.5996
asc@chapmanlawgroup.net
grg@chapmanlawgroup.net

DAVIS GRAHAM & STUBBS LLP


*Molly Kokesh, Esq*
Molly Kokesh, Esq.
Admitted pro hac vice
1550 17th Street, Suite 500
Denver, Colorado 80202

Tel: (303) 892-9400

molly.kokesh@dgslaw.com

*Counsel for Plaintiffs La Dolfina S.A.
LLC and Adolfo Cambiaso*

31

## **Certificate of Service**

      I HEREBY CERTIFY that on the date appearing on the first page of this document, I electronically filed the foregoing with the document with the Clerk of the Court using the CM/ECF filing system, which will then serve  all counsel of record or pro se parties on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*

Avery S. Chapman, Esq.

**Service List**
La Dolfina, S.A., LLC, et al. v. D. Alan Meeker, et al.
CASE NO. 9:20-cv-82231-AMC/BER

Gary A. Woodfield
Nason Yeager Gerson Harris & Fumero, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
561-686-3307
gwoodfield@nasonyeager.com, bpetroni@haileshaw.com, sdaversa@nasonyeager.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Ryan Dwight O'Quinn
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
305-423-8553
Email: ryan.oquinn@dlapiper.com , javier.rodriguez@dlapiper.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Caitlyn Elizabeth Hubbard, Esq.
William N. Warren, Esq.
Kelly Hart & Hallman
201 Main Street Suite 2500
Fort Worth, TX 76102
817-332-2500
Email: caitlyn.hubbard@kellyhart.com, bill.warren@kellyhart.com
*Counsel for Defendant Alan David Meeker and Defendant Crestview Farm, LLC.*

James C. Bookhout, Esq.
Jason S. Lewis, Esq.
DLA Piper LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
(214) 743-4549
Email: james.bookhout@dlapiper.com, jason.lewis@dlapiper.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Robert I. Chaskes, Esq.
Noelle P. Pankey, Esq.
AKERMAN LLP
777 South Flagler Drive Suite
1100 West Tower
West Palm Beach, Florida  33401
(561) 653-5000
robert.chaskes@akerman.com
noelle.pankey@akerman.com
*Counsel for Defendant Park Place Polo Team Corporation, and
For Defendant Park Place Polo Fields Corporation.*