UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION

CASE NO.: 9:20-cv-82231-AMC/BER

LA DOLFINA S.A. LLC,
a Florida limited liability company, and
ADOLFO CAMBIASO, individually

       Plaintiffs,

v.

D. ALAN MEEKER, individually,
a/k/a ALAN MEEKER,
a/k/a DAVID ALAN MEEKER,
CRESTVIEW FARM, LLC,
a Texas limited liability company, and
CRESTVIEW GENETICS, LLC,
a Nevada limited liability company,

       Defendants.

_____/

## THIRD AMENDED COMPLAINT

As and for their Third Amended Complaint and Action for Declaratory Relief,[1] Plaintiffs La Dolfina S.A. LLC ("La Dolfina") and Adolfo Cambiaso ("Mr. Cambiaso") (collectively "Cambiaso / La Dolfina"), allege and set forth their Third Amended Complaint[2] against Defendants D. Alan Meeker a/k/a Alan Meeker a/k/a David Alan Meeker ("Meeker"), Crestview Farm, LLC ("Crestview Farm" or "Farm") and Crestview Genetics, LLC ("Crestview Genetics" or "Genetics") (Meeker, Farm and Genetics, collectively the "Crestview Defendants").

---

[1] Plaintiffs submit this Third Amended Complaint consistent with the directions of the Court in its August 19, 2022 Omnibus Order of Motions to Dismiss [ECF Nos. 144, 167, 168, 234] and Motion for Preliminary Injunction [ECF No. 179] ("Order on Motions to Dismiss") [ECF No. 299].

[2] In the Order on Motions to Dismiss [ECF 299], the Court held that the Counterclaims by Cambiaso/La Dolfina in the consolidated case under Case No. 21-81066-CIV-AMC/BER have survived.   Therefore those Counterclaims by Cambiaso/La Dolfina are incorporated by reference within this Third Amended Complaint.

## I.     <u>Allegations Common to All Counts</u>.

### A.     **A History of the Contractual Relationship.**

1.     This case concerns the evolution and dissolution of an equine cloning venture spanning more than 10 years.   During this time, Meeker, as manager of both Farm and Genetics, utilized the Farm and Genetics entities interchangeably and as his alter-egos.

2.     This case is about an ongoing unlawful and fraudulent scheme orchestrated by the Crestview Defendants to misappropriate unique and invaluable horses and genetic material owned by Plaintiffs, by creating the fiction of a magically-resuscitated 2009 Agreement, so that the Crestview Defendants could give the false impression that Crestview Farm had the authority and title to convey clones and genetic material of the World's best polo horses belonging to Plaintiffs, and then make and sell clones of those horses to the international market.

3.     During November 2010, and contemporaneously with an auction in Argentina where an ownership interest in the first polo horse clone was sold, the parties abandoned the idea of selling clones because once a clone is sold, its genetic material is forever propagated, and it can be continually cloned. Instead, the parties decided to start a new venture in Argentina to provide cloning services and sell only offspring of clones[3] (rather than clones themselves).

4.     Since November 2, 2009, if not earlier, Crestview Farm was the 50% owner of Crestview Genetics, and as of December 31, 2017, Crestview Farm became the 100% owner of Crestview Genetics. Exhibits [1, 2, and 3] the Operating Agreement of Genetics, the Purchase and

---

[3] A clone is a genetically identical copy of a cell or an organism, that is not created from two parents and is not the product of sexual reproduction. A clone of a horse has the identical DNA as the original horse.
"Clones are genetic copies of an animal," says Larisa Rudenko, Ph.D., a Molecular Biologist and Senior Adviser for biotechnology in at the FDA Center for Veterinary Medicine.

By contrast, offspring of clones differ from clones in that: offspring are (i) formed from two parents; (ii) the product of sexual reproduction; (iii) involve formation and fusion of two gametes (reproductive cells); and (iii) offspring of the same parents differ in their genetic constitution.

Sale Agreement by Crestview Farm with its Crestview Genetics Co-Member, and the Assignment of 100% of Membership Interests in Genetics to Farm (collectively bates stamped "DHMCIT001 through 42").

5.      The relationship between Mr. Cambiaso and Meeker and Farm commenced with a 2009 Horse Cloning Agreement (the "2009 Agreement"). **Exhibit 4 hereto.**   Therein, Meeker, by and through Farm, and Mr. Cambiaso agreed to explore equine cloning of Mr. Cambiaso's horses, and that 2009 Agreement contemplated certain future and mutual agreements and consents between Meeker and Mr. Cambiaso.

6.      The 2009 Agreement reads much like an exploratory letter of intent, with many future events needing to occur, such as proving out the science of cloning horses, further cooperation and mutual agreements to sales price and terms, and the formation of a future joint venture. In fact, the 2009 Agreement failed or was illusory because of the non-occurrence, or non-performance of material terms set forth in ¶¶ 3, 4 and 5 thereof, to wit: (i) Farm never acquired the cloning technology so as to be able to produce the clones; (ii) the parties never came to a mutually acceptable agreement as to the endorsement marketing; (iii) the parties never came to a mutual agreement as to the final sales price and terms of sale of any clones; and (iv) the parties never came to an agreement as to production of the additional "second edition" clones.

7.      More specifically, the 2009 Agreement was particularly clear, and the parties expressly agreed, that no such clones of Cambiaso horses, if such clones were ever created, could be sold *unless both* Meeker / Farm *and* Mr. Cambiaso agreed *not only* as to the price of such sale, but on the *terms* of any such sale. The 2009 Agreement never transferred title to the Cambiaso horses, nor gave Meeker unilateral control over the joint venture.

8.    Certain provisions of the 2009 Agreement required the occurrence of future events, as, and thus those provisions were so indefinite that the promises of future agreement did not constitute a contract at all.   For example, the 2009 Agreement required the *mutual agreement* of Mr. Cambiaso and Meeker and Farm in the following paragraphs: in ¶ 3, requiring further cooperation, to agree on a "mutually acceptable program"; in ¶ 4 requiring the parties to "jointly determine all final sales prices *and terms*"; and, in ¶ 5, requiring mutual agreement to produce additional clones of the Cambiaso horses, to wit:

3.    Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

4.    Sale of Clones.  Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.  Owner and Crestview will jointly determine all final sales prices and terms.

5.    Number of Clones.  Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.  If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

9.    The 2009 Agreement, was therefore illusory, in whole or in part, because the parties failed to agree on its material terms.

10.    Additionally, even if a valid agreement was even formed (which Plaintiffs deny), it was later terminated, novated and forever extinguished or abandoned by, inter alia, the parties' agreement to novation, via the March 23, 2011 Quota Holders Agreement (the "Quota Holders Agreement").   **Exhibit 5.**

11.    The named parties to the 2011 Quota Holders Agreement were Ernesto Gutierrez, a friend and business associate of Mr. Cambiaso, Adolfo Cambiaso, and Crestview Genetics, LLC.

4

However, because of the manner in which the parties were defined (by "Groups"), and because of the common ownership and management and close relationship of Alan Meeker to both Crestview Genetics and Crestview Farm, all three Crestview Defendants were actually party to this 2011 Quota Holders Agreement.   In the present litigation, neither Plaintiffs nor Defendants have challenged the validity of this Agreement.

12.     Farm was a party to the 2011 Quota Holders Agreement by virtue of Farm's 50% ownership of Genetics pursuant to the November 2, 2009 Operating Agreement of Genetics. **Exhibit [1]**.   In fact, Farm later became a 100% owner of Genetics pursuant to the December 31, 2017 Purchase and Sale Agreement and Assignment to Farm of the remaining 50% of Genetics. **Exhibit [2 and 3]**.

13.     The Quota Holders Agreement formed the Argentine equine cloning company "Crestview Genetics SRL", for the purpose of cloning horses, amongst Meeker, Genetics, Farm, Mr. Cambiaso, and Mr. Julio Ernesto Gutierrez Conte ("Ernesto Gutierrez"), an Argentine businessman.

14.     As well, the 2009 Agreement was terminated by the course of conduct of the Crestview Defendants, which did not rely or otherwise ever act upon the 2009 Agreement for over 10 years, while simultaneously acting upon the provisions of the 2011 Quota Holders Agreement and subsequent Agreements in 2019.

15.     The 2011 Quota Holders Agreement cancelled, terminated and replaced all prior agreements amongst the parties regarding the topic of equine cloning, pursuant to Section 8.6 thereto. The 2009 Agreement was cancelled, discharged, terminated and/or replaced by the Quota Holders Agreement.

16.     The Quota Holders Agreement provided that Crestview Genetics SRL, the Argentine entity being formed, was to be managed by Ernesto Gutierrez, who was also funding the operations of that new company. The parties to the Quota Holders Agreement expressly agreed that the parties' performance under the Quota Holders Agreement would not result in a breach or default of any other agreement to which they were parties.

17.     Ernesto Gutierrez paid Mr. Meeker $ 1,533,000 (U.S.) as consideration for the cancelation, termination, extinguishment and/or replacement of the 2009 Agreement and this payment included reimbursement for money expended by Meeker to clone horses under the 2009 Agreement.   Meeker directed to which Meeker entities such payments were to be made by Mr. Gutierrez.

18.     The other parties each performed under the Quota Holders Agreement, which was a legally valid agreement.

19.     After the making of the 2011 Quota Holders Agreement, for the ensuing ten (10) years, no further mention of the 2009 Agreement, nor of any purported continuing rights of Meeker or Farm under that extinguished or abandoned agreement, was thereafter made by Meeker, nor by Farm, nor Genetics, nor anyone else. Thus, any purported "rights" arising thereunder have been discharged, extinguished, abandoned, or otherwise waived by the subsequent course of conduct of the Crestview Defendants.

20.     Finally, if the 2009 Agreement was not novated or extinguished, or if the subsequent course of conduct of Defendants did not clearly demonstrate the termination of the 2009 Agreement, that Agreement, as set forth more fully herein, was materially breached in multiple ways in 2020 by the Crestview Defendants.

6

21.     However, in the interim, in 2019, the parties decided to terminate the 2011 Quota Holders Agreement according to the terms of that agreement.   In so terminating, the parties agreed to create two new agreements: the 2019 Settlement Agreement, **Exhibit 6**, and the 2019 Side Letter Agreement, **Exhibit 7.**

22.     The 2019 Settlement Agreement, **Exhibit 6,** dated July 29, 2019, expressly terminated the 2011 Quota Holders Agreement, and disbursed the assets of Crestview Genetics SRL amongst the parties.

23.     Contemporaneously with the July 29, 2019 Settlement Agreement, Genetics and the Cambiaso / La Dolfina parties came to an agreement to produce clones of La Dolfina horses for Mr. Cambiaso on a very limited basis.   This offer was accepted by Mr. Cambiaso / La Dolfina, and the offer and acceptance is known as the "2019 Side Letter Agreement." **Exhibit 7**

24.     The 2019 Side Letter Agreement explicitly stated that the parties "wish[ed] to continue developing business with horse breeding and clones," that La Dolfina would be the registered owner of certain clones, that Crestview Genetics LLC "has certain breeding, cloning, trademark and licensing marketing rights of each of the Clones," and that "[t]he Parties wish to enter into this this agreement in order to regulate certain specific matters."

25.     The 2019 Side Letter Agreement between Mr. Cambiaso, La Dolfina and Genetics, managed by Meeker, strictly limited the right of action by the Crestview Defendants, *expressly requiring*: (i) mutual agreement of the parties as to the sale price of any clone of Cambiaso / La Dolfina horse, if there were to be such a sale; (ii) that all equine tissue relating to the Cambiaso / La Dolfina horse clones were then and "shall always be" under the custody and control of the parties; (iii) clones created under the Side Letter Agreement "shall only be played on a La Dolfina branded team, and all other uses of such clones was prohibited"; (iv) that Meeker was allowed to

7

create only 2 clones of La Dolfina's famous polo pony "Dolfina Cuartetera" for his and his children's amateur, non-professional use; (v) that Meeker was prohibited from further cloning of his two Dolfina Cuartetera clones; and (vi) in the event further Dolfina Cuartetera clones were made by Meeker or Crestview, or were sold or transferred, then the Meeker Dolfina Cuartetera clones and any clones therefrom shall be delivered to Mr. Cambiaso within 48 hours.

26.     The parties to that Side Letter Agreement also expressly agreed that the 2019 Side Letter Agreement constituted the entire agreement between the parties with respect to the equine cloning of Cambiaso / La Dolfina horses, and the parties further expressly agreed that the Side Letter Agreement superseded all prior written or verbal negotiations, understanding, representations and agreements, if any.

**b.     Subsequent Developments.**

27.     The within lawsuit was commenced December 8, 2020 and Amended subsequently. Since then, the Farm and Crestview Defendants have admitted Farm assigned certain past (though previously terminated) rights under the (invalid or previously cancelled) 2009 Agreement to Genetics (the **"Admission of Assignment"**).   During the months following that Admission of Assignment, the Crestview Defendants have never denied nor attempted to retract this Admission.

28.     Further, it has also now been discovered that at least <u>twenty-two</u> (22) clones of Dolfina Cuartetera have been created by the Crestview Defendants, although Defendants' counsel represented to the Court on September 29, 2021 that no further sales of Cuartetera clones were contemplated.

29.     In June 2021, after a court-ordered turnover of documents to Plaintiffs by the Crestview Defendants, Plaintiffs learned that on November 9, 2020, the Crestview Defendants sold three (3) Dolfina Cuartetera clones to Pegasus Rider Limited ("Pegasus"), a closely-related

entity and agent of Park Place Polo Team Corporation ("Park Place Polo Team") and Park Place Polo Fields Corporation ("Park Place Polo Fields") (collectively, the "Park Place Polo Entities").

30.     Discovery has shown that both Pegasus and the Park Place Entities are ultimately beneficially owned and controlled by Andrey Borodin, a Russian billionaire and exile living in the United Kingdom who owns a competitor polo team called Park Place Polo Team.

31.     Plaintiffs also learned from that production of documents by Defendants that the Crestview Defendants had additionally sold to Pegasus an option for the creation and purchase of seven (7) additional Cuartetera clones, and the ability for Pegasus to create more Cuartetera clones.

32.     Park Place Polo Team is a direct competitor to Mr. Cambiaso and La Dolfina in the highly competitive professional polo industry.

33.     This sale of up to a total of 10 Dolfina Cuartetera clones was memorialized in a November 9, 2020 Horse Purchase and Sale Agreement (the "2020 Secret Horse Purchase Agreement"). **Exhibit 8.**   Defendants withheld the 2020 Secret Horse Purchase Agreement from Plaintiffs for more than 6 months during this litigation, until the production of that Secret Horse Purchase Agreement was forced by Court Order.

34.     The total purchase price paid to the Crestview Defendants for the sale of the first three (3) Dolfina Cuartetera clones under the 2020 Secret Horse Purchase Agreement is $2,400,000, or $800,000 per horse.   The price for exercising the option to purchase seven (7) more clones was set at $2,905,000.00.

35.      In the 2020 Secret Horse Purchase Agreement, the Crestview Defendants made material representations to Pegasus as to Mr. Cambiaso, below, which were untrue or inaccurate.

6.1    Seller is a limited liability company, duly formed and existing in good standing under the laws of the State of Texas. Seller has obtained the approvals of all persons whose approvals are required to enter into this Agreement and perform its obligations hereunder. The person executing this Agreement on behalf of Seller has full corporate authority to do so. Seller's entering into this Agreement, consummating the transactions and performing the obligations hereunder will not result in any breach of, or constitute a default under, any agreement to which Seller is a party or any order, writ, injunction, decree or demand of any court or governmental authority to which Seller is bound. There are no actions, suits or proceedings pending against Seller, or, to the best of Seller's knowledge, threatened  that could affect Seller's ability to perform Seller's obligations to Buyer under this Agreement.  As of the Effective Date, Seller has not breached the Horse Cloning Agreement, and Cambiaso has not sent Seller notice of any breach of the Horse Cloning Agreement or otherwise alleged or contended that Seller is not entitled to enforce the Horse Cloning Agreement or License in accordance with its terms. To the best of Seller's knowledge there has been no waiver or any other event that would limit Seller's right to enforce the Horse Cloning Agreement and/or License in accordance with its terms. This Agreement is legal, valid, binding and enforceable against Seller in accordance with its terms.

36.    Specifically *untrue or inaccurate* were Crestview's representations to Pegasus that: (i) Crestview would not be in default of any other agreement to which Crestview was a party; (ii) there were no threatened suits or proceedings which could affect Crestview's ability to sell the clones; (iii) Crestview had not breached the 2009 Agreement; (iv) Mr. Cambiaso had not contended that Crestview was not entitled to produce and sell clones under the 2009 Agreement; (v) there were no other waivers or events that would limit Crestview's right to rely upon and enforce the 2009 Agreement.

37.    Nevertheless, and despite these misrepresentations, through the 2020 Secret Horse Purchase Agreement, the Crestview Defendants purportedly (i) sold three (3) Cuartetera clones to Pegasus, and (ii) granted an option to Pegasus for the purchase 7 more Cuartetera clones.

38.    Further, the Crestview Defendants breached the prior agreements with Mr. Cambiaso and La Dolfina by misrepresenting to Pegasus that: (vi) the Dolfina Cuartetera clones sold to Pegasus were "free and clear of any claims by Cambiaso"; (vii) while the Crestview Defendants would not produce any further Cuartetera clones (other than the 10 clones to Pegasus,

and 10 clones to Mr. Cambiaso, should he order them pursuant to the 2019 Side Letter Agreement); and (viii) Pegasus was sold the "right" to produce more Dolfina Cuartetera clones should Pegasus so decide.

39.     Essentially, the Crestview Defendants have sold La Dolfina horses and options under the disguise of purported rights held by Crestview Farm pursuant to the 2009 Agreement, which was illusory and in any event novated in 2011 and 2019.   Instead, the Crestview Defendants breached those prior agreements by entirely ignoring the limitations and need for mutual consent from Cambiaso in the 2009 Agreement.

40.     In sum, the Crestview Defendants have now attempted to rewrite history to give the false impression that Crestview Farm had the authority and title to convey Dolfina Cuartetera clones, acting as if the 2009 Agreement was valid or had not been terminated in 2011, novated, extinguished or abandoned, to create a new fiction to suit their improper and illegal objectives, and to support the Crestview Defendants' illicit sales of La Dolfina clones to Pegasus.

41.     The Crestview Defendants have since then continually repeat their position in numerous transactional documents and court filings, in an attempt to *gaslight* this Court, Plaintiffs, and the global public into believing the cancelled and replaced 2009 Agreement (if it was even formed) is somehow still in existence.   Not only was the 2009 Agreement invalid for lack of agreement or performance, but the 2009 Agreement had been forever terminated and replaced by the parties' agreement to enter into the 2011 Quota Holder Agreement. The 2009 Agreement was never valid or has been extinguished for almost a decade.

42.     Dissemination of clones of the horses of Mr. Cambiaso and La Dolfina into the general public will cause irreparable harm and great damage.   The Crestview Defendants recognized this obvious fact when they included an irreparable harm provision into their contract

with Pegasus.   Therein, the Crestview Defendants insisted on a provision providing that if Pegasus were to sell, transfer or assign Dolfina Cuartetera clones into the public market, the Crestview Defendants would suffer irreparable, non-monetary harm, would thus be entitled to an injunction against Pegasus, and could recover those clones and all genetic tissue of those clones.

43.     Finally, under that 2020 Secret Horse Purchase Agreement, the Crestview Defendants and Pegasus set up an indemnity and escrow structure in Florida with a Florida law firm to fund anticipated litigation by Mr. Cambiaso and La Dolfina to either "rescind" the 2009 Agreement or otherwise recover the Dolfina Cuartetera clones from the Crestview Defendants and / or Pegasus.

44.     Under that escrow structure, the Crestview Defendants escrowed $250,000 of the clone sales money paid by Pegasus with a Florida law firm, Akerman, LLP, pursuant to a written Florida-based and Florida-law and jurisdiction-governed Escrow Agreement that is within Exhibit E to the 2020 Secret Horse Purchase Agreement.   **See Exhibit 8 hereto.**

45.     Further, under that escrow structure, Pegasus, by its owner Andrey Borodin and his entities, was required to pay the costs of defense of any claims by Mr. Cambiaso / La Dolfina once the $250,000 escrow was exhausted.

46.     The escrow has been exhausted and Pegasus, by and through its affiliated entities owned or controlled by Mr. Borodin, are presently paying for the defense of the Crestview Defendants in this suit, and for the defense of the Counterclaim and Third Party Complaint in the related case (the "2021 SDFL" case) after its transfer from the Northern District of Texas.

47.     Further, during the course of this litigation, the 2020 Secret Horse Purchase Agreement has since been amended and extended four times, on December 21, 2020, June 10, 2020, October 29, 2021, and most recently on June 7, 2022 (the "Amendments").   **See Exhibits**

**9, 10, 11, 12.**   Remarkably, while the Amendments extend the time of Pegasus to exercise the option to purchase 7 additional Dolfina Cuartetera clones, they also restate and ratify the remaining material terms and the misrepresentations by Meeker, as contained in the 2020 Secret Horse Purchase Agreement.   In that sense, the subsequent Amendments each constitute a new breach of the 2019 Agreements and, to the extent Crestview alleges it is still viable, of the 2009 Agreement.

48.     For example, one of the material terms of the 2020 Secret Horse Purchase Agreement is that no litigation exists by Mr. Cambiaso to challenge the clone sale and recover the clones, and that the Crestview Defendants have no reason to know of any such litigation.   Clearly, after the December 9, 2020 inception of the within litigation, that is not the case, and the representations to Pegasus by the Crestview Defendants in the Amendments to the contrary are patently false and are breaches of the prior agreements of the Crestview Defendants with Mr. Cambiaso and La Dolfina.

**c.   Even if Not Invalid or Illusory for Lack of Future Agreement or Performance of its Material Terms, the Post-Execution Course of Conduct of the Crestview Defendants demonstrates that 2009 Agreement was Forever Terminated by the 2011 Quota Holders Agreement Novation.**

49.     The 2009 Agreement failed for lack of agreement or performance of material terms by that time. Farm never acquired the cloning technology (it was licensed by Genetics from Viagen in 2010).   The parties never came to a mutually acceptable agreement as to the endorsement marketing, nor as to the final sales price and terms of sale of any clones; nor as to the production of the additional "second edition" clones. Thus, the 2009 Agreement was never valid.

50.     In 2011, to be certain that any claimed rights under the 2009 Agreement were extinguished, the parties agreed that the 2009 Agreement was entirely cancelled, forever terminated and replaced by the mutual agreement of the parties to enter into the Quota Holders

Agreement along with payment to the Crestview Defendants of $1,533,000 in consideration paid in 2011 and 2012 by Ernesto Gutierrez.

51.     Additionally, the course of conduct by the Crestview Defendants demonstrated that the Defendants considered the 2009 Agreement to have been terminated and replaced in 2011.

52.     Throughout the next decade, Meeker, Manager of both Farm and Genetics, repeatedly told the global media that neither Meeker, the Crestview Defendants, nor Mr. Cambiaso or La Dolfina planned to make and sell clones of La Dolfina and /or Cambiaso horses commercially but were focused solely on selling only offspring of clones.

53.     Then, in 2020, almost a decade after accepting payment for the novation and termination of the 2009 Agreement (if it was not illusory), for the first time, the Crestview Defendants suddenly claimed the right to unilaterally set all sale terms, clandestinely sell, and pocket all proceeds from unauthorized creation of and sales of clones of Mr. Cambiaso's, and even more defiantly, the La Dolfina horses and genetic material.

54.     Since the filing of the initial Complaint in this case, discovery documents has revealed that the Crestview Defendants have unilaterally sold, without authorization from Plaintiffs, clones of Dolfina Cuartetera, to the general public, including direct competitors with Mr. Cambiaso and La Dolfina.   The discovery also reveals that Defendants made misrepresentations and mischaracterized the 2009 and 2019 Agreements in an attempt to articulate a plausible theory of unilateral authorization to produce and sell Dolfina Cuartetera clones to the public.

55.     Surreptitiously, the Crestview Defendants entered into the multi-million dollar 2020 Secret Horse Purchase Agreement with Andrey Borodin, a competitor of Plaintiffs through

Mr. Borodin's Park Place Polo Team, to produce and sell clones created by the misappropriation of the genetic material of Dolfina Cuartetera.

56.    Not only have the Crestview Defendants sold and delivered to Pegasus 3 unauthorized clones of Dolfina Cuartetera, and sold the option for purchase of 7 more such clones, the Defendants have made those sales to Pegasus for training and use in competition by Park Place Polo Team, all while making untrue representations to the public that the Crestview Defendants were authorized by Plaintiffs to make those sales. Borodin is the ultimate beneficial owner and decision-maker for both Pegasus and Park Place Polo Team.

57.    The clandestine and unilateral conduct of Meeker, Crestview Farm and Crestview Genetics is a clear breach of the 2009 and 2019 Agreements, unauthorized, as well as terribly heartbreaking for Mr. Cambiaso.   Mr. Cambiaso, who spent decades developing his horse breeding operation to arrive at premier horses such as Cuartetera, has for the last decade, reposed trust and confidence in the Crestview Defendants.

58.    Commencing at a November 2010 auction, the Crestview Defendants made statements to Mr. Cambiaso, La Dolfina, as well as to third parties and the global media, that no clones of horses belonging to La Dolfina and / or Mr. Cambiaso would ever be sold to the general public.

59.    The Crestview Defendants executed the 2011 and the 2019 Agreements whereby those Defendants committed to closely restrict the dissemination of the genetic material of Cambiaso/La Dolfina horses.   The 2009 Agreement likewise required the mutual consent and authorization of Mr. Cambiaso before any sale or production of clones could occur.

60.    Mr. Cambiaso and La Dolfina relied on those contractual representations by The Crestview Defendants, which contained their commitment to closely restrict the production of the

Cambiaso / La Dolfina horse clones, and the Crestview Defendants' representations that those Defendants would never sell Cambiaso / La Dolfina horse clones without the express, mutual consent of Mr. Cambiaso.

61.     The Crestview Defendants made these representations first in the now-terminated (if even formed) 2009 Agreement, and then again in conjunction with the Crestview Defendants agreement to novation and termination of the 2009 Agreement by acceptance of $1,533,000 and entering into a substituted agreement known as the 2011 Quota Holder Agreement.

62.     Further, the Crestview Defendants' course of conduct in their dealings with Plaintiffs, and the Defendants' statements to the public, during the 10 years following the execution of the 2009 Agreement, demonstrate that the Crestview Defendants did not rely upon the 2009 Agreement for any unilateral right to produce and sell clones of Cambiaso / La Dolfina horses.

63.     The Crestview Defendants' belated and unauthorized efforts to resurrect the cancelled and terminated 2009 Agreement (if ever valid) is a complete fiction, invented by Meeker and his entities to support their unlawful multi-million dollar sale of Cuartetera clones to Pegasus, in breach of the Crestview Defendants' contractual obligations to Plaintiffs.

64.     Further, the Defendants' attempt to rely, in 2020, on the long-terminated 2009 Agreement, is not only a breach of that 2009 Agreement (if ever valid), but also the 2011 and 2019 Agreements.   Additionally, that attempt to rely on the 2009 Agreement 11 years later, gives Pegasus, and the public, the false impression that the Crestview Defendants have the unilateral authority to create and sell La Dolfina horse clones and genetic material, and further gave the false impression that the Crestview Defendants had the endorsement of Mr. Cambiaso and La Dolfina to do so.

65.     Defendants' continued breaches and threatened breaches cause continuing and irreparable harm to Plaintiffs, whose horses are being cloned and sold without their authorization or consent.   Such harm, as detailed further herein, dilutes Mr. Cambiaso and La Dolfina's carefully created-bloodlines which took decades to develop, and are not generally known to the public, nor able to be replicated by the public.   Plaintiffs have also undertaken great effort, as reflected by the significant limitations and covenants in the 2009, 2011 and 2019 Agreements, to greatly restrict the access to, and dissemination of, clones of Cambiaso/La Dolfina horses. Such efforts to restrict public access to the clones and their genetic material include direct covenants in the Agreements not to produce or sell such clones without mutual agreement, no sales of clones to the general public for over 10 years, (the one 2010 auction sale being recovered by purchase at the auction by Mr. Cambiaso and his business partners), public media statements by the Crestview Defendants that clones were not available for sale to the public, and the contractual restrictions as to the personal use and ownership of a limited number of such clones by Mr. Meeker and Mr. Gutierrez.

66.     Nevertheless, Defendants have breached those Agreements and now disseminated the clones to the public, while at the same time wrongfully usurping the endorsement, prestige and brand recognition of Mr. Cambiaso and La Dolfina in the world of the sport of international polo.

67.     Plaintiffs thus seek declaratory relief to establish that the 2009 Agreement: (i) failed for lack of agreement on its material terms, (ii) was illusory in whole or in part because multiple provisions required future agreements to be reached; and (iii) to the extent the 2009 Agreement somehow survived that lack of agreement or performance, it was thereafter terminated upon the parties' novation and agreement to cancel and extinguish the 2009 Agreement by entering into the Quota Holders Agreement and the Crestview Defendants' acceptance of $1,533,000 in 2011 and

17

2012, and further (iv) to the extent that the 2009 Agreement is deemed valid by the Court (which Plaintiffs deny), it has been materially breached by the unilateral production and sale to the public of clones by the Crestview Defendants

> d.    **The Context of Cloning Polo Ponies.**[4]

68.    In the sport of polo, the quality of the horses ridden by the player of a team are the most significant part of the success of the player and the team. Meeker himself has admitted this fact in a December 2016 interview, explaining: "It's 70% to 80% the horse, and everyone, including Cambiaso, will tell you this."[5]

69.    The polo horse clones at issue are derived from the genetic stock of polo ponies ("donor" horses) owned by Plaintiffs Mr. Cambiaso and La Dolfina's parent La Dolfina S.A., an Argentine company ("La Dolfina S.A."), polo ponies that are world-renowned for their unique and superior athletic abilities, acumen, temperament, and vastly superior performance in the sport of high-goal polo. Mr. Cambiaso and his wife are the sole owners of La Dolfina S.A., and Mr. Cambiaso or La Dolfina S.A. own the donor horses and genetic material from the donor horses relevant hereto.[6]

---

[4] Horses utilized as equine athletes in the modern sport of polo are commonly called "polo ponies" though not pony-size at all.

[5] *Six cloned horses help rider win prestigious polo match*, by Jon Cohen, Dec. 13, 2016.
Source: https://www.sciencemag.org/news/2016/12/six-cloned-horses-help-rider-win-prestigious-polo-match

[6] Most cloning today uses a process called somatic cell nuclear transfer:
- Scientists take an egg from a female animal … and remove the gene-containing nucleus.
- The nucleus of a cell from an animal the breeder wishes to copy is added to the egg.
- After other steps in the laboratory take place, the egg cell begins to form into an embryo.
- The embryo is implanted in the uterus of a surrogate dam (female parent), which carries it to term and delivers it like her own offspring. Clones may allow farmers to upgrade the quality of their herds by providing more copies of their best animals…. Source: United States Food and Drug Administration, https://www.fda.gov/consumers/consumer-updates/animal-cloning-and-food-safety

70.     In Argentina, as well as throughout the World, breeders tightly control the reproductive capacities of their animals by charging stud fees or controlling the brood stock. Meeker and Crestview Farm entered into the 2009 Agreement, which was never valid or was later terminated and replaced by the 2011 Quota Holders Agreement, and later terminated by the 2019 Settlement Agreement and replaced in part by the 2019 Side Letter Agreement. Under those Agreements, the Crestview Defendants are otherwise subject to certain obligations and duties from those contractual events and novation, relating to the cloning, marketing and selling offspring of clones of Plaintiffs' renown polo ponies. None of these contractual obligations give the Crestview Defendants the unfettered, unilateral right to make or sell clones of Plaintiffs' horses. Yet, as set forth herein, the Crestview Defendants have ignored their contractual duties and obligations and Plaintiffs' rights under all of the relevant contracts and have caused, and continue to cause, actual and continuing harm to Plaintiffs.

71.     Meeker, individually and as an agent and representative of Crestview Farm, and utilizing the resources and facilities of Defendant Crestview Genetics, has:

    (a)     engaged in the unauthorized misappropriation of certain genetic material belonging to La Dolfina and from certain of La Dolfina's renowned polo ponies;

    (b)     has used La Dolfina's genetic material to create at least twenty-two (22) unauthorized clones of Cuartetera; and

    (c)     has continued to create additional unauthorized clones during the pendency of this litigation.

72.     These actions by the Crestview Defendants are direct breaches of the Agreements between the parties which restrict the use and dissemination of clones of the donor horses.

73.     The past breaches and present intentions of the Crestview Defendants, to commit further breaches of the contractual duties between Plaintiffs and those Defendants have already caused, and threaten to further cause irreparable harm to the La Dolfina and Cambiaso genetic line

19

of polo ponies, as well as to the professional performance of the owner of La Dolfina, Adolfo Cambiaso.

74.     Mr. Cambiaso is a professional 10-goal polo player, the highest ranking, and he, his La Dolfina horses, and his La Dolfina stable and team are widely regarded as the very best amongst the best in the sport of polo. Mr. Cambiaso is globally recognized as the best polo player in world history.

75.     The unauthorized cloning of La Dolfina and Cambiaso horses and international sale of the clones and genetic material threatens to irreparably harm Plaintiffs' ability to successfully compete and win at the highest levels of polo because this unauthorized distribution of Plaintiffs clones and genetic material dilutes and irretrievably distributes the unique and irreplaceable genetic material found in the La Dolfina polo pony lineages. Defendants' actions constitute breaches of contract, theft of proprietary trade secret information, and unauthorized appropriation, possession and distribution of genetic material owned by Mr. Cambiaso through his La Dolfina S.A entity. This conduct thus constitutes continuing violations of The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1) and 1839(3), as well as theft of proprietary commercial information with independent economic value, and commercial appropriation of Plaintiffs' name and identity, all in violation of the Florida Uniform Secrets Act, F.S. §§ 688.001 et seq.

76.     As with the initial Complaint, First Amended Complaint, and Second Amended Complaint, but now further informed by discovered facts of wrongdoing by the Crestview Defendants, this Third Amended Complaint therefore seeks determinations as to the contractual relationship, ownership rights, and in the alternative, breaches of contracts by Defendants in order to recover the Cambiaso / La Dolfina horse clones and related genetic material as well as to prevent the further irretrievable and irreparable dilution and dissemination of the La Dolfina genetic pool

by the unauthorized activities of Meeker, whether alone or by and through the other Crestview Defendants and other Crestview-related entities or affiliates.

77.     Despite demand by Plaintiffs to cease and desist, the Crestview Defendants have failed to cease and desist their unauthorized use, misappropriation, licensing and sale of La Dolfina and Mr. Cambiaso's genetic material and clones.   Further, on December 3, 2020, the Crestview Defendants abruptly filed an anticipatory suit in the Northern District of Texas during the pre-litigation settlement negotiations, which was later transferred to this Court as an improper anticipatory lawsuit, which lawsuit has now been dismissed by this Court.

## II.     Common Allegations of Parties, Jurisdiction and Venue.

### A.     The Parties.

78.     **Plaintiff La Dolfina S.A., LLC ("La Dolfina")** is a Florida limited liability company with offices in Palm Beach County, Florida, and is the assignee of **La Dolfina, S.A.,** an Argentine entity *Sociedad Anónima* (Corporation) which is considered an Argentine citizen and resident, and which is wholly owned by La Dolfina, S.A., which is the company's only member.

79.     **Plaintiff Adolfo Cambiaso ("Mr. Cambiaso")** is an Argentinian national, with an address in Palm Beach County, Florida who plays polo professionally in Wellington, Palm Beach County, Florida. Mr. Cambiaso is currently ranked number one in the world of international polo. In 2020, Mr. Cambiaso and La Dolfina won their eighth (8th) consecutive title at the World's most prestigious and competitive polo tournament, the 127th edition of the Argentine Polo Open ("*Abierto Argentino de Polo*").   La Dolfina has won the Argentine Polo Open fourteen (14) times in their last twenty (20) appearances, while Mr. Cambiaso, individually, has won the Argentine Open seventeen (17) times. Mr. Cambiaso, with horses and professional players provided by La Dolfina, also won in April, 2021 the most prestigious domestic tournament, the United States Polo

Championship, in Palm Beach County, Florida. As a result of Mr. Cambiaso's performance on the field and his world-renowned polo pony breeding program, Mr. Cambiaso is widely recognized as a polo superstar and the leading celebrity in the United States and in the international polo community.

80.     In addition to winning their eighth (8th) consecutive Argentine Open in December 2020, Mr. Cambiaso and La Dolfina's cloned horses including La Dolfina's renowned "Cuartetera" polo horse received the following accolades:

**Fomento Equino Cup to the best mounted player of the final:** *Adolfo Cambiaso.*

**Gonzalo Tanoira Award to the best mounted player of the tournament:** *Adolfo Cambiaso.*

**Lady Susan Townley Best Playing Pony Award:** *Dolfina B09 Cuartetera Clone*, played by *Adolfo Cambiaso*.

**BPP Polo Argentino and Best Playing Pony Sociedad Rural Argentina:** *Dolfina B06 Cuartetera Clone*, played by *Adolfo Cambiaso*.

81.     Cuartetera and her clones are uniquely and solely affiliated with La Dolfina and Mr. Cambiaso, as Mr. Cambiaso bred her, trained her, and through his playing skill and success with Cuartetera playing for the La Dolfina polo team made her the dominant equine athlete and celebrity in the world of international polo.

82.     **Defendant D. Alan Meeker a/k/a Alan Meeker, a/k/a David Alan Meeker ("Meeker")** is a citizen and resident of Tarrant County, Texas, having an address at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107.   Meeker, both individually as well as the Manager of and through and by use of the entities Crestview Farm, LLC, Crestview Genetics, LLC, and Crestview Farm Aiken, LLC, as well as through some of his other 114 entities, conducted substantial, repeated and not isolated business in Florida, as well as in Florida with La Dolfina and Mr. Cambiaso. Meeker has further come into Florida repeatedly to conduct business on behalf of

22

himself and Crestview Farm and Crestview Genetics. At all times relevant hereto, Defendant Meeker acted in Palm Beach County, Florida as the sales agent and representative of Defendants Crestview Genetics and Crestview Farm, offering Defendants' cloning services of Plaintiffs' horses.   Meeker made repeated "sales pitches" and solicited business regarding Plaintiffs' clones in Florida on behalf of himself and the other Defendants.

83.     Meeker has also availed himself of the privilege of conducting further business in Florida, registering his genetics company CQUENTIA NGS, LLC (CQuentia"), a Texas limited liability company, under FLDOS filing # M18000001107, in which he is the Chief Executive Officer and Manager, to conduct business in Florida, on January 31, 2018.   Meeker subsequently and repeatedly has filed annual reports in Florida listing Meeker as a manager of that Florida company from 2018 through the present.   In addition to being in Florida for the purpose of engaging in business solicitation and service activities as to Mr. Cambiaso and La Dolfina, S.A., Meeker also conducted business in Palm Beach County, Florida with respect to and on behalf of his genetics company, CQuentia, where he solicited individuals to raise money for CQuentia. While doing so, Meeker relied upon the reputation of having conducted cloning business with Plaintiffs.

84.     Further in addition to the Cambiaso, La Dolfina and CQuentia business activities in Florida, Meeker conducted a related cloning business in Palm Beach County, Florida during periods relevant hereto, such as with Chris Young and Overbrook Farm, LLC, owners of the famous "Storm Cat", a grandson of the racehorse "Secretariat."   Set forth below, misrepresentations by Defendants as to their rights to Storm Cat became part of the material terms of the contractual obligations of Defendants with Plaintiffs.

85.     Further, Meeker has previously availed himself of the privilege of conducting other business in Florida, registering his company, in which he is the Chief Executive Officer and Manager, TOTAL DIAGNOSTIX II, LLC ("Total Diagnostix"), a Tennessee limited liability company, under FLDOS filing # M15000007588 to conduct business in Florida, on December 23, 2015.   Meeker subsequently and repeatedly filed annual reports in Florida listing Meeker as a manager of that Florida company from 2015 through 2018. Meeker and his Total Diagnostix and CQuentia companies have been sued in both Florida state and federal courts for claims including but not limited to fraud, civil theft, unjust enrichment, and for breach of contract. [7]

86.     Meeker also resides at least part-time in Florida, at a single family, one bedroom condominium at 2211 Las Casitas Drive, in Wellington, Palm Beach County, Florida 33414. Meeker, as a manager of yet another of his companies,[8] previously contracted in Florida with a Florida company, J-5 Construction, LLC, for the renovation of that condominium. The Standard Terms and Conditions in the Construction Agreement state that the location of any dispute shall be exclusively in Palm Beach County, and Florida law is to be applied.

87.     This Court previously determined that Defendants were subject to the personal jurisdiction of this Court in Florida. See ECF 81 herein.

88.     **Defendant Crestview Farm, LLC ("Crestview Farm")** is incorporated in Texas as a Texas limited liability company having an address and principal place of business at 4770

---

[7] Meeker's CQuentia was subject to a *qui tam* lawsuit for False Claim Act violations for Anti-Kickback and Stark Law violations in *United States ex rel. Piñon v. CQuentia Series LLC d/b/a CQuentia Labs, Total Diagnostix, LLC, and Decatur Hospital Authority, d/b/a Wise Regional Health Systems.*   Meeker is the Chief Executive Officer of the CQuentia Labs conglomerate and his attorney involved in the facts herein, Mr. Eichberg, is CQuentia's General Counsel.   From:   http://www.cquentia.com/about-cquentia/our-team/

[8] According to corporationwiki.com, Alan Meeker has been associated with thirty-eight companies, according to public records. The companies were formed over a nineteen year period with the most recent being incorporated two years ago in March of 2018. Twenty-five of the companies are still active while the remaining thirteen are now listed as inactive.
Source: https://www.corporationwiki.com/Texas/Fort-Worth/alan-meeker/34667043.aspx

We are putting together the Viagen Argentina LLC agreement to govern our yearly cloning rights with Viagen and our ability to promote Viagen Argentina as the go to cloning company that we own too. The LLC will be owned 90% by Viagen's parent company Genetic Reflections, LLC. The remaining 10% is to be owned by AC, J5 and Crestview Farm (me).

Bryant Irvin Court, Suite 400, Fort Worth, TX 76107.   Meeker denies being an individual Member; however he admits he is the Manager. [DE 18-1].   At all times relevant hereto, Meeker so dominated and controlled Crestview Farm to such an extent that the independent existence of Crestview Farm is non-existent and Meeker is the alter ego of Crestview Farm. Meeker himself illustrates the lack of separateness or distinction between himself and Crestview Farm writing in a September 10, 2019 email:

> We are putting together the Viagen Argentina LLC agreement to govern our yearly cloning rights with Viagen and our ability to promote Viagen Argentina as the go to cloning company that we own too. The LLC will be owned 90% by Viagen's parent company Genetic Reflections, LLC. The remaining 10% is to be owned by AC, J5 and Crestview Farm (me).

**See Exhibit 13 hereto.**

89.    At times relevant hereto, Meeker deliberately used the corporate form of Crestview Farm fraudulently or for improper purposes, and as more fully set forth herein below, formed or used the corporate form, including but not limited to being a mere device or sham and used to commit fraud and to frustrate La Dolfina and Mr. Cambiaso and which caused and threaten to further cause injury to Plaintiffs.   Crestview Farm, by and through its agent and representative Meeker, conducted substantial, repeated and not isolated business with La Dolfina and Mr. Cambiaso in the State of Florida.   Crestview Farm further has committed the aforesaid breaches and tortious acts in Florida, having an effect on La Dolfina and Mr. Cambiaso in Florida as further described herein below.   Further, Crestview Farm conducted a cloning business with Plaintiffs, Mr. Cambiaso, La Dolfina's parent and assignor, and others in Palm Beach County, Florida during periods relevant hereto.

90.    Since 2009, according to the written admission of Defendants in this litigation, **"_Farm_ assigned the right to possess or create certain clones to _Genetics_…."** See [ECF 18 *3]

25

(Defendants' Motion to Dismiss, emphasis added) previously filed by Defendants in this case. This event has become known in this case as the **"Assignment"** and counsel's statement has become known as the **"Admission of Assignment."**

91.     However, any such purported assignment of rights by Farm was never valid because of the failure of the 2009 Agreement for lack of agreement or performance of material terms, as well as by the 2011 Quota Holder Agreement novation of the 2009 Agreement.

92.     **Defendant Crestview Genetics, LLC ("Crestview Genetics")** is incorporated in Nevada as a Nevada limited liability company, having an address and principal place of business at 4770 Bryant Irvin Court, Suite 400, Fort Worth, TX 76107. Meeker presently denies being an individual Member; however, he admits that he is the Manager.   [DE 18-1]. Since November 2, 2009, if not earlier, Crestview Farm was the 50% owner of Genetics, and as of December 31, 2017 Farm became the 100% owner of Genetics.   **Exhibits [1, 2, and 3].[9]**   .

93.     At all times relevant hereto, Meeker so dominated and controlled Crestview Genetics to such an extent that the independent existence of Crestview Genetics is non-existent and Meeker is the alter ego of Crestview Genetics. At all times relevant hereto, Meeker deliberately formed and used the corporate form of Crestview Genetics fraudulently or for improper purposes, and as more fully set forth herein below, formed and used the corporate form, including but not limited to being a mere device or sham and being used to commit fraud and to frustrate La Dolfina and Mr. Cambiaso and which caused and threaten to further cause injury to Plaintiffs. Crestview

---

[9] The pre-2017 ownership of Genetics reflected in Exhibits [1, 2, and 3] is inconsistent with a May 2016 Certificate of Interested Persons that Crestview Genetics filed in the Northern District of Texas, listing the Members of Crestview Genetics as the David Alan Meeker Family Irrevocable Trust, Dan H. Meeker, Trustee and Dan H. Meeker Family Children's Irrevocable Trust, D. Alan Meeker, Trustee. **Exhibit 14.**

Genetics, by and through its agent and representative Meeker, conducted substantial, repeated and not isolated business with La Dolfina and Mr. Cambiaso in the State of Florida.

94.     Crestview Genetics further has committed the breaches and tortious acts in Florida, having an effect on La Dolfina and Mr. Cambiaso in Florida as further described herein below. Further, Crestview Genetics conducted cloning business with Plaintiffs, Mr. Cambiaso and assignor La Dolfina S.A. and others in Palm Beach County, Florida during periods relevant hereto. Crestview is involved in breeding jumping horses, champion Arabians, thoroughbreds, and others and envisions an expanded worldwide program and exponential growth.[10]

95.     The misrepresentations of the Crestview Defendants set forth herein were made by the Crestview Defendants in Wellington, Palm Beach County, Florida.   Further, the misconduct and breaches by the Crestview Defendants have had an effect on Plaintiffs in Palm Beach County, Florida as well as elsewhere, in that Defendants have sold unauthorized clones of Plaintiffs' horses to competitors of Plaintiffs in Florida, who compete against Plaintiffs in Palm Beach County and elsewhere.

96.     **Pegasus Rider Limited** is owned by a competitor of Plaintiffs, which purchased the 3 Dolfina Cuartetera clones and holds an option for purchase of at least 7 more of those clones. Pegasus is a British Virgin Islands limited liability company with an address at Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. Discovery has shown that at times relevant hereto, Pegasus has been solely and beneficially owned by Andrey Borodin through an intermediate entity.

---

[10]  According to a telephone interview by Lewis T. Stevens with Alan Meeker on behalf of Crestview Genetics on March 14, 2016. https://uknowledge.uky.edu/cgi/viewcontent.cgi?article=1157&context=kjeanrl

97.     From the aforesaid substantial and repeated, and not isolated, activities in Florida with respect to his and Defendants' cloning and genetics business, Meeker and Defendants Crestview Farm and Crestview Genetics are at home in Florida or have operated, conducted, engaged in or carried on a business venture in Florida.   Further, as set forth more fully herein, these Defendants have committed tortious acts in Florida (making fraudulent misrepresentations and Defense of Trade Secret Act violations), causing injury to Plaintiffs here in Florida (selling clones to Plaintiffs' competitor in Florida, diluting and distributing proprietary genetic material here and injuring Plaintiffs' competitive advantage and business reputation in Florida) while conducting or soliciting cloning sales and services in Florida.

98.     This Court has previously determined that it has personal jurisdiction over all the Crestview Defendants and Mr. Meeker, which is now the law of the case. [DE 81*4].   To the extent the personal jurisdictional foundations must be restated, in addition to the other jurisdictional averments set forth herein, Plaintiffs state herein:

a.  On numerous occasions spanning over a decade from 2009-2019,   Mr. Meeker, Farm, Genetics, and their attorneys came to Florida to negotiate and discuss with Mr. Cambiaso and La Dolfina the 2009, 2011, and 2012 agreements at issue in this lawsuit. Namely, Mr. Meeker, Farm, Genetics, held repeated meetings with Cambiaso and La Dolfina at the J-5 Equestrian Farm in Wellington, Palm Beach County Florida negotiating and contracting the 2009 Agreement and 2019 Side Letter Agreement. Mr. Meeker, for himself and as an agent and representative of Farm and Genetics, repeatedly, and on numerous occasions held meetings and negotiations with Plaintiffs Adolfo Cambiaso and La Dolfina in Wellington, Palm Beach County, Florida negotiating the 2009 Agreement and 2019 Side Letter Agreement.

28

b.   Further, Mr. Meeker, on behalf of himself and Genetics and Farm, conducted a "tremendous amount of business concerning equine cloning" in Wellington, Palm Beach County, Florida. Mr. Meeker, on behalf of himself and Genetics and Farm, solicited others to purchase clones and foals of clones in Wellington, Palm Beach County, Florida.

c.   Because the Crestview Defendants have repeatedly and on numerous occasions met with Plaintiffs in Florida to negotiate and discuss the cloning Agreements that are the basis for this lawsuit, and because those Defendants undertook significant business operations within Florida including the solicitation of business and customers, the Crestview Defendants have purposefully availed themselves of Florida such that Mr. Meeker, Farm and Genetics should reasonably anticipate being hauled into court in Florida and are therefore subject to the personal specific, and general, jurisdiction of this Court pursuant to the Florida Long Arm Statute.

d.   The exercise of personal jurisdiction over Meeker, Farm and Genetics in Florida also comports with fair play and substantial justice.  Meeker, Farm, and Genetics are at home here, conduct other business, and clearly have ample financial resources and would not be burdened financially by having to litigate this case in Florida.

e.   Meeker has held himself out as the sole decision-maker of Farm and Genetics, and Meeker also resides at least part-time in Florida, at a single family, one bedroom condominium at 2211 Las Casitas Drive, in Wellington, Palm Beach County, Florida.

f.   Mr. Meeker, Farm, Genetics, and their attorneys held several meetings at the J-5 Equestrian Farm in Wellington, Palm Beach County Florida negotiating and contracting the 2009 Agreement and 2019 Side Letter Agreement.   Mr. Meeker, Farm,

and Genetics repeatedly conducted business with Robert P. Jornayvaz and other individuals in Wellington, Palm Beach County, Florida.

g.  The three unauthorized Cuartetera clones and option to the seven more Cuartetera clones were sold to Pegasus in Florida, and a Florida-based escrow, with a Broward County, Florida law firm, Akerman, L.P., serving as escrow agent, was set up by   the Crestview Defendants and Pegasus in Florida to fund any litigation related to or arising from the sale of La Dolfina's Cuartetera clones.

h.  The initial three misappropriated Dolfina Cuartetera clones were located here in Wellington, Florida, until improperly and secretly moved out of Florida by all Defendants in concert.   As depicted in **<u>Figure 1</u>** of this Third   Amended Complaint, a December 2020 photograph taken of those three clones at the 62 acre equestrian facility belonging to Park Place Polo and Mr. Borodin, located at 4370 South Road, Wellington, Florida 33414.



i.  Mr. Meeker, as a manager of yet another of his companies, previously conducted other business in Florida with a Florida company, J-5 Construction, LLC, for the renovation

of that condominium. [DE 22 ¶ 19].

j.  Because Defendants are selling Plaintiffs' misappropriated genetic material and clones into Florida and soliciting customers and further sales of genetic material and clones belonging to La Dolfina or Cambiaso in Florida, Florida has a strong interest in hearing this case.  Florida has a further interest in hearing this case because several of La Dolfina / Cambiaso clones have been played in polo tournaments in Palm Beach County, Florida, including a clone of Cuartetera.[11]

k.  Moreover, Plaintiffs have an undeniable interest in efficiently resolving the dispute in the forum where most of the agreements were negotiated, Plaintiffs maintain property, and where Plaintiffs routinely met with Defendants.   See *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1359 (11th Cir. 2013).   As well, performance of the covenants and restrictions by Defendants in the Agreements was due in Florida, and violations of the Defend Trade Secrets Act occurred here in Florida.

88.     This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337, by virtue of the allegations of the Crestview Defendants' violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq., as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

89.     This Court has supplemental jurisdiction over all of the state law claims against all Defendants, because those claims arise out of a common nucleus of operative fact with Plaintiffs' federal claim and are so integrally related to each other that they are part of the same case and

---

[11]  See, e.g.: *The Best Playing Pony and Her Chicken – Part 2:* "When B09 [9th Clone of Cuartetera]  went to Valiente, she got very nervous since she was always in a stall just like the rest of them. She was not used to this way of life. She had to have that chicken all the way through the U.S. Open final [in Wellington Florida], when she won best-playing pony. There's a famous photo of her at the awards ceremony with a chicken sitting on her back." Source:   https://polochannel.com/the-best-playing-pony-and-her-chicken-part-2/

controversy.  All of the claims alleged herein arise from the unauthorized creation and sale of Plaintiffs' clones, horses, and genetic material by the Crestview Defendants to Pegasus.

90.     This Court also has original subject matter jurisdiction pursuant to 22 U.S.C. §§ 2201 and 2202 and pursuant to Fed. R. Civ. P. 57 because Plaintiffs also seek declaratory relief herein.

91.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this is the Judicial District in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated or has been previously situated at the commencement of this action, and is a Judicial District in which the Court has determined Defendants are subject to the Court's personal jurisdiction with respect to such action.

92.     The Northern District of Texas Related Case, which now has been consolidated with this case, and now dismissed by this Court, was previously transferred to this Court by the Northern District of Texas. The Northern District found that "Florida has a more localized connection to the lawsuit, and this factor weighs in favor of transfer." [DE 80-1 *17].   The Northern District further found that "[b]ecause the balance of the 1404(a) factors are either neutral or weigh in favor of transfer, the Court concludes that transfer to the Southern District of Florida is proper here."   [DE 80-1 *17].

## III.     Further Facts of the Common Allegations.

### A.     Mr. Cambiaso's 2006 Idea to Clone Polo Ponies.

93.     Mr. Cambiaso's interest in cloning polo ponies arose out of an unfortunate and mortal injury to his favorite horse, an agile chestnut stallion named "Aiken Cura."   During a tie-break period ("chukker") of the 2006 Argentine Polo Open Championship ("*Campeonato*

*Argentino Abierto de Polo*") a high-goal, professional polo tournament that Mr. Cambiaso and La Dolfina had been playing in, Aiken Cura collapsed with a broken limb when returning to the side of the field in Palermo, Bueno Aires, Argentina.   When Mr. Cambiaso felt the horse begin to limp beneath him, he leapt out of his saddle and threw his blue-and-white helmet to the ground in anguish.   "Save this one whatever it takes!" he pleaded, covering his face with his gloves.   But the leg had to be amputated below the knee, and eventually Mr. Cambiaso, whose La Dolfina team won the Argentine Open that year and has won this most-prestigious of high-goal tournaments an additional twelve times[12], was forced to euthanize his beloved Aiken Cura.

94.    Before euthanizing Aiken Cura, Mr. Cambiaso requested veterinarians obtain a skin sample from the horse and put the sample into a deep freeze to store in a Buenos Aires laboratory. This decision turned out to be prescient because the technology at the time was not thought to be capable of recreating tissue that could be used to generate life and recreate animals.

95.    Mr. Cambiaso who, together with his La Dolfina team, relies heavily on the abilities of his equine athletic partners on the field of play, remembers his thinking that day: "I just thought maybe, someday, I could do something with the cells."

---

[12]  La Dolfina has won the Argentine Open eight consecutive times including in 2020.

####    B.   The 2009 Agreement.

96.     Three years later, in 2009, Meeker, who is a Texas oilman with an amateur interest in cloning, approached Mr. Cambiaso and offered to enter into a joint business venture to determine the viability of cloning some of the best polo ponies belonging to Mr. Cambiaso. Many of the discussions with Mr. Cambiaso and misrepresentations by the Crestview Defendants regarding the Cloning Initiative occurred in Wellington, Palm Beach County, Florida.   Many of the agreements and negotiations amongst the parties regarding the 2009 Agreement were made in Palm Beach County, Florida.

97.     Meeker, Crestview Farm and Mr. Cambiaso entered into the 2009 Agreement, promising to explore and potentially agree to its material terms. Numerous additional and further mutual agreements were required by the provisions of that 2009 Agreement, thus rendering that contract illusory in whole or in part.   Thereafter, in an abundance of caution, and at the insistence of Mr. Gutierrez, their new partner, who did not want any competing cloning endeavors remaining with his new partners, the parties agreed to cancel and terminate and extinguish any claimed rights under the 2009 Agreement in perpetuity and replace it with the 2011 Quota Holders Agreement. Thus, in 2011, the parties agreed to the novation of any claimed rights arising under the 2009 Agreement.

98.     The 2009 Agreement, drafted on or about June 15, 2009 by attorneys for the Crestview Defendants, was premised on the mutual assumptions and understandings shared by Meeker, Crestview Farm, and Mr. Cambiaso that:

> WHEREAS, Owner is the owner of certain mares and also owns full rights to the tissue of Aiken Currah, a deceased stallion, which tissue is currently in cryogenic stasis;
>
> WHEREAS, Crestview is currently involved in the use of advanced biotechnologies in the cloning of horses;
>
> WHEREAS, Owner and Crestview wish to enter into an arrangement for the purpose of jointly producing, marketing and selling cloned animals;
>
> WHEREAS, in furtherance of the foregoing, Owner is willing to provide tissue from certain mares and from Aiken Currah in accordance with the terms and conditions set forth hereinbelow.

99.     The document was thus premised upon the underlying understanding of Meeker, Crestview Farm, and Mr. Cambiaso that:

(a)     The genetic donor polo pony mares and the tissue of Aiken Cura (misspelled Aiken Currah in the Contract) was owned and would continue to be owned by Mr. Cambiaso;

(b)     Meeker through his Crestview Farm, LLC entity was then "involved in the use of advanced technologies in the cloning of horses";

(c)     A joint "arrangement" was later to be entered into between the parties; and

(d)     Mr. Cambiaso would provide genetic tissue from Aiken Cura and polo pony mares that Mr. Cambiaso owned according the terms of the Contract.

100.    The parties never intended the 2009 Agreement to be the final expression of the terms of the cloning business endeavor, which is clear from the further agreement that were contemplated in most of the material provisions of that contract.   The 2009 Agreement reads more akin to a letter of intent, contingent on future occurrences and agreements, such as the cloning technology actually working, and that terms and agreements would be negotiated at a later time:

• in paragraphs 1 and 2, requiring the successful cloning to occur;

• in paragraph 3, requiring further negotiation to establish a mutually acceptable cloning program only if the cloning was successful, to wit:

3.   Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

- also in paragraph 3, providing that until the negotiation and establishment of a mutually acceptable program, Mr. Cambiaso, and not Meeker and not Crestview Farm, was to continue to be considered the owner of the original animal;

- requiring, in paragraph 4, further mutual agreement between the parties as to sales price and, as importantly, terms; and

- in paragraph 5, requiring further mutual agreement prior to any "second edition" (or generation) of cloned polo ponies.

101.   The 2009 Agreement also contained significant restrictions upon the Crestview Defendants, requiring the further cooperation and *mutual agreement* of the parties with respect to the *production, endorsement, and marketing* of clones of Mr. Cambiaso's horses, and with respect to the final sales prices and *terms of sale* of any such clones, if ever produced, to wit:

3.   Further Cooperation.  Upon the successful production of one or more clones, Owner and Crestview agree to negotiate in good faith to establish a mutually acceptable program providing for the endorsement and marketing of clones and Crestview's cloning program.  Pending any such agreement Crestview shall be entitled to identify the name of the original animal and Owner to potential purchasers.

4.   Sale of Clones.  Upon the successful production of clones, Owner will use its commercially reasonable best efforts to market the first three clones of each cloned animal for sale with Owner's client base or others, with a minimum sales price of US$250,000.  Owner and Crestview will jointly determine all final sales prices and terms.

5.   Number of Clones.  Crestview agrees to clone approximately ten (10) "limited first edition" clones from each mare and Aiken Currah, if cloned.  If Crestview determines it wishes to clone a "limited second edition," Owner and Crestview will mutually so agree..

102.    Mr. Cambiaso, an Argentine for whom English is not his native language, did not participate in the drafting of this English-only document, which was not translated by the Crestview Defendants' attorneys.

103.    At all times relevant hereto, Mr. Cambiaso was the owner of the original horse Aiken Cura. The 2009 Agreement pertains only to certain horses and genetic material belonging to Mr. Cambiaso. While the horse "Aiken Cura", and the genetic material contemplated under the 2009 Agreement belonged solely to Mr. Cambiaso, the horses, clones, and genetic material presently being misappropriated by Defendants pursuant to alleged rights conveyed to Crestview Farm and Meeker under the 2009 Agreement belong to, and are the sole property of, La Dolfina.

104.    For clarity, and as set forth herein, the central factual complaints of Mr. Cambiaso and La Dolfina herein are that (1) Plaintiffs did not mutually agree with Defendants as to either the production, endorsement, marketing, sales and terms of sale of clones of horses belonging to Mr. Cambiaso or La Dolfina, and that (2) the 2009 Agreement never conveyed any rights to any of the Defendants to *unilaterally* produce, sell, license or exercise any ownership whatsoever over horses, clones, or genetic material belonging to Mr. Cambiaso or La Dolfina.   Paragraphs 3, 4 and 5 were all very clear that *mutual* agreement of Mr. Cambiaso and Farm were required before any of those acts, and/or a change in clone ownership, was to occur.

105.    Although the 2009 Agreement first failed for lack of agreement on or performance of its material terms, and was subsequently cancelled and replaced by the parties via the novation of the 2011 Quota Holders Agreement, to the extent that the Crestview Defendants erroneously rely upon that 2009 Agreement, the 2009 Agreement expressly prevented the Crestview Defendants from unilaterally producing, endorsing, marketing or setting the sales prices and terms of the sale of any clones produced pursuant to the 2009 Agreement. Thus, although Plaintiffs

believe that the 2009 Agreement was never entered into or forever extinguished and terminated in its entirely, and that the gaslighting to the contrary by the Crestview Defendants is wholly specious, to the extent there may be a judicial finding that the 2009 Agreement somehow survived its failure of agreement on material terms or performance or was not replaced by novation in 2011 agreement, the evidence reflects that the Crestview Defendants have knowingly and intentionally breached material terms of that 2009 Agreement.

106.   The cloning technology ultimately proved successful by Viagen, a cloning technology company, which later licensed that technology to Crestview Genetics in 2010.   Farm did not ever develop on its own technology required to make clones, and the Defendants were merely resellers of that technology.   Discovery, in the form of the testimony of Blake Russell, President of Viagen (now called "Genetic Reflections") has revealed that in 2016, Viagen terminated Defendants' license to such technology because Defendants failed to pay to Viagen the required royalties for use of such technology.

88.   Between January 6, 2010 and January 2, 2011, certain polo pony clones were born including a clone of Cuartetera, Adolfo Cambiaso's best and most famous polo pony that is owned by La Dolfina.

107.   Significantly, nowhere in the 2009 Agreement or elsewhere does Mr. Cambiaso grant Meeker or the Crestview Farm any ownership rights in any of the horses, clones, and / or genetic material therefrom, nor allow the unilateral sale of those clones.

108.   The Crestview Defendants repeatedly represented that they would not clone *any* Cambiaso or La Dolfina horse outside of express, mutual agreements between the parties. Their representations and commitments ultimately have proved false and Defendants have breached the

Agreements by selling, in 2020, three (3) of the Dolfina Cuartetera clones to Pegasus, and granting an option to Pegasus to purchase seven (7) more of those clones

### C.   The Cancelation and Termination of the 2009 Agreement – All Parties Mutually Agree to a Novation (if the Agreement was Even Valid).

109.    In November 2010, as part of an exploratory initiative of the parties to understand the monetary value of such a clone, the only authorized offer for sale of one Cuartetera clone, "B 02", took place in a highly-regarded auction in San Ysidro, Argentina.

110.    However, during the auction, Ernesto Gutierrez explained to the parties that public release of the B 02 Cuartetera clone into the market would not be to the benefit of the parties.   Mr. Gutierrez advised Messrs. Cambiaso and Meeker to never sell clones, because then the clones could be continually replicated by downstream purchasers and the group would lose control of unique and highly valuable genetics possessed within a Dolfina Cuartetera clone.

111.    Mr. Gutierrez right then proposed that he and David Nalbandian, a friend of Mr. Cambiaso, bid and attempt to win the auction and then return the clone back into the ownership and control of La Dolfina and the parties, with Mr. Gutierrez then joining in and investing in an equine cloning business with the parties.

112.    Mr. Gutierrez then proceeded to outbid all bidders for Cuartetera, and he and David Nalbandian jointly purchased a partial ownership stake in the clone for a price of $800,000, and Meeker received $400,000 from the proceeds of this one sale.

113.    Immediately, and true to his word, Mr. Gutierrez returned B 02 to La Dolfina and the parties entered into the joint venture he and the parties had agreed to set up and operate for equine cloning.

114.     No more public sales of Cuartetera or Cambiaso / La Dolfina horse clones ever occurred in the decade since, until the Crestview Defendants began their recent campaign of unauthorized clone creation, misappropriation, and sales.

115.     In March 2011, consistent with their agreement that public sale of any Cambiaso or La Dolfina clone was not prudent, to the extent the 2009 Agreement was not already extinguished by the failure of agreement on or the performance of its material terms, the parties expressly agreed to **cancel and extinguish** the 2009 Agreement and by novation **replace** the 2009 Agreement by entering into the 2011 Quota-Holders Agreement.   See **Exhibit 5,** to wit:

> 8.6. <u>Entire Agreement</u>. This Agreement shall constitute the complete agreement between the Parties in relation to the topics contained herein and replaces all the agreements, statements and understandings previous to the Parties, either orally or in writing.

116.     Farm was a party to the 2011 Quota Holders Agreement by virtue of Farm's 50% ownership of Genetics pursuant to the November 2, 2009 Genetics Operating Agreement. **Exhibit [1] hereto**.   Farm later became a 100% owner of Genetics on December 31, 2017. **Exhibits [2 and 3] hereto**.

117.     The $ 1,533,000 paid by Ernesto Gutierrez to Meeker as consideration to cancel and replace the 2009 Agreement were made by Mr. Gutierrez to Meeker to entities owned or controlled by Meeker, and as specifically directed by Meeker, to wit: two wire transfers to Meeker's company **"Conglomerate Gas II, L.P."** and two wire transfers to **Meeker's Crestview Genetics, LLC:**

| Date | Recipient | Amount (U.S. $) | Recipient Bank |
|------|-----------|------------------|----------------|
| **May 26, 2011** | **Conglomerate Gas II, L.P.** | **$ 500,000.00** | **South West Bank** |
| **August 23, 2011** | **Conglomerate Gas II, L.P.** | **$ 250,000.00** | **South West Bank** |
| **November 21, 2011** | **Crestview <u>Genetics</u>, LLC** | **$ 250,000.00** | **South West Bank** |
| **May 9, 2012** | **Crestview <u>Genetics</u>, LLC** | **$ 533,000.00** | **South West Bank** |

118.    Mr. Gutierrez has since testified that he would not enter into the 2011 Quota holders Agreement unless all prior cloning contracts amongst his new partners were extinguished and terminated.   The parties agreed and provided for such a provision in that 2011 Agreement.

119.    In sum, and as demonstrated by Meeker's acceptance of the $ 1,533,000 from Mr. Gutierrez and the cancellation of all prior cloning contracts, Meeker, on behalf of himself and his Crestview entities, Mr. Cambiaso, La Dolfina, and Mr. Gutierrez all agreed that selling a clone was a bad business idea because the sold clone could then be re-cloned continually by its purchasers.   In fact, the one clone offered for sale was partially purchased at that sale by Messrs. Gutierrez and Nalbandian and immediately brought back into the possession and control of Mr. Cambiaso and La Dolfina.   The parties to the 2009 Agreement never agreed to key terms including regarding the prices and terms of clone sales and Messrs. Cambiaso, Meeker and Gutierrez entered into a different venture with a different business objective than selling clones.

120.    A fundamental premise behind the termination and extinguishment in perpetuity of the 2009 Agreement among Messrs. Gutierrez, Cambiaso, and Meeker was that clones would and should never be sold.   This was a founding principle of the agreement amongst the parties, and was a principle that Meeker reiterated and repeated frequently to Mr. Cambiaso, La Dolfina, Mr. Gutierrez and to the public through the global media.

121.    Mr. Gutierrez paid $1,533,000 to The Crestview Defendants for the cancellation and novation of any claimed rights arising under the 2009 Agreement. Thus, any claimed rights under this now terminated 2009 Agreement were waived, extinguished, discharged in perpetuity by the parties' agreement to a novation. According to Mr. Gutierrez:

> 20.     We all intended everything concerning the prior 2009 agreement between Mr.
> Meeker and Mr. Cambiaso to be terminated by my payment to Mr. Meeker and formation of the
> Argentine SRL entity, which would take up the cloning business.  I paid $1,533,000 to Mr.
> Meeker in exchange for his agreement to terminate that 2009 Agreement and instead start the
> SRL business with me.  My understanding that part of this money was to reimburse Mr. Meeker
> for any money he paid Mr. Cambiaso or La Dolfina for genetic samples of their polo horses. Mr.
> Meeker accepted the payment  from me under these terms without complaint, reservation or
> objection.

**Exhibit 15,** *Affidavit of Julio Ernesto Gutierrez Conte* [DE 41-1].

122.     The 2011-2012 Gutierrez payments to The Crestview Defendants forever cancelled and replaced the 2009 Agreement with the 2011 Quota Holders Agreement.

123.     Thus, the Crestview Defendants cannot claim any rights to horses, clones, or genetic material belonging to Cambiaso or La Dolfina under the 2009 Agreement.

124.     Because the 2009 Agreement was previously forever terminated and replaced (if ever valid), the Crestview Defendants do not possess any right under the 2009 Agreement to unilaterally create, sell or convey La Dolfina or Cambiaso clones to Pegasus as the Crestview Defendants have purported to do by the 2020 Secret Horse Purchase Agreement.

125.     Until very recently, none of the Crestview Defendants have claimed or asserted any rights or entitlement under the 2009 Agreement to: (i) ownership of Mr. Cambiaso's or La Dolfina horses; or (ii) the authority to market, endorse, produce and sell any Cambiaso / La Dolfina horse clones.  In fact, their course of conduct was just the opposite: Meeker made repeated public statements that Dolfina/Cambiaso horse clones were not for sale, and the Crestview Defendants did not ever, for a decade, produce nor sell such clones to the public.

126.     For 10 years, from 2010 to 2020, no mention of any claimed rights under the 2009 Agreement was ever made.   This is consistent with the acceptance by The Crestview Defendants

of the $1,533,000 in consideration of the cancellation and replacement of the 2009 Agreement, and the accompanying course of conduct of the Crestview Defendants in dealings with Plaintiff extending over the next ten years.

127.    Further Meeker made multiple public statements to international global media outlets including *Vanity Fair Magazine*, *60 Minutes*, *National Geographic and Science Magazine* about the importance of restricting the distribution of clones and focusing instead on selling of the babies of clones rather than the clones themselves, and during which time no assertion of any purported rights under the 2009 Agreement to anyone was ever made. **See Exhibits 16, 17, and 18.**

128.    The Crestview Defendants' course of conduct, by and through Meeker, their common manager, for a decade, and during which time they never claimed any rights to sell clones of horses of Cambiaso /La Dolfina, is consistent with the 2011 Quota Holders Agreement novation of the 2009 Agreement, and the parties' conduct in failing to agree on and finalize material terms of the 2009 Agreement.

129.    No party has ever disputed the validity of the 2011 Quota Holders Agreement in the past nor presently in this litigation.

   **B.    2019 Settlement Agreement.**

130.    On July 29, 2019, Mr. Cambiaso, La Dolfina, Meeker, Farm and Genetics, and Mr. Gutierrez entered into the 2019 Settlement Agreement, wherein the parties expressly agreed to "terminate [their] commercial and corporate relationship." [13]  **Exhibit 6, \*2 ¶ B.**

---

[13] Substantially all of the negotiations amongst Meeker, the other Crestview Defendants, La Dolfina and Mr. Cambiaso, which included and misrepresentations by those Defendants, occurred in Wellington, Palm Beach County, Florida.   Previously, much of the agreements and negotiations amongst the parties that became part of the 2009 Agreement and the later 2019 Agreement were made in Palm Beach County, Florida.   Further, performance of the covenants and restrictions

131.    Notably, the 2019 Settlement Agreement did not convey ownership of any clone to Genetics, Crestview Farm or Meeker, and no rights were given to Meeker, Crestview Farm or Genetics to clone or market any Cuartetera clones.

132.    The 2019 Settlement Agreement did not somehow resurrect, as of 2011, the previously invalid and forever terminated 2009 Agreement.

**C.      2019 Side Letter Agreement.**

133.    Also on July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement, **Exhibit 7** hereto. The 2019 Side Letter Agreement regarded breeding certain cloned Cambiaso / La Dolfina horses identified in Schedule I attached to the 2019 Side Letter Agreement.

134.    The 2019 Side Letter Agreement provided, among other things, that La Dolfina S.A. would transfer the oocytes of the Schedule I clones to Genetics in order for the oocytes to be fertilized with semen provided from stallions belonging to and chosen by Plaintiffs.[14] **Exhibit 7**. The 2019 Side Letter Agreement made clear that, in the event of the sale of offspring (not clones) from any of the clones identified by Schedule I or in the event of the sale of any non-clone oocytes (oocytes from clones to be fertilized with stallion semen as the parties agree to produce offspring of clones), Plaintiffs and Genetics "*shall agree on a market price.*" **Exhibit 7.**

135.    In addition, the 2019 Side Letter Agreement stated that Crestview Genetics must clone 10 "Cuarteteras" for the exclusive use of Cambiaso and La Dolfina, and, should Crestview

---

made by and binding Defendants in the 2009 and 2019 Agreements, including the extinguishment of the 2009 Agreement was undertaken and owed in Wellington, Florida, the epicenter of competitive polo in the United States for four months of each year, to wit: Defendants were bound from misappropriating Plaintiffs' proprietary equine genetic material and from selling clones World-wide, including Florida. Defendants have now violated those covenants and restrictions.

[14] An oocyte is an immature ovum, or egg cell.

Genetics successfully complete and deliver these Cuartetera clones to La Dolfina, Alan Meeker, by and through Crestview Genetics, may clone two Cuarteteras "for the exclusive amateur (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras) but that the sale or further cloning of the Meeker Cuarteteras is "expressly prohibited." **Exhibit 7**.

136.    The 2019 Side Letter Agreement did not allow, nor otherwise contemplate, unilateral actions by the Crestview Defendants for the production, endorsement, marketing nor sale of any clone from the genetic material of Cambiaso / La Dolfina horses, nor allow the sale of any oocytes to be used to clone such horses.

137.    There were material misrepresentations by the Crestview Defendants to Mr. Cambiaso and La Dolfina in the 2019 Side Letter Agreement.   As consideration for Mr. Cambiaso and La Dolfina agreeing to enter into the 2019 Side Letter Agreement, Meeker, Farm and Genetics purportedly conveyed to Mr. Cambiaso and La Dolfina the ownership and cloning rights to the valuable "Storm Cat 02" racehorse clone.   However, Plaintiffs have come to understand that at the time of the 2019 Side Letter Agreement, Meeker and Crestview Genetics did not actually own Storm Cat 02 and its genetic material, but the Crestview Defendants in fact only possessed a very limited license to use, on a very restrictive schedule, the Storm Cat 02 clone.

138.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the right to sell any clones or genetic material of horses owned by Plaintiffs under any circumstances.

139.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the right to sell any clones or offspring of clones owned by Plaintiffs unilaterally.

**B.  Defendants' Misrepresentations to Plaintiffs and Breaches Regarding the
    2019 Side Letter Agreement.**

140.    Concurrently with the negotiation and execution of the 2019 Side Letter Agreement, numerous misrepresentations were made by Meeker, individually and through Crestview Genetics. To the extent Genetics is or was owned by Farm at that time, then those misrepresentations were also made by Farm.

141.    First, Meeker consistently represented that La Dolfina is and would always be expressly recognized as the Registered Owner of the clones listed in Schedule 1 with Genetics having only certain limited rights. **Exhibit 7,** ***2019 Side Letter Agreement* \*1 ¶ II.**

142.    Meeker, on behalf of himself and Crestview Genetics made promises that those Defendants would undertake only the mutually-agreed upon use of the genetic material to create only clones and offspring from clones as specifically authorized and agreed upon by the parties. Importantly, any Cuartetera clones would only be ridden in competition by Mr. Cambiaso and his then-minor son (who is now a professional polo player of the highest caliber) and these clones could only be played on La Dolfina-branded teams. **Exhibit 7,** ***2019 Side Letter Agreement* \*1 ¶2.**

143.    Park Place Polo Team is not a La Dolfina-branded team but rather a competitor of La Dolfina.

144.    These representations were made by Meeker to Adolfo Cambiaso both at the time of making the 2009 Agreement, as well as at the time of making the 2019 Side Letter Agreement, and during the decade within.

145.    Those representations were consistent with the purpose and intent of the 2009 and 2019 agreements and business relationship, which was to explore and potentially promote the very limited cloning of a very small number of polo pony clones and to closely restrict the commercial distribution of those clones belonging to Mr. Cambiaso and La Dolfina.   This close restriction of

the creation and distribution of the clones was also consistent with the terms of the 2011 Quota Holders Agreement and the relationship between the parties throughout the prior decade.

146.    These restrictive terms were also consistent with the sport of polo, where it is widely considered that a player's success is more than 70% attributable to the quality of his polo pony string,[15] and in the case of La Dolfina, where a powerful and valuable brand had been built by Mr. Cambiaso based upon the competitive successes, celebrity, and "drawing power" of Mr. Cambiaso himself and La Dolfina.

147.    However, those underlying representations were false, and made by the Crestview Defendants only to induce Plaintiffs to enter into the contractual relationships set forth herein. The Crestview Defendants had and have no intention of honoring those representations or the contractual terms to which Plaintiffs eventually agreed.

148.    Additionally, La Dolfina and Mr. Cambiaso only later learned that despite the representations by Meeker in connection with the 2019 Side Letter Agreement and 2019 Settlement Agreement, at that time neither Meeker nor any of his Crestview entities were the actual *owners* of the Storm Cat stallion Clone, and had falsely induced the Plaintiffs into signing the 2019 Side Letter Agreement based on misrepresentations about their ownership of this Clone.

149.    Had La Dolfina and Mr. Cambiaso known that Meeker, Crestview Farm, and Crestview Genetics did not intend to honor Defendants' promised commitment to restrict the ownership and distribution of the Cambiaso / La Dolfina clones, Cambiaso would not have entered into the 2009 Agreement and Cambiaso and La Dolfina would not have entered into the 2019 Side Letter Agreement.

---

[15]  See footnote 2, herein, 70% estimate attributable to Meeker.

150.    Since then, the Crestview Defendants were required, in April of 2022, to make a substantial payment to the owners of the Storm Cat donor horse in order for Crestview to continue to have rights to clone Storm Cat and possess Strom Cat 02.   Despite request for confirmation, the Defendants have refused to reveal whether or not they have made that required payment.

151.    Thus, the 2019 Side Letter Agreement has been breached by Crestview, which apparently does not have the rights to the Storm Cat 02 clone.

152.    Meeker's recent conversion of the cloned horses is also contravention clear breach of the terms of the 2019 Side Letter Agreement that did not transfer any ownership rights nor allow Meeker or the Crestview Defendants to secretly and surreptitiously make and sell cloned horses.

153.    At the time Plaintiffs and Defendant Crestview Genetics entered into the 2019 Side Letter Agreement, Meeker and Crestview Genetics purportedly contributed as consideration the ownership and cloning rights to the valuable "Storm Cat 02" racehorse clone.

154.    Because Meeker and Crestview Genetics did not actually own Storm Cat 02, despite their express representations to the contrary to induce Plaintiffs to execute the Side Letter Agreement, those Defendants neither put in the full consideration required under the Side Letter Agreement, nor were able to perform under the Side Letter Agreement and hid the nature of their true and limited rights concerning Storm Cat 02. Moreover, there was no consideration paid for the unilateral usurpation of the valuable property rights belonging to Plaintiffs in their horses and their genetic lineages, which The Crestview Defendants are fraudulently treating as their own.

### C.    Defendants' Misappropriation of Valuable Equine Genetic Material.

155.    The deliberate plan by The Crestview Defendants to misappropriate and sell genetic material and clones from rightful owners has now become clear to La Dolfina and Mr. Cambiaso.

156.    The present scheme by the Crestview Defendants under color of purported contract is not the first time that the Crestview Defendants have attempted to misappropriate, use, and sell

the  highly valuable and unique equine genetic material that does not belong to the Crestview Defendants.

**D.    The Prior "Storm Cat" Misappropriation by Crestview.**

157.    The present case is not the first instance wherein Meeker, through the use of his Crestview entities, has misappropriated genetic material and clones owned and belonging to another party.

158.    Overbrook Farm, LLC, the owner of the famous racehorse Storm Cat[16], a grandson of the World-renowned thoroughbred racehorse "Secretariat," is a prior victim of Meeker and his Crestview Entities.

159.     Meeker, by and through his alter-ego Crestview entities, embarked on an aggressive scheme to misappropriate the unique and famous genetic material of Storm Cat, and spared no effort to wrongfully strip away the rightful ownership of the genetic material from the owners of Storm Cat.

160.    Specifically, Meeker, by and through Crestview Genetics, misappropriated Storm Cat genetic material from Overbrook Farm LLC and created an unauthorized clone of Storm Cat, named "Storm Cat 02."   **Exhibit 19.**

---

[16] The bloodline of Storm Cat is very valuable because of Secretariat's successes and the subsequent successes of Storm Cat progeny.   For example, as of 2016, Storm Cat progeny had earned an aggregate of over $ 128,000,000 in winning race purses, have sold for an aggregate of over $ 319,000,000 over 452 yearlings (averaging over $ 705,750 per yearling) with 91 Storm Cat yearlings selling for over $ 1,000,000.

Defendant Crestview Genetics has itself admitted in a prior federal lawsuit that Storm Cat was "a championship thoroughbred; Storm Cat was a grandson of the world-renowned thoroughbred, Secretariat; Storm Cat has also been known as the leading North American sire in 1999 and 2000; and Storm Cat had a breeding career that was legendary throughout the equine world, which career extended over twenty years."

161.    It was only upon the owner of Storm Cat happening upon an article exposé about the cloning of Storm Cat in the magazine *Vanity Fair* did the owner learn of the misappropriation and unauthorized cloning of Overbrook Farm LLC's horse. **Exhibit 19.**

162.    The owner of Storm Cat has made clear, "[w]e never discussed giving Crestview ownership of the genetic material, but simply a right to produce, with our approval, a certain number of clones with the material." **Exhibit 19.**

163.    When the owner of Storm Cat found out about the unauthorized Storm Cat clone from *Vanity Fair* and then made demand upon Meeker and Crestview Genetics to cease and desist, Crestview Genetics decided that the best defense to their malfeasance was to commence litigation against Overbrook and its individual owner in an effort to suppress and avoid compliance with that cease and desist demand.

164.    Ultimately, Meeker and Crestview Genetics were forced to concede that they did not own either the Storm Cat genetic material or the right to trademark Storm Cat marks.   In the Storm Cat Settlement Agreement that was reached in April 2017, wherein Crestview Genetics conceded its misappropriation of the genetic material and withdrew, in perpetuity, its intent to use application with the U.S. Patent and Trademark Office which it had unilaterally filed without authorization of the owners of Storm Cat.

165.    In return, under the Storm Cat Settlement Agreement, Meeker and Crestview Genetics received very limited rights which were defined as (1) a *limited license* "to use" certain Storm Cat genetic material for limited cloning, and (2) certain "*licensed rights*" with respect to the Storm Cat mark, which limited rights were renewable in 5-year increments.   **Exhibit 20.**

50

166.     Significant to the present case, neither Meeker, Genetics, Crestview Farm, or any other individual or entity received *ownership* of Storm Cat genetic material or the initial unauthorized Storm Cat clone wrongfully created by Meeker and Crestview Genetics.

167.     For clarity, in the Storm Cat litigation, Meeker and Crestview Genetics: (1) misappropriated genetic material from a famous and valuable horse; (2) created an unauthorized clone of that horse; (3) with the intent to market the clone and its progeny and genetic material throughout the World; (4) when confronted with the malfeasance, commenced litigation to block the owner's rights; and (5) was later forced to relinquish Meeker and Crestview Genetics' specious claims to Storm Cat and settle for strictly limited rights.

168.     In the present case, it appears history is repeating itself, because Meeker has made representations to the public that Meeker and his entities possess the unilateral right to clone Cambiaso / La Dolfina horses and possess the unilateral right to then sell those clones, all without the mutual agreement and consent of Mr. Cambiaso or La Dolfina.

**E.     The "Cuartetera" Misappropriation:   Defendants Violate Federal Law by the Unauthorized Creation and Sale of Cuartetera Clones Without Authorization by Plaintiffs.**

169.     Just prior to the filing of the initial Complaint, La Dolfina and Mr. Cambiaso learned that, in the Fall of 2020, Meeker, by and through the use of the Crestview Defendants, had commenced the unauthorized creation and selling of three Dolfina Cuartetera clones to third parties by fraudulently representing that the 2009 Agreement was still valid. Specifically, on November 18, 2020, only after execution of the 2020 Secret Horse Purchase Agreement, an Agent of the Crestview Defendants admitted, in paragraph #2 of correspondence to La Dolfina **[Exhibit 21 hereto]**, that:

> Crestview Farm has created several cloned foals under
> its continuing rights under the 2009 Agreement, and has

```
sold three of them to a third party for more than the
minimum price mentioned in the 2009 Agreement or as
later agreed by the parties.
```

**See Exhibit 21,** *18 November 2020 correspondence from Defendants' attorneys,* specifically describing in <u>Exhibit </u>1 to that correspondence, those clones of Plaintiffs' Cuartetera as:

**"CF Cuartetera P01 dob April 4, 2020;**
**CF Cuartetera P02 dob April 21, 2020;**
**CF Cuartetera P03 dob June 2, 2020"**

170.    From correspondence with Meeker and in subsequent conversations with his agents, it has become clear to La Dolfina and Mr. Cambiaso that The Crestview Defendants have disavowed all of the representations and contractual obligations made by Defendants to Plaintiffs from 2010 through 2019 regarding all agreements and cloning business dealings.

171.    The invalid or later terminated 2009 Agreement never imparted to Meeker nor to Crestview Farm, the rights claimed by the Crestview Defendants to unilaterally (i) sell and / or set the terms for the sale of any Dolfina Cuartetera clone; or (ii) set the terms for the use or sale of any genetic material belonging to Mr. Cambiaso or La Dolfina.   In truth and in fact, the invalid or terminated 2009 Agreement was not signed or otherwise entered into by La Dolfina and never gave any of the Defendants any rights to clone, much less own, sell or license any La Dolfina horses, genetic material, or clones.

172.    Further, the Crestview Defendants have appropriated the identity of Mr. Cambiaso and La Dolfina, champions and leaders of the polo world, to falsely imply an endorsement by Plaintiffs to the cloning and sale of the clones.

173.    The Crestview Defendants' unauthorized misappropriation, use, and unilateral sale of equine genetic material belonging to La Dolfina and Mr. Cambiaso forms a familiar pattern also seen in the Storm Cat litigation – Defendants making misrepresentations, then grab highly unique

and valuable equine genetic material from their rightful owners, claim ownership to it, surreptitiously produce unauthorized clones, and then market and sell the clones and material throughout the world for profit, all the while falsely implying to third parties purchasing the clones that the rightful owners have approved the terms of those illicit sales.

174.    That pattern of misappropriation and misrepresentation as to cloning authorization has likewise been repeated by the Crestview Defendants to Pegasus by the Crestview Defendants' misplaced reliance upon the 2009 Agreement when contracting with Pegasus in the November 9, 2020 Agreement.

**F.    The Cuartetera Clone Sales by Crestview to Plaintiffs' Competitor in Florida.**

175.    The Crestview Defendants have, without authorization, utilized the genetic material belonging to La Dolfina to create a presently unknown number of unauthorized clones of Cuartetera, which number at least 22.   Meeker, by and through the use of Crestview Farm, has sold three (3) Cuartetera clones along with the option to purchase at least seven (7) more Cuartetera clones to Pegasus, the British Virgin Island shell company beneficially owned and controlled by Plaintiffs' competitor, Park Place Polo Team patron Andrey Borodin.

176.    Indeed, the first drafts of the 2020 Secret Horse Purchase Agreement were made directly with another Park Place Polo entity, "Park Place Polo, Ltd.", another Borodin-owned and controlled B.V.I. company.

177.    That sale and option of a total of ten (10) Cuartetera clones to Borodin's Pegasus was consummated through the 2020 Secret Horse Purchase Agreement.   **See Exhibit 8 hereto, 26 pages Bates stamped by Defendants as "CF000004 to CF 000030."**

178.    The 2020 Secret Horse Purchase Agreement is secret because it was keep hidden from its execution, and for an additional six months from the Court during the pendency of this case, despite demand from Plaintiffs.

179.    The 2020 Secret Horse Purchase Agreement was turned over to Plaintiffs as part of 32 pages of documents produced to Plaintiffs by Defendants pursuant to a June 17, 2021 Order of the Court. This production was made six months after Plaintiffs first requested the documents surrounding the sale of the Cuartetera clones and Defendants' legal team agreement on the record at the January 29, 2021 Hearing to produce them.

180.    The creation and sale by the Crestview Defendants to Pegasus of these Dolfina Cuartetera clones was not authorized by La Dolfina or Mr. Cambiaso.   Even the 2009 Agreement, if ever valid, was forever terminated, extinguished and replaced in 2011, and did not permit such unilateral action by the Crestview Defendants.   There is no legal basis on which the Crestview Defendants can legitimately rely on as a basis for presently allowing the Crestview Defendants to create, market or sell the Dolfina Cuartetera clones.

181.    Further, the commercial advertising or promotion and sale of these clones of Cuartetera to Pegasus and Andrey Borodin for use by Plaintiffs' competitor, Park Place Polo Team, was not authorized by Plaintiffs, and falsely claimed or implied by false implication that La Dolfina had no rights to their own horses and clones and that La Dolfina's horses could be cloned and sold by the Crestview Defendants without the authorization of La Dolfina and / or Mr. Cambiaso, and that the Crestview Defendants had the unrestricted authority to sell Plaintiffs' horses and genetic material.

182.    The Crestview Defendants, through their agent and attorney Ross Eichberg, informed Plaintiffs on November 18, 2020 that Crestview Farm had sold, without authorization

from La Dolfina or Mr. Cambiaso, three (3) of the unauthorized foals of Cuartetera to someone else.   Court-ordered discovery as well as admissions made by the Crestview Defendants Counsel then revealed that the purchaser of the clones was Pegasus for use by the competitor of Plaintiffs, the Park Place Polo Team, owned by billionaire Andrey Borodin. **Composite Exhibit 22,** *Andrey Borodin's Park Place Polo Team Purchased the Clones*; **Exhibit 23,** *Affidavit of Robert Jornayvaz III, ¶ 14.*

183.    When Mr. Eichberg made that disclosure to Plaintiffs on November 18, 2020, Defendants and Eichberg as their agent intentionally failed to disclose:

(a) The actual identity of the purchaser of the clones;

(b) the Crestview Defendants had also sold Mr. Borodin an option to purchase seven more Cuartetera clones;

(c) the Crestview Defendants had falsely stated to Mr. Borodin or his representatives, *inter alia*, that the Crestview Defendants had an exclusive license to sell those clones for their "own account;" that their actions were allegedly authorized by the canceled and replaced 2009 Agreement; that all approvals of persons whose approvals were required had been allegedly obtained; and that the 2009 Agreement had not been novated, extinguished, or terminated in any manner;

(d) Mr. Borodin has agreed to finance the cost of any litigation that were to ensue if Mr. Cambiaso and / or La Dolfina were to challenge the right of the Crestview Defendants to sell the Cuartetera clones;

(e) That the Crestview Defendants considered any breach of the 2020 Secret Horse Purchase Agreement by Borodin or Pegasus to cause irreparable harm, entitling the Crestview Defendants to injunctive relief and replevin of the Cuartetera clones; and

(f) Conversely, the Crestview Defendants were required to reimburse Pegasus and Borodin if Mr. Cambiaso and / or La Dolfina was successful in obtaining replevin of the clones from Pegasus or Borodin.

184.    All of these undisclosed sales and options for sales of Cuartetera clones to Pegasus for the Park Place Polo Entities and Mr. Borodin by the Crestview Defendants were part of the pattern of willful misconduct constituting a continuing fraud upon Plaintiffs, and evidence of the continuing violations of federal law by Defendants, causing irreparable harm to Plaintiffs.

**G. The Three Sold Cuartetera Clones Were Secretly Moved
Out of Florida During this Litigation and One of Them Has Since Been Injured
and Euthanized.**

185.     In Early November 2020 three Cuartetera clones were transported from Crestview

Farm's facility in Aiken, South Carolina to Wellington, Palm Beach County, Florida. See **Figure**

**1,** below, a December 2020 photograph taken of those three clone foals at the 62 acre equestrian

facility belonging to Park Place Polo Fields, run by Park Place Polo Team, and located at 4370

South Road, Wellington, Florida 33414:

**Figure 1**



186.     Plaintiffs later discovered that the three unauthorized Cuartetera clones were moved

out of Florida and into Aiken, South Carolina on or about December 22, 2020. See **Exhibit 24,**

*Andrey Borodin's Park Place Polo Removes the 3 Clones from this Jurisdiction in the Midst of*

*Litigation, Brookledge003-4, 10.*

187.     The farm manager for the purchaser of the clones, Ms. Ash Price, confirmed in

deposition that the clones are in Aiken, South Carolina.   However, discovery of messages with

the farm owner in Aiken where the clones are now located reveals that Ms. Price was asked by her

employer, Mr. Borodin, to hide this information from Mr. Cambiaso and La Dolfina: **Exhibit [25],**

**Transcript[17] of Message:**

> *"So now what I really want to try and do is try and protect the fact that they are in Aiken. I don't think he's going to do anything stupid, but· they are -- they're fighting over the -- like the sort of litigation and where this hearing and whatever the Meeker/Adolfo battle is, where it ends up being, whether it's in Texas or Florida or· Argentina.· So I think where they are kind of has something to do with that, and I think if they're in· Florida it works to Adolfo's advantage because he wants to do the court case in Florida, and obviously· they've now left."*
>
> *"But, yeah, if you could try and go along· with the play, you know, just -- I mean, you can even say Park Place asked me to say nothing about it. I don't know much about it, but, you know, I've been asked to say nothing.· That way you're not denying anything, confirming anything.· But, yeah, they are on to trying to find where they are.· But if they think they're in Kentucky, that's better for us."*
>
> [End of recording.]

188.    This matter was filed against the Crestview Defendants on December 8, 2020. The removal of the three unauthorized Cuartetera clones from the jurisdiction of this Court occurred after this litigation had commenced and with both the Crestview Defendants and the Park Place Polo Entities aware of this litigation, and the within lawsuit and applications for injunction and for temporary restraining order.

189.    Further, in order to transport the Clones out of Florida, Defendants were required by law to have the Clones tested for equine infections anemia ("EIA"), and obtain from a veterinarian both a negative test result for the EIA (a "Coggins test" certificate), and Defendants were also required to obtain from a veterinarian an "Equine Health Certificate" prepared and executed by a local veterinarian in Florida within thirty (30) days of travel.

---

[17] *Certified Transcript of Voice Message,* Produced by Julio ·Arellano and Amista Polo, Inc. on August 11, 2021, as **Bates Number JA-Amista**

190.    Those documents were submitted to the Florida Department of Agriculture by the Defendants and, because they are required by law to be truthful, should be presumed to be truthful, accurate and admissible prior statements of the Defendants.

191.    Defendants compelled that veterinarian to execute a document stating the veterinarian would not speak to anyone regarding those health and Coggins tests and papers for the three clones moved to South Carolina.   The identity of the veterinarian is known, Daren Tamplin DVM, and he is now being represented by Akerman LLP, the same law firm that is counsel to the Park Place Polo Entities. **Exhibit 26**.

192.    Further, produced documents confirm that Dr. Tamplin was required to sign a non-disclosure agreement by the Park Place Polo Entities when providing care to the clones – a highly unusual step in the equine veterinary industry.

193.    The purchaser of the clones, Pegasus, is ultimately beneficially owned and controlled by Mr. Borodin, whose Park Place Polo Team is a direct competitor with Plaintiffs. Park Place Polo competed *against Mr. Cambiaso in Wellington, Florida* at the International Polo Club in Wellington, Florida in the Winter of 2020 and in the Spring of 2021.[18]

194.    Mr. Borodin and his Park Place Polo operation operate in the United Kingdom and elsewhere in the World when they are not competing in Florida, thus rendering imminent the risk that the unauthorized Cuartetera clones in the possession of Mr. Borodin and his Park Place Polo operation will be transported to the United Kingdom or elsewhere in the World, beyond the reach of this Court.

---

[18] See United States Polo Association press release December 22, 2020:
https://www.uspolo.org/gauntlet-of-polo/2021

195.    One of the clones sold to Pegasus has since been injured while in the Park Place Entities' custody and control, and subsequently euthanized at the instruction of Pegasus in July 2022.

196.    The two remaining Cuartetera clones could again be moved to the United Kingdom, and will later likely be trained and used in international polo tournaments against La Dolfina and against other polo teams for which Mr. Cambiaso is employed as a player. Mr. Cambiaso has competed against Mr. Borodin and his Park Place Polo Team throughout the pendency of this litigation.

197.    Upon further information and belief, Mr. Borodin, Pegasus, and/or Park Place Polo Limited intend to extract genetic material from the Cuartetera clones in their possession in order to create additional Cuartetera clones, causing significant additional imminent risk of imminent risk of irreparable harm to Plaintiffs.

### H.    The Crestview Defendants Continue to Misappropriate and Sell Unauthorized Cuartetera Clones During this Litigation.

198.    For clarity, on June 17, 2021, the Court ordered that the Defendants "***provide Plaintiffs with the bill(s) of sale for the three Cuartetera clone foals described in the First Amended Complaint [ECF No. 22], including any agreements or documentation underlying those bill(s) of sale***."

199.    These were documents Defendants had promised to produce to Plaintiffs during the January 29, 2021 Hearing on Plaintiffs' Motion for Temporary Restraining Order, but had failed to produce to Plaintiffs.

200.    Those documents were finally produced with redactions six months later, are thirty-two (32) pages, and are attached hereto as **Exhibit 8,** *The Secret Horse Purchase Agreement***;**

**Exhibit 9,** *Amendment to the Secret Horse Purchase Agreement***;** and **Exhibit 10** *Second Amendment to the Secret Horse Purchase Agreement***.**

201.    What Plaintiffs have learned from the 32 pages of documents are the following, highly relevant facts which, according to **Table 1** and **Table 2**, attached hereto as **Exhibit 27,** are *inconsistent* with the prior, sworn factual averments of Meeker before this Court and in the Northern District of Texas, and are further *inconsistent* with the statements of counsel for Meeker, Crestview Farm and Genetics. As noted above, although made six months after the January 29, 2021 Hearing wherein the Crestview Defendants first promised this Court the production of these documents, this production was notably and materially incomplete due to over-redaction, and production of unsigned and incomplete documents including a Bill of Sale that contains no signature block or signature for Pegasus Rider Ltd., the shell British Virgin Island entity controlled by Mr. Borodin, and his Cyprus based lawyers.

202.    The 32 pages produced demonstrate misconduct by Meeker, Crestview Farm and Genetics:

      (a)  On November 9, 2020, Meeker, by using Crestview Farm, and Pegasus, the entity owned and controlled by Mr. Borodin contracted   for the purchase and sale of the ***three (3) Cuartetera clones*** and for an option (the "Option") to purchase ***an additional seven (7) Cuartetera clones*** by Borodin [**Exhibit 8,** CF00004]; and

      (b)  the Crestview Defendants represented to Borodin that the Crestview Defendants ***had the unilateral right, pursuant to the 2009 Agreement, to sell those Cuartetera clones without permission of Mr. Cambiaso*** or La Dolfina [**Exhibit 8,** CF00004];

      (c)  That the purchase price for the clones was ***$ 800,000 per clone***, for an aggregate of   $2.4 million [**Exhibit 8,** CF00005] ;

      (d)  That Borodin's ***time to exercise the Option was extended <u>twice</u> <u>during the present litigation:</u>*** by a First and then Second Amendment, on ***December 21, 2020*** (the "First Amendment") [**Exhibit 9,** CF00001-2] and again ***on June 10, 2021*** (the "Second Amendment") [**Exhibit 10,** CF000031-32], so that Mr. Borodin has an additional year, until late June, 2022, to elect his Option;

(e) That should the Option to purchase the seven additional Cuarteteria clones be exercised, then ***Borodin's purchase price would be diminished by approximately 49% f***or each of the ten (10) Cuarteteria clones purchased [**Exhibit 8,** CF00005];

(f) the Crestview Defendants represented to Borodin three times that the Crestview Defendants ***were not aware of any litigation or any claims by Mr. Cambiaso*** that the Crestview Defendants were not entitled to enforce the 2009 Agreement at three times: (i) the time of making of the 2020 Secret Horse Purchase Agreement [**Exhibit 8, CF00007**], and at the (ii) the December 21, 2020 Amendment[**Exhibit 9,** CF00001-2]; and (iii) the June 10, 2021 Amendment [**Exhibit 10,** CF000031-32**]**;

(g) the Crestview Defendants represented to Borodin that the Crestview Defendants ***were not in default under the 2009 Agreement*** at each of those three times described in 6) [**Exhibit 8, CF00007**];

(h) the Crestview Defendants represented to Borodin that the ten Cuarteteria clones were ***free and clear of any claims by Mr. Cambiaso*** at each of those three times described in 6) [**Exhibit 8, CF00007**];

(i) the Crestview Defendants granted an ***assignable license*** to Borodin for Borodin ***to produce an additional ten (10) Cuarteteria clones*** [**Exhibit 8, CF00008**];

(j) the Crestview Defendants claimed ***irreparable injury, no adequate remedy at law, and*** the ***right to enjoin*** Borodin from producing any further Cuarteteria clones, and a ***right to recover*** from Borodin ***all Cuarteteria clones*** in the event of breach of the 2020 Secret Horse Purchase Agreement by Borodin or an assignee of Borodin [**Exhibit 8, CF00008-9**] ;

(k) the Crestview Defendants were so concerned that Mr. Cambiaso had a legitimate claim to the clones (despite their prior and inconsistent representation that Mr. Cambiaso had no such claim), that they anticipated litigation by Mr. Cambiaso about the clones was likely, and so Crestview Farm, Meeker and Borodin agreed that if Mr. Cambiaso sued to rescind the 2009 Agreement or recover the Cuarteteria clones, then: (i) ***Meeker and Borodin would each be responsible to pay certain share of the legal expenses of defense***, that (ii) ***any such litigation would not be settled without Borodin's consent***, and (iii) that the Crestview Defendants ***would have to pay back Borodin*** for the Cuarteteria clones if Mr. Cambiaso or La Dolfina successfully recovers any of the clones [**Exhibit 8, CF00010**];

(l) ***the Crestview Defendants disclaimed any liability*** to Borodin as a result of any claims by Mr. Cambiaso challenging rights to the clones [**Exhibit 8, CF00010**];

(m) ***Meeker, Crestview Farm and Borodin set up an Escrow Agreement*** with the **<u>Florida</u>** law firm of Akerman LLP ("the Akerman Escrow Agreement") t***o escrow against any litigation by Mr. Cambiaso*** certain of Borodin's

purchase monies from the purchase and sale of the Cuartetera clones from the Crestview Defendants, [**Exhibit 8,** CF000024-30]; and

(n) That Meeker, Crestview Farm and ***Borodin consented to the jurisdiction and venue of the federal courts located in the*** <u>***Southern District of Florida***</u> in any action relating to the Akerman Escrow Agreement. [**Exhibit 8,** CF000028, ¶ 10].That under the Akerman Escrow Agreement, in the event of dispute, ***the escrowed Cuartetera clone purchase monies can be paid*** into the federal or state Courts in Broward County, Florida. **Exhibit 8**, CF000024, ¶¶ 4, 10.

203.     The 32 pages demonstrate a high level of inconsistency with Meeker's and his counsel's prior averments in this case and in the closely-related case amongst the same parties, *Crestview Farm, LLC v. Cambiaso, et al.,* (Case No. 21-cv-81066-AMC/BER) (the "SDFL 21" case), which was transferred to this Court from the Northern District of Texas. See **Exhibit 27**.

204.     The 32 pages also demonstrate the continuing efforts by Defendants to hide their breaches before and during this litigation, by (i) creating and not disclosing the 2020 Secret Horse Purchase Agreement structure; (ii) repeatedly extending the Borodin / Pegasus option to purchase seven more Cuartetera clones during this litigation and not disclosing same; (iii) providing for an escrow arrangement in Florida and not disclosing the same; and (iv) by spuriously opposing equitable relief when the Crestview Defendants themselves insisted upon such equitable relief from Borodin / Pegasus for the same reasons.

205.     The 2020 Secret Horse Purchase Agreement provides direct evidence that the Crestview Defendants have not only sold 3 unauthorized Cuartetera clones to Pegasus, but also provided an option for Pegasus "[a]t any time on or before the 6 weeks from the Effective Date, the Buyer may elect to purchase all the seven Cloned Foals [7 additional unauthorized Cuartetera clones] by giving written notice to the Seller….". **Exhibit 8.** *CF000005 § 3.1.*

206.     The sale of this option to purchase the clones was concealed from the Plaintiffs and from the Court for over 6 months from the inception of this lawsuit.

62

207.    After this litigation was commenced against Defendants, the Crestview Defendants continue their brazen misappropriation of La Dolfina's genetic material.

208.    On December 21, 2020, the Crestview Defendants entered into the **First Amendment** to the 2020 Secret Horse Purchase Agreement, by which the Defendants extended the time during which Pegasus could exercise the option to purchase 7 additional unauthorized Cuartetera Clones, agreeing "[a]t any time on or before 30 June 2021, the Buyer may elect to purchase all the seven Cloned Foals….'". **Exhibit 9,** *CF000001-2 First Amendment to the 2020 Secret Horse Purchase Agreement ¶ 2.*

209.    As it became clear that this case was going to continue, and that the anticipatory suit by the Crestview Defendants was likely to be transferred to Florida, on June 10, 2021, the Crestview Defendants entered into a **Second Amendment** to the 2020 Secret Horse Purchase Agreement, by which Defendants again extended the time during which Pegasus could exercise the option to purchase 7 additional unauthorized Cuartetera Clones, agreeing "[a]t any time on or before 30 June 2022, the Buyer may elect to purchase all the seven Cloned Foals …". **Exhibit 10,** *CF000031-32 Second Amendment to the 2020 Secret Horse Purchase Agreement ¶ 2.*

210.    During this litigation, discovery has revealed that there have now been Third and Fourth Amendments to the 2020 Secret Horse Purchase Agreement, again extending the option by Pegasus to purchase the Dolfina Cuartetera clones from the Crestview Defendants.  **Exhibits 11 and 12.**

211.    Notably, the Amendments to the 2020 Secret Horse Purchase Agreement ratified the representations by the Crestview Defendants in the initial the 2020 Secret Horse Purchase Agreement, stating "[a]ll other provision of the Agreement continue with full force and effect."

212.     Particularly repeated and ratified, but problematic for the Crestview Defendants, are the representations that no litigation exists by Mr. Cambiaso to challenge the clone sale and recover the clones, and that the Crestview Defendants have no reason to know of any such litigation. See **Exhibits 9, 10**, **11 and 12**.

213.     This continuing misconduct and continued misrepresentations by the Crestview Defendants is direct evidence of the ongoing unauthorized misappropriation of genetic material and clones belonging to Plaintiffs and is why a Permanent Injunction should be entered against all Defendants preventing further sales and distribution of those clones and genetic material.

214.     The distribution of Plaintiffs' unique genetic material and clones by the Crestview Defendants to a polo competitor with the financial means to transport those cloned foals throughout the world has irreparably harmed Plaintiffs, and the now-known looming exercise of the option by Pegasus to purchase from the Crestview Defendants an additional seven (7) unauthorized Cuartetera clones to Plaintiffs' competitor threatens further irreparable harm to Plaintiffs by the irreversible dissipation and dilution to competitors of Mr. Cambiaso and La Dolfina of the Cambiaso / La Dolfina unique equine genetic material and clones.

215.     Additionally, Meeker, Farm and Genetics have purportedly "assigned" their non-existent cloning rights under the defunct 2009 Agreement to Mr. Borodin and his entities in exchange for millions of dollars in Cuartetera clone purchases, and in exchange for an agreement by Mr. Borodin and his entities to indemnify and hold Meeker and the Crestview entities harmless from any lawsuit by Mr. Cambiaso or La Dolfina regarding ownership of the clones and the right to create and sell the clones.

216.     Additionally, a contract has surfaced, a **"Technical Consulting and Services Agreement"** (the "Consulting Agreement") between Crestview Farm, LLC and Park Place Polo

Limited, respectively the Meeker and Borodin affiliated entities that are very closely related to the Crestview Defendants and the Park Place Polo Entities. Park Place Polo Limited is a British Virgin Island limited liability company with an address at Geneva Place, Waterfront Drive, Road Town, Tortola, British Virgin Islands.   It is beneficially owned and controlled by Borodin.

217.    Part of the ongoing breaches by the Crestview Defendants is the constant creation and use of similarly named entities, to avoid detection and thwart Plaintiffs' rights and claims set forth herein. As of December, 2020, Meeker had created at least 114 separate corporate entities, and at least eight separate Crestview entities, to the extent known.   All of these Crestview entities share common ownership and management and have been created by Meeker as his alter egos and, at relevant times set forth herein, were used for fraudulent and deceptive purposes by the Crestview Defendants.

218.    Under the Consulting Agreement, which was also dated November 9, 2020, the same date as the Secret Horse Purchase Agreement, the Crestview Defendants have agreed **_"to provide to Park Place [Polo Limited] assistance with the setting up [sic] Park Place's laboratory facilities and horse cloning program, including providing assistance regarding the acquisition of equipment, installation of equipment, and advising Park Place in the commercial and technical aspects of horse cloning."_**

219.    Under the Consulting Agreement, for an initial payment of several million dollars to the Crestview Defendants, and a second payment of well-over a million additional dollars, the Crestview Defendants will assist Park Place Polo Limited, an agent and closely-related affiliate of Park Place Polo Team, to set up an equine cloning laboratory in Aiken, South Carolina[19], and provide access and personnel to do so.

---

[19]  Public Records reveal that the Park Place Polo Entities and Mr. Borodin made two large land tract purchases in Aiken, South Carolina, very near the Crestview Farm Aiken laboratory location.

220.     The Consulting Agreement payments were made to the same Frost Bank account belonging to Crestview Farm that received payments pursuant to the 2020 Secret Horse Purchase Agreement.

221.     The motive of the Crestview Defendants to sell Cuartetera clones has been revealed: money, millions of dollars, arising from both the 2020 Secret Horse Purchase Agreement and from the contemporaneous Consulting Agreement.

222.     This prurient, motive of greed is all the more clear when viewed in the context of the fact that from May through the end of June, 2020, Meeker had been negotiating with the principal of J-5 Equestrian, Mr. Robert P. Jornayvaz, III, to borrow $ 1,500.000.00 from Mr. Jornayvaz.

223.     On June 30, 2020, when Mr. Jornayvaz insisted on a personal guarantee, Meeker abandoned Meeker's loan negotiations with Mr. Jornayvaz, and pivoted to Mr. Borodin and Park Place Polo.   Meeker then created a complex transactional structure with Mr. Borodin and his Park Place Polo Team and its closely-related entities, whereby Meeker did not have to give a personal guarantee, nor provide any standard releases for the transaction.

224.     Thus, the entire transaction with Pegasus and the Park Place Polo Entities by the Crestview Defendants is permeated and infected by greed, and was undertaken by the Crestview Defendants with knowing and malicious disregard for the rights of the Plaintiffs.

225.     Further, the 32 pages, which Defendants were forced to turn over by the June 17, 2021 Court Order [ECF 85], including the 2020 Secret Horse Purchase Agreement, two Amendments to the Secret Horse Purchase Agreement, and an Escrow Agreement utilizing Akerman LLP as Escrow Agent, with a Florida jurisdiction, venue and choice of law clause all evidence the great lengths to which the Crestview Defendants are willing to go in order to disguise

their unlawful and fraudulent scheme to misappropriate unique and invaluable horses and genetic material owned by Plaintiffs.

**I.     The Crestview Defendants Continue to Create Additional Unauthorized Cuartetera Clones During this Litigation.**

226.    In addition to the three (3) Cuartetera clones sold to Pegasus, the Crestview Defendants, at the direction of Meeker, have continued to cause the creation of additional unauthorized Cuartetera clones during the pending of this litigation.

227.    The Crestview Defendants have contracted with Viagen Equine for the gestation of no fewer than nineteen (19) additional unauthorized Cuartetera clones.

228.    The Crestview Defendants contracted with Viagen Equine for the creation of twelve (12) clones of a horse identified in the contract only as "CF Pantera 2," in a contract effective December 1, 2020, but executed on December 7, 2020. As admitted by Meeker, "CF Pantera 2" was an alias for Cuartetera, and these are clones of Cuartetera, again illustrating the evasive behavior by Crestview as they continue to breach the Agreements by unilaterally producing more Cuartetera clones.

229.    The Crestview Defendants also contracted with Viagen Equine for the creation of seven (7) clones of a horse identified in the contract only as "CF Symphony, T-Bred, dark bay/brown, Female," in a contract effective December 1, 2020, but executed on December 11, 2020.  As admitted by Meeker, "CF Symphony" was an alias for Cuartetera, and these are clones of Cuartetera, once again an illustration of evasive conduct by Crestview Defendants to avoid detection of their breaches.

230.    None of the Crestview Defendants sought permission from any of the Plaintiffs to create these additional clones.

231.   Plaintiffs did not authorize any Defendant to create, nor sell, these additional clones.   Nevertheless, the Crestview Defendants continue to represent to Pegasus that Crestview has the contractual right to produce and sell those Cuartetera clones to Pegasus, and continue to trade on the name, identity of Mr. Cambiaso and La Dolfina and their affiliation with the clones, in violation of federal and state law.

**J.**   **Secret Horse Purchase Agreement**

**1.**   **The Crestview Defendants Offer to the Public the Unauthorized Sale of Other Unauthorized La Dolfina Horse Clones.**

232.   In December, 2020, one month after the unauthorized sale of the unauthorized clones to Pegasus on November 1, 2020, the Crestview Defendants also offered the sale of La Dolfina horse clones to Bartolome Castagnola, another competitor of Plaintiffs.   See **Exhibit 28,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto, and **Exhibit 29,** *Affidavit of Bartolome Castagnola* ¶¶ 4-10.

233.   On December 1, 2020, Meeker, on behalf of himself, Crestview Genetics and Crestview Farm, stated to Camila Castagnola in a Whatsapp message exchange [See **Table 1** below] that Meeker and his Crestview entities are presently making clones of Plaintiffs' polo horses and are selling them, and falsely implied that Defendants were authorized by Plaintiffs to do so, to wit:

(a)   "***You guys should buy one of my new Colibri or Aiken Cura clones! I'm making new Lapa clones too***."

(b)   Meeker also stated that all of Plaintiffs' "***Cuartetera***" polo horse clones are already "***all spoken for***", and

(c)   that Meeker has "***babies of Cuartetera***" for sale.

**Table 1**



**See Exhibit 28,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and <u>Exhibit 1</u> thereto and images above at <u>**Figure 2,**</u> *WhatsApp messages of December 1, 2020 from Alan Meeker to Camila Castagnola,*

234.    The Crestview Defendants are thus continuing, without authorization and in violation of federal and state law, to use Plaintiff's proprietary trade secrets to create clones from equine genetic material belonging to Plaintiffs, and to otherwise manipulate, transport and sell clones and genetic material that is the sole and exclusive property of La Dolfina without authorization, to other competitors of Mr. Cambiaso and La Dolfina.   **Exhibit 29,** *Affidavit of Bartolome Castagnola* ¶¶ 4-10**; Exhibit 28,** *Affidavit of Camila Castagnola* ¶¶ 3-4.

235.    These December 1, 2020 false or misleading statements to Bartolome Castagnola and Camila Castagnola by Meeker and Defendants are consistent with the prior admissions by

69

Defendants' Counsel on November 18, 2020 that Defendants have "created several cloned foals …. and has sold three of them….." **Exhibit 21.**

236.    Meeker, on behalf of himself and the Crestview Defendants, then called Mr. Castagnola in early December, 2020, and during that call, Meeker:

(a)    offered to sell Mr. Castagnola cloned polo ponies of Lapa, Aiken Cura and Colibri;

(b)    told Mr. Castagnola that the Crestview Defendants owned those clones of Plaintiffs' unique polo horses; and

(c)    would imminently begin selling clones of Plaintiffs' famous and successful polo horse "Cuartetera."

**Exhibit 29**, Affidavit of Bartolome Castagnola ¶¶ 5, 8 and 9.

237.    Defendants have, without authorization, used the name and identity of Mr. Cambiaso, his celebrity, and his affiliation with his horses for a commercial purpose.

238.    These statements to the public were false or misleading, violate Florida privacy law, and as well constitute breaches of the 2009 and 2019 Agreements.

239.    Plaintiffs currently are and have long-been the registered owners of the original polo horses (the clones of which Defendants now are advertising for sale). The names of those horses have long-been associated with the La Dolfina and Cambiaso names and teams. **Exhibits 30 and 31,** *Affidavit and Second Affidavit of Roberto Zedda.*   Meeker's statements to the Castagnolas and other consumers in Florida and elsewhere that the Crestview Defendants had the authorization of Plaintiffs and the contractual right to sell the clones were false or misleading descriptions of fact or false or misleading representations of fact. Defendants have made and continue to make unauthorized use of the names and identities of Plaintiff Adolfo Cambiaso and his affiliation with the unique horses of La Dolfina, such as Cuartetera.

240.     These false descriptions or false representations of fact *("[y]ou guys should buy one of my Colibri or Akin Cura Clones!"... "I have babies of Cuartetera")* have the capacity to deceive or did deceive consumers of high end polo horses.

241.     Moreover, the statements evidenced in the recent production on June 17, 2021 and the commercial promotion and advertising to the Castagnolas discussed above omitted material information that both shows the misappropriation of Plaintiffs' trade secrets as well as the misuse of Mr. Cambiaso's name.   Both of this breach and this act have a material effect on purchasing decisions that resulted in the unauthorized sale and transport of the clones discussed above and future clones. Moreover, given the interstate and international nature of the sales of these championship polo ponies, these misrepresentations affected interstate and foreign commerce.

242.     Meeker himself has previously admitted and stated to the public that Defendants would not sell the clones of Plaintiffs' horses, stating "***If we sold one of our clones of Cuartetera or Lapa, we would be selling the original genetic material that someone else could then clone for themselves. That takes us out of the loop.***"   **Exhibit 18,** *Cloning: Fort Worth firm seeks the best polo ponies in the world*, Jeff Hooper, Fort Worth Business Press, March 24, 2018, found at: https://fortworthbusiness.com/technology/cloning-fort-worth-firm-seeks-the-best-polo-ponies-in-the-world/.   Indeed, the tight restriction of distribution of equine genetic material and clones of Mr. Cambiaso was a fundamental premise of the 2009 Agreement, the parties' subsequent contracts and related course of conduct thereafter.

243.     The grant of the "limited right" to clone 10 additional Cuartetera clones in the Secret Cloning Agreement will proliferate additional breaches of contract by Defendants, as well as continued misappropriation of propriety and confidential trade secrets, and demonstrate the continued misappropriation of Mr. Cambiaso's name.

244.    Mr. Cambiaso is the most well-known polo player and breeder of polo horses in the world. Mr. Cambiaso is considered the best polo player in world history. He is a celebrity in the polo world, and La Dolfina is recognized as the most accomplished and successful polo team owning several of the best polo ponies in history along with renowned as the top polo pony breeder in the world.

245.    The false implication that Mr. Cambiaso, the leading celebrity in the World, approves of or sponsors these unauthorized clones, is likely to cause confusion, or to cause mistake or to deceive his employers as well as deceiving the public sponsorship, or approval of these clones by MR. Cambiaso, and about the unauthorized commercial activities of Defendants. **Exhibit 32**, *Affidavit of Santiago Ballester,* ¶¶ 20-28.

246.    Florida law, F.S. § 540.08, protects the public's interest in freedom from deception and the celebrity's interest in his or her commercial investment and the "drawing power" of his fame in affiliation with commercial endeavors.   Specifically, F.S. § 540.08(a) provides that   *"No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by: (a)Such person…."* [italics added].

247.    The Crestview Defendants, through their conduct in offering for sale clones of the horse Cuartetera and other horses, traded for commercial purposes upon the name of Adolfo Cambiaso and his affiliation with such horses.   Defendants' conduct hijacks or appropriates Mr. Cambiaso's name and celebrity status, and his fame and renown, without his authorization. This conduct has and is likely to cause both harm Mr. Cambiaso by creating confusion among his

present and future employers, who rely on his superior equine mounts in making their hiring decisions in the competitive world of polo.

248.    The clones originated with Mr. Cambiaso and La Dolfina, the owners of the original horses from which these clones were created and the owners of the genetic material that was used for their creation.

**M. The Harm to Plaintiffs is Irreparable.**

249.    This case cannot be resolved solely through monetary damages.   More importantly to Plaintiffs, the harm to Plaintiffs is irreparable and cannot ever be cured by monetary damages alone. Once the unique genetic material and clones that are the exclusive property of Plaintiffs are distributed World-wide by the technologically savvy and well-financed Defendants, beyond the jurisdiction of this Court, there will be no remedy available to reverse or cure that harm. **Exhibit 29,** *Affidavit of Bartolome Castagnola* ¶11. Indeed, the Park Place Polo Entities and Pegasus have already moved the 3 Cuartetera clones out of the state of Florida during the pendency of this litigation, the litigation of which Park Place Entities had full knowledge of.

250.    The irreparable injury is *neither* remote *nor* speculative. **Exhibit 32**, *Affidavit of Santiago Ballester,* ¶¶ 20-28. The Crestview Defendants have sold an option to sell an additional 7 Cuartetera clones, which are the sole and exclusive property of La Dolfina, to Pegasus / Borodin. **Exhibit 10**. The Crestview Defendants have already sold and shipped, and imminently intend to sell and ship more of, the unauthorized Cuartetera clones, and the Crestview Defendants themselves have previously acknowledged that the unauthorized sale of the clones would cause irreparable harm.   **See Exhibit 8,** CF000008; § 9.2 of the 2020 Secret Horse Purchase Agreement. Moreover, the Crestview Defendants have continue to contract for and cause the gestation of

additional Cuartetera clones during the pendency of this litigation, including at least nineteen (19) more beyond the three (3) already sold to the Park Place Polo Defendants.

251.    Leading up to and during the January 29, 2021 TRO Hearing, Defendants and their attorneys materially mislead this Court by representing that neither Meeker, Crestview Farm, or Genetics has any interest or intention of conducting any additional sales of any other clones belonging to Mr. Cambiaso or La Dolfina. To wit:

> There are **no additional sales of any other clones of any other horses associated with Mr. Cambiaso or La Dolfina, S.A.** that are **pending or under discussion**. Thus, there is **no imminent "harm" to enjoin**. [DE 38*18] *Response in Opposition to Plaintiff's Motion to Expedite Ex Parte Renewed Motion for TRO.*

> The other thing I would point out is the **sale** of those foals **took place on November 9th of 2020**, so you know, this is posited to you as if it is some TRO to grab property and there was confusion earlier between personal jurisdiction over a party and whether the Court has ability to enjoin and reach property or other third parties. I'm not going to go too far into that confusion, but here, there is **no urgency arising out of the potential sale of those horses**. That sale took place between people in Texas and South Carolina and **was consummated in early November, long before either of these actions were filed. [DE 53**, *TRO Hearing Transcript*, Mr. O'Quinn, 92:15-25].

> Meeker similarly swore under oath:

> The contract for sale of the "Cuartetera" clones was signed before this lawsuit was filed. There are **no additional sales of any other clones of any other horses associated with Mr. Cambiaso or La Dolfina, S.A. that are pending or under discussion**. There are **no ongoing negotiations for the sale of any clone** of any horses associated with Mr. Cambiaso or La Dolfina, S.A. at present. [38-1*7] *Declaration of D. Alan Meeker* ¶ 12

> **To date** [February 4, 2021], **only four of the clones developed under the 2009 Agreement** have been **sold**. [DE 54] *Declaration of David Alan Meeker* ¶ 15

252.    Thus, leading up to, during, and continuing after the January 29, 2021 TRO Hearing, the Crestview Defendants and their attorneys materially mislead this Court by representing that neither Meeker, Crestview Farm, or Genetics has any interest or intention of conducting any additional sales of any other clones. The representation that no further cloning or

sale of clones was imminent leading up to and at the January 29, 2021 TRO Hearing is demonstrably false in light of the 2020 Secret Horse Purchase Agreement and the first two amendments thereto. **Exhibit**s **8, 9, and 10**.

253.    Meeker's false statements in Defendants' communications and advertisements to sell Plaintiffs' clones to Mr. Castagnola, a competitor of Plaintiffs, as well as admissions of previously offering to sell to others, as well as the 32 pages of the 2020 Secret Horse Purchase Agreement and four Amendments thereto during the pendency of this litigation extending the time during which the Borodin / Pegasus option and the Escrow Agreement, establish that the Crestview Defendants are not only violating their prior agreements with Plaintiffs but have ongoing interest, intention, and plans to sell additional clones and genetic material owned by Plaintiffs. See **Exhibit 29,** *Affidavit of Bartolome Castagnola* ¶¶ 8 – 10;   **Exhibit 28,** *Affidavit of Camila Castagnola* ¶¶ 3-4 and Exhibit 1 thereto; **Exhibit 9**, *Amendment to the 2020 Secret Horse Purchase Agreement*; **Exhibit 10**, *Second Amendment to the 2020 Secret Horse Purchase Agreement;* **Exhibit 11,** *Third Amendment to the 2020 Secret Horse Purchase Agreement*, and **Exhibit 12,** *Fourth Amendment to the 2020 Secret Horse Purchase Agreement*.

254.    The evidence also shows that unrestricted cloning and World-wide distribution of the unique genetic clones belonging to Plaintiffs cannot be reversed, is irreparable, and cannot be cured by monetary damages. **Exhibit 29;** *Affidavit of Bartolome Castagnola* ¶ 11; **Exhibit 30;** *Affidavit of Roberto Zedda* ¶¶ 27-31; **Exhibits 8, 9, and 10,** CF000001-32.**; Exhibit 32,** *Affidavit of Santiago Ballester,* ¶¶ 20-28.

255.    Defendants themselves unequivocally acknowledged in their 2020 Secret Horse Purchase Agreement the irreparable nature of the harm caused by the unauthorized distribution or sale of Cuartetera and other Cambiaso / La Dolfina clones or genetic material.   **See Exhibit 8,**

CF000008-10. Therein, the Crestview Defendants reserved their right to seek injunctive relief in the event of breach of their agreement with Mr. Borodin and/or Pegasus. Thus, any contrary assertions in this litigation must be deemed waived and lack any credibility whatsoever.

256.    All conditions precedent to this Action have either been waived, excused or performed.

## Count I

### Declaratory Judgment – Failure to Agree on Material Terms, Invalidity, Novation or Extinguishment of the 2009 Agreement

257.    Plaintiffs repeat and reallege against Defendants ¶¶ 1 through 256 of the General Allegations.

258.    There is a case and controversy regarding the respective rights to Plaintiffs' equine genetic material and horses under ¶¶ 1, 2 and 4 of the 2009 Agreement.   Plaintiffs seek declaratory judgment establishing that the 2009 Agreement failed and it was void as a matter of law because: (i) the parties never came to a mutually acceptable agreement as to the endorsement marketing; (ii) the parties never came to a mutual agreement as to the final sales price and terms of sale of any clones; and (iii) the parties never came to an agreement as to production of the additional "second edition" clones.   Plaintiffs believe that this issue can be determined as a matter of law from the four corners of the agreement.

259.    In the alternative, Plaintiffs seek declaratory judgment establishing that it is beyond doubt that this Agreement was extinguished in perpetuity by the novation and agreement of the parties to enter into the 2011 Quota Holder Agreement along with the Crestview Defendants' acceptance of $1,533,000.

260.    The Parties to that 2009 Agreement as well agreed to cancel or extinguish that Agreement in 2011.

261.    The Parties agreed that the 2011 Quota Holder Agreement would take the place of the 2009 Agreement. The parties agree that the Quota Holders Agreement was a valid Agreement until terminated by the 2019 Settlement Agreement.

262.    Further, the course of conduct by the Crestview Defendants, in the 10 years following the 2009 Agreement in their dealings with Plaintiffs and in their statements to the public media, demonstrates that the parties intended to abandon and extinguish any and all unilateral rights by Crestview to make and sell clones under the 2009 Agreement.

263.    The 2019 Settlement Agreement did not resurrect the previous 2009 Agreement.

264.    The 2019 Side Letter Agreement instead addressed equine cloning of Plaintiff's horses, and that 2019 Side Letter Agreement specifically prohibited the Crestview Defendants from taking unilateral action to market, advertise, endorse, set the terms for and sell Cambiaso / La Dolfina horses, while superseding any prior agreements regarding cloning, which would have included the 2009 Agreement if it had not already been cancelled by the 2011 Quota holders Agreement.

265.    The cancellation and replacement of the 2009 Agreement by the 2011 Quota Holder Agreement was supported by valid consideration in the form of payment of $ 1,533,000 to the Crestview Defendants and reflected by the subsequent course of conduct in the Crestview Defendants' dealings with Plaintiffs and statements in the public media following the execution of that 2011 Agreement.

266.    The 2011 Quota Holder Agreement was a valid agreement and that is not disputed by the Crestview Defendants.

267.    The Crestview Defendants have no right to unilaterally use and sell the genetic material of La Dolfina's Cuartetera under a claim of right of the previously-cancelled and replaced 2009 Agreement, nor under any subsequent contract amongst the parties.

268.    The recent improper reliance in 2020 upon the invalid or novated 2009 Agreement by the Crestview Defendants has caused and continues to cause the Plaintiffs past and future injury.

269.    However, the Crestview Defendants continue to state to the public, such as to Pegasus, the Park Place Polo Entities, and to various courts, and to others, that the 2009 Agreement is a valid basis for the present Cambiaso / La Dolfina horse clone sales by the Crestview Defendants.

270.    Therefore, there is a bona fide, actual, present and practical need for a declaration of the Court as to the rights and remedies of the court with respect to the invalid or cancelled 2009 Agreement and the effect of that invalidity or cancellation upon the Secret Horse Purchase Agreement, and the sale of clones and attempted assignment of cloning rights thereunder by the Crestview Defendants to Pegasus.

271.    The controversy between the parties is real and immediate. As a result of the outstanding option Crestview Farm has conveyed to Pegasus to elect to purchase seven (7) additional Cuartetera clones, and a concomitant grant of cloning rights, Plaintiffs have suffered injury to their ownership rights, and there is a substantial likelihood that is practically a certainty that the Plaintiffs will suffer further substantial injury in the future absent intervention.

272.    The execution of four Amendments to the Secret Horse Purchase Agreement by Meeker on behalf of Crestview Farm, as well as the creation of the equine cloning Consulting Agreement between the Crestview Defendants and the Park Place Polo closely related affiliates, establishes not only a reasonable expectation this misconduct regarding the Cambiaso / La Dolfina

clones will continue and be repeated in the future, but a certainty that the Crestview Defendants and Pegasus intend to continue the unauthorized cloning and that the Defendants' misconduct with the clones is thus ongoing.

273.    At this point in time, Defendants have a sufficient repository of misappropriated equine genetic material belonging to Plaintiffs to continue this misconduct unabated without the intervention of this Court.

274.    Thus, the standing requirements are satisfied.

275.    The genetic material of the horses and clones owned by La Dolfina and / or Mr. Cambiaso is highly unique and not subject to public knowledge, nor replicable. The strict limitations on the cloning and distribution of the clones is necessary to ensure the continued viability and quality of the cloned genetic lines, as well as to sustain the market demand and market value of the genetic copies of the La Dolfina polo ponies. **Exhibit 23**, *Affidavit of Santiago Ballester ¶¶26-28.*

276.    Further, during the pendency of this litigation, the Crestview Defendants together with Pegasus have executed four Amendments to the Secret Horse Purchase Agreement, extending the option for Pegasus to elect to purchase seven (7) additional unauthorized Cuartetera clones that are the sole property and belong to La Dolfina.

277.    The unauthorized misappropriation of the La Dolfina and Mr. Cambiaso's horses' genetic material, and the subsequent unauthorized cloning, unauthorized sale and unauthorized World-wide distribution of the La Dolfina and Mr. Cambiaso clones by Defendants, as alleged herein has caused and will continue to cause La Dolfina and Mr. Cambiaso irreparable and immediate injury, loss, and damages, for which there is no adequate remedy at law.

278.     No adequate remedy of law exists that can fully protect Plaintiffs from damages, Plaintiffs will continue to suffer if Meeker, Crestview Farm, and Crestview Genetics, are permitted to continue to misappropriate the genetic material and clones owned by La Dolfina or Mr. Cambiaso horses and sell the unauthorized clones and / or their genetic material into the market.

279.     The Crestview Defendants have both not only admitted to but insisted upon recognition that ***irreparable injury, no adequate remedy at law, and*** the ***right to enjoin*** Pegasus (and thus Borodin) from producing any further Cuartetera clones, and a ***right to recover*** from Pegasus ***all Cuartetera clones*** in the event of breach of the 2020 Secret Horse Purchase Agreement by Pegasus or an assignee of Pegasus. Defendants should be estopped from and have waived taking a contrary position to this request for injunctive relief as Plaintiffs herein are suffering and continue to suffer the same irreparable harm by the continued and ongoing unauthorized cloning and sale of clones owned by La Dolfina.

280.     The Crestview Defendants have purportedly "assigned" the cloning rights to Cuartetera to Pegasus or its affiliates.

281.     Injunctive relief is necessary to prevent and restrain the ongoing violations of law described herein.

282.     Injunctive relief is warranted upon consideration of the balance of hardships between the Plaintiffs and the Defendants.

283.     A permanent injunction enjoining Defendants and their entities, principals, owners, individuals, parents, subsidiaries, affiliates thereof, or agents from continuing to misappropriate and clone the La Dolfina and Mr. Cambiaso horses and genetic material, and from marketing and selling the clones and genetic material, and requiring them to return all such genetic material and clones to Plaintiffs would not hurt the public interest.

WHEREFORE, Plaintiffs seek declaratory judgement against the Crestview Defendants, or such other remedies as the Court may deem proper, such as return of all clones to Plaintiffs, and to determine that (i) the 2009 Agreement failed for lack of agreement or performance of its material terms, and (ii) that the parties agreed to a novation or abandonment/extinguishment of the 2009 Agreement via the 2011 Quota Holders Agreement; and what the rights and remedies of the parties under the 2009 Agreement (if any) presently are.   The relief also requested includes a declaratory judgment that the 2020 Secret Horse Purchase Agreement, which relies upon the purported survival of the 2009 Agreement, and any Amendments thereto, are also void *ab initio*, novated, breached, or otherwise invalid, for lack of any underlying right to create and sell clones under the invalid or cancelled and replaced 2009 Agreement.   Plaintiffs also seek injunctive relief against Defendants, and against all of Defendants' entities, principals, owners, individuals, parents, subsidiaries, affiliates thereof, or agents, enjoining those individuals and entities from continuing to misappropriate and clone the La Dolfina and Mr. Cambiaso horses and genetic material, and from marketing and selling the clones and genetic material, and requiring them to return all such genetic material and clones to Plaintiffs.   Plaintiffs also seek actual and incidental damages, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

## Count II
### Breach of the 2009 Agreement

284.   Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

285.   This count is brought in the alternative, to the extent the 2009 Agreement is determined to still be in effect.

286.    Plaintiff Cambiaso and Defendants Meeker and his alter-ego Crestview Farm entered into the 2009 Agreement (the "2009 Agreement"). **Exhibit 4.**

287.    The Crestview Defendants have admitted in this litigation that certain claimed rights under the 2009 Agreement were assigned to Crestview Genetics from Crestview Farm. Both Crestview Defendants are controlled by and used as alter-egos by Defendant Meeker

288.    The 2009 Agreement was invalid, cancelled, forever terminated and replaced by the parties' agreement to enter into the 2011 Quota Holders Agreement, which the Parties agree was a valid agreement.

289.    To the extent the Crestview Defendants presently take the position that the 2009 Agreement is still valid and operating (which Plaintiffs dispute) or the Court finds that this Agreement is valid, then the Crestview Defendants breached the 2009 Agreement by unilaterally using the genetic material of the horse Cuartetera owned by La Dolfina, creating unauthorized clones of Cuartetera, and unilaterally selling and setting all prices and terms of such sales of the unauthorized clones of Cuartetera, and even allowing Pegasus to continue cloning this horse, without any knowledge or consent by Mr. Cambiaso or La Dolfina.

290.    Such unilateral action was not permitted by ¶¶ 3, 4 and 5 of the 2009 Agreement, and such unilateral action constitute breaches of that 2009 Agreement.

291.    The 2009 Agreement did not convey nor contemplate the conveyance of ownership of any horse or genetic material to Meeker, Crestview Farm, or other Crestview Entity. The 2009 Agreement only ever allowed Crestview Farm, as provided in ¶ 1, very limited access and license for Crestview Farm "to select four mares from Owner's (defined as Mr. Cambiaso) stock *for the purpose of extracting tissue samples for cloning*." [emphasis added].

292.     Further, ¶ 4 of the 2009 Agreement *required a mutuality of agreement* by both Mr. Cambiaso and Crestview Farm (and by Genetics as admitted assignee), stating *"Owner and Crestview will jointly determine all final sales prices and terms."*

293.     Mr. Cambiaso never agreed to the unilateral production and sale by Crestview Farm, Meeker, or any other individual or entity of any clones of Mr. Cambiaso's horses or the horses or especially the clones of La Dolfina, because La Dolfina was not ever part of the failed 2009 Agreement. Mr. Cambiaso never agreed that the Crestview Defendants could grant the rights to third parties such as Pegasus to continue cloning Cuartetera as contemplated by the 2020 Secret Horse Purchase Agreement.

294.     Mr. Cambiaso never agreed or otherwise provided the rights to Crestview Farm and Meeker to sell clones of Cuartetera as Crestview Farm and Meeker have now done and is evidenced by the 2020 Secret Horse Purchase Agreement and amendments thereto.   **Exhibits 8, 9 and 10.** Quite to the contrary, to the extent that the 2009 Agreement contemplated the sale of any clones, the 2009 Agreement required Mr. Cambiaso, not Meeker or Crestview Farm, to market the first three of each cloned horse for sale and required Mr. Cambiaso "jointly determine [with Crestview Farm and Meeker] all final sales prices and terms." **Exhibit 4, ¶ 4.**

295.     The 2009 Agreement did not convey unlimited rights to or ownership of any genetic material, horses, or clones therefrom from Mr. Cambiaso to Crestview Farm. Nor did the 2009 Agreement permit the surreptitious sales of Cuartetera clones without the knowledge or authorization of Mr. Cambiaso.

296.     Additionally, Mr. Cambiaso, Meeker, and Crestview Farm did not ever negotiate and agree to "an acceptable breeding program providing for the endorsement and marketing of clones and Crestview's cloning program" as required by ¶ 3 of the 2009 Agreement. **Exhibit 4.**

297.    By breaching the aforesaid provisions of the 2009 Agreement in the manner and method by which they did so, the Crestview Defendants also breached the implied covenant of good faith and fair dealing implicit in those provisions of the 2009 Agreement.

WHEREFORE, Plaintiff Adolfo Cambiaso demands judgment against the Crestview Defendants, including but not limited to actual and incidental damages, injunctive relief including an order directing the return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

## Count III
### Breach of Contract
### Regarding the 2019 Side Letter Agreement

298.    Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

299.    On July 29, 2019, Plaintiffs, Meeker, and Crestview Genetics entered into the 2019 Side Letter Agreement. **Exhibit 7**

300.    The 2019 Side Letter Agreement provided, among other things, that La Dolfina S.A. would transfer the oocytes of the <u>Schedule I</u>  Cambiaso / La Dolfina horse clones to Defendant Genetics in order for the oocytes to be fertilized with semen provided from stallions belonging to and chosen by Plaintiffs. **Exhibit 7**.

301.    A material term of the 2019 Side Letter Agreement was the agreement and representation by Meeker and Crestview Genetics, on behalf of Meeker the Crestview Defendants that "Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells ***for the exclusive use***

*of AC (Mr. Cambiaso) and LD (La Dolfina)* at no cost to AC or LD during the term of this agreement." **Exhibit 7**, ¶ 8.

302.    The Crestview Defendants did not honor that provision.    The continuing unauthorized production and sale of Cuartetera clones by Meeker by and through Crestview Farm to persons and entities other than Mr. Cambiaso or La Dolfina violates material terms and a fundamental premise of the 2019 Side Letter Agreement.

303.    This conduct constitutes a material breach of the 2019 Side Letter Agreement, which has caused, and continues to cause damage and irreparable harm to Plaintiffs. In addition, the 2019 Side Letter Agreement stated that Crestview Genetics must clone 10 "Cuarteteras" for the exclusive use of Cambiaso and La Dolfina, and, should Crestview Genetics successfully complete and deliver these Cuartetera clones to La Dolfina, Alan Meeker, by and through Crestview Genetics, may clone two Cuarteteras "for the exclusive amateur (non-professional) sports use of David Alan Meeker and any of his children, (the Meeker Cuarteteras)" but that the sale or further cloning of the Meeker Dolfina Cuarteteras was "expressly prohibited." **Exhibit 7**.

304.    The 2019 Side Letter Agreement did not allow or otherwise contemplate the sale of any clone or the sale of any oocytes to be used to clone.

305.    The 2019 Side Letter Agreement did not give Meeker, Crestview Genetics, or any other individual or entity the unilateral right to sell any clones or genetic material of horses owned by Plaintiffs under any circumstances. Defendant Meeker acknowledged and reaffirmed in March 2020 that the Cuartetera clones in gestation were for the use of Mr. Cambiaso and that he promised to discuss payment for cloning services for the creation of those clones. Despite this affirmation, Defendant Meeker then quietly and secretly sold those very clones to Pegasus.   **Exhibit 8.**

85

306.     Further, the sales of the Cuartetera clones to Pegasus or Mr. Borodin himself, violates the express restrictive terms of the 2019 Side Letter Agreement, which has as its core, material term, that only a limited number of clones of Cuartetera under very specific conditions were ever to be produced.

307.     The 2019 Side Letter Agreement prohibits the unilateral sale of clones by the Defendants. Mr. Cambiaso is required to expressly consent to any cloning under the terms of the agreement. **Exhibit 7,** ¶ 6.

308.     Any clones produced under the 2019 Side Letter Agreement are to be registered to La Dolfina. **Exhibit 7,** ¶ 1.

309.     The 2019 Side Letter Agreement mandates that any Cuartetera clones shall only be played on a La Dolfina branded team. **Exhibit 7,** ¶ 2.   By breaching the aforesaid provisions of the 2019 Side Letter Agreement in the manner and method by which they did so, Defendants also breached the implied covenant of good faith and fair dealing implicit in those provisions of the 2019 Side Letter Agreement.

310.     The 2019 Side Letter Agreement contains a remedy of replevin that requires Defendants to deliver within 48 hours any unauthorized clones or those being used contrary to the specific language in this agreement restricting their production and use. **Exhibit 7,** ¶ 6.

WHEREFORE, Plaintiffs demand judgment against Defendants Meeker, Crestview Farm, and Crestview Genetics, including but not limited to actual and incidental damages, injunctive relief including an order directing the return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

**Count IV**

**Breach of Bailment Contracts Regarding the 2009 Agreement
and 2019 Side Letter Agreement**

311.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 256 of

the General Allegations. This count is brought in the alternative with respect to the 2009

Agreement.

312.    Both the 2009 and 2019 Agreements gave possession to Defendants of certain of

Plaintiffs' genetic material for strictly limited purposes and under strictly limited parameters that

were defined by contract.

313.    While the 2009 Agreement was never valid or forever terminated and extinguished

in 2011 by agreement to novation and the parties entering into the Quota Holders Agreement, to

the extent relied upon presently by the Crestview Defendants, the 2009 Agreement has also been

breached by the recent acts of those Defendants.

314.    Under both the invalid or terminated 2009 Agreement and 2019 Side Letter

Agreement, equine genetic material belonging to Plaintiffs, and any clones therefrom, were

delivered to the Crestview Defendants for the limited purpose of applying cloning technology to

that genetic material.  The Agreements did not convey to Crestview unilateral ownership and

control of that material and the clones created therefrom

315.    The 2009 and 2019 Agreements, as well can be implied from the conduct of the

parties during this time period, created only a bailment for the mutual benefit of the parties in

return for the benefits flowing from the fact of bailment.

316.    Further, Crestview Defendants were charged with the exercise of care, to preserve

the value of the bailed genetic material and clones, for example, by not engaging in unauthorized

production and sale which would dilute the valuable genetic bloodlines.

317.     Defendants nonetheless exceeded the scope of their authorized bailment and misappropriated Plaintiffs' genetic material and produced and sold unauthorized clones and provided options to sell more of those clones.

318.     The 2019 Side Letter Agreement contains a remedy of replevin that requires Defendants to deliver within 48 hours any unauthorized clones or those being used contrary to the specific language in this agreement restricting their production and use. **Exhibit 7, ¶ 6.**

319.     As a direct and proximate consequence of these breaches of the conditions of bailment under both the 2009 and 2019 Agreements, and the refusal of the Defendants to return tissue harvested thereunder or the Cuartetera clones created from that tissue, Plaintiffs have been injured.

WHEREFORE, Plaintiffs demand judgment against the Crestview Defendants, including but not limited to actual and incidental damages, injunctive relief including an order directing the return of all clones and genetic material, prejudgment and post judgment interest, attorney's fees and costs as allowed by law, and such other relief the Court finds just and proper.

### Count V

#### Unjust Enrichment

320.     Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

321.     This count is brought in the alternative to breach of the 2009 Agreement and breach of the 2019 Agreement.

322.     The Crestview Defendants have now received and enjoyed the benefit of the possession and use of Plaintiffs' equine genetic material and clones therefrom, and their breeding and earning capacity without paying for same and while having exceeded the strict limits of Defendants' very limited bailment of that genetic material and clones.

323.    The Crestview Defendants accepted, appreciated, and have wrongfully retained the benefits of Plaintiffs' equine genetic material and clones therefrom, and their breeding and earning capacity.

324.    The Crestview Defendants know that the 2009 Agreement was never valid or long-since cancelled and replaced, and thus know or should know that any recent reliance upon the 2009 Agreement is not legitimate.

325.    The Crestview Defendants have now profited by their wrongful and unauthorized sale of clones of horses belonging to Plaintiffs. That purposeful and malicious misconduct and omissions by Defendants, the most recent of which, the 2020 Secret Horse Purchase Agreement and extensions of options to sell Borodin / Pegasus the Cuartetera clones, is particularly egregious, wanton, and undertaken with reckless and gross disregard for the rights of Plaintiffs and to the harm and damage to Plaintiffs.

326.    In contrast, Plaintiffs have been denied possession of the clones, the genetic material of the clones, have seen their brand and genetic bloodlines sold without authorization, the value diluted, and Plaintiffs have been denied Plaintiffs' right to approve or disapprove of the sale and terms of the sale of the clones, not to mention Plaintiffs' right to an equal share of any proceeds from any such sale.

327.    Under these circumstances, it is therefore inequitable for the Crestview Defendants to retain the millions of dollars paid to them, or the genetic material and clones derived therefrom, , and they should be ordered to disgorge same to Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against the Crestview Defendants, including but not limited to return of all clones and genetic material from Plaintiffs' horses and disgorgement of all profits and proceeds of sale of the Cambiaso / La Dolfina horse clones.

## Count VI

### Equitable Accounting

328.     Plaintiffs repeat and reallege against the Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

329.     Under the 2009 and 2019 Agreements, Defendants represented that they possessed and were experienced in the use of advanced biotechnologies in the cloning of horses and Plaintiffs relied upon Defendants and their expertise. As such equine cloning experts, Defendants enjoyed a superior position to Plaintiffs during the negotiation and performance of those Agreements.

330.     The relationship between the parties contemplated a complex scientific process, equine cloning, which requires meticulous record-keeping, accounting and involves use of sophisticated technology including the extraction, propagation and storage of genetic tissue.

331.     By virtue of Defendants' physical possession of Plaintiffs' genetic material and operation of the biotechnology to effect the cloning therefrom as agreed and specified under the preliminary but cancelled 2009 Agreement, the 2019 Side Letter Agreement, and 2019 Settlement Agreement, Defendants were required to keep and disclose accurate records to account for the location and use of Plaintiffs' genetic material and the clones therefrom, and the revenues derived from all financial activity regarding same.

332.     The Crestview Defendants have not adequately shared this information with Plaintiffs despite Plaintiffs' demand, while admitting that Defendants have sold and plan to imminently sell, several Cuartetera clones belonging to La Dolfina into the public market, and arranged for the production of as many as twenty-two (22) Cuartetera clones.

333.     Under the aforesaid circumstances, Defendants should be ordered to account to Plaintiffs for the inventory and use of Plaintiffs' genetic material and the clones created therefrom, and the revenues derived from all financial activity regarding same.

WHEREFORE, Plaintiffs demands judgment against the Crestview Defendants requiring an accounting to Plaintiffs of the inventory and use of Plaintiffs' genetic material, the clones created therefrom, and the revenues derived from all financial and contractual activity regarding the same.

## Count VII

### Violation of The Defend Trade Secrets Act
### 18 U.S.C. §§ 1832 *et seq.*

334.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

335.    The genetic material from Plaintiffs' renowned polo horses are proprietary, confidential trade secrets, developed from decades of selective breeding, the details of which not known nor readily ascertainable by the general public.   **Exhibits 30 and 31,** *Affidavit and Second Affidavit of Robert Zedda.*   The horses involved include the horses Aiken Cura, Cuartetera, Lapa, Colibri, the further horses listed in the schedule to the 18 November 2020 correspondence from Defendant Crestview Genetics counsel, and all other horses belonging to Plaintiffs. **Exhibit 21.**

336.    In 2009 and 2019, the Crestview Defendants agreed to very limited circumstances under which Defendants might sample and utilize the genetic material.   Very tight restrictions and protocols were put on the use the genetic material, to prevent the public dissemination of this confidential genetic material. Further, Plaintiffs undertook significant efforts to maintain the confidentiality and proprietary nature of this genetic material, including in all contracts involving the cloning, provisions that strictly required mutual agreements and action, and further including provision that strictly limited the use, dissemination and prohibiting the resale of clones made under these contracts.

337.    The post-execution course of conduct by the Crestview Defendants in their dealings with Plaintiffs supports that the Defendants themselves considered this genetic material of independent, economic value, not to be released to the general public.  In fact, the Crestview Defendants confirmed in media statements this was the understanding of the parties, to avoid being cut "out of the loop."   See **Exhibit 18.**

338.    In both of the 2009 and 2019 Side Letter Agreements, and during the decade in between, Defendants agreed and represented and covenanted and engaged in dealings to and with Plaintiffs to the effect that Defendants would keep confidential the equine genetic material of Plaintiffs' horses.

339.    The "tissue samples" as described in the 2009 Agreement, and the clones containing the equine genetic material belonging to Plaintiffs under the 2019 Agreement were intended by Defendants to be kept secret and away from the public, had independent economic value as a result of the decades of selective breeding efforts and expense and the ability to produce superior equine mounts, which was neither known nor replicable by the general public.

340.    To that end, in the 2019 Agreement, Defendants expressly represented and warranted to keep strict control over the clones with Adolfo Cambiaso ("AC") and La Dolfina ("LD"), to wit:

**5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

341.    Therefore, the genetic material, whether in tissue samples from, or within clones from Plaintiffs' renowned polo horses, are considered trade secrets under The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1); 1839(3).   These trade secrets are confidential information   related to a product or service used in, or intended for use in, interstate or foreign commerce in that: (a) Mr. Cambiaso and La Dolfina are engaged in the international professional sport of polo as a business, in which Plaintiffs' polo horses and clones are utilized by Plaintiffs; and (b) Defendants' cloning services to Plaintiffs have been provided through interstate and foreign commerce of the equine genetic material and clones, both interstate domestically, such as between Florida and South Carolina, and internationally, such as between Argentina and the United States.

342.    Through the prior representations of Plaintiffs, see **Exhibit 31,** *Second Affidavit of Roberto Zedda,* Plaintiffs have registered Plaintiffs' ownership of the original polo horses, and the Defendants have agreed to keep the equine genetic material from these horses from the general public.   Therefore, the equine genetic material taken from or derived from Plaintiffs' horses has independent economic value from this genetic material's information not being generally known to the public.

343.    Consistent with this protection of genetic material by Plaintiffs, Defendants too have acknowledged and agreed to keep any Cuartetera genetic material from being distributed in their Secret Horse Purchase Agreement with Mr. Borodin/Pegasus:

> 9.1   Except as expressly authorized in this Clause 9.1, Seller agrees that, without Buyer's prior written consent, Seller will not produce any clones of Cuatatera or provide tissue samples containing Cuartetera genetic material to any person. Seller has agreed to produce ten (10) clones of Cuartetera for Cambiaso (AC Clones). As of the Effective Date, Cambiaso has not elected to have such AC Clones produced. In the event Cambiaso does elect to have such AC Clones produced and Cambiaso tenders payment for such AC Clones, such AC Clones will be produced and delivered to Cambiaso.   Seller agrees that Seller will not produce, or license any other party to produce, any further clones of Cuartetera pursuant to Seller's rights under the Horse Cloning Agreement. Except as provided in this Agreement, Seller makes no representations, warranties or covenants regarding the cloning of Cuartetera by Cambiaso or other person.

344.   Thus, Defendants should be estopped from now claiming that this genetic material is anything other than valuable trade secret information that is protectable under the DTSA.

345.   The equine genetic material from Plaintiffs' horses is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information has been closely guarded by Plaintiffs and continues to be the subject of reasonable efforts by Plaintiffs to maintain its secrecy, such as by strict contract provisions directed to the use and dissemination of such material.

346.   In their Secret Horse Purchase Agreement with Mr. Borodin/Pegasus, Defendants recognize that the distribution of genetic material in light of its uniqueness and value, will lead to irreparable harm, and reserve themselves injunctive remedies should this material be distributed in violation of the need for secrecy:

> 9.2   Seller and Buyer also agree that, in the event Seller violates the covenant in Clause 9.1, Buyer would suffer irreparable injury for which it would not have an adequate remedy at law. Accordingly, Seller agrees that Buyer is entitled to specifically enforce the covenant in Clause 9.1 in equity. Without limiting the generality of the foregoing, Buyer shall have the right to an injunction to enjoin Seller from producing clones of Cuartetera and/or providing tissue samples to any other person what would enable such other person to produce clones of Cuartetera, in violation of Clause 9.1. In addition, Buyer may compel Seller to transfer, and to recover from Seller's transferees and transfer, to Buyer at no cost to Buyer, any clones of Cuartetera that are produced in violation of the covenant in Paragraph 7.1.

347.    Despite expressly representing and warranting to maintain the confidentiality of the genetic material and demanding this protection from Mr. Borodin/Pegasus, Defendants have undertaken the aforesaid misconduct by which Defendants have willfully and maliciously released Plaintiffs' proprietary equine genetic material into the general public marketplace thus exposing Plaintiffs' trade secrets to discovery by the public. **Exhibits 28, 29, 23, 21, 8, 9, 10, 11 and 12,** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Horse Purchase Agreement and Amendments.*

348.    Defendants have done so by willfully and maliciously misappropriating, in violation of the DTSA, Plaintiffs' genetic material from Plaintiffs' horses, by improper means for profit, selling clones of Plaintiffs' renowned polo horses to third parties such as Mr. Borodin and Pegasus, and threaten to do so again. See **Exhibits 28, 29, 23, 12, 8, 9, 10, 11, and 12,** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Horse Purchase Agreement and Amendments.*

349.    These wrongful acts of releasing Plaintiffs' trade secrets into the public domain for profit have injured and threaten to further injure and damage Plaintiffs, including but not limited to: (a) forcing Plaintiffs to compete against clones of Plaintiffs' best playing polo ponies (this year, for example, two of Plaintiffs' clones won for Plaintiff two *Best Playing Pony* awards in the final of the Argentine Polo Open); (b) irreparably diluting the genetic purity of the superior equine blood lines belonging to Plaintiff; (c) damaging the good will of Plaintiffs; and (d) damaging Plaintiffs' uniquely successful and superior brand names and public identity through misuse and mis-affiliation of Plaintiffs with the unauthorized clones.

350.    Defendants' actions therefore constitute willful and malicious misuse of Plaintiffs' trade secrets.    This is particularly so with respect to the actions of Defendants taken since the 2019 Agreement, in violation of that 2019 Agreement and by their execution of the Secret Horse Purchase Agreement.

351.    The intentions expressed by the Crestview Defendants in Mr. Meeker's December 1, 2020 WhatsApp communications to the Castagnolas constitutes actual and threatened misuse of Plaintiffs' trade secrets.

WHEREFORE, Plaintiffs demands against the Crestview Defendants jointly and severally monetary damages pursuant to 28 U.S.C. § 1836(b)(3)(B), injunctive relief requiring the return of all of Plaintiffs' equine genetic material, whether tissue sample, clones in gestation, foals of clones, or full-grown clones derived therefrom, a permanent injunction enjoining Defendants from utilizing said trade secret information in any way; consequential and incidental damages, imposition of a constructive trust upon the income obtained by any Defendant or on their behalf from the sale of any of Plaintiffs' equine genetic material, disgorgement of profits and compensatory damages pursuant to 18 U.S.C. §1836(b)(3)(B), exemplary and punitive damages pursuant to 18 U.S.C. §1836(b)(3)(C), and reasonable attorneys' fees under 18 U.S. C. § 1836(b)(3)(D).

## Count VIII

### Violation of the Florida Uniform Secrets Act– F.S. §§ 688.001 *et seq.*

352.    Plaintiffs repeat and reallege against all Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

353.    The genetic material from Plaintiffs' renowned polo horses are proprietary, confidential trade secrets, developed from decades of selective breeding, which information is not known to the public nor easily ascertainable, and which information Defendants have taken steps

to protect by not releasing that material.    **Exhibits 30 and 31,** *Affidavits of Robert Zedda.*    The horses involved include the horses Aiken Cura, Cuartetera, Lapa, Colibri, the further horses listed in the schedule to the November 18, 2020 correspondence from Crestview Genetics counsel, and all other horses belonging to Plaintiffs.

354.    In 2009 and 2019, as part of Plaintiffs' efforts to maintain the confidentiality of the genetic code in the material, the Crestview Defendants agreed in contracts with Plaintiffs, to very limited circumstances under which Defendants might sample and utilize the genetic material.

355.    Further, Plaintiffs undertook significant efforts to maintain the confidentiality and proprietary nature of this genetic material, including in all contracts involving the cloning, provisions that strictly required mutual agreements and action, and further including provision that strictly limited the use, dissemination and prohibiting the resale of clones made under these contracts.

356.    The post-execution course of conduct by the Crestview Defendants in their dealings with Plaintiffs supports that the Defendants themselves considered this genetic material of independent, economic value, not to be released to the general public.    In fact, the Crestview Defendants confirmed in media statements this was the understanding of the parties, to avoid being cut "out of the loop."    See **Exhibit 18.**

357.    In both of the Agreements, and during the decade in between, Defendants agreed and represented and covenanted to Plaintiffs that Defendants would keep confidential the equine genetic material of Plaintiffs' horses, which Plaintiff considered trade secrets, as part of the agreements between the parties.

358.    The "tissue samples" as described in the 2009 Agreement, and the clones containing the equine genetic material belonging to Plaintiffs under the 2019 Agreement were intended by

Defendants to be kept secret and away from the public, had independent economic value as a result of the decades of selective breeding efforts and expense and the ability to produce superior equine mounts, which was neither known nor replicable by the general public.

359.    To that end of maintaining the confidentiality of that genetic information, in the 2019 Agreement, Plaintiffs included language, and Defendants expressly represented and warranted, that they would keep strict control over the clones with Adolfo Cambiaso ("AC") and La Dolfina ("LD"), to wit:

> **5. Representation:** AC and LD represent and warrant to Crestview US, that AC and LD shall always maintain the Clones under their custody and control at either AC's farm in the Province of Cordoba, Argentina or at the La Dolfina Farm in Cañuelas, Argentina, and both Parties represent and warrant the other that all equine tissue relating to such Clones are and shall always be under the custody and control of the Parties. Crestview US represents that it currently has custody of cells in cryogenic storage originating from horses belonging to AC or LD. Crestview US shall maintain such cells for the exclusive use of AC and LD at no cost to AC or LD during the term of this agreement. In the event AC or LD independently clone more Cuarteteras, such clones shall be considered Clones and added to Schedule I herein.

360.    Therefore, the genetic material, whether in tissue samples from, or within clones from Plaintiffs' renown polo horses, are considered trade secrets under the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. § 688.001 *et seq.*    These trade secrets are confidential information because Plaintiffs derive independent economic value from this information, because it is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts by Plaintiffs to maintain their secrecy. At all relevant times, Defendants were aware of these facts and even represented and warranted to keep that trade secret information confidential.

361.    The Crestview Defendants demanded similar assurances from Mr. Borodin in the Secret Horse Purchase Agreement and prohibited the distribution of any tissue samples given their value and the need for secrecy.   Consistent with this protection of genetic material by Plaintiffs, Defendants too have acknowledged and agreed in the Secret Horse Purchase Agreement to keep any Cuartetera genetic material from being distributed in their Agreement with Mr. Borodin/Pegasus.

362.    Thus, the Crestview Defendants should be estopped from now claiming that this genetic material is anything other than valuable trade secret information that is protectable under the FUTSA.   Through the prior representations of Plaintiffs, **Exhibit 31,** *Second Affidavit of Roberto Zedda,* Plaintiffs have registered Plaintiffs' ownership of the original polo horses, and the Defendants have agreed to keep the equine genetic material from these horses from the general public.   Therefore, the equine genetic material taken from or derived from Plaintiffs' horses has independent economic value from this genetic material's information not being generally known to the public.

363.    The equine genetic material from Plaintiffs' horses is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information has been closely guarded by Plaintiffs and continues to be the subject of reasonable efforts by Plaintiffs to maintain its secrecy, such as by strict contract provisions directed to the use and dissemination of such material.

364.    Despite expressly representing and warranting to maintain the confidentiality of the genetic material, the Crestview Defendants have willfully and maliciously undertaken the aforesaid misconduct by which Defendants have released Plaintiffs' proprietary equine genetic material into the general public marketplace, thus exposing Plaintiffs' trade secrets to discovery

by the public. **Exhibits 28, 29, 23, and 21** *Affidavits of Camila Castagnola, Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel.*

365.   The Crestview Defendants have done so by willfully and maliciously misappropriating Plaintiffs' trade secrets by improper means for profit, selling clones of Plaintiffs' renown polo horses to third parties such as Mr. Borodin and Pegasus, and threaten to do so again. **Exhibits 29, 23, 21, 8, 9, 10, 11, and 12,** *Affidavit Bartolome Castagnola, Robert Jornayvaz, III,* and *18 November 2020 Correspondence from Crestview Genetics counsel, Secret Horse Purchase Agreement with Amendments and Escrow Agreement.*

366.   These wrongful, malicious and willful acts of releasing Plaintiffs' trade secrets into the public domain for profit have injured and threaten to further injure and damage Plaintiffs, including but not limited to: (a) forcing Plaintiffs to compete against genetic twins of Plaintiffs' best playing polo ponies (this year, for example, two of Plaintiffs' clones won for Plaintiff two *Best Playing Pony* awards in the final of the Argentine Polo Open); (b) irreparably diluting the genetic purity of the superior equine blood lines belonging to Plaintiff; (c) damaging the good will of Plaintiffs; and (d) damaging Plaintiffs' uniquely successful and superior brand names and public identity through misuse and mis-affiliation of Plaintiffs with the unauthorized clones.

367.   The Crestview Defendant actions therefore constitute willful and malicious misuse of Plaintiffs' trade secrets.   This is particularly so with respect to the actions of Defendants taken since the 2019 Agreement, in violation of that 2019 Agreement and by their execution of the Secret Horse Purchase Agreement.

368.     Defendants' intentions expressed in Meeker's December 1, 2020 WhatsApp communications to the Castagnolas constitutes actual and threatened misuse of Plaintiffs' trade secrets.

WHEREFORE, pursuant to F.S. §§ 688.001 *et seq.*, Plaintiffs' demand against the Crestview Defendants jointly and severally monetary damages pursuant to: injunctive relief requiring the return of all of Plaintiffs' equine genetic material, whether tissue sample, clones in gestation, foals of clones, or full-grown clones derived therefrom, a permanent injunction enjoining Defendants from utilizing said trade secret information in any way; consequential and incidental damages, and imposition of a constructive trust upon the income obtained by any Defendant or on their behalf from the sale of any of Plaintiffs' equine genetic material, disgorgement of profits and compensatory damages, exemplary and punitive damages, and reasonable attorneys' fees pursuant to F.S. § 688.005.

## Count IX

### Violation of F.S. §§ 540.08 *et seq.*
### Commercial Appropriation Of Name And Identity

369.     Plaintiff Adolfo Cambiaso repeats and realleges against all Crestview Defendants ¶¶ 1 through 256 of the General Allegations.

370.     Florida Statutes § 540.08, Florida Statutes, provides in relevant part that: "[n]o person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use."

371.     Despite the clear language of F.S. §540.08, the Crestview Defendants have made the aforesaid statements, set forth in the General Allegations, to the public by using Plaintiffs' names and names of Plaintiffs' horses, that Plaintiffs have endorsed the cloning and sale of the

clones of Plaintiffs' original, unique polo horses by specifically naming the horses Aiken Cura, Cuartetera, Colibri and Lapa. **Exhibits 29 and 28 hereto,** *Affidavits of Bartolome Castagnola and Camila Castagnola.*

372. These horses at issue are known throughout the polo industry to be the best and most prized horses belonging to Plaintiffs, responsible for much of Plaintiffs' professional success since their originals were introduced to the sport. It is reasonable that no one would represent that they had for sale clones originating from such horses unless such clones and cloning were endorsed by Plaintiffs.

373. However, as described herein above, Plaintiffs have not in fact endorsed the sale of the clones of Plaintiffs' horses to the public, such as the Castagnolas or Mr. Borodin.

374. Therefore, by the specific use of Plaintiffs' horses' names by Defendants in Defendants' advertising and public statements, Defendants have falsely advertised and represented that Plaintiffs have endorsed the sale of the Cambiaso and La Dolfina clones.

375. For example, when the Crestview Defendants represented to the Castagnolas that *"You should buy one of my new Colibri or Aiken Cura clones!   I'm making new Lapa clones too. ... I have babies of Cuartetera"* **Figure 2 herein, and Exhibits 28 and 29,** *Affidavit of Camila Castagnola* and *Affidavit of Bartolome Castagnola,* Defendants falsely implied an endorsement of the cloning and sale by Plaintiffs when such endorsement did not exist.

376. Defendants further represented to the public, in response to a member of the public's inquiry   *"Si, you have Cuartetera??"* that Defendants had already produced and sold clones of Cuartetera: *"No, they are all spoken for."*   That statement was misleading by implying that Plaintiffs had endorsed the creation and sale to the public clones of Plaintiffs' renown Cuartetera polo horse, when in fact Plaintiffs had not endorsed such cloning and sale.

377.    Defendants made and created these false endorsement statements and implications for the commercial benefit of Defendants.

378.    The Crestview Defendants used Plaintiff Adolfo Cambiaso' famous name and the affiliation of his name to the donor horses for the clones in social media, in communications, in interviews, amongst other public medial, in order to promote, advertise and market the clones of Plaintiff's horses.

379.    The Crestview Defendants did not have the permission or authority to use Mr. Cambiaso's name to produce and sell the clones of Plaintiffs' horses, on any terms, and further not and do not have Plaintiffs' consent to use Plaintiffs' name and identity to advertise, promote, market or endorse Defendants' cloning business.

380.    Defendants intentionally, willfully and maliciously publicly misappropriated the name of Mr. Cambiaso and then used Mr. Cambiaso's identity and of the affiliation of his name with his original polo horses, to produce and sell clones without Plaintiffs' consent to produce clones for sale to the public. Defendants did so for purposes of trade or for other commercial or advertising purposes and profit.

381.    Defendants had actual or constructive knowledge of the wrongfulness of their conduct and acted with intent or with reckless disregard to Plaintiffs of property interests during the entire time period in which the unauthorized use of Plaintiffs' identities and Plaintiffs' horses' identities has taken place, which is continuing presently.

382.    Defendants' conduct was reckless and wanton in care, willful and malicious, and further such conduct constitutes a conscious disregard of or indifference to Plaintiffs' rights.

383.    As detailed more fully herein above, the willful and malicious misconduct by Defendants has caused and continues to cause irreparable harm to Plaintiffs' name, reputation, good will, competitive advantage, as well as inflicting other harm upon Plaintiffs.

WHEREFORE, Plaintiff Adolfo Cambiaso demands judgment jointly and severally against the Crestview Defendants for all remedies available under F.S.§ 540.08, including but not limited to, both actual loss and damages, costs, interest, reasonable royalties, punitive and exemplary damages, restitution of Defendants' unlawfully-obtained proceeds and profits, a statutory fine of $ 1,000 per violation in addition to the civil remedies allowed by law, injunction against further use of Plaintiff's name and any representation of the affiliation that name with any cloned horses sold or offered for sale by Defendants, and for any other purpose, injunction against further use and sale of any equine genetic material belonging to Plaintiffs from Plaintiffs' horses, and for such other relief the Court finds just and proper.

### Jury Demand

Plaintiffs hereby request trial by jury on all matters so triable as of right.

Respectfully submitted,

CHAPMAN LAW GROUP, PLC

*Avery S. Chapman*
Avery S. Chapman, Esq.
FL Bar No. 517321
12008 South Shore Blvd.
Suite 105
Wellington, Florida 33414
Tel. 561.753.5996
asc@chapmanlawgroup.net


WHEELER TRIGG O'DONNELL LLP


*Habib Nasrullah*
Habib Nasrullah, Esq.
Miles Orton, Esq.
Harry Dorcy, Esq.

Admitted *pro hac vice*
370 17th Street, Suite 4500
Denver, Colorado 80202
Tel: (303) 244-1800
nasrullah@wtotrial.com
orton@wtotrial.com
dorcy@wtotrial.com

*Counsel for Plaintiffs La Dolfina S.A. LLC
and Adolfo Cambiaso*

## Certificate of Service

I HEREBY CERTIFY that on the date appearing on the first page of this document, I electronically filed the foregoing with the document with the Clerk of the Court using the CM/ECF filing system, which will then serve all counsel of record or pro se parties on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

CHAPMAN LAW GROUP, PLC


*Avery S. Chapman*
Avery S. Chapman, Esq.


**Service List**
La Dolfina, S.A., LLC, et al. v. D. Alan Meeker, et al.
CASE NO. 9:20-cv-82231-AMC/BER

Gary A. Woodfield
Nason Yeager Gerson Harris & Fumero, P.A.
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
561-686-3307
gwoodfield@nasonyeager.com, bpetroni@haileshaw.com, sdaversa@nasonyeager.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Ryan Dwight O'Quinn
DLA Piper LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
305-423-8553
Email: ryan.oquinn@dlapiper.com , javier.rodriguez@dlapiper.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*

Caitlyn Elizabeth Hubbard, Esq.
William N. Warren, Esq.
Kelly Hart & Hallman
201 Main Street Suite 2500
Fort Worth, TX 76102
817-332-2500
Email: caitlyn.hubbard@kellyhart.com, bill.warren@kellyhart.com
*Counsel for Defendant Alan David Meeker and Defendant Crestview Farm, LLC.*

106

James C. Bookhout, Esq.
Jason S. Lewis, Esq.
DLA Piper LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
(214) 743-4549
Email: james.bookhout@dlapiper.com, jason.lewis@dlapiper.com
*Counsel for Defendant Alan David Meeker, Defendant Crestview Genetics, LLC, and Defendant Crestview Farm, LLC.*


Robert I. Chaskes, Esq. Noelle P. Pankey, Esq. AKERMAN LLP
777 South Flagler Drive Suite 1100 West Tower
West Palm Beach, Florida 33401 (561) 653-5000
robert.chaskes@akerman.com noelle.pankey@akerman.com

*Counsel for Defendant Park Place Polo Team Corporation, and For Defendant Park Place Polo Fields Corporation.*

Francis M. McDonald, Jr., Esq.
Florida Bar No. 0327093
MCDONALD TOOLE WIGGINS, P.A.
111 N. Magnolia Avenue, Suite 1200Orlando, FL 32801
fmcdonald@mtwlegal.com
slong@mtwlegal.com
*Co-counsel for Plaintiffs, La Dolfina S.A. LLC and Adolfo Cambiaso*