UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO. 20-82231-CIV-CANNON


LA DOLFINA S.A., LLC, a Florida
limited liability company, and
ALDOLFO CAMBIASO, individually,

                Plaintiffs,               FORT PIERCE, FLORIDA

     vs.

                                   OCTOBER 15, 2021

D. ALAN MEEKER, individually,
CRESTVIEW FARM, LLC, a Texas
limited liability company, and        PAGES 1 - 60
CRESTVIEW GENETICS, LLC, a
Nevada limited liability company,

                Defendants.      /


TRANSCRIPT OF **VIDEO TELECONFERENCED** MOTION HEARING
BEFORE THE HONORABLE AILEEN M. CANNON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:    AVERY S. CHAPMAN, ESQ.
                       GRACE DE LA GUERONNIERE, ESQ.
                       Chapman Law Group, PLC
                       12008 South Shore Blvd.
                       Suite 105
                       Wellington, FL  33414

                       HABIB NASRULLAH, ESQ.
                       Wheeler, Trigg O'Donnell, LLP
                       370 17th Street, Suite 4500
                       Denver, CO  80202

<u>APPEARANCES (Cont'd.)</u>


FOR THE DEFENDANTS:        JASON LEWIS, ESQ.
                           JAMES BOOKHOUT, ESQ.
                           DLA Piper LLP (US)
                           200 South Biscayne Blvd.
                           Suite 2500
                           Miami, FL  33131

                           ROBERT CHASKES, ESQ.
                           Akerman LLP
                           Suntrust International Center
                           1 SE 3rd Avenue, 25th Floor
                           Maimi, FL  33131-1714

                           NOELLE PANKEY, ESQ.
                           Akerman Senterfitt
                           222 Lakeview Avenue
                           4th Floor Esperante Building
                           West Palm Beach, FL  33401-6147


REPORTED BY:               DIANE M. MILLER, RMR, CRR, CRC
                           Official Court Reporter
                           United States District Court
                           (772)467-2337
                           diane_miller@flsd.uscourts.gov

<u>P–R–O–C–E–E–D–I–N–G–S</u>

1

2      THE COURTROOM DEPUTY:  Good morning, Your Honor.  May

3   I call the case?

4      THE COURT:  Good morning, Ms. Glass, you may call the

5   case.

6      THE COURTROOM DEPUTY:  Good morning, Your Honor;

7   thank you.

8      Calling case 20-CV-82231, La Dolfina S.A. LLC, versus

9   Meeker, et al.

10      Can we have Counsel enter your appearance beginning

11   with the plaintiff, please.

12      MR. CHAPMAN:  Good morning, Your Honor; good morning

13   Counsel; and good morning, Mr. Sweeney and the rest of the

14   staff at the court.  Thank you for having us.

15      My name is Avery Chapman.  I am the plaintiff's

16   counsel, that is the counsel for La Dolfina S.A. LLC and

17   Mr. Cambiaso as well as La Dolfina S.A.  With me is Habib

18   Nasrullah, Mr. Nasrullah is co-counsel here.  Also with us is

19   Grace de la Gueronniere, also counsel to the plaintiffs.

20      Joining us as well is Mr. Steve Winarski who is a

21   paralegal; and on the phone is Mr. Diego Bucking, the attorney

22   for La Dolfina in Argentina.  You will also see a member of the

23   public, Mr. Jornayvaz.

24      Thank you very much for having us.

25      THE COURT:  Thank you, Mr. Chapman; good morning to

Friday, October 15, 2021.

```
 1   your entire team.

 2            Who is here for the Meeker defendants and Crestview

 3   entities?

 4            MR. LEWIS:  Good morning, Your Honor; this is Jason

 5   Lewis, DLA Piper.  With me is James Bookhout with DLA Piper on

 6   behalf of Crestview Farm Genetics and Mr. Meeker; good morning.

 7            THE COURT:  Good morning.

 8            All right.  Moving on now to Park Place Defendants.

 9            MR. CHASKES:  Good morning, Your Honor; Robert

10   Chaskes of Akerman LLP.  It is my privilege today to be

11   representing both Park Place Polo Team Corporation and Park

12   Place Polo Fields Corporation.  And with me today is my

13   partner, Noelle Pankey who may be participating as necessary,

14   as appropriate.

15            We also have with us here in the conference room a

16   new associate with our firm, Jennifer Batista who has just

17   joined us from a clerkship with the Fourth District Court of

18   Appeal.  Miss Batista will not be participating; but with the

19   Court's permission, we would like her to view the proceedings

20   from this side of the bar for a change.

21            THE COURT:  Certainly, that will be fine.

22            I want to remind all of the parties of prohibition on

23   recording this hearing both in audio and video.

24            We are here to discuss three pending motions.  We

25   have Crestview's motion to dismiss, at docket entry 144; we
```

 1   have Crestview's other motion to dismiss at docket entry 167;

 2   and we have Plaintiff's renewed expedited motion for issuance

 3   of a preliminary injunction at docket entry 179.

 4        I would like to start first with the last one I just

 5   mentioned; and, Mr. Chapman, seeing it is you are motion, I'll

 6   permit you to go first please.  We have allotted 90 minutes for

 7   this hearing, and there is a lot of territory to cover, so I

 8   ask that you be concise in your presentation and that you get

 9   right to the heart of the matter.

10        I also have questions for Defense Counsel seeing as

11   some of the issues overlap, particularly on the likelihood of

12   success issue and that dovetails with the matters briefed in

13   the motions, plural, to dismiss.

14        So with that, Mr. Chapman, let's hear from you on

15   your motion for preliminary injunction.

16        MR. CHASKES:  Your Honor, preliminarily -- this is

17   Mr. Chaskes, I apologize for interrupting, but the Park Place

18   defendants also have a pending motion to dismiss which we

19   understood to be included in the notice of hearing today.

20        THE COURT:  Yes, yes, you are correct, my oversight.

21   That is also on the agenda for today.  So everybody will get an

22   opportunity to put forth their arguments this morning, but I

23   would like to turn to Mr. Chapman at this time.

24        MR. CHAPMAN:  Thank you, Your Honor.

25        And I do note that Mr. Chaskas -- briefing on

1    Mr. Chaskas' clients' motion is not fully concluded yet, it is

2    still open.

3            Thank you, Your Honor.  A lot has changed since we

4    were here before you on January 29th of 2021.  That was many

5    months ago, as we know.  And I think that's important because

6    one of the threshold concerns or attacks that the other side

7    has to this preliminary injunction motion is, it is the same

8    motion.  Judge warned you, "don't bring it."  Again, well, a

9    lot has changed.

10           The discovery in this case has been -- and

11   understood, we have 90 minutes so, but I'll just say the

12   discovery has come in trickles.  When Your Honor finally

13   ordered that the bill of sale be produced, all of a sudden, we

14   get a horse purchase agreement, what we call the secret cloning

15   agreement because we didn't know about the agreement.

16   November 9th, 2020, something that's negotiated, we now

17   understand from the discovery, during the time that Juan Carlos

18   Di Caro and Alan Meeker are having their back-and-forth debate

19   about whether or not this 2009 contract allows for cloning --

20   you remember that email string, there was quite a bit of it,

21   and then from May to December 2nd while that's going on,

22   Mr. Meeker has gone out and negotiated that.  So he called it

23   the "secret cloning agreement" because it was a secret to us.

24   Your Honor had ordered it to be produced.  Once we saw that

25   document which was produced to us only in June -- and it's

179-2, docket entry ECF 179-2, once we saw that document, we
had a significant uptick in our concern for the irreparable
harm.  And we think it also quite frankly, now that we are
sitting here today, has a significant impact on the substantial
likelihood of the merits because that document -- and I know
Your Honor has heard a lot about that document.  That document
creates a whole plethora of concerns for the Court and for the
parties.  It creates -- it memorializes the sale of the clones
which they told us about in the November 18th letter, but it
does it in the framework of an escrow structure and an option
structure that's been expended during this time with
Mr. Borodin and has Park Place Polo entities who are nominally
represented in that agreement by something called "Pegasus
Rider" whereby seven and then ten more clones can be sold, and
there is no restriction on the seller so -- excuse me, the
buyer, what the buyer then does with them.

       As a footnote to that, Judge, just in the context of
discussing the preliminary injunction, I will note that
sections 8.1 and 9.2 of that contract allow for preliminary
injunctive relief to the buyer and seller in that contract.  So
Crestview's own contract specifically emphasizes this concept
if there is going to be an unauthorized proliferation of clones
by either the buyer or seller under that, that there is a right
to injunctive relief because irreparable harm will occur.  So
even Mr. Meeker understood, at that time in November, that

1    there was a concept of keeping control of the clones and the

2    genetic structure because they contracted that into their own

3    agreement with the Park Place board and entities.

4            I think that's important because it's not as if

5    Mr. Meeker thinks that this idea of a preliminary injunction

6    was foreign with respect to these particular clones, so a lot

7    has changed.  Then discovery comes out, Your Honor orders

8    discovery to commence.  It commences in late July, and we get

9    several tranches.  The last tranche just appeared

10   September 24th of this year.

11           So with respect to anyone who says, oh, latches or

12   something like that, you waited too long, we had to digest all

13   of this discovery, read it in the context of what we had

14   induced which is very little but what we had induced prior and

15   understand the impact, and what do we know.  And that I think

16   is important because the "what we know" starts at document 179

17   at page three, which is sort of a summary of the new material

18   additional evidence.  I'm just going to touch on it very

19   briefly, but it is significant, and you may see a document or

20   an audio snippet come up at some point about this for everyone

21   to listen to.

22           The secret cloning agreement is completely anathema

23   to that idea that in the concept that was expressed to your

24   court, that there are no anticipated sales beyond the three

25   that have already been consummated, so there is no pressing

1    emergency.

2          Well, the horse purchase agreement, the secret

3    cloning agreement, and the other documents all relate to

4    completely, completely are contrary to that statement.  I think

5    that is important because we are in different footing than we

6    were on January 29.

7          THE COURT:  So, Mr. Chapman, just focusing in on

8    specifically how many clones in your view have been sold at

9    this point or are on the verge of being sold?

10         MR. CHAPMAN:  Three have been sold, seven more is an

11   option for, and there is a possibility of ten more under that

12   agreement.

13         THE COURT:  So those seven haven't yet been sold, but

14   there is an action to sell them, correct?

15         MR. CHAPMAN:  The way this went down is that there

16   was an option in that agreement, that secret cloning agreement,

17   during the litigation including the latest amendment was

18   June 10th of this year.  I think Counsel flew down to the

19   British Virgin Islands to get it.  There was an extension of

20   the time to June of 2022 for Mr. Borodin and his organization

21   to exercise the option.  So what that means is that the

22   potentiality, all he has to do is say "I exercise the option,

23   here's my money," and that's done, and he has the right to do

24   that.  It has already happened under the secret cloning

25   agreement that the Park Place entities and Mr. Borodin are

1    paying for the litigation or the defense of the --

2            THE COURT:  Right.  Hypothetically, assuming you were

3    to get the injunctive relief you seek -- and I have not made a

4    decision on that -- in the specific most crystalized terms,

5    what exactly are you requesting?

6            MR. CHAPMAN:  Judge, we want to stop the hemorrhaging

7    of genetic material.  So we want the freezing of that

8    agreement.  The option cannot be exercised; cloning cannot

9    occur; distribution -- physical distribution of any clones that

10   have been manufactured cannot occur.  And with respect -- under

11   that agreement and with respect to anybody else by Mr. Meeker

12   and the Crestview entities, they can't sell, transfer embryos,

13   export, encumber, promise anything that they might claim that

14   they have the right to do under the 2009 agreement.  And that

15   would apply to Crestview, to Park Place Polo, to any entity

16   affiliated with them, okay, because Mr. Borodin's Park Place

17   entities now has three clones.  They could start cloning those

18   clones and that has to stop as well.

19           THE COURT:  All right.  Well, are you suggesting that

20   the Court enjoin parties that aren't present in this

21   litigation?

22           MR. CHAPMAN:  You asked that before, and the answer

23   is yes because they are actually present in this litigation.

24   That's a misnomer, with respect.  The Park Place Polo

25   defendants, Park Place Polo Team Corporation, Park Place Fields

```
 1    Corporation are, at the very least, agents in the United States

 2    of and the possessors of the clones of this Pegasus Rider

 3    organization which was apparently created as some sort of shell

 4    entity.  But the Park Place Polo entities -- and this isn't

 5    debated -- are the ones who possess, have care, custody, and

 6    control of the clones.  The only way Pegasus Rider acts with

 7    respect to those clones is through them, particularly in the

 8    United States.  We all know where they are.

 9            So if Your Honor doesn't want to order Pegasus Rider,

10    okay, you don't have to, but because Pegasus Rider has agents

11    here who are the possessors of the clones if not the beneficial

12    owners, respectfully, if you order an agent of an offshore

13    entity, you are essentially ordering the offshore entity.  For

14    example, what is to prevent that offshore entity from creating

15    yet a third entity, Park Place avoid the litigation LLC, and

16    cause them to do something.

17            THE COURT:  All right.  And let's turn to your Lanham

18    Act claims.

19            I don't know.  Mr. Nasrullah, are you going to handle

20    that portion of it?  I'm not sure how you divided the

21    presentation, but I would like to focus in on those and really

22    highlight, in your view, the best authority in support of your

23    case that accepting all of the allegations as true, you put a

24    plausible Lanham Act violation in counts I think it's 13 and 14

25    of the second amended complaint.
```

Friday, October 15, 2021.

1          MR. NASRULLAH:  Thank you, Your Honor.  It is

2     actually 13, 14, and 16.

3          THE COURT:  Okay.

4          MR. NASRULLAH:  We amplified some of the counts when

5     we filed the second amended complaint, and I can touch on

6     centrally the arguments that we make to sustain these claims.

7          The first argument that we have heard from the

8     defendants is that there is no standing.  And I think, as I

9     have told you before and we have had this discussion on

10    January 29, we pled this case really faithful to the precedent

11    in *Lexmark*, and we have alleged that there is -- that we

12    alleged that the damages here are the standing stems from a

13    commercial interest in sales, business reputation, and we think

14    there is proximate cause here because we believe Mr. Meeker's

15    statements and Crestview Farm statements directly impact

16    Mr. Cambiaso's and La Dolfina's promotion interest in sales.

17         THE COURT:  So what are the statements?  Let's talk

18    about the exact statements that you are relying on, one by one.

19         MR. NASRULLAH:  Your Honor, as you heard the last

20    time around, the statements were made when we didn't have much

21    discovery at that point.

22         THE COURT:  All right.  So let's get to them.  I want

23    to be precise in detail, statement number one.

24         MR. NASRULLAH:  Statement number one was statements

25    made to Lolo Castagnola and Bartolome Castagnola essentially

1    stating that Mr. Meeker had clones for sale that he referred to

2    as "my clones."  He offered clones for sale that he purported

3    to own, and he offered them without Mr. Cambiaso's involvement

4    and indeed behind Mr. Cambiaso's back.

5            So the first set of false statements, the first set

6    of misrepresentations that form the basis of these claims are

7    essentially those statements that were made to Mr. Castagnola.

8    And you have seen is the WhatsApp messages that the Court was

9    provided with and have been filed as part of the second amended

10   complaint.  So that is one set of claims of false statements.

11           Now, the other set of false statements stems from

12   what we have learned from this secret cloning agreement.  And

13   as you heard, the secret cloning agreement is remarkable for

14   three reasons.  Number one, it was glossed over on

15   January 29th.  We had it ordered by you to be produced in June.

16   We learned the three clones had sold, that was not news.  We

17   had an option for the seven clones.  We also learned that there

18   was a license, and Mr. Chapman didn't touch on this, so I'm

19   going to touch on it because I think it feeds into the Lanham

20   Act claims.  There was a license that was granted to Pegasus as

21   the agent for the Park Place entities to do their cloning.

22   They could actually do some cloning themselves of these

23   Cuartetera clones.  That, in itself, is troubling.  It becomes

24   extraordinarily troubling when you learn, as we did after you

25   ordered the production of this cloning agreement, the Park

1   Place defendants produced what I call a technology transfer

2   agreement.  Mr. Meeker has been paid $2.1 million to help Park

3   Place create a cloning lab and continue cloning.  That stems

4   from this horse purchase, what we call the "secret cloning

5   agreement."

6           So when you think about injunctive relief here, what

7   we are thinking, what we think really drove us to come back to

8   court is now we have a confluence of three things that are

9   troubling:  Park Place and Mr. Borodin has clones, Park Place

10  and Mr. Borodin can get more clones, and Park Place and

11  Mr. Borodin can actually do their own cloning because they now

12  have the technology.

13          THE COURT:  Can you get back to the Lanham Act

14  claims, please.

15          MR. NASRULLAH:  Going back to the Lanham Act claims,

16  why is that important to us?  Because in the agreements with

17  Mr. Borodin, it's very clear that more false statements were

18  made because what Mr. Cambiaso -- what Mr. Borodin is being

19  told is that Mr. Cambiaso has absolutely no problem with this

20  agreement, he has no basis for any objection to this agreement.

21  And I think what I do is --

22          Steve, if you could you put up the --

23          Your Honor, may I have your permission to share

24  documents?

25          THE COURT:  Yes.

1          MR. CHAPMAN:  Your Honor, some of this is set forth

2     at page 6 of DE 179, as well as some of the things that Mr.

3     Nasrullah is going to get into.

4          MR. NASRULLAH:  I would like to go specifically to

5     section 6.1, please.

6          THE COURT:  I'm seeing a spreadsheet at the moment.

7          We are in recess for a minute, until you can

8     straighten out the display.  I just don't need all of this

9     background conversation, Mr. Chapman.  Why don't you mute

10    yourself, figure out what you want to show on the screen, then

11    let me know when you are ready.

12         MR. CHAPMAN:  We are ready, Your Honor.

13         THE COURT:  Let's continue.

14         MR. NASRULLAH:  If you look at 6.1 of the secret

15    cloning agreement, look at the second line, it says, "Seller

16    has obtained approval -- approval of all persons whose

17    approvals are required to enter into this agreement and perform

18    its obligations hereunder."  Mr. Cambiaso had no idea that this

19    was being negotiated much less providing any kind of approval,

20    so that is a false statement.

21         THE COURT:  Why?  I mean, they are saying in their

22    view.  Of course, you all have a dispute about who has the

23    right to clone and distribute these clones.  Let's assume you

24    are right about that, that you are the rightful owner and these

25    sales are unlawful under those contractual agreements.  Why

1   would was this statement nevertheless, you know, still be true

2   given the qualification that they make as to who actually needs

3   to approve it?

4         I mean, they believe that no approval is necessary

5   because that's their interpretation of the contract.  You all

6   have a different view of that.  But why is this per se false,

7   as you say it is?

8         MR. NASRULLAH:  Your Honor, it is per se false

9   because I think you have to look at this contextually, and you

10  have to look at what was actually going on between Mr. Meeker

11  and La Dolfina at that point.

12        It is pretty clear that the parties already had a

13  disagreement about cloning.  Mr. Booking and Mr. Meeker were

14  talking about disagreements that had arisen in the context of

15  their relationship.  And as a result, Mr. Meeker was on notice,

16  as he was on notice before he signed the cloning agreement,

17  that Mr. Cambiaso absolutely did not believe he had any rights

18  whatsoever to do what he was doing.  He had no rights -- and I

19  think you recognized this the last time when we had this

20  discussion, he has no rights to conduct unilateral cloning and

21  sales behind Mr. Cambiaso's back.

22        If you look at the 2009 agreement, Mr. Cambiaso is

23  defined as "the owner" of these animals.  They were well aware

24  they had no rights to be making these kinds of representations

25  or entering into these kinds of agreements without

```
 1   Mr. Cambiaso's approval if that 2009 agreement was invalid

 2   which Mr. Cambiaso had already asserted.  And you will see it

 3   in correspondence dated -- you will see in correspondence that

 4   Ms. Cambiaso did not believe that the 2009 agreement was valid.

 5           THE COURT:  This might help you on your breach

 6   claims.  But again turning back to the Lanham Act, how does it

 7   support that claim in particular which is what the Court is

 8   focused on?

 9           MR. NASRULLAH:  I think it goes to the falsity of the

10   statements.  It goes to the misrepresentations to the market.

11   Mr. Borodin is part of the market.  And in cases like this

12   where you have got a small market, we have only done discovery

13   on two different transactions.  That's all we have been given

14   so far.  And in those two transactions, we see this unequivocal

15   representation that they have authority to conduct transactions

16   against the will of the contracting party -- of the other

17   contracting party is false, and that should be -- it's a

18   misrepresentation under the Lanham Act.  And, you know, I

19   can -- if you look at section 1125, it talks about different

20   kinds of statements that are made, and this is one of those

21   statements.  This is a false misrepresentation.  It is a -- it

22   is essentially a false designation of origin because it

23   suggests that Mr. Cambiaso is okay with this transaction.  He

24   was absolutely not and had made it clear.

25           It is a false or misleading description of fact that
```

1  they have the approval to conduct these sales; or, at the very

2  least, it is a false and misleading representation of fact

3  which is likely to confuse or cause mistake within the market.

4       THE COURT:  So who is being confused as a result of

5  this agreement?

6       MR. NASRULLAH:  Your Honor, it has to turn on the

7  market, the confusion to the market.  That is the driver within

8  the Lanham Act.  It is not Mr. Cambiaso's confusion.  It is the

9  confusion that is made in the results from market confusion,

10  and there is market confusion because nobody knows whose clones

11  these are.  We know they are Cuartetera's clones, but

12  Mr. Meeker is representing that they are his clones.  He is

13  treating them like his clones.  That is the false

14  representation of fact that he doesn't really have the

15  authority to conduct these transactions.

16       THE COURT:  All right.  Assuming you are correct that

17  there is no authority and this is a material breach of the

18  earlier contractual agreements, I'm assuming that -- I'm

19  willing to assume that for purposes of discussion.

20       Let's turn now to the issue of consumer confusion and

21  really hone in on that.  Are you saying that the parties to

22  this contract are in some way confused about the rightful

23  ownership of the clones?

24       MR. NASRULLAH:  Your Honor, if you look at the

25  representations that are made, yes, there is a great deal of

1    caginess awareness on Mr. Meeker's behalf in terms of the

2    representations as far as he is willing to go.

3            You know, he uses terms like, as you can see in 6.1,

4    "to his best knowledge."  And yes, there is our contention

5    under these statements there is consumer confusion from that.

6    It is very unclear as to whether or not Mr. Meeker has title to

7    these clones.  He has made false recommendations to

8    Mr. Castagnola.  He encapsulated false representations within

9    6.1 and other provisions of the horse purchase agreement.  He

10   claims he hasn't breached the 2009 agreement, and then Cambiaso

11   hasn't sent him a notice of any breach of the horse agreement

12   or otherwise contended that Mr. Meeker couldn't enforce his

13   purported rights under the 2009 agreement.

14           So our view is that it's this bundle of

15   representations made by Mr. Meeker that result in confusion to

16   the market, and you need to look at confusion to the market.

17   We have got Mr. Borodin buying these clones.  Clearly,

18   Mr. Castagnola and others were also made -- well,

19   Mr. Castagnola [unintelligible] these representations.  So the

20   question really is -- and I think the -- this is a different

21   kind of claim because I think, Your Honor, in these Lanham Act

22   claims, more discovery would be helpful.

23           We have seen documents suggesting from Mr. Meeker

24   that if Park Place didn't want to sell these clones, he had a

25   bunch of other people that would be willing to sell these

1    clones, and he would be willing to buy these clones.  So it

2    appears to me that there was an effort here to confuse the

3    marketplace, and the confusion in the marketplace stems from

4    the fact that Mr. Meeker was trying to convince people that he

5    had a right to these clones.  That is the market confusion.

6              Your Honor, I have said this before, and I'll say it

7    again.  This animal Cuartetera that you heard so much about,

8    her name is La Dolfina Cuartetera, she is a horse that was

9    bred, trained, made, and made famous by Mr. Cambiaso.  There is

10   absolutely no question who this horse is affiliated with.

11             When Mr. Meeker gets into the mix and decides he is

12   going to sell clones of this horse and contend that they are

13   his clones, there is confusion to the marketplace.  Confusion

14   arises from the fact that he is now apparently advancing what

15   he claims to be a possessory interest to the market.

16             Nobody really knows whose clones these are when

17   Mr. Meeker is out there telling Mr. Castagnola, "You should buy

18   my clones."

19             He says, "Do you have Cuartetera?"

20             He says, "Those are all spoken for."  So that, in our

21   view, is the confusion.

22             And we are pulling up an email that we will show you,

23   and I would like you to take a look at this, and I think it is

24   on the screen.

25             Would you identify that by document number, please.

```
 1              And this is --

 2              UNIDENTIFIED SPEAKER:  Crestview Farm 1992.

 3              MR. NASRULLAH:  It is based on 1992, and we just

 4   found this.  This is an email between Mr. Meeker and a

 5   representative of Mr. Borodin named David Thirsk, and he says,

 6   "David, please call me ASAP.  I think we need a quick change of

 7   the horses names."

 8              These horses were bred originally as B10, B11, and

 9   B12.  That would be Cuartetera 10, 11, and 12.  That's how

10   Mr. Meeker impressed [unintelligible], and now they want to

11   change the names to B1, B2, and B3.

12              He says Mr. Meeker goes on to say, "Andre and I

13   agree."  "Andre" is Mr. Borodin.  This, Your Honor, erodes and

14   it demonstrates, actually, the connective tissue between the

15   Park Place entities and Pegasus.  Mr. Borodin is in charge of

16   everybody.  Mr. Borodin, the buck stops there.  He is the

17   ultimate person.  He is the owner, player, captain of the Park

18   Place team.  He has been discussing with Mr. Meeker, and he

19   says, "Andre and I agreed to this point last week as it will

20   coordinate with the brands on these horses and lessens

21   confusion."

22              Now, Mr. Cambiaso's Cuartetera -- he has ten

23   Cuarteteras, they go from B01 to B10.  And these three

24   Cuarteteras that Mr. Cambiaso claims he owns -- he believes he

25   owns that have now ended up in Mr. Borodin's hands were B11,
```

1   12, and 13, and they have changed those names to P1, P2, and P3

2   admittedly to "lessen confusion," and that is from Mr. Meeker's

3   own mouth.  So even Mr. Meeker recognized here that there is a

4   possibility of confusing Cuarteteras that were bred were

5   Crestview Farms illicitly in our opinion, or Cuartetera's bred

6   genuinely by La Dolfina which would have the B series that you

7   see there.

8          So there is some confusion, and I think the parties

9   have recognized the potential from confusion which is why they

10  are taking the time to change names.

11         THE COURT:  That email that you just showed us, has

12  that been filed as an exhibit yet?

13         MR. NASRULLAH:  Your Honor, we were just going

14  through the production.  I think it has --

15         MR. CHAPMAN:  We will give you the docket entry

16  number in a moment, Your Honor.

17         MR. NASRULLAH:  To us, that's very telling.  That's a

18  very telling document.

19         Remember, Your Honor, I said this before, consumer

20  confusion is not decided at the motion to dismiss.  This is

21  something that requires discovery; and as you heard this

22  morning, discovery it is being dribbled out.  We are getting

23  bits and pieces.  We get the cloning agreement; a month later,

24  we get a technology transfer agreement -- maybe two months

25  later, we got a technology transfer.  We are getting this in

1    drips and drabs, and we are trying to pull this altogether.

2         Who else has Mr. Meeker solicited?  We don't know.

3    We know Mr. Meeker has connections all over the United States,

4    and he is well-known as somebody who manufactures and sells

5    clones, so we don't know.  We are going to need more discovery.

6    We are going to need some latitude on this, Your Honor, to

7    establish the elements of confusion and perhaps more as a

8    threshold matter to establish the various statements of fact

9    and misrepresentations that were made in the context of those

10   sales that could be actionable under the Lanham Act.

11        THE COURT:  All right.  Let's turn to Mr. Bookhout.

12        Who is going to take the lead for you both or

13   Mr. Lewis?

14        MR. BOOKHOUT:  I'm going to be, Your Honor.  This is

15   James Bookhout.

16        THE COURT:  I would like to focus in on first the

17   issue of irreparable injury.  And please update the Court on

18   exactly what has transpired insofar as sales of horses from our

19   prior hearing on this issue.  I understand it has now gone

20   beyond the three; and obviously, Plaintiffs are quite concerned

21   about that, so let's get some clarity on that, please.

22        MR. BOOKHOUT:  Sure, Your Honor.

23        There's -- we are at three -- a sale of three horses

24   in January, and there has been a sale three horses now.  That

25   is the only sale of any of these clones that has occurred.

Friday, October 15, 2021.

```
 1              THE COURT:  Okay.  So three in January?

 2              MR. BOOKHOUT:  And the same three as of today.  No

 3    more; no more have been sold since then, Your Honor.  I want to

 4    be very clear about that.  The November 9, 2020, horse purchase

 5    and sale agreement which is [inaudible] --

 6              THE COURT:  I can't -- there is an issue with your

 7    audio, Mr. Bookhout.  I think because you are far, there is

 8    like this echo.

 9              MR. BOOKHOUT:  Is this better, Your Honor?

10              THE COURT:  Yes.

11              MR. BOOKHOUT:  The horse purchase and sale agreement

12    which is dated November 9, 2020, before this litigation was

13    filed, has an option in addition to the sale of the three for

14    the purchase of seven more if the option is exercised.  That

15    option was in the original agreement.  It is not new, and it

16    wasn't in any amendment.  It has not been exercised.  It may

17    never be exercised.

18              THE COURT:  But it could be exercised at any moment,

19    correct?

20              MR. BOOKHOUT:  It is possible it could be exercised.

21              THE COURT:  There is nothing to stop the exercise of

22    that option and it could happen tomorrow.

23              MR. BOOKHOUT:  The exercise of the option, yes, it

24    could happen at any time.  It is not obviously new, it has been

25    around for a while.
```

Friday, October 15, 2021.

1            THE COURT:  It certainly wasn't really part of the

2     discussion earlier, let's put it that way.  It was really more

3     focused on the three horses that had been sold.  Where were

4     those horses?  Had they been in Florida?  And really, I don't

5     recall any discussion of this option for additional horses, so

6     that factual point has changed.

7            Now, I would like for you, Mr. Bookhout, assuming you

8     are incorrect that -- on the issue of who owns the right to

9     license these funds, let's assume for a moment that your

10    interpretation of the contract is incorrect.  Why, in your

11    view, do you still think you prevail on the Lanham Act claims?

12            MR. BOOKHOUT:  Sure.

13            So on the Lanham Act claims, obviously, as Your Honor

14    pointed out just prior to when Mr. Nasrullah was speaking,

15    having a contract dispute or even prevailing on contract

16    dispute does not result in a Lanham Act claim.  A Lanham Act,

17    as Your Honor pointed out, requires a misrepresentation.  But

18    it is not just a, quote, unquote, false representation, it has

19    to be about the nature, characteristics, qualities, or

20    geographic origin of the product, right?  And then there has to

21    be confusion in the market place, and so there is no false

22    representation that Mr. Nasrullah identified.

23            I can go through the ones he stated.  But the big

24    one, section 6.1, the horse PSA, has a very standard

25    representation about all approvals having been obtained.

```
 1   That's -- first of all, it wasn't false.  Mr. -- Genetics

 2   believed that it did the required approval saying it was

 3   permitted to sell these clones in the 2009 agreement, and

 4   that's not false.  But two, it is not about the horses.  It is

 5   not -- there is still Cuartetera clones.  There is still

 6   actually exactly what is being sold.  Everything that's being

 7   said about the horses is true.  The representation that they

 8   are trying to say is about who owns it.

 9            So, for example, if I buy an iPhone in an Apple store

10   and somebody steals it from me and sells it to a third party,

11   Apple doesn't have a Lanham Act claim about the sale of the

12   Apple iPhone.  It is still an Apple iPhone.  The dispute who

13   owns the phone does not give rise to a Lanham Act claim.

14            THE COURT:  Isn't this case a little bit sort of more

15   nuanced because the product at issue is so allegedly

16   intertwined with Mr. Cambiaso and the original "Cuartetera"

17   name?

18            MR. BOOKHOUT:  Sure.  So I would say that's

19   absolutely not true.  It is very clear to everyone, including

20   in the [unintelligible] first purchase and sale agreement that

21   that's a clone of Cuartetera.  They are not passing it off as

22   Cuartetera.  No one is passing it off as having been the actual

23   clone as having ever even been next to Mr. Cambiaso or even in

24   the same farm with him.  No one could be confused into thinking

25   by any statements at issue here that this horse itself has ever
```

```
1    been associated with Mr. Cambiaso.  That's not the case.

2              THE COURT:  You say that why?  Why exactly?

3              MR. BOOKHOUT:  Because it is a clone of the -- of

4    Cuartetera.  Unless the clone itself -- remember, yes, it has

5    the same genetics, but there is a nature-nurture thing here.

6    People want the horse because it has the genetics, but nobody

7    who is a sophisticated person who buys millions of dollars of

8    horses can possibly be confused into thinking that just because

9    a horse has similar genetics to another horse means it is the

10   same horse that was ridden in polo competition by a famous polo

11   player.  That's what they are trying to say, Your Honor.

12             THE COURT:  Well, we have to accept the allegations

13   that genetic material, at least a large portion of it, is what

14   makes the horse successful.  So assuming that, then continue.

15             MR. BOOKHOUT:  Well, assuming that, Your Honor, then

16   that takes away the entire point of the alleged association

17   with Mr. Cambiaso because the genetic material is what is

18   important.  It is absolutely true that these clones of

19   Cuartetera contain the genetic material of Cuartetera.  They

20   are clones.  That's what a clone is, as I'm sure the Court is

21   aware so -- but the association with Mr. Cambiaso has

22   absolutely nothing to do with the genetic material.  They

23   either are clones of Cuartetera or they aren't; and, in fact,

24   they are clones of Cuartetera.  I don't think --

25             THE COURT:  I think the allegation is that the name
```

1   "Cuartetera" is so hand in hand with Mr. Cambiaso and his

2   operation and success as a polo player that you can't really

3   divorce the two.

4          MR. BOOKHOUT:  Sorry, Your Honor, I didn't mean to

5   interrupt.

6          THE COURT:  That's okay.  You may continue.

7          MR. BOOKHOUT:  So in response to your question, Your

8   Honor, there are two different standards here.  There is a

9   motion to dismiss standard which I think you were alluding to,

10  and there is an injunction standard.  An injunction standard

11  requires evidence and requires the party, the movant, to

12  establish substantial likelihood of success on the merits.

13  There is absolutely no evidence before the Court that anybody

14  buying is the clone of Cuartetera because of the clone's

15  association with Aldolfo Cambiaso.  There is nobody claiming

16  that the clone is associated with Adolfo Cambiaso.  Nobody

17  would claim that.  It would be ridiculous for Genetics to

18  suggest -- or farm -- excuse me -- to suggest that the clone

19  itself is associated Mr. Cambiaso.  He has never ridden the

20  horse.

21          Now, if you are saying that the facts that Cuartetera

22  became well-known in the first place is because Mr. Cambiaso

23  rode it, that may be true.  But it's very similar to the Apple

24  iPhone, the fact the Apple produced the iPhone is why the

25  product is in demand, but just because there is a dispute over

1    ownership of the phone doesn't change the fact that it is an

2    Apple iPhone.

3         THE COURT:  The reason why the clone is valuable is

4    because it's -- it contains the same genetic material of the

5    original horse that did so well which in turn was connected to

6    Cambiaso.  This is the chain of argument that is being

7    presented with the allegation so --

8         MR. BOOKHOUT:  Yes, Your Honor, that's the argument,

9    but it is piling unlikely inference on top of unlikely

10   inference.

11        What they are saying is that Mr. Cambiaso's riding of

12   the horse in a way that made the horse successful somehow

13   transfers to the horse's genetics, and therefore because it

14   is the same horse's genetic material, it is associated with

15   Mr. Cambiaso.  That's obviously false.  The genetic material

16   and the genetic value of the horse is the same whether

17   Mr. Cambiaso has ridden the horse or not.

18        Now, the specific horse Cuartetera, the original

19   horse, sure.  That horse is well-known because Mr. Cambiaso has

20   ridden the horse, but nobody is trying to set claim that this

21   clone is Cuartetera.  This clone is a clone and it has the same

22   genetic material, that's 100 percent true and accurate; and

23   whatever value comes from that genetic material comes from it

24   being the same genetic material.  No value arises, and it is

25   not reasonable to state or infer that the value of the genetic

1    material arises from the fact that Mr. Cambiaso had ever ridden

2    the horse.

3            THE COURT:  All right.  Okay.

4            So let's hear from Mr. Chaskes.  Anything you wish to

5    add, sir, on the question of preliminary injunctive relief?

6            MR. CHASKES:  Yes, Your Honor, briefly.

7            Counsel for Plaintiffs have made much of these

8    options and the extensions of the options and how that presents

9    an immediate threat of irreparable harm.  In fact, it is just

10   the opposite.

11           As the Court noted, this agreement has been in

12   existence since November 2020 -- the horse sale agreement has

13   been in existence now for 11 months.  The option was not

14   exercised.  It could have been exercised, but rather than

15   exercising it, the parties have extended it.  They have

16   extended it to give this Court time to resolve the issues.  So

17   rather than mitigating -- militating toward irreparable harm,

18   the fact that the party to the agreement which is Pegasus Rider

19   and not my clients here today and Mr. Meeker entered into

20   amendments extending the deadline for exercising the option

21   actually reduces the likelihood of any irreparable arm.

22           As evidenced by the fact further, Your Honor, that

23   Plaintiffs came into possession of the horse purchase agreement

24   in June of this year yet waited until September 24th to file

25   their motion for preliminary injunction, there is a long line

 1    of cases in the Eleventh Circuit and a long line of cases in

 2    the Southern District of Florida that a delay like that, in and

 3    of itself, is sufficient to wholly undermine a claim of

 4    irreparable injury.

 5          The other problem is their claim for injunctive

 6    relief.  To be brief, because there are many, as Your Honor

 7    noted, the present owner of the horses is not a party to this

 8    case.  Pegasus Rider, which is clearly the buyer named in the

 9    horse purchase agreement, has not been named as a party despite

10    the fact that Plaintiffs had the horse purchase agreement in

11    their possession in June and decided when they filed the second

12    amended complaint in August not to name the party to the

13    contract that they are seeking to vitiate.  They elected not to

14    name the owner of the horses that they are seeking to recover.

15          The same issue with respect to the technical services

16    agreement that they want.  They want to say it is Park Place,

17    it's Park Place, but it is a different entity.  It is Park

18    Place Polo Limited.  It is not either of the present

19    defendants.  The present defendants are not signatories to any

20    of the contracts at issue in this litigation, either the 2009

21    agreement between Mr. Meeker and Mr. Cambiaso, the 2019

22    agreement between Mr. Cambiaso which, as Your Honor has noted,

23    it's the language of those contracts on which this case turns.

24          But moreover, the Park Place defendants, the entities

25    named as defendants today in this case are not parties to the

1   horse purchase and sale agreement and not parties to the

2   technical services agreement that Mr. Nasrullah made reference

3   to.

4         The case is deficient for a number of reasons, Your

5   Honor, which we can address on the motion to dismiss.  But for

6   purposes of an injunction, there are indispensable parties that

7   are not before the Court, and they are not before the Court

8   because of these unsupported allegations that they had trouble

9   getting discovery or they are delayed in discovery.  They are

10  not before the Court because the plaintiffs decided for

11  whatever reason not to name them.  Instead, they make

12  unsupported assertions that these Park Place defendants are

13  the, quote, unquote, agent of Pegasus Rider.

14        As Your Honor herself noted in your recent decision

15  *in Humana Pharmacy v. Michelin* this past June, the Court is not

16  required, the Court is not obligated to take as true

17  unsupported legal arguments couched as factual allegations, and

18  that's what we have here.  Mr. Chapman is attempting to pierce

19  the corporate veil or impose some form of alter ego liability.

20  That's not pled in this complaint.  There is just a bald

21  allegation of an agency relationship which has been totally

22  rebutted by the declaration of John Simmons that accompanies

23  our opposition to the motion for preliminary injunction.

24  Argument of counsel absent evidence is not a proper basis for

25  injunctive relief.

1        I couldn't help but think, when they were talking

2    about confusion, there is confusion in this case, but the

3    confusion is on Plaintiffs' side.  They can't even consistently

4    allege who the owner of Cuartetera is in their complaint.  At

5    various times, they say it is Mr. Cambiaso; at other times,

6    they say it is La Dolfina S.A., LLC.  But there is an affidavit

7    of the second Zeta affidavit that is attached to their second

8    amended complaint that says, since 2007 among the records of

9    the Argentinian Polo Association, La Dolfina S.A., the

10   Argentinian entity that is not a party to this case is the

11   owner of Cuartetera.  They don't even -- there is no basis for

12   awarding injunctive relief on the record of this case.  They

13   can't consistently allege much less show to the Court who the

14   owner of the horse is.

15         The fact that Mr. Cambiaso hasn't submitted an

16   affidavit in support of this motion for preliminary injunction

17   I think speaks volume.  And even if they could, Your Honor,

18   given that the way of when they found out and clearly knew

19   about the horse purchase agreement in June delaying until the

20   end of September to file a motion for preliminary injunction on

21   a number of cases in the Southern District and the Eleventh

22   Circuit cited in our brief is cause in and of itself to deny

23   injunctive relief.

24         THE COURT:  If there are no imminent -- if the option

25   is not being exercised and is, from what you say, essentially

1    on hold sort of internally by the parties to that agreement,

2    then I guess what would be the harm of saying, you know, you

3    can't exercise it, if you are not actually wanting to anyhow?

4            MR. CHASKES:  Because the parties to that agreement

5    are not before the Court.

6            THE COURT:  So that's your argument, the issue who is

7    before the Court, not actually that it would actually make a

8    material practical difference at this point.

9            MR. CHASKES:  In our motion to dismiss, you know, in

10   our indispensable party argument, we go through the same

11   analysis that Your Honor went through in the *Humana Pharmacy*

12   case.  Is Pegasus Rider a required party?  Clearly they are,

13   they are the buyer under one of the contracts that Plaintiffs

14   are seeking relief concerning.  They also are the owner of the

15   horses which Plaintiffs are seeking to recover, so they are

16   clearly required of a required party.  Then the analysis is:

17   Is there joinder feasible?  And that's a determination to be

18   made; but until that determination is made in the affirmative

19   and they are joined, there is no proper basis to enjoin the

20   entity that actually owns the horses.

21           The Park Place entities, as described in the Simmons

22   affidavit which is unrebutted, simply provide care and upkeep

23   of the three horses.  They have no ownership interest.  They

24   have no possessory interest.  And as much as Mr. Chapman may

25   want to argue to the contrary, his argument doesn't change the

1    facts.  It doesn't change the facts.  And they have avoided it

2    because, you know, we are late to this movie not being sued

3    until August and then trying to play catch-up, and I'll save my

4    argument of how difficult that has been because of the shotgun

5    nature of the pleading.

6          But in trying to get caught up, I can't help but be

7    amused by Mr. Chapman's lecturing on gaslighting, accusing the

8    Meeker defendants of gaslighting.  Then I turn the page, and

9    the horse purchase agreement, he refers to as a "secret cloning

10   agreement," and everything that he argues is nefarious.

11         THE COURT:  Can we just get to what really matters

12   here?

13         All right.  Anything mourn on the preliminary

14   injunctive relief issue, Mr. Chaskes?

15         MR. CHASKES:  Well, I think they also have the

16   ability to be adequately protected by money damages.  They

17   allege and concede that they have sold other Cuartetera clones

18   to other people for prices.  They themselves have created a

19   market for these clones and set the price, so there is

20   nothing -- they are clones, it is nothing unique about them,

21   and there is a market for them, and they can be compensated by

22   dollars.

23         THE COURT:  All right.  I have a question,

24   Mr. Nasrullah.  If the text message, for example, had said

25   something like, you know, I believe I can sell these to you, I

1    believe I have legal ownership over them, but that's being

2    disputed, then would you say there was a false statement that

3    created any confusion?

4             I'm just kind of wondering what more would have been

5    required in your view to make that statement not actionable

6    under the Lanham Act?

7             You are on mute.

8             MR. NASRULLAH:  I think what you just said, Your

9    Honor, if Mr. Meeker had said that "Adolfo and I have an

10   agreement, but we are not on the same page on this, I think I

11   have the right to sell these clones, he doesn't," there is a

12   disparate.  I think that would go a long ways towards viciating

13   the false statement.  But the reference as "my clones" is what

14   the damaging -- what the damaging statement is, that's the

15   actionable statement.

16            THE COURT:  All right.  Now, as far as the failure to

17   join the Pegasus entity, Mr. Nasrullah or Mr. Chapman, what is

18   your ultimate view on the Court's authority as far as the

19   injunction is concerned in light of that entity's nonappearance

20   in this case?

21            MR. CHAPMAN:  Go ahead.

22            MR. NASRULLAH:  Your Honor, you know, Mr. Chaskes

23   said a lot of things.  I want to sort of try and put aside some

24   of the cheap shots and get to what he was saying.

25            Park Place Polo, the two entities before the Court,

1    are undisputedly before the Court.  And they have undisputedly

2    have possession, custody, and complete control over these

3    clones.  Now, they create an entity in the British Virgin

4    Islands that in turn is owned by an entity in Cypress that has

5    absolutely no footprint in the world.  We couldn't find

6    anything on these entities.  These entities were created for

7    one sole purpose, and that sole purpose was to try and get away

8    from the jurisdiction of this Court.  That is a complete sham,

9    and the Court should see through that.

10          What Mr. Chaskes is arguing today is a technicality,

11   a gotcha.  "Oh, gee, we set up a BVI corporation, and they are

12   not in the case, so you can't get injunctive relief over us."

13          Let me say something, Your Honor.  We had this

14   situation that you have had in your cases where they say, you

15   have named the wrong party.

16          And we say, okay, who do we need to name.

17          And they would say, name the BVI party.

18          And we say, great.  Would you accept service on their

19   behalf.

20          And I asked that question twice.  If this party is so

21   important to you, Mr. Chaskes, why don't you accept service so

22   I don't have to spend six months going through The Hague

23   Convention to serve somebody in the British Virgin Islands?

24          They haven't done that.  So while they will tell you

25   that, oh, boy, they served the wrong party, they have got the

Friday, October 15, 2021.

1   wrong party, they will do nothing to ratify that.  And these

2   are the people that are telling you how necessary Pegasus Rider

3   is in this case, but they won't accept service.  So one of the

4   reasons we haven't brought Pegasus into this case, it would

5   probably take us six months to serve them; then, they come into

6   the case.  We don't want there to be a stay, we want this to be

7   resolved.  So there are a whole bunch of technicalities going

8   on here.

9         What I can show you, and I will and I pull up more

10  emails just to show you that the fact of the matter is, there

11  is one man at the helm of that, and that's Andre Borodin.  And

12  Andre Borodin is the captain the Park Place Polo Team and a

13  Russian billionaire who lives in the UK in charge of

14  everything.

15        And, Steve, if you would put up 11-9 email.

16        Your Honor, if I can show you a couple emails, if it

17  is helpful to the Court, because what I want to show you is the

18  man who owns all of these entities is the man making the

19  decisions.  And money, for example, if you look at the email

20  right now, the Bates number is -- I'll give you the Bates

21  number in just a second -- 0001.  This was produced by Mr.

22  Chaskes's firm.  What this shows is Mr. Thirsk, who is

23  representing Mr. Borodin, is telling Mr. Meeker that money is

24  ready to move they are about to close the deal, and I'll

25  confirm with Ash that she is ready to take physical delivery of

1   the horses as soon as possible.

2          Now who is "Ash."  "Ash" is Ash Price.  Ash Price is

3   the manager of the Fire Place Polo, so these horses are coming

4   to the custody of Ash Price.  If we have a few minutes, I'll

5   tell you a little more of -- play a tape that Ms. Price -- we

6   have a recording of what Ms. Price has been doing in this case.

7          Steve, go to the next email before that.

8          And if you look at this, let's look at the money

9   trail here.  We have Pegasus Rider sending money to Crestview.

10  We have Pegasus Rider sending money to Ackerman, and we have

11  one of the Park Place Polo entities selling money under the

12  technical services agreement.

13         Now, I want to be completely candid with Your Honor.

14  This is not one of the two defendants Park Place Polo Entities.

15  This is yet a third Park Place Polo entity that is established

16  in the BVI that is sending money under the technical services

17  agreement.  So we have all of that money flowing from all of

18  these Park Place entities into Mr. Meeker's coffers to get

19  these horses.

20         Now, that's the last one.  I would like to show you

21  one more email.

22         I mentioned Mr. Borodin.  Mr. Borodin is -- who this

23  email is from and Ash Price is his manager at Park Place.  She

24  says, "Andre, I have been discussing arrangements with Julio

25  Arellano who is the guy caring for the clones to show the

1   property is sufficiently well set up to receive the foals."

2   The foals are the clones of the babies.  This goes up to

3   Mr. Borodin, and Mr. Borodin says okay.  The point of this is,

4   as I told you, there is one person pulling all of these

5   strings, and that's Mr. Borodin.  He is -- at the end of the

6   day, he is the owner of these horses and he is the ultimate,

7   ultimate beneficiary of these horses.  And let me tell you why.

8           Mr. Borodin is an avid polo player, and he is going

9   to be in Florida this winter playing polo.  The only reason

10  that these horses are being bought is for Mr. Borodin.  I

11  thought this was a remarkable -- this is Mr. Borodin, he is on

12  the cover of the Polo Magazine U.S.  This is actually published

13  here in Wellington, Florida, published here and it is the

14  October 11 edition, and this Mr. Borodin playing for Park Place

15  Polo Team on the cover.

16          So what you see here, there is no reason to buy

17  clones.  This man wants to win, he wants to win polo games.

18  The document number on this is DE 200-1.  And then if you go

19  further, I would like to show the picture with Ash Price.

20          So what they do here in this article of this month is

21  they talk about their operations, and how it is going to be

22  also playing in the United States, and they talk -- that is a

23  picture of Ms. Prize with Mr. Borodin, and you can see it says

24  "Park Place Polo."  So they can call it Pegasus, they can call

25  it whatever they want.  The beneficiaries of these clones are

```
 1   Mr. Borodin and Park Place Polo.

 2            Now, I want to say something else about injunctions,

 3   since that's been brought up.  Every contract -- and we have

 4   mentioned this in our briefing, every contract that Mr. Meeker

 5   has signed with Mr. Borodin, Mr. Meeker himself has reserved

 6   the right for injunctive relief.  Why?  It is quite simple,

 7   because everybody recognizes how valuable these animals are.

 8   Unlike what Mr. Bookhout says, a clone is just a clone, it's a

 9   commodity.  No, these clones are inherently associated with

10   Mr. Cambiaso, they are unique.  And when you sell clones and

11   when you lose control of clones, it is very difficult to

12   retrieve these clones.  Mr. Borodin can make a thousand of

13   these clones.

14            And if you look at DE-15 and DE-179-15, we just

15   learned, they have 7 million Cuartetera cells in the custody of

16   an entity that Mr. Meeker has contracted with to make clones.

17   Now, Mr. Borodin has a factory, his own factory of clones

18   because he has three clones now, and he has got a sophisticated

19   cloning lab from Mr. Meeker that he is paying $2.1 million for.

20            So it is easy to say that Pegasus is an indispensable

21   party, but, gee, you don't have jurisdiction over them.  Your

22   Honor, I'm sorry; and, gee, we won't accept service over them.

23   And if you do get service over them, we will spend six --

24   arguing there is no personal jurisdiction over you.  The fact

25   of the matter is you can enter an injunction for the two Park
```

```
 1   Place very much before the Court.

 2             There has been a lot of obfuscation in this case.

 3   The fact of the matter is, Mr. Chaskes says a great deal about,

 4   oh, gee, these guys don't know who owns this horse.  We do know

 5   this horse is indelibly connected with Aldolfo Cambiaso.

 6   Adolfo Cambiaso and his wife are 100 percent owners of La

 7   Dolfina.  There is nobody else involved.  For them to spin some

 8   tail that we don't have any idea who these horses belong to, it

 9   is completely off base.

10             THE COURT:  All right.  I just want to make sure that

11   I have the proper docket entry numbers for the documents

12   referenced today.  I think, Mr. Chapman, you were looking for

13   some of those.

14             MR. CHAPMAN:  Yes, Your Honor, the "lessens

15   confusion" email is 2000-4.

16             THE COURT:  Docket entry 2,000?

17             MR. CHAPMAN:  Two hundred dash four -- sorry.

18             THE COURT:  Dash 3.

19             MR. CHAPMAN:  Dash 3; okay, 200-3, that was the

20   confusion.  We will get you the ones that just popped up, we

21   will get you those.

22             We gave you the article, Your Honor.  Do you need

23   that one?  That's 200-1.  This month's Polo Magazine article of

24   Mr. Borodin where they say they are going to be engaging in

25   cloning as well in that article.
```

1          And, Your Honor, the second amended complaint, just

2     for the record, has Mr. Mutto's dialogue at docket entry 22-4

3     where he talks about the specific characteristics of the clone

4     that is so special.  Mr. Bookhout spent a lot of time about

5     these clones being just clones, and there was a very specific

6     discussion in there 22-4.

7          MR. BOOKHOUT:  Your Honor, can I address that just

8     one moment?

9          THE COURT:  Sure, just briefly; then we are going to

10    be wrapping up.  I know we did not get to cover an additional

11    substance, the motions to dismiss, but many of the issues are

12    overlapping and I think the Court has heard sufficient argument

13    for it to resolve at least the motion for preliminary

14    injunction.

15         But, Mr. Bookhout, you do have a few minutes now to

16    offer any final argument, and then I'll give each side just a

17    couple of minutes to conclude, and then we will wrap up

18    Mr. Bookhout.

19         MR. BOOKHOUT:  Thank you, Your Honor.

20         I would just like to address two main points.  One

21    about I say that a clone is just a clone.  A clone is a clone

22    in the sense that it is what it is, right?  It is a genetic

23    copy.  I did not say these were not valuable animals.  Of

24    course they are, right?  That's why the clone -- that's why we

25    are creating a clone market is because there is a valuable

```
 1    market for cloning animals.  That's not true.  The issue is

 2    about whether who has the rights to do it.  As you know, the

 3    2009 agreement provides a complete exclusive license to

 4    Crestview Farm.  But that's what the dispute is about.

 5              On the Lanham Act issue, the fact that the clone is

 6    valuable does not establish a Lanham Act claim.  It has nothing

 7    to do with it.  A product could be not valuable and there is a

 8    Lanham Act claim.  A Lanham Act claim is whether a false

 9    representation is being made about the nature, characteristics,

10    qualities, or geographic origin of the product.  In this case,

11    there is no such, quote unquote, misrepresentation, and that's

12    the issue on the confusion.

13              They showed an email about changing the horse

14    branding on the physical animal from B11 B01, that is literally

15    to show that's from this production of clone.  The word

16    "Cuartetera" is not even in the email, and it is not being

17    branded on the animals.  So that's literally an email about

18    horse branding, and that's it.  So there is nothing there with

19    that email with respect to a Lanham Act claim.

20              Finally, the "my clones" statement, if you take every

21    text message anyone ever says and use two words that they used

22    colloquially when they talking with somebody via text messages

23    and say, "That's a Lanham Act claim," the courts are going to

24    be inundated with millions such claims.

25              First of all, it is Mr. Meeker saying "my clones."  I
```

1    don't think he really meant "my clones," I think he met

2    Crestview Farm's clones.  This is a text message where somebody

3    is talking back and forth to someone.  It does not give rise to

4    a Lanham Act claim.  It is not reasonable to say that every

5    time someone sends a text message, they are going to say, oh,

6    and by the way, here is the whole history of the dispute

7    between us.

8         As to the main issue, the horse PSA, the fact of the

9    dispute with Mr. Cambiaso was well-known to the Park Place Polo

10   defendants, the plaintiffs admit that.  That's why the

11   agreement has detailed negotiated identification and escrow

12   provisions.  So there is no confusion in the marketplace as to

13   the buyer of these Cuartetera clones about the fact that there

14   could be a dispute with Mr. Cambiaso over the cloning rights of

15   these clones.  Obviously, it is true [unintelligible] that it

16   believes it has the right to clones under the 2009 agreement.

17        Thank you, Your Honor.

18        THE COURT:  Thank you, Mr. Bookhout.

19        All right, Mr. Chaskes briefly; then, I'll turn

20   finally to Mr. Nasrullah, and then we will be done.

21        MR. CHASKES:  Very briefly, Your Honor.

22        As I argued, we don't believe there is a proper basis

23   for entry of a motion for preliminary injunction against these

24   defendants or any defendants even taking the argument that

25   Mr. Nasrullah and Mr. Chapman have made.

1          As set out in our motion to dismiss the second

2     amended complaint, they have failed to allege sufficiently any

3     cause of action against these defendants, even if Your Honor

4     were willing to take as a given that these defendants are --

5     acted as agents for other individuals and entities, even though

6     there is no support for that allegation.  There is no viable

7     cause of action alleged against either of the Park Place

8     entities in the motion to dismiss.

9          Mr. Nasrullah makes much of the fact that I didn't

10    agree to accept service on behalf of Pegasus Rider.  I don't

11    represent Pegasus Rider, but I think it is worth noting for the

12    Court that paragraph section 14 of the horse purchase and sale

13    agreement contains a provision of a governing law venue and

14    consent to jurisdiction provision whereby Pegasus Rider

15    expressly consents to jurisdiction in Texas.  That provision

16    says any legal action commenced to enforce or interpret this

17    agreement shall be brought Terra County, Texas.  The parties

18    here to consent to both venue and jurisdiction in Terra County,

19    Texas.  Of course, one of those parties is Pegasus Rider.  If

20    the case were brought in Texas, as one of these cases was

21    originally, there wouldn't be a six-month delay of the parties'

22    fight about personal jurisdiction because Pegasus Rider has

23    consented to jurisdiction in Texas.  So for all of the reasons

24    that the Texas judge transferred the Texas case to Your Honor

25    to avoid piecemeal litigation for the sake of judicial economy

```
1    and efficiency ironically, all of those conversations dictate

2    in favor of dismissal of this action here so that the parties

3    can litigate in Texas where all affected parties can be brought

4    within the Court's jurisdiction.

5              THE COURT:  All right.  Thank you very much.

6              Very briefly, Mr. Chapman or Mr. Nasrullah, one of

7    you will get a couple of minutes, and then I would like to

8    conclude this hearing.

9              MR. NASRULLAH:  Your Honor, I have got one email to

10   share with you and one recording I want you to hear, then I'm

11   not going to say anything.

12             Mr. Chaskes says he doesn't represent Pegasus Rider.

13   We found this email written by one of his partners at Akerman,

14   Glen Stankee; and Mr. Stankee tells Mr. Meeker's lawyer whose

15   name is Ross Eichberg, you will get a highlighted portion, this

16   is in connection with the series of agreements being

17   negotiated -- and there it says the technology license and

18   service agreement -- this is the agreement when Mr. Meeker

19   helps Park Place set up its lab -- is being handled by my

20   parter Brian Bianco in our Chicago office.  That's significant

21   because they say they don't represent Pegasus Rider, but they

22   are drafting the [unintelligible] in connection with this --

23             MR. CHASKES:  Your Honor, Pegasus --

24             THE COURT:  No, no, no, we are not interrupting each

25   other, no.
```

Friday, October 15, 2021.

1          Continue, Mr. Nasrullah.

2          MR. NASRULLAH:  That's all I wanted to -- the point I

3     wanted to you make, Akerman represents them all.

4          The last point I would like to make, we are now in a

5     court of equity, Your Honor.  We are asking for equitable

6     relief.  The conduct we discovered on -- by the Park Place

7     entities, I think you should listen to literally 30-second

8     tape, and it goes to their efforts to conceal the location of

9     these clones from Adolfo Cambiaso.  The tone is what I would

10    ask you to pay attention to.

11         MR. CHAPMAN:  The transcript of this can be found at

12    DE 179-16.

13         MR. NASRULLAH:  This is Ash Price, the lady who I

14    alluded to earlier.

15         THE COURT:  It is not working, Mr. Nasrullah, so I'll

16    just --

17         MR. NASRULLAH:  Can you hear that, Your Honor?

18         THE COURT:  It is not audible, sir.  There is now a

19    problem with your audio.  I'll give you just 30 seconds to make

20    a final remark, then we are done.

21    (Audio recording played)

22         MR. NASRULLAH:  The point of this, Your Honor, is at

23    the end of the tape, Ms. Price asks Mr. Arellano to go along

24    with the game of pretending that the clones were in Kentucky

25    rather than in -- where they actually were in South Carolina.

1   And she does say -- and we filed this, you can look at the

2   transcript.  She does say that -- she asks him to go along

3   to -- this is an actual quote, "to conceal the location of the

4   clones."

5           So Park Place is going through an awful lot of

6   trouble to conceal the location of these clones, and it is

7   exercising a great deal of control over these clones.  It's

8   hard to now hide behind the veil of an offshore corporate

9   entity.  The two Park Place entities who are most directly

10  involved in the care, concealment, and the benefit of these

11  clones are subject to Your Honor's injunction.

12          In fact, Your Honor, I don't understand why, if they

13  are not going to exercise these options that they are talking

14  about, why they would not stipulate to an injunction that these

15  options would not be exercised as long as the litigation is

16  pending and as long as the parties' rights under the 2009

17  agreement, which is the bundle of rights that this all stems

18  from, have been decided.

19          Thank you, Your Honor.

20          THE COURT:  Thank you all very much for your

21  appearance this morning.  I appreciate the able presentation.

22  The Court will take the matter under advisement and, if

23  necessary, schedule another hearing on the motions we didn't

24  get to, but the priority this morning was the preliminary

25  injunction.  For that, I thank you all, and I wish you a good

```
 1   rest of the day and weekend.

 2            MR. BOOKHOUT:  Thank you, Your Honor.

 3            THE COURTROOM DEPUTY:  Court is in recess.

 4       (PROCEEDINGS ADJOURNED AT 9:57 a.m.)

 5                    C-E-R-T-I-F-I-C-A-T-E

 6            I hereby certify that the foregoing is

 7       an accurate transcription of digitally recorded

 8       proceedings in the above-entitled matter to the

 9       best of my abilities.

10            This hearing occurred during the COVID-19

11       pandemic and is therefore subject to the technological

12       limitations of reporting remotely.

13

14   11/16/2021              /s/DIANE MILLER
       DATE                  DIANE MILLER, RMR, CRR
15                           Official Court Reporter
                             United States District Court
16                           Fort Pierce, FL  34950
                             diane_miller@flsd.uscourts.gov
17

18

19

20

21

22

23

24

25
```

Friday, October 15, 2021.

Page 51

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC
Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 51 of 60

**MR. BOOKHOUT:**
**[16]** 23/14 23/22 24/2 24/9 24/11 24/20 24/23 25/12 27/3 27/15 28/4 28/7 29/8 43/7 43/19 50/2
**MR. CHAPMAN:**
**[13]** 3/12 5/24 9/10 10/6 10/22 15/1 15/12 22/15 36/21 42/14 42/17 42/19 48/11
**MR. CHASKES:**
**[8]** 4/9 5/16 30/6 34/4 34/9 35/15 45/21 47/23
**MR. NASRULLAH:**
**[21]** 12/1 12/4 12/19 12/24 14/15 15/4 15/14 16/8 17/9 18/6 18/24 21/3 22/13 22/17 36/8 36/22 47/9 48/2 48/13 48/17 48/22
**THE COURT: [48]** 3/4 3/25 4/7 4/21 5/20 10/2 10/19 11/17 12/3 12/17 12/22 14/13 14/25 15/6 15/13 15/21 17/5 18/4 18/16 22/11 23/11 23/16 24/1 24/6 24/10 24/18 24/21 25/1 26/14 27/2 27/12 27/25 28/6 29/3 30/3 33/24 34/6 35/11 35/23 36/16 42/10 42/16 43/9 45/18 47/5 48/15 48/18 49/20
**THE COURTROOM DEPUTY: [3]** 3/2 3/6 50/3

**$**

**$2.1 [2]** 14/2 41/19

$2.1 million [2]
14/2 41/19

**/**

**/s/DIANE [1]**
50/14

**0**

**0001 [1]** 38/21

**1**

**10 [1]** 21/9
**100 percent [2]**
29/22 42/6
**105 [1]** 1/20
**10th [1]** 9/18
**11 [3]** 21/9 30/13 40/14
**11-9 [1]** 38/15
**11/16/2021 [1]**
50/14
**1125 [1]** 17/19
**12 [2]** 21/9 22/1
**12008 [1]** 1/19
**13 [3]** 11/24 12/2 22/1
**14 [3]** 11/24 12/2 46/12
**144 [1]** 4/25
**15 [3]** 1/7 41/14 41/14
**16 [2]** 12/2 48/12
**167 [1]** 5/1
**1714 [1]** 2/8
**179 [3]** 5/3 8/16 15/2
**179-16 [1]** 48/12
**179-2 [2]** 7/1 7/1
**17th [1]** 1/22
**18th [1]** 7/9
**19 [1]** 50/10
**1992 [2]** 21/2 21/3

**2**

**2,000 [1]** 42/16
**20-82231-CIV-CA NNON [1]** 1/2
**20-CV-82231 [1]** 3/8
**200 [1]** 2/4
**200-1 [2]** 40/18 42/23
**200-3 [1]** 42/19
**2000-4 [1]** 42/15

**2007 [1]** 33/8
**2009 [12]** 6/19 10/14 16/22 17/1 17/4 19/10 19/13 26/3 31/20 44/3 45/16 49/16
**2019 [1]** 31/21
**2020 [4]** 6/16 24/4 24/12 30/12
**2021 [3]** 1/7 6/4 50/14
**2022 [1]** 9/20
**22-4 [2]** 43/2 43/6
**222 [1]** 2/10
**2337 [1]** 2/24
**24th [2]** 8/10 30/24
**2500 [1]** 2/5
**25th [1]** 2/8
**29 [2]** 9/6 12/10
**29th [2]** 6/4 13/15
**2nd [1]** 6/21

**3**

**30 [1]** 48/19
**30-second [1]** 48/7
**33131 [1]** 2/5
**33131-1714 [1]** 2/8
**33401-6147 [1]** 2/11
**33414 [1]** 1/20
**34950 [1]** 50/16
**370 [1]** 1/22
**3rd [1]** 2/8

**4**

**4500 [1]** 1/22
**467-2337 [1]** 2/24
**4th [1]** 2/11

**6**

**6.1 [5]** 15/5 15/14 19/3 19/9 25/24
**60 [1]** 1/8
**6147 [1]** 2/11

**7**

**7 million [1]**
41/15
**772 [1]** 2/24

**8**

**8.1 [1]** 7/19
**80202 [1]** 1/23
**82231 [1]** 3/8

**9**

**9.2 [1]** 7/19
**90 [2]** 5/6 6/11
**9:57 [1]** 50/4
**9th [1]** 6/16

**A**

**a.m [1]** 50/4
**abilities [1]** 50/9
**ability [1]** 35/16
**above [1]** 50/8
**above-entitled [1]**
50/8
**absent [1]** 32/24
**absolutely [9]**
14/19 16/17 17/24 20/10 26/19 27/18 27/22 28/13 37/5
**accept [6]** 27/12 37/18 37/21 38/3 41/22 46/10
**accepting [1]**
11/23
**accompanies [1]**
32/22
**accusing [1]** 35/7
**Ackerman [1]**
39/10
**Act [24]** 11/18 11/24 13/20 14/13 14/15 17/6 17/18 18/8 19/21 23/10 25/11 25/13 25/16 25/16 26/11 26/13 36/6 44/5 44/6 44/8 44/8 44/19 44/23 45/4
**acted [1]** 46/5
**action [5]** 9/14 46/3 46/7 46/16 47/2
**actionable [3]**
23/10 36/5 36/15
**acts [1]** 11/6
**add [1]** 30/5
**addition [1]** 24/13
**address [3]** 32/5 43/7 43/20

**adequately [1]**
35/16
**ADJOURNED [1]**
50/4
**admit [1]** 45/10
**admittedly [1]**
22/2
**Adolfo [4]** 28/16 36/9 42/6 48/9
**advancing [1]**
20/14
**advisement [1]**
49/22
**affidavit [4]** 33/6 33/7 33/16 34/22
**affiliated [2]**
10/16 20/10
**affirmative [1]**
34/18
**agency [1]** 32/21
**agenda [1]** 5/21
**agent [3]** 11/12 13/21 32/13
**agents [3]** 11/1 11/10 46/5
**agreement [68]**
**agreements [5]**
14/16 15/25 16/25 18/18 47/16
**AILEEN [1]** 1/13
**Akerman [5]** 2/7 2/10 4/10 47/13 48/3
**al [1]** 3/9
**ALAN [2]** 1/7 6/18
**ALDOLFO [3]** 1/5 28/15 42/5
**allegation [4]**
27/25 29/7 32/21 46/6
**allegations [4]**
11/23 27/12 32/8 32/17
**allege [4]** 33/4 33/13 35/17 46/2
**alleged [4]** 12/11 12/12 27/16 46/7
**allegedly [1]**
26/15
**allotted [1]** 5/6
**allow [1]** 7/19
**allows [1]** 6/19
**alluded [1]** 48/14

Page 52

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC

Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 52 of 60

## A

alluding [1]  28/9
alter [1]  32/19
altogether [1]
  23/1
amended [7]
  11/25 12/5 13/9
  31/12 33/8 43/1
  46/2
amendment [2]
  9/17 24/16
amendments [1]
  30/20
amplified [1]  12/4
amused [1]  35/7
analysis [2]  34/11
  34/16
anathema [1]
  8/22
Andre [6]  21/12
  21/13 21/19 38/11
  38/12 39/24
animal [2]  20/7
  44/14
animals [5]  16/23
  41/7 43/23 44/1
  44/17
answer [1]  10/22
anticipated [1]
  8/24
anyhow [1]  34/3
apologize [1]
  5/17
Appeal [1]  4/18
appearance [2]
  3/10 49/21
APPEARANCES
  [2]  1/17 2/1
Apple [7]  26/9
  26/11 26/12 26/12
  28/23 28/24 29/2
apply [1]  10/15
appreciate [1]
  49/21
approval [7]
  15/16 15/16 15/19
  16/4 17/1 18/1
  26/2
approvals [2]
  15/17 25/25
approve [1]  16/3
Arellano [2]  39/25

48/23
aren't [2]  10/20
  27/23
Argentina [1]
  3/22
Argentinian [2]
  33/9 33/10
argue [1]  34/25
argued [1]  45/22
argues [1]  35/10
arguing [2]  37/10
  41/24
argument [11]
  12/7 29/6 29/8
  32/24 34/6 34/10
  34/25 35/4 43/12
  43/16 45/24
arguments [3]
  5/22 12/6 32/17
arisen [1]  16/14
arises [3]  20/14
  29/24 30/1
arm [1]  30/21
arrangements [1]
  39/24
article [4]  40/20
  42/22 42/23 42/25
ASAP [1]  21/6
Ash [9]  38/25
  39/2 39/2 39/2
  39/2 39/4 39/23
  40/19 48/13
asserted [1]  17/2
assertions [1]
  32/12
associate [1]
  4/16
associated [5]
  27/1 28/16 28/19
  29/14 41/9
association [4]
  27/16 27/21 28/15
  33/9
assume [3]  15/23
  18/19 25/9
assuming [6]
  10/2 18/16 18/18
  25/7 27/14 27/15
attached [1]  33/7
attacks [1]  6/6
attempting [1]
  32/18
attorney [1]  3/21

audible [1]  48/18
audio [5]  4/23
  8/20 24/7 48/19
  48/21
authority [5]
  11/22 17/15 18/15
  18/17 36/18
Avenue [2]  2/8
  2/10
AVERY [2]  1/18
  3/15
avid [1]  40/8
avoid [2]  11/15
  46/25
avoided [1]  35/1
awarding [1]
  33/12
awareness [1]
  19/1
awful [1]  49/5

## B

B01 [2]  21/23
  44/14
B1 [1]  21/11
B10 [2]  21/8
  21/23
B11 [3]  21/8
  21/25 44/14
B12 [1]  21/9
B2 [1]  21/11
B3 [1]  21/11
babies [1]  40/2
background [1]
  15/9
bald [1]  32/20
bar [1]  4/20
Bartolome [1]
  12/25
base [1]  42/9
basis [6]  13/6
  14/20 32/24 33/11
  34/19 45/22
Bates [2]  38/20
  38/20
Batista [2]  4/16
  4/18
Beach [1]  2/11
becomes [1]
  13/23
behind [3]  13/4
  16/21 49/8
belong [1]  42/8

beneficial [1]
  11/11
beneficiaries [1]
  40/25
beneficiary [1]
  40/7
benefit [1]  49/10
beyond [2]  8/24
  23/20
Bianco [1]  47/20
bill [1]  6/13
billionaire [1]
  38/13
Biscayne [1]  2/4
Blvd [2]  1/19 2/4
board [1]  8/3
BOOKHOUT [12]
  2/3 4/5 23/11
  23/15 24/7 25/7
  26/18 41/8 43/4
  43/15 43/18 45/18
Booking [1]
  16/13
Borodin [32]  7/12
  9/20 9/25 14/9
  14/10 14/11 14/17
  14/18 17/11 19/17
  21/5 21/13 21/15
  21/16 38/11 38/12
  38/23 39/22 39/22
  40/3 40/3 40/5
  40/8 40/10 40/11
  40/14 40/23 41/1
  41/5 41/12 41/17
  42/24
Borodin's [2]
  10/16 21/25
boy [1]  37/25
branded [1]  44/17
branding [2]
  44/14 44/18
brands [1]  21/20
breach [3]  17/5
  18/17 19/11
breached [1]
  19/10
bred [4]  20/9 21/8
  22/4 22/5
Brian [1]  47/20
brief [2]  31/6
  33/22
briefed [1]  5/12
briefing [2]  5/25

41/4
British [3]  9/19
  37/3 37/23
buck [1]  21/16
Bucking [1]  3/21
Building [1]  2/11
bunch [2]  19/25
  38/7
bundle [2]  19/14
  49/17
business [1]
  12/13
buyer [7]  7/16
  7/16 7/20 7/23
  31/8 34/13 45/13
BVI [3]  37/11
  37/17 39/16

## C

C-E-R-T-I-F-I-C-A-
  T-E [1]  50/5
caginess [1]  19/1
CAMBIASO [38]
  1/5 3/17 14/18
  14/19 15/18 16/17
  16/22 17/2 17/4
  17/23 19/10 20/9
  21/24 26/16 26/23
  27/1 27/17 27/21
  28/1 28/15 28/16
  28/19 28/22 29/6
  29/15 29/17 29/19
  30/1 31/21 31/22
  33/5 33/15 41/10
  42/5 42/6 45/9
  45/14 48/9
Cambiaso's [8]
  12/16 13/3 13/4
  16/21 17/1 18/8
  21/22 29/11
candid [1]  39/13
CANNON [2]  1/2
  1/13
captain [2]  21/17
  38/12
Carlos [1]  6/17
Caro [1]  6/18
Carolina [1]
  48/25
Castagnola [7]
  12/25 12/25 13/7
  19/8 19/18 19/19
  20/17

Page 53

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC
Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 53 of 60

# C

catch [1] 35/3
catch-up [1] 35/3
caught [1] 35/6
cells [1] 41/15
Center [1] 2/7
centrally [1] 12/6
certify [1] 50/6
chain [1] 29/6
CHAPMAN [17]
1/18 1/19 3/15
3/25 5/5 5/14 5/23
9/7 9/15 13/18
15/9 32/18 34/24
36/17 42/12 45/25
47/6
Chapman's [1]
35/7
characteristics
[3] 25/19 43/3
44/9
charge [2] 21/15
38/13
Chaskas [1] 5/25
Chaskas' [1] 6/1
CHASKES [11]
2/6 4/10 5/17 30/4
35/14 36/22 37/10
37/21 42/3 45/19
47/12
Chaskes's [1]
38/22
cheap [1] 36/24
Chicago [1] 47/20
Circuit [2] 31/1
33/22
cited [1] 33/22
CIV [1] 1/2
claim [16] 10/13
17/7 19/21 25/16
26/11 26/13 28/17
29/20 31/3 31/5
44/6 44/8 44/8
44/19 44/23 45/4
claiming [1]
28/15
claims [15] 11/18
12/6 13/6 13/10
13/20 14/14 14/15
17/6 19/10 19/22
20/15 21/24 25/11
25/13 44/24

clarity [1] 23/21
clear [5] 14/17
16/12 17/24 24/4
26/19
clerkship [1] 4/17
clients [1] 30/19
clients' [1] 6/1
clone [24] 15/23
26/21 26/23 27/3
27/4 27/20 28/14
28/16 28/18 29/3
29/21 29/21 29/21
41/8 41/8 43/3
43/21 43/21 43/21
43/21 43/24 43/25
44/5 44/15
clone's [1] 28/14
clones [78]
cloning [28] 6/14
6/19 6/23 8/22 9/3
9/16 9/24 10/8
10/17 13/12 13/13
13/21 13/22 13/25
14/3 14/3 14/4
14/11 15/15 16/13
16/16 16/20 22/23
35/9 41/19 42/25
44/1 45/14
close [1] 38/24
co [2] 1/23 3/18
co-counsel [1]
3/18
coffers [1] 39/18
colloquially [1]
44/22
commence [1]
8/8
commenced [1]
46/16
commences [1]
8/8
commercial [1]
12/13
commodity [1]
41/9
company [3] 1/4
1/8 1/9
compensated [1]
35/21
competition [1]
27/10
complaint [9]
11/25 12/5 13/10

31/12 32/20 33/4
33/8 43/1 46/2
complete [3] 37/2
37/8 44/3
conceal [3] 48/8
49/3 49/6
concealment [1]
49/10
concede [1]
35/17
concept [3] 7/21
8/1 8/23
concern [1] 7/2
concerns [2] 6/6
7/7
concise [1] 5/8
conclude [2]
43/17 47/8
concluded [1] 6/1
conduct [5] 16/20
17/15 18/1 18/15
48/6
conference [1]
4/15
confirm [1] 38/25
confluence [1]
14/8
confuse [2] 18/3
20/2
confused [4] 18/4
18/22 26/24 27/8
confusing [1]
22/4
confusion [29]
18/7 18/8 18/9
18/9 18/10 18/20
19/5 19/15 19/16
20/3 20/5 20/13
20/13 20/21 21/21
22/2 22/8 22/9
22/20 23/7 25/21
33/2 33/2 33/3
36/3 42/15 42/20
44/12 45/12
connected [2]
29/5 42/5
connection [2]
47/16 47/22
connections [1]
23/3
connective [1]
21/14
consent [2] 46/14

46/18
consents [1]
46/15
consistently [2]
33/3 33/13
consumer [3]
18/20 19/5 22/19
consummated [1]
8/25
Cont'd [1] 2/1
contain [1] 27/19
contains [2] 29/4
46/13
contend [1] 20/12
contended [1]
19/12
contention [1]
19/4
context [4] 7/17
8/13 16/14 23/9
contextually [1]
16/9
contract [12] 6/19
7/19 7/20 7/21
16/5 18/22 25/10
25/15 25/15 31/13
41/3 41/4
contracted [2]
8/2 41/16
contracting [2]
17/16 17/17
contracts [3]
31/20 31/23 34/13
contractual [2]
15/25 18/18
contrary [2] 9/4
34/25
control [5] 8/1
11/6 37/2 41/11
49/7
Convention [1]
37/23
convince [1] 20/4
coordinate [1]
21/20
corporate [2]
32/19 49/8
corporation [5]
4/11 4/12 10/25
11/1 37/11
correspondence
[2] 17/3 17/3
couched [1]

32/17
counts [2] 11/24
12/4
County [2] 46/17
46/18
court [41] 1/1
2/23 2/24 3/14
4/17 7/7 8/24 9/7
9/13 10/20 13/8
14/8 17/7 23/17
27/20 28/13 30/11
30/16 32/7 32/7
32/10 32/15 32/16
33/13 34/5 34/7
36/25 37/1 37/8
37/9 38/17 42/1
42/18 43/12 46/12
47/24 48/5 49/22
50/3 50/15 50/15
Court's [3] 4/19
36/18 47/4
courts [1] 44/23
cover [4] 5/7
40/12 40/15 43/10
COVID [1] 50/10
COVID-19 [1]
50/10
CRC [1] 2/23
create [2] 14/3
37/3
created [4] 11/3
35/18 36/3 37/6
creates [2] 7/7
7/8
creating [2] 11/14
43/25
CRESTVIEW [12]
1/8 1/9 4/2 4/6
10/12 10/15 12/15
21/2 22/5 39/9
44/4 45/2
Crestview's [3]
4/25 5/1 7/21
CRR [2] 2/23
50/14
crystalized [1]
10/4
Cuartetera [26]
13/23 20/7 20/8
20/19 21/9 21/22
26/5 26/16 26/21
26/22 27/4 27/19
27/19 27/23 27/24

Page 54

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC

Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 54 of 60

# C

**Cuartetera... [11]** 28/1 28/14 28/21 29/18 29/21 33/4 33/11 35/17 41/15 44/16 45/13

**Cuartetera's [2]** 18/11 22/5

**Cuarteteras [3]** 21/23 21/24 22/4

**custody [4]** 11/5 37/2 39/4 41/15

**CV [1]** 3/8

**Cypress [1]** 37/4

# D

**damages [2]** 12/12 35/16

**dash [3]** 42/17 42/18 42/19

**David [2]** 21/5 21/6

**de [7]** 1/18 3/19 15/2 40/18 41/14 41/14 48/12

**DE-15 [1]** 41/14

**DE-179-15 [1]** 41/14

**deadline [1]** 30/20

**debate [1]** 6/18

**debated [1]** 11/5

**December 2nd [1]** 6/21

**decided [4]** 22/20 31/11 32/10 49/18

**decides [1]** 20/11

**decision [2]** 10/4 32/14

**decisions [1]** 38/19

**declaration [1]** 32/22

**defendants [20]** 1/10 2/3 4/2 4/8 5/18 10/25 12/8 14/1 31/19 31/19 31/24 31/25 32/12 35/8 39/14 45/10 45/24 45/24 46/3 46/4

**defense [2]** 5/10 10/1

**deficient [1]** 32/4

**defined [1]** 16/23

**delay [2]** 31/2 46/21

**delayed [1]** 32/9

**delaying [1]** 33/19

**delivery [1]** 38/25

**demand [1]** 28/25

**demonstrates [1]** 21/14

**Denver [1]** 1/23

**deny [1]** 33/22

**description [1]** 17/25

**designation [1]** 17/22

**despite [1]** 31/9

**detail [1]** 12/23

**detailed [1]** 45/11

**determination [2]** 34/17 34/18

**Di [1]** 6/18

**dialogue [1]** 43/2

**diane [5]** 2/23 2/25 50/14 50/14 50/16

**dictate [1]** 47/1

**Diego [1]** 3/21

**difference [1]** 34/8

**difficult [2]** 35/4 41/11

**digest [1]** 8/12

**digitally [1]** 50/7

**disagreement [1]** 16/13

**disagreements [1]** 16/14

**discovered [1]** 48/6

**discovery [14]** 6/10 6/12 6/17 8/7 8/8 8/13 12/21 17/12 19/22 22/21 22/22 23/5 32/9 32/9

**discussion [6]** 12/9 16/20 18/19 25/2 25/5 43/6

**dismiss [11]** 4/25 5/1 5/13 5/18 22/20 28/9 32/5

**dismissal [1]** 34/9 43/11 46/1 46/8

**dismissal [1]** 47/2

**disparate [1]** 36/12

**display [1]** 15/8

**dispute [9]** 15/22 25/15 25/16 26/12 28/25 44/4 45/6 45/9 45/14

**disputed [1]** 36/2

**distribute [1]** 15/23

**distribution [2]** 10/9 10/9

**DISTRICT [8]** 1/1 1/1 1/14 2/24 4/17 31/2 33/21 50/15

**divided [1]** 11/20

**DIVISION [1]** 1/2

**divorce [1]** 28/3

**DLA [3]** 2/4 4/5 4/5

**docket [8]** 4/25 5/1 5/3 7/1 22/15 42/11 42/16 43/2

**document [10]** 6/25 7/1 7/5 7/6 7/6 8/16 8/19 20/25 22/18 40/18

**documents [4]** 9/3 14/24 19/23 42/11

**DOLFINA [11]** 1/4 3/8 3/16 3/17 3/22 16/11 20/8 22/6 33/6 33/9 42/7

**Dolfina's [1]** 12/16

**dollars [2]** 27/7 35/22

**dovetails [1]** 5/12

**drabs [1]** 23/1

**drafting [1]** 47/22

**dribbled [1]** 22/22

**drips [1]** 23/1

**driver [1]** 18/7

**drove [1]** 14/7

# E

**easy [1]** 41/20

**ECF [1]** 7/1

**echo [1]** 24/8

**economy [1]** 46/25

**edition [1]** 40/14

**efficiency [1]** 47/1

**effort [1]** 20/2

**efforts [1]** 48/8

**ego [1]** 32/19

**Eichberg [1]** 47/15

**elected [1]** 31/13

**elements [1]** 23/7

**Eleventh [2]** 31/1 33/21

**email [16]** 6/20 20/22 21/4 22/11 38/15 38/19 39/7 39/21 39/23 42/15 44/13 44/16 44/17 44/19 47/9 47/13

**emails [2]** 38/10 38/16

**embryos [1]** 10/12

**emergency [1]** 9/1

**emphasizes [1]** 7/21

**encapsulated [1]** 19/8

**encumber [1]** 10/13

**enforce [2]** 19/12 46/16

**engaging [1]** 42/24

**enjoin [2]** 10/20 34/19

**enter [3]** 3/10 15/17 41/25

**entities [22]** 4/3 7/12 8/3 9/25 10/12 10/17 11/4 13/21 21/15 31/24 34/21 36/25 37/6 37/6 38/18 39/11 39/14 39/18 46/5 46/8 48/7 49/9

**entitled [1]** 50/8

**entity [15]** 10/15 11/4 11/13 11/13 11/14 11/15 31/17

**33/10 34/20 36/17 37/3 37/4 39/15 41/16 49/9**

**entity's [1]** 36/19

**entry [9]** 4/25 5/1 5/3 7/1 22/15 42/11 42/16 43/2 45/23

**equitable [1]** 48/5

**equity [1]** 48/5

**erodes [1]** 21/13

**escrow [2]** 7/10 45/11

**Esperante [1]** 2/11

**ESQ [7]** 1/18 1/18 1/21 2/3 2/3 2/6 2/9

**essentially [5]** 11/13 12/25 13/7 17/22 33/25

**establish [4]** 23/7 23/8 28/12 44/6

**established [1]** 39/15

**et [1]** 3/9

**everybody [3]** 5/21 21/16 41/7

**everyone [2]** 8/20 26/19

**evidence [4]** 8/18 28/11 28/13 32/24

**evidenced [1]** 30/22

**exclusive [1]** 44/3

**excuse [2]** 7/15 28/18

**exercise [6]** 9/21 9/22 24/21 24/23 34/3 49/13

**exercised [10]** 10/8 24/14 24/16 24/17 24/18 24/20 30/14 30/14 33/25 49/15

**exercising [3]** 30/15 30/20 49/7

**existence [2]** 30/12 30/13

**expedited [1]** 5/2

**expended [1]** 7/11

**export [1]** 10/13

Page 55

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC
Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 55 of 60

**E**

expressed [1] 8/23
expressly [1] 46/15
extended [2] 30/15 30/16
extension [1] 9/19
extensions [1] 30/8
extraordinarily [1] 13/24

**F**

fact [23] 17/25 18/2 18/14 20/4 20/14 23/8 27/23 28/24 29/1 30/1 30/9 30/18 30/22 31/10 33/15 38/10 41/24 42/3 44/5 45/8 45/13 46/9 49/12
factory [2] 41/17 41/17
facts [3] 28/21 35/1 35/1
factual [2] 25/6 32/17
failed [1] 46/2
failure [1] 36/16
faithful [1] 12/10
false [23] 13/5 13/10 13/11 14/17 15/20 16/6 16/8 17/17 17/21 17/22 17/25 18/2 18/13 19/7 19/8 25/18 25/21 26/1 26/4 29/15 36/2 36/13 44/8
falsity [1] 17/9
famous [2] 20/9 27/10
farm [7] 1/8 4/6 12/15 21/2 26/24 28/18 44/4
Farm's [1] 45/2
Farms [1] 22/5
favor [1] 47/2
feasible [1] 34/17
feeds [1] 13/19

Fields [2] 4/12 10/25
fight [1] 46/22
figure [1] 15/10
file [2] 30/24 33/20
final [2] 43/16 48/20
finally [3] 6/12 44/20 45/20
FL [5] 1/20 2/5 2/8 2/11 50/16
flew [1] 9/18
Floor [2] 2/8 2/11
FLORIDA [7] 1/1 1/4 1/6 25/4 31/2 40/9 40/13
flowing [1] 39/17
flsd.uscourts.gov [2] 2/25 50/16
foals [2] 40/1 40/2
focus [2] 11/21 23/16
focused [2] 17/8 25/3
focusing [1] 9/7
footing [1] 9/5
footnote [1] 7/17
footprint [1] 37/5
foregoing [1] 50/6
foreign [1] 8/6
form [2] 13/6 32/19
FORT [3] 1/2 1/6 50/16
Fourth [1] 4/17
framework [1] 7/10
frankly [1] 7/3
freezing [1] 10/7
funds [1] 25/9

**G**

game [1] 48/24
games [1] 40/17
gaslighting [2] 35/7 35/8
genetic [15] 8/2 10/7 27/13 27/17 27/19 27/22 29/4 29/14 29/15 29/16

29/22 29/23 29/24 29/25 43/22
genetics [8] 1/9 4/6 26/1 27/5 27/6 27/9 28/17 29/13
genuinely [1] 22/6
geographic [2] 25/20 44/10
gets [1] 20/11
Glass [1] 3/4
Glen [1] 47/14
glossed [1] 13/14
gotcha [1] 37/11
governing [1] 46/13
GRACE [2] 1/18 3/19
granted [1] 13/20
great [4] 18/25 37/18 42/3 49/7
Group [1] 1/19
GUERONNIERE [2] 1/18 3/19

**H**

HABIB [2] 1/21 3/17
Hague [1] 37/22
handle [1] 11/19
handled [1] 47/19
harm [5] 7/3 7/24 30/9 30/17 34/2
hearing [8] 1/13 4/23 5/7 5/19 23/19 47/8 49/23
heart [1] 5/9
helm [1] 38/11
helpful [1] 19/22 38/17
hemorrhaging [1] 10/6
here's [1] 9/23
hereby [1] 50/6
hereunder [1] 15/18
hide [1] 49/8
highlight [1] 11/22
highlighted [1] 47/15
history [1] 45/6

hold [1] 34/1
hone [1] 18/21
Honor [70]
Honor's [1] 49/11
HONORABLE [1] 1/13
horse [42] 6/14 9/2 14/4 19/9 19/11 20/8 20/10 20/12 24/4 24/11 25/24 26/25 27/6 27/9 27/9 27/10 27/14 28/20 29/5 29/12 29/12 29/16 29/17 29/18 29/19 29/19 29/20 30/2 30/12 30/23 31/9 31/10 32/1 33/14 33/19 35/9 42/4 42/5 44/13 44/18 45/8 46/12
horse's [2] 29/13 29/14
horses [24] 21/7 21/8 21/20 23/18 23/23 23/24 25/3 25/4 25/5 26/4 26/7 27/8 31/7 31/14 34/15 34/20 34/23 39/1 39/3 39/19 40/6 40/7 40/10 42/8
Humana [2] 32/15 34/11
hundred [1] 42/17
Hypothetically [1] 10/2

**I**

identification [1] 45/11
illicitly [1] 22/5
immediate [1] 30/9
imminent [1] 33/24
impact [3] 7/4 8/15 12/15
impose [1] 32/19
impressed [1] 21/10
inaudible [1] 24/5

incorrect [2] 25/8 25/10
indeed [1] 13/4
indelibly [1] 42/5
indispensable [3] 32/6 34/10 41/20
individually [2] 1/5 1/7
individuals [1] 46/5
induced [2] 8/14 8/14
infer [1] 29/25
inference [2] 29/9 29/10
inherently [1] 41/9
injunction [19] 5/3 5/15 6/7 7/18 8/5 28/10 28/10 30/25 32/6 32/23 33/16 33/20 36/19 41/25 43/14 45/23 49/11 49/14 49/25
injunctions [1] 41/2
injunctive [12] 7/20 7/24 10/3 14/6 30/5 31/5 32/25 33/12 33/23 35/14 37/12 41/6
injury [2] 23/17 31/4
insofar [1] 23/18
Instead [1] 32/11
interest [5] 12/13 12/16 20/15 34/23 34/24
internally [1] 34/1
International [1] 2/7
interpretation [2] 16/5 25/10
interrupt [1] 28/5
interrupting [2] 5/17 47/24
intertwined [1] 26/16
inundated [1] 44/24
invalid [1] 17/1
involvement [1] 13/3

Page 56

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC
Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 56 of 60

**I**

iPhone [6]  26/9
26/12 26/12 28/24
28/24 29/2
ironically [1]  47/1
irreparable [7]
7/2 7/24 23/17
30/9 30/17 30/21
31/4
Islands [3]  9/19
37/4 37/23
issuance [1]  5/2
issue [16]  5/12
18/20 23/17 23/19
24/6 25/8 26/15
26/25 31/15 31/20
34/6 35/14 44/1
44/5 44/12 45/8
issues [3]  5/11
30/16 43/11

**J**

JAMES [3]  2/3 4/5
23/15
January 29 [2]
9/6 12/10
January 29th [2]
6/4 13/15
JASON [2]  2/3 4/4
Jennifer [1]  4/16
John [1]  32/22
join [1]  36/17
joinder [1]  34/17
joined [2]  4/17
34/19
Joining [1]  3/20
Jornayvaz [1]
3/23
Juan [1]  6/17
judge [5]  1/14 6/8
7/17 10/6 46/24
judicial [1]  46/25
Julio [1]  39/24
June 10th [1]
9/18
jurisdiction [9]
37/8 41/21 41/24
46/14 46/15 46/18
46/22 46/23 47/4

**K**

Kentucky [1]
48/24

kinds [3]  16/24
16/25 17/20
knows [2]  18/10
20/16

**L**

la [14]  1/4 1/18
3/8 3/16 3/17 3/19
3/22 12/16 16/11
20/8 22/6 33/6
33/9 42/6
lab [3]  14/3 41/19
47/19
lady [1]  48/13
Lakeview [1]  2/10
language [1]
31/23
Lanham [24]
11/17 11/24 13/19
14/13 14/15 17/6
17/18 18/8 19/21
23/10 25/11 25/13
25/16 25/16 26/11
26/13 36/6 44/5
44/6 44/8 44/8
44/19 44/23 45/4
large [1]  27/13
latches [1]  8/11
late [2]  8/8 35/2
latest [1]  9/17
latitude [1]  23/6
law [2]  1/19 46/13
lead [1]  23/12
learn [1]  13/24
learned [4]  13/12
13/16 13/17 41/15
lecturing [1]  35/7
legal [3]  32/17
36/1 46/16
lessen [1]  22/2
lessens [2]  21/20
42/14
letter [1]  7/9
LEWIS [4]  2/3 4/4
4/5 23/13
Lexmark [1]
12/11
liability [4]  1/4
1/8 1/9 32/19
license [5]  13/18
13/20 25/9 44/3
47/17
light [1]  36/19

likelihood [4]
5/11 7/5 28/12
30/21
limitations [1]
50/12
limited [4]  1/4 1/8
1/9 31/18
listen [2]  8/21
48/7
literally [3]  44/14
44/17 48/7
litigate [1]  47/3
litigation [9]  9/17
10/1 10/21 10/23
11/15 24/12 31/20
46/25 49/15
LLC [7]  1/4 1/8
1/9 3/8 3/16 11/15
33/6
LLP [4]  1/22 2/4
2/7 4/10
location [3]  48/8
49/3 49/6
Lolo [1]  12/25

**M**

Magazine [2]
40/12 42/23
Maimi [1]  2/8
main [2]  43/20
45/8
man [4]  38/11
38/18 38/18 40/17
manager [2]  39/3
39/23
manufactured [1]
10/10
manufactures [1]
23/4
market [17]  17/10
17/11 17/12 18/3
18/7 18/7 18/9
18/10 19/16 19/16
20/5 20/15 25/21
35/19 35/21 43/25
44/1
marketplace [4]
20/3 20/3 20/13
45/12
material [15]  8/17
10/7 18/17 27/13
27/17 27/19 27/22
29/4 29/14 29/15

29/22 29/23 29/24
30/1 34/8
matter [7]  5/9
23/8 38/10 41/25
42/3 49/22 50/8
matters [2]  5/12
35/11
MEEKER [40]  1/7
3/9 4/2 4/6 6/18
6/22 7/25 8/5
10/11 13/1 14/2
16/10 16/13 16/15
18/12 19/6 19/12
19/15 19/23 20/4
20/11 20/17 21/4
21/10 21/12 21/18
22/3 23/2 23/3
30/19 31/21 35/8
36/9 38/23 41/4
41/5 41/16 41/19
44/25 47/18
Meeker's [5]
12/14 19/1 22/2
39/18 47/14
member [1]  3/22
memorializes [1]
7/8
merits [2]  7/5
28/12
message [4]
35/24 44/21 45/2
45/5
messages [2]
13/8 44/22
Miami [1]  2/5
Michelin [1]
32/15
militating [1]
30/17
miller [5]  2/23
2/25 50/14 50/14
50/16
million [3]  14/2
41/15 41/19
millions [2]  27/7
44/24
misleading [2]
17/25 18/2
misnomer [1]
10/24
misrepresentatio
n [4]  17/18 17/21
25/17 44/11

misrepresentatio
ns [3]  13/6 17/10
23/9
Miss [1]  4/18
Miss Batista [1]
4/18
mistake [1]  18/3
mitigating [1]
30/17
mix [1]  20/11
moment [5]  15/6
22/16 24/18 25/9
43/8
month [3]  22/23
40/20 46/21
month's [1]  42/23
months [5]  6/5
22/24 30/13 37/22
38/5
motion [22]  1/13
4/25 5/1 5/2 5/5
5/15 5/18 6/1 6/7
6/8 22/20 28/9
30/25 32/5 32/23
33/16 33/20 34/9
43/13 45/23 46/1
46/8
motions [4]  4/24
5/13 43/11 49/23
mourn [1]  35/13
mouth [1]  22/3
movant [1]  28/11
movie [1]  35/2
MR [44]  4/4 4/6
5/17 9/15 12/16
13/3 13/4 14/9
14/18 14/19 15/2
16/17 16/21 16/22
17/1 17/2 17/11
17/23 20/9 21/22
21/25 25/7 26/1
26/18 26/23 27/1
27/17 27/21 28/1
28/19 28/22 29/11
29/15 29/17 29/19
33/5 33/15 38/21
38/22 41/10 45/9
45/14 47/14 48/15
Mr. [132]
Mr. Arellano [1]
48/23
Mr. Bookhout [7]
23/11 24/7 41/8

Page 57

KRISTINA VITALE-RENNER vs. SIXT RENT-A-CAR, LLC
Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 57 of 60

**M**

**Mr. Bookhout...**
 **[4]** 43/4 43/15
43/18 45/18
**Mr. Booking [1]**
16/13
**Mr. Borodin [28]**
7/12 9/20 9/25
14/10 14/11 14/17
14/18 19/17 21/5
21/13 21/15 21/16
38/23 39/22 39/22
40/3 40/3 40/5
40/8 40/10 40/11
40/14 40/23 41/1
41/5 41/12 41/17
42/24
**Mr. Borodin's [1]**
10/16
**Mr. Cambiaso [7]**
3/17 15/18 21/24
26/16 30/1 31/21
31/22
**Mr. Cambiaso's**
 **[1]** 18/8
**Mr. Castagnola**
 **[5]** 13/7 19/8
19/18 19/19 20/17
**Mr. Chapman [13]**
 3/25 5/5 5/14
5/23 9/7 13/18
15/9 32/18 34/24
36/17 42/12 45/25
47/6
**Mr. Chapman's**
 **[1]** 35/7
**Mr. Chaskas [1]**
5/25
**Mr. Chaskas' [1]**
6/1
**Mr. Chaskes [8]**
30/4 35/14 36/22
37/10 37/21 42/3
45/19 47/12
**Mr. Diego [1]**
3/21
**Mr. Jornayvaz [1]**
3/23
**Mr. Lewis [1]**
23/13
**Mr. Meeker [34]**
6/22 7/25 8/5

10/11 13/1 14/2
16/10 16/13 16/15
18/12 19/6 19/12
19/15 19/23 20/4
20/11 20/17 21/4
21/10 21/12 21/18
22/3 23/2 23/3
30/19 31/21 36/9
38/23 41/4 41/5
41/16 41/19 44/25
47/18
**Mr. Meeker's [4]**
12/14 19/1 22/2
39/18
**Mr. Mutto's [1]**
43/2
**Mr. Nasrullah [12]**
3/18 11/19 25/14
25/22 32/2 35/24
36/17 45/20 45/25
46/9 47/6 48/1
**Mr. Stankee [1]**
47/14
**Mr. Steve [1]** 3/20
**Mr. Sweeney [1]**
3/13
**Ms [1]** 39/6
**Ms. [5]** 3/4 17/4
39/5 40/23 48/23
**Ms. Cambiaso [1]**
17/4
**Ms. Glass [1]** 3/4
**Ms. Price [2]** 39/5
48/23
**Ms. Prize [1]**
40/23
**mute [2]** 15/9
36/7
**Mutto's [1]** 43/2

**N**

**NASRULLAH [16]**
1/21 3/18 3/18
11/19 15/3 25/14
25/22 32/2 35/24
36/17 45/20 45/25
46/9 47/6 48/1
48/15
**nature [4]** 25/19
27/5 35/5 44/9
**nature-nurture [1]**
 27/5
**necessary [4]**

4/13 16/4 38/2
49/23
**nefarious [1]**
35/10
**negotiated [5]**
6/16 6/22 15/19
45/11 47/17
**Nevada [1]** 1/9
**news [1]** 13/16
**nobody [7]** 18/10
20/16 27/6 28/15
28/16 29/20 42/7
**NOELLE [2]** 2/9
4/13
**nominally [1]**
7/12
**nonappearance**
 **[1]** 36/19
**notice [4]** 5/19
16/15 16/16 19/11
**November 18th**
 **[1]** 7/9
**November 2020**
 **[1]** 30/12
**November 9 [2]**
24/4 24/12
**November 9th [1]**
6/16
**nuanced [1]**
26/15
**number [10]**
12/23 12/24 13/14
20/25 22/16 32/4
33/21 38/20 38/21
40/18
**numbers [1]**
42/11
**nurture [1]** 27/5

**O**

**O'Donnell [1]**
1/22
**obfuscation [1]**
42/2
**objection [1]**
14/20
**obligated [1]**
32/16
**obligations [1]**
15/18
**obtained [2]**
15/16 25/25
**October 11 [1]**

40/14
**offer [1]** 43/16
**office [1]** 47/20
**Official [2]** 2/23
50/15
**offshore [4]**
11/12 11/13 11/14
49/8
**oh [5]** 8/11 37/11
37/25 42/4 45/5
**open [1]** 6/2
**operation [1]**
28/2
**operations [1]**
40/21
**opinion [1]** 22/5
**opportunity [1]**
5/22
**opposite [1]**
30/10
**opposition [1]**
32/23
**option [16]** 7/10
9/11 9/16 9/21
9/22 10/8 13/17
24/13 24/14 24/15
24/22 24/23 25/5
30/13 30/20 33/24
**options [4]** 30/8
30/8 49/13 49/15
**order [2]** 11/9
11/12
**orders [1]** 8/7
**organization [2]**
9/20 11/3
**origin [3]** 17/22
25/20 44/10
**original [4]** 24/15
26/16 29/5 29/18
**originally [2]** 21/8
46/21
**overlap [1]** 5/11
**overlapping [1]**
43/12
**oversight [1]** 5/20
**owned [1]** 37/4
**owner [10]** 15/24
16/23 21/17 31/7
31/14 33/4 33/11
33/14 34/14 40/6
**owners [2]** 11/12
42/6
**ownership [4]**

18/23 29/1 34/23
36/1
**owns [8]** 21/24
21/25 25/8 26/8
26/13 34/20 38/18
42/4

**P**

**P-R-O-C-E-E-D-I-**
**N-G-S [1]** 3/1
**P1 [1]** 22/1
**P2 [1]** 22/1
**P3 [1]** 22/1
**page [4]** 8/17
15/2 35/8 36/10
**PAGES [1]** 1/8
**Palm [1]** 2/11
**pandemic [1]**
50/11
**PANKEY [2]** 2/9
4/13
**paragraph [1]**
46/12
**paragraph**
 **section [1]** 46/12
**paralegal [1]** 3/21
**Park [46]** 4/8 4/11
4/11 5/17 7/12 8/3
9/25 10/15 10/16
10/24 10/25 10/25
11/4 11/15 13/21
13/25 14/2 14/9
14/9 14/10 19/24
21/15 21/17 31/16
31/17 31/17 31/24
32/12 34/21 36/25
38/12 39/11 39/14
39/15 39/18 39/23
40/14 40/24 41/1
41/25 45/9 46/7
47/19 48/6 49/5
49/9
**part [3]** 13/9
17/11 25/1
**parter [1]** 47/20
**participating [2]**
4/13 4/18
**parties [16]** 4/22
7/8 10/20 16/12
18/21 22/8 30/15
31/25 32/1 32/6
34/1 34/4 46/17
46/19 47/2 47/3

Page 58

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC   Entered on FLSD Docket 11/23/2022   Page 58 of 60
Case 9:20-cv-82231-AMC   Document 323

**P**

parties' [2]  46/21
49/16
partner [1]  4/13
partners [1]
47/13
party [18]  17/16
17/17 26/10 28/11
30/18 31/7 31/9
31/12 33/10 34/10
34/12 34/16 37/15
37/17 37/20 37/25
38/1 41/21
passing [2]  26/21
26/22
pay [1]  48/10
Pegasus [26]
7/13 11/2 11/6
11/9 11/10 13/20
21/15 30/18 31/8
32/13 34/12 36/17
38/2 38/4 39/9
39/10 40/24 41/20
46/10 46/11 46/14
46/19 46/22 47/12
47/21 47/23
pending [3]  4/24
5/18 49/16
people [5]  19/25
20/4 27/6 35/18
38/2
perhaps [1]  23/7
permission [2]
4/19 14/23
permit [1]  5/6
permitted [1]
26/3
person [3]  21/17
27/7 40/4
personal [2]
41/24 46/22
persons [1]  15/16
Pharmacy [2]
32/15 34/11
phone [3]  3/21
26/13 29/1
picture [2]  40/19
40/23
piecemeal [1]
46/25
pieces [1]  22/23
pierce [4]  1/2 1/6

32/18 50/16
piling [1]  29/9
Piper [3]  2/4 4/5
4/5
place [49]  4/8
4/11 4/12 5/17
7/12 8/3 9/25
10/15 10/16 10/24
10/25 10/25 11/4
11/15 13/21 14/1
14/3 14/9 14/9
14/10 19/24 21/15
21/18 25/21 28/22
31/16 31/17 31/18
31/24 32/12 34/21
36/25 38/12 39/3
39/11 39/14 39/15
39/18 39/23 40/14
40/24 41/1 42/1
45/9 46/7 47/19
48/6 49/5 49/9
plaintiff [1]  3/11
plaintiff's [2]  3/15
5/2
plaintiffs [11]  1/6
1/18 3/19 23/20
30/7 30/23 31/10
32/10 34/13 34/15
45/10
Plaintiffs' [1]  33/3
plausible [1]
11/24
play [2]  35/3 39/5
played [1]  48/21
player [4]  21/17
27/11 28/2 40/8
playing [3]  40/9
40/14 40/22
PLC [1]  1/19
pleading [1]  35/5
pled [2]  12/10
32/20
plethora [1]  7/7
plural [1]  5/13
point [12]  8/20
9/9 12/21 16/11
21/19 25/6 27/16
34/8 40/3 48/2
48/4 48/22
points [1]  43/20
polo [27]  4/11
4/12 7/12 10/15
10/24 10/25 11/4

27/10 27/10 28/2
31/18 33/9 36/25
38/12 39/3 39/11
39/14 39/15 40/8
40/9 40/12 40/15
40/17 40/24 41/1
42/23 45/9
popped [1]  42/20
possess [1]  11/5
possession [3]
30/23 31/11 37/2
possessors [2]
11/2 11/11
possessory [2]
20/15 34/24
possibility [2]
9/11 22/4
potential [1]  22/9
potentiality [1]
9/22
practical [1]  34/8
precedent [1]
12/10
precise [1]  12/23
preliminarily [1]
5/16
preliminary [15]
5/3 5/15 6/7 7/18
7/19 8/5 30/5
30/25 32/23 33/16
33/20 35/13 43/13
45/23 49/24
present [5]  10/20
10/23 31/7 31/18
31/19
presentation [3]
5/8 11/21 49/21
pressing [1]  8/25
pretending [1]
48/24
prevail [1]  25/11
prevailing [1]
25/15
prevent [1]  11/14
price [10]  35/19
39/2 39/2 39/4
39/5 39/6 39/23
40/19 48/13 48/23
prices [1]  35/18
priority [1]  49/24
privilege [1]  4/10
Prize [1]  40/23
problem [3]  14/19

31/5 48/19
proceedings [3]
4/19 50/4 50/8
product [5]  25/20
26/15 28/25 44/7
44/10
production [3]
13/25 22/14 44/15
prohibition [1]
4/22
proliferation [1]
7/22
promise [1]  10/13
promotion [1]
12/16
proper [4]  32/24
34/19 42/11 45/22
property [1]  40/1
protected [1]
35/16
provision [3]
46/13 46/14 46/15
provision of [1]
46/13
provisions [2]
19/9 45/12
proximate [1]
12/14
PSA [2]  25/24
45/8
public [1]  3/23
published [2]
40/12 40/13
pull [2]  23/1 38/9
pulling [2]  20/22
40/4
purchase [15]
6/14 9/2 14/4 19/9
24/4 24/11 24/14
26/20 30/23 31/9
31/10 32/1 33/19
35/9 46/12
purported [2]
13/2 19/13
purposes [2]
18/19 32/6

**Q**

qualification [1]
16/2
qualities [2]
25/19 44/10
question [6]

19/20 20/10 28/7
30/5 35/23 37/20
questions [1]
5/10
quick [1]  21/6
quote [4]  25/18
32/13 44/11 49/3

**R**

ratify [1]  38/1
ready [4]  15/11
15/12 38/24 38/25
rebutted [1]
32/22
recent [1]  32/14
recess [2]  15/7
50/3
recognized [3]
16/19 22/3 22/9
recognizes [1]
41/7
recommendation
s [1]  19/7
record [2]  33/12
43/2
recorded [1]  50/7
recording [4]
4/23 39/6 47/10
48/21
records [1]  33/8
recover [2]  31/14
34/15
reduces [1]  30/21
reference [2]  32/2
36/13
referenced [1]
42/12
relationship [2]
16/15 32/21
relief [14]  7/20
7/24 10/3 14/6
30/5 31/6 32/25
33/12 33/23 34/14
35/14 37/12 41/6
48/6
relying [1]  12/18
remark [1]  48/20
remarkable [2]
13/13 40/11
remind [1]  4/22
remotely [1]
50/12
renewed [1]  5/2

Page 59

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC
Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 59 of 60

**R**

**Reporter [2]**  2/23 50/15

**reporting [1]** 50/12

**representation [8]**  17/15 18/2 18/14 25/18 25/22 25/25 26/7 44/9

**representations [6]**  16/24 18/25 19/2 19/8 19/15 19/19

**representative [1]**  21/5

**reputation [1]**  12/13

**required [7]**  15/17 26/2 32/16 34/12 34/16 34/16 36/5

**reserved [1]**  41/5

**resolve [2]**  30/16 43/13

**resolved [1]** 38/7

**respectfully [1]**  11/12

**response [1]** 28/7

**rest [2]**  3/13 50/1

**restriction [1]**  7/15

**result [4]**  16/15 18/4 19/15 25/16

**results [1]**  18/9

**retrieve [1]**  41/12

**ridden [5]**  27/10 28/19 29/17 29/20 30/1

**Rider [19]**  7/14 11/2 11/6 11/9 11/10 30/18 31/8 32/13 34/12 38/2 39/9 39/10 46/10 46/11 46/14 46/19 46/22 47/12 47/21

**ridiculous [1]**  28/17

**riding [1]**  29/11

**rightful [2]**  15/24 18/22

**rights [9]**  16/17 16/18 16/20 16/24

19/13 44/2 45/14 49/16 49/17

**rise [2]**  26/13 45/3

**RMR [2]**  2/23 50/14

**ROBERT [2]**  2/6 4/9

**rode [1]**  28/23

**room [1]**  4/15

**Ross [1]**  47/15

**Russian [1]**  38/13

**S**

**S.A [6]**  1/4 3/8 3/16 3/17 33/6 33/9

**sake [1]**  46/25

**sale [15]**  6/13 7/8 13/1 13/2 23/23 23/24 23/25 24/5 24/11 24/13 26/11 26/20 30/12 32/1 46/12

**sales [8]**  8/24 12/13 12/16 15/25 16/21 18/1 23/10 23/18

**save [1]**  35/3

**schedule [1]**  49/23

**screen [2]**  15/10 20/24

**se [3]**  2/8 16/6 16/8

**second [11]**  11/25 12/5 13/9 15/15 31/11 33/7 33/7 38/21 43/1 46/1 48/7

**seconds [1]**  48/19

**secret [12]**  6/14 6/23 6/23 8/22 9/2 9/16 9/24 13/12 13/13 14/4 15/14 35/9

**section [4]**  15/5 17/19 25/24 46/12

**sections [1]**  7/19

**seek [1]**  10/3

**seeking [4]**  31/13 31/14 34/14 34/15

**seller [4]**  7/15 7/20 7/23 15/15

**selling [1]**  39/11

**sense [1]**  43/22

**Senterfitt [1]**  2/10

**September 24th [2]**  8/10 30/24

**series [2]**  22/6 47/16

**serve [2]**  37/23 38/5

**served [1]**  37/25

**service [7]**  37/18 37/21 38/3 41/22 41/23 46/10 47/18

**services [4]**  31/15 32/2 39/12 39/16

**seven [5]**  7/14 9/10 9/13 13/17 24/14

**shall [1]**  46/17

**sham [1]**  37/8

**share [2]**  14/23 47/10

**shell [1]**  11/3

**Shore [1]**  1/19

**shotgun [1]**  35/4

**shots [1]**  36/24

**side [4]**  4/20 6/6 33/3 43/16

**signatories [1]**  31/19

**signed [2]**  16/16 41/5

**Simmons [2]**  32/22 34/21

**simple [1]**  41/6

**situation [1]**  37/14

**six-month [1]**  46/21

**small [1]**  17/12

**snippet [1]**  8/20

**sole [2]**  37/7 37/7

**solicited [1]**  23/2

**soon [1]**  39/1

**sophisticated [2]**  27/7 41/18

**South [3]**  1/19 2/4 48/25

**SOUTHERN [3]**  1/1 31/2 33/21

**SPEAKER [1]**

21/2

**special [1]**  43/4

**specific [4]**  10/4 29/18 43/3 43/5

**spend [2]**  37/22 41/23

**spent [1]**  43/4

**spin [1]**  42/7

**spoken [1]**  20/20

**spreadsheet [1]**  15/6

**staff [1]**  3/14

**standard [4]**  25/24 28/9 28/10 28/10

**standards [1]**  28/8

**standing [2]**  12/8 12/12

**Stankee [2]**  47/14 47/14

**starts [1]**  8/16

**state [1]**  29/25

**stated [1]**  25/23

**statement [11]**  9/4 12/23 12/24 15/20 16/1 36/2 36/5 36/13 36/14 36/15 44/20

**statements [17]**  12/15 12/15 12/17 12/18 12/20 12/24 13/5 13/7 13/10 13/11 14/17 17/10 17/20 17/21 19/5 23/8 26/25

**STATES [8]**  1/1 1/14 2/24 11/1 11/8 23/3 40/22 50/15

**stay [1]**  38/6

**steals [1]**  26/10

**stems [5]**  12/12 13/11 14/3 20/3 49/17

**Steve [4]**  3/20 14/22 38/15 39/7

**stipulate [1]**  49/14

**store [1]**  26/9

**straighten [1]**  15/8

**Street [1]**  1/22

**string [1]**  6/20

**strings [1]**  40/5

**structure [3]**  7/10 7/11 8/2

**submitted [1]**  33/15

**substance [1]**  43/11

**substantial [2]**  7/4 28/12

**success [3]**  5/12 28/2 28/12

**successful [2]**  27/14 29/12

**sudden [1]**  6/13

**sued [1]**  35/2

**sufficient [2]**  31/3 43/12

**sufficiently [2]**  40/1 46/2

**suggest [2]**  28/18 28/18

**suggesting [2]**  10/19 19/23

**suggests [1]**  17/23

**Suite [3]**  1/20 1/22 2/5

**summary [1]**  8/17

**Suntrust [1]**  2/7

**support [4]**  11/22 17/7 33/16 46/6

**sustain [1]**  12/6

**Sweeney [1]**  3/13

**T**

**tail [1]**  42/8

**tape [3]**  39/5 48/8 48/23

**team [6]**  4/1 4/11 10/25 21/18 38/12 40/15

**technical [4]**  31/15 32/2 39/12 39/16

**technicalities [1]**  38/7

**technicality [1]**  37/10

**technological [1]**  50/11

**technology [5]**  14/1 14/12 22/24

Page 60

KRISTINA VITALE-BENNER vs. SIXT RENT-A-CAR, LLC

Case 9:20-cv-82231-AMC   Document 323   Entered on FLSD Docket 11/23/2022   Page 60 of 60

# T

technology... [2]
22/25 47/17
**TELECONFEREN**
**CED [1]** 1/13
terms [3] 10/4
19/1 19/3
Terra [2] 46/17
46/18
territory [1] 5/7
Texas [9] 1/8
46/15 46/17 46/19
46/20 46/23 46/24
46/24 47/3
text [5] 35/24
44/21 44/22 45/2
45/5
thank [15] 3/7
3/14 3/24 3/25
5/24 6/3 12/1
43/19 45/17 45/18
47/5 49/19 49/20
49/25 50/2
thinking [3] 14/7
26/24 27/8
Thirsk [2] 21/5
38/22
thought [1] 40/11
thousand [1]
41/12
threat [1] 30/9
threshold [2] 6/6
23/8
time [12] 5/23
6/17 7/11 7/25
9/20 12/20 16/19
22/10 24/24 30/16
43/4 45/5
times [2] 33/5
33/5
tissue [1] 21/14
title [1] 19/6
tone [1] 48/9
totally [1] 32/21
touch [4] 8/18
12/5 13/18 13/19
toward [1] 30/17
towards [1] 36/12
trail [1] 39/9
tranche [1] 8/9
tranches [1] 8/9
transaction [1]

17/23
transactions [4]
17/13 17/14 17/15
18/15
transcript [3]
1/13 48/11 49/2
transcription [1]
50/7
transfer [4] 10/12
14/1 22/24 22/25
transferred [1]
46/24
transfers [1]
29/13
transpired [1]
23/18
treating [1] 18/13
trickles [1] 6/12
Trigg [1] 1/22
trouble [2] 32/8
49/6
troubling [3]
13/23 13/24 14/9
turning [1] 17/6
twice [1] 37/20

# U

U.S [1] 40/12
UK [1] 38/13
ultimate [4] 21/17
36/18 40/6 40/7
unauthorized [1]
7/22
unclear [1] 19/6
undermine [1]
31/3
undisputedly [2]
37/1 37/1
unequivocal [1]
17/14
**UNIDENTIFIED [1]**
21/2
unilateral [1]
16/20
unintelligible [5]
19/19 21/10 26/20
45/15 47/22
unique [2] 35/20
41/10
**UNITED [8]** 1/1
1/14 2/24 11/1
11/8 23/3 40/22
50/15

unlawful [1]
15/25
Unless [1] 27/4
Unlike [1] 41/8
unlikely [2] 29/9
29/9
unquote [3] 25/18
32/13 44/11
unrebutted [1]
34/22
unsupported [3]
32/8 32/12 32/17
update [1] 23/17
upkeep [1] 34/22
uptick [1] 7/2
us [17] 2/4 3/14
3/18 3/20 3/24
4/15 4/17 6/23
6/25 7/9 14/7
14/16 22/11 22/17
37/12 38/5 45/7

# V

valid [1] 17/4
valuable [6] 29/3
41/7 43/23 43/25
44/6 44/7
value [4] 29/16
29/23 29/24 29/25
veil [2] 32/19 49/8
venue [2] 46/13
46/18
verge [1] 9/9
versus [1] 3/8
via [1] 44/22
viable [1] 46/6
viciating [1]
36/12
video [2] 1/13
4/23
violation [1]
11/24
Virgin [3] 9/19
37/3 37/23
vitiate [1] 31/13
volume [1] 33/17
vs [1] 1/6

# W

warned [1] 6/8
weekend [1] 50/1
well-known [4]
23/4 28/22 29/19

45/9
Wellington [2]
1/20 40/13
West [1] 2/11
WhatsApp [1]
13/8
whatsoever [1]
16/18
Wheeler [1] 1/22
wholly [1] 31/3
willing [5] 18/19
19/2 19/25 20/1
46/4
win [2] 40/17
40/17
Winarski [1] 3/20
winter [1] 40/9
wish [2] 30/4
49/25
wondering [1]
36/4
world [1] 37/5
worth [1] 46/11
wrap [1] 43/17
wrapping [1]
43/10

# Z

Zeta [1] 33/7