**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 20-82231-CIV-CANNON/Reinhart**

**LA DOLFINA S.A., LLC**, and
**ADOLFO CAMBIASO,**

      Plaintiffs/Counter-Defendants,

v.

**D. ALAN MEEKER**,
**CRESTVIEW FARM LLC**,
and **CRESTVIEW GENETICS LLC**,

      Defendants/Counter-Plaintiffs

v.

**LA DOLFINA S.A.**

      Counter-Claimant/Counter-Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'**
**MOTION TO REVISIT PERSONAL JURISDICTION**

    **THIS CAUSE** comes before the Court upon Defendants' Motion to Revisit Personal

Jurisdiction (the "Motion"), raised orally during trial following Defendants' earlier Rule 12(b)(2)

challenge and the Court's decision to defer its jurisdictional determination post-trial under a

preponderance standard [ECF No. 515 pp. 86–88; ECF No. 517 pp. 262–63; ECF No. 81 (citing

*AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1365 (11th Cir. 2021))].[1]  Defendants argue

---

[1] Defendants raise the Motion pursuant to Rule 50(a) [ECF No. 515 pp. 87–89].  Plaintiffs invoke
Rule 52(c) [ECF No. 486 p. 2 n.1].  Neither procedural vehicle is correct.  As the Eleventh Circuit
explained in *AcryliCon*, 985 F.3d at 1365 & n.36, the mechanism through which to raise a revisited
challenge to personal jurisdiction, as is the case here, is to do so through a post-trial "motion to
revisit" the personal jurisdiction issue following Defendants' earlier Rule 12(b)(2) motion
[ECF No. 37].  The Court therefore construes Defendants' Motion as a Motion to Revisit.

that Plaintiffs failed to adduce sufficient trial evidence to support this Court's exercise of personal jurisdiction over all claims and all Defendants [ECF No. 488]. The Court has considered the Motion, the parties' supplemental briefs on the issue [ECF Nos. 486, 488], and the extensive trial record [ECF Nos. 496, 498, 511–20]. For the reasons below, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND[2]

The instant jurisdictional dispute can be traced back to the beginning of this complex and lengthy proceeding. In January 2021, one month after the initial Complaint was filed, Defendants moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction [ECF No. 37]. Following full briefing and a hearing on the motion—and construing all reasonable inferences in favor of the nonmovants—the Court held that Plaintiffs had "set forth at least a prima facie case that the exercise of personal jurisdiction over Defendants is consistent with Florida's long-arm statute and Due Process Clause of the Fourteenth Amendment" [ECF No. 81 pp. 4–5; ECF No. 53]. The Court stated, however, that Defendants could "revisit personal jurisdiction in light of the evidence produced at trial, at which time the court will impose a preponderance-of-the-evidence standard" [ECF No. 81 p. 6 (quoting *AcryliCon*, 985 F.3d at 1365)].[3]

---

[2] A more fulsome procedural and factual background section is included in the Court's Post-Trial Findings of Fact and Conclusions of Law, issued in conjunction with this Order [ECF No. 527]. Findings of fact that are essential to resolving the personal jurisdiction issues, however, are integrated into the analysis below and are consistent with the findings of fact in the Court's contemporaneous post-trial order [ECF No. 527].

[3] On June 15, 2021, a United States District Court in the Northern District of Texas transferred a related action to this Court under 28 U.S.C. § 1404(a), finding that that this action "might have been brought" in this district as a matter of personal jurisdiction. *See Crestview Farm, L.L.C. v. Cambiaso et al.*, No. 21-81066-CIV-AMC, ECF No. 62 (S.D. Fla. Dec. 3, 2020). Albeit on the basis of different arguments, the Texas court nevertheless found that Defendants had "purposefully availed" themselves of this forum.

Almost three-and-a-half years later, at the conclusion of Plaintiffs' case in chief during a nine-day (partially advisory) jury trial in May 2024, Defendants moved for a directed verdict based on lack of personal jurisdiction [ECF No. 515 pp. 86–88].  Consistent with the Court's earlier ruling at the Rule 12(b)(2) stage, the Court elected to reserve ruling on the motion until the full trial was complete [ECF No. 515 p. 99].  Following the presentation of Defendants' case in chief, Defendants again raised their personal jurisdiction challenge [ECF No. 517 pp. 262–63].  Given the plethora of claims in this action and the parties' oftentimes muddled presentation of their own claims, the Court directed the parties to file supplemental briefing on the personal jurisdiction question in a claim-specific and defendant-specific manner [ECF No. 517 p. 263].  The parties timely filed their supplemental briefing, and Plaintiffs attached a chart listing the applicable Florida-long arm subsections associated with each claim and Defendant [ECF Nos. 486, 488; *see* ECF No. 486-1 (chart)].[4]  The Motion is now ripe for resolution.

## LEGAL STANDARDS

**Motion to revisit**.  Where, as here, Plaintiffs have satisfied the prima facie standard for personal jurisdiction at the pretrial stage, Defendants seeking a post-trial reexamination of the Court's pretrial jurisdictional ruling should raise a motion to revisit.  *AcryliCon*, 985 F.3d 1365 & n.36.  The Court resolves such a motion by evaluating the trial record using a preponderance-of-the-evidence standard.  *Id.* at 1365.  In doing so, the court determines the credibility of witness testimony, weighs evidence, and finds relevant jurisdictional facts.  *Id.* at 1364–65 & n.36.

---

[4] Plaintiffs' chart is not entirely accurate.  Plaintiffs list Meeker as a defendant for their Breach of 2019 Side Letter Agreement (Count III) and Breach of Bailment Agreement (Count IV) claims [ECF No. 486-1 p. 2].  Meeker is not a defendant for those claims, however.  Moreover, Plaintiffs bring an unjust enrichment claim against Meeker personally, but the chart does not identify a long-arm provision—with the exception of the general-jurisdiction provision, Fla. Stat. § 48.193(2)—that confers jurisdiction over that claim [ECF No. 486-1].

**Personal jurisdiction**.  A federal court sitting in Florida may exercise personal jurisdiction only if the requirements of (1) Florida's long-arm statute and (2) the Due Process Clause of the Fourteenth Amendment are satisfied.  *See, e.g.*, *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855–56 (11th Cir. 1990).  There are two types of personal jurisdiction: general and specific.  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013).  "General personal jurisdiction is based on a defendant's substantial activity in [a state] without regard to where the cause of action arose," whereas "specific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within [a state] . . . ." *Id.*

## DISCUSSION

Plaintiffs Adolfo Cambiaso and La Dolfina, S.A. bring various claims against Defendant Alan Meeker personally, and against Crestview Farm LLC ("Farm") and Crestview Genetics LLC ("Genetics"), based on actions taken by Meeker as a manager of both of those entities [ECF No. 303];[5] *see Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385 (11th Cir. 1985) (explaining that it is "well established that a corporation is an artificial entity that can act only through agents").[6]  Personal jurisdiction is a claim-specific and defendant-specific inquiry.  *See Stubbs v. Wyndham Nassau Resort and Crysal Palace Casino*, 447 F.3d 1357, 1361 (11th Cir. 2006); *Argos Glob. Partner Servs., LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1086–87 (S.D. Fla. 2020).  Courts

---

[5]  The Court recently dismissed the claims brought by Plaintiff La Dolfina, S.A., LLC for lack of Article III standing [ECF No. 520].

[6]  The trial record supports the Court's finding that Meeker, as a manager of Farm and Genetics, acted as an agent of the LLCs.  *See Virgin Health Corp. v. Virgin Enterprises Ltd.*, 393 F. App'x 623, 626 (11th Cir. 2010) (citing *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (1990)) (setting forth elements to support a finding of agency).  Throughout his testimony, Meeker described and reiterated his position as manager for the LLC Defendants [*E.g.*, ECF No. 515 pp. 143–51, 156–57; *see also* ECF No. 517].

4

therefore "may not ascribe the forum contacts of one co-defendant to another in determining the existence of personal jurisdiction." *Fraser v. Smith,* 594 F.3d 842, 852 (11th Cir. 2010). Instead, courts must engage in a claim-by-claim, defendant-by-defendant analysis. Below, the Court applies the facts and testimony adduced throughout the nine-day trial to the tangled thicket of claims and parties in this case [*See* ECF Nos. 462, 463, 500-1 pp. 39–40 (charting live claims); ECF Nos. 496, 498 (admitted exhibits), 511–19 (trial transcripts)].[7]

## I.   The Court lacks jurisdiction over the unjust enrichment claim (Count V) brought against Defendant Meeker personally.

The Court begins with a discussion of the applicability of the "corporate shield doctrine" as related to the claims brought against Meeker personally. In short, because the preponderance of the evidence shows that Meeker's relevant Florida contacts were made in his corporate (rather than personal) capacity—the Court lacks personal jurisdiction over the unjust enrichment claim brought against Meeker.

"For purposes of personal jurisdiction under Florida law, the corporate shield doctrine creates a 'distinction between a corporate officer acting on one's own and a corporate officer acting on behalf of one's corporation.'" *Louis Vuitton,* 736 F.3d at 1355 (quoting *Doe v. Thompson,* 620

---

[7] As the transcripts before and during trial reveal, the parties had a less-than-firm grasp on many of their own claims and defenses throughout this trial. This confusion made adjudication and oversight of this case difficult [*E.g.,* ECF No. 523; ECF No. 518 pp. 3–87]. Indeed, throughout trial, the parties often seemed to be searching to crystalize their own understanding of their respective claims, counterclaims, affirmative defenses, and how they interacted with one another. Further, despite having years to prepare their arguments on personal jurisdiction, Plaintiffs still seemed somewhat unprepared, adjusting their arguments on the fly. In responding to Defendants' initial *ore tenus* motion, Plaintiffs argued that only two of Florida's long-arm provisions applied, and only to certain claims [ECF No. 515 pp. 98–99]. Then, in their post-trial briefing on personal jurisdiction, Plaintiffs identified four long-arm provisions that applied to their various claims [ECF No. 486]. And as briefly discussed above, the associated chart—filed by Plaintiffs in tandem with their briefing—is not entirely consistent with Plaintiffs' surviving claims. *See infra.* p. 3 n.3.

So. 2d 1004, 1006 (Fla. 1993)).  Under this doctrine, "personal jurisdiction cannot be exercised over a nonresident corporate employee sued individually for acts performed in his corporate capacity." *LaFreniere v. Craig-Myers*, 264 So. 3d 232, 237 (Fla. Dist. Ct. App. 2018) (citing *Doe*, 620 So. 2d at 1006).  The corporate shield doctrine is inapplicable, however, "where the corporate officer commits intentional torts." *Louis Vuitton*, 736 F.3d at 1355; *Kitroser v. Hurt*, 85 So.3d 1084, 1088 n.3 (Fla. 2012).  Moreover, when a plaintiff effectively advances an alter-ego or veil-piercing theory, the jurisdictional contacts of a corporate officer can be imputed to him personally. *United States ex rel. v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1354–55 (11th Cir. 2021); *See, e.g.*, *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 654 (5th Cir. 2002) ("When a corporation is deemed the 'alter ego' of an individual, then those entities are considered to be one and the same under the law.").

Plaintiffs' trade secret claims (Counts VII–VIII) sound in tort.  *E.g.*, *Vance v. Tire Eng'g & Distribution, LLC*, 32 So. 3d 774, 776 (Fla. Dist. Ct. App. 2010); *see Bangor Punta Operations, Inc. v. Universal Marine Co.*, 543 F.2d 1107, 1109 (5th Cir. 1976).  Thus, the corporate shield doctrine does not apply to them.  Plaintiffs' unjust enrichment claim (Count V) is quasi-contractual in nature, however.  *E.g.*, *Mobil Oil Corp. v. Dade Cnty. Esoil Mgmt. Co.*, 982 F. Supp. 873, 880 (S.D. Fla. 1997).  As such, the corporate shield doctrine *does* apply to it—that is, of course, unless Plaintiffs can establish that Farm and/or Genetics were merely "alter egos" of Meeker under a veil-piercing theory.  Yet despite relying on such theories for the near-entirety of this case [ECF Nos. 22, 41, 303], Plaintiffs elected to "drop[] their alter ego/piercing the corporate veil allegations" on the eve of trial [*e.g.*, ECF No. 500-1 pp. 38, 57, 63, 65, 84; ECF No. 456 ("[W]e're not pursuing that theory at trial.  Instead, we're pursuing, as we pled, direct claims against Mr. Meeker personally.")].  Consistent with Plaintiffs' failure to pursue a veil-piercing theory at trial, the

Court's analysis (for purposes of Count V against Meeker) is limited to the forum contacts he took in his personal capacity.[8]

Upon review of Meeker's personal contacts with the forum, the Court finds an insufficient basis for the exercise of jurisdiction over him for the unjust enrichment claim. The preponderance of the evidence, although mixed, shows that Meeker mostly acted in his corporate capacity (rather than his personal capacity) when conducting business with Plaintiffs in Florida. In testifying, Meeker repeatedly emphasized—at times, to the point of strategic excess—this very point [ECF Nos. 515–17 (Meeker trial testimony)].[9] The evidence introduced at trial also showed Meeker communicating through his corporate email account (alan@cviewgroup.com) and signing these emails in his capacity as an agent for the "Crestview Group of Companies" [ECF Nos. 496-2, 496-4, 496-5, 496-10, 496-13, 498-46]. Meeker and other Crestview employees used their corporate email accounts to send clone-related invoices to Florida [ECF Nos. 496-11, 496-12, 496-13].

It is true, as evidenced by large swaths of admitted text messages [ECF Nos. 498-34, 496-41, 496-40], that Meeker also communicated via text with Plaintiffs and related associates. It is also true that Meeker had some personal contacts with Florida—*e.g.*, playing polo at Wellington [ECF No. 496-50], purchasing and renovating a Wellington condo for himself and his son [ECF No. 496-46], coordinating his son's travel to visit the Cambiaso family [ECF No. 517 p. 59].

---

[8] *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (explaining that the parties "control the course of the litigation; if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision"); *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).

[9] [*E.g.*, ECF No. 517 p. 29 ("I was abundantly clear that I was speaking as the manager of Crestview Farm."), p. 138; ECF No. 516 (consistently specifying that he was acting in his capacity *as manager* of one or both of the LLC Defendants)].

But on balance, the Court finds that Meeker's personal contacts and/or communications, to the extent they concern Florida-connected business sufficient to confer personal jurisdiction over the unjust enrichment claim in Count V, were transmitted and/or engaged in primarily in his role as manager of Farm and/or Genetics. *See* Fla. Stat. § 48.193(1)(a) (requiring that the claims "aris[e] from" one of several enumerated contacts with the forum).

This is not to say that the Court finds Meeker's testimony concerning his supposedly diligent corporate line-drawing to be entirely credible; in fact, the Court has doubts about Meeker's manipulation of the corporate form and his overall credibility [*See*, *e.g.*, ECF No. 467-1]. But it is to say that the preponderance of the evidence, overall, shows that Meeker acted more like a manager of the LLC Defendants than he did in a personal capacity as to the forum contacts that are relevant to this Order.[10]   Put another way, insofar as Plaintiffs argue that Meeker was acting, at times, in his personal rather than managerial capacity when conducting business [*see* ECF No. 486 p. 5 n.3], the Court finds it is more likely than not that Meeker, in engaging in forum contacts that may otherwise be connected to the unjust enrichment claim, was acting in his corporate capacity (rather than his personal capacity).[11]

---

[10]  *See supra* n.7.   This Order takes no position on whether Plaintiffs—had they *not* dropped their veil-piercing theory—adduced sufficient evidence to establish that Meeker was an alter ego of the LLC Defendants, thus enabling the Court to impute Meeker's personal contacts with those he undertook as an agent or manager of Farm and/or Genetics (and vice versa). *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (setting forth elements required to pierce the corporate veil under Florida law).

[11]  Plaintiffs also point to a few instances of Meeker using the first-person pronouns like "I" and "me" as evidence of his failure to maintain clear corporate distinctions when dealing with Plaintiffs [ECF No. 486 p. 5 n.3 (citing to record)].   Meeker testified that these instances do not signify a shift from him acting in his corporate role to a personal role [*See* ECF No. 517 p. 180 (Meeker testifying about his use of first-person pronouns)].   Again, the Court declines to weigh the evidence here given Plaintiffs' abandonment of a veil-piercing theory.  *See supra* n.7.

Because this Court lacks personal jurisdiction over the unjust enrichment claim brought against Meeker (Count V), that claim must be dismissed.

## II.     Personal jurisdiction under Florida's long-arm statute.

The first step in the two-step personal jurisdiction inquiry is evaluating the application of Florida's long-arm statute. *Cable/Home Commc'n Corp.*, 902 F.2d at 855–56. Because federal courts generally follow state law in determining the extent of their jurisdiction, construction of Florida's long-arm statute "is a question of Florida law," and federal courts must apply the statute as would Florida state courts. *Louis Vuitton*, 736 F.3d at 1352 (citation omitted); *see United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). The Florida long-arm statute "'must be strictly construed' and 'any doubts about applicability of the statute must be resolved in favor of the defendant and against a conclusion that personal jurisdiction exists.'" *Keston v. FirstCollect, Inc.*, 523 F. Supp. 2d 1348, 1352 n.2 (S.D. Fla. 2007) (quoting *Gadea v. Star Cruises, Ltd.*, 949 So.2d 1143, 1150 (Fla. Dist. Ct. App. 2007)); *see Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) ("Florida's long-arm statute is to be strictly construed."). Finally, a "'district court has personal jurisdiction over the entire case' when 'all of the claims arise from the same jurisdiction generating event.'" *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1231 (11th Cir. 2023) (quoting *Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 671 & n.10 (11th Cir. 1993) (internal brackets removed)).

### A.  General jurisdiction under Fla. Stat. § 48.193(2)

Plaintiffs first argue that the Court "has personal jurisdiction over all Defendants for all claims under Section 48.193(2)" [ECF No. 486 p. 4]. The Court disagrees. Section 48.193(2) provides for "general personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida." *Carmouche v.*

*Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1204 (11th Cir. 2015) (quoting Fla. Stat. § 48.193(2)). "The reach of this provision extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Fraser*, 594 F.3d at 846 (citing *Woods v. Nova Cos. Belize*, 739 So.2d 617, 620 (Fla. Dist. Ct. App. 1999)). Thus, the Court "need only determine whether the district court's exercise of jurisdiction over [Defendants] would exceed constitutional bounds." *Id.*; *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

It is undisputed that Defendants are not Florida residents [ECF No. 303 pp. 22–27]. Thus, to be subject to general jurisdiction, Defendants' contacts must be so "'continuous and systematic' as to render them essentially at home in the forum State." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 13112 (11th Cir. 2018) (quoting *Goodyear*, 564 U.S. at 919); *see Carmouche*, 789 F.3d at 1205 (explaining that a foreign corporation cannot be subject to general jurisdiction unless its in-forum activities "closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business"). Such a finding is reserved for "exceptional cases." *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014); *see Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952). This is not such a case. In arguing for this Court's exercise of general jurisdiction, Plaintiffs assert that Defendants "engaged in substantial and not isolated activity within the state of Florida" [ECF No. 486 p. 7], and emphasize that Meeker engaged in the following contacts:

- Visited Florida five times between January 2019 and February 2020 to discuss and negotiate the parties' cloning enterprise;

- Sent invoices, agreements, and other documents to Plaintiffs and other business partners in Florida;

- Corresponded with Plaintiffs and others—who were located in Florida—via telephone, chat, and email;

- Facilitated the transportation of three Cuartetera clones from South Carolina to Florida; and

- Agreed to an escrow contract with a Florida law firm, which required the deposit of funds into a Florida trust account.

ECF No. 468 pp. 4–7 (citing trial exhibits and transcripts)]. Having considered these contacts and the full trial record [ECF Nos. 496, 498, 511–19], and without prejudice to the remainder of the jurisdictional analysis, the Court does not find Defendants' Florida contacts to be sufficiently "continuous and systematic" to render Defendants essentially "at home" in this forum. *Goodyear*, 564 U.S. at 919. The Supreme Court has found general jurisdiction lacking in cases featuring substantially more forum contacts than present here.[12] Even if all the above-mentioned contacts were collectively attributed to each Defendant, they would still fall short of the "high threshold" required for general jurisdiction. *Woods*, 739 So. 3d at 620; *see also Meier*, 288 F.3d at 1269–71 (explaining that Florida courts impute an agent's general jurisdictional contacts to the agent's principal). Plaintiffs have not proven general jurisdiction by a preponderance of the evidence.

### B. Specific jurisdiction under Fla Stat. § 48.193(1)(a)

The Court turns next to specific jurisdiction under the Florida long-arm statute. "[S]ection 48.193(1)(a) lists acts that subject a defendant to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida." *Carmouche*, 789 F.3d

---

[12] *See, e.g., Daimler*, 571 U.S. 117 (finding no general jurisdiction over corporate defendant where its subsidiary—defendant's exclusive importer/distributor in the U.S.—was the largest supplier of luxury vehicles to the California market, and maintained numerous California facilities of offices); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) (finding no general jurisdiction over corporate defendant despite defendant sending corporate officers to Texas for training and contract negotiations; collecting checks drawn on a Texas bank; and purchasing eighty percent of its helicopter fleet from the forum); *BNSF Ry. Co. v. Loos*, 581 U.S. 310 (2019) (finding Montana's exercise of general jurisdiction improper even though corporate defendant had "over 2,000 miles of railroad track and more than 2,000 employees in Montana").

at 1204.  Merely establishing one of these nine enumerated acts is not enough, however, to satisfy the specific-jurisdiction provision.  "The long-arm statute also imposes a connexity requirement between the enumerated activity in Florida and the plaintiff's cause of action." *SkyHop*, 58 F.4th at 1228 (citing *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1292 (11th Cir. 2022)).  In other words, because Section 48.193(1)(a) requires that a plaintiff's claims "aris[e] from" the enumerated activity, there must be a "direct affiliation, nexus, or substantial connection" between a plaintiff's claims and the defendant's forum contacts.  *Wells Fargo Equip. Fin., Inc. v. Bacjet, LLC*, 221 So. 3d 671, 675 (Fla. Dist. Ct. App. 2017).

Plaintiffs cite three of the long-arm statute's specific-jurisdiction provisions as applying here [ECF No. 486-1].  The Court addresses each in turn.

### i.   Section 48.193(1)(a)(2) provides jurisdiction over Genetics and Meeker, but not Farm, as to the trade secrets claims.

Plaintiffs argue that Fla. Stat. § 48.193(1)(a)(2)—the "tortious act" provision—provides jurisdiction for their trade secrets claims brought against all Defendants (Counts VII–VIII) [ECF No. 486 p. 8].  Section 48.193(1)(a)(2) extends personal jurisdiction over nonresident defendants who "commit[] a tortious act within this state."  Fla. Stat. § 48.193(1)(a)(2).  A tortfeasor need not be physically present in Florida for Section 48.193(1)(a)(2) to attach: a nonresident defendant still commits a "tortious act within this state" when he "commits an act outside the state that causes injury within Florida."  *Louis Vuitton*, 736 F.3d at 1353; *Wendt v. Horowitz,* 822 So.2d 1252, 1259 (Fla. 2002).[13]  This principle does not, however, obviate Section

---

[13]  Generally speaking, this principle applies when an out-of-state defendant directs a tortious act at the forum.  *See, e.g.*, *Wendt*, 822 So. 2d at 1259 (holding that "telephonic, electronic, or written communications into Florida may form the basis for personal jurisdiction under section 48.193(1)(b) if the alleged cause of action arises from the communications"); *Machtinger v. Inertial Airline Servs., Inc.*, 937 So. 2d 730, 735 (Fla. Dist. Ct. App. 2006) (same); *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008) (finding Section 48.193(1)(a)(2) to apply

48.193(1)(a)'s overarching connexity requirement, which nevertheless "requires a connection . . . between the enumerated activity in Florida and the cause of action." *Knepfle*, 48 F.4th at 1292. Put differently, under Section 48.193(1)(a)(2), there still must be a connection between the out-of-forum tortious act and the in-forum injury, beyond the mere fact that harm resulted in Florida. *See id.*; *Phillips v. Orange Co.*, 522 So. 2d 64, 67 (Fla. Dist. Ct. App. 1988) (holding that the occurrence of injury in the forum, without more, does not satisfy Fla. Stat. § 48.193(1)(a)(2)). Moreover, acts that are merely ancillary to the underlying tort do not qualify: a defendant must "commit[] a substantial aspect of the alleged tort in Florida" that is "essential to the success of the tort." *Williams Elec. Co., Inc. v. Honeywell, Inc.*, 854 F.2d 389, 394 (11th Cir. 1988) (citation omitted); *see Licciardello*, 544 F.3d at 1284 n.3 (explaining that "it is not enough that there be some *similarity* between the acts that connect the defendant to the forum and the plaintiff's claim").

With these principles in mind, the Court must answer two questions. First, did Defendants engage in any acts, directed at Florida, that were "essential to the success" of the trade-secret misappropriation torts such that Section 48.193(1)(a)(2) attaches?[14] And if so, did those acts result in Plaintiffs experiencing an injury in Florida? Upon review of the trial record, applying a preponderance standard, the Court finds that Section 48.193(1)(a)(2) confers jurisdiction over Genetics and Meeker, but not Farm.

---

because—despite defendant creating a website using infringing trademark in Tennessee—the website was accessible in Florida and thus sufficiently connected to the state).

[14] Under both the federal and state trade secret statutes, Plaintiffs must prove essentially the same three elements: (1) Plaintiffs possessed or owned a trade secret; (2) Plaintiffs took reasonable steps protect its secrecy; and (3) Defendants misappropriated the secret. *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018). Here, Defendants argue that the alleged "misappropriation" is the unauthorized disclosure of Plaintiffs' genetic material to a third-party competitor [ECF No. 500-1 p. 81]. As determined in the Court's contemporaneous Order, Plaintiffs have satisfied those elements for Counts VII and VIII as to Meeker and Genetics.

> **a. Did Defendants commit a tortious act directed at Florida "essential to the success" of the alleged misappropriation?**

**As to Farm**, Plaintiffs argue that the "tortious act" amounting to misappropriation was Farm's unauthorized disclosure of genetic material via the sale of Cuartetera clones to Pegasus Rider ("Pegasus"), a British Virgin Islands LCC owned by Plaintiffs' direct competitor, Park Place Polo [ECF No. 500-1 p. 81; ECF No. 486 pp. 6, 9; *see* ECF No. 303 ¶¶ 348, 365 (describing the misappropriation as "selling clones of Plaintiffs' renowned polo horses to third parties")].[15]  The trial record indicates that, in November 2020, Pegasus and Farm (through Meeker) executed the Horse Purchase and Sale Agreement ("HPSA"), which transferred the clones—and thus the subject genetic material—to Pegasus in exchange for $2.4 million [ECF No. 498-6].

The problem with Plaintiffs' theory is that the HPSA negotiation, drafting, and signing occurred outside of Florida [ECF No. 514 pp. 32–58 (describing negotiating and drafting of the HPSA in the Bahamas, Texas, and via Zoom); ECF Nos. 496-27, 496-28, 496-31].  Plaintiffs do not challenge that reality, and it is accurate based on the evidence submitted trial.  Moreover, the terms of the HPSA did not call for performance in Florida [ECF No. 498-6].  Where a contract serving as the basis for a "tortious act" is negotiated, drafted, and signed in a different state, Section 48.193(1)(a)(2) generally does not attach.  *Phillips*, 522 So. 2d at 65–66.  Plaintiffs attempt to argue that "'[i]t is irrelevant' that Meeker actually sold the horses outside of Florida 'when, as is the case here, the injury occurred in Florida'" [ECF No. 486 p. 9 (quoting *Worman v. Golden Cattle City, Inc.*, No. 8:22-CV-2891, 2023 WL 10404993, at *2 (M.D. Fla. Mar. 8, 2023))].  That

---

[15]  As background, Pegasus is a legal entity created by Andre Borodin—the owner of Park Place Polo—at the time of the transaction solely for purposes of effectuating the unauthorized sale of Cuarteteras [ECF No. 514 pp. 42–44 (Simmonds conceding that Pegasus "was created solely for the purpose of Mr. Borodin to put these clones in so nobody would know that they were owned by Park Place Polo")].

broad statement misstates Florida law.  Even if Plaintiffs experienced harm in Florida, an in-state injury—without more—is insufficient to confer jurisdiction.  Put another way, Section 48.193(1)(a)(2) does not apply merely because a plaintiff suffers damage in Florida.  *Arch Aluminum & Glass Co. v. Haney*, 964 So. 2d 228, 232 (Fla. Dist. Ct. App. 2007).  *Harris v. Shuttleworth and Ingersoll, P.C.*, 831 So. 2d 706, 708 (Fla. Dist. Ct. App. 2002) ("[S]tanding alone, the fact of a loss to a Florida resident caused by conduct outside the state is insufficient to impose jurisdiction.").  The "tortious act" prong of the long-arm statute still "requires a connection . . . between the enumerated activity in Florida and the cause of action."  *Knepfle*, 48 F.4th at 1292. *See supra* pp. 11–12 (discussing connexity requirement).  That connection is missing here as to Farm.  As Plaintiffs acknowledge, Farm's "tortious act"—misappropriation of genetic material through the sale of the Cuartetera clones—was consummated outside of the state [ECF No. 486 p. 9]; *see Arch Aluminum*, 831 So. 2d at 233–34 (finding personal jurisdiction lacking where defendant's disclosure of trade secret occurred entirely outside Florida).

**As to Genetics**, different jurisdictional facts place it within the ambit of Section 48.193(1)(a)(2) under a preponderance standard.  "Even though Genetics did not sign the [HPSA]," Plaintiffs argue, it "helped disclose the trade secret to Pegasus" by facilitating the post-sale transport of the clones from Aiken, South Carolina to Park Place Polo's facility in Wellington, Florida [ECF No. 500-1 p. 81].  This is true, the Court finds.  As the evidence shows (and as Meeker testified), a Genetics employee signed the November 17, 2020, bill of lading, or shipping invoice, by which the clones were ultimately transported to Florida [ECF No. 496-51 p. 2 (showing signature of Genetics employee Wendi Smith as "shipper"); ECF No. 517 pp. 73–80].[16]  This

---

[16]  Unlike Genetics, Farm was not a signatory to the shipping invoice [ECF No. 496-51].  And because Plaintiffs no longer advance an alter ego theory, Genetics' actions in shipping the Cuartetera clones to Florida cannot be imputed to Farm.

undisputed act, which was undertaken "through an agent" and directed at the forum (Florida), is sufficient under a more-likely-than-not-standard to satisfy the connexity requirement as to Genetics. Fla. Stat. § 48.193(1)(a).[17]  Specifically, this Court finds that authorizing the shipment to transfer the misappropriated Cuartetera clones to Florida was "essential to the success of the tort" in that it clearly effectuated, and practically consummated, the physical disclosure and transfer of the subject genetic material to an unauthorized third party's facility in Florida. *Williams Elec. Co., Inc.*, 854 F.2d at 394; *see Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) ("Any conduct by the actor that enables another to learn the trade secret . . . is 'disclosure' of the secret.") (citation omitted); *see* 18 U.S.C. § 1839(5)(B)(ii)–(iii) (defining "misappropriation" as, *inter alia*, "disclosure or use of a trade secret").  Indeed, it was that conduct by Genetics that yielded the physical transfer—and ultimate disclosure—of the subject misappropriated material to Cambiaso's competitor.[18]

Finally, **as to Meeker**, there are sufficient facts to confer jurisdiction under Section 48.193(1)(a)(2).  Although the negotiation of the HPSA occurred outside of Florida through Meeker as agent of Farm, the Court finds that Meeker, as the clear and unequivocal sole decisionmaker for Genetics, participated in the shipment of the highly valuable ($2.4 million) clones to Pegasus Rider in Florida.  The trial evidence shows that Meeker was the only person who made decisions on behalf of Genetics [*E.g.*, ECF No. 513 pp. 57–58 (Gutierrez testimony)].  Meeker attempted at trial to weaken this unmistakable reality by suggesting that his brother Dan

---

[17]  Section 48.193(1)(a) is applicable to those who "personally *or through an agent* do[] any of the acts enumerated in this subsection . . . ." Fla. Stat. § 48.193(a)(1) (emphasis added).

[18]  It bears noting that, on December 22, 2020, just *two days* after Plaintiffs filed their initial Complaint in this case [ECF No. 1], Park Place Polo shipped the clones out of Florida and back to South Carolina [ECF No. 496-51 pp. 3–4].

had a material role in operations and decisions [*see*, *e.g.*, ECF No. 517 pp. 34–35, 41–42]. The Court finds this testimony incredible [ECF No. 517 p. 57]. Dan Meeker was a named manager of Genetics [ECF No. 496-1 p. 10].[19] But in actuality, Dan's involvement in operations, negotiations, and decisions was minimal, if not nonexistent [ECF No. 467-1 p. 12; ECF No. 517 pp. 41–42]. Indeed, during Dan Meeker's deposition, on the subject of Genetics, Dan stated that "I don't get into [Alan's] business," and confirmed that he "didn't interfere with [Alan's] decision-making" [ECF No. 467-1 p. 12].

In sum, the trial record shows, and the Court finds, that Meeker overwhelmingly controlled all material decisions of Genetics—negotiating on behalf of Genetics, controlling the production of clones, and generally running the company's operations as leader and directing all material decisions for the business. This powerful decision-making authority extended to the shipment of the misappropriated clones to Pegasus from Defendants' facility in South Carolina to Wellington, Florida, on November 17, 2020. Insofar as Meeker attempted at trial to insinuate that he was not aware of the shipment of the highly valuable Cuartetera clones,[20] the Court finds Meeker's suggestions not credible given his obvious and exclusive role as head of Genetics and Farm; given the magnitude of the deal with Pegasus and Meeker's role in that deal specifically [ECF No. 514 pp. 32–58]; and given the clear, controversial nature of Meeker's actions at a time when Cambiaso was openly voicing concerns about the Cuartetera clones and demanding their return

---

[19]  During the relevant period, Dan Meeker also served as trustee on trusts benefitting his children and Defendant Alan Meeker's children [ECF No. 467-1; ECF No. 515 pp. 153–54].

[20]  [ECF No. 517 pp. 73–80 (Meeker testifying that "this is not a document I was involved with"); *but see* ECF No. 517 p. 80 ("The shipper asked for someone to sign off to – to say that the weanlings had been put into the . . . trailer.")]

[ECF No. 496-41 pp. 107–08].[21]   And it was Genetics—managed exclusively by Meeker—that created the clones that were ultimately sold and shipped to Florida [ECF No. 498-34 p. 70; *see also* ECF No. 498-46; ECF No. 500-1 p. 54 & n.16; ECF No. 517 p. 32].

### b.  Did Genetics' and Meeker's conduct cause an injury in Florida?

The Court next asks whether Genetics' and Meeker's actions caused an "injury in Florida." *Louis Vuitton*, 736 F.3d at 1353.  Defendants argue that in trade-secret misappropriation cases, the situs of the injury is the trade secret holder's residence, and therefore, Plaintiffs—Argentine citizens—cannot show an in-forum injury [ECF No. 488 p. 10].  Plaintiffs generally argue that they have suffered an injury in Florida because "Cuartetera, her clones, and the tissue are vitally important trade secrets to Plaintiffs, which Plaintiffs use and rely on in Florida" [ECF No. 486 p. 8].  Although the Eleventh Circuit has not decided where the "place of injury" is in cases of misappropriation, the Court concludes that in this case, on this record, the harm resulting from the alleged misappropriation is experienced in Florida, even if not exclusively so.

As mentioned, the Eleventh Circuit has not directly weighed in on the injury-situs question in intellectual property cases.  *See Licciardello*, 544 F.3d at 1283 & n.1 (considering, without adopting, competing approaches to the injury-situs question in the trademark context).  There appears to be a split among federal circuits that have considered the issue, both in the trade secret context and in other intellectual property contexts.  One circuit has concluded that the situs of injury is the residence of the trade secret owner.  *Horne v. Adolph Coors Co.*, 684 F.2d 255, 259 (3d Cir. 1982) ("[I]nsofar as the situs of the property damaged by the alleged wrongdoing is a concern, both a state trade secret and a patent should be deemed to have their fictional situs as the

---

[21] Meeker negotiated a non-disclosure agreement between Pegasus Rider and Farm and also an escrow agreement in anticipation of potential litigation stemming from the sale of the clones [ECF No. 498-6; ECF No. 514 pp. 32–60; ECF Nos. 496-28].

residence of the owner.").[22]   Under this theory, La Dolfina—an Argentine corporation—presumably could not have experienced an injury in Florida [ECF No. 512 p. 31].  As to Cambiaso, he too is an Argentine citizen [ECF No. 512 p. 31], but it is undisputed that he resides in Florida for three months out of every year (January–March) during polo season and has a home in Florida, the capital of the sport of polo in the United States [ECF No. 512 pp. 31, 37, 44].  Another circuit has identified the situs of injury at the place where economic harm is felt by the plaintiff.  *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569–71 (Fed. Cir. 1994) (concluding that "the situs of the injury is the location, or locations, at which the infringing activity directly impacts the interests" of the plaintiff); *see also Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 36 n.4 (2d Cir. 2010) (surveying varying approaches in dicta).  Florida courts have not taken a definitive approach to ascertaining the situs of injury, although at least one intermediate appellate decision focused on the place where plaintiff suffered harm from the out-of-state trade secret misappropriation.  *Arch Aluminum & Glass Co. v. Haney*, 964 So. 2d 228, 234 (Fla. Dist. Ct. App. 2007) (rejecting approach focused only on the place of incorporation and then assessing location of plaintiff's injury); *Ultimate Fitness Grp., LLC v. Felix*, No. 18-60981, 2018 WL 11459451, at *6 (S.D. Fla. Dec. 12, 2018) (determining that "injury resulting from

---

[22] Some courts in this district have implemented this approach, although not to the direct exclusion of any other approach.  *See VAS Aero Servs., LLC v. Arroyo*, 868 F. Supp. 2d 1374, 1380 (S.D. Fla. 2012) (noting that, where Florida-based company's trade secrets were misappropriated, the harm would be "felt primarily—if not exclusively—in Florida"); *Grillo's Pickles, Inc. v. Patriot Pickle, Inc.*, No. 1:23-CV-22387, 2023 WL 9094237, at *5 (S.D. Fla. Nov. 9, 2023), report and recommendation adopted, No. 23-CV-22387, 2023 WL 8467269 (S.D. Fla. Dec. 7, 2023) ("[F]or a trade secret misappropriation claim, the situs of the injury for purposes of jurisdiction has generally been held to be the state where the [trade secret] owner resides.") (internal quotation marks omitted).

misappropriation occurs primarily where the business was damaged, not necessarily where the business was domiciled").

Reviewing these authorities, the Court does not see a basis to consider only the plaintiffs' residence as the potential situs of harm for personal jurisdiction purposes in this complex trade secret dispute. Although federal circuits have engaged with competing approaches, Florida courts have not settled on an exclusive test, and the authority that is available suggests a more flexible consideration of harm that includes the location where the harm is felt and/or where a plaintiff's interests are impacted. When analyzed under this framework, it is more likely than not that Plaintiffs experienced an injury in Florida as a result of Meeker's and Genetics' misappropriation of the Cuarterera genetic material. It is undisputed that Plaintiffs Cambiaso and La Dolfina have competed, and plan to continue competing, in southern Florida, the location of the U.S. Open Polo Championship and premier polo destination in the United States [ECF No. 512 pp. 37, 44, 77, 88, 235]. Cambiaso keeps many horses in Florida during the polo season and uses those horses to compete on his La Dolfina-branded team [ECF No. 512 pp. 37, 88]. And most specifically, Cuarterera clones play for Plaintiffs in the U.S. Open in Florida, achieving success and accolades at the highest level [ECF No. 512 pp. 174–75 (describing a Cuarterera clone entrusted to Meeker's care that won "Best Playing Pony" in the U.S. Open in Florida); ECF No. 512 p. 44]. The three Cuarterera clones sold to Pegasus Rider were created *for* Plaintiffs under the 2019 Side Letter Agreement and would have joined Plaintiffs' polo team and competed in Florida had they not been transferred to an unauthorized third party. *See supra* pp. 17–18 (finding that the three Cuarterera clones were made by Genetics for Plaintiffs pursuant to the 2019 Side Letter Agreement); ECF No. 512 p. 168 (Cambiaso testifying about horses being shipped to and from Florida); ECF No. 498-5

p. 2 (Side Letter Agreement expressly requiring any clones created pursuant to that agreement to be played exclusively on a "La Dolfina branded team")].

By transferring clones to Plaintiffs' direct competitor's facility in Florida and thus disclosing Plaintiffs' horses' unique genetic code to third parties, Genetics exposed Plaintiff to competition against genetically superior horses—horses derived from *Plaintiffs' own intellectual property*—in this forum, lessening their on-field competitive advantage [ECF No. 512 pp. 47, 77 (discussing, without dispute, the importance of polo ponies' genetics to success in the sport, and competing against horses containing Plaintiffs' genetic material in Florida); ECF No. 465-1 pp. 6–10 (explaining the central role that horses play to success in the sport); ECF No. 496-8 (Meeker acknowledging that "horses are 80% of the game"); *see* ECF No. 512 pp. 163–65 (Cambiaso testifying credibly that his career and competitive advantage would be jeopardized if Mr. Borodin and other competitors ride Cuartetera clones against him and the La Dolfina team); ECF No. 512 p. 133 (Cambiaso testifying that he "play[s] a lot against him," referring to Borodin)].  Moreover, Plaintiffs market and sell horses containing the subject genetic material in the United States [ECF No. 513 p. 91].  And Florida serves as the key location in the United States for showcasing Plaintiffs' product—that is, horses deriving from Plaintiffs' unique equine genetic material—and promoting Plaintiffs' brand [ECF No. 512 p. 89 (discussing how the value of a horse is impacted by promotion and on-field success); ECF No. 512 pp. 87–88 (testifying about the importance of La Dolfina's brand)].  Cambiaso testified credibly that "[i]f a horse doesn't play at the U.S. Open, it means it's not that good" [ECF No. 512 p. 89].  The dilution and "loss of control" of the equine bloodlines resulting from unauthorized cloning lowers the demand for, and value of, the clones [ECF No. 465-1 pp. 14, 21 (Jornayvaz deposition); ECF No. 512 pp. 177–78, 182 (Cambiaso testifying credibly that "if everybody has [the genetic material], obviously, the business – you kill

your own business.")].  This additional information relative to Plaintiffs' operation/involvement in this state—from polo-playing, promotional, and business standpoints—adds additional credible evidence to support an injury here.

In sum, on this record, Section 48.193(1)(a)(2) provides a basis for this Court's exercise of jurisdiction over the trade secret claims against Genetics and Meeker, but not Farm.

As a final point, the Court addresses the impact of its jurisdictional determinations on Counts III and IV.  Because Plaintiffs' contractual claims against Genetics are predicated on the "same jurisdiction generating event" that provides jurisdiction over the trade secret claims against Genetics—*i.e.*, Genetics' direct facilitation of the shipment of the genetic material to an unauthorized third party—the Court's jurisdictional finding vis-à-vis Section 48.193(1)(a)(2) also provides jurisdiction over Counts III (Breach of 2019 Side Letter Agreement) and IV (Breach of Bailment – 2019 Side Letter Agreement).  *See SkyHop*, 58 F.4th at 1231 (quoting *Cronin*, 980 F.2d at 671 & n.10).  The 2019 Side Letter Agreement states that the subject equine tissue "shall always be under the custody and control of the Parties" and that Genetics "shall maintain such cells for the exclusive use of [Cambiaso] and [La Dolfina]" [ECF No. 498-5 p. 3].  Through the Genetics' employee's authorization of the shipment of the clones to a third party's facility in Florida, Genetics breached the 2019 Side Letter Agreement (Count III) and failed to exercise a duty of reasonable care as to the genetic material (Count IV).  Thus, the Court has jurisdiction over those claims.  *E.g.*, *Thomas v. Brown*, 504 F. App'x 845, 847 (11th Cir. 2013) ("If the forum's long-arm statute provides jurisdiction over one claim, the district court has personal jurisdiction over the entire case so long as the claims arose from the same jurisdiction-generating event.").

**ii.    Section 48.193(1)(a)(6) does not serve as a basis for jurisdiction over any of Plaintiffs' claims.**

Plaintiffs next allege that Section 48.193(1)(a)(6) provides a basis for jurisdiction over all three Defendants for various claims [ECF No. 486 pp. 7–8; *see* ECF No. 486-1 (charting claims)]. Specifically, Plaintiffs rely on subsection (b) of Section 48.193(1)(a)(6), often referred to as the "stream of commerce" or "products liability" provision [ECF No. 486 p. 7]. Section 48.193(1)(a)(6)(b) confers jurisdiction over nonresident defendants for "[c]ausing injury to persons or property within this state arising out of an act or omission by the defendant outside the state, if, at or about the time of the injury . . . [p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use." Fla. Stat. § 48.193(1)(a)(6)(b).[23]

Upon review, the Court has not located any Eleventh Circuit or Florida case authorizing Section 48.193(1)(a)(6)(b) as a basis for obtaining jurisdiction over any of the types of claims brought by Plaintiffs in this action.  Nor did Plaintiffs cite any such authority.[24]  Instead, as far as the Court can discern, Section 48.193(1)(a)(6)(b) serves as a jurisdictional basis for products liability claims—not contractual, quasi-contractual, or trade secret claims as brought here. *See, e.g.*, *Patt v. Volkswagen Grp. of Am., Inc.*, 688 F. Supp. 3d 1186, 1191 (S.D. Fla. 2023) (finding

---

[23]  Plaintiffs no longer reference the "doing business" prong of Section 48.193(1)(a)(6). *See* Fla. Stat. § 48.193(1)(a)(6)(a) (requiring that the defendant "was engaged in solicitation or service activities within this state") [*See* ECF No. 486 pp. 8–9 (focusing solely on Section 48.193(1)(a)(6)(b); ECF No. 41 p. 14 (previously relying on Stat. § 48.193(1)(a)(6)(a))].

[24]  Plaintiffs cite only one out-of-district case in which the district court, with only threadbare analysis, found the "doing business" prong of Section 48.193(1)(a)(6) to confer jurisdiction over a trademark infringement claim [ECF No. 486 p. 8 (citing *High Tech Pet Prod., Inc. v. Shenzhen Jianfeng Elec. Pet Prod. Co.*, No. 6:14-CV-759-ORL-22, 2015 WL 926048, at *3 (M.D. Fla. Feb. 12, 2015), *report and recommendation adopted,* No. 6:14-CV-759-ORL-22TB, 2015 WL 926023 (M.D. Fla. Mar. 4, 2015))].  This unreported case does not alter the Court's determination here.

jurisdiction under products-liability prong for alleged defect in automobile resulting in Florida injury); *Kravitz v. Gebrueder Pletscher Druckgusswaremfabrik*, 442 So. 2d 985, 987 (Fla. Dist. Ct. App. 1983) (same, as to defective bike rack).  This construction makes sense, as the statute's focus remains on injury to "persons or property" in Florida where, at the time of the injury, "[p]roducts, materials, or things processed, serviced or manufactured by the defendant anywhere were used or consumed within [Florida] in the ordinary course of commerce, trade or use."  Fla. Stat. § 48.193(1)(a)(6)(b).  In light of the product-based thrust of that language, and given the state of Florida law, the Court declines to initiate an extension of the statute in the manner sought by Plaintiffs.  The Court is guided in this analysis by the following precepts: Florida's long-arm statute should be "strictly construed," *Sculptchair*, 94 F.3d at 627; "any doubts about the applicability of the statute must be resolved in favor of the defendant and against a conclusion that jurisdiction exists," *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1289 (S.D. Fla. 2014); and courts generally "defer to the Florida courts for the initial construction of [Fla. Stat. 48.193(1)(a)(6)]," *Rebozo v. Washington Post Co.*, 515 F.2d 1208, 1213 n.12 (5th Cir. 1975) (rejecting "[u]tilization of the products liability section of the Florida long arm as a jurisdictional base in the instant libel suit," and describing that extension as a "rather tortured reading of the statute" (referring to products-liability prong of Florida's long-arm statute));[25] *Mallard v. Aluminum Co. of Canada*, 634 F.2d 236, 241 (5th Cir. 1981) (declining to "expansively read" the products liability provision of Florida's long-arm statute, which "is intended to reach out-of-state manufacturers in products liability actions," to cover plaintiff's negligence claim); *cf. Almond v. Coloplast A/S*, No. 8:20-CV-731, 2021 WL 2042659, at *5 (M.D. Fla. May 21, 2021) (finding

---

[25] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

jurisdiction lacking under Section 48.193(1)(a)(6)(b) because "this is not a case where the defendant made the product at issue and put it into the stream of commerce").

Alternatively, even if the Court were to engage in Plaintiffs' seemingly novel extension of Section 48.193(1)(a)(6)(b) to the instant contractual, qausi-contractual, and trade-secret claims, the Court still would be required to adhere to the Supreme Court of Florida's directive that Section 48.193(1)(a)(6)(b) applies only to claims resulting in "personal injury or physical property damage." *Aetna Life & Cas. Co. v. Therm-O-Disc, Inc.*, 511 So. 2d 992, 994 (Fla. 1987). This means, as the Eleventh Circuit has explained, that purely economic losses without a corresponding personal injury or physical property injury do not confer personal jurisdiction over nonresident defendants. *See Sculptchair*, 94 F.3d at 629. No physical property damage is alleged here, nor is there any evidence in the trial record of any such in-forum, physical property damage. That leaves non-economic "personal injury" to consider in the context of a statute intended for—and heretofore applied only to—products liability claims and associated injuries. While Plaintiffs do reference, and establish, harm to their competitive advantage in Florida and potential resultant harms to their professional reputation in Florida [*see* ECF No. 486 p. 8 (citing to record)]; *see also supra* (discussing evidence of harm to competitive advantage)], it remains unclear whether those harms amount to "personal injuries" as understood by the Florida Supreme Court.

Finally, even assuming the Court were inclined to graft the "products liability" (or "stream of commerce") prong onto Plaintiffs' non-products-liability claims, Plaintiffs' briefing contains no analysis or development of the connexity analysis as rooted in Florida's long-arm statute. *See SkyHop*, 58 F.4th at 1228 ("The long-arm statute also imposes a connexity requirement between the enumerated activity in Florida and the plaintiff's cause of action."). The difficulty in applying the connexity requirement to Section 48.193(1)(a)(6)(b)—a provision "intended to reach out-of-

state manufacturers in products liability actions," *Mallard*, 634 F.2d at 241—is compounded by Plaintiffs' novel attempt to apply it to breach-of-contract, unjust enrichment, and trade secret claims.

For all of these reasons, the Court declines to extend Section 48.193(1)(a)(6)(b) to claims beyond those which Florida courts have authorized to date.

### iii.     Section 48.193(1)(a)(9) does not provide jurisdiction over Farm.

Finally, the Court addresses and rejects Plaintiffs' argument that Section 48.193(1)(a)(9) provides for jurisdiction over all four claims brought against Farm (Counts V–VIII) [ECF No. 486 pp. 9–11; ECF No. 486-1].

Section 48.193(1)(a)(9) confers jurisdiction over non-resident defendants who "enter[] into a contract that complies with [Section] 685.102." Fla. Stat. § 48.193(1)(a)(9). The cross-referenced provision, Section 685.102, concerns jurisdiction over:

> any person or other entity residing or located outside this state, if the action or proceeding *arises out of or relates to any contract, agreement, or undertaking for which a choice of the law of this state*, in whole or in part, has been made pursuant to s. 685.101 and which contains a provision by which such person or other entity residing or located outside this state agrees to submit to the jurisdiction of the courts of this state.

Fla. Sat. § 685.102 (emphasis added); *see also Jetbroadband WV, LLC v. MasTec N. Am., Inc.*, 13 So.3d 159, 162 (Fla. Dist. Ct. App. 2009) (setting forth the five requirements for contract's choice-of-law clause to establish personal jurisdiction).

Plaintiffs base their Section 483.193(1)(a)(9) arguments in an Escrow Agreement referenced in the HPSA. That Escrow Agreement contains a Florida choice-of-law provision, which Plaintiffs say provides a sufficient relationship to this proceeding to satisfy the terms of Section 685.102 [ECF No. 486 p. 9; *see* ECF No. 498-6]. As discussed below, this argument fails

for two reasons: Plaintiffs were not signatories or third-party beneficiaries to the Escrow Agreement, which was entered into Farm, Pegasus, and law firm Akerman LLP, and Plaintiffs' claims against Farm do not "arise out of" or "relate to" the Escrow Agreement such that Section 48.193(1)(a)(9) (through Section 685.102) would attach. The Court reasons below, providing factual background as necessary.

The Horse Purchase and Sale Agreement ("HPSA") is the contract by which Farm wrongfully sold the three Cuartetera clones to Pegasus [ECF No. 498-6]. The HPSA contains Texas choice-of-law and forum-selection clauses [ECF No. 498-6 pp. 7–8 ¶ 14 ("This Agreement shall be governed by the laws of the State of Texas. Any legal action commenced to enforce or interpret this Agreement shall be brought in Tarrant County, Texas.")]. But in drafting the HPSA, Pegasus—sensing that the sale may result in litigation—"wanted Meeker to have some skin in the game in case that happened" [ECF No. 514 p. 58 (Simmonds testimony)]. Accordingly, the HPSA was drafted to include an escrow provision requiring that the seller (*i.e.*, Farm) deposit $250,000 into an escrow account to be used to pay legal fees "in the event that Cambiaso sues Seller" to recover the clones [ECF No. 498-6 p. 7 ¶ 10.2 ("Seller shall deposit $250,000 into an escrow account in the form attached as Exhibit E at the closing of this transaction to be disbursed as provided herein.")]. Attached as an exhibit to the HPSA is a separate contract, the Escrow Agreement, to which Farm, Pegasus, and Akerman LLP (the escrow agent)—but crucially, *not Plaintiffs*—are parties [ECF No. 498-6 pp. 18–26]. The Escrow Agreement contains a Florida choice-of-law clause [ECF No. 498-6 p. 24 ¶ 10 ("This Escrow Agreement shall in all respects be governed and constructed in accordance with the laws of the State of Florida.")].

Plaintiffs' reliance on the Escrow Agreement and Section 48.193(1)(a)(9) fails.

First, as mentioned above, Plaintiffs are not signatories to the Escrow Agreement [ECF No. 498-6 p. 18 (expressly stating that Pegasus, Farm, and Akerman LLP are parties to the contract)]. Nor have Plaintiffs alleged to be third-party beneficiaries to the Escrow Agreement [*See* ECF No. 498-6 p. 24 ¶ 9]. Under these facts, as courts have determined, Section 48.193(1)(a)(9) does not apply. *Giuliani v. NCL (Bahamas) Ltd.*, 558 F. Supp. 3d 1230, 1237–39 (S.D. Fla. 2021) (rejecting reliance on Section 48.193(1)(A)(9) when defendant was not signatory or third-party beneficiary); *Snyder v. Royal Caribbean Cruises Ltd.*, 540 F. Supp. 3d 1175, 1180–81 (S.D. Fla. 2021) (same); *Johnson v. Royal Caribbean Cruises Ltd.*, 474 F. Supp. 3d 1260, 1268 (S.D. Fla. 2020) (collecting cases); *E & H Cruises, Ltd. v. Baker*, 88 So. 3d 291, 296 n.1 (Fla. Dist. Ct. App. 2012). Plaintiffs offer no authority to conclude otherwise.

Second, the Escrow Agreement is only tangential to Plaintiffs' claims against Farm; thus, it fails to satisfy the Section 48.193(1)(a)'s connexity requirement. *See Knepfle*, 48 F.4th at 129. As Plaintiffs themselves acknowledge, the Escrow Agreement "is not at issue here," and Plaintiffs are "not suing over that contract" [ECF No. 515 p. 99]. It is not the Escrow Agreement, but rather the *HPSA*—and the sale and transfer of Cuarteteras contemplated therein—that underlies Plaintiffs' claims against Farm. Plaintiffs acknowledge as much when arguing for Section 48.193(1)(a)(9)'s applicability: "All claims in the present litigation arose from and relate to the unauthorized sale of those clones and related rights under the *Horse Purchase and Sale Agreement*" [ECF No. 486 pp. 10–11 (emphasis added)]. But that contract, the HPSA, is governed by *Texas* law, not Florida law [ECF No. 498-6 pp. 7–8 ("This Agreement shall be governed by the laws of the State of Texas.")]. And while it may be true in a general sense that the Escrow Agreement "relates to" this litigation, the Court concludes it is too attenuated from the claims for which Plaintiffs rely on Section 48.193(1)(a)(9) as a jurisdictional baseline. Accordingly,

Plaintiffs cannot assert that their claims against Farm "aris[e] from," "arise[] out of," or "relat[e] to" the Escrow Agreement as is required under the relevant provisions and applicable caselaw. Fla. Stat. §§ 48.193(1)(a), 685.101–.102; *see supra* pp. 30–31 (collecting cases).

***

Following the long-arm analysis, the Court is left with the following claims as raised against the following parties:

- Breach of 2019 Side Letter Agreement (Count III) against Genetics

- Breach of Bailment Contract (Count IV) against Genetics

- Defendant Trade Secrets Act (Count VII) against Genetics and Meeker

- Florida Uniform Trade Secrets Act (Count VIII) against Genetics and Meeker

To this point, the Court has not discussed Plaintiffs' claim for equitable accounting (Count VI) [ECF No. 303 pp. 90–91]. Although Plaintiffs' chart lists Fla. Stat. §§ 48.193(2) and 48.193(1)(a)(6) as bases for jurisdiction [ECF No. 436-1], Plaintiffs do not address the equitable accounting claim in any meaningful way [ECF No. 486]. Nor do Defendants [ECF No. 488]. Nevertheless, because Plaintiffs' equitable accounting arises "from the same jurisdiction generating event[s]" as the claims for which the Court ultimately concludes jurisdiction exists, *SkyHop*, 58 F.4th at 1231, the Court determines that it possesses personal jurisdiction over Count VI but only as to Meeker and Genetics (not Farm).[26]

The Court now proceeds to the constitutional analysis over the surviving claims.

---

[26] For purposes of this Order, consistent with the parties' treatment of Plaintiffs' equitable accounting claim, the Court assumes that such a claim operates as a separate cause of action rather than as a remedy for a cause of action.

### III.    Personal jurisdiction under the Due Process Clause.

Upon finding a statutory basis for the exercise of personal jurisdiction, a district court must next "determine whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).  As with the analysis under the Florida long-arm statute, the constitutional analysis contemplates two types of personal jurisdiction: general and specific.  *Skyhop*, 58 F.4th at 1228–29.  Because the Court already found that general jurisdiction was not satisfied in this case, *supra* pp. 9–10 (citing *Fraser*, 594 F.3d at 846), the analysis below is limited to specific jurisdiction.

At its core, the specific jurisdiction analysis asks whether Defendants "purposefully established 'minimum contacts' in the forum State."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985) (quoting *International Shoe*, 326 U.S. at 316).  Specific jurisdiction is evaluated using a three-prong test.  *Louis Vuitton*, 736 F.3d at 1355.  The Court must consider whether Plaintiffs' claims "arise out of or relate to at least one of the defendant's contacts with the forum" state; whether Defendants "purposefully availed [themselves] of the privilege of conducting activities within the forum state"; and whether the exercise of personal jurisdiction "comports with traditional notions of fair play and substantial justice."  *Id.* (internal quotation marks and citation omitted).

Upon a review of the preponderance of the evidence adduced at trial, the Court concludes that exercising jurisdiction over Meeker and Genetics as to the remaining contractual and tort claims comports with due process.

CASE NO. 20-82231-CIV-CANNON/Reinhart

With respect to the contract claims, the record shows that the 2019 Side Letter Agreement—the agreement upon which Counts III and IV are based—was negotiated in Florida during numerous in-person meetings in 2019.  Meeker, Roberto Zedda, and Cambiaso all testified about these contractual negotiations in Florida [ECF No. 517 pp. 69–70 (Meeker testifying about the "two or three meetings in the early part of 2019" in Florida in regards to the 2019 SLA); ECF No. 514 pp. 116–122, 131 (Zedda testifying about Meeker's various visits to Florida in early- and mid-2019); ECF No. 512 p. 96 (Cambiaso discussing meeting with Meeker and others in Florida negotiating 2019 cloning)].  These Florida contract negotiations are further corroborated by documentary evidence, including text messages in which Meeker acknowledged that the 2019 Side Letter Agreement was agreed to in Florida [ECF No. 498-34 p. 70 (Meeker confirming in late 2019 that "[t]he Cuarteteras are relative to the Side Agreement" and pursuant to "the cloning effort we all agreed to at Valiente")],[27] as well as emails memorializing the parties' Florida discussions during the weekend of February 2019 "regarding our future breeding goals" [ECF No. 496-10; *see also* ECF No. 496-40 pp. 39–41 (confirming Meeker met with the parties at Valiente the prior weekend); *see also* ECF No. 498-15 p. 15 (Meeker messaging with Bucking about Valiente meetings); ECF No. 496-41 pp. 53–60 (Meeker messaging with Cambiaso about Florida meetings)].  Following these in-person meetings at which the new cloning enterprise was negotiated, Meeker sent invoices to Roberto Zedda and Robert Jornayvaz while they were in Florida [ECF Nos. 496-11, 496-12, 496-13].  And Genetics ultimately breached that contract by (1) failing to maintain the Cuarterera genetic material for the exclusive use of Plaintiffs, including by authorizing the shipment of the clones to a third party in Florida, and (2) failing to return the

---

[27]  Valiente is a polo club owned by Jornayvaz located in Wellington, Florida [ECF No. 512 p. 187].

Cuarterera clones to Plaintiffs within 48 hours of Cambiaso's request, as required by the contract [*See* ECF No. 498-5 §§ 5–6; *see* ECF No. 496-41 p. 108 (Cambiaso informing Meeker that Zedda would be in contact about the Cuartetera clones "so we can arrange to pick them up and move to our farm," followed by Meeker resisting any return and ultimately never returning them); *see* ECF No. 496-40 p. 81].  These important contractual negotiations in Florida, the parties' overall course of dealing as reflected through the Florida meetings, and Genetics' ultimate transfer to Florida of the misappropriated goods to an unauthorized third-party are sufficient to satisfy the relatedness prong of the specific-jurisdiction, due process inquiry.  *See Burger King*, 471 U.S. at 479 (explaining that courts must consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" when evaluating jurisdiction over contractual claims).

The trade secret claims against Genetics and Meeker (Counts VII–VIII) are also sufficiently related to Florida.  As discussed above, *see supra* pp. 15–16, Genetics clearly effectuated the physical transfer and disclosure of the subject genetic material from Defendants' facility in South Carolina to Cambiaso's competitor in Florida [ECF No. 496-51 p. 2].  And, as covered above, Meeker, as the key and sole decisionmaker for Farm and Genetics, participated in that crucial transfer of valuable assets to Plaintiffs' competitor in Florida.  More broadly, Defendants' relationship with Plaintiffs was largely anchored in the state of Florida, the capital of polo in the United States.  As discussed *supra*, the parties met in Florida numerous times to discuss their cloning endeavors, all of which were tied to the subject genetic material that underlies Plaintiffs' trade secret counts.  *See supra* pp. 30–31 (discussing the parties' business meetings in Florida); *e.g.*, ECF No. 496-4 (email exchange between Meeker and Cambiaso about Florida meeting); ECF No. 496-41 pp. 23–29 (Cambiaso WhatsApp); ECF No. 496-40 pp. 47–48 (Zedda

WhatsApp)]; *see also* ECF No. 517 p. 62 (Meeker testifying that he "would come down [to Wellington, Florida] and visit and talk about polo and watch polo")].  Meeker also routinely sent invoices, clone-related business correspondence, and other communications to Plaintiffs' (and Plaintiffs' business associates) while they were in Florida [*E.g.*, ECF No. 496-41 pp. 58–60; ECF No. 496-40 pp. 39–41; ECF No. 496-16].  For these reasons, on this record, the Court finds that the trade secret claims at issue are sufficiently "related to" Florida and to the cloning-related business meetings the parties had here.  *Ford Motor*, 592 U.S. at 365 (quoting *Helicopteros*, 466 U.S. at 414)).

Next, Genetics and Meeker must have "'purposefully availed' [themselves] of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws." *Louis Vuitton*, 736 F.3d at 1355.  This requires a sufficient showing that Defendants "deliberately 'reached out beyond' [their] home" to engage in various acts in Florida.  *Ford Motor*, 592 U.S. at 359 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).  Moreover, these contacts with Florida must have been defendants' "own choice and not random, isolated, or fortuitous." *Skyhop*, 58 U.S. at 1230 (internal quotation marks and citations omitted).  For the reasons below, the Court finds this prong satisfied.

Traditionally, courts employ the three-part "minimum contacts test" to evaluate purposeful availment.  This requires asking whether the contacts are: (1) related to the plaintiff's claims; (2) involve some act by which the defendant purposefully availed himself of the privilege of doing business within the forum; and (3) are such that the defendant should reasonable anticipate being subject to the laws of the forum.  *Louis Vuitton*, 736 F.3d at 1357.  "In performing this analysis, we identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these [three] criteria." *Id.*

Here, the trial record shows that Genetics and Meeker "deliberately 'reached out beyond' [their] home" to engage in various acts in Florida such that they could reasonably foresee being haled into a Florida court. *Ford Motor*, 592 U.S. at 359 (quoting *Walden*, 571 U.S. at 285). As explained above, the parties' professional relationship that underlies all of Plaintiffs' claims was based largely in Florida. Meeker purposefully traveled to Florida on numerous occasions to discuss cloning, the subject genetic material, and the contracts underlying several claims. *See supra* pp. 30 (discussing 2019 contacts); [ECF Nos. 496-4, 496-43, 496-47, 496-48 (showing Defendants' 2012, 2016, and 2017 trips to Florida for business related to cloning and equine breeding)].[28] Horses cloned by Defendants were sold, shipped, and played in Florida. And Defendants contacted Plaintiffs and Plaintiffs' associates—through WhatsApp, email, and other correspondence—about the cloning enterprise while Plaintiffs were in Florida. Considered collectively, these contacts show that Defendants "purposefully availed' [themselves] of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws." *Louis Vuitton*, 736 F.3d at 1355.[29] Thus, it cannot be said that Defendants could not "reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357; *see Burger King*, 471 U.S. at 474.

---

[28] Meeker also purchased and renovated a condominium in Wellington, Florida, through one of his subsidiary companies, Kobayashi Capital Partners, LLC [ECF No. 517 pp. 62–65; ECF No. 496-46]. While Meeker testified that he primarily purchased the condo for his son's use, he also testified that he "spent less than five nights" there himself [ECF No. 517 p. 63].

[29] In cases of intentional torts, like Plaintiffs' trade secret claims, courts may also apply the "effects test." *Louis Vuitton*, 736 F.3d at 1356 (citing *Licciardello*, 544 F.3d at 1285–88). The effects test asks whether the tort was (1) intentional, (2) aimed at the forum state, and (3) caused harm that defendant should have anticipated would be suffered in the forum. *Id.* This test would be satisfied for Genetics and Meeker, given their involvement in shipping the misappropriated clones to the forum.

Finally, the exercise of personal jurisdiction over Defendants must "comport[] with fair play and substantial justice." *Id.* at 1358 (citing *Int'l Shoe*, 326 U.S. at 320).  In conducting this analysis, courts consider the following factors: (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the judicial system's interest in resolving the dispute." *Licciardello,* 544 F.3d at 1288.

Here, all four factors favor this court's exercise of jurisdiction.  First, Defendants are not burdened by litigating in this state.  Meeker—both personally, and as representative of Farm and/or Genetics—has traveled to Florida many times over the past decade or more.  As discussed above, Meeker even purchased a condo in Wellington, Florida [ECF No. 517 pp. 62–65; ECF No. 496-46].  Second, Florida has a considerable interest in this dispute.  In addition to being a major venue for polo and the site of the U.S. Open, Florida is where Plaintiffs were injured and continue to experience harm to this day, even if not the exclusive location of injury.  Moreover, Florida is where the clones containing the misappropriated genetic material were initially shipped, and the state where the clones—or other horses containing the misappropriated genetic material—will likely compete in the future.  As to the final two factors, this complex and protracted litigation has been ongoing in this forum since December 2020 and incorporates a federal action commenced in Texas and transferred to this Court [ECF No. 1].  Plaintiffs and the judicial system have an interest in bringing the litigation to a close.

CASE NO. 20-82231-CIV-CANNON/Reinhart

### **CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion is **GRANTED IN PART AND DENIED IN PART.**

2. Plaintiffs' unjust enrichment claim (Count III) is **DISMISSED WITHOUT PREJUDICE**.

3. Plaintiffs' Defendant Trade Secrets Act claim (Count VII) is **DISMISSED WITHOUT PREJUDICE** against Farm.

4. Plaintiffs' Florida Uniform Trade Secrets Act claim (Count VIII) is **DISMISSED WITHOUT PREJUDICE** against Farm.

5. The Court concludes that it possesses jurisdiction over the remainder of Plaintiffs' surviving claims against Meeker and Genetics.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 16th day of October 2024.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

36